**FILED**

Hon. Marshall Ferguson

2024 JAN 31 04:06 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 22-2-15958-8 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

KURT A. BENSHOOF ,

                            Plaintiff,

              v.

NATHAN CLIBER, *et al.*,

                        Defendants.

Case No.

PLAINTIFF'S SUMMARY RE:
PETITION FOR WRIT OF
HABEAS CORPUS

WHC - 2

## I.    INTRODUCTION

COMES NOW Plaintiff Kurt Benshoof ("Benshoof"), in accordance with this Court's Order Restricting Abusive Litigation of Kurt Benshoof ("Order"), summarizing Benshoof's Petition for Writ of Habeas Corpus.

## II.    SUMMARY

The Petition for Writ of Habeas Corpus evidences that Defendants Jessica R. Owen ("Owen"), Magalie E. Lerman ("Lerman"), and their co-conspirator, Nathan L. Cliber ("Cliber"), have unlawfully restrained Benshoof and Benshoof's minor son, A.R.W. under color of law through perjury, subornation of perjury, and extrinsic fraud.

SUMMARY OF PETITION
FOR WRIT OF HABEAS CORPUS
Page 1 of 3

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0001**

1

2      The ongoing restraint upon Benshoof and A.R.W. constitute kidnapping by Owen and

3  Lerman in violation of RCW 9A.40.020, unlawful imprisonment of Benshoof in violation of

4  RCW 9A.40.040, and Cliber has acted to aid and abet Owen and Lerman by lending them

5  criminal assistance in violation of RCW 9A.76.070.

6      The violations of the First Amendment by Owen, Lerman, and Cliber have caused, and

7  are causing, irreparable harm to A.R.W. and Benshoof.  Attempts by A.R.W. to run away from

8  Owen's and Lerman's home failed.  A.R.W. was forced to return to Owen's and Lerman's home

9  where he has been subjected to further mental and emotional abuse, pushing A.R.W. to consider

10  suicide.

11      Attached to the Petition for Writ of Habeas Corpus as Appendix G is the witnessed

12  affidavit and power-of-attorney signed by A.R.W.

13                                    **VERIFICATION**

14      I, Affiant Kurt Benshoof, do hereby declare that the foregoing is true and correct to the

15  best of my knowledge under penalty of perjury in the State of Washington, and am competent to

16  testify to the matters stated herein.  Executed this 31st day of January in the year 2024, in the City

17  of Seattle, in the county of King, in the state of Washington.

18

19

20                          By: _____/s/ Kurt Benshoof_____
                                 Kurt Benshoof *Pro Se*
21

22                          1716 N 128th Street
                             Seattle, WA 98133
23                          Phone: (206) 460-4202
                             Email: kurtbenshoof@gmail.com
24

25

26  SUMMARY OF PETITION                         Kurt Benshoof, Plaintiff
    FOR WRIT OF HABEAS CORPUS                   1716 N 128th ST
    Page 2 of 3                                 Seattle, Washington 98133
                                                (206) 460-4202
                                                kurtbenshoof@gmail.com

1

2

## CERTIFICATION OF SERVICE

Petitioner hereby certifies that on January 31, 2024, he did electronically file the

3

4

foregoing motion with the Clerk of Court by using the e-filing system, which will send a notice

of electronic filing to all counsel of record, and by email to the addresses listed below.

5

6

7

8

9

10

11

**Attorney For Defendant Jessica Owen:**
Blair M. Russ, WSBA #40374
1000 Second Avenue
Suite 3660
Seattle, WA 98104
Email: bmr@tbr-law.com
Phone: (206) 621-1871

**Attorneys for Defendant Nathan Cliber:**
Sarah N. Turner, WSBA #37748
Michael C. Tracy, WSBA #51226
701 Fifth Avenue
Suite 2100
Seattle, WA 98104
Phone: (206) 695-5178
Email: sturner@grsm.com
Email: mtracy@grsm.com

12

13

14

15

16

**Attorney for Defendants**
**Magalie Lerman and Owen Hermsen:**
Moshe Y. Admon, WSBA #50325
300 Lenora Street
Suite 4008
Seattle, WA 98121
Email: jeff@admonlaw.com
Phone: (206) 739-8383

17

18

19

20

21

DATED:  January 31, 2024

Signed:  ___/s/ Kurt Benshoof_____

Kurt Benshof, *pro se*

22

23

24

25

26

SUMMARY OF PETITION
FOR WRIT OF HABEAS CORPUS
Page 3 of 3

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

## 0003

Hon. Marshal Ferguson

# IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
# IN AND FOR THE COUNTY OF KING

KURT A. BENSHOOF,

                                    Plaintiff,

v.

NATHAN CLIBER, *et al.*,

                                    Defendants.

Case No.  22-2-15958-8

PETITION FOR
WRIT OF HABEAS CORPUS

## I.    RELIEF REQUESTED

Kurt Benshoof ("Petitioner") petitions for a writ of habeas corpus to inquire into the cause of the unlawful restraints upon the liberty of himself and his minor son, A.R.W., so that they shall be delivered therefrom when the Honorable Court determines their restraints illegal.

This sworn petition is brought pursuant to Wash. Const. Art I § 13; Art IV § 6; and RCW 7.36, under which writs of habeas corpus shall be granted in favor of parents, to enforce their rights, and the protection of their minor children.

Because Petitioner does not know which court will hear this petition, Petitioner will hereinafter attempt to strike a balance between redundantly presenting evidence

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 1 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1
2

the Court has already considered versus not providing enough evidence in the event this petition is assigned to another court.

## II.    INTRODUCTION

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

The great and central office of the writ of habeas corpus is to test the legality of unlawful restraint.  The function of a writ of habeas corpus is to inquire into jurisdictional defects amounting to a want of legal authority for one restrained, on whose behalf it is asked, and the court in which a writ is sought examines only the power and authority of the court to act, not the correctness of its conclusions.  A writ of habeas corpus is available when his imprisonment is contrary to federal constitutional or statutory law and tests whether he has been accorded due process, not whether he is guilty.  The purpose of a petition for writ of habeas corpus is not to correct errors of fact, but to determine whether his constitutional rights have been violated.  "The basic principle of the Great Writ of habeas corpus is that, in a civilized society, government must always be accountable to the judiciary for a man's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release."[1]  Habeas corpus is, above all, an adaptable remedy, and "is not now and never has been a static, narrow, formalistic remedy."[2] Federal courts may adjust the scope of the writ of habeas corpus in accordance with equitable and prudential considerations.

23
24
25
26

[1] *Fay v. Noia,* 372 U.S. 391, 399-402 (1963)
[2] *Lehman v. Lycoming Cty. Ch. Svcs. Agcy.,* 458 U.S. 502 (1982) quoting J. Black, *Jones v. Cunningham,* 371 U.S. 236, 371 U.S. 243 (1963)

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 2 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1
2
3
4
5

## III.   SWORN STATEMENT OF FACTS

Petitioner avers the following upon his information and belief, but has not been able to verify the current locations of Jessica Owen, Magalie Lerman, nor Petitioner's fourteen-year-old son, A.R.W.

## A. RESTRAINING PARTIES

### 1) Jessica R. Owen

6
7

1.      Jessica R. Owen ("Owen") is the mother of A.R.W., Petitioner's son.

8
9
10

2.      Owen's home is located at 849 NE 130th Street, Seattle, WA 98125.

### 2) Magalie E. Lerman

11
12

3.      Magalie E. Lerman ("Lerman") is the girlfriend of Owen.

13

4.      Lerman resides with Owen at 849 NE 130th Street, Seattle, WA 98125.

14

### 4) Nathan L. Cliber

15
16
17
18

5.      Nathan Cliber ("Cliber") is Owen's former family law attorney in King County Case No. 21-5-00680-6 SEA, and an accessory to Owen's and Lerman's kidnapping of A.R.W..

19

## B. LOCATION OF RESTRAINT

20

### 1) A.R.W.

21
22

6.      Owen and Lerman imprisoned A.R.W. in their home, located at 849 NE 130th Street, Seattle, WA 98125.

23

### 2) Petitioner

24
25

7.      Petitioner has been effectively imprisoned within his home, located at 1716 N 128th Street, Seattle, WA 98133 for the previous ten months.

26

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 3 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0006**

## C. PRETENSE OF RESTRAINTS

### 1) Imprisonment of A.R.W.

8.      The false narrative promulgated by Owen, Lerman, and Cliber since August 2021 is that Petitioner is crazy, dangerous, and that A.R.W. is afraid of his father.

9.      Cliber and Owen obtained a restraining order against Petitioner on October 21, 2022, in King County Superior Court Case No. 21-5-00680-6 SEA.

10.      Cliber, Owen, and Lerman continue to assert that the restraining order was: (1) not obtained through Owen's perjury and extrinsic fraud; and (2) that the restraining order—even if it were not fraudulently obtained—would not have expired on October 21, 2023, as required by RCW 7.105.315(2).

### 2) Restraint of Petitioner

11.      Petitioner is restrained from any contact with A.R.W., and effectively imprisoned in his own home, under threat of immediate arrest as the intended, direct, and proximate result of Owen's perjury and Cliber's subornation of Owen's perjury.

12.      Cliber cunningly obtained a restraining order with *two* expiration dates, knowing that the Seattle Police Department would believe the expiration date of the restraining order to be September 28, 2027, instead of October 21, 2023.

13.      In 2022 and January 2023, Petitioner and A.R.W. texted each other funny memes and strategized how to end their unlawful restraint; in retaliation, the City of Seattle filed ninety-one (91) "domestic violence" charges against Petitioner, including a $250,000 arrest warrant, and a $50,000 bench warrant.

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 4 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0007

## D. UNLAWFULNESS OF RESTRAINT

### 1) First Amendment Violations - Part 1

14.     Owen and Lerman retaliated against Petitioner for the free exercise of his religious beliefs.  Because of Owen's and Lerman's invidious discriminatory animus toward Petitioner's beliefs, Owen and Lerman felt justified in violating Petitioner's and A.R.W.'s right of association.

15.     Owen and Lerman retaliated against Petitioner for exercising his right to free speech and expression.  Because of Owen's and Lerman's invidious discriminatory animus toward Petitioner's beliefs, Owen and Lerman felt justified in violating Petitioner's right to free speech and expression so that Petitioner wouldn't be able to share his spiritual beliefs with A.R.W., and so that Petitioner wouldn't be able to expose Owen's and Lerman's lies to A.R.W.

16.     No one is more venomously hated by liars than an honest person.

17.     Owen and Lerman retaliated against Petitioner for exercising his right to petition for redress of his grievances.  Because Petitioner is absolutely honest, and because Owen and Lerman had lied to violate Petitioner's First Amendment rights, Owen and Lerman retaliated against Petitioner for exposing the perjury of Owen and Lerman in judicial proceedings.

### 2) Fraudulent Petition to Decide Parentage

18.     Petitioner and Owen discovered she was pregnant with Petitioner's child, A.R.W., in August 2008; thereupon, Petitioner and Owen entered into a verbal

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 5 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0008

parenting contract at common law ("Covenant") after notice, consideration, and accord; thereby exercising their unlimited right to contract as private individuals.

19.     Under their Covenant as father and mother, they would henceforth have full, equal and inalienable rights as parents of their son-to-be, sharing all significant decisions regarding A.R.W.'s care and upbringing, such as education, family scheduling, medical and dental care, and nutrition.

20.     Though Petitioner and Owen never married, they raised A.R.W. amicably for the following twelve years, prioritizing their son's well-being and sharing equally in all significant decisions regarding their son's education, medical care, dental care, and living arrangements.

21.     Petitioner had good cause to believe that Owen would never violate their Covenant; doing so would harm A.R.W., and Petitioner did not believe Owen would ever be so selfish as to harm knowingly harm their son: one of the gravest miscalculations of Petitioner's life.

22.     Benshoof and Owen have never been parties to a marriage, domestic partnership, legal separation, or a declaration of invalidity.

23.     Benshoof has never yelled at A.R.W., nor threatened corporal punishment, let alone spanked his son.

24.     Cliber suborned Owen's perjury with extrinsic fraud to aid Owen to: (1) violate the existing twelve-year parenting Covenant at Common Law between Owen and Petitioner; (2) abet the kidnapping A.R.W. by Owen and Lerman; (3) extort

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 6 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0009**

Petitioner for money; and (4) fraudulently obtain an Order Restricting Abuse Litigation to prevent exposure of their fraud and deny Petitioner redress.

25.     Under color of law, Cliber, Owen, and Lerman conspired to violate the First Amendment by: (1) retaliating against Petitioner's religious beliefs, (2) denying Petitioner's freedom of speech; (3) denying Petitioner's right of association with A.R.W.; and (4) denying Petitioner redress.

26.     On September 3, 2021, Lerman kidnapped A.R.W. and stole Petitioner's 2011 Toyota FJ Cruiser #BGF 9753.

27.     On September 28, 2021, Owen and her newly hired family law attorney, Defendant Nathan L. Cliber ("Cliber"), filed a Petition to Decide Parentage as the ruse by which to seek a restraining order to abrogate Petitioner's familial right of association with A.R.W. by making inconsistent material statements of fact under oath.

28.     Cliber and Owen did not, and could not, provide family court evidence of "domestic relations" between Benshoof and Owen to establish family court jurisdiction under RCW Title 26.

29.     Owen's parentage petition averred three elements essential to providing family court jurisdiction for her parentage action, that Benshoof: (1) was ***not*** the biological father of A.R.W.; (2) had ***never*** lived with A.R.W., and (3) had ***never*** held out A.R.W. as his son. As such, all three avowed statements evidenced Owen's inconsistent material statements of fact under penalty of perjury in King County Superior Court within the span of one month.

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

30.    All three avowed statements evidenced Owen's inconsistent material statements of fact under penalty of in King County Superior Court less than a month apart by contradicting that Owen had declared under penalty of perjury on August 21, 2021, that A.R.W. is the son of Owen and Lerman.  (Appendix A: WAWD No. 2:23-cv-1392-JNW, Dkt. #13-1 pg. 72, 73)

31.    Among Owen's exhibits she included three Seattle Police Department incident reports spanning November 2015 to September 14, 2020, which all affirmed that A.R.W. is Benshoof's son." (Appendix B: *Id.*, Dkt. #13-1 pg. 84, 89, 225)

32.    On September 22, 2021, Owen again reversed course, contradicting herself by declaring under penalty of perjury, "[Benshoof]…acted as [A.R.W.'s] father for [A.R.W.'s] entire life." (Appendix C: *Id.* pg. 229) Owen also stated, "We moved in together in July 2008.  [A.R.W.] was born nine months later…" (Appendix C: *Id.* pg. 230) "[Benshoof] always insisted on being treated as A.R.W.'s father and that A.R.W. was his." (Appendix: C *Id.* pg. 230)  "[September of 2020] I finally moved out of our shared residence…" (Appendix C*: Id.* pg. 231)

33.    Under RCW Title 26, family court lacked statutory authority to obtain jurisdiction for such a parentage action without Benshoof's consent after A.R.W. reached four years of age unless: (1) Benshoof was not the genetic father of A.R.W.; 92) Benshoof had never lived with A.R.W.; and (3) Benshoof had never held A.R.W. out as his son. *See* Rcw 26.26A.435(2)

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 8 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

34.    Nathan Cliber, Owen's family law attorney, suborned Owen's perjury in Owen's sworn Declaration, Petition to Decide Parentage, (Appendix D: *Id.* pg. 257) and Motion for Immediate Restraining Order.  (Appendix E: *Id.* pg. 250)

35.    Owen's perjury was extrinsic and collateral fraud perpetrated by Owen and Cliber to violate the Covenant between Benshoof and Owen, so that Owen could obtain a restraining order to abduct A.R.W. by falsely alleging that Benshoof was violent and that A.R.W. was scared of his own father.

### 3)  No Valid Restraining Order

36.    Even *if* the family court case initiated by Owen and Cliber was not barratrous, perjurious, and fraudulent, the restraining order that Owen and Cliber now claim is valid would have expired on October 21, 2023, pursuant to law.

37.    On October 21, 2022, Owen and Cliber obtained a Final Restraining Order ("Order") to deny Petitioner any contact with A.R.W. in King County Superior Court Case No. 21-5-00680-6 SEA.

38.    The Order presented by Cliber listed *two* expiration dates: October 21, 2023, and September 28, 2027. (Appendix F: *Id.* Dkt. #13-2 pg. 2)

39.    RCW 7.105.310(5) states, "the order shall specify *the date* the order expires."

40.    RCW 7.105.315(2), states, ""If a protection order restrains the respondent from contacting the respondent's minor children, the *restraint must be for a fixed period not to exceed one year*."

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 9 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0012

41.    Cliber knew that pursuant to RCW 7.105.325(2), the Clerk would forward the Order "by electronic means if possible, to the law enforcement agency specified in the order."

42.    Cliber knew the Seattle Police Department would enforce the Order as expiring on September 28, 2027, thereby subjecting Petitioner to immediate arrest if Petitioner had any contact with A.R.W. until his son turned the age of eighteen years and five months.

### 4)  First Amendment Violations - Part 2

43.    On January 23, 2024, Petitioner filed his First Amended Complaint in WAWD No. 2:23-cv-1829-JNW (Dkt. #32), which exposed: (1) the kidnapping of A.R.W. by Owen and Lerman; (2) Lerman's auto theft; (3) the attempted extortion of Petitioner by Owen, Lerman and their friend Owen Hermsen; and (4) that Cliber has lended criminal assistance to Owen and Lerman.

44.    Through his attorneys, Cliber retaliated against Petitioner, seeking to imprison and silence Petitioner because Petitioner exercised his right to seek redress of his grievances against Cliber, Owen, Lerman, and Hermsen. (Docket 267)

## IV.  AUTHORITY

## A. AUTHORITY OF THE COURT

### 1)  Duty

45.    As Petitioner has presented several federal questions by the petition, *supra* at #14-17, #43-44, it **shall** be the duty of the Court to determine whether

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 10 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

Petitioner has been denied a right guaranteed by the Constitution of the United States. RCW 7.36.140.

46.    Upon application, a writ of habeas corpus "***shall*** be granted without delay."  RCW 7.36.040.

**2) *Temporary Order Necessary***

47.    RCW 7.36.220 authorizes the Court to "make any temporary orders during the progress of the proceedings that justice may require" and "the custody of any party restrained may be changed from one person to another, by order of the court or judge."

48.    On July 6, 2022, A.R.W. tried running away from Owen's and Lerman's to come home to Petitioner, but police forced A.R.W. to return to Owen's.

49.    Within weeks, A.R.W. considered jumping from a summer camp balcony to kill himself.

50.    On October 24, 2022, A.R.W. texted Petitioner, "What would happen if I killed mom."

51.    On January 23, 2023, A.R.W. again tried running away from Owen's, and again forced A.R.W. to return to Owen's.

52.    One does not need a PhD in psychology to apprehend that when a child is subjected to prolonged and severe mental and emotional abuse, and they cannot escape their abuser, that the only remaining options to stop their abuse it to: (1) kill themselves; or (2) kill the abuser.

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 11 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

53.    As of the filing of this petition, A.R.W. has been separated from his father for eight hundred and eighty days.  There is no right more sacred, more primeval, than the right of parent and child to associate.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976)

54.    Upon the foregoing, and pursuant to the Court's authority under RCW 7.36.220, "justice [***does***] require" that "[t]he custody of [A.R.W.] be changed from [Owen] to [Petitioner], by order of the court or judge."

### 3) Arrest Warrants

55.    Owen, Lerman, and Cliber are pathological liars and unrepentant criminals who will continue to perpetrate crimes perpetuating the abuse of A.R.W. until they are stopped by court order, or their arrest.

56.    Owen and Lerman are high end escorts who regularly travel interstate, and internationally, in their work.  They have wealthy clients who pay to believe the lies of Owen and Lerman.  Owen and Lerman pose a flight risk for themselves, as well as the risk they will flee Washington with A.R.W. to escape accountability.

57.    Therefore, Petitioner requests that the Court weigh the merits of issuing warrants for the apprehension of Owen and Lerman.

## B.  *Res Judicata* INAPPLICABLE

58.    The Court has authority to investigate whether family court had jurisdiction to abrogate Petitioner's right of association with A.R.W.

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 12 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0015**

59.     A habeas petition is an inquiry of the trial court's ***jurisdiction***, not a petition for a trial *de novo*, nor an appeal.

60.     "All the authorities agree that *res judicata* does not apply to applications for habeas corpus. The courts must be kept open to guard against injustice through judicial error."[3]

### 2) Extrinsic Fraud

61.     Because Petitioner's right of association with A.R.W. has been violated by the acts of Owen and Cliber, the Court has authority to examine the perjury and extrinsic fraud perpetrated by Owen and Cliber to barratrously initiate Case No. 21-5-00680-6 without evidence of "domestic relations" between Petitioner and Owen.

62.     Owen's perjury, and Cliber's subornation of Owen's perjury, were integral to the extrinsic fraud of their Petition to Decide Parentage, which was the fraudulent basis of their obtaining restraining orders against Petitioner.

63.     The "extrinsic or collateral fraud" included Cliber "purposely keeping [Plaintiff] in ignorance of the [action]." *Burke v. Bladine,* 99 Wash. 383, 394 (1918) "Adopting the language of *Pico v. Cohn*, 91 Cal. 129, 25 Pac. 970, 27 Pac. 537, 13 L.R.A. 336, 25 Am. St. Rep. 159.***In all such instances, the unsuccessful party is really prevented, by the fraudulent contrivances of his adversary, from having a trial[.]"

---

[3] *Darr v. Burford*, 339 U.S. 200, 214-215 (1950)

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 13 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1
2
3
4
5
6
7

64.     Because Petitioner's right to redress is being infringed upon as a result of Defendants' actions, the Court has authority to examine the perjury and extrinsic fraud perpetrated by Owen and Lerman, and suborned by their attorneys, which was then used by Defendants' attorneys to obtain an Order Restricting Abusive Litigation ("ORAL") without the required element that a court had ever found Petitioner to be a domestic violence perpetrator.

8
9
10
11
12

65.     The Court has authority to examine the perjury and extrinsic fraud perpetrated by Owen and Lerman, and suborned by their attorneys, which was recently used by Cliber's attorneys to seek the arrest and imprisonment of Petitioner under the ORAL.  (Docket 267)

13
14
15
16
17

66.     Cliber and his counsel concealed from Petitioner that an ORAL is granted under RCW 26.51, which prevented Petitioner from knowing the controlling statutory requirements.  This prevented Petitioner "from presenting all of his case to the court." *United States v. Throckmorton*, 98 U.S. 61, 66 (1878)

**D.  CHILD IMPRISONMENT**

18
19
20
21
22
23
24

67.     In an early test of the Habeas Corpus Act, a 12-year-old child petitioned for a writ of habeas corpus to free herself from her unlawful imprisonment.  Having been unlawfully restrained under indentured servitude by her mother's former slave owner, the young girl's freedom was restored in only a matter of days under habeas corpus.[4]

25
26

---

[4] *In re Turner*, 24 Fed. Cas. 337 (No. 14247) C.C.D. Md. (1867)

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 14 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

68.     Before three witnesses, including the college professor who tutored A.R.W. during the 2020-2021 school year, A.R.W. affirmed much of the foregoing, as well as, of sound mind, granting Petitioner power-of-attorney to effectuate the release of A.R.W. from his imprisonment by Owen and Lerman. (Appendix G)

## VERIFICATION

I, Kurt Benshoof, do hereby declare that the foregoing is true and correct to the best of my knowledge under penalty of perjury in the State of Washington. Executed this 31st day of January in the year 2024, in the city of Seattle, in the county of King, in the state of Washington.

Petitioner certifies that this petition contains less than 3,100 words in compliance with LCR.

By:  ____/s/ Kurt A. Benshoof_____
     Kurt A. Benshoof *Pro Se*

1716 N 128th Street
Seattle, WA 98133
Phone: (206) 460-4202
Email: kurtbenshoof@gmail.com

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 15 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0018

# CERTIFICATION OF SERVICE

Petitioner hereby certifies that on January 31, 2024, he did electronically file the foregoing motion with the Clerk of Court by using the e-filing system, which will send a notice of electronic filing to all counsel of record, and by email to the addresses listed below.

**Attorney For Defendant Jessica Owen:**
Blair M. Russ, WSBA #40374
1000 Second Avenue
Suite 3660
Seattle, WA 98104
Email: bmr@tbr-law.com
Phone: (206) 621-1871

**Attorneys for Defendant Nathan Cliber:**
Sarah N. Turner, WSBA #37748
Michael C. Tracy, WSBA #51226
701 Fifth Avenue
Suite 2100
Seattle, WA 98104
Phone: (206) 695-5178
Email: sturner@grsm.com
Email: mtracy@grsm.com

**Attorney for Defendants**
**Magalie Lerman and Owen Hermsen:**
Moshe Y. Admon, WSBA #50325
300 Lenora Street
Suite 4008
Seattle, WA 98121
Email: jeff@admonlaw.com
Phone: (206) 739-8383

DATED:  January 31, 2024

Signed:   /s/ Kurt A. Benshoof

Kurt A. Benshoof, *Pro Se*

PLAINTIFF'S PETITION FOR
WRIT OF HABEAS CORPUS
Page 16 of 16

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

# Appendix  **A**

FILED
2021 AUG 23
KING COUNTY
SUPERIOR COURT CLERK

CASE #: 21-2-11149-8 SEA

| **Superior Court of Washington For King County** | |
|---|---|
| Jessica Rae Owen    11/23/1975 | **No.** 21-2-11149-8 SEA |
| Petitioner | |
| vs. | **Petition for Order for Protection (PTORPRT)** |
| Kurt   Alden   Benshoof    07/18/1969 | |
| Respondent | |

1. ☒ I am a victim of domestic violence committed by the respondent.
   ☐ A member of my family or household is a victim of domestic violence committed by the respondent.
   ☐ I am a ☐ guardian ☐ guardian ad litem ☐ next friend of a minor who is 13 to 15 years of age and is a victim of domestic violence in a dating relationship with a person age 16 or older.   The name of the minor victim is _____.   This person's identifying information is provided in paragraph 5 below.

2. ☒ The victim lives in this county.
   ☐ The victim left their residence because of abuse and this is the county of their new or former residence.

3. The victim's age is:              Respondent's age is:
   ☐ Under 16   ☐ 16 or 17  ☒18 or over     ☐Under 16   ☐ 16 or 17   ☒ 18 or over

4. The victim and the respondent are:
   ☒ Intimate Partners because they are:
      ☒ current or former spouses or domestic partners ☒ parents of a child-in-common
      ☐ age 16 or older and are/were in a dating relationship, and are currently residing together or resided together in the past   ☐ age 16 or older and are/were in a dating relationship, but have *never* resided together.
   ☐ Family or household members because they are:
      ☐ current or former adult cohabitants as roommates   ☐ adult in-laws   ☐ adults related by blood ☐ parent and child ☐ stepparent and stepchild ☐ grandparent and grandchild.

**77** PF DV-1.015 Mandatory (07/2019) - RCW 26.50.030              - Page 1 of 6

**0021**

5. Identification of Minors (if applicable)  ☐ No Minors involved.

| Name (First, Middle Initial, Last) | Age | Race | Sex | How Related to Petitioner | Respondent | Resides with |
|---|---|---|---|---|---|---|
| A_____ R___ W_____ | 12 yrs | White | M | Child | Child | Petitioner |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

6. Other court cases or other restraining, protection or no-contact orders involving me, the minors and the respondent:

| Case Name | | | |
|---|---|---|---|
| Case Number | 15-424720 | 15-393274 | 15-393274 |
| Court/County | King | King | |

**I Request an Order for Protection** following a hearing that will:

¹ ☒  **Restrain** respondent from causing any physical harm, bodily injury, assault, including sexual assault, and from molesting, harassing, threatening, or stalking ☒ me ☒ the minors named in paragraph 5 above ☐ these minors only:

(If the court orders this relief, and  you and the respondent are current or former spouses or domestic partners, parents of a child-in-common, age 16 or older and are/were in a dating relationship, and are currently residing together or resided together in the past,  age 16 or older and are/were in a dating relationship, but have *never* resided together, the respondent will not be able to obtain or possess a firearm, other dangerous weapon, ammunition, or concealed pistol license for the duration of the order.)

² ☒  **Restrain** respondent from harassing, following, keeping under physical or electronic surveillance, cyberstalking as defined in RCW 9.61.260, and using telephonic, audiovisual, or other electronic means to monitor the actions, locations, or wire or electronic communication of ☒ me ☒ the minors named in paragraph 5 above ☐ only the minors listed below; ☒ members of the victim's household listed below ☐ the victim's adult children listed below:     Magalie Lerman

³ ☒  **Restrain** respondent from coming near and from having any contact whatsoever, in person or through others, by phone, mail, or any means, directly or indirectly, except for mailing of court documents, with ☒ me ☒ the minors named in paragraph 5 above, subject to any court-ordered visitation ☐ these minors only, subject to any court-ordered visitation:

⁴ ☒  **Exclude** respondent from ☐ our shared residence ☒ my residence
☒ my workplace ☐ my school ☐ the residence, day care, or school of ☒ the minors named in paragraph 5 above ☐ these minors only:
☐ other:

You have a right to keep your residential address confidential.

**78** WPF DV-1.015 Mandatory (07/2019) - RCW 26.50.030                      - Page 2 of 6

| | |
|---|---|
| **5** ☐ *Direct* respondent to vacate our shared residence and restore it to me. | |

**6** ☒ *Prohibit* respondent from knowingly coming within, or knowingly remaining within **500 feet_____** (distance) of ☐ our shared residence ☒ my residence ☒ my workplace ☐ my school ☒ the day care or school of ☒ the minors named in paragraph 5 above. ☐ these minors only:
    ☐ other:

**7** ☐ *Grant* me possession of essential personal belongings, including the following:

**8** ☒ *Grant* me use of the following vehicle:
    Year, Make & Model <u>2014 Toyota FJ Cruiser</u>   License No. <u>BGF9753</u>

**9** ☒ *Other*: No contact with my son, Azhrael R Walker, my partner, Magalie Lerman, or me in person or through any form of communication.

**Protection involving a minor:**

**10** ☒ Subject to any court-ordered visitation, *Grant* me the care, custody and control of ☒ the minors named in paragraph 5 above ☐ these minors only:

**11** ☒ *Restrain* respondent from interfering with my physical or legal custody of ☒ the minors named in paragraph 5 above ☐ these minors only:

**12** ☒ *Restrain* the respondent from removing from the state: ☒ the minors named in paragraph 5 above ☐ these minors only:

**Additional Requests:**

**13** ☒ *Direct* the respondent to participate in appropriate treatment or counseling services.

**14** ☒ *Require* the respondent to pay the fees and costs of this action.

**15** ☒ *Remain Effective* longer than one year because respondent is likely to resume acts of domestic violence against me if the order expires in a year.

**Protection involving pets.**

**16** ☐ *Grant* me exclusive custody and control of the following pet(s) owned, possessed, leased, kept, or held by me, respondent, or a minor child residing with either me or the respondent. (Specify name of pet and type of animal.):

**17** ☐ *Prohibit* respondent from interfering with my efforts to remove the pet(s) named above.

18 ☐ **Prohibit** respondent from knowingly coming within, or knowingly remaining within
_____(distance) of the following locations where the pet(s) are regularly found:
☐ petitioner's residence (You have a right to keep your residential address confidential.)
☐ _____ Park
☐ other: _____

| Protection from Firearms and Other Dangerous Weapons |

19 ☒ **Require** the respondent to surrender all firearms, or other dangerous weapons, and any
concealed pistol licenses, and prohibit the respondent from accessing, obtaining or
possessing firearms, other dangerous weapons, or concealed pistol licenses.

Notice: If you **are** the respondent's intimate partner, after actual notice and an opportunity to
be heard at the hearing, the court may be required to order the respondent to surrender
firearms, other dangerous weapons, or concealed pistol license.

---

**I want emergency temporary protection effective immediately, that lasts
(up to 14 days) until the court hearing:**

☒ An emergency exists as described below. I request that a **Temporary Order for
Protection** granting the relief requested above in 1) through 12) be issued immediately,
without prior notice to the respondent, to be effective until the hearing.

☒ I also request temporary surrender all firearms, other dangerous weapons, and any
concealed pistol licenses without notice to the other party because irreparable injury
could result if an order is not issued until the hearing.

What irreparable harm would result if an order is not issued immediately without prior notice
to the respondent?
He is currently preventing my son from talking to me or coming home. I have had a verbal agreement
with Kurt that we split time with my son 50/50 and it is now seven days into my week with my son and I
still have not gotten him back. I am afraid he will continue to keep him from me.

---

Request for Special Assistance from Law Enforcement Agencies:
I request the court order the appropriate law enforcement agency to assist me in obtaining:
☐ Possession of my residence. ☒ Possession of the vehicle designated above.
☐ Possession of my essential personal belongings at ☐ the shared residence ☐
respondent's residence
    ☐ other location _____
☒ Custody of ☒ the minors named in paragraph 5 above ☐ these minors only (if applicable):
_____.
☐ Other: _____

> "Domestic violence" means physical harm, bodily injury, assault, including sexual assault,
> stalking, **_Or_** inflicting fear of imminent physical harm, bodily injury or assault between
> family or household members.

**Statement:** The respondent has committed acts of domestic violence as follows. (Describe
specific acts of domestic violence and their approximate dates, beginning with the most recent
act. You may want to include police responses.)

**80**
WPF DV-1.015 Mandatory (07/2019) - RCW 26.50.030

Describe the most recent violent act, fear or threat of violence, and why the temporary order should be entered today without notice to the respondent:
*Kurt has repeatedly texted me multiple times a day through his phone and now my son's.   He will not let my son come home and won't let him speak to me.   It has been a week and my son has not come home.   Please refer to exhibits (5).*

Describe the past incidents where you experienced violence, where you were afraid of injury or where the respondent threatened to harm or kill you:
*He shattered my truck window after an argument (see Broken Truck Window 1-5).   We had an argument that escalated to pushing and hitting (see Incident # 15-393274). Please refer to exhibits (2), (3).*

Describe any violence or threats towards children:
*We had an argument that escalated to him leaving a bruise on my arm and hitting our child's head on the wall.   Please refer to exhibits (1), (4).*

Describe any stalking behavior by respondent, including use of telephonic, audiovisual or electronic means to harass or monitor:
*He has repeatedly texted me more than 10 times in a day, often more thank 20 despite a complete lack of response from me.   Now that I have blocked his number he is now using my son's phone to text me.   He is also emailing me repeatedly also without a response from me.*

Describe medical treatment you received and for what:

Describe any threats of suicide or suicidal behavior by the respondent:

Does the respondent own or possess firearms? ☐Yes   ☐ No I'm not sure.

Does the respondent use firearms, weapons or objects to threaten or harm you?   Please describe:

Has the respondent used, displayed, or threatened to use a firearm or other dangerous weapon in a felony? Please describe:

Is the respondent ineligible to possess a firearm under the provisions of RCW 9.41.040? Please describe:

Does possession of a firearm or other dangerous weapon by the respondent present a serious and imminent threat to public health or safety, or to the health or safety of any individual? Please describe:

If you are requesting that the protection order lasts longer than one year, describe the reasons why:

Given the duration and insidiousness I have already experienced his abuse I think one year will not be sufficient protection.  I would like for my son, partner and myself to finally have peace without his constant texts, emails, and general harassment.

Other: _____

_____

_____

_____

_____.

(Continue on separate page if necessary.)

Check box if substance abuse is involved: ☐alcohol ☐ drugs ☐ other: _____

☐ Personal service cannot be made upon respondent within the state of Washington.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

Dated: 08/21/2021 _____ at Seattle, WA_____.

_____
Signature of Petitioner

**IMPORTANT:** You have a right to keep your residential address confidential.   If you have one, please provide an address, other than your residence, where you may receive legal documents:

**82**

*WPF DV-1.015 Mandatory (07/2019) - RCW 26.50.030*                    - Page 6 of 6

Kurt Benshoof is not the legal guardian of my son. I am the sole legal guardian, and he has been acting in the role of father for 12 years. However, my name is the only name listed as the parent on A█████ R███ W█████'s birth certificate. Kurt and I had a tumultuous relationship for 13 years, in which he was emotionally abusive and sometimes violent. I describe some of the worst of these incidents in the pages and pictures that follow but they are a small part of the extensive intimidation, lying, gaslighting and emotional abuse I endured from him. Through all of it, I wanted A██ to have a father and I wanted a co-parent who I could trust and who was respectful. Kurt has been neither trustworthy nor respectful. And, while I know that Kurt loves A██ I believe that things have escalated to a place that compromises A██'s well-being, both mentally and physically, and I am asking the courts to intervene on his behalf.

I moved out of the house that I own where I was cohabitating with Kurt in September of 2020 and moved into a new house with my current partner. I wanted Kurt to be the one to leave but he wouldn't, so I became his landlord instead as I own the house he lives in. The verbal agreement when I moved out was that we would have 50/50 parental custody but the first week I moved out, A██ asked to stay with us. Over the next nine months, A██ begged us not to have to go over to his father's. Part of the reason why is because his father is a fervent anti-masker and anti-vaxxer. He took A██ to an anti-mask rally and tried to get him to go into stores with him unmasked where Kurt would proceed to have conflicts with staff that asked him to mask up. It embarrassed A██.

In April 2021, after we took A██ away for a 3 weeklong road trip, Kurt demanded that Azh come over. My response was that we weren't keeping A██ from him - A██ didn't want to go to his house because Kurt would fall asleep during the day and A██ was bored and disliked feeling alone while Kurt was asleep. I said that he would need to clean his place up and stay awake when A██ was around to engage him. My partner and I talked with A██ about it, and he agreed to start spending one week with us and one week with Kurt, but even then, he asked to come over one to several nights during Kurt's week. Every time he would come back to our house, Kurt had undone the parenting work we had done to get A██ to be more independent including sleeping on his own, using silverware, and helping with chores around the house. He also was confused by the things his father told him about the pandemic: conspiracy theory after conspiracy theory about how the pandemic wasn't real and vaccines are harmful. We presented A██ with evidence to the contrary and my partner even got COVID. On top of that, A██ never got to have a pod with his friends because his father presented a significant risk to other family's health leaving him isolated and depressed…which Kurt rarely had to see or deal with.

After A██ turned 12 last April and one of the vaccines was approved for children 12 and over, we started to discuss A██'s options with him. He chose not to for a while but told me in July that he wanted to get vaccinated so he could play with his friends. I asked him if he was going to tell Kurt, to which he replied that he didn't think that was a good idea. Then, last Saturday, August 14th, Kurt wanted to go dancing with friends and A██ asked if he could stay with us. We were excited to have him over because our friends were getting married and some of A██'s friends would be at the party. We had a great night together.

**67**

The next morning, we woke up and my partner made us breakfast. While we were sitting at the table eating together, I mentioned to A⬤ that the next day we were going to get his second vaccine dose, as well as go to the doctor for a Wellness Check and to discuss a new vaccine schedule to catch up on his childhood vaccines he would need to go to school. He started shaking his head adamantly which was really startling. I asked him what was wrong, and he completely shut down. It took my partner and I ten minutes to get him to tell us what was up, and when he did, he said that his father found out about his first vaccine and was angry about it – he said that Kurt always knew when he was lying. Kurt didn't want him to get the second dose and he wasn't supposed to tell us that. We tried to talk with him about the implications of this choice, but he completely shut down again and asked to go to his room. Thirty minutes later he said he was going to play pickle ball with Kurt who came to pick him up. I asked A⬤ later that night over text if he wanted to come back and he said he wanted to, but a few hours later he'd changed his mind and said he wanted to stay. It was the last day of Kurt's parenting night per our verbal agreement.

Monday morning, I sent him a text to check in with him and to let him know that I would be picking him about 12pm for his Lego summer camp and for his doctor's appointment. He texted back that he would be staying with his dad that day. At that point, I told him to call me. He didn't answer, so I texted him a reminder that we had arranged a sleepover for him and a friend the following day. I tried calling him again and he said he was "talking with dad still". My partner and I became concerned that he had shut down and wasn't answering us. I texted to ask if he felt safe. His answer cut me to the core: he said that he didn't feel safe that I wouldn't make him get the second vaccine shot. I explained that we would never force him to do that – he has been able to make his own decisions regarding vaccinations in the past few years because his father adamantly opposed him from receiving any, including the normal series of vaccines recommended for all babies and children. I have been afraid of fighting with Kurt about vaccinating A⬤, so I have had to present reasoned arguments to my son about their value.

I have had to convince my own son, a minor, about the merits of receiving lifesaving medical protection to avoid the very thing we are dealing with now – Kurt taking him from me and isolating him and escalating the harassment that has existed between us for years.

I told my son that the most I was going to do was to have a doctor, a trained medical professional, explain COVID and the COVID vaccine to him. I asked him to please think about all the adults and young friends who were vaccinated and to ask them about why they got it. A⬤ texted that he wanted to come over the next day to have a sleepover with his friend. I decided to back off, not wanting to escalate an already tense situation. The next day, Tuesday, I texted him that I would pick him up for Lego camp that has been scheduled for the whole week (8/16-8/20) and he didn't respond. I texted him about coming back for the sleepover and he didn't respond.

Also, beginning Sunday night, Kurt was sending me continuous threatening texts and emails telling me that I am an unfit mother because I was harming our son and that "any further

**68**

stonewalling will be considered willful neglect, negligence, and/or reckless endangerment of our child". Tuesday morning, I woke up to 17 text messages that Kurt had sent in the previous two hours. After blocking his number, he took Azh's phone and started texting me from it. He said,

"This is Kurt. He does not want to talk to you. He knows you're lying. He is not interested in you coming to get him. Your lies are obvious. He is not a fool, and what you are doing is now clear to him. Respect his wishes. He's smart enough to see the most basic of sales and coercion techniques – fear and social conformity."

Kurt continued at length and then told me that I could "go ahead and cancel whatever [I] had planned for now, we've made other plans with families that aren't engaging in medical apartheid, discrimination and segregation". There are more texts calling me "irrational and unhinged".  (It is important to note that Kurt has two phone numbers and that I had to block the other one on August 2nd after he sent me text after text, harassing me about Azh wearing masks while in stores and at summer camp. He said they were "experimental devices" and presented the argument that if he, Kurt, "mandated that A⬛ wear a ball gag or a butt plug during [his] week with him, would [I] raise an objection that such mandating would be without [my] consent?  Legally speaking. Same legal principle.", and then further equated wearing a mask with wearing a ball gag and that I needed to respect A⬛'s body, or the law would force me to comply.  The texts went on and on until finally he called me a "Child abuser" and "One step up from a pedophile in [his] book" at which point I said he was crazy and offensive and blocked him.) (See photos Kurt to me 1 and 2.)

Since then, Kurt has emotionally isolated and turned A⬛ against me even more. A⬛ won't talk to me and is clearly afraid of upsetting his dad. I don't know to what extent Kurt has brainwashed him and to what extent he is afraid of Kurt and appeasing him. My partner has tried to reach out to A⬛ via text, and so has his grandmother – both adults who he has a very close relationship with - and the mother of the friend who was coming for the sleepover also tried to reach to him. Kurt has responded with his phone for A⬛ until they all blocked him, harassing them about asking me for vaccination information.

Next, Kurt started harassing this same young friend of A⬛'s, another 12-year-old, through A⬛'s number asking him to find out what vaccine A⬛ received (which shows the extent of his scientific misinformation because there is only one approved for minors – he just wants to harass people). I have pleaded with Kurt to let me talk with my son and to let me have my son. I am afraid to go over there and try and get him because I am afraid of Kurt and afraid of what Kurt might do that my son will have to see. However, this was the last straw, and I am begging for the court's help.

In addition to keeping my son on my parenting week, Kurt has prevented A⬛ from going to a doctor's Wellness Check appointment on Monday and an orthodontist appointment on Wednesday. A⬛ has also missed out on an entire week's worth of Lego summer camp and three play dates with different friends. You will see in the rest of this document that Kurt has

**69**

hurt me and my son too many times. He is actively harming my family now and I want him out of my son's and my life. He has no legal right to be there. I want my son back. I want my house back. I want my car back. I know Kurt will retaliate. The last time Kurt felt slighted, he brought a gun to intimidate the person he felt slighted by. But the system has not charged him with that even though he is a felon and is not legally allowed to have a gun. He is free to terrorize my family and the Seattle community. I submit this case to ask for the highest level possible of protection from him.

On June 24th, 2021, Kurt contacted A⬛ and me irate because A⬛ plagiarized one of his final papers for school this past year. After a laborious and extremely boring year online, I am not surprised that A⬛ resorted to this. This was discovered by Kurt during a trip my partner and I had taken A⬛ on to see her family in Annapolis, MD. First, I received a text from Kurt talking about how A⬛ had lied and was going to be failed on his homework and would have to redo the entire year as punishment. I immediately responded, asking him to explain what he was talking about, but he didn't text me back. I texted A⬛'s tutor and begged him not to fail Azh for the entire year because I thought that it would have very negative repercussions on A⬛'s mental wellbeing if he had to repeat a grade after everything he had already missed out on this past year. I didn't hear back from his tutor for several hours. Kurt would also not respond to my repeated texts asking him to explain what had happened.

In the meantime, Kurt began to send A⬛ texts, one after another. Kurt told him exactly how he would be punished and that he was "a lying little cheater" and that he didn't "want see your boo hoo fake ass tears or hear your fake ass "I'm sorry I won't do it again" Your ass is grass." Kurt threatened to take away all his electronics and that A⬛ was "going to learn the consequences of lying". I walked into his room at the Airbnb and found A⬛ crying on the bed. After A⬛ explained what had happened and showed us the texts his dad was sending him, we had a talk with him about why plagiarism is not okay and how he would need to correct his homework. And, also, that the way Kurt was talking to him was unacceptable. I asked him if he wanted to block Kurt's number and told him that he could unblock it at any time. I said that the way Kurt was talking to him was abusive and that Kurt could have made his point about the severity of cheating without belittling him. I said that I thought that there were more constructive ways to deal with what happened. A⬛ decided to block his number and when I asked him every day afterwards, he said he didn't want to talk to his dad. I reminded A⬛ during one of these days that it was Father's Day, but he still did not want to talk to him. Eventually Kurt used a different phone number to contact A⬛ and, when he did, he said that he found out that I had told Azh to block him. He asked A⬛ leading questions about how that had come to pass and then Kurt told him that he had texted those things out of love and because he wanted A⬛ to do better. And, to never EVER block him again. EVER. After that Kurt began to send me vague and threatening texts. Eventually I blocked him myself on that number. (See **photos 1.PNG and 2.PNG**)

On the night of December 17th, 2020, when Azh was with Kurt, I received a phone call around 11:30pm. My ringer was off and by the time I noticed that A⬛ had called, I had missed 6 calls from him. Azh said that they had been pulled over and the police were attacking his dad. He

**70**

handed the phone over to a police officer who said that Mr. Benshoof was probably going to spend the night in jail and was I able to come pick up my son? My partner and I immediately went to where Kurt had been pulled over. He was being loaded into the back of a police car with his hands handcuffed. A⬤ got out of the car and ran to us. He was visibly shaken up and upset. He immediately began to cry once he was inside our car. The officer asked to talk to me, so A⬤ stayed in the car with my partner while I stepped outside to talk with her. She told me that Kurt was pulled over for erratic driving – he disobeys traffic laws all the time and then contests traffic violations where they consistently get dismissed. She said once pulled over, Kurt refused to stay in his car even after verbal commands to get back in his vehicle. They tackled him to the ground and A⬤ saw all of it. One of the officers said he seemed like he was intoxicated and asked if he had a history of drug or alcohol abuse, or mental illness. I said he has not been diagnosed with any mental illness that I know of but that I thought that might be the case. The car that Kurt drives is in my name and insured by me. Therefore, when they saw my name on the registration, I was able to drive it away while my partner drove my son home (Incident # 20-346226).

The next day, a CPS investigator contacted me because one of the officers had called them. She came and interviewed my son and myself and said we have a lovely home. I informed the investigator that, at the time, my son refused to spend the night at Kurt's house more than once every other week and was seeing a tutor there three days a week for two hours a day. I never heard any more about the CPS investigation. It was Kurt's actions which prompted the CPS investigation. But that did not prevent Kurt from using this as another opportunity to begin to harass me repeatedly via text about how I was going to get our son taken away from us and that I should never have accepted the interview. There was no accountability about how it was his arrest for driving erratically that triggered the investigation. This went on for days. Eventually I reached out to Kurt's other child, an adult named Samara Lane and asked her to talk to him. She responded via text and said that she felt that she had reached him and calmed him down. His texts subsided after that.

On September 11, 2020, Kurt was arrested for refusing to put on a mask at Sprouts and getting into an altercation with the security guard and got arrested for Assault, and Criminal Trespass – 1st degree, and Resisting Arrest (Incident # 20-264905). One week later, on September 18th, 2020, I went over to the house that Kurt is renting from me and that I had just moved out of. I was in the process of packing up the remaining things I had left at the house when I noticed that he had a shotgun on the dining room table in front of our son. I asked him, "Why do you have a gun?!" He asked me in return, "Why do you lock your doors?" I said, "So you're planning on protecting your house by shooting someone? Not to mention that I don't want a gun in the house around A⬤! And how did you get one? You're a felon!" He said that he had read the RCW 9.91.040 and that it didn't say he couldn't. Shortly thereafter he said he was off to Sprouts to get some answers and I told him not to get shot or arrested. He was later arrested and charged with Criminal Trespassing, Assault, and Unlawful Use of a Weapon to Intimidate Another (Incident #20-268834) for standing menacingly in the parking lot with the shotgun. This was after he had already spent one night in jail the previous week for the initial charge. The initial charges were dropped for the first incident at Sprouts, but he is facing trial next month

**71**

on September 21st, 2021, for the subsequent charges when he brought the rifle to Sprouts. In addition to these charges, he has a warrant for his arrest for failure to appear at a prior trial. On November 13th, 2020, he was arrested for Criminal Trespass – 1st degree and Theft (Incident# 20-304716) after refusing to wear a mask at PCC on Aurora. He failed to appear in court for that trial because he refused to wear a mask in the courthouse or provide medical proof that he did not need to wear one. I took a photo of Kurt with his rifle on the dining table in front of our son from that afternoon.

When I lived at my house with Kurt, it had two parking spots next to the house. One day in fall of 2019 he ordered a large load of lumber and had it unloaded into my parking spot after which I had to park on the street. The lumber stayed in my spot for over six months and eventually, in January 2020, I got into an argument about how he should be the one to park on the street not me. He told me that I should move the lumber if I wanted my space back. I told him that he should do that since it was him that had them drop it in my spot. Later that day, he borrowed my truck and shattered the rear window in my truck. Then he parked it on the street and didn't tell me about it. I discovered it the next day when I was leaving to visit my best friend. It had rained overnight, and rain and glass covered the boxes of children's books I had back there to give to my best friend's son. I went to her house and arrived there incredibly upset and crying. The next day, I went to the police station to file a report against him. I ended up not filing, though, because the officer that I spoke to told me that Kurt would be notified that I had made the report. I was afraid of what would happen if he found out while I was still living there. I decided to just document the incident with photographs. Several people witnessed the damage and how upset I was.

On September 10th, 2019, Kurt taped Cosmos, my cat, in a box. He said it was in retaliation for Cosmos killing a bird and left him on the porch alone. He was in the box with no one at the house for over two hours until I got home. There were no holes punched in the box for air. He did this instead of just leaving him in the house with the cat door closed.

On December 12th of 2018, after arguing about my acceptance of an invitation for our family to attend a Christmas party without consulting him first, Kurt slammed the front door hard enough to brake three glass panes in the door and began shouting at me. When I said that if he didn't stop, I would call the police he broke ¾" wood cutting board, shattered dishes in the sink and continued shouting at me. At this time, I walked to my bedroom and closed the door and called the police. I opened my door to look for my son, who was nine at the time, but couldn't find him. Instead, I saw Kurt ripping a door off the door jamb. I closed the door and a moment later I found my son hiding under my bed. He refused to come out because Kurt was shouting so loudly. A▮ was terrified.

Eventually Kurt quieted down, and I could hear some indiscernible noises from my bedroom. I stayed on the phone with the operator until a police officer arrived and came into the house. That's when I discovered what the noises had been: Kurt had cleaned up all the broken glass and swept up all the shattered dishes and then taped plastic over the broken windowpanes. He had also leaned the door back into the doorjamb and draped a towel over it to cover up the damage to the jamb. This was the most unnerving part of this experience. He had the

**72**

wherewithal to clean up his mess and make it look better before the police arrived.  As though he could have gotten himself under control at any time but chose not to.

He was outside of the house when the two officers arrived and, according to the officer who came in, was very confrontational with them.  Kurt was also very insistent that it was me who was in the wrong, not him.  The officer asked me if I felt I was in physical danger.  I told him I did not which was not true, but I was afraid of what would happen if I did.  They told Kurt to leave me alone and he came back inside.  He said a few sarcastic things to me and went to his bedroom upstairs (we were living together at the time but no longer romantically involved).  My son did not want to see him, and I regret to this day that I did not have Kurt taken away that evening for my son's sake.  I wish that I had shown my son that I would protect him and keep him safe from anyone who scared him and made him feel unsafe.  Two days later, Kurt bought him an extravagant Lego gift and A⬛ forgave him.  (I took pictures of the damage to the house and the **incident # is missing but I am waiting for report to be emailed to me.**)

One morning in fall of 2016 Kurt and I got into an argument that escalated and led to my son hiding under my bed.  On this day had Kurt slept in.  He had recently moved into my house, and we had established a routine of waking up together and getting our son on his way to school.  When I realized that he was not going to get up and help me with Azh I said something in a sarcastic tone to him about, "at least letting me know the night before" that he wasn't planning on helping me the next day.  In response to this he jumped out of bed and started shouting about how he was "awake now" and, "how dare [he] sleep in", and that I had told him he should "rest more but [i] was lying".  He began to bang pots and pans around in the kitchen while still shouting at me.  I think he was dramatically trying to make me tea as this was something he often did when we would wake up together.

A⬛, meanwhile, had crawled under my bed to hide.  I shut the bedroom door to block out Kurt's shouting and told A⬛ to come out and sit with me.  He came and sat on my lap.  I told him that his dad was being really awful and that it was wrong to act like that.  I said that Kurt was scary and that no one who loves you should make you feel scared.  But that it wasn't our problem and that we would just walk out of the front door and go straight to my truck.  We would stop and get breakfast on the way to school, and I would buy him lunch instead of going into the kitchen to grab his lunchbox and that we didn't need to pay any more attention to his dad.  I asked if he was ready to go and we walked as quickly as possible out the front door.  Kurt was still ranting and throwing things around the kitchen.  I did not file a police report for this incident.  A⬛, however, remembers this morning.  We have talked about it in recent months in response to his questions about his dad getting arrested several times in 2020.  I used it as another example of Kurt's bad decision-making ability and Azh agreed that his dad had badly overreacted.

In the afternoon of December 7th, 2015, Kurt stopped by my house to pick up some things from our basement and my son was with him.  I had recently started dating someone and there was a series of photos of us kissing in a photobooth I had put up with a magnet on the fridge.  I include this detail because I have no other explanation for why the following conflict happened.

**73**

**0033**

I took my son into my bedroom while Kurt was busy, and my son said he wanted some candy. I told him that that was okay and gave him a piece. He said that his dad had told him he couldn't have any. I said that he could just finish it in my room and his dad would not know the difference. His father yelled for him a few minutes later, saying that they were leaving and to come to the front door. I said A⬤ would be there in a minute. Kurt came into my room and angrily said that they were leaving now.

A⬤ and I walked to the front door together and I put my shoes on so I could carry A⬤ him down to Kurt's car. I picked A⬤ up and Kurt told me to stay inside and to leave them alone. I said, "Why? I am just going to carry him down to the car." He insisted that I couldn't come to the car and grabbed A⬤ out of my arms. We began to argue, and he called me a "lying cunt", a "slut", and "bitch". I tried reaching for A⬤ to get him back. I said, "I just wanted to walk him down to the car. Why can't I just carry him out to the car?" Kurt just kept walking away from me with A⬤ in his arms, holding him away from me. Then Kurt grabbed my arm to hold me back. Things escalated and we were arguing and A⬤ started crying. Suddenly Kurt lifted A⬤ up away from me so that I couldn't reach him, and he bumped A⬤'s head on the wall which made A⬤ cry even harder and shout at us to, "Just stop it!" At this point I backed up and let them leave without protest. I called Kurt's girlfriend, who had not come with them, and begged her to please take care of A⬤ who was really upset. I was devastated. I later realized that Kurt had grabbed my arm hard enough to leave a bruise. He said that this all happened because I gave A⬤ a piece of candy after he explicitly told him he couldn't have one. But the amount of anger was so disproportionate to what I had done that I suspect that it was because of the evidence of my new relationship. I filed a report against him the next day (**Incident #15-424720**).

On November 10th, 2015, after Kurt had begun seeing each other again I let him stay over. That evening he told me that his girlfriend was coming to stay with him at his house on a one-way ticket from Ohio. I was deeply hurt by this new rejection and betrayal of our relationship. At the time, I was working and going to school so was overwhelmed by caring for A⬤ who was six. I asked Kurt if he would now take our son a few days a week at his place and he said no. He demanded that everything would still need to be done at my house and he would be staying there half time. I told him that was unacceptable. Our conversation escalated to a screaming match, and he pushed me. I retaliated by slapping him repeatedly on the arm. Kurt is 6 feet, 175 pounds. I was 5'8, 135 pounds. He angrily told me that I'd crossed a line and went downstairs to sleep in my bed instead of going to his home. I told him to leave, and he said, "Make me." He refused to leave until the morning. The fight really scared me, and I didn't want him in my house anymore, so I filed a police report two days later (**Incident# 15-393274**).

In the spring of 2014 A⬤ was attending pre-K at Phinney Ridge Co-op. To join this Co-op everyone had to have a background check. Kurt, however, had managed to avoid this for the first year and a half and this was because he was a felon: we possibly would be asked to leave the co-op if they found this out. Eventually, however, the mother in charge of overseeing the paperwork for all the parents involved in the co-op asked him to fill out the background check form. Kurt had recently been asked to stop riling the kids up too much after school by playing

**74**

with them. And he felt that he was being singled out for that. In response to her request, rather than simply filling out the background check, he began to incessantly email this mother at the co-op with veiled threatening letters. Very quickly she began to feel threatened by him and we were kicked out of the co-op because of him. I had to petition separately to bring A⬤ back into the co-op to finish out the last two months of pre-K without Kurt which was only possible because we had broken up shortly before this and I was living separately from him. The co-op accepted my petition with the explicit boundary that Kurt was not to go into the co-op any more or have any more contact with any of the parents. Later, the teacher, Francine, told me that they would not have kicked us out since the felony was not for harming a minor or an incapacitated adult. It was for growing marijuana. I would not have had to go through all the stress and embarrassment of being kicked out and then asking to come back into the co-op for my son's sake if Kurt had simply filled out the form. A⬤ loved going to pre-K. He had many friends and was very popular with the other parents. He didn't understand why he wasn't allowed to go back and play with his friends while I was petitioning to get him back into school. It didn't need to be so hard. Kurt made it difficult and scared people outside of our relationship.

I ask the courts to please think about Kurt's history within our family and to consider how it has escalated in the past week and what that means going forward. I am scared for my son and for myself. I beg the courts to please help me get my son back and prevent any further harm to us. Thank you.

Sincerely,
Jessica Rae Owen

**75**

# Appendix **B**

Report Number 2015-393274 - Incident / Offense Report Report (Seattle Police Department)

# Report Number 2015-393274 - Incident / Offense Report Report

| REPORT DATE / TIME | PRECINCT / SECTOR / BEAT / RA / SUBDIVISION 5 | CAD EVENT START DATE / TIME - CAD EVENT END DATE / TIME |
|---|---|---|
| Nov 10, 2015 13:15 | N / N / N2 / 2337 | Nov 9, 2015 22:30 |

**REPORT WRITER**
JACOB MASTERSON #8350

**ASSISTING PERSONNEL / TYPE(S)**
TAMMY FRAME #7474 (Partner)

**REPORT TAKEN LOCATION**
1716 N 128 ST, SEATTLE 98133

**LEGACY DATA**

GO_DISTRICT: N
REPORT_NOTIFICATION_GROUP: V/C CLEARANCE NOTIFICATION -
NOTIFIED: N ; DATE: ; NOTIFIED BY: ; HOW NOTIFIED:
DRUG_INFO: N

GO_ZONE: N2
PROPERTY_INFO: N
GO_LOCATION: 1716 N 128 ST
GO_MUNICIPALITY: SEATTLE

GO_X_COORDINATE: 1270460

ENTRY_DATE: 10-NOV-15
CLEARANCE_INFO: Y
OP_STATUS: REFERRED -CITY ATTNY LAW DEPT BY FOLLOW-UP UNIT,
Cleared By: 5912
GO_GRID: 2337
GO_Y_COORDINATE: 267166

## NARRATIVE

Document No: GO0016286530001
Subject: GO NARRATIVE
Author: JACOB MASTERSON (8350)
Date:2015-11-10 14:49:00

[TT_VERSION 1.0] [GENERAL OFFENSE INITIAL INVESTIGATION NARRATIVE]1 BACK-UP OFFICERS(S): (NAMES, SERIAL #'s, AND ROLES IN INCIDENT)[Frame #7474-FTO ]2 CHARGES: [ ] CHARGE DESCRIPTION:[]3 ARREST SCREENED BY: (SUPERVISOR'S NAME AND SERIAL)[ ]4 PHOTO(S) TAKEN? [N] IF SO, [ ]UPLOADED TO DEMS, OR [ ]ICV USED5 RECORDED STATEMENT(S) TAKEN? [N] IF SO, [ ]UPLOADED TO DEMS, OR [ ]ICV USED6 DIGITAL IN-CAR VIDEO(S) UPLOADED? [Y] FLAGGED? [Y] IF NO, [ ] PROVIDE REASON: RECORDING OFFICER(S): [Frame #7474, Masterson #8350 ] NAME(S), SERIAL #'(S) 7DNA / FORENSIC EVIDENCE SUBMITTED? [N ]8 FINGERPRINTS: FINGERPRINTS SEARCH MADE? [N] FINGERPRINT EVIDENCE OR CARDS SUBMITTED? [N ] ANALYSIS REQUEST SUBMITTED?[N ] COMPARISON REQUEST SUBMITTED? [N ]9 FELONY ALERT PACKET SUBMITTED? [N ] OFFICER SUBMITTING: [ ] FOLLOW-UP UNITDESTINATION: [ ]10 USE OF FORCE REPORT SUBMITTED? [N] USE OF FORCE SCREENED BY (SUPERVISOR'S NAME AND SERIAL): [ ]11 LIST ALL HARDCOPY PAPERWORK SUBMITTED:[ ] ARREST REFERRAL TRACKING SHEET (Crisis Solution Center)[ ]CRIMINAL TRESPASS WARNING 5.34.1[ ]DUI PACKET[ ]DV SUPPLEMENTALS[ ] IDENTITY and MAIL THEFT (Photocopy of Recovered ID or Mail)[ ]INVENTORY SEARCH FORM[ ]MENTAL HEALTH CONTACT REPORT[ ]PARK EXCLUSION[ ]TOW IMPOUND RECORD[ ]VEHICLE REPORT[ ]WRITTEN STATEMENTS (Required on Felony Arr, Juvenile Crime, DV Incident)[ ] OTHER (Describe in Box Below)[ ]12 VICTIM(S) INJURIES: SFD Responded? [N][scratch on right index finger ]13 INCIDENTAL PROPERTY DAMAGE: (DESCRIPTION AND VALUE)[]14 VEHICLE IMPOUNDED? [N] STORAGE LOCATION: [ ]15 INITIAL INCIDENT DESCRIPTION / NARRATIVE:[On 11/10/15 at approximately 1356 hours while working as 2E11 I was dispatched to 411 E Loretta Pl in reference a domestic violence assault that had occurredon 11/09/15 at 1716 N 128th St. The suspect was not currently on scene at 411E Loretta Pl. Upon arriving on scene I made contact with the victim, V/JessicaOwen 11/23/75.V/Owen wanted to report the incident that happened the other night at her placeof residence (1716 N 128th Pl). She stated that the suspect was herex-boyfriend of six years with whom she has a child in common with, S/KurtBenshoof 07/18/69, and he was still at her house. This is why she is reportingthis incident from her friend's house (411 E Loretta Pl).V/Owen said that she and S/Benshoof broke up approximately two years ago butthey have continued what she described as an "on-again-off-again" relationshipfor the past two years. V/Owen said that during that time S/Benshoof has alsobeen seeing another woman. It was last night at approximately 2230 hours ather residencewhen S/Benshoof had told V/Owen that he would be flying hisgirlfriend in for an unspecified amount of time to live in Seattle. V/Owenresponded by saying that she wanted S/Benshoof to leave her house. Sheexplained to me that S/Benshoof had been staying with her for the past threemonths and just prior to that approximately six months in what she alsodescribed as "on-again-off-again." Both V/Owen and S/Benshoof had agreed thatresiding together would be best for their child. When V/Owen told S/Benshoofthat she wanted him to leave and go back to his own residence at 4241 NGreenwood Av he became upset.This led to an argument that lasted approximately one hour according to V/Owen.The argument occurred upstairs in her "sewing room." At one point in theargument, while V/Owen was sitting down in a chair, she said that S /Benshoofstood over her and was yelling at her. He was yelling that V/Owen was justlike his mother and implying that V/Owen was drunk. V/Owen did say that shedid have a glass of wine that night but was not intoxicated. Because ofS/Benshoof's posture and him standing

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| JACOB MASTERSON #8350    Nov 10, 2015 13:15 (e-signature) | SETH DIETRICH #4901    Nov 10, 2015 23:59 (e-signature) |
| PRINT NAME | PRINT NAME |
| JACOB MASTERSON #8350 | SETH DIETRICH #4901 |

**89**

Seattle Police Department
Mark43 RMS Form v2.0 generated by A. STREB #7140 on Aug 20, 2021 13:12.
Imported Report.

Pg 1 of 3

0037

## Report Number 2015-424720 - Incident / Offense Report Report

| REPORT DATE / TIME | PRECINCT / SECTOR / BEAT / RA / SUBDIVISION 5 | CAD EVENT START DATE / TIME - CAD EVENT END DATE / TIME |
|---|---|---|
| Dec 7, 2015 15:51 | N / N / N2 / 2337 | Dec 6, 2015 13:21 |

REPORT WRITER
RYAN KENNARD #7555

REPORT TAKEN LOCATION
1716 N 128 ST, SEATTLE 98133

LEGACY DATA

GO_GRID: 2337
GO_MUNICIPALITY: SEATTLE

GO_X_COORDINATE: 1270460
DRUG_INFO: N
REPORT_NOTIFICATION_GROUP: V/C CLEARANCE NOTIFICATION -
NOTIFIED: N ; DATE: ; NOTIFIED BY: ; HOW NOTIFIED:

PROPERTY_INFO: N
OP_STATUS: REFERRED -CITY ATTNY LAW DEPT BY FOLLOW-UP UNIT,
Cleared By: 6057
GO_LOCATION: 1716 N 128 ST
CLEARANCE_INFO: Y
GO_Y_COORDINATE: 267166

GO_DISTRICT: N
GO_ZONE: N2
ENTRY_DATE: 07-DEC-15

## NARRATIVE

Document No: GO0016373650001
Subject: NARRATIVE
Author: RYAN KENNARD (7555)
Date:2015-12-07 17:37:00

[TT_VERSION 1.0] [GENERAL OFFENSE INITIAL INVESTIGATION NARRATIVE]1 BACK-UP OFFICERS(S): (NAMES, SERIAL #'s, AND ROLES ININCIDENT)[None] 2 CHARGES: [ ] CHARGE DESCRIPTION:[3 ARREST SCREENED BY: (SUPERVISOR'S NAME AND SERIAL)[ ] [4 PHOTO(S) TAKEN? [Y] IF SO, [X] UPLOADED TO DEMS, OR [ ]CV USED5 RECORDED STATEMENT(S) TAKEN? [N] IF SO, [ ]UPLOADED TO DEMS, OR [ ]ICV USED6 DIGITAL IN-CAR VIDEO(S) UPLOADED? [Y] FLAGGED? [Y] IF NO, [ ] PROVIDE REASON: RECORDING OFFICER(S): [Kennard #7555 ] NAME (S), SERIAL #'(S) 7DNA / FORENSIC EVIDENCE SUBMITTED? [N ]8 FINGERPRINTS: FINGERPRINTS SEARCH MADE? [N] FINGERPRINT EVIDENCE OR CARDS SUBMITTED? [N ] ANALYSIS REQUEST SUBMITTED?[N ] COMPARISON REQUEST SUBMITTED? [N ]9 FELONY ALERT PACKET SUBMITTED? [N ] OFFICER SUBMITTING: [ ] FOLLOW-UP UNITDESTINATION: [ ]10 USE OF FORCE REPORT SUBMITTED? [N] USE OF FORCE SCREENED BY (SUPERVISOR'S NAME AND SERIAL): [ ]11 LIST ALL HARDCOPY PAPERWORK SUBMITTED? [ ]ARREST REFERRAL TRACKING SHEET (Crisis Solution Center)[ ][CRIMINAL TRESPASS WARNING 5.34.1[ ]DUI PACKET[ ]DV SUPPLEMENTALS[ ]IDENTITY and MAIL THEFT (Photocopy of Recovered ID or Mail)[ ]INVENTORY SEARCH FORM[ ]MENTAL HEALTH CONTACT REPORT[ ]PARK EXCLUSION[ ]TOW IMPOUND RECORD[ ]VEHICLE REPORT[ ]WRITTEN STATEMENTS (Required on Felony Arr, Juvenile Crime, DV Incident)[ ]OTHER (Describe in Box Below)[ ]12 VICTIM(S) INJURIES: SFD Responded? [N][small bruise to right bicep]13 INCIDENTAL PROPERTY DAMAGE: (DESCRIPTION AND VALUE)[none]14 VEHICLE IMPOUNDED? [N] STORAGE LOCATION: [ ]15 INITIAL INCIDENT DESCRIPTION / NARRATIVE:[On 12-7-15 I was working as a fully uniformed Police Officer for the City ofSeattle as unit 2-Nora-22. I responded to the lobby of the North Precinct whereJessica R. Owen WF 11-23-75 was waiting to report "INV ASLT. OCC'D YESTERDAY.EX-GRABBED THEIR SON OUT OF HER ARMS YESTERDAY AND BRUISED HER ARM. MEDICSDECLINED. SUSP NOT HERE NOW OR EXPECTED. SUSPECT LIVES IN THE FREMONT AREA. SEECOMP WAITING IN THE PCT LOBBY."I arrived and contacted V / <mark>Owen who stated that she and her ex-husband Kurt A.Benshoof WM 7-18-69 both own the house that she lives in at 1716 N 128 St.</mark> S /Benshoof works in the basement.Yesterday they got into an argument over giving their child A_____ R. W_____ UM 4__-09 candy. V / Owen and W / W_____ went to the kitchen and were sittingthere talking. S / Benshoof decided to leave and take W / W_____ with him (they<mark>have a rotating 3 day informal parenting plan</mark>). V / Owen stated she would walkW / W_____ out to S / Benshoof's vehicle. S / Benshoof was upset bythis andtook W / W_____ out of V / Owens arms. She tried to grab W / W_____ back andthey got into a "shoving" match during which he pushed her in the bicep causingthe bruise. At one point he also "bumped" W / W_____ into a wall.V / Owen allowed me to take a couple of photographs of her bruise using mydepartment issued digital camera.I offered V / Owen an SPD DV Pamphlet which she refused. She then told me shedid not want to get S / Benshoof into any legal trouble and stated she wouldnot assist with prosecution or seek any orders against him. She told me shejust wanted a report written.I provided her with an SPD business card with my information and the casenumber on it.]

*WITNESS-1*

| WITNESS-1 (PERSON) | | DOB / ESTIMATED AGE RANGE |
|---|---|---|
| W-1 W_____, A_____ R | | 2009-0___ |

| SEX | RACE / ETHNICITY |
|---|---|
| Male | Unknown |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| RYAN KENNARD #7555    Dec 7, 2015 15:51 (e-signature) | THERESE BEEMSTER #6354    Dec 7, 2015 23:59 (e-signature) |
| PRINT NAME<br>RYAN KENNARD #7555 | PRINT NAME<br>THERESE BEEMSTER #6354 |

**94**

Seattle Police Department
Mark43 RMS Form v2.0 generated by A. STREB #7140 on Aug 20, 2021 12:58.
Imported Report.

Pg 1 of 3

## Report Number 2021-241501 - Incident / Offense Report Report

| REPORT DATE / TIME | PRECINCT / SECTOR / BEAT / RA / SUBDIVISION 5 | CAD EVENT START DATE / TIME - CAD EVENT END DATE / TIME |
|---|---|---|
| Sep 14, 2021 10:34 | N / L / L1 / 3539 | Sep 14, 2021 08:41 - 08:41 |

REPORT WRITER

**ROBERT STEVENSON #5859**

ASSISTING PERSONNEL / TYPE(S)

**RYAN BECK #6898 (Backing Officer)**

REPORT TAKEN LOCATION

███████ **SEATTLE, WA 98125**

EMS / FIRE / OTHER LE AGENCIES ON SCENE

☐ YES ☒ NO

EVENT STATISTICS

☐ Event Contains Bias Elements      ☐ Homelessness
☐ AED Used                          ☐ Naloxone Administered
☐ Hate Graffiti                     ☐ Cybercrime
☐ Event is DV Related               ☒ ICV Exists
☐ Shooting (Non-Fatal Injury)       ☐ Shooting (Fatal Injury)
☒ Body Worn Video                   ☐ DEMS
☐ Shots Fired (Eyewitness/Casings/Property Damage)

## NARRATIVE

Owen and Benshoof were in a dating relationship for approximately six years. They lived together and share custody of W███, there six 10 year old son. Benshoof has a history of emotional and physical abuse against Owen. Owen is now in a relationship with Lerman and they reside together at ███████████ with W███. There are no current court orders in place and there is no parenting plan either.

On 09-14-2021 at approximately 0830 hours Owen was driving W███ to school and getting ready to exit the long shared driveway onto 10th Av Ne. Owen stated that Benshoof appeared out of nowhere and blocked the driveway so she couldn't leave. Owen backed up towards her home and Benshoof stayed directly in front of her. Owen backed into her driveway and went into the house with W███. Owen stated that they were both afraid of Benshoof and what he might do. W███ is especially afraid of Benshoof and does not want to split time with him.

Benshoof never crossed onto their property, but did stand in the street and yelled for W███. Benshoof did no threaten anyone and alleged that he just wanted to see and talk with his son W███.

Benshoof left prior to our arrival. Owen and Lerman believe that Benshoof is mentally ill and de-compensating. They afraid of what he might do in the future. I gave Owen a business card and case number for her records.

## OFFENSE-1

OFFENSE CODE

**RCW 9A.46.020.2A I HARASSMENT - MISDEMEANOR**

| OFFENSE START DATE | OFFENSE END DATE | OFFENSE COMPLETION | DOES EVENT CONTAIN BIAS ELEMENTS? |
|---|---|---|---|
| Sep 14, 2021 08:45 | Sep 14, 2021 08:45 | ☒ COMPLETED  ☐ ATTEMPTED | ☐ YES ☒ NO |

| DOMESTIC VIOLENCE | GANG INFORMATION |
|---|---|
| ☒ YES ☐ NO | No Gang Involvement/Unknown |

*OFFENSE LOCATION*

LOCATION NAME / STREET ADDRESS/LOCATION NAME / APT, UNIT, STE / DESCRIPTION

███████

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| ROBERT STEVENSON #5859    Sep 14, 2021 12:06 (e-signature) | PATRICK MOORE #7808    Sep 16, 2021 10:36 (e-signature) |
| PRINT NAME | PRINT NAME |
| ROBERT STEVENSON #5859 | PATRICK MOORE #7808 |

Seattle Police Department
Mark L. SPMS Form v2.2 generated by E. PICKERING #6245 on Sep 17, 2021 07:01.

225

**0039**

# Appendix  **C**

**Superior Court of Washington, County of King**

In re:

Petitioner/s *(person/s who started this case)*:
JESSICA R. OWEN,

And Respondent/s *(other party/parties)*:
KURT A. BENSHOOF.

No. 21-5-00680-6 SEA

Declaration of Jessica R. Owen
(DCLR)

## Declaration of JESSICA R. OWEN

I am over the age of 18 and am the Petitioner in this case. I hereby declare as follows:

My former romantic partner, Kurt Benshoof, has always refused to be legally recognized or acknowledged as a parent to my son, A█████ W████ (Azh). This despite Kurt having acted as A███'s father for Azh's whole life, and a near certainty that he is, in fact, the biological father. Over the last 13 years, I endured Kurt's abuse, threats, and violence towards me because I desperately wanted A██ to have a father in his life. Since I finally ended my relationship with Kurt in September 2020 and moved in with my new partner, the harm caused to A██ by Kurt's actions has become much clearer.

Kurt's behavior has worsened in the year since I moved out, culminating in him withholding A██ from me for nearly three weeks in late August of 2021, in defiance of a temporary DVPO. It was only by luck, community support, and police intervention that A██ was returned to my care. Since then, Kurt has continued to harass me, and come to my house to make threats. I am terrified that he will hurt me, or my new partner, or, worse, take A██ from me again.

Optional Form (05/2016)
█████ mily 135

Declaration
p. 1 of 15



2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681



When my petition for a full DVPO was denied, the Court said that I should file a Parentage action instead. **Exhibit A** at 2. I have filed this Parentage action as instructed, and I need the Court's protection to keep Azh and me safe while the matter is resolved. To that end, I'm asking that:

- The Court issue an Immediate Restraining Order, without notice to Kurt, preventing Kurt from any contact with me, and allowing him only video calls with A⬛.

- The Court issue a subsequent Temporary Restraining Order under the same terms.

- If Kurt is determined to be A⬛'s other legal parent, and *if* Kurt wishes to pursue a Parenting Plan, that the Court issue a Temporary Parenting Plan limiting Kurt's time with A⬛ to professionally supervised visits, granting me sole decision making authority, and requiring Kurt to participate in domestic violence treatment.

- That, if Kurt wants more residential time than I propose, the Court appoint a Guardian ad Litem to investigate our case.

## BACKGROUND

Kurt and I started dating in July 2007. We moved in together in July of 2008. A⬛ was born nine months later on April 22, 2009. When A⬛ was born, and many times since, Kurt refused my requests that he sign an Acknowledgment of Parentage, but he always insisted on being treated as A⬛'s father and that A⬛ was "his."

While I was always the one who did most of the work of childcare and parenting (day-to-day care, doctor's appointments, school, food, clothing), I must acknowledge that Kurt seemed invested in A⬛ from the beginning. It's only been in the last few months that I've realized how much of his attachment to A⬛ is about Kurt's ego, sense of ownership, and need to control both A⬛ and me. Kurt sees A⬛ as his property. **Exhibit B** at 7. More, Kurt has shown himself increasingly willing to use A⬛ as a pawn in his efforts to hurt and control me.

Throughout our relationship, Kurt was violent, threatening, and verbally/emotionally abusive towards me, as well as anyone else who disagrees with him or pushes back against him. I've included an extensive, but not exhaustive list of specific incidents below. His physical

**230** Form (05/2016)
Family 135

Declaration
p. 2 of 15

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

**0042**

threats and violence have never been aimed at A⬤, but his emotional abuse and manipulation of A⬤ are getting worse as time goes by.

For much of the last 8 years, Kurt's and my dating relationship has been on-again-off-again. Nonetheless, except for one period around 2015, I continued to live with Kurt until about a year ago. I kept thinking he would change, or that if I could do the right things I could make it work. I desperately wanted A⬤ to have a father in his life and, frankly, I was afraid of what Kurt would do if I actually got him out of my life. When COVID hit in March of 2020, Kurt got caught up in the wildly unscientific conspiracy theories about the pandemic, and masks, and, eventually, the vaccines. His opinions are so severe that he equates getting a child vaccinated with child sexual abuse. **Exhibit B**. This led to some increasingly frightening behavior including him threatening the employees of the Sprouts Farmer's Market with a shotgun in September of 2020 (see below).

It was around the time of his arrest for the incidents at Sprouts in September of 2020 that I finally moved out of our shared residence and into a new home with my new partner. Despite moving out, I remained in frequent contact with Kurt because I still wanted A⬤ to have contact with the man he'd known as his father for the past 11+ years.

A⬤'s time with Kurt has varied a lot in the last year. For the first seven months, through April 2021, A⬤ was almost solely with me. Starting around April of this year, until recent events showed how unsafe it really was, A⬤ has lived close to equally between Kurt and I, though still more with me. I've also continued to be the parent who takes care of A⬤'s general needs for medical care, extracurricular activities, education, and clothing; but, after a few months of getting used to it, Kurt did seem to be figuring out how to show up and care for A⬤ when A⬤ was with him. I mistakenly thought that Kurt's violent and abusive behavior wasn't aimed at A⬤, and that A⬤ was safe in Kurt's care. Recent events have shown me how wrong I was, and have precipitated this Petition and Motion.

WPF Form *(05/2016)*
All Family 135

Declaration
p. 3 of 15

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

## HISTORY OF ABUSE, VIOLENCE, AND THREATS

Kurt has always been violent and abusive. As is often the case, the severity and scope of harm he's caused wasn't clear to me until I got some space from him. Below I include an extensive, but non-exhaustive list of specific incidents that exemplify his harmful and abusive behavior. I list the incidents from most recent to oldest, starting with the current situation and going back to 2014. Throughout the following, I ask that the Court keep in mind that, though Kurt has been acting as A●'s father since A●'s birth, he has always refused to be legally recognized as such, and has no standing to assert any parenting rights at all.

### The Current Situation: August 2021 through Today

The events that finally brought home to me the extent of the risk Kurt poses to A● started on Sunday, August 15, 2021. A●, who turned 12 in April, received his first vaccine dose (without Kurt's knowledge) in July 2021. A● had requested the vaccine because he wanted to be able to play with his friends whose parents were hesitant while A● remained unvaccinated. On August 15, we learned that Kurt, who has no right to a say in A●'s medical care, had bullied A● into disclosing his vaccination status, and was angry. A● asked if he could go play pickle ball with Kurt that afternoon, which I hoped might mean that Kurt had calmed down about the vaccination. I was terribly mistaken. A● did not come home again until Kurt was arrested on September 3rd.

It started with A●, on the 15th, texting to ask if he could stay at Kurt's that night. I now doubt that the texts came from A● at all, as, in the following days, it became clear that Kurt was using A●'s phone to threaten and berate me.

Monday morning, the 16th, I texted A● to let him know that I would be picking him about 12pm for his Lego summer camp and for a doctor's appointment. I got a text back saying he would be staying with his dad that day. As the day went on, my efforts to contact A● went

Mandatory Form (05/2016)
WPF Family 135

Declaration
p. 4 of 15



2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

**0044**

largely unanswered.  My efforts to communicate with Kurt directly on the previous day had been

futile.  *See*, **Exhibit C**.

A⬤ missed a doctor's appointment, and Lego camp that day and in the days that followed.

He did not answer his phone, did not call me, and the few responses I received by text sounded

more and more like Kurt.  Suddenly A⬤ was supposedly afraid that we would "make him" get

the second Covid vaccine dose.  **Exhibit D** at 14.  Eventually, on Tuesday the 17th, Kurt openly

used A⬤'s phone to claim that A⬤ didn't want to talk to me and would not be coming home.

*Id* at 14 & 15.  He compared vaccinations with Nazi eugenics.  *Id.*  Kurt was not only keeping me

from communicating with my son, and keeping A⬤ from coming home, he was deliberately

trying to convince A⬤ of the Q-Anon style conspiracy theories Kurt has come to believe, and

was actively trying to turn A⬤ against me.

Kurt kept A⬤ from me for nearly three weeks after that.  Given Kurt's past behavior,

threats, and violence towards me and others, I am horrified to think of what kind of fear and

emotional abuse he was inflicting on A⬤ during that time.

When Kurt didn't bring A⬤ back that week, and I stopped hearing from Azh, I became

truly terrified of what was happening, and what Kurt might do.  On Monday the 23rd, I obtained a

Temporary DVPO protecting me and A⬤ from Kurt, and placing A⬤ in my care.  **Exhibit E**.

Kurt was served with the Temporary DVPO by a police officer on Thursday, August 26th.

Shortly thereafter, Kurt showed up at the police precinct without A⬤ and instead with a

handwritten note—supposedly written by A⬤—saying that he (A⬤) was running away because

he was afraid that I would make him get his second shot.  Kurt also said that his vehicle had

been stolen in the night and that was why he was driving a rental car.  He indicated that I may

have stolen the vehicle (the vehicle is mine, not his, and he still had it, see below).  He chose not

to file either a missing person's report or a stolen vehicle report.  I was told by police that since

Kurt said A⬤ wasn't in his care, they couldn't do anything to retrieve A⬤ under the DVPO.  On

**233** Form *(05/2016)*
Family 135

Declaration
p. 5 of 15

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

**0045**

advice from the police, I filed a missing person's report in the hopes that, one way or another, it would result in A⬤ being returned home safe. **Exhibit F.**

Over the following two weeks, I heard nothing from Azh, and nothing but abuse from Kurt. I tried to convince the police that A⬤ was still at Kurt's house (I could see that A⬤'s IPad was active at Kurt's address), but they said they were waiting to see what the Prosecutor's Office would do and whether a Judge would grant a Warrant.

On September 3, 2021, over two weeks since I'd heard from A⬤ at all, my full DVPO was denied because the Court thought the issue belonged in a Parentage case. **Exhibit A** at 2. Nonetheless, later that afternoon, Kurt was arrested with A⬤ (whom he'd said had run away), driving the car that Kurt had claimed was stolen. Both A⬤ and the car (which, again, is mine by title and registration) were returned to me that evening.

A⬤ has not been himself since his return, though he's getting better. He hasn't wanted to talk much about what happened during the weeks Kurt had him, but I can tell he is afraid of how angry Kurt is and has been. I am devastated at the thought of what it must have been like for him.

Since A⬤ has been back in my care, Kurt has twice come to my home to harass us. He came by on Monday, August 13 as I was trying to take A⬤ to school. He refused to leave when I asked, and I didn't feel able to safely prevent A⬤ from talking with him. Kurt spent that time telling A⬤ what a terrible person I am.

Later that same morning, I wrote Kurt to tell him he was not to come to my home again. **Exhibit G** at 28. He showed up again the next day, on August 14, when we were leaving for school. He pulled up in a red rental car and blocked me in my driveway. A⬤ ran inside and locked himself in the bathroom to avoid Kurt. I had my partner call the police. *Id* at 29-31. Kurt left before the police showed up. The police told me to call again if Kurt shows up again. He showed up again today, Sept. 24, 2021. He left after I called the police.

Declaration
p. 6 of 15

SDS
SEATTLE
DIVORCE
SERVICES
2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

I realize now that I will never have peace, and A will not be safe until I can get a restraining order to keep Kurt away. I also realize that I need to force Kurt to acknowledge his legal parentage and the responsibilities that come with it if he wants to spend time with A●. Having that legal parent status will allow us to get a proper Parenting Plan and set limits on Kurt's access to A●. I hate what that will do to A●, who loves Kurt tremendously. But I am terrified if I let A● spend time with Kurt unsupervised, Kurt will disappear with him and I'll never see my son again.

**Emotional Abuse of Azh Over Homework: June 2021**

On June 24th, 2021, Kurt contacted A● and me irate because A● plagiarized one of his final papers for school this past year. First, I received a text from Kurt talking about how A● had lied and was going to be failed on his homework and would need to redo the entire year as punishment. I immediately responded, asking him to explain what he was talking about, but he didn't text me back. In the meantime, Kurt began to send A● repeated texts, calling A● "a lying little cheater" and that he didn't "want see your boo hoo fake ass tears or hear your fake ass "I'm sorry I won't do it again". And "Your ass is grass." **Exhibit H.**

I walked into his room at the Airbnb (we were on vacation at the time) and found A● crying on the bed. After A● explained what had happened and showed me the texts his dad was sending him, I had a talk with him about why plagiarism is not okay and how he would need to correct his homework. And, also, that the way Kurt was talking to him was unacceptable. I asked him if he wanted to block Kurt's number and told him that he could unblock it at any time. I said that I thought that there were more constructive ways to deal with what happened than the way Kurt was acting. A● decided to block Kurt's number and when I asked him every day afterwards, he said he didn't want to talk to his dad. I reminded A● during one of these days that it was Father's Day, but he still declined to talk to Kurt. Eventually Kurt used a different phone number to contact A●, and demanded that A● never block him again. After that Kurt

235 Form (05/2016)
Family 135

Declaration
p. 7 of 15

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

0047

began to send me vague and threatening texts. Eventually I blocked him myself on that number.

**Kurt Arrested: December 17, 2020**

On the night of December 17th, 2020, when A⬤ was with Kurt, I received a phone call around 11:30pm. My ringer was off and by the time I noticed that A⬤ had called, I had missed 6 calls from him. A⬤ said that they had been pulled over and the police were attacking his dad. He handed the phone over to a police officer who said that Mr. Benshoof was probably going to spend the night in jail and was I able to come pick up my son? My partner and I immediately went to where Kurt had been pulled over. He was being loaded into the back of a police car with his hands handcuffed. A⬤ got out of the car and ran to us. He was visibly shaken up and upset. He immediately began to cry once he was inside our car.

It is my understanding that Kurt was pulled over for erratic driving. Kurt refused to stay in his car even after verbal commands to get back in his vehicle so he was tackled and arrested. *See,* **Exhibit I**.

The next day, a CPS investigator contacted me because one of the officers had called them. She came and interviewed my son and myself and said we have a lovely home. I informed the investigator that A⬤ refused to spend the night at Kurt's house more than once every other week, which was the case at the time. I never heard any more about the CPS investigation.

It was Kurt's actions which prompted the CPS investigation. But that did not prevent Kurt from using this as another excuse to harass me repeatedly via text. **Exhibit J**. This went on for days.

**A Shotgun at Sprouts Market: September 11 & 18, 2020**

On September 11, 2020, Kurt refused to put on a mask at Sprouts Farmer's Market on Aurora Ave, and got into an altercation with the security guard. He was arrested for Assault,

 Form (05/2016)
Family 135

Declaration
p. 8 of 15

 SEATTLE DIVORCE SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

**0048**

and Criminal Trespass – 1st degree, and Resisting Arrest. **Exhibit K**. A week later, around September 18th, 2020, Kurt was arrested for threatening people with a Shotgun in the Sprouts parking lot. He'd told me he was going to take the shotgun to Sprouts to "get some answers." I wish I'd taken him more seriously at the time. He was arrested and charged with Criminal Trespassing, Assault, and Unlawful Use of a Weapon to Intimidate Another. **Exhibit L**. This was after he had already spent one night in jail the previous week for the initial charge.

The initial charges were dropped for the first incident at Sprouts, but he is facing trial on September 21st, 2021, for the subsequent charges when he brought the shotgun to Sprouts.

In addition to these charges, he has a warrant for his arrest for failure to appear at a prior trial. **Exhibit M** at 53. On November 13th, 2020, he was arrested for Criminal Trespass – 1st degree and Theft after refusing to wear a mask at PCC on Aurora and stealing some groceries about it. *See* **Exhibit N** He failed to appear in court for that trial because he refused to wear a mask in the courthouse or provide medical proof that he did not need to wear one.

**Destruction of Property: January 2020**

In January of 2020, when I still lived at my house with Kurt, we got into an argument about him storing a bunch of lumber where I usually parked my truck. Later that day, he borrowed my truck and, in retaliation, shattered the rear window. *See*, **Exhibit O**. Then he parked it on the street and didn't tell me about it. I discovered it the next day when I was leaving to visit a friend. It had rained overnight, and rain and glass covered the boxes of children's books I had in there, intended for my friend's child.

I ended up not filing a police report for this incident because the officer that I spoke to told me that Kurt would be notified that I had made the report. I was afraid of what would happen if he found out I had contacted police.

WPF DRPSCU Form *(05/2016)*
Family 135

Declaration
p. 9 of 15

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

0049

**Cruelty to My Cat: September 10, 2019**

On September 10th, 2019, Kurt taped Cosmos, my cat, in a box. He said it was in retaliation for Cosmos killing a bird and left him on the porch alone. He was in the box with no one at the house for over two hours until I got home. There were no holes punched in the box for air.

**Domestic Violence Incident: December 12, 2018.**

On December 12th of 2018, we argued about my acceptance of an invitation for our family to attend a Christmas party without consulting him first. Kurt began berating me then slammed the front door hard enough to brake three glass panes. When I said that if he didn't stop I would call the police he broke a thick wooden cutting board, shattered dishes in the sink, and continued shouting at me. I went into bedroom and closed the door and called the police. *See*, **Exhibit P**. I opened my door to look for my son, who was nine at the time, but couldn't find him. Instead, I saw Kurt ripping a door off the door jamb. I closed the door and a moment later I found my son hiding under my bed, not for the first time (see below). A● refused to come out because Kurt was shouting so loudly.

I stayed on the phone with the operator until a police officer arrived and came into the house. While I waited, Kurt had cleaned up all the broken glass and swept up all the shattered dishes and then taped plastic over the broken windowpanes. He had also leaned the door back into the doorjamb and draped a towel over it to cover up the damage to the jamb. This was the most unnerving part of this experience. He had the wherewithal to clean up his mess and make it look better before the police arrived. As though he could have gotten himself under control at any time but chose not to.

Kurt was outside of the house when the two officers arrived, and was very confrontational with them, insisting that *I* was the one in the wrong. The officer asked me if I felt I was in physical danger. I told him 'no,' which was not true, but I was afraid of what would

**238** Form (05/2016)
Family 135

Declaration
p. 10 of 15

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

**0050**

happen if I said I was. They told Kurt to leave me alone and he came back inside. He said a few sarcastic things to me and went to his bedroom upstairs (we were living together at the time but not romantically involved). My son did not want to see him, and I regret to this day that I did not have Kurt taken away that evening for my son's sake. I wish that I had shown my son that I would protect him and keep him safe from anyone who scared him and made him feel unsafe.

**Domestic Violence Incident: Autumn 2016.**

One morning in fall of 2016 Kurt and I got into an argument about household responsibilities that escalated to shouting and Kurt banging things in the Kitchen. Azh was scared of Kurt and crawled under my bed to hide. I shut the bedroom door to block out Kurt's shouting and told Azh to come out and sit with me. He came and sat on my lap. I told him that his dad was being really awful and that it was wrong to act like that. I said that no one who loves you should make you feel scared, but that it wasn't our problem and that we would just walk out of the front door and go straight to my truck. We would stop and get breakfast on the way to school, and I would buy him lunch instead of going into the kitchen to grab his lunchbox and that we didn't need to pay any more attention to Kurt.

That's just what we did. I didn't file a police report about this incident.

**Domestic Violence Incident: December 6, 2015**

In the afternoon of December 6th, 2015, During a time when Kurt and I were not living together and between instances of us dating, Kurt came by my home, with A⬤ (8yo at the time), to get some things from the house. I hung out with A⬤ while Kurt gathered things to put in the car. When they were ready to leave, I put on my shoes and picked up A⬤ to carry him out to Kurt's car.

Kurt told me to stay inside and to leave them alone. I said, "Why? I am just going to carry him down to the car." He insisted that I couldn't come to the car and grabbed A⬤ out of my arms. We began to argue, and he called me a "lying cunt", a "slut", and "bitch". I tried

239 Form (05/2016)
Family 135

Declaration
p. 11 of 15


2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

0051

reaching for A⬤ to get him back. I said, "I just wanted to walk him down to the car. Why can't I just carry him out to the car?" Kurt just kept walking away from me with A⬤ in his arms, holding him away from me. Then Kurt grabbed my arm to hold me back. Things escalated and we were arguing and A⬤ started crying. Suddenly Kurt lifted A⬤ up away from me so that I couldn't reach him, and he bumped A⬤'s head on the wall which made A⬤ cry even harder and shout at us to, "Just stop it!" At this point I backed up and let them leave without protest.

I later realized that Kurt had left bruises on my arm. **Exhibit Q**. I filed a report against him the next day **Exhibit R**. Kurt's explanation for this was that I'd given A⬤ a piece of candy when Kurt didn't want him to have one.

### Domestic Violence Incident: November 9, 2015

On November 9th, 2015, Kurt and I got into an argument about parenting and our respective living situations (we weren't living together at the time). It escalated to a screaming match, and Kurt pushed me. I retaliated by slapping him repeatedly on the arm. Kurt is 6 feet, 175 pounds. I was 5'8, 135 pounds. He angrily told me that I'd crossed a line and went downstairs to sleep in my bed instead of going to his home. I told him to leave, and he said, "Make me." He refused to leave until the morning. The fight really scared me, and I didn't want him in my house anymore, so I filed a police report the next day. **Exhibit S**.

### Intimidation and Threats at Preschool: Spring 2014

In the spring of 2014 A⬤ was attending pre-K at Phinney Ridge Co-op. To join this Co-op everyone had to have a background check. Kurt, a convicted felon (albeit only for cannabis violations so far), had managed to avoid this for the first year and a half. Eventually, however, the mother in charge of overseeing the paperwork for all the parents involved in the co-op asked him to fill out the background check form. Kurt had recently been asked to stop riling the kids up too much after school by playing with them, and he felt that he was being singled out for that. In response to her request, rather than simply filling out the background check, he began to

Declaration
p. 12 of 15

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

incessantly email this mother at the co-op with veiled threatening letters. Soon we were kicked out of the preschool because of his threats.

I had to petition separately to bring Azh back into the co-op to finish out the last two months of pre-K without Kurt which was only possible because we had broken up shortly before this and were living separately for a while. The co-op accepted my petition with the explicit boundary that Kurt was not to go into the co-op any more or have any more contact with any of the parents.

**Generally**

The eleven incidents and situations described above are only the ones for which I have clear records and memories. Kurt has been threatening, abusive, and violent towards me almost since we met. I have spent more than a decade frightened for my own safety around Kurt Benshoof, and trying to adjust my behavior to avoid conflict with him. For years I told myself that having a father, even one who refused to be legally recognized as such, was important enough to A⬤ to be worth the fear and abuse I suffered. It took Kurt kidnapping my son and keeping him away from me for three weeks for me to realize that Kurt will never change and that so long as he feels like he can use A⬤ to hurt and control me, A⬤ cannot be safe with Kurt. I now also realize that watching Kurt's treatment of me over the years has, itself, been harmful to A⬤.

Honestly, I am still torn. What I really want is to never have to deal with Kurt again, and I desperately want to protect A⬤ from Kurt's threats, abuse, and manipulation. On the other hand, I know that A⬤ loves his dad and that he'll be devastated if he never sees Kurt again. Yet still, given Kurt's latest episode of abuse, and his chronic, utter disregard for the law, I worry that if A⬤ spends any unsupervised time with Kurt at all, Kurt will simply refuse to let A⬤ come back home. I need ways to address this and keep A⬤ and myself safe.

Local Form (05/2016)
Family 135

Declaration
p. 13 of 15


SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

0053

I'm asking the Court to enter an initial Immediate Restraining Order, without notice to Kurt, to help protect A⬤ and me from Kurt, especially his reaction to this filing once he is served. With that in place, if Kurt continues to refuse to be legally acknowledged as A⬤'s father, then I ask that only a Temporary Restraining Order be put in place while I figure out what to do.

If Kurt wants to acknowledge his status as a legal parent, I cannot deny that he is the biological father and will agree to it. If that's the case, and if Kurt wants to seek actual in-person time with A⬤, I ask that the Court enter my proposed Temporary Parenting Plan in addition to the TRO. Under my proposed Temporary Parenting Plan, Kurt can see A⬤ only every other weekend and only under professional supervision at the At Indaba facility. I wish I didn't feel it necessary to restrict their contact so severely, but I can't think of another way to protect A⬤ from Kurt simply taking him away.

I also ask that, as a minimum prerequisite to seeking more or unsupervised time with A⬤, Kurt be ordered to undergo a domestic violence assessment and cooperate with any recommended treatment.

If Kurt wants more time with A⬤ than supervised visits every other week, I ask that the Court appoint a Guardian ad Litem to investigate Kurt and I, and advocate for what is in A⬤'s best interest.

## CONCLUSION

For all the reasons set out above, I ask that the Court enter an Immediate Restraining Order protecting me and my son from Kurt Benshoof, and then a Temporary Restraining Order doing the same. I also ask that if Kurt acknowledges his parentage to the Court, that the Court enter my proposed Temporary Parenting Plan which gives me sole decision making authority for and primary residential care of A⬤, and which limits Kurt's time with my son to occasional, supervised visits at least until Kurt completes domestic violence treatment.

Clients Form (05/2016)
Family 135

Declaration
p. 14 of 15

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

I declare under penalty of perjury under the laws of the state of Washington that the facts I have provided on this form (and any attachments) are true.

Signed at (city and state): _____Seattle, WA_____     Date: 9/22/21

JESSICA OWEN

*Warning!* Documents filed with the court are available for anyone to see unless they are sealed. Financial, medical, and confidential reports, as described in General Rule 22, **must** be sealed so they can only be seen by the court, the other party, and the lawyers in your case. Seal those documents by filing them separately, using a *Sealed* cover sheet (form FL All Family 011, 012, or 013). You may ask for an order to seal other documents

Optional Form (05/2016)
FL All Family 135

Declaration
p. 15 of 15

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

243

0055

# Appendix  **D**

**Superior Court of Washington, County of King**

In re parentage:

Petitioner *(person who started this case)*:

JESSICA R. OWEN,

And Respondent/s *(parent / presumed parent / possible genetic parent)*:

KURT A. BENSHOOF,

No. 21-5-00680-6 SEA

Petition to Decide Parentage (PTDTP)

# Petition to Decide Parentage

*Use this form to ask the court to decide if a possible genetic parent is a legal parent*

## *Parentage*

1. Petitioner asks the court to decide who are the legal parent/s of the child listed below.

2. **Child**

| Child's name *(first, middle, last)* | Born *(month/day/year)* | Lives in *(county and state)* |
|---|---|---|
| A̶n̶d̶r̶e̶w̶ R. W̶a̶l̶k̶e̶r̶ | April 22, 2009 | King County, WA |
| | | |

   *Important! Don't list more than one child unless they have all the same parents or possible parents. If they have (or may) have different parents, fill out a separate Petition for each child. If multiple children are listed, change "child" to "children" in this form as needed.*

3. **Petitioner**

| Petitioner's Name *(first, middle, last)* | Lives in *(county and state)* |
|---|---|
| Jessica R. Owen | King County, WA |

   **Petitioner's relationship to child**

   **Birth Parent –** I am this child's parent because I gave birth to the child.

**252**

RCW 26.26A.430 - .460
(07/2019)
FL Parentage 301

Petition to Decide Parentage

p. 1 of 6


2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

**0057**

**4.   Respondent/s**

> *Important!* **You must** name anyone who is already a parent and anyone whose parentage you're asking the court to decide.  This includes a person who:
> - gave birth to the child (except as a surrogate).
> - is a possible genetic parent (if you are asking the court to make a decision about this person).
> - is a parent by court order (from a parentage, divorce, or adoption case).
> - is presumed to be a parent because the child was born during a marriage or state registered domestic partnership or within 300 days after the marriage or domestic partnership ended.
> - is presumed to be a parent because s/he lived in the same household with the child for the first four years of the child's life, including any period of temporary absence, and openly held out the child as his/her child. (See RCW 26.26A.204(b).)
> - signed an Acknowledgment of Parentage.
> - signed a Denial of Parentage (if you are challenging the Denial or related Acknowledgment).
> - consented to assisted reproduction with the intent to be a parent.
>
> Parents do **not** include any person who a court has ordered is not a parent.

| Respondent's Name *(first, middle, last)* | Lives in *(county and state)* |
|---|---|
| Kurt A. Benshoof | King County, WA |

**Respondent's relationship to child** (for each Respondent, write their name in the category below that applies):

**Possible Genetic Parent/s** –

*KURT A. BENSHOOF*
may be a parent because the birth parent had sex with this person throughout 2008 when this child was conceived.

**5.   Personal Jurisdiction**

*Fill out below to say if a Washington state court has personal jurisdiction (authority to make decisions) over each Respondent.  (Add columns if needed for more Respondents.)*

| Basis for Personal Jurisdiction *(check all that apply)* | Respondent's Name: **KURT A. BENSHOOF** |
|---|:---:|
| Will be served in Washington | ☒ |
| Lives in Washington now | ☒ |
| Lived in Washington with child | ☒ |
| Lived in Washington and paid pregnancy costs or support for child | ☐ |
| Caused child to live in Washington | ☐ |
| Had sex in Washington that may have produced the child | ☒ |
| Agrees to Washington deciding | ☐ |
| None of the above | ☐ |

**253**

RCW 26.26A.430 - .460
(07/2019)
FL Parentage 301

Petition to Decide Parentage

p. 2 of 6



SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA  98107
phone: (206) 784-3049
fax: (206) 784-2681

**6. Correct County (Venue)**

This is the correct county for this case to be heard because this is where:

The child lives or is located.

The Respondent lives or is located.

**7. Genetic Testing**

I do **not** want the court to use genetic testing to decide parentage unless requested by the Respondent.

**8. Presumed Parent, if any** *(by marriage, domestic partnership, or holding out)*

**Does not apply** – To my knowledge, no one is already presumed to be a parent by marriage, domestic partnership, or holding out.

**9. Challenge to Acknowledgment or Denial of Parentage by person who signed**

Does not apply.  The Respondent has, at all times, refused to sign an Acknowledgment of Parentage or otherwise agree to legal recognition as a parent of the child.

**10. Challenge by Person <u>not included</u> in Acknowledgment or Court Decision**

Does not apply.

**11. Assisted Reproduction (not surrogacy)**

**Does not apply** –The child was not conceived by assisted reproduction.

**12. Birth Record**

If appropriate, I ask the court to change the parents listed on the child's birth record based on the decision in this case.

**13. Other children together**

Does not apply.

*Child Support*

**14. Child Support**

The Petitioner is not seeking child support at this time.

The child has a right to child support (including medical support) from the legal parents according to state law.  The court will order child support unless all parents are living together with the child or there is already an administrative order set by the Division of Child Support.

**15. Past support and repayment of specific expenses**

No request.

**254**

RCW 26.26A.430 - .460
(07/2019)
FL Parentage 301

Petition to Decide Parentage

p. 3 of 6

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

0059

*Parenting Plan / Residential Schedule*

I am asking the court to make orders about parenting or residential time.

## 16. Child's Home/s

During the past 5 years has the child lived:
- on an Indian reservation,
- outside Washington state,
- in a foreign country, or
- with anyone who is not a party to this case?

No. *(Skip to 17.)*

## 17. Other people with a legal right to spend time with the child

Do you know of anyone besides yourself and Respondent/s who has or claims to have a legal right to spend time with the child?

No.

## 18. Other court cases involving the child

Do you know of any court cases involving the child?

Yes.

| Kind of case (Family Law, Criminal, Protection Order, Juvenile, Dependency, Other) | County and State | Case number and year |
|---|---|---|
| DVPO | King County, WA | 21-2-11149-8 SEA |

## 19. Jurisdiction over the child (RCW 26.27.201 – .221, .231, .261, .271)

The court **can** decide a *Parenting Plan* or *Residential Schedule* for the child and decide who the child should live with most of the time because:

**Home state jurisdiction** – Washington is the child's home state because

The child lived in Washington with a parent or someone acting as a parent for at least the 6 months just before this case was filed, or if the child is less than 6 months old, the child has lived in Washington with a parent or someone acting as a parent since birth and the child does not have another home state.

## 20. Parenting Plan or Residential Schedule

The child currently lives with *Petitioner, JESSICA R. OWEN.*

I am not asking the court for a Permanent *Parenting Plan* or *Residential Schedule* at this time.  I am asking that the Court enter a final order naming me the sole residential parent **and decision maker for A_____ W_____.**  If the Respondent chooses to be acknowledged as a legal parent to my son, and if he wants to seek residential time with my son, then I will submit a proposed Permanent Parenting Plan.

**255**

RCW 26.26A.430 - .460
(07/2019)
FL Parentage 301

Petition to Decide Parentage

p. 4 of 6

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

> *Warning!* If the parents are not living together, the court may decide who the child will live with most of the time even if no parent requests a Parenting Plan or Residential Schedule.  That decision will affect all parents' rights.

## Other Requests

**21. Protection Order**

*Do you want the court to issue an Order for Protection as part of the final orders in this case?*

**Not at this time.** I am not seeking an *Order for Protection* at this time.

**22. Restraining Order**

*Do you want the court to issue a Restraining Order as part of the final orders in this case?*

**Yes.** *Check the type of orders you want:*

**Do not disturb** – Order KURT A. BENSHOOF not to disturb my peace or the peace of the child.

**Stay away** – Order KURT A. BENSHOOF not to go onto the grounds of or enter my home, workplace, or school, and the child's daycare or school.

Also, not knowingly to go or stay within 1,000 feet of my home, workplace, or school, or the child's daycare or school.

**Do not hurt or threaten** – Order KURT A. BENSHOOF:

- Not to assault, harass, stalk or molest me or the child; and
- Not to use, try to use, or threaten to use physical force against me or the child that would reasonably be expected to cause bodily injury.

> *Warning!* If the court makes this order, the court must consider if weapons restrictions are required by state law; federal law may also prohibit the Restrained Person from possessing firearms or ammunition.

**Prohibit weapons and order surrender** – Order KURT A. BENSHOOF:

- Not to access, possess, or obtain any firearms, other dangerous weapons, or concealed pistol licenses until the Order ends, and
- To immediately surrender any firearms, other dangerous weapons, and any concealed pistol licenses that he/she possesses to *(check one):* ☒ the police chief or sheriff. ☐ his/her lawyer. ☐ other person *(name):* _____.

**No Contact** – Order KURT A. BENSHOOF to have no contact whatsoever with the protected person or the child, including, but not limited to, in-person, telephone, text, email, or through third parties.

> *Important!* If you want a restraining order *now*, you must file a Motion for Temporary Family Law Order and Restraining Order (form FL Parentage 323) or a Motion for Immediate Restraining Order (Ex Parte) (FL Parentage 321).

**23. Fees and Costs**

Does not apply.

**256**

RCW 26.26A.430 - .460
(07/2019)
FL Parentage 301

Petition to Decide Parentage

p. 5 of 6

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

0061

**24. Other (if any)**

None at this time.

**Petitioner fills out below:**

I declare under penalty of perjury under the laws of the state of Washington that the facts I have provided on this form are true.

Signed at (city and state): _____ Seattle, WA _____    Date: 9/20/21 _____

▶ _J.R. Owen_____

_JESSICA R. OWEN._

**Petitioner's lawyer (if any) fills out below:**

▶ _Nathan Cliber (Sep 21, 2021 09:15 PDT)_____    Sep 21, 2021 _____

_NATHAN CLIBER, WSBA #41787_    _Date_
Attorney for Petitioner

**257**

RCW 26.26A.430 - .460
(07/2019)
FL Parentage 301

Petition to Decide Parentage

p. 6 of 6
0062



2317 NW Market St.
Seattle, WA  98107
phone: (206) 784-3049
fax: (206) 784-2681

# Appendix **E**

**Superior Court of Washington, County of** King

In re parentage:

Petitioner *(person/s who started this case):*

JESSICA R. OWEN,

And Respondent/s *(other party/parties):*

KURT A. BENSHOOF,

No. 21-5-00680-6 SEA

Motion for Immediate Restraining Order
(Ex Parte)

(MTSC)

# Motion for Immediate Restraining Order (Ex Parte)

*Use this form for unmarried parents (parentage) cases only. For other cases, use FL Divorce 221, FL Non-Parent 421, or FL Modify 621, depending on the type of case.*

**To both parties:**

***Deadline!*** Your papers must be filed and served by the deadline in your county's Local Court Rules, or by the State Court Rules if there is no local rule. Court Rules and forms are online at www.courts.wa.gov.

If you want the court to consider your side, you **must**:

- File your original documents with the Superior Court Clerk; AND
- Give the Judge/Commissioner a copy of your papers (if required by your county's Local Court Rules); AND
- Have a copy of your papers served on all other parties or their lawyers; AND
- Go to the hearing.

Read your county's Local Court Rules, if any.

Bring proposed orders to the hearing.

**To the person filing this motion:**

You must ask the court to sign the *Immediate Restraining Order (Ex Parte) and Hearing Notice* (FL Parentage 322). This Order may be signed "ex parte" (without the other party there). Contact the Superior Court Clerk's office for the procedure in your county. You must have this *Motion* and the *Immediate Restraining Order* personally served (by someone else) on the restrained person.

**To the person receiving this motion:**

If you do not agree with the requests in this motion, file a statement (using form FL All Family 135, *Declaration*) explaining why the court should not approve those requests. You may file other written proof supporting your side, and propose your own *Parenting Plan, Residential Schedule*, or *Child Support Worksheets.*

If the court grants an *Immediate Restraining Order* without notice to you, you can file a motion to change or terminate it before the hearing date. (Civil Rule 65(b).) There is no pattern form for that motion.

**245**

RCW 26.26A.470, .465, CR 65(b)
(07/2019)
FL Parentage 321

Motion for Immediate
Restraining Order (Ex Parte)
**0064**

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

**1.** My name is JESSICA OWEN. I am asking the court for an *Immediate Restraining Order* against KURT BENSHOOF.

I want these children under 18 to be protected by the order:

| Child's name | Age |
|---|---|
| 1. A███ W███ | 12 |

**2.** I ask the court to approve an *Immediate Restraining Order* to protect me and/or any child listed in 1. Without this Order, the children or I could be hurt or suffer damage or loss immediately. This harm could be irreparable. *(Explain how you or the children could be harmed beyond repair):*

If I do not have an Immediate Restraining Order to protect A███ and myself from KURT BENSHOOF between the day he is served with my Petition and Motion for Temporary Orders and the day of our hearing, I fear that KURT will continue to harass and threaten me, to harass A███, and possibly escalate into physical violence as he has in the past. Most importantly, I fear that KURT will take A███, either from my home by force or from school, and withhold him again or, worse, flee with him to another state.

**3.** Notice *(check one):*

I should **not** have to notify the other parties in advance that I am filing this *Motion* because any child listed in **1** or I could be harmed beyond repair if I gave any advance notice. *(Explain why you or the children could be harmed by providing advance notice.)*

I believe that if KURT has notice that I am seeking an Immediate Restraining Order, there is a very real risk that he will come to my home and violently kidnap A███ from me.

KURT has a violent history generally, and a history of violence and threats against me. He owns firearms and has used them to threaten people in the past. In August of this year KURT withheld A███ from me for nearly three weeks without my permission or any legal authority.

More, KURT currently has no legal right to any time with A███ whatsoever as he is not A███'s legal parent and has not, at this time, sought to be recognized as one. His parenting rights do not exist and cannot be affected by a Restraining Order.

**4.** **Court hearing request**

I ask the court to approve an *Immediate Restraining Order* now, and hold a hearing within at the next available court date to consider my requests for temporary orders listed below. I will have the other parties served with notice of the hearing so the court can hear their sides.

**5.** **Active duty military**

*(The **federal** Servicemembers Civil Relief Act covers:*
- Army, Navy, Air Force, Marine Corps, and Coast Guard members on active duty;
- National Guard or Reserve members under a call to active service for more than 30 days in a row; and
- commissioned corps of the Public Health Service and NOAA.

**246**

RCW 26.26A.470, .465, CR 65(b)
(07/2019)
FL Parentage 321

Motion for Immediate
Restraining Order (Ex Parte)
p. 2 of 8

**0065**

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

*The state Service Members' Civil Relief Act covers those service members listed above who are either stationed in or residents of Washington state, and their dependents, except for the commissioned corps of the Public Health Service and NOAA.)*

None of the other parties are covered by the state or federal Service Members' Civil Relief Acts.

## I ask the Court to approve these orders immediately *(check all that apply)*:

### 6.  Do not disturb

Order *KURT BENSHOOF* not to disturb my peace or the peace of any child listed in **1**.

### 7.  Stay away

Order *KURT BENSHOOF* not to go onto the grounds of or enter my home, workplace, or school, and the daycare or school of any child listed in **1**.

Also, not knowingly to go or stay within 1,000 feet of my home, workplace or school, or the daycare or school of any child listed in **1**.

### 8.  Do not hurt or threaten

Order *KURT BENSHOOF* not to:

- Assault, harass, stalk or molest me or any child listed in **1**; or
- Use, try to use, or threaten to use physical force against me or the children that would reasonably be expected to cause bodily injury.

> *Warning!* If the court extends this order after a full hearing and the parties are intimate partners, the court must consider if weapons restrictions are required by state law; federal law may also prohibit the Restrained Person from possessing firearms or ammunition.

Intimate Partner: The Restrained Person and the Protected Person were intimate partners because they are former cohabitants in a dating relationship, and KURT BENSHOOF is the alleged biological father of JESSICA OWEN'S child, listed in **1**.

### 9.  Surrender weapons

Order *KURT BENSHOOF* to immediately surrender any firearms and other dangerous weapons that he/she possesses to *(check one)*:
☒ the police chief or sheriff.  ☐ his/her lawyer.  ☐ other person:

### 10.  Care and safety of children until the hearing

Order that the children listed in **1** will live with me until the hearing and that KURT BENSHOOF shall have no contact with the child other than weekly video calls on Wednesday evenings, coordinated over email with me, and which I may record.

### 11.  Other immediate orders

**Do not contact.** KURT BENSHOOF shall make no attempts whatsoever to contact the protected person or the child listed in **1**, including but not limited to contact in-person, by phone, by text, by email, by written letter, or through third parties except that KURT

**247**

RCW 26.26A.470, .465, CR 65(b)  
(07/2019)  
FL Parentage 321

Motion for Immediate  
Restraining Order (Ex Parte)  
p. 3 of 6  
**0066**

SDS  
SEATTLE  
DIVORCE  
SERVICES

2317 NW Market St.  
Seattle, WA 98107  
phone: (206) 784-3049  
fax: (206) 784-2681

BENSHOOF may email the protected person solely for the purpose of arranging weekly video calls with the child.

*I ask the court to approve these temporary orders <u>at the hearing</u> to stay in effect until the case is done* (check all that apply):

**12. Extend immediate orders**

Extend the immediate orders I asked for above to stay in effect until the case is done.

**13. Prohibit weapons and order surrender**

Order *KURT BENSHOOF*

Not to access, possess, or obtain any firearms, other dangerous weapons, or concealed pistol licenses until the Order ends, and to

- Immediately surrender any firearms, other dangerous weapons, or concealed pistol licenses that he/she possesses or controls to *(check one):* ☒ the police chief or county sheriff. ☐ his/her lawyer. ☐ other person *(name):* _____.

**14. Care and safety of children** *(Check all that apply.)*

IF *KURT BENSHOOF* <u>agrees, prior to or at the HEARING, that he is and should be recognized as a legal parent of A█████</u>, then I ask that the Court approve my proposed Temporary Parenting Plan (submitted herewith), which allows him limited, supervised visits with A█████; grants me sole decision making; and requires KURT to engage in Domestic Violence treatment.

IF *KURT BENSHOOF* <u>agrees, prior to or at the HEARING, that he is and should be recognized as a legal parent of A█████</u>, *and* if he is seeking more residential time than I propose or that he not have to engage in domestic violence treatment, then I ask that the Court Appoint a person to investigate and report to the court about what is in the children's best interest, and order who will pay this person's fees. This person should be a Guardian ad Litem (GAL).

**15. Provide support**

No request.

**16. Pay fees and costs**

No request.

**17. Other temporary orders**

No request.

**248**

RCW 26.26A.470, .465, CR 65(b)
(07/2019)
FL Parentage 321

Motion for Immediate
Restraining Order (Ex Parte)
p. 4 of 6
**0067**

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

### *Reasons for my requests*

**18. Why are you asking the court for the orders you checked above?** *(Explain):*

My former romantic partner, KURT BENSHOOF, who is not at this time A̶▓▓▓̶'s legal parent, has recently shown himself increasingly willing to use A̶▓▓▓̶ as leverage in his efforts to control me and my behavior. He has also grown increasingly irrational and frightening around his beliefs about COVID-19 and the vaccines for it. His responses to my behaving in ways he does not like (e.g., having my son vaccinated) have escalated since I moved out of our shared residence in September 2020.

In August 2021, he took A̶▓▓▓̶ and kept him from me for nearly *three weeks* (August 15 through September 3) without my permission. He not let me see or speak to A̶▓▓▓̶, and refused to return him to my care. When I obtained a Temporary DVPO requiring that A̶▓▓▓̶ be returned to my care, KURT, upon being served, refused to return A̶▓▓▓̶, and instead told police that A̶▓▓▓̶ had run away. Over a week later, after I filed a missing person's report, KURT was found by police with A̶▓▓▓̶ in the car. KURT was arrested and A̶▓▓▓̶ was returned to me.

KURT was released a day or two later and, since that day, has ignored my request that he not come to my home. At the time of this writing, he has come to my door and refused to leave until he could speak to A̶▓▓▓̶ and has come to my house and blocked my car in with his car, again demanding to speak to A̶▓▓▓̶ and then come by again on the day this Motion is being filed.

My efforts to secure an ongoing full DVPO were denied at our return hearing, with the Court saying that I needed to seek remedy and protection through a Parentage action, which was filed along with this request for an Immediate Restraining Order.

KURT has a long history of violent and threatening behavior both in general and towards me specifically. He has now proven himself willing and able to kidnap my son and keep him from my care, going so far as lying to the police about A̶▓▓▓̶ running away. I need a Restraining Order to keep me and my son safe while the larger issues of Parentage and a Parenting Plan are being decided.

See Also the *Declaration of Jessica R. Owen*, filed herewith.

### Reasons for "Prohibit weapons and order surrender" request *(check all that apply):*

KURT BENSHOOF has used, displayed, or threatened to use a firearm or other dangerous weapon in a felony when he intentionally intimidated the employees of Sprouts Farmer's Market with a Shotgun. See, *Declaration of Jessica Owen*, filed herewith, at page 9.

KURT BENSHOOF previously committed an offense making him ineligible to possess a firearm under RCW 9.41.040. *(Describe):*

Kurt was convicted of a cannabis-related felony in 2009 or 2010.

KURT BENSHOOF'S possession of firearm presents a serious and imminent threat (harm that may happen immediately) to public health or safety, or to the health or safety of the protected persons herein. They are former intimate partners and KURT BENSHOOF has a history of violent behavior and threats, including threats with a firearm.

**249**

RCW 26.26A.470, .465, CR 65(b)
(07/2019)
FL Parentage 321

Motion for Immediate
Restraining Order (Ex Parte)
p. 5 of 6
**0068**

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

**Person asking for this order fills out below:**

I declare under penalty of perjury under the laws of the state of Washington that the facts I have provided on this form are true.

Signed at (city and state): _____ Seattle, WA _____        Date: 9/22/21

JESSICA OWEN

I agree to accept legal papers for this case at my lawyer's address, listed below.

> Note: You and the other party/ies may agree to accept legal papers by email under Civil Rule 5 and local court rules.

(If this address changes before the case ends, you **must** notify all parties and the court clerk in writing. You may use the Notice of Address Change form (FL All Family 120). You must also update your Confidential Information form (FL All Family 001) if this case involves parentage or child support.)

**Lawyer (if any) fills out below:**

NATHAN CLIBER, WSBA #41787
Attorney for Petitioner
Date:

Seattle Divorce Services
2317 NW Market St
Seattle, WA 98178
nathan@seattledivorceservices.com

> Warning! Documents filed with the court are available for anyone to see unless they are sealed. Financial, medical, and confidential reports, as described in General Rule 22, **must** be sealed so they can only be seen by the court, the other party, and the lawyers in your case. Seal those documents by filing them separately, using a Sealed cover sheet (form FL All Family 011, 012, or 013). You may ask for an order to seal other documents.

**250**

RCW 26.26A.470, .465, CR 65(b)
(07/2019)
FL Parentage 321

Motion for Immediate
Restraining Order (Ex Parte)
p. 6 of 6

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

# Appendix  **F**

FILED
2022 OCT 21 10:59 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 21-5-00680-6 SEA

## Superior Court of Washington, County of King

| In re: | |
|---|---|
| Petitioner/s *(person/s who started this case)*: | No. **21-5-00680-6 SEA** |
| JESSICA R. OWEN, | **Restraining Order**<br>Final (RSTO) |
| And Respondent/s *(other party/parties)*: | Clerk's action required: **6, 7** |
| KURT A. BENSHOOF. | Surrender Weapons Ordered: ☒ yes ☐ no |

# Restraining Order

*This order replaces all earlier Restraining Orders with the same Restrained Person, issued under this case number.*

**1.** **This Order restrains** *(name)*:
Kurt A. Benshoof
Restrained Party's distinguishing features:

### Restrained Party's Identifiers

| Sex | Race | Hair |
|---|---|---|
| Male | White | Grey/Bald |
| **Height** | **Weight** | **Eyes** |
| 6'0" | 175 | Blue |

**Caution:** Access to weapons: ☒ yes ☐ no ☐ unknown

**2.** **This Order protects** *JESSICA OWEN,*
**and the following children, who are under 18 (if any)**

| Child's name | Age |
|---|---|
| 1. A█████ R. W█████ | 13 |

**3.** **To the Restrained Person listed in 1:**

This Order starts immediately, and ends in 12 months or on *September 28, 2027*

*Warning!* **You** must **obey this order.** Violation of this order with actual notice of its terms is a **criminal offense** under Chapter 7.105 RCW and will subject the violator to arrest *(RCW 7.105.450)*. This order is enforceable in all 50 U.S. states, the District of Columbia, and U.S. territories and tribal lands *(18 U.S.C. § 2265).*

**448**

RCW 26.09.060, .110, .120, .194, .300
Mandatory Form *(07/2022)*
FL All Family 150

Restraining Order

p. 1 of 4

SDS
SEATTLE
DIVORCE
SERVICES
2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

**0071**

**4. Findings**

**Authority:** The court has jurisdiction over the parties, the children listed in **2**, and the subject matter.

**Notice:** The Restrained Person had reasonable notice and an opportunity to be heard. This Final Restraining Order was entered pursuant to an Order for Default.

**Credible Threat:** The Restrained Person represents a credible threat to the physical safety of the Protected Person.

**Intimate Partner:** The Restrained Person and the Protected Person are/were intimate partners because they are parents of a child-in-common, and formerly in a dating relationship (age 13 or older) and have lived together.

**5. Court Orders to the Restrained Person listed in 1:**

*Warning!* You **must** obey this order until it ends. If you know about this order but do not obey, you may be arrested and charged with a crime.

**Do not disturb**

Do not disturb the peace of the Protected Person or of any child listed in **2**.

**Stay away**

Do not go onto the grounds of or enter the Protected Person's home, workplace, vehicle, or school, or the daycare or school of any child listed in **2**.

Do not knowingly go or stay within **500 feet** of the Protected Person's home, vehicle, workplace, school, or the daycare or school of any child listed in **2**.

**Do not hurt or threaten**

> *Warning!* If the court checks this box, the court must consider if weapons restrictions are required by state law; federal law may also prohibit the Restrained Person from possessing firearms or ammunition.

Do not:

- Assault, harass, stalk or molest the Protected Person or any child listed in **2**; or
- Use, try to use, or threaten to use physical force against the Protected Person or children that would reasonably be expected to cause bodily injury.

**Prohibit weapons and order surrender (separate order required)**

The Restrained Person must:

- Immediately surrender to law enforcement and not access, possess, have in their custody or control, purchase, receive, or attempt to purchase or receive firearms, other dangerous weapons, or concealed pistol licenses; and
- Comply with the *Order to Surrender and Prohibit Weapons* (form WS 001) filed separately.

**Findings** – The court **must** issue the orders referred to above because the court ordered the **do not hurt or threaten** restraints above and the court finds that the restrained person had **actual notice** and an **opportunity to participate**. AND:

**449**

RCW 26.09.060, .110, .120, .194, .300
Mandatory Form *(07/2022)*
FL All Family 150

Restraining Order

p. 2 of 4

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

**0072**

- the restrained person represents a **credible threat** to the physical safety of a protected person, OR

- This order explicitly prohibits the use, attempted use, or threatened use of **physical force** against any protected person.

Therefore, the weapons restrictions are required by state law. RCW 9.41.800(2).

**Do not contact.** KURT BENSHOOF shall make no attempts whatsoever to contact the protected person or the child listed in **1**, including but not limited to contact in-person, by phone, by text, by email, by written letter, or through third parties, except as may be set out in the parties' Parenting Plan.

**Service of Process.** KURT BENSHOOF may only effect service of process, for any and all legal proceedings, through use of either Pegasus Process Service or ABC Legal Services. Any service of process made by KURT BENSHOOF by any other means is a violation of this Restraining Order.

**6.** **Washington Crime Information Center (WACIC) and Other Data Entry**

**Clerk's Action.** The court clerk shall forward a copy of this order immediately to the following law enforcement agency Seattle Police Department.

This agency shall enter this order into WACIC and National Crime Info. Center (NCIC).

**7.** **Service:**

☒ **Required.** The Restrained Person must be served with a copy of this order.

> *Important!* The Protected Person has a right to have law enforcement serve this order free of charge if the "Do not disturb," "Stay away," "Do not hurt or threaten," or "Prohibit weapons and order surrender" boxes are checked above.

☒ The **law enforcement agency** where the Restrained Person lives or can be served shall serve the Restrained Person with a copy of this order and shall promptly complete and return proof of service to this court.

Law enforcement agency: SEATTLE POLICE DEPARTMENT

☐ The **Protected Person** shall make private arrangements for service. (*This is only an option if surrender of weapons is **not** ordered*)

After serving, the server fills out a *Proof of Personal Service* (form FL All Family 101) and gives it to you. File the original *Proof of Personal Service* with the court clerk, and give a copy to the law enforcement agency listed in section 6 above.

**Clerk's Action**. The court clerk shall forward a copy of this order on or before the next judicial day to the agency and/or person checked above. The court clerk shall also provide a copy to the Protected Person.

☐ **Not required.** The Restrained Person does not have to be served because the Restrained Person or their lawyer signed this order, or was at the hearing when this order was made and the court finds sufficient notice.

**450**

RCW 26.09.060, .110, .120, .194, .300
Mandatory Form *(07/2022)*
**FL All Family 150**

Restraining Order

p. 3 of 4

SDS
SEATTLE
DIVORCE
SERVICES

2317 NW Market St.
Seattle, WA 98107
phone: (206) 784-3049
fax: (206) 784-2681

**0073**

**Ordered.**

_____     ▶ _____

Date           Time          _Judge or Commissioner_

**Petitioner and Respondent or their lawyers fill out below.**

| This order _(check any that apply)_: | This order _(check any that apply)_: |
|---|---|
| ☐ is an agreement of the parties | ☐ is an agreement of the parties |
| ☒ is presented by me | ☐ is presented by me |
| ☐ may be signed by the court without notice to me | ☐ may be signed by the court without notice to me |

_____        _____

NATHAN CLIBER, WSBA 41787          KURT A. BENSHOOF,
Attorney for Petitioner                 Respondent, pro se

_____

AMY FRANKLIN-BIHARY, .
WSBA #35787
Guardian ad Litem

---

_**Important!** **Protected Person**: you must fill out a Law Enforcement and Confidential Information form, PO 003, and give it to the court clerk._

---

**451**

RCW 26.09.060, .110, .120, .194, .300      Restraining Order      SDS    2317 NW Market St.
Mandatory Form _(07/2022)_                                     SEATTLE    Seattle, WA 98107
**FL All Family 150**                      p. 4 of 4          DIVORCE   phone: (206) 784-3049
                                                    SERVICES   fax: (206) 784-2681

0074

King County Superior Court
Judicial Electronic Signature Page

Case Number:      21-5-00680-6
Case Title:       OWEN VS BENSHOOF

Document Title:   ORDER  RE RESTRAINING ORDER

Signed By:        David Keenan
Date:             October 21, 2022

Judge:  David Keenan

This document is signed in accordance with the provisions in GR 30.

Certificate Hash:            D4CD579720E4BB8A7E792BCE878FD210340F014A
Certificate effective date:  1/3/2022 3:21:39 PM
Certificate expiry date:     1/3/2027 3:21:39 PM
Certificate Issued by:       C=US, E=kcscefiling@kingcounty.gov, OU=KCDJA,
                             O=KCDJA, CN="David Keenan:
                             CCQR2jst7BGY3&#43;AVCKww&#43;Q=="

452

# Appendix  **G**

*ORIGINAL*

# AFFIDAVIT OF  ~~AZHRAEL RUNE WALKER~~

I, ~~Azhrael Rune Walker~~ **A.R.W.**, state and declare as follows:

1. I am the son of Kurt Benshoof and Jessica Owen.
2. My dad has never engaged in domestic violence.
3. My dad has never abused me in any way and has never spanked me.
4. In December 2015 my mom was angry and block the front door, and chased my dad around our house, and I was held in my dad's left arm.
5. My mom tried to grab me, and my dad used his right hand to grab my mom's upper left arm to keep her away.
6. My dad accidentally bumped my head against the wall or door frame because he was running from my mom to get out of the house.
7. My mom called the police and showed the police a bruise on her right arm and lied to police that my dad grabbed her on her right arm and bruised it.
8. My mom lied to me in July 2021 and coerced me to get a Pfizer vaccine.
9. My mom told me the Pfizer vaccine was safe, effective and FDA Approved.
10. My mom told me that I wouldn't be able to play with my friends or attend school unless I got the Pfizer vaccine.
11. My mom did not tell me that the Pfizer vaccine could cause permanent disability or death to me.
12. When I told my dad in August 2021 that my mom had me get the Pfizer vaccine, my dad showed me the CDC Vaccine Adverse Event Reporting System data, and how many thousands of people had died or been disabled after getting the Pfizer vaccine.
13. My dad showed me CDC data that showed I was at zero risk of being hospitalized or dying from Covid-19.
14. My dad explained to me that, because me and my mom had got Covid-19 a few months earlier that I had natural immunity, and getting a Pfizer vaccine was unnecessary and potentially lethal.
15. After realizing that my mom coerced me to get a Pfizer vaccine that was not safe, effective or necessary, I didn't want to talk to my mom or go back to her house.
16. My dad made me call my mom because he said she was accusing him of withholding me from my mom.
17. When I called my mom, she was very angry and started yelling and said my dad was an "abuser," which upset me, so I walked away from my phone and went to my room.
18. My dad used my phone to text my mom to invite her to come over to my dad's house and have a family discussion together, but my mom refused to.
19. My mom then got a temporary restraining order to try to take me and my dad's car.

**.494**

1

20. My mom said in her declaration that if she took me from my dad that it would devastate me.

21. In King County Superior Court Case No. 21-2-11149-8 SEA, my mom lied to family court by saying that my dad withheld me from my mom in August 2020.

22. The truth is, I didn't want to talk to my mom at that time, or see her.

23. After my dad won the hearing on September 3, 2021 for Case No. 21-2-11149-8, my dad made me call my mom so that she wouldn't worry. I didn't want to call my mom, but my dad said I had to.

24. Later that day, my mom and her girlfriend Justice (her real name is Magalie Lerman) had the police arrest my dad, and Justice drove away in my dad's FJ Cruiser with me inside.

25. My mom and Justice then kept my dad's FJ Cruiser in their garage for about eight months.

26. During September of 2021, my mom texted my dad from my phone, pretending that she was me.

27. Pretending to be me, my mom texted my dad that I was busy and that it was scary when he came over to her house to see me, and that I didn't want him to come back.

28. During September of 2021, my mom wouldn't let my dad see me or talk to me.

29. In September of 2021, my mom got a family attorney named Nathan Cliber and my mom got another temporary restraining order against my dad in Case No. 21-5-00680-6.

30. My mom lied and said that my dad wasn't my presumed dad in her Petition to Decide Parentage. Everyone knows my dad is my dad, and always has been.

31. My mom lied to family court by saying that my dad refused to be acknowledged as my dad.

32. My mom lied to family court by saying that my dad had abused me.

33. My mom lied to family court by saying that my dad had exercised "coercive control."

34. My mom lied to family court by saying that my dad had engaged in domestic violence.

35. After my mom lied to family court to take me from my dad, she again coerced me to get another Pfizer vaccine in October of 2020.

36. My mom said that my dad was crazy because he said that the Pfizer vaccine wasn't safe, effective, or necessary.

37. My mom tried to get my dad to give her money to get his FJ Cruiser back.

38. My mom and Justice said that unless my dad gave them $100,000 they would evict my dad from his house where I had lived with him since 2015.

39. On July 6, 2022 I went to my dad's house, but the police made me go back to my mom's house.

40. In August of 2022 I considered killing myself because I didn't know if I would be forced to stay at my mom's until I am eighteen years old.

41. Then my mom got family court to forbid any contact at all with my dad.

**.495**

2

42. On January 23, 2023, I left my mom a note that said I had hated her for months and that I wanted to go back to my dad's house, and that if she loved me she should stop keeping me from my dad.

43. My mom found the note before I walked to my dad's house. She told me that she would talk to her attorney about resolving things with my dad, and then she said I could go over to my dad's house.

44. After I walked over to my dad's house, my mom called the police to get my dad arrested, and the police came made me go back to my mom's house.

45. Justice hates my dad, and Justice does not care about what I want or need.

46. My mom does not care about what I want or what I need. She hates my dad, and keeps lying to keep me from being with my dad.

47. On February 10, 2023, I signed a Durable Power-of-Attorney Agreement with my dad, so that he can act on my behalf in all matters.

48. It is my express wish that my dad initiates a lawsuit against my mom and her family attorney because they lied to take me away from my dad.

49. It is my express wish that my dad has King County Superior Court Case No. 21-5-00680-6 SEA vacated because it was fraudulently initiated with lies by my mom and her family attorney, Nathan Cliber.

50. It is my express wish that my dad act as a "Next Friend" pursuant to FrCP 17(c)(2), or as my "guardian" or "fiduciary" pursuant to FrCP 17(1)(A)(D), or pursuant to RCW 11.125 Uniform Power of Attorney Act, so that my dad can bring claims on my behalf, either in Equity or in law, so I can go home to him.


## WASHINGTON DURABLE FINANCIAL POWER OF ATTORNEY


NOTICE: THE POWERS GRANTED BY THIS DOCUMENT ARE BROAD AND SWEEPING. THE POWERS LISTED IN THIS DOCUMENT DO NOT INCLUDE ALL POWERS THAT ARE AVAILABLE UNDER APPLICABLE LAW. ADDITIONAL POWERS AVAILABLE UNDER LAW MAY BE ADDED BY SPECIFICALLY LISTING THEM UNDER THE SPECIAL INSTRUCTIONS SECTION OF THIS DOCUMENT. IF YOU HAVE ANY QUESTIONS ABOUT THESE POWERS, OBTAIN COMPETENT LEGAL ADVICE. THIS DOCUMENT DOES NOT AUTHORIZE ANYONE TO MAKE MEDICAL AND OTHER HEALTH-CARE DECISIONS FOR YOU. YOU MAY REVOKE THIS POWER OF ATTORNEY IF YOU LATER WISH TO DO SO.

**496**

I, A̶̶̶R̶̶ W̶̶̶, currently residing at 849 NE 130ᵗʰ ST, Seattle, WA 98125 hereby appoint Kurt A. Benshoof, currently residing at 1716 N 128ᵗʰ ST, Seattle, WA 98133 as my agent (attorney-in-fact) to act for me in any lawful way with respect to the following subjects:

- Real property transactions.
- Tangible personal property transactions.
- Banking and other financial institution transactions.
- Insurance and annuity transactions.
- Estate, trust, and other beneficiary transactions.
- Claims and litigation.
- Personal and family maintenance.
- Benefits from social security, medicare, medicaid, or other governmental programs, or civil or military service.
- Retirement plan transactions.
- Tax matters.

## SPECIAL INSTRUCTIONS:

1. The foregoing powers shall specifically include the right to request and receive any health information or other medical records as would I with respect to my rights regarding the use and disclosure of my individually identifiable health information or other medical records, as may be governed by, and the foregoing shall constitute my release authority to the agent as authorized pursuant to, the Health Insurance Portability and Accountability Act (HIPAA). The foregoing release authority given my agent has no expiration date and shall expire only in the event I revoke the authority by written instrument delivered to my health-care provider or by revocation of this Power of Attorney.

2. The foregoing powers shall specifically include the power of my agent to submit claims, seek and receive reimbursements, pursue, settle or compromise claims, and to otherwise take any and all actions as may be necessary or desirable for purposes of enforcing the principal's rights, benefits and entitlements under any medical policies, medical reimbursement or other medical or health-care related plans or programs.

3. In addition to the statutory powers granted above with respect to retirement plan transactions, my agent is hereby granted the power to (i) access any account values and information relating to any interest which I may have in any qualified retirement plan, profitsharing plan, defined benefit plan, contribution plan, IRA, SEP-IRA, Roth IRA, 403(b) annuity plan, other annuity plan, Code Section 526 plan, Code Section 529 plan, and/or any other retirement or

**497**

4

**0080**

savings plan or account (collectively, the "retirement and savings accounts"), (ii) make contributions to retirement and savings accounts, (iii) make, authorize or otherwise direct the withdrawal and distribution of assets for my benefit from retirement and savings accounts and (iv) take any and all actions as may be desirable for purposes of ensuring the application and use of such retirement and savings accounts for my needs, and to comply with applicable tax and other laws pertaining thereto.

4. My agent may access, control, archive, transfer, and delete my digital assets. Digital assets include my email accounts, digital music, digital photographs, digital videos, gaming accounts, software licenses, social-network accounts, file-sharing accounts, financial accounts, domain registrations, Domain Name System (DNS) service accounts, blogs, listservs, web-hosting accounts, tax-preparation service accounts, online stores and auction sites, online accounts, and any similar digital asset that currently exists or may be developed as technology advances. My digital assets may be stored on the cloud or on my own digital devices. My agent may access, use, and control my digital devices in order to access, control, archive, transfer, and delete my digital assets. Digital devices include desktops, laptops, tablets, peripherals, storage devices, mobile telephones, smartphones, and any similar hardware that currently exists or may be developed as technology advances.

## EFFECTIVE DATE:

_A.R.W._   THIS POWER OF ATTORNEY IS EFFECTIVE IMMEDIATELY AND WILL CONTINUE UNTIL IT IS REVOKED. THIS POWER OF ATTORNEY WILL CONTINUE TO BE EFFECTIVE EVEN THOUGH I BECOME INCAPACITATED.

_A.R.W._   THIS POWER OF ATTORNEY IS EFFECTIVE ON February 10, 2023. IT WILL CONTINUE UNTIL IT IS REVOKED. THIS POWER OF ATTORNEY WILL CONTINUE TO BE EFFECTIVE EVEN THOUGH I MAY BE CONSIDERED, OR BECOME CONSIDERED, INCAPACITATED.

_n/a_   THIS POWER OF ATTORNEY SHALL BECOME EFFECTIVE ONLY AT SUCH TIME AS I BECOME INCAPACITATED AND SHALL CONTINUE THEREAFTER EVEN THOUGH I AM INCAPACITATED UNTIL SUCH TIME AS I AM NO LONGER INCAPACITATED, UNLESS THIS POWER OF ATTORNEY IS REVOKED.

For purposes of this Power of Attorney, "incapacitated" shall mean either (1) an adjudication by a court of competent jurisdiction to the effect that I am incompetent, or (2) the appointment by a court of competent jurisdiction of a conservator or guardian for my estate or (3) written certification by two (2) physicians who are unrelated to me or to each other in any personal, business or professional capacity that in their opinion I am substantially unable to

**498**

**0081**

manage my financial resources or resist fraud or undue influence. The effective date of such incapacity shall be the earlier of (a) the date of the order or decree adjudicating the incapacity, (b) the date of the order or decree appointing the conservator or guardian, or (c) the later date where both of the physicians' certifications described in this paragraph are obtained. A certified copy of the order or decree declaring incapacity or appointing a conservator or guardian or a copy of the physicians' certifications described herein shall be attached to the original of this Power of Attorney (and photocopies thereof shall be attached to photocopies hereof).

**EXERCISE OF POWER OF ATTORNEY WHERE MORE THAN ONE AGENT DESIGNATED:** If I have designated more than one (1) agent, the agents may act separately as follows: at any time while two (2) or more persons are acting as my co-agents, any one (1) or more of such persons may be given the power to execute documents on my behalf or bind me in any particular transaction(s) or type(s) of transactions as set forth herein, and any such action taken by such person(s) pursuant to such power may be relied upon by third parties dealing with the agent(s). At any time while two (2) or more persons are acting as my agents, all decisions made hereunder shall be made by a majority of the agents. The power granted to an agent under the first sentence of this paragraph must be granted by a majority vote of the agents.

Successor Attorney- in-Fact. If Kurt A. Benshoof (agent's name) is unable or unwilling to serve or to continue to serve as my attorney-in-fact for any reason, then Peter L. Kral (alternate agent's name), presently residing at 1757 Greentree Rd. Encinitas, CA 92024 (address) is hereby appointed successor attorney-in-fact hereunder.

I agree that any third party who receives a copy of this document may act under it. Revocation of the power of attorney is not effective as to a third party until the third party has actual knowledge of the revocation. I agree to indemnify the third party for any claims that arise against the third party because of reliance on this power of attorney.

All prior general powers of attorney I have executed are hereby revoked.

Signed this 10th day of February , 20 23 .

x Azhrael Rune Walker
(signature)

Azhrael Rune Walker
(printed name)

.499

6

**0082**

## ACKNOWLEDGMENT

**Statement of Witnesses**

On February 10, 2023, the declarer of this document, Azhrael Rune Walker, signed it in my presence. I believe the declarer is able to understand this document, and to have signed it voluntarily.

- I am not related to the principal by blood, marriage, or state registered domestic partnership.

## VERIFICATION

As a Witness, I do hereby declare that all herein be true and correct to the best of my knowledge, under penalty of perjury in the State of Washington.

Executed this 10th day of February, in the year 2023, in Seattle, in King County, in Washington state.

**Witness 1**

_Kyrrah Nork_
Signature

Kyrrah Nork
Print Name
411 75th Place SW
Everett, WA 98203
Address

**Witness 2**

_Michael Bayles_
Signature

Michael Bayles
Print Name
411 75th place SW
Everett, WA 98203
Address

Witness 3

_Thomas Clay Layton_
Signature

Thomas Clay Layton
Print Name

8623 Palatine Ave N, APT 326 SEATTLE, Wa
Address                                    98103

7

**0083**









3:55

**Wrench**

**seraphdmortego**  09/25/2022 6:37 PM
Do you feel lonely or isolated, or are you feeling okay?

Tell me straight up

**Wrench**  09/25/2022 6:40 PM
I'm feeling like I am truly understanding insanity and I thought of writing a book called the face of insanity

💕 1

**seraphdmortego**  09/25/2022 6:41 PM
DO!!!!  Or just keep writing your thoughts and observations down and you can organize them into the structure of a book, or whatever later. Feel me?

The perspective on this from the eyes of a "13 year old" will be like Anne Frank's diary in a few years.

CAPTURE THIS EXPERIENCE

**Wrench**  09/25/2022 6:46 PM
I WILL

**seraphdmortego**  09/25/2022 6:48 PM
Candice told me this experience will shape who you are and your life in a big way.  Positive. Like you will truly understand what I have been taking about and the importance of seeing at is true and eating to protect others and all

Jump to Message



FILED

Hon. Marshall Ferguson

2023 OCT 31 12:07 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 22-2-15958-8 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

KURT A. BENSHOOF *Pro Se,*

Petitioner,

v.

CITY OF SEATTLE,

Respondent.

CASE NO.

PETITIONER'S SUMMARY RE:
PETITION FOR WRIT OF PROHIBITION

WRM - 2

Re: Seattle Municipal Case No. 669329

## I.    INTRODUCTION

COMES NOW Petitioner Kurt Benshoof ("Benshoof"), under threat, duress, and coercion of this Court's Order Restricting Abusive Litigation of Kurt Benshoof ("Order"), summarizing Benshoof's Petition for Writ of Prohibition Re: Seattle Municipal Case No. 669329 ("Writ").

## II.    SUMMARY

The Order was granted in violation of RCW 26.51.030, which required that Benshoof had "been found by the court to have committed domestic violence." No court has found Benshoof to be a domestic violence perpetrator.

The Order was granted in violation of RCW 26.51.030, ignoring the statutory requirement that, "the court shall set a hearing to determine whether the litigation meets the

SUMMARY OF PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL COURT CASE NO. 669329
Page 1 of 4

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0089**

1  definition of abusive litigation." This Court did not seek to determine if Benshoof had been

2  found to be a domestic violence perpetrator by any court.

3      The Order was granted in violation of RCW 26.51.040(1), which states, "the court shall

4  hear all relevant testimony." This Court did not hold a hearing to hear all relevant testimony to

5  consider whether Benshoof had been found to be a domestic violence perpetrator by any court.

6      As such, the Order was *void ab initio.* This has been detailed in Benshoof's federal

7  complaint in U.S. District Court for the Western District of Washington, Case No. 2:23-cv-

8  01392-JNW in which His Honor is a named defendant for *ultra vires* acts in violation of the

9  First Amendment; that is, acts which are not protected by the doctrine of judicial immunity.

10      The Writ evinces that Judge David Keenan ("Keenan") did not have jurisdiction to

11  adjudicate family court Case No. 21-5-00680-6, and that Keenan knowingly allowed, enabled,

12  and facilitated the felony perjury of Jessica R. Owen, mother of Benshoof's son. Keenan

13  thereby issued *void ab initio* orders, causing Benshoof and his son irreparable, ongoing harm.

14      The Writ evinces that the City initiated Case No. 669329 without personal jurisdiction

15  over Benshoof, as the City knowingly and willfully failed to comply with RCW 35.20.270(1),

16  and ignored Benshoof repeatedly raising this threshold, dispositive issue at the commencement

17  of the case.

18      The Writ evinces that the City initiated Case No. 669329 in violation of RCW

19  7.105.050(1)(a)(d) which states that only a Superior Court is so authorized to adjudicate the

20  domestic violence allegations against Benshoof.

21      Upon the foregoing, the Writ evinces that the City has violated RCW 9.62.010 to

22  perpetrate the malicious prosecution of Benshoof, in violation of 18 U.S. Code §§ 241; 242;

23  1512; 1513; 1962.

SUMMARY OF PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL COURT CASE NO. 669329
Page 2 of 4

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

Benshoof seeks the Writ to prohibit the City from further violations of state and federal law, and to prevent the City from continuing to aid and abet state and federal law violations by Jessica R. Owen.

## VERIFICATION

I, Affiant Kurt Benshoof, do hereby declare that the foregoing is true and correct to the best of my knowledge under penalty of perjury in the State of Washington, and am competent to testify to the matters stated herein.  Executed this 31st day of October in the year 2023, in the City of Seattle, in the county of King, in the state of Washington.


By:    _____s/ Kurt Benshoof_____
              Kurt Benshoof *Pro Se*

              1716 N 128th Street
              Seattle, WA 98133
              Phone: (206) 460-4202
              Email: kurtbenshoof@gmail.com

SUMMARY OF PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL COURT CASE NO. 669329
Page 3 of 4

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0091**

## CERTIFICATION OF SERVICE

I, Kurt Benshoof, hereby certify that on October 31, 2023, I did effect service upon

counsels for Defendants by e-filing in King County Superior Court Case No. 22-2-15958-8 the

Petition for Writ of Prohibition Re: Case No. 669329 and this Summary of Petition for Writ of

Prohibition Re: Seattle Municipal Court Case No. 669329 by emailing to the email addresses

listed below:

**Attorney For Defendant Jessica Owen:**         **Attorney for Defendant Nathan Cliber:**
Blair M. Russ, WSBA #40374                       Kyle Rekofke, WSBA #49327
1000 Second Avenue                               701 Fifth Avenue
Suite 3660                                       Suite 2100
Seattle, WA 98104                                Seattle, WA 98104
Email: bmr@tbr-law.com                           Email: krekofke@grsm.com


**Attorney for Defendants Magalie Lerman and Owen Hermsen:**
Moshe Y. Admon, WSBA #50325
300 Lenora Street
Suite 4008
Seattle, WA 98121
Email: jeff@admonlaw.com

DATED:  October 31, 2023

Signed:  _____s/ Kurt Benshoof_____

Kurt Benshoof, *Pro Se*
1716 N 128th ST
Seattle, WA 98133
(206) 460-4202

SUMMARY OF PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL COURT CASE NO. 669329
Page 4 of 4

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0092**

Hon. Marshall Ferguson

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| KURT A. BENSHOOF *Pro Se,* | CASE NO. |
| Petitioner, | |
| | PETITION FOR WRIT OF PROHIBITION |
| v. | |
| | WRM - 2 |
| CITY OF SEATTLE, | |
| | Re: Seattle Municipal Case No. 669329 |
| Respondent. | |

## I.    INTRODUCTION

COMES NOW Petitioner Kurt Benshoof ("Benshoof") requesting that this Court issue a writ of prohibition to arrest Seattle Municipal Court Case No. 669329 as such proceedings are absent the jurisdiction of Seattle Municipal Court pursuant to RCW 7.105.050(1)(a)(d).

The City Attorney's Office and municipal judges have been notified by Benshoof that only a Superior Court is authorized under the aforementioned statute to adjudicate the City's allegation against Benshoof of domestic violence in Case No. 669329. Despite its absence of jurisdiction to proceed, Seattle Municipal Court has refused to dismiss the case or hear any motion by Benshoof. As such, Benshoof has no plain, speedy and adequate remedy in the ordinary course of law other than to petition for Writ of Prohibition.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 1 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0093

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## II.    VERIFIED STATEMENTS OF FACT

Benshoof avers the following statements and is prepared to testify under penalty of perjury to these facts in a court of law authorized and convened under the Washington Constitution. Benshoof incorporates by reference as if fully restated herein the following documents filed in U.S. District Court for the Western District of Washington Case No. 2:23-01392-JNW: Complaint (Dkt. #9) Exhibits (Dkt. #13-1; #13-2; and #13-3)

All *emphasis* that of Benshoof.

### A.  Family Background

Benshoof and defendant Jessica Owen ("Owen") discovered she was pregnant with Benshoof's child, A.R.W., in August 2008.  Thereupon, Benshoof and Owen entered into a verbal parenting contract at common law ("Covenant") after notice, consideration, and accord; thereby exercising their unlimited right to contract as private individuals.

Under their Covenant as father and mother, they would henceforth have full, equal, and inalienable rights as parents of their son-to-be, sharing all significant decisions regarding A.R.W.'s care and upbringing, such as education, family scheduling, medical and dental care, and nutrition.

Though Benshoof and Owen never married, they raised A.R.W. amicably for the following twelve years, prioritizing their son's well-being and sharing equally in all significant decisions regarding their son's education, medical care, dental care, and living arrangements.

### B.  Owen Seizes Custody of A.R.W.

Owen explicitly threatened to steal Benshoof's car, seize custody of A.R.W., deny Benshoof's equity ownership in his home and evict Benshoof on August 16, 2021, via text message. (Dkt. #13-1 at 44)  When Benshoof refused to be intimidated by Owen's threats, Owen

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 2 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0094**

filed for a TRO in King County Superior Court Case No. 21-2-11149-8 on August 23, 2021.

In Owen's TRO petition, she truthfully stated under penalty of perjury that A.R.W. was related to Benshoof as his child, that Benshoof and A.R.W. had lived together, and that Benshoof had raised A.R.W. his entire life.

King County Superior Court issued a full denial order of Owen's TRO petition on September 3, 2021.  Benshoof thought Owen would thereafter stop her lies and threats.  Benshoof was mistaken.

Thereafter, Owen acted to keep Benshoof from seeing or communicating with A.R.W., including telling Jane Addams Middle School that Owen was the "sole legal guardian" of A.R.W.  Owen was not the "sole legal guardian" of A.R.W., and could not be the sole "legal guardian" of A.R..W., as RCW 26.33.0209(11) defines a "legal guardian" as someone *other than a parent.*

Upon Owen's false statements that she was the "sole legal guardian" of A.R.W., school staff refused Benshoof access to A.R.W. and denied Benshoof access to his son's school records.  RCW 28A.605.020 assures parent access to their child's classroom.  RCW 28A.605.030 protects the right of a parent to review all education records of their child.

On September 24, 2021, Benshoof called 911 to do a wellness check on A.R.W.  SPD Officers Kieran Barton #8747 ("Barton") and Adam Beaty #7453 ("Beaty") responded.  Beaty refused to take a sworn affidavit from Benshoof evidencing that Benshoof had full rights as the father of A.R.W.  Beaty stated, "I'm not taking anything from you.  We know you're trying to set us up." (Dkt. #13-1 at 35-38)

Barton and Beatty asserted that Owen was the "sole legal guardian" of A.R.W.  RCW 26.33.0209(11) defines a "legal guardian" as someone *other than a parent.*  Barton and Beatty

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 3 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0095

did not possess evidence that a court order had determined Owen to be sole "legal guardian" of A.R.W.

Owen hired family attorney Nathan Cliber ("Cliber") in September 2021, filing a Petition to Decide Parentage ("parentage action"). Case no. 21-5-00680-6 was a ruse so that Owen could seek an emergency restraining order against Benshoof to deny Benshoof's rights as A.R.W.'s father.

Benshoof did not consent to family court adjudicating his rights as the father of A.R.W. Defendant David Keenan ("Keenan") was assigned as presiding judge.

**C. Impairing the Obligation of Contracts**

No evidence of Owen's and Benshoof's contractual privity with Washington state, by dissolution of marriage or domestic partnership, declaration of invalidity, or legal separation exists.

Cliber, and Owen knowingly and willfully acted in concert to impair the obligations of Owen to uphold the Covenant. By and through Cliber, Owen made materially false statements to initiate Family Court case no. 21-5-00680-6 by filing a barratrous, perjurious parentage action.

In August 2021 case no. 21-2-11149-8 and September 2021 case no. 21-5-00680-6 Owen took two mutually exclusive positions foundational to her parentage action.

First, Owen declared on August 23, 2021, in TRO case no. 21-2-11149-8 that: (1) Owen and Benshoof are the parents of A.R.W. (Dkt. #13-1 at 72); (2) A.R.W. is related to Benshoof as his child (*Id.* at 73); and (3) Benshoof had raised A.R.W. his entire life. (Dkt. #13-1 at 62)

Four weeks later in case no. 21-5-00680-6, Owen and Cliber filed a parentage action, the basis of which was that Benshoof: (1) was not the biological father of A.R.W.; (2) had never lived with A.R.W., and (3) had never held out A.R.W. as his son.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 4 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1

2    Owen's September 20, 2021, statement (Dkt. #13-1 at 254) that Benshoof was not the

presumed father of A.R.W. was an inconsistent material statement under oath which directly

3    contradicted Owen's prior sworn statement weeks earlier in case no. 21-2-11149-8, averring On

4    August 21, 2021, that Owen and Benshoof are "parents of a child in common." (Dkt. #13-1 at

5    77) which affirmed that: (1) Owen and Benshoof are the parents of A.R.W.; (2) A.R.W. is related

6    to Benshoof as his child; and (3) Benshoof had raised A.R.W. his entire life.

7

8    As such, Owen took two mutually exclusive positions between case no. 21-2-11149-8 and

9    case no. 21-5-00680-6, in violation of RCW 9A.72.020; 9A.72.050.

10    First, Owen declared in August 2021 that Benshoof: (1) was the biological father of

11    A.R.W., (2) had lived with A.R.W. his entire life; and (3) had acted as his father his entire life.

12    Then in Owen's parentage action, the basis of which was that Benshoof was not the presumed

13    father of A.R.W., Owen averred under penalty of perjury, "To my knowledge, no one is already

14    presumed to be a parent" (Dkt. #13-1 at 254)

15    Owen also declared that Benshoof had at all times refused to agree to the legal recognition

16    of A.R.W.  (*Id.*)  However, Benshoof had texted Owen on September 18, 2021, stating

17    Benshoof's belief that Owen had refused to add Benshoof's name to A.R.W.'s birth certificate

18    as part of Owen's fraud to assert that Owen was the "sole legal guardian" of their son. (Dkt. #13-

19    4 at 392)

20

21    On September 19, 2021, Benshoof texted Owen, "Are you still refusing to amend

22    [A.R.W.'s] birth certificate to show my legal name (as I have previously and repeatedly

23    requested)?" (*Id.*)

24

25

26   PETITION FOR WRIT OF PROHIBITION                    Kurt Benshoof, Benshoof
     RE: SEATTLE MUNICIPAL CASE NO. 669329               1716 N 128th ST
     Page 5 of 27                                        Seattle, Washington 98133
                                                         (206) 460-4202
                                                         kurtbenshoof@gmail.com

Pursuant to RCW 26.26A.115, there is presumption of fatherhood once the father has: (1) lived with the child for the first four years of the child's life, and (2) openly held out the child as his own, even if the child was not biologically his own.

In defiance of all logic or pretense of plausible honesty, ***two days after*** Owen signed the petition to decide parentage on September 20, 2021, asserting that Benshoof was not the presumed father of their son, Owen then signed her Declaration of Jessica R. Owen on September 22, 2021, stating, "***Kurt having acted as [A.R.W.'s] father for [A.R.W.'s] entire life…***" (Dkt. #13-1 at 229)

Owen also stated, "We moved in together in July of 2008. [A.R.W.] was born nine months later…" (Dkt. #13-1 at 230) "[Benshoof] always insisted on being treated as A.R.W.'s father and that A.R.W. was his." (*Id.*) "…September of 2020 that ***I finally moved out of our shared residence…***" (Dkt. #13-1 at 231)

Family law attorney Cliber then reviewed Owen's statements, affixed his signature to the petition to decide parentage and motion for immediate restraining order, and filed them.

At no time did Owen ever claim that there was another possible biological father of A.R.W. Owen and Benshoof have known since August 2008 that A.R.W. was conceived during sexual intercourse involving only Owen and Benshoof on July 18, 2008, which also happens to be Benshoof's birthday.

**D. TRO Hearing**

On October 25, 2021, Commissioner Jason Holloway ("Holloway") heard Owen's petition for temporary restraining order. Owen sought to seize sole custody of A.R.W. and prevent Benshoof from associating with his son.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 6 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

Holloway consulted the Judicial Information System but did not disclose this fact to Benshoof in accordance with the requirement of RCW 2.28.210(2).

Cliber asserted that Benshoof had engaged in "domestic violence" against Owen and A.R.W.

Benshoof has never engaged in domestic violence against anyone, nor threatened to do so. On the contrary, Owen has assaulted Benshoof during their parenting relationship on multiple occasions, including striking Benshoof in the face repeatedly and causing inches long, bloody scratches on Benshoof's leg.

Benshoof has never spanked his son, nor yelled at A.R.W., nor any child.  Neither has Benshoof ever threatened to hit any woman, nor done so.  In fact, the uncontested record showed that Owen had in fact been the domestic violence abuser on multiple occasions; that is, Owen repeatedly struck Benshoof in the face and arms, and also cause inches long bloody scratches on Benshoof's legs.

Holloway stated on the record, "I'm not requiring that [Benshoof] do a domestic violence assessment.  That would have been something that would have been ordered if he had been found to be a domestic violence perpetrator, ***which he is not.***"

Holloway thereby implicitly acknowledged that Owen's claims of being stalked by Benshoof, and her claims that Benshoof inflicted fear upon her and A.R.W., were false.  (*See* RCW 26.50.010(3)).

Holloway asserted that Benshoof was a "credible threat" to A.R.W. due to Holloways discriminatory animus toward Benshoof's minority religious beliefs.

A State must, if it is to invoke the statutes after injunctive relief has been sought, assume the burden of obtaining a permissible narrow construction in a noncriminal proceeding.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 7 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0099

After Benshoof discovered that family court does not allow trial by jury, he filed a motion objecting to the violations of due process.  (Dkt. #13-1 at 278-284)

Keenan denied Benshoof's motion absent findings of fact or conclusions of law.

## E.  No Justiciable Issue

For a court to obtain jurisdiction, there must be a justiciable issue before said court.

Owen, Cliber, and assigned Judge David Keenan ("Keenan"), knew or should have known that the evidence in the record of King County Superior Court as of the filing of the parentage action on September 28, 2021, evidenced that family court could not overcome Benshoof's legal presumption as the father of A.R.W., pursuant to RCW 26.26A.115; RCW 26.26A.435(2).

Family court had an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenged it.   Benshoof did challenge it, repeatedly.

Cliber, Holloway, and Keenan ("Keenan") knew that the doctrine of judicial estoppel and RCW 9A.72.020 prohibited Owen from making inconsistent material statements under oath; that is, Owen was prohibited from committing felony perjury.

Cliber, Holloway, and Keenan knew that the consent of Benshoof was never given to adjudicate case no. 21-5-00680-6 without a trial by jury.

Cliber, Holloway, and Keenan knew that through the Fourteenth Amendment the Seventh Amendment protects the right to trial by jury in all civil litigation and that Wash. Const. art I §14 prohibits a public official from denying a civil litigant the right to trial by jury absent the consent of both parties.  Benshoof has never consented to family court adjudication.

## F.  No Contractual Privity with State

On, or around, March 10, 2023, Benshoof discovered that family court plans and orders apply to fathers and mothers in contractual privity with the state via marriage, domestic

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 8 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0100**

partnership, declaration of invalidity, or legal separation; none of which Benshoof and Owen were party to. (*See* RCW 26.09.004(3)(4)).

Between September 2021 and March 2022, Cliber failed to disclose that RCW 26.09.004(3)(4) did not apply to Benshoof without Benshoof' voluntary consent.

Washington BAR Rules of Professional Conduct ("RPC") 3.3(A)(3) states that a lawyer shall not knowingly, "fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by the opposing party."

In March 2022, Benshoof emailed Cliber upon his discovery of RCW 26.09.004.

Benshoof informed Cliber that Cliber had engaged in deceit to invoke family court jurisdiction. Cliber responded by stating that he had obtained the jurisdiction of family court by other means.

Upon Benshoof's request that Cliber disclose what this other means was, Cliber refused to disclose by what controlling authority he had done so.

Benshoof emailed Keenan's bailiff, Beatrice Marquez ("Marquez"), informing Marquez that family court did not have jurisdiction to impose plans and orders involving Benshoof and A.R.W. because Benshoof and Owen were not in contractual privity with the state via marriage, domestic partnership, declaration of invalidity, or legal separation. Marquez instructed Benshoof to bring the issue up before Keenan.

On April 1, 2022, Keenan heard Benshoof's motions to dismiss the case for lack of subject matter jurisdiction and the interests of A.R.W. (Dkt. #13-1 at 339-354; Dkt. #13-1 at 356-368)

Cliber could not, and did not, establish subject matter jurisdiction to maintain an action in case no. 21-5-00680-6. Cliber asserted *res judicata* and claimed that Benshoof's motions quoting

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 9 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0101

U.S. Supreme Court cases were "unintelligible" and "frivolous." Keenan dismissed Benshoof's motions without the requested findings of fact and conclusions of law.

### G. SPD Incident 2022-154753

On, or around, May 1, 2022, Benshoof called 911 to report custodial interference to SPD. Benshoof made complaint by telephone to SPD Officer Ashlie T. Bissell ("Bissell"), also known as Ashlie Clark. Benshoof had already made numerous such complaints to SPD, beginning in August 2021, including sworn affidavits as a victim witness.

Benshoof reported that Owen and Lerman had unlawfully taken Benshoof's 2011 Toyota FJ Cruiser and, with the aid of their friend, Owen Hermsen, had attempted felony extortion of Benshoof seeking $19,000 for the return of Benshoof's stolen FJ Cruiser. (Dkt. #13-1 at 299-334)

Benshoof reported that Owen and Lerman had engaged in felony custodial interference in order to deny Benshoof's right of association with A.R.W. Benshoof reported that Owen and Lerman had violated RCW 9A.36.070 by coercing A.R.W. to be subjected to a Pfizer medical experiment by threatening that A.R.W. would be restrained from going to school or seeing his friends.

Bissell told Benshoof that she could not file a complaint against Owen and Lerman for coercing A.R.W. to be subjected to Pfizer medical experimentation because all SPD officers had been required to get a "covid vaccine."

Benshoof reported that Owen and Lerman, both prostitutes, had brought their prostitution clients into their home while A.R.W. was present in the house. Benshoof also provided the SPD video of A.R.W. confirming this fact.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 10 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0102

1

2

3

On June 29, 2022, Benshoof emailed the General Investigation Unit and Bissell, providing them with verified documents evidencing felony and gross misdemeanor crimes perpetrated by Owen, Lerman, and family law attorney Nathan L. Cliber. (Dkt. #13-1 at 379-410; Dkt. #13-3 at 294-320)  The City took no action against Cliber, Owen, or Lerman.

4

5

6

**H.  SPD Incident 2022-173684**

7

On July 6, 2022, A.R.W. ran away from Owen's to come home to Benshoof.

8

9

SPD Officers were dispatched to Benshoof's home: Elias Williams #8767 ("Williams"), Charles Foreman #7569 ("Foreman"), and Eric Whitehead #7493 ("Whitehead).

10

11

Benshoof informed Williams that Owen and Lerman were welcoming their prostitution clients into their home when A.R.W. was present.

12

13

14

15

16

Benshoof informed Williams that Owen and Lerman had made false and misleading statements to police to take A.R.W. and Benshoof's FJ Cruiser, that Owen had committed perjury and custodial interference to fraudulently initiate family court case no. 21-5-00680-6, and that A.R.W. was being subjected to mental and emotional abuse by Owen and Lerman.

17

18

19

20

Benshoof informed Williams that Owen and Lerman, with the approval of family court, had coerced A.R.W., to engage in conduct that A.R.W. had the right to abstain from, by threatening him with confinement or restraint; that is, a Pfizer gene therapy that had not even completed adequate animal trials, let alone phase 3 of a clinical trial to ensure safety and efficacy.

21

22

23

Benshoof informed Williams that Owen and Lerman had accomplished by deception the unlawful imprisonment of both A.R.W. and Benshoof by restricting their movement without consent and without valid legal authority in a manner which interfered substantially with their liberty.

24

25

26

Pursuant to RCW 9A.40.040 it is a class C felony to restrict the movement of Benshoof without valid legal authority in a manner which interfered substantially with his liberty.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 11 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1

2     Benshoof informed Williams that Lerman had threatened a process server at Owen's home

3  with an aluminum baseball bat, while screaming lies which disparaged Benshoof in A.R.W.'s

4  presence.

5     Benshoof informed Williams that Lerman's threats and intimidation of a process server

6  constituted a felony law violation, and that such threats were made to violate Benshoof's right to

7  petition for redress by scaring all of Benshoof's friends away from serving court documents under

8  CR 4.  Williams refused to act on Benshoof's complaints and A.R.W. was taken back to Owen's.

9  **I.   SPD Incident #2022-177198**

10     On July 7, 2022, A.R.W. did not appear on the court scheduled Zoom video call with

11  Benshoof, as required by Owen's signature in family court case no. 21-5-00680-6.

12     At approximately 6:00pm on July 9, 2022, Benshoof called 911 to report Owen for custodial

13  interference, perjury, and barratry, and Benshoof asked SPD dispatch to send officers to do a wellness

14  check on A.R.W.  SPD Officers Hayden Hogg #8472 ("Hogg") and Jeremy Weiss #8793 ("Weiss")

15  eventually phoned Benshoof around 12:30am.

16     Benshoof met Hogg and Weiss and attempted to give the officers evidence of Owen's

17  violations of the allegedly valid family court restraining order, evidence of Owen's perjury and

18  barratry in obtaining the restraining order, and evidence supporting Benshoof's contention that the

19  restraining order could not, and did not, apply to Benshoof and A.R.W. because Benshoof was not

20  subject to the jurisdiction of family court in case no. 21-5-00680-6.

21     Hogg and Weiss refused to take Benshoof's documents, refused to even look at them, and

22  refused to let Benshoof explain the documents' contents.

23  **J.   Benshoof Withdraws from Case No. 21-5-00680-6**

24

25

26  PETITION FOR WRIT OF PROHIBITION                    Kurt Benshoof, Benshoof
    RE: SEATTLE MUNICIPAL CASE NO. 669329               1716 N 128th ST
    Page 12 of 27                                        Seattle, Washington 98133
                                                         (206) 460-4202
                                                         kurtbenshoof@gmail.com

**0104**

1

2

On August 9, 2022, Benshoof filed his Notice of Withdrawal to Judge Keenan in family court case no. 21-5-00680-6.  (Dkt. #13-1 at 433-39)

3

4

Benshoof sent Keenan, via certified USPS mail, legal notice on August 8, 2021, demanding that Keenan cease and desist.  (Dkt. #13-1 at 441-42)

5

6

7

8

9

Thereafter, Benshoof emailed Keenan's bailiff, Beatrice Marquez ("Marquez"), to verify that the restraining order had been amended to reflect that Benshoof was no longer a party subject to its terms, or that it had been dismissed.  Marquez refused to confirm or deny and instructed Benshoof to contact the King County clerk.

10

11

Benshoof contacted the clerk and was told that Benshoof would have to come to the King County Courthouse *in person, with a facemask on*, to obtain confirmation.

12

13

14

15

16

When Benshoof informed the clerk that wearing a facemask to come to the clerk's office wasn't an option, as King County Sheriff deputies had repeatedly forced Benshoof from the courthouse for not wearing a face mask, the clerk instructed Benshoof to obtain confirmation regarding the restraining order by contacting the SPD.

17

18

19

20

Benshoof contacted SPD and spoke with Dispatcher #13 to determine whether SPD possessed record, whether digital or paper, of a valid restraining order preventing Benshoof from contacting A.W.R.  Dispatch #13 stated that SPD would not confirm any such record; Dispatch #13 told Benshoof to seek verification at the King County Superior Court clerk's office.

21

22

23

24

25

On, or around, August 14, 2022, Benshoof called 911 to report that, if there was a valid family court restraining order in effect, Owen had again violated it by withholding A.R.W. from communicating with Benshoof via Zoom video both Saturday and Sunday.  Benshoof reported to 911 that Owen was perpetrating custodial interference by withholding A.R.W. from Benshoof

26

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 13 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

Neither the King County Superior Court, nor the SPD, would confirm the existence of a valid order restraining Benshoof from A.R.W.    911 refused to dispatch officers to take Benshoof's complaint.

**K.  SPD Incident #2022-215424**

On August 15, 2022, Benshoof drove down NE 130th Street where Owen's home is located to verify that A.R.W. was okay.  Owen was in her driveway and threatened to call the police, stating that A.R.W. was at summer camp; Benshoof left without incident.

When Benshoof arrived at his home, SPD Officers Jared Alden #8892 ("Alden"), Jordan Wallace #8382 ("Wallace") and Nicholas Hughes #8408 ("Hughes") followed Benshoof's up his driveway, passing two clearly marked "NO TRESPASSING" signs.

When Benshoof tried to enter his home, Wallace accosted Benshoof outside the front door by firmly grabbing his arm.

Benshoof stated that his right of association with A.R.W., protected by the First Amendment, had been violated since September 3, 2021, by and through the perjury of Owen and the abuse of discretion by King County Superior Court judges due to their discriminatory animus towards Benshoof's religious beliefs.

Benshoof stated that Owen, Lerman, SPD officers, City prosecutors, City judges, King County sheriff deputies, and King County Superior Court commissioners and judges denied Benshoof equal protection under the law in violation of the Fourteenth Amendment by knowingly and willfully ignoring Owen's felony perjury used initiate case no. 21-5-00680-6.

Benshoof tried to give Alden, Hughes and Wallace verified documents evincing Benshoof's claims.  Alden, Hughes and Wallace refused to take any documents from Benshoof.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 14 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0106

Alden and Wallace arrested Benshoof and took him to King County Jail where Benshoof had a spit sock forced over is head in violation of the Americans with Disabilities Act, RCW 49.60.030, and SPD Policy Manual 11.010.21; 11.010.22.  (Dkt. 13-3 at 148-155)

**L.    Complaint to SPD**

On August 16, 2022, after getting out of King County Jail, Benshoof called 911, and spoke to SPD Officers Ashlie Bissell #8559 ("Bissell") and Katrina O'Dell #6600 ("O'Dell").

Benshoof made complaint of Owen's violation of RCW 9A.40.070 (2) Custodial Interference in the second degree by Owen's violation of the either the family court temporary parenting plan, or unlawfully imprisoning Benshoof and A.R.W. from each other.

Bissell and Odell asserted to Benshoof that it was a "civil matter".

Benshoof informed Bissell and O'Dell that they were either: 1) ignorant of the law, or 2) knowingly and willfully lying to Benshoof, thereby violating the equal protection clause of the Fourteenth Amendment, in order to deny Benshoof his right to equal protection under the law.

To ensure that Bissell and O'Dell were not ignorantly well-intentioned, Benshoof then read aloud the Washington Legislative intent for Custodial Interference from the state website:

> Intent—2015 c 38: "It is the intent of the legislature to address the Washington supreme court's decision in State v. Veliz, 176 Wn.2d 849 (2013). The court held that a parent cannot be charged with custodial interference under RCW 9A.40.060(2) if a parent withholds the other parent from having access to the child in violation of residential provisions of a domestic violence protection order. The legislature intends that the provisions of RCW 9A.40.060(2) and 9A.40.070(2) be applicable in cases in which a court has entered any order making residential provisions for a child including, but not limited to, domestic violence protection orders that include such residential provisions."

Bissell and O'Dell refused to acknowledge that the state statute and legislative intent, coupled with the facts enumerated by Benshoof, evinced Owen's felony law violation of either RCW 9A.40.070 or RCW 9A.40.040.  Bissell and O'Dell took no action to uphold the law.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 15 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

SPD Policy Manual 15.110 Investigating Custodial Interference requires SPD officers to act upon evidence of custodial interference.  (Dkt. 13-4 at 158-161)

## M.  A.R.W. Considers Suicide

On, or around, August 16, 2022, A.R.W. informed Owen, as recounted in the Guardian ad Litem report, "On August 16, [A.R.W.] disclosed contemplating jumping off a balcony at summer camp to kill himself."  (Dkt. #13-3 at 334)

Owen and Lerman isolating A.R.W. from Benshoof has been mentally and emotionally traumatizing to A.R.W.  It has also mentally and emotionally traumatized Benshoof.

## N.  Trial In Absentia

On October 21, 2022, Keenan heard Owen's motions for final orders.

Benshoof was not afforded the opportunity to appear in person, and Keenan continued to deny Benshoof entrance to the courtroom in violation of Wash. Const. art I §§ 10, 22, nor was Benshoof allowed to testify before a jury of his peers pursuant to Wash. Const. art I § 21.

Keenan declared Benshoof to be a "credible threat" to A.R.W. and Owen, ordering that Benshoof would be subject to immediate arrest if Benshoof had any contact with A.R.W. before October 21, 2027, *five months after the 18th birthday of A.R.W.*

Keenan ordered that Benshoof would be subject to immediate arrest if he effected legal service of process upon Owen by any other means than ABC Legal Services or Pegasus Process Service.  (Dkt. #13-2 at 4)

Keenan was not delegated the authority to effectively re-write Wash. CR 4 and Fed.R.Civ.P. 4, by which Benshoof effectuating legal service of process could be criminalized.

## O.  No Proof of Service

On November 15, 2022, SPD Detective Ryan Ellis ("Ellis") allegedly filed Proof of

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 16 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0108**

Service in family court case no. 21-5-00680-6, which stated on page one, "**Important!** *Do not use electronic service if your case involves the surrender of firearms…. After 2 unsuccessful attempts at personal service, you can ask the court to authorize electronic service.*" (Dkt. #13-3 at 163)

Page two stated that Ellis served an Order to Surrender and Prohibit Weapons. Ellis did not ask for, nor receive, authorization from Judge Keenan to serve Benshoof via electronic service. Ellis did not obtain confirmation that Benshoof had been served final orders in case no. 21-5-00680-6.

Ellis did not date his signature under penalty of perjury on page three. The **date** line stated, "Seattle." GR 30(d)(3) requires compliance with GR 13(a)(2). CR 4, GR 13(a)(2) and RCW 5.50.050 require that proof of service sworn under penalty of perjury **be dated.** (*Id.* at 165) As such, Ellis did not legally serve Benshoof the final orders in case no. 21-5-00680-6.

**P. SMC Case No. 669329**

On November 15, 2022, Benshoof discovered in his mailbox that he was charged with violating RCW 7.105.450 related to the events of August 15, 2022, SPD Incident #2022-215424.

The City letter stated that a hearing was scheduled for November 16, 2022, at 230pm.

Benshoof wrote a motion to dismiss for lack of personal jurisdiction, citing the requirement of RCW 35.20.270(1) which states, "All criminal and civil process issuing out of courts created under this title shall be directed to the chief of police of the City served by the court and/or to the sheriff of the county in which the court is held and/or to the warrant officers and be by them executed according to law in any county of this state." (Dkt. #13-3 at 139-144).

Benshoof then wrote a motion for change of venue on the grounds that SMC had repeatedly denied his right to appear in person without a facemask. (Dkt. #13-3 at 146-149)

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 17 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0109

On the morning of November 16, 2022, Benshoof attempted to e-file his two motions via the SMC web portal. Despite SMC repeatedly asserting for the prior five months that Benshoof had been granted access to e-filing, the web portal would not permit Benshoof to e-file his motions.

Benshoof then emailed the two .pdf documents to the City Attorney Ann Davison, Senior Assistant Attorney Christopher Karr, Assistant Attorney Kevin Kilpatrick, and to courtroom 1102. (Dkt. #13-3 at 152-3)

At 230pm on November 16, 2022, Benshoof appeared by Special Appearance via WebEx in courtroom 1102 before Judge Gregory under threat, duress, and coercion.

Benshoof cited RCW 35.20.270(1) as a threshold issue and asked Gregory if the prosecutor had provided evidence the City effectuated legal service of process to grant jurisdiction to the court. Gregory did not affirm that the City had done so; rather, Gregory simply asserted, "The court has jurisdiction."

Unsatisfied with what appeared to Benshoof to be tautological evasion by Gregory, Benshoof asked City prosecutor Cooper directly if she had provided the court with evidence of the City's compliance with RCW 35.20.270(1); Cooper remained silent on the issue.

Gregory again asserted, "The court has jurisdiction," despite Benshoof's repeated objections that the court had no evidence of personal service granting the court jurisdiction to proceed.

Cooper did not provide the court evidence that a valid protection order existed, nor that the City had effected personal service pursuant to RCW 35.20.270(1).

Cooper did not provide the court with evidence that Seattle Municipal Court was authorized by law to have jurisdiction over a domestic violence protection order pursuant to RCW

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 18 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0110**

7.105.050(1) which states, "The superior and district courts have jurisdiction over domestic violence protection order proceedings."

Gregory entered a plea of not guilty on Benshoof's behalf and set bail in the amount of $10,000. Benshoof stated that Gregory's conduct constituted a violation of RCW 9A.56.030 theft in the first degree. RCW 9A.56.020(1)(a) states in part, "Theft means to wrongly obtain or **exert unauthorized control** over the property or services of another or the value thereof, with intent to deprive him or her of such property."

Gregory increased the bail amount to $25,000 and stated that he was issuing a restraining order preventing Benshoof from contacting Owen or being within 1000 feet of her or her home.

Benshoof asked why, if there was **actually** a valid restraining order from family court would Gregory issue a verbatim duplicate? Gregory did not answer. Gregory set the bail amount to $10,000, and a bail hearing was set for November 22, 2022, despite Benshoof's objections.

Benshoof appeared by Special Appearance via WebEx on November 22, 2022, before Judge Adam Eisenberg ("Eisenberg"). Benshoof again cited RCW 35.20.270(1) and demanded evidence that the City had effectuated legal service of process to grant the court jurisdiction.

Eisenberg did not affirm that personal service of Benshoof was evidenced before the court; rather, Eisenberg asserted that Gregory had already addressed this issue on November 16, 2022, and that Benshoof had been arraigned. Benshoof rejected Eisenberg's claim and reminded Eisenberg that the Gregory court was absent jurisdiction to arraign Benshoof.

Eisenberg declared that Benshoof had failed to comply with Gregory's $10,000 bail order and thereupon issued bench warrant #990434611, in the amount of $10,000.

On February 10, 2023, Public Defender Faiz Pirani appeared on Benshoof's behalf. Upon Mr. Pirani's motion, warrant #990434611 was quashed.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 19 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0111**

On June 21, 2023, Benshoof appeared by WebEx before Judge Jerome Roache ("Roache").  City prosecutor Katrina Outland ("Outland") motion to issue a $100,000 warrant for Benshoof's arrest.  Benshoof made an oral motion for Roache to issue a $1,000,000 warrant commensurate with the absurdity of such a kangaroo court.  Roache issued warrant #990437083 in the amount of $50,000 for Benshoof's "failure to appear."  The worksheet stated that Benshoof appeared. (Dkt. #13-3 at 161)

**Q.  A.R.W. Runs Away Again**

On January 23, 2023, A.R.W. tried to run away from Owen's a second time to come home to his father.  Owen discovered her son's plans and told A.R.W. that he could either go to school or walk to Benshoof's house while Owen called her attorney to resolve the family dispute.

A.R.W. walked home to Benshoof's.  Upon arrival at Benshoof's home, A.R.W. burst into tears and said, "I think mom disowned me."

While A.R.W. was walking home to his father's house, Owen called 911 to have Benshoof arrested.  Owen also contacted Lerman.  Lerman then immediately posted to her public Twitter account, "I really thought everything was going to be okay.  But it isn't.  It won't be as long as he's alive and free," referring to Benshoof; that is, Lerman predicated her need to have Benshoof dead or incarcerated as a condition of her own sense of well-being, without any regard for the devastating impact that would have on A.R.W.  Lerman deleted the tweet shortly thereafter. (Dkt. 13-1 at 199)

**R.  SMC Case No. 671384**

On March 13, 2023, CITY prosecutor Katrina Outland ("Outland") filed eighty-nine criminal charges against Benshoof alleging that Benshoof violated a restraining order by

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 20 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0112

effectuating legal service of process at Owen's house pursuant to CR4 and FrCP 4 and texting with A.R.W. over the Discord app.

Outland was given Discord text messages between Benshoof and A.R.W. As such, Outland knows that A.R.W. expressed his desire to be freed from his imprisonment at Owen's. When Benshoof texted his son in December 2022 to ask if Benshoof should just give Owen his home and all of his money as effective ransom payment so that his son could come back to his father, instead of Benshoof seeking remedy through the courts, A.R.W. responded, "No way. Hit [Owen and Lerman] with everything you got. Keep hitting them."

Outland also read text messages from A.R.W. in which A.R.W. stated his belief that Owen and Lerman are "crazy."

On, or around, March 13, 2023, Judge Faye Chess determined there was probable cause to issue $250,000 warrant #990435958 for Benshoof's immediate arrest.

The City did not provide Judge Chess that Seattle Municipal Court had jurisdiction to proceed pursuant to RCW 7.105.050(1)(a)(d).

Benshoof emailed Outland, offering to turn himself in on the $250,000 warrant within twenty-four (24) hours if Outland would simply provide Benshoof evidence that the Seattle Municipal Codes she had charged Benshoof with were laws in accordance with Wash. Const. art II §§ 18; 22; 32; art III § 12 which the CITY had the legislative power to enact, enforce, and prosecute Benshoof under Wash. Const. art XI § 11. (Dkt. #13-3 at 155)

Benshoof also offered to have the best polygraph analyst in Washington state hired to determine whether Owen or Benshoof was telling the truth. Benshoof proposed a payment of $50,000 to Outland and Owen if anything Benshoof had alleged was false. (*Id.* at 155)

Outland refused both offers. In poker that is called "calling their bluff."

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 21 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0113**

## S.  Benshoof's Petition for Habeas Corpus

Benshoof filed a Petition for Writ of Habeas Corpus in U.S. District Court for the Western District of Washington in May 2023, Case No. 2:23-cv-00751-RAJ.

In May 2023, Benshoof attempted to contact Owen's attorney of record, Blair Russ, in order to have Mr. Russ accept service.  Mr. Russ refused to respond, despite Benshoof informing Mr. Russ that, if Owen and Lerman were *actually* traumatized by legal service to their home, Mr. Russ should be more than willing to accept service.

However, this is illustrative of the blatantly sophomoric game that Owen and her co-conspirators have been playing; that is, feign victimhood to create the thin veneer of plausibility for more retaliation against Benshoof.  It's well known in clinical psychology.  Narcissists exhibit a predictable pattern of behavior:  Deny, Accuse, Reverse Victim and Abuser.

Benshoof f eventually had an associate effect service of process to Owen.  Predictably, Owen called 911.  Predictably, SPD Officer Gabriel Ladd, who is a named defendant in Benshoof's federal lawsuit, filed SPD Incident Report #2023-151429.

The dismissal has been appealed to the 9th Circuit, Case No. 23-35418.

## T.  SMC Case No. 675317

City prosecutor William Cotter is the latest accessory to the predicate acts of the City's RICO Enterprise targeting Benshoof.  On September 28, 2023, Mr. Cotter filed charges against Benshoof, based upon Ofc. Ladd's SPD Incident Report #2023-151429, to initiate Seattle Municipal Court Case No. 675317.

This latest malicious prosecution, in violation of RCW 9.62.010, constituted additional predicate acts in violation of 18 U.S. Code §§ 4; 241; 242; 1512; 1513(e); and 1962(c)(d).

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 22 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0114

On October 11, 2023, Benshoof emailed a Motion to Dismiss SMC Case No. 675317 to the prosecutors and Court.

On October 11, 2023, City prosecutor Soheila Sarrafan ("Sarrafan") appeared on behalf of the City in courtroom 902 before the Honorable Pooja Vadddadi.  Sarrafan informed the Court of the cases the City had noted for dismissal; Case No. 675317 was not among those noted.

Benshoof then made a Special Appearance by WebEx before Judge Vaddadi.  Sarrafan abruptly moved to dismiss Case No. 675317 prior to arraignment such that Benshoof's Motion to Dismiss Case No. 675317 was not heard.  SMC Case No. 675317 was thereupon dismissed without prejudice on October 11, 2023, under the pretense that the City needed to do "further investigation."

### III.    ISSUES WARRANTING WRIT

**1.  Does the evidence show that Jessica R. Owen committed felony perjury to barratrously initiate King County family court case no. 21-5-00680-8 which was allowed, enabled, and facilitated by Nathan L. Cliber and David S. Keenan?**

Yes.  The evidence is irrefutable, yet it has been ignored.

**2.  Is the City Attorney's Office in possession of irrefutable evidence that Owen, Cliber, and Keenan knowingly and willfully conspired to assert jurisdiction over Benshoof and A.R.W. in violation of the First Amendment and the Fourteenth Amendment?**

Yes.  City attorneys are complicit in these ongoing violations enabling Owen's crimes.

**3.  Was the City absent evidence that SPD Det. Ryan Ellis legally effected service of process upon Benshoof?**

Yes.  The City was absent such evidence, and City police officers, prosecutors, and judges have refused to acknowledge Benshoof's evidence.

**4.  Did the City comply with the statutory requirement of RCW 35.20.270(1) to effect service of process upon Benshoof to obtain *in personam* jurisdiction?**

No.  The City has a custom and widespread practice of violating RCW 35.20.270(1).

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 23 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**5. Does the City have jurisdiction to hear allegations of domestic violence related to King County family court case no. 21-5-00680-6 pursuant to RCW 7.105.050(1)(a)?**

No.  Only King County Superior Court is authorized by statute.

## IV.    ARGUMENT FOR GRANTING WRIT

To be valid and enforceable, a prosecution must be supported by three elements: (1) the court must have jurisdiction of the parties; (2) the court must have jurisdiction of the subject matter; and (3) the court must have the authority to render the particular judgment.

## A.  NO PERSONAL JURISDICTION

Even if the final orders granted by Keenan on October 21, 2022, were valid, which they are not, the City failed to comply with RCW 35.20.270(1) to effect service of process, as Benshoof argued prior to arraignment when he made a special appearance before Judge Willie Gregory on November 16, 2022.

Judge Gregory asserted that "the Court has jurisdiction" absent any substantiating evidence from the City that the prosecution had complied with RCW 35.20.270(1).

As the Court did not have evidence of personal jurisdiction to proceed, the Court's order of $10,000 bail and the subsequent $50,000 warrant were *void ab initio, ultra vires,* and in violation of Wash. Const. art. I § 14.

Pursuant to RCW 9A.56.020(1)(a) "Theft" means to wrongfully obtain or exert unauthorized control over property or services of another or the value thereof, with intent to deprive him or her of such property or services;"

Attempting to exert unauthorized control over Benshoof's money in excess of $5,000 violated RCW 9A.56.030(1)(a) first degree theft, a class B felony.

## B.  NO SUBJECT MATTER JURISDICTION

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 24 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

Under the Fruit of the Poisonous Tree Doctrine, City officials cannot profess the legitimacy of evidence that is the direct result of illegal conduct on the part of City and King County officials including, but not limited to, David Keenan, Katrina Outland, and Willie Gregory.

The City cannot assert jurisdiction to prosecute or adjudicate case no. 669329 in the face of irrefutable evidence that King County family court case no. 21-5-00680-8 was *void ab initio* due to the perjury of Jessica Owen and absence of subject matter jurisdiction precluding the family court's authority to proceed.

## C. MUNICIPAL COURT ABSENT AUTHORITY

As a court of limited jurisdiction, Seattle Municipal Court lacks the authority to adjudicate the alleged domestic violence charge against Benshoof even if there were valid allegations premised upon a valid family court adjudication.

RCW 7.105.050(1)(a) stipulates that an alleged violation of a domestic violence protection order in King County District Court must be transferred to Superior Court when "a superior court has exercised or is exercising jurisdiction over a proceeding involving the parties."

As such, all acts by City prosecutors and judges related to SMC Case No. 669329 were *ultra vires* and thus violative of Benshoof's rights.

## V.    REQUESTED RELIEF

*WHEREFORE*, upon his verified statements herein Benshoof moves this honorable Court to grant a Writ of Prohibition arresting Seattle Municipal Court Case No. 669329 for the municipal court's absence of jurisdiction to proceed in accordance with RCW 7.16.300. Pursuant to RCW 7.16.310, this petition seeks an alternative writ commanding the City, immediately after the receipt of the writ, to desist from prosecuting and adjudicating Case No.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 25 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

669329 and any related action to threaten, detain, arrest, or imprison, Benshoof under Warrant #990437083, or to show cause before the court on or before November 10, 2023, why the City has not so desisted.

**VERIFICATION**

I, Affiant Kurt Benshoof, do hereby declare that the foregoing is true and correct to the best of my knowledge under penalty of perjury in the State of Washington, and am competent to testify to the matters stated herein.  Executed this 31st day of October in the year 2023, in the City of Seattle, in the county of King, in the state of Washington.


By:    s/ Kurt Benshoof
          Kurt Benshoof *Pro Se*

          1716 N 128th Street
          Seattle, WA 98133
          Phone: (206) 460-4202
          Email: kurtbenshoof@gmail.com

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 669329
Page 26 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0118**

1

2

## CERTIFICATION OF NOTICE

3       I, Kurt Benshoof, hereby certify that on October 31, 2023, I did effect service upon

4   counsels for Defendants by e-filing in King County Superior Court Case No. 22-2-15958-8 the

5   Petition for Writ of Prohibition Re: Case No. 669329 and this Summary of Petition for Writ of

6   Prohibition Re: Seattle Municipal Court Case No. 669329 by emailing to the email addresses

7   listed below:

8

**Attorney For Defendant Jessica Owen:**           **Attorney for Defendant Nathan Cliber:**

9   Blair M. Russ, WSBA #40374                      Kyle Rekofke, WSBA #49327
    1000 Second Avenue                              701 Fifth Avenue
10  Suite 3660                                      Suite 2100
    Seattle, WA 98104                               Seattle, WA 98104
11  Email: bmr@tbr-law.com                          Email: krekofke@grsm.com

12

13

**Attorney for Defendants Magalie Lerman and Owen Hermsen:**

14  Moshe Y. Admon, WSBA #50325
    300 Lenora Street
15  Suite 4008
    Seattle, WA 98121
16  Email: jeff@admonlaw.com

17

18                              DATED:  October 31, 2023

19                              Signed:   ___s/ Kurt Benshoof___

20                              Kurt Benshoof, *Pro Se*
                                1716 N 128th ST
21                              Seattle, WA 98133
                                (206) 460-4202
22

23

24

25

26  PETITION FOR WRIT OF PROHIBITION                        Kurt Benshoof, Benshoof
    RE: SEATTLE MUNICIPAL CASE NO. 669329                   1716 N 128th ST
    Page 27 of 27                                           Seattle, Washington 98133
                                                            (206) 460-4202
                                                            kurtbenshoof@gmail.com

## 0119

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**FILED**

Hon. Marshall Ferguson

2023 OCT 31 02:01 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 22-2-15958-8 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

KURT A. BENSHOOF *Pro Se,*

Petitioner,

v.

CITY OF SEATTLE,

Respondent.

CASE NO.

PETITIONER'S SUMMARY RE:
PETITION FOR WRIT OF PROHIBITION

WRM - 2

Re: Seattle Municipal Case No. 671384

## I.    INTRODUCTION

COMES NOW Petitioner Kurt Benshoof ("Benshoof"), under threat, duress, and coercion

of this Court's Order Restricting Abusive Litigation of Kurt Benshoof ("Order"), summarizing

Benshoof's Petition for Writ of Prohibition Re: Seattle Municipal Case No. 671384 ("Writ").

## II.    SUMMARY

The Order was granted in violation of RCW 26.51.030, which required that Benshoof

had "been found by the court to have committed domestic violence." No court has found

Benshoof to be a domestic violence perpetrator.

The Order was granted in violation of RCW 26.51.030, ignoring the statutory

requirement that, "the court shall set a hearing to determine whether the litigation meets the

SUMMARY OF PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL COURT CASE NO. 671384
Page 1 of 4

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0120**

definition of abusive litigation." This Court did not seek to determine if Benshoof had been found to be a domestic violence perpetrator by any court.

The Order was granted in violation of RCW 26.51.040(1), which states, "the court shall hear all relevant testimony." This Court did not hold a hearing to hear all relevant testimony to consider whether Benshoof had been found to be a domestic violence perpetrator by any court.

As such, the Order was *void ab initio.* This has been detailed in Benshoof's federal complaint in U.S. District Court for the Western District of Washington, Case No. 2:23-cv-01392-JNW.

The Writ evinces that Judge David Keenan ("Keenan") did not have jurisdiction to adjudicate family court Case No. 21-5-00680-6, and that Keenan knowingly allowed, enabled, and facilitated the felony perjury of Jessica R. Owen, mother of Benshoof's son. Keenan thereby issued *void ab initio* orders, causing Benshoof and his son irreparable, ongoing harm.

The Writ evinces that the City initiated Case No. 671384 without personal jurisdiction over Benshoof, as the City knowingly and willfully failed to comply with RCW 35.20.270(1), and ignored Benshoof repeatedly raising this threshold, dispositive issue at the commencement of the case.

The Writ evinces that the City knows SPD Det. Ryan Ellis neither legally served Benshoof Keenan's final orders, nor filed proper service in Case No. 21-5-00680-6.

The Writ evinces that the City initiated Case No. 671384 in violation of RCW 7.105.050(1)(a)(d) which states that only a Superior Court is so authorized to adjudicate the domestic violence allegations against Benshoof.

SUMMARY OF PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL COURT CASE NO. 671384
Page 2 of 4

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0121**

Upon the foregoing, the Writ evinces that the City has violated RCW 9.62.010 to perpetrate the malicious prosecution of Benshoof, in violation of 18 U.S. Code §§ 241; 242; 1512; 1513; 1962.

Benshoof seeks the Writ to prohibit the City from further violations of state and federal law, and to prevent the City from continuing to aid and abet state and federal law violations by Jessica R. Owen.

## VERIFICATION

I, Affiant Kurt Benshoof, do hereby declare that the foregoing is true and correct to the best of my knowledge under penalty of perjury in the State of Washington, and am competent to testify to the matters stated herein. Executed this 31st day of October in the year 2023, in the City of Seattle, in the county of King, in the state of Washington.


By: _____s/ Kurt Benshoof_____
Kurt Benshoof *Pro Se*

1716 N 128th Street
Seattle, WA 98133
Phone: (206) 460-4202
Email: kurtbenshoof@gmail.com

SUMMARY OF PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL COURT CASE NO. 671384
Page 3 of 4

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0122**

1

2

## CERTIFICATION OF SERVICE

I, Kurt Benshoof, hereby certify that on October 31, 2023, I did effect service upon

counsels for Defendants by e-filing in King County Superior Court Case No. 22-2-15958-8 the

Petition for Writ of Prohibition Re: Case No. 671384 and this Summary of Petition for Writ of

Prohibition Re: Seattle Municipal Court Case No. 671384 by emailing to the email addresses

listed below:

**Attorney For Defendant Jessica Owen:**          **Attorney for Defendant Nathan Cliber:**
Blair M. Russ, WSBA #40374                        Kyle Rekofke, WSBA #49327
1000 Second Avenue                                701 Fifth Avenue
Suite 3660                                        Suite 2100
Seattle, WA 98104                                 Seattle, WA 98104
Email: bmr@tbr-law.com                            Email: krekofke@grsm.com


**Attorney for Defendants Magalie Lerman and Owen Hermsen:**
Moshe Y. Admon, WSBA #50325
300 Lenora Street
Suite 4008
Seattle, WA 98121
Email: jeff@admonlaw.com

DATED:  October 31, 2023

Signed:  _____s/ Kurt Benshoof_____

Kurt Benshoof, *Pro Se*
1716 N 128th ST
Seattle, WA 98133
(206) 460-4202

SUMMARY OF PETITION FOR WRIT OF PROHIBITION          Kurt Benshoof, Benshoof
RE: SEATTLE MUNICIPAL COURT CASE NO. 671384          1716 N 128th ST
Page 4 of 4                                          Seattle, Washington 98133
                                                     (206) 460-4202
                                                     kurtbenshoof@gmail.com

## 0123

Hon. Marshall Ferguson

1
2
3
4
5
6          IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
7                    IN AND FOR THE COUNTY OF KING
8

| | |
|---|---|
| KURT A. BENSHOOF *Pro Se,* | CASE NO. |
| Petitioner, | |
| v. | PETITION FOR WRIT OF PROHIBITION |
| CITY OF SEATTLE, | WRM - 2 |
| Respondent. | Re: Seattle Municipal Case No. 671384 |

## I.    INTRODUCTION

COMES NOW Petitioner Kurt Benshoof ("Benshoof") requesting that this Court issue a writ of prohibition to arrest Seattle Municipal Court Case No. 671384 as such proceedings are absent the jurisdiction of Seattle Municipal Court pursuant to RCW 7.105.050(1)(a)(d).

The City Attorney's Office and municipal judges have been notified by Benshoof that only a Superior Court is authorized under the aforementioned statute to adjudicate the City's allegation against Benshoof of domestic violence in Case No. 671384.  Despite its absence of jurisdiction to proceed, Seattle Municipal Court has refused to dismiss the case or hear any motion by Benshoof.  As such, Benshoof has no plain, speedy and adequate remedy in the ordinary course of law other than to petition for Writ of Prohibition.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 1 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0124**

## II.     VERIFIED STATEMENTS OF FACT

Benshoof avers the following statements and is prepared to testify under penalty of perjury to these facts in a court of law authorized and convened under the Washington Constitution. Benshoof incorporates by reference as if fully restated herein the following documents filed in U.S. District Court for the Western District of Washington Case No. 2:23-01392-JNW: Complaint (Dkt. #9) Exhibits (Dkt. #13-1; #13-2; and #13-3)

All *emphasis* that of Benshoof.

### A.  Family Background

Benshoof and defendant Jessica Owen ("Owen") discovered she was pregnant with Benshoof's child, A.R.W., in August 2008.  Thereupon, Benshoof and Owen entered into a verbal parenting contract at common law ("Covenant") after notice, consideration, and accord; thereby exercising their unlimited right to contract as private individuals.

Under their Covenant as father and mother, they would henceforth have full, equal and inalienable rights as parents of their son-to-be, sharing all significant decisions regarding A.R.W.'s care and upbringing, such as education, family scheduling, medical and dental care, and nutrition.

Though Benshoof and Owen never married, they raised A.R.W. amicably for the following twelve years, prioritizing their son's well-being and sharing equally in all significant decisions regarding their son's education, medical care, dental care, and living arrangements.

### B.  Owen Seizes Custody of A.R.W.

Owen explicitly threatened to steal Benshoof's car, seize custody of A.R.W., deny Benshoof's equity ownership in his home and evict Benshoof on August 16, 2021, via text message. (Dkt. #13-1 at 44)  When Benshoof refused to be intimidated by her threats, Owen filed

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 2 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

for a TRO in King County Superior Court Case No. 21-2-11149-8 on August 23, 2021 under the false pretense that Benshoof was preventing Owen from seeing A.R.W.

In Owen's TRO petition, she truthfully stated under penalty of perjury that A.R.W. was related to Benshoof as his child, that Benshoof and A.R.W. had lived together, and that Benshoof had raised A.R.W. his entire life.

King County Superior Court issued a full denial order of Owen's TRO petition on September 3, 2021. Benshoof thought Owen would thereafter stop her lies and threats. Benshoof was mistaken.

Thereafter, Owen acted to keep Benshoof from seeing or communicating with A.R.W., including telling Jane Addams Middle School that Owen was the "sole legal guardian" of A.R.W. Owen was not the "sole legal guardian" of A.R.W.

Upon Owen's false statements that she was the "sole legal guardian" of A.R.W., school staff refused Benshoof access to A.R.W. and denied Benshoof access to his son's school records. RCW 28A.605.020 assures parent access to their child's classroom. RCW 28A.605.030 protects the right of a parent to review all education records of their child.

On September 24, 2021, Benshoof called 911 to do a wellness check on A.R.W. SPD Officers Kieran Barton #8747 ("Barton") and Adam Beaty #7453 ("Beatty") responded. Beaty refused to take a sworn affidavit from Benshoof evidencing that Benshoof had full rights as the father of A.R.W. Beaty stated, "I'm not taking anything from you. We know you're trying to set us up." (Dkt. #13-1 at 35-38)

Barton and Beatty asserted that Owen was the "sole legal guardian" of A.R.W. RCW 26.33.0209(11) defines a "legal guardian" as someone *other than a parent.* Barton and Beatty

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 3 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0126

did not possess evidence that a court order had determined Owen to be "sole legal guardian" of A.R.W.

Owen hired family attorney Nathan Cliber ("Cliber") in September 2021, filing a Petition to Decide Parentage ("parentage action").  Case no. 21-5-00680-6 was a ruse so that Owen could seek an emergency restraining order against Benshoof to deny Benshoof's rights as A.R.W.'s father.

Benshoof did not consent to family court adjudicating his family affairs.  Defendant David Keenan ("Keenan") was assigned as presiding judge.

**C. Impairing the Obligation of Contracts**

No evidence of Owen's and Benshoof's contractual privity with Washington state, by dissolution of marriage or domestic partnership, declaration of invalidity, or legal separation exists.

Cliber, and Owen knowingly and willfully acted in concert to impair the obligations of Owen to uphold the Covenant.  By and through Cliber, Owen made materially false statements to initiate Family Court case no. 21-5-00680-6 by filing a barratrous, perjurious parentage action.

In August 2021 case no. 21-2-11149-8 and September 2021 case no. 21-5-00680-6 Owen took two mutually exclusive positions foundational to her parentage action.

First, Owen declared on August 23, 2021, in TRO case no. 21-2-11149-8 that: (1) Owen and Benshoof are the parents of A.R.W. (Dkt. #13-1 at 72); (2) A.R.W. is related to Benshoof as his child (*Id.* at 73); and (3) Benshoof had raised A.R.W. his entire life.  (Dkt. #13-1 at 62)

Four weeks later in case no. 21-5-00680-6, Owen and Cliber filed a parentage action, the basis of which was that Benshoof: (1) was not the biological father of A.R.W.; (2) had never lived with A.R.W., and (3) had never held out A.R.W. as his son.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 4 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0127**

Owen's September 20, 2021, statement (Dkt. #13-1 at 254) that Benshoof was not the presumed father of A.R.W. was an inconsistent material statement under oath which directly contradicted Owen's prior sworn statement weeks earlier in case no. 21-2-11149-8, averring On August 21, 2021, that Owen and Benshoof are "parents of a child in common." (Dkt. #13-1 at 77) which affirmed that: (1) Owen and Benshoof are the parents of A.R.W.; (2) A.R.W. is related to Benshoof as his child; and (3) Benshoof had raised A.R.W. his entire life.

As such, Owen took two mutually exclusive positions between case no. 21-2-11149-8 and case no. 21-5-00680-6, in violation of RCW 9A.72.020; 9A.72.050.

First, Owen declared in August 2021 that Benshoof: (1) was the biological father of A.R.W., (2) had lived with A.R.W. his entire life; and (3) had acted as his father his entire life. Then in Owen's parentage action, the basis of which was that Benshoof was not the presumed father of A.R.W., Owen averred under penalty of perjury, "To my knowledge, no one is already presumed to be a parent" (Dkt. #13-1 at 254)

Owen also declared that Benshoof had at all times refused to agree to legal recognition of A.R.W. (*Id.*) However, Benshoof had texted Owen on September 18, 2021, stating Benshoof's belief that Owen had refused to add Benshoof's name to A.R.W.'s birth certificate as part of Owen's fraud to assert that Owen was the "sole legal guardian" of their son. (Dkt. #13-4 at 392)

On September 19, 2021, Benshoof texted Owen, "Are you still refusing to amend [A.R.W.'s] birth certificate to show my legal name (as I have previously and repeatedly requested)?" (*Id.*)

Pursuant to RCW 26.26A.115, there is presumption of fatherhood once the father has: (1) lived with the child for the first four years of the child's life, and (2) openly held out the child as his own, even if the child was not biologically his own.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 5 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

In defiance of all logic or pretense of plausible honesty, ***two days after*** Owen signed the petition to decide parentage on September 20, 2021, asserting that Benshoof was not the presumed father of their son, Owen then signed her Declaration of Jessica R. Owen on September 22, 2021, stating, "***Kurt having acted as [A.R.W.'s] father for [A.R.W.'s] entire life…***" (Dkt. #13-1 at 229)

Owen also stated, "We moved in together in July of 2008.  [A.R.W.] was born nine months later…" (Dkt. #13-1 at 230)  "[Benshoof] always insisted on being treated as A.R.W.'s father and that A.R.W. was his.   (*Id.*)  "…September of 2020 that ***I finally moved out of our shared residence…***" (Dkt. #13-1 at 231)

Family law attorney Cliber then reviewed Owen's statements, affixed his signature to the petition to decide parentage and motion for immediate restraining order, and filed them.

 At no time did Owen ever claim that there was another possible biological father of A.R.W.  Owen and Benshoof have known since August 2008 that A.R.W. was conceived during sexual intercourse involving only Owen and Benshoof on July 18, 2008, which also happens to be Benshoof's birthday.

**D.  TRO Hearing**

On October 25, 2021, Commissioner Jason Holloway ("Holloway") heard Owen's petition for temporary restraining order.  Owen sought to seize sole custody of A.R.W. and prevent Benshoof from associating with his son.

Holloway consulted the Judicial Information System but did not disclose this fact to Benshoof in accordance with the requirement of RCW 2.28.210(2).

Cliber asserted that Benshoof had engaged in "domestic violence" against Owen and A.R.W.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 6 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

Benshoof has never engaged in domestic violence against anyone, nor threatened to do so. On the contrary, Owen has assaulted Benshoof during their parenting relationship on multiple occasions, including striking Benshoof in the face repeatedly and causing inches long, bloody scratches on Benshoof's leg.

Benshoof has never spanked his son, nor yelled at A.R.W., nor any child. Neither has Benshoof ever threatened to hit any woman, nor done so.

Holloway stated on the record, "I'm not requiring that [Benshoof] do a domestic violence assessment. That would have been something that would have been ordered if he had been found to be a domestic violence perpetrator, **which he is not.**"

Holloway thereby implicitly acknowledged that Owen's claims of being stalked by Benshoof, and her claims that Benshoof inflicted fear upon her and A.R.W., were false. (*See* RCW 26.50.010(3)).

Holloway asserted that Benshoof was a "credible threat" to A.R.W. due to Holloways discriminatory animus toward Benshoof's minority religious beliefs.

A State must, if it is to invoke the statutes after injunctive relief has been sought, assume the burden of obtaining a permissible narrow construction in a noncriminal proceeding.

After Benshoof discovered that family court does not allow trial by jury, he filed a motion objecting to the violations of due process. (Dkt. #13-1 at 278-284)

Keenan denied Benshoof's motion absent findings of fact or conclusions of law.

**E.  No Justiciable Issue**

For a court to obtain jurisdiction, there must be a justiciable issue before said court.

Owen, Cliber, and assigned Judge David Keenan ("Keenan"), knew or should have known that the evidence in the record of King County Superior Court as of the filing of the parentage

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 7 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

action on September 28, 2021, evidenced that family court could not overcome Benshoof's legal presumption as the father of A.R.W., pursuant to RCW 26.26A.115; RCW 26.26A.435(2).

Family court had an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenged it.   Benshoof did challenge it, repeatedly.

Cliber, Holloway, and Keenan ("Keenan") knew that the doctrine of judicial estoppel and RCW 9A.72.020 prohibited Owen from making inconsistent material statements under oath; that is, Owen was prohibited from committing felony perjury.

Cliber, Holloway, and Keenan knew that the consent of Benshoof was never given to adjudicate case no. 21-5-00680-6 without a trial by jury.

Cliber, Holloway, and Keenan knew that through the Fourteenth Amendment the Seventh Amendment protects the right to trial by jury in all civil litigation and that Wash. Const. art I §14 prohibits a public official from denying a civil litigant the right to trial by jury absent the consent of both parties.  Benshoof has never consented to family court adjudication.

**F.  No Contractual Privity with State**

On, or around, March 10, 2023, Benshoof discovered that family court plans and orders apply to fathers and mothers in contractual privity with the state via marriage, domestic partnership, declaration of invalidity, or legal separation; none of which Benshoof and Owen were party to.  (*See* RCW 26.09.004(3)(4)).

Between September 2021 and March 2022, Cliber failed to disclose that RCW 26.09.004(3)(4) did not apply to Benshoof.

Washington BAR Rules of Professional Conduct ("RPC") 3.3(A)(3) states that a lawyer shall not knowingly, "fail to disclose to the tribunal legal authority in the controlling jurisdiction

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 8 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0131**

known to the lawyer to be directly adverse to the position of the client and not disclosed by the opposing party."

In March 2022, Benshoof emailed Cliber upon his discovery of RCW 26.09.004. Benshoof informed Cliber that Cliber had engaged in deceit to invoke family court jurisdiction. Cliber responded by stating that he had obtained the jurisdiction of family court by other means.

Upon Benshoof's request that Cliber disclose what this other means was, Cliber refused to disclose by what controlling authority he had done so.

Benshoof emailed Keenan's bailiff, Beatrice Marquez ("Marquez"), informing Marquez that family court did not have jurisdiction to impose plans and orders involving Benshoof and A.R.W. because Benshoof and Owen were not in contractual privity with the state via marriage, domestic partnership, declaration of invalidity, or legal separation. Marquez instructed Benshoof to bring the issue up before Keenan.

On April 1, 2022, Keenan heard Benshoof's motions to dismiss the case for lack of subject matter jurisdiction and the interests of A.R.W. (Dkt. #13-1 at 339-354; Dkt. #13-1 at 356-368)

Cliber could not, and did not, establish subject matter jurisdiction to maintain an action in case no. 21-5-00680-6. Cliber asserted *res judicata* and claimed that Benshoof's motions quoting U.S. Supreme Court cases were "unintelligible" and "frivolous." Keenan dismissed Benshoof's motions without the requested findings of fact and conclusions of law.

## G.  SPD Incident 2022-154753

On, or around, May 1, 2022, Benshoof called 911 to report custodial interference to SPD. Benshoof made complaint to SPD Officer Ashlie T. Bissell ("Bissell"). Benshoof had already made numerous such complaints to SPD, beginning in August 2021, including sworn affidavits as a victim witness.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 9 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1

2   Benshoof reported that Owen and Lerman had unlawfully taken Benshoof's 2011 Toyota

3   FJ Cruiser and, with the aid of their friend, Owen Hermsen, had attempted felony extortion of

4   Benshoof seeking $19,000 for the return of Benshoof's stolen FJ Cruiser.  (Dkt. #13-1 at 299-

5   334)

6   Benshoof reported that Owen and Lerman had engaged in felony custodial interference in

7   order to deny Benshoof's right of association with A.R.W.  Benshoof reported that Owen and

8   Lerman had violated RCW 9A.36.070 by coercing A.R.W. to be subjected to a Pfizer medical

9   experiment by threatening that A.R.W. would be restrained from going to school or seeing his

10  friends.

11  Bissell told Benshoof that she could not file a complaint against Owen and Lerman for

12  coercing A.R.W. to be subjected to Pfizer medical experimentation because all SPD officers had

13  been required to get a "covid vaccine."

14  Benshoof reported that Owen and Lerman, both prostitutes, had brought their prostitution

15  clients into their home while A.R.W. was present in the house.  Benshoof also provided the SPD

16  video of A.R.W. confirming this fact.

17  On June 29, 2022, Benshoof emailed the General Investigation Unit and Bissell, providing

18  them with verified documents evidencing felony and gross misdemeanor crimes perpetrated by

19  Owen, Lerman, and family law attorney Nathan L. Cliber. (Dkt. #13-1 at 379-410; Dkt. #13-3 at

20  294-320)  The City took no action against Cliber, Owen, or Lerman.

21

22  **H.  SPD Incident 2022-173684**

23  On July 6, 2022, A.R.W. ran away from Owen's to come home to Benshoof.

24  SPD Officers were dispatched to Benshoof's home: Elias Williams #8767 ("Williams"),

25  Charles Foreman #7569 ("Foreman"), and Eric Whitehead #7493 ("Whitehead).

26
PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 10 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0133**

Benshoof informed Williams that Owen and Lerman were welcoming their prostitution clients into their home when A.R.W. was present.

Benshoof informed Williams that Owen and Lerman had made false and misleading statements to police to take A.R.W. and Benshoof's FJ Cruiser, that Owen had committed perjury and custodial interference to fraudulently initiate family court case no. 21-5-00680-6, and that A.R.W. was being subjected to mental and emotional abuse by Owen and Lerman.

Benshoof informed Williams that Owen and Lerman, with the approval of family court, had coerced A.R.W., to engage in conduct that A.R.W. had the right to abstain from, by threatening him with confinement or restraint; that is, a Pfizer gene therapy that had not even completed adequate animal trials, let alone phase 3 of a clinical trial to ensure safety and efficacy.

Benshoof informed Williams that Owen and Lerman had accomplished by deception the unlawful imprisonment of both A.R.W. and Benshoof by restricting their movement without consent and without valid legal authority in a manner which interfered substantially with their liberty.

Benshoof informed Williams that Lerman had threatened a process server at Owen's home with an aluminum baseball bat, while screaming lies which disparaged Benshoof in A.R.W.'s presence.

Benshoof informed Williams that Lerman's threats and intimidation of a process server constituted a felony law violation, and that such threats were made to violate Benshoof's right to petition for redress by scaring all of Benshoof's friends away from serving court documents under CR 4. Williams refused to act on Benshoof's complaints and A.R.W. was taken back to Owen's.

**I.    SPD Incident #2022-177198**

On July 7, 2022, A.R.W. did not appear on the court scheduled Zoom video call with Benshoof, as required by Owen's signature in family court case no. 21-5-00680-6.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 11 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0134**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

At approximately 6:00pm on July 9, 2022, Benshoof called 911 to report Owen for custodial interference, perjury, and barratry, and Benshoof asked SPD dispatch to send officers to do a wellness check on A.R.W.  SPD Officers Hayden Hogg #8472 ("Hogg") and Jeremy Weiss #8793 ("Weiss") eventually phoned Benshoof around 12:30am.

Benshoof met Hogg and Weiss and attempted to give the officers evidence of Owen's violations of the allegedly valid family court restraining order, evidence of Owen's perjury and barratry in obtaining the restraining order, and evidence supporting Benshoof's contention that the restraining order could not, and did not, apply to Benshoof and A.R.W. because Benshoof was not subject to the jurisdiction of family court in case no. 21-5-00680-6.

Hogg and Weiss refused to take Benshoof's documents, refused to even look at them, and refused to let Benshoof explain the documents' contents.

**J.    Benshoof Withdraws from Case No. 21-5-00680-6**

On August 9, 2022, Benshoof filed his Notice of Withdrawal to Judge Keenan in family court case no. 21-5-00680-6.  (Dkt. #13-1 at 433-39)

Benshoof sent Keenan, via certified USPS mail, legal notice on August 8, 2021, demanding that Keenan cease and desist.  (Dkt. #13-1 at 441-42)

Thereafter, Benshoof emailed Keenan's bailiff, Beatrice Marquez ("Marquez"), to verify that the restraining order had been amended to reflect that Benshoof was no longer a party subject to its terms, or that it had been dismissed.  Marquez refused to confirm or deny and instructed Benshoof to contact the King County clerk.

Benshoof contacted the clerk and was told that Benshoof would have to come to the King County Courthouse ***in person, with a facemask on***, to obtain confirmation.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 12 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0135**

1

2

When Benshoof informed the clerk that wearing a facemask to come to the clerk's office

wasn't an option, as King County Sheriff deputies had repeatedly forced Benshoof from the

3

4

courthouse for not wearing a face mask, the clerk instructed Benshoof to obtain confirmation

regarding the restraining order by contacting the SPD.

5

6

Benshoof contacted SPD and spoke with Dispatcher #13 to determine whether SPD

7

possessed record, whether digital or paper, of a valid restraining order preventing Benshoof from

8

contacting A.W.R.  Dispatch #13 stated that SPD would not confirm any such record; Dispatch

9

#13 told Benshoof to seek verification at the King County Superior Court clerk's office.

10

On, or around, August 14, 2022, Benshoof called 911 to report that, if there was a valid

11

family court restraining order in effect, Owen had again violated it by withholding A.R.W. from

12

communicating with Benshoof via Zoom video both Saturday and Sunday.  Benshoof reported

13

to 911 that Owen was perpetrating custodial interference by withholding A.R.W. from Benshoof

14

Neither the King County Superior Court, nor the SPD, would confirm the existence of a

15

valid order restraining Benshoof from A.R.W.  911 refused to dispatch officers to take

16

Benshoof's complaint.

17

18

**K. SPD Incident #2022-215424**

19

On August 15, 2022, Benshoof drove down NE 130th Street where Owen's home is located

20

to verify that A.R.W. was okay.  Owen was in her driveway and threatened to call the police,

21

stating that A.R.W. was at summer camp; Benshoof left without incident.

22

When Benshoof arrived at his home, SPD Officers Jared Alden #8892 ("Alden"), Jordan

23

Wallace #8382 ("Wallace") and Nicholas Hughes #8408 ("Hughes") followed Benshoof's up his

24

driveway, passing two clearly marked "NO TRESPASSING" signs.

25

26

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 13 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0136**

1

2

When Benshoof tried to enter his home, Wallace accosted Benshoof outside the front door by firmly grabbing his arm.

3

4

Benshoof stated that his right of association with A.R.W., protected by the First Amendment, had been violated since September 3, 2021, by and through the perjury of Owen and the abuse of discretion by King County Superior Court judges due to their discriminatory animus towards Benshoof's religious beliefs.

5

6

7

8

9

Benshoof stated that Owen, Lerman, SPD officers, City prosecutors, City judges, King County sheriff deputies, and King County Superior Court commissioners and judges denied Benshoof equal protection under the law in violation of the Fourteenth Amendment by knowingly and willfully ignoring Owen's felony perjury used initiate case no. 21-5-00680-6.

10

11

12

13

Benshoof tried to give Alden, Hughes and Wallace verified documents evincing Benshoof's claims.  Alden, Hughes and Wallace refused to take any documents from Benshoof.

14

15

Alden and Wallace arrested Benshoof and took him to King County Jail where Benshoof had a spit sock forced over is head in violation of the Americans with Disabilities Act, RCW 49.60.030, and SPD Policy Manual 11.010.21; 11.010.22.  (Dkt. 13-3 at 148-155)

16

17

18

**L.  Complaint to SPD**

19

On August 16, 2022, after getting out of King County Jail, Benshoof called 911, and spoke to SPD Officers Ashlie Bissell #8559 ("Bissell") and Katrina O'Dell #6600 ("O'Dell").

20

21

Benshoof made complaint of Owen's violation of RCW 9A.40.070 (2) Custodial Interference in the second degree by Owen's violation of the either the family court temporary parenting plan, or unlawfully imprisoning Benshoof and A.R.W. from each other.

22

23

24

Bissell and Odell asserted to Benshoof that it was a "civil matter".

25

26

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 14 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

Benshoof informed Bissell and O'Dell that they were either: 1) ignorant of the law, or 2) knowingly and willfully lying to Benshoof, thereby violating the equal protection clause of the Fourteenth Amendment, in order to deny Benshoof his right to equal protection under the law.

To ensure that Bissell and O'Dell were not ignorantly well-intentioned, Benshoof then read aloud the Washington Legislative intent for Custodial Interference from the state website:

> Intent—2015 c 38: "It is the intent of the legislature to address the Washington supreme court's decision in State v. Veliz, 176 Wn.2d 849 (2013). The court held that a parent cannot be charged with custodial interference under RCW 9A.40.060(2) if a parent withholds the other parent from having access to the child in violation of residential provisions of a domestic violence protection order. The legislature intends that the provisions of RCW 9A.40.060(2) and 9A.40.070(2) be applicable in cases in which a court has entered any order making residential provisions for a child including, but not limited to, domestic violence protection orders that include such residential provisions."

Bissell and O'Dell refused to acknowledge that the state statute and legislative intent, coupled with the facts enumerated by Benshoof, evinced Owen's felony law violation of either RCW 9A.40.070 or RCW 9A.40.040.  Bissell and O'Dell took no action to uphold the law.

SPD Policy Manual 15.110 Investigating Custodial Interference requires SPD officers to act upon evidence of custodial interference.  (Dkt. 13-4 at 158-161).

## M.  A.R.W. Considers Suicide

On, or around, August 16, 2022, A.R.W. informed Owen, as recounted in the Guardian ad Litem report, "On August 16, [A.R.W.] disclosed contemplating jumping off a balcony at summer camp to kill himself."  (Dkt. #13-3 at 334)

Owen and Lerman isolating A.R.W. from Benshoof has been mentally and emotionally traumatizing to A.R.W.  It has also mentally and emotionally traumatized Benshoof.

## N.  Trial In Absentia

On October 21, 2022, Keenan heard Owen's motions for final orders.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 15 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

Benshoof was not afforded the opportunity to appear in person, and Keenan continued to deny Benshoof entrance to the courtroom in violation of Wash. Const. art I §§ 10, 22, nor was Benshoof allowed to testify before a jury of his peers pursuant to Wash. Const. art I § 21.

Keenan declared Benshoof to be a "credible threat" to A.R.W. and Owen, ordering that Benshoof would be subject to immediate arrest if Benshoof had any contact with A.R.W. before October 21, 2027, *five months after the 18th birthday of A.R.W.*

Keenan ordered that Benshoof would be subject to immediate arrest if he effected legal service of process upon Owen by any other means than ABC Legal Services or Pegasus Process Service.  (Dkt. #13-2 at 4)

Keenan was not delegated the authority to effectively re-write Wash. CR 4 and Fed.R.Civ.P. 4, by which Benshoof effectuating legal service of process could be criminalized.

**O.  No Proof of Service**

On November 15, 2022, SPD Detective Ryan Ellis ("Ellis") allegedly filed Proof of Service in family court case no. 21-5-00680-6, which stated on page one, "***Important!*** *Do not use electronic service if your case involves the surrender of firearms…. After 2 unsuccessful attempts at personal service, you can ask the court to authorize electronic service."*  (Dkt. #13-3 at 163)

Page two stated that Ellis served an Order to Surrender and Prohibit Weapons.  Ellis did not ask for, nor receive, authorization from Judge Keenan to serve Benshoof via electronic service.  Ellis did not obtain confirmation that Benshoof had been served final orders in case no. 21-5-00680-6.

Ellis did not date his signature under penalty of perjury on page three.  The ***date*** line stated, "Seattle."  GR 30(d)(3) requires compliance with GR 13(a)(2).  CR 4, GR 13(a)(2) and

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 16 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0139

RCW 5.50.050 require that proof of service sworn under penalty of perjury **be dated.** (*Id.* at 165)  As such, Ellis did not legally serve Benshoof the final orders in case no. 21-5-00680-6.

**P.  SMC Case No. 669329**

On November 15, 2022, Benshoof discovered in his mailbox that he was charged with violating RCW 7.105.450 related to the events of August 15, 2022, SPD Incident #2022-215424.

The City letter stated that a hearing was scheduled for November 16, 2022, at 230pm.

Benshoof wrote a motion to dismiss for lack of personal jurisdiction, citing the requirement of RCW 35.20.270(1) which states, "All criminal and civil process issuing out of courts created under this title shall be directed to the chief of police of the City served by the court and/or to the sheriff of the county in which the court is held and/or to the warrant officers and be by them executed according to law in any county of this state." (Dkt. #13-3 at 139-144).

Benshoof then wrote a motion for change of venue on the grounds that SMC had repeatedly denied his right to appear in person without a facemask. (Dkt. #13-3 at 146-149)

On the morning of November 16, 2022, Benshoof attempted to e-file his two motions via the SMC web portal.  Despite SMC repeatedly asserting for the prior five months that Benshoof had been granted access to e-filing, the web portal would not permit Benshoof to e-file his motions.

Benshoof then emailed the two .pdf documents to the City Attorney Ann Davison, Senior Assistant Attorney Christopher Karr, Assistant Attorney Kevin Kilpatrick, and to courtroom 1102. (Dkt. #13-3 at 152-3)

At 230pm on November 16, 2022, Benshoof appeared by Special Appearance via WebEx in courtroom 1102 before Judge Gregory under threat, duress, and coercion.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 17 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0140**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Benshoof cited RCW 35.20.270(1) as a threshold issue and asked Gregory if the prosecutor had provided evidence the City effectuated legal service of process to grant jurisdiction to the court.  Gregory did not affirm that the City had done so; rather, Gregory simply asserted, "The court has jurisdiction."

Unsatisfied with what appeared to Benshoof to be tautological evasion by Gregory, Benshoof asked City prosecutor Cooper directly if she had provided the court with evidence of the City's compliance with RCW 35.20.270(1); Cooper remained silent on the issue.

Gregory again asserted, "The court has jurisdiction," despite Benshoof's repeated objections that the court had no evidence of personal service granting the court jurisdiction to proceed.

Cooper did not provide the court evidence that a valid protection order existed, nor that the City had effected personal service pursuant to RCW 35.20.270(1).

Cooper did not provide the court with evidence that Seattle Municipal Court was authorized by law to have jurisdiction over a domestic violence protection order pursuant to RCW 7.105.050(1) which states, "The superior and district courts have jurisdiction over domestic violence protection order proceedings."

Gregory entered a plea of not guilty on Benshoof's behalf and set bail in the amount of $10,000.  Benshoof stated that Gregory's conduct constituted a violation of RCW 9A.56.030 theft in the first degree.  RCW 9A.56.020(1)(a) states in part, "Theft means to wrongly obtain or **exert unauthorized control** over the property or services of another or the value thereof, with intent to deprive him or her of such property."

Gregory increased the bail amount to $25,000 and stated that he was issuing a restraining order preventing Benshoof from contacting Owen or being within 1000 feet of her or her home.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 18 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

Benshoof asked why, if there was ***actually*** a valid restraining order from family court would Gregory issue a verbatim duplicate?  Gregory did not answer.  Gregory set the bail amount to $10,000, and a bail hearing was set for November 22, 2022, despite Benshoof's objections.

Benshoof appeared by Special Appearance via WebEx on November 22, 2022, before Judge Adam Eisenberg ("Eisenberg").  Benshoof again cited RCW 35.20.270(1) and demanded evidence that the City had effectuated legal service of process to grant the court jurisdiction.

Eisenberg did not affirm that personal service of Benshoof was evidenced before the court; rather, Eisenberg asserted that Gregory had already addressed this issue on November 16, 2022, and that Benshoof had been arraigned.  Benshoof rejected Eisenberg's claim and reminded Eisenberg that the Gregory court was absent jurisdiction to arraign Benshoof.

Eisenberg declared that Benshoof had failed to comply with Gregory's $10,000 bail order and thereupon issued bench warrant #990434611, in the amount of $10,000.

On February 10, 2023, Public Defender Faiz Pirani appeared on Benshoof's behalf.  Upon Mr. Pirani's motion, warrant #990434611 was quashed.

On June 21, 2023, Benshoof appeared by WebEx before Judge Jerome Roache ("Roache").  City prosecutor Katrina Outland ("Outland") motion to issue a $100,000 warrant for Benshoof's arrest.  Benshoof made an oral motion for Roache to issue a $1,000,000 warrant commensurate with the absurdity of such a kangaroo court.  Roache issued warrant #990434611 in the amount of $50,000 for Benshoof's "failure to appear."  The worksheet stated that Benshoof appeared. (Dkt. #13-3 at 161)

**Q.  A.R.W. Runs Away Again**

On January 23, 2023, A.R.W. tried to run away from Owen's a second time to come home to his father.  Owen discovered her son's plans and told A.R.W. that he could either go to school

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 19 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0142**

1    or walk to Benshoof's house while Owen called her attorney to resolve the family dispute.

2        A.R.W. walked home to Benshoof's.  Upon arrival at Benshoof's home, A.R.W. burst

3    into tears and said, "I think mom disowned me."

4        While A.R.W. was walking home to his father's house, Owen called 911 to have

5    Benshoof arrested.  Owen also contacted Lerman.  Lerman then immediately posted to her public

6    Twitter account, "I really thought everything was going to be okay.  But it isn't.  It won't be as

7    long as he's alive and free," referring to Benshoof; that is, Lerman predicated her need to have

8    Benshoof dead or incarcerated as a condition of her own sense of well-being, without any regard

9    for the devastating impact that would have on A.R.W.  Lerman deleted the tweet shortly

10   thereafter.  (Dkt. 13-1 at 199)

11

12   **R.  SMC Case No. 671384**

13       On March 13, 2023, CITY prosecutor Katrina Outland ("Outland") filed eighty-nine

14   criminal charges against Benshoof alleging that Benshoof violated a restraining order by

15   effectuating legal service of process at Owen's house pursuant to CR4 and FrCP 4 and texting

16   with A.R.W. over the Discord app.

17       Outland was given Discord text messages between Benshoof and A.R.W.  As such,

18   Outland knows that A.R.W. expressed his desire to be freed from his imprisonment at Owen's.

19   When Benshoof texted his son in December 2022 to ask if Benshoof should just give Owen his

20   home and all of his money as effective ransom payment so that his son could come back to his

21   father, instead of Benshoof seeking remedy through the courts, A.R.W. responded, "No way.  Hit

22   [Owen and Lerman] with everything you got.  Keep hitting them."

23       Outland also read text messages from A.R.W. in which A.R.W. stated his belief that Owen

24   and Lerman are "crazy."

25

26   PETITION FOR WRIT OF PROHIBITION                          Kurt Benshoof, Benshoof
     RE: SEATTLE MUNICIPAL CASE NO. 671384                     1716 N 128th ST
     Page 20 of 27                                             Seattle, Washington 98133
                                                               (206) 460-4202
                                                               kurtbenshoof@gmail.com

Judge Faye Chess determined there was probable cause to issue $250,000 warrant #990435958 for Benshoof's immediate arrest.

Benshoof emailed Outland, offering to turn himself in on the $250,000 warrant within twenty-four (24) hours if Outland would simply provide Benshoof evidence that the Seattle Municipal Codes she had charged Benshoof with were laws in accordance with Wash. Const. art II §§ 18; 22; 32; art III § 12 which the CITY had the legislative power to enact, enforce, and prosecute Benshoof under Wash. Const. art XI § 11. (Dkt. #13-3 at 155)

Benshoof also offered to have the best polygraph analyst in Washington state hired to determine whether Owen or Benshoof was telling the truth. Benshoof proposed a payment of $50,000 to Outland and Owen if anything Benshoof had alleged was false. (*Id.* at 155)

Outland refused both offers. In poker that is called "calling their bluff."

## S.  Benshoof's Petition for Habeas Corpus

Benshoof filed a Petition for Writ of Habeas Corpus in U.S. District Court for the Western District of Washington in May 2023, Case No. 2:23-cv-00751-RAJ.

In May 2023, Benshoof attempted to contact Owen's attorney of record, Blair Russ, in order to have Mr. Russ accept service. Mr. Russ refused to respond, despite Benshoof informing Mr. Russ that, if Owen and Lerman were ***actually*** traumatized by legal service to their home, Mr. Russ should be more than willing to accept service.

However, this is illustrative of the blatantly sophomoric game that Owen and her co-conspirators have been playing; that is, feign victimhood to create the thin veneer of plausibility for more retaliation against Benshoof. It's well known in clinical psychology. Narcissists exhibit a predictable pattern of behavior:  Deny, Accuse, Reverse Victim and Abuser.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 21 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0144**

Benshoof f eventually had an associate effect service of process to Owen.  Predictably, Owen called 911.  Predictably, SPD Officer Gabriel Ladd, who is a named defendant in Benshoof's federal lawsuit, filed SPD Incident Report #2023-151429.

**T.    SMC Case No. 675317**

City prosecutor William Cotter is the latest accessory to the predicate acts of the City's RICO Enterprise targeting Benshoof.  On September 28, 2023, Mr. Cotter filed charges against Benshoof, based upon Ofc. Ladd's SPD Incident Report #2023-151429, to initiate Seattle Municipal Court Case No. 675317.

This latest malicious prosecution, in violation of RCW 9.62.010, constituted additional predicate acts in violation of 18 U.S. Code §§ 4; 241; 242; 1512; 1513(e); and 1962(c)(d).

On October 11, 2023, Benshoof emailed a Motion to Dismiss SMC Case No. 675317 to the prosecutors and Court.

On October 11, 2023, City prosecutor Soheila Sarrafan ("Sarrafan") appeared on behalf of the City in courtroom 902 before the Honorable Pooja Vadddadi.  Sarrafan informed the Court of the cases the City had noted for dismissal; Case No. 675317 was not among those noted.

Benshoof then made a Special Appearance by WebEx before Judge Vaddadi.  Sarrafan abruptly moved to dismiss Case No. 675317 prior to arraignment such that Benshoof's Motion to Dismiss Case No. 675317 was not heard.  SMC Case No. 675317 was thereupon dismissed without prejudice on October 11, 2023, under the pretense that the City needed to do "further investigation."

### III.    ISSUES WARRANTING WRIT

1. **Does the evidence show that Jessica R. Owen committed felony perjury to barratrously initiate King County family court case no. 21-5-00680-8 which was allowed, enabled, and facilitated by Nathan L. Cliber and David S. Keenan?**

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 22 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0145**

Yes.  The evidence is irrefutable.

**2. Is the City Attorney's Office in possession of irrefutable evidence that Owen, Cliber, and Keenan knowingly and willfully conspired to assert jurisdiction over Benshoof and A.R.W. in violation of the First Amendment and the Fourteenth Amendment?**

Yes.  City attorneys are complicit in these ongoing violations enabling Owen to continue the abuse of A.R.W., as the City has had in its possession irrefutable evidence of Owen's perjury for many months.

**3. Was the City absent evidence that SPD Det. Ryan Ellis legally effected service of process upon Benshoof?**

Yes.  The City was absent such evidence, and City police officers, prosecutors, and judges have refused to acknowledge Benshoof's evidence.

**4. Did the City comply with the statutory requirement of RCW 35.20.270(1) to effect service of process upon Benshoof to obtain *in personam* jurisdiction?**

No.  The City has a custom and widespread practice of violating RCW 35.20.270(1).

**5. Does the City have jurisdiction to hear allegations of domestic violence related to King County family court case no. 21-5-00680-6 pursuant to RCW 7.105.050(1)(a)?**

No.  Only King County Superior Court is authorized by statute.

## IV.    ARGUMENT FOR GRANTING WRIT

To be valid and enforceable, a prosecution must be supported by three elements: (1) the court must have jurisdiction of the parties; (2) the court must have jurisdiction of the subject matter; and (3) the court must have the authority to render the particular judgment.

## A.  NO FAMILY COURT SERVICE OF PROCESS

SPD Det. Ryan Ellis did not properly effect legal service of process upon Benshoof. Neither did Det. Ellis file properly completed certificate of service with King County Superior Court.

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 23 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0146

The refusal by City officials to acknowledge Benshoof's evidence of Ellis's failures would lead a reasonable person to conclude that City officials are willfully and knowingly ignoring factual evidence showing the City had no jurisdiction to bring complaint.

**B.  NO PERSONAL JURISDICTION**

Even if the final orders granted by Keenan on October 21, 2022, were valid, which they are not, the City failed to comply with RCW 35.20.270(1) to effect service of process, as Benshoof argued prior to arraignment when he made a special appearance before Judge Willie Gregory on November 16, 2022.

On, or around, March 14, 2023, Judge Chess asserted that "the Court has jurisdiction" absent any substantiating evidence from the City that the prosecution had complied with RCW 35.20.270(1).

The City did not provide Judge Chess that Seattle Municipal Court had jurisdiction to proceed pursuant to RCW 7.105.050(1)(a)(d).

As the Court did not have evidence of personal jurisdiction to proceed, the Court's $250,000 warrant was *void ab initio, ultra vires,* and in violation of Wash. Const. art. I § 14.

Pursuant to RCW 9A.56.020(1)(a) "Theft" means to wrongfully obtain or exert unauthorized control over property or services of another or the value thereof, with intent to deprive him or her of such property or services;"

Attempting to exert unauthorized control over Benshoof's money in excess of $5,000 violated RCW 9A.56.030(1)(a) first degree theft, a class B felony.

**C.  NO SUBJECT MATTER JURISDICTION**

Under the Fruit of the Poisonous Tree Doctrine, City officials cannot profess the legitimacy of evidence that is the direct result of illegal conduct on the part of City and King

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 24 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0147**

County officials including, but not limited to, David Keenan, Katrina Outland, and Willie Gregory.

The City cannot assert jurisdiction to prosecute or adjudicate case no. 671384 in the face of irrefutable evidence that King County family court case no. 21-5-00680-8 was *void ab initio* due to the perjury of Jessica Owen and absence of subject matter jurisdiction precluding the family court's authority to proceed.

## D. MUNICIPAL COURT ABSENT AUTHORITY

As a court of limited jurisdiction, Seattle Municipal Court lacks the authority to adjudicate the alleged domestic violence charge against Benshoof even if there were valid allegations premised upon a valid family court adjudication.

RCW 7.105.050(1)(a) stipulates that an alleged violation of a domestic violence protection order in King County District Court must be transferred to Superior Court when "a superior court has exercised or is exercising jurisdiction over a proceeding involving the parties."

As such, all acts by City prosecutors and judges related to SMC Case No. 671384 were *ultra vires* and thus violative of Benshoof's rights.

## V.     REQUESTED RELIEF

*WHEREFORE*, upon his verified statements herein Benshoof moves this honorable Court to grant a Writ of Prohibition arresting Seattle Municipal Court Case No. 671384 for the municipal court's absence of jurisdiction to proceed in accordance with RCW 7.16.300. Pursuant to RCW 7.16.310, this petition seeks an alternative writ commanding the City, immediately after the receipt of the writ, to desist from prosecuting and adjudicating Case No. 671384 and any related action to threaten, detain, arrest, or imprison Benshoof under Warrant

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 25 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

#990435958, or to show cause before the court on or before November 7, 2023, why the City has not so desisted.

## VERIFICATION

I, Affiant Kurt Benshoof, do hereby declare that the foregoing is true and correct to the best of my knowledge under penalty of perjury in the State of Washington, and am competent to testify to the matters stated herein.  Executed this 31st day of October in the year 2023, in the City of Seattle, in the county of King, in the state of Washington.


By:    s/ Kurt Benshoof
        Kurt Benshoof *Pro Se*

        1716 N 128th Street
        Seattle, WA 98133
        Phone: (206) 460-4202
        Email: kurtbenshoof@gmail.com

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 26 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0149**

1

2

## CERTIFICATION OF SERVICE

I, Kurt Benshoof, hereby certify that on October 31, 2023, I did effect service upon

counsels for Defendants by e-filing in King County Superior Court Case No. 22-2-15958-8 the

Petition for Writ of Prohibition Re: Case No. 671384 and this Summary of Petition for Writ of

Prohibition Re: Seattle Municipal Court Case No. 671384 by emailing to the email addresses

listed below:

**Attorney For Defendant Jessica Owen:**          **Attorney for Defendant Nathan Cliber:**
Blair M. Russ, WSBA #40374                        Kyle Rekofke, WSBA #49327
1000 Second Avenue                                701 Fifth Avenue
Suite 3660                                        Suite 2100
Seattle, WA 98104                                 Seattle, WA 98104
Email: bmr@tbr-law.com                            Email: krekofke@grsm.com


**Attorney for Defendants Magalie Lerman and Owen Hermsen:**
Moshe Y. Admon, WSBA #50325
300 Lenora Street
Suite 4008
Seattle, WA 98121
Email: jeff@admonlaw.com

DATED:  October 31, 2023

Signed:  _____ s/ Kurt Benshoof_____

Kurt Benshoof, *Pro Se*
1716 N 128th ST
Seattle, WA 98133
(206) 460-4202

PETITION FOR WRIT OF PROHIBITION
RE: SEATTLE MUNICIPAL CASE NO. 671384
Page 27 of 27

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0150**

1

2  The Honorable Marshall Ferguson

3

4

5

6

**FILED**
2023 NOV 14
KING COUNTY
SUPERIOR COURT CLERK
CASE #: 22-2-15958-8 SEA

**FILED**
KING COUNTY WASHINGTON
NOV 14 2023
SUPERIOR COURT CLERK
BY Andre Jones
DEPUTY

7     SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

8

9  KURT BENSHOOF,

          Plaintiff,

10

    v.

11

12  NATHAN CLIBER, JESSICA OWEN,
MAGALIE LERMAN, and OWEN
HERMSEN,

13

        Defendants.

NO. 22-2-15958-8 SEA

ORDER PERMITTING KURT BENSHOOF
TO PURSUE PETITION FOR WRIT OF
PROHIBITION AGAINST CITY OF
SEATTLE

14

15     On October 31, 2023, pursuant to the Court's Order Restricting Abusive Litigation Of Kurt

16  Benshoof entered on March 31, 2023 ("Vexatious Litigant Order"; Sub. No. 189), Mr. Benshoof

17  filed with this Court an application for approval to initiate litigation against the City of Seattle via

  a petition for a writ of prohibition.

18

19     The Court has reviewed Mr. Benshoof's application materials and Jessica Owen's response

20  to Mr. Benshoof's application.  Mr. Benshoof's proposed petition for a writ of prohibition against

21  the City of Seattle is not barred by this Court's Vexatious Litigant Order and he may commence

  and/or file that petition action without further permission of this Court.

22

23     This Order is without prejudice, however, to any future effort to dismiss Mr. Benshoof's

24  writ petition and/or seek sanctions or other relief against him if future evidence shows that Mr.

25  Benshoof has abused legal processes or procedures in the writ action (for example, by misusing

ORDER PERMITTING KURT
BENSHOOF TO PURSUE PETITION
FOR WRIT OF PROHIBITION
AGAINST CITY OF SEATTLE - 1

JUDGE MARSHALL FERGUSON
KING COUNTY SUPERIOR COURT
516 THIRD AVENUE
SEATTLE WA 98104
(206) 477-1513



subpoenas) in order to harass, intimidate, or unfairly burden any persons protected by the Vexatious Litigant Order.

Nothing in this Order excuses Mr. Benshoof from complying with all statutes, regulations, court rules, and other controlling authorities applicable to his writ petition action.

DATED this 14th day of November, 2023.

Judge Marshall Ferguson
King County Superior Court

ORDER PERMITTING KURT
BENSHOOF TO PURSUE PETITION
FOR WRIT OF PROHIBITION
AGAINST CITY OF SEATTLE - 2

JUDGE MARSHALL FERGUSON
KING COUNTY SUPERIOR COURT
516 THIRD AVENUE
SEATTLE WA 98104
(206) 477-1513

Page 152
0152

1

2    The Honorable Marshall Ferguson

3

4

**FILED**

2024 MAR 04 12:28 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 22-2-15958-8 SEA

5

6

7                SUPERIOR COURT OF THE STATE OF WASHINGTON
                              FOR KING COUNTY
8

9    KURT BENSHOOF,                          NO. 22-2-15958-8 SEA

                    Plaintiff,
10
                                             ORDER DENYING PLAINTIFF KURT
           v.                                BENSHOOF'S REQUEST FOR LEAVE TO
11                                           FILE PETITION FOR WRIT OF *HABEAS
     NATHAN CLIBER, JESSICA OWEN,            CORPUS*
12   MAGALIE LERMAN, and OWEN
     HERMSEN,
13
                    Defendants.
14

15         On January 31, 2024, Plaintiff Kurt Benshoof filed with this Court an application for

16   approval to file a petition for a writ of *habeas corpus* against Jessica Owen, Magalie Lerman, and

17   Nathan Cliber, each of whom is protected from Mr. Benshoof's abusive litigation by this Court's

     March 31, 2023 Order Restricting Abusive Litigation Of Kury Benshoof ("Abusive Litigation
18
     Order"). Sub No. 189.
19
           The Court has reviewed Mr. Benshoof's application materials. Based upon such review, it
20
     is
21
           ORDERED, ADJUDGED, AND DECREED that Mr. Benshoof's request for leave to file
22
     his proposed *habeas corpus* petition is DENIED. The Abusive Litigation Order bars Mr.
23
     Benshoof's proposed petition against Ms. Owen, Ms. Lerman, and Mr. Cliber for the reasons set
24
     forth below.
25

ORDER DENYING PLAINTIFF KURT
BENSHOOF'S REQUEST FOR LEAVE
TO FILE PETITION FOR WRIT OF
*HABEAS CORPUS* - 1

JUDGE MARSHALL FERGUSON
KING COUNTY SUPERIOR COURT
516 THIRD AVENUE
SEATTLE WA 98104
(206) 477-1513

0153

Washington's state constitution secures for citizens the right to petition for a writ of *habeas corpus*. "The privilege of the writ of *habeas corpus* shall not be suspended, unless in case of rebellion or invasion the public safety requires it." Const. art. 1, § 13. The writ referred to in our constitution is more fully known as a writ of *habeas corpus ad subjiciendum*, which is a writ "directing an official who is detaining another to show the cause of that person's confinement, and why he or she should not be released." *Petition of Runyan*, 121 Wn.2d 432, 853 P.2d 424 (1993). "The writ is not a substitute for an appeal or a writ of error." *Fleetwood v. Rhay*, 7 Wn. App. 225, 226, 498 P.2d 891 (1972), citing *Massey v. Rhay*, 76 Wn.2d 78, 455 P.2d 367 (1969). Yet, that is precisely what Mr. Benshoof seeks to accomplish here.

In his proposed petition, Mr. Benshoof seeks to reverse a civil restraining order protecting defendant Jessica Owen entered in a separate parentage action filed in 2021 in this Court[1]; he demands that this Court investigate "whether family court had jurisdiction" in that other matter and look into allegedly fraudulent proceedings in that case; and he claims that assorted constitutional violations occurred in those other proceedings. In other words, Mr. Benshoof clearly intends to use his proposed *habeas* petition as a substitute for appeal of those other proceedings. His petition is frivolous and without merit. If permitted to proceed, Mr. Benshoof's *habeas corpus* proceeding would be antithetical to justice and would only serve to further harass and burden Ms. Owen, Ms. Lerman, and Mr. Cliber through abusive litigation.

Accordingly, Mr. Benshoof is barred from filing his *habeas corpus* petition.

DATED this 4th day of March, 2024.

_____
Judge Marshall Ferguson
King County Superior Court

---

[1] King County Superior Court Case No. 21-5-00680-6 SEA.

ORDER DENYING PLAINTIFF KURT
BENSHOOF'S REQUEST FOR LEAVE
TO FILE PETITION FOR WRIT OF
*HABEAS CORPUS* - 2

JUDGE MARSHALL FERGUSON
KING COUNTY SUPERIOR COURT
516 THIRD AVENUE
SEATTLE WA 98104
(206) 477-1513

0154

King County Superior Court
Judicial Electronic Signature Page

Case Number:      22-2-15958-8
Case Title:       BENSHOOF VS CLIBER ET AL

Document Title:   ORDER  RE MOTION RE HABEAS PETITION

Signed By:        Marshall Ferguson
Date:             March 04, 2024

_____

Judge: Marshall Ferguson

This document is signed in accordance with the provisions in GR 30.

Certificate Hash:            A4ABB09C7C1D81F742E845B69E1C4CD6FEAA5E8C
Certificate effective date:  7/17/2023 2:21:34 PM
Certificate expiry date:     7/17/2028 2:21:34 PM
Certificate Issued by:       C=US, E=kcscefiling@kingcounty.gov, OU=KCDJA,
                             O=KCDJA, CN="Marshall Ferguson:
                             8skMktsk7hG1yuM6zbJ6iw=="

Page 3 of 3

1

2

3

4

**FILED**
2023 DEC 26 09:00 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 22-2-15958-8 SEA

5

6

7

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

8

9

10

11

12

13

14

15

| | |
|---|---|
| Kurt A. Benshoof, | CASE NO. |
| Plaintiff, | PETITION FOR WRIT OF MANDAMUS |
| v. | WRM-2 |
| SEATTLE PUBLIC SCHOOLS, | |
| Defendant. | |

16

17

### I.     INTRODUCTION

18

19

20

21

22

23

24

25

26

COMES NOW Plaintiff Kurt Benshoof ("Plaintiff") requesting that the Court issue a Writ of Mandamus compelling Seattle Public Schools ("Defendant") to comply with RCW 28A.605.030 and immediately produce for review the complete records of Plaintiff's minor son, A.R.W., without redactions concealing where the records of A.R.W. were sent to for the 2023-2024 school year.  Defendant officials began withholding all records related to A.R.W. on September 23, 2021, without lawful authority.  While Defendant finally produced redacted school records of A.R.W. on November 28, 2023, Defendant is conspiring with the mother of A.R.W. to completely prevent Plaintiff access to education records of A.R.W. for the next four years by

PETITION FOR WRIT OF MANDAMUS
SEATTLE PUBLIC SCHOOLS RCW 28A.605.030
Page 1 of 13

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0156**

denying Plaintiff's right to access education records currently in Defendant's possession indicating which school A.R.W.'s records were forwarded to.

Such denial of Plaintiff's full and equal access to the school records of A.R.W. constitutes violations of RCW 28A.605.030, 9A.80.010, and 18 U.S.C. §§ 241; 242.

Seattle School District No. 1 recently filed a complaint ("Complaint") seeking declaratory relief indemnifying prior and current official misconduct by Defendant officials.  (WAWD No. 2:23-cv-01829-MLP)

Defendant would have the Court believe that Plaintiff's inalienable rights and Washington state law are subordinate to the Family Educational Rights and Privacy Act ("FERPA").

Defendant would have the Court believe that the policies of FERPA are not limited to regulating the administrative disclosure of records to persons, individuals, or entities *other than fathers and mothers.*

Defendant would have the Court believe that, by citing 20 U.S.C. § 1232g, *et seq.* in its Complaint, Defendant is concerned about public disclosure of A.R.W.'s records, despite the fact that Defendant *did not redact A.R.W.'s personally identifiable information.*  (WAWD No. 2:23-cv-01829-MLP, Dkt. No. 2)

Defendant would have the Court believe that, despite denying Plaintiff access to the records of A.R.W., in violation of RCW 28A.605.030, beginning on September 23, *2021*, Defendant is suddenly now concerned about following the law and seeks clarification from U.S. District Court.

Defendant would have the Court believe that Defendant has standing to bring its Complaint against Plaintiff upon the presumption that Defendant is a party to a King County family court Restraining Order which, if it had been valid, would have expired on October 21, 2023.

PETITION FOR WRIT OF MANDAMUS
SEATTLE PUBLIC SCHOOLS RCW 28A.605.030
Page 2 of 13

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

Defendant would have the Court believe that Defendant's alleged fear of losing funding if it complies with RCW 28A.60.020 is not unsubstantiated and hypothetical.

Defendant would have the Court believe that it can deny Plaintiff the full and equal access to A.R.W.'s educational records in order to enable the school which A.R.W. is currently enrolled in to avoid compliance with laws governing parental access to their children's school records.

Defendant would have the Court believe that it can act as a proxy of Jessica R. Owen, mother of A.R.W., to perpetrate continued and ongoing violations of RCW 9A.40.060(3) by concealing A.R.W. from Plaintiff under color of law.

Defendant would have the Court believe that Defendant's Petition for Declaratory Judgment was not filed for the improper purpose of indemnifying Seattle Public Schools officials' misconduct which began on September 23, 2021. (*See* RCW 9A.80.010)

All *emphasis* that of Plaintiff.

## II.    PARTIES

1.    Plaintiff Kurt A. Benshoof is the father of A.R.W., a former student in Seattle Public Schools from kindergarten through eighth grade.  Plaintiff currently lives, and has lived at all times material to this Petition for Writ of Mandamus, in King County, Washington.

2.    Defendant Seattle Public Schools is a public school district established by the laws of Washington state and has its principal place of business at the John Stanford Center for Educational Excellence, 2445 Third Avenue South, Seattle, WA 98134.

## III.    JURISDICTION AND VENUE

3.    This is an action for Writ of Mandamus pursuant to RCW 7.16, *et seq.* for the purpose of compelling Defendant and its officials to comply with Washington laws including, but not limited to, RCW 28A.605.030.

PETITION FOR WRIT OF MANDAMUS
SEATTLE PUBLIC SCHOOLS RCW 28A.605.030
Page 3 of 13

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0158**

4.     This Court has authority to issue a Writ of Mandamus compelling Defendant to comply with Washington state laws pursuant to RCW 7.16.160, *et seq.*

5.     Venue in King County Superior Court is proper because the parties are located in King County and the substantial portion of the events giving rise to this action occurred in King County.

6.     This action is brought within one year of the last production of A.R.W.'s records by Seattle Public Schools in accordance with RCW 42.56.550(6).

### IV.  VERIFIED STATEMENTS OF FACT

7.     On September 23, 2021, Plaintiff drove to Jane Addams Middle School where his minor son, A.R.W., had been enrolled for seventh grade by Jessica R. Owen ("Owen"), the mother of A.R.W.

8.     Vice-Principal Devin Booker ("Booker") refused to allow Plaintiff access to the records of A.R.W.

9.     RCW 28A.605.030 states, in part, "The parent or guardian of a student who is or has been in attendance at a school ***has the right to review all education records of the student***."

10.     Subsequently, Principal Paula Montgomery and General Counsel Gregory Narver ("Narver") continued to deny Plaintiff ***any*** access to the records of A.R.W. until November 28, 2023, when Narver emailed Plaintiff ***redacted*** records of A.R.W.

11.     On, or around, November 28, 2023, Defendant, by and through Counsel Sarah Mack and Pacifica Law Group, filed a Complaint seeking declaratory relief in U.S. District Court for the Western District of Washington.  (WAWD No. 2:23-cv-01829-MLP, Dkt. No. 1)

12.     Defendant, by and through Counsel Mack, stated that they have "been asked by ***attorneys*** for [Owen] the mother of Mr. Benshoof's son not to disclose information that would

PETITION FOR WRIT OF MANDAMUS                                    Kurt Benshoof, Plaintiff
SEATTLE PUBLIC SCHOOLS RCW 28A.605.030              1716 N 128th ST
Page 4 of 13                                                                         Seattle, Washington 98133
                                                                                          (206) 460-4202
                                                                                          kurtbenshoof@gmail.com

allow [Plaintiff] to locate [Owen] and [A.R.W.] out of fear for their physical safety." (*Id.* Dkt. No. 1 at 2)

13.    Defendant has not provided Plaintiff proof that Plaintiff has ever threatened anyone or posed a "credible threat" to anyone.

14.    Owen only has one attorney ***currently*** known to represent her, Mr. Blair M. Russ ("Russ"): family attorney Nathan L. Cliber filed a Notice of Withdrawal on September 25, 2023, in King County family court No. 21-5-00680-6.

15.    Defendant has not provided Plaintiff proof that more than one attorney asked Defendant to not disclose information to Plaintiff.

16.    Owen, by and through Russ, previously argued "domestic relations exclusion" related to "state court proceedings" to deny the District Court's and the Ninth Circuit's jurisdictional inquiry into the absence of King County family court jurisdiction via Plaintiff's petition for writ of habeas corpus.  (*See* WAWD No. 2:23-cv-00751-RAJ; Ninth Circuit No. 23-35418)

17.    Plaintiff's Petition for Writ of Habeas Corpus to the United States Supreme Court has been distributed for conference hearing on January 5, 2024. (U.S. Supreme Court No. 23-6090)

18.    Defendant has not provided Plaintiff proof that Defendant is not acting by proxy for Owen to now take a contrary position asserting federal courts can and should review state court domestic relations proceedings in King County family court vis-à-vis the Restraining Order, and are not thereby subject to collateral and judicial estoppel.

19.    Defendant has not provided Plaintiff proof that a valid Restraining Order ("Order") was issued in King County family court No. 21-5-00680-6, dated October 21, 2022.

PETITION FOR WRIT OF MANDAMUS
SEATTLE PUBLIC SCHOOLS RCW 28A.605.030
Page 5 of 13

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0160**

20.    Defendant has not provided Plaintiff proof that the allegedly valid Order was granted in a proceeding for "dissolution of marriage or domestic partnership, legal separation, or declaration of invalidity" ("domestic relations").  (*See* RCW 26.09.060(1)(a)(b))

21.    Defendant has not provided Plaintiff proof that the allegedly valid Order was not issued under RCW 26.09.060.  (WAWD No. 2:23-cv-01829-MLP Dkt. No. 1 at 56)

22.    Defendant has not provided Plaintiff proof that a restraining order issued under RCW 26.09.060(1)(a) is limited to "a proceeding for: [d]issolution of marriage or domestic partnership, legal separation, or a declaration of invalidity." *Expressio unius est exclusion alterius:* the expression of one thing implies the exclusion of others.  (*See Reading Law: The Interpretation of Legal Texts,* Scalia and Garner (published 2012))

23.    Plaintiff and Owen were never parties to a marriage, domestic partnership, legal separation, or a declaration of invalidity.

24.    Defendant has not provided Plaintiff proof that, upon being emailed Plaintiff's First Amended Complaint (WAWD 2:23-cv-01392-JNW, Dkt. No. 47) and Petition for Writ of Habeas Corpus (U.S. Supreme Court No. 23-6090), Defendant was not thereupon in possession of incontrovertible evidence of felony perjury perpetrated by Owen to initiate King County family court no. 21-5-00680-6.

25.    Defendant has not provided Plaintiff proof that the allegedly valid Order was granted by a court with subject matter jurisdiction.

26.    Defendant has not provided Plaintiff proof that the allegedly valid Order was legally served upon Plaintiff.  (*See* WAWD No. 2:23-cv-01392-JNW Dkt. No. 47 at 72)

27.    Defendant has not provided Plaintiff proof that Plaintiff was given notice of the allegedly valid Order pursuant to RCW 26.09.300(2).

PETITION FOR WRIT OF MANDAMUS
SEATTLE PUBLIC SCHOOLS RCW 28A.605.030
Page 6 of 13

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0161

28.     Defendant has not provided Plaintiff proof that the Order, granted on October 21, 2022, did not state, "This Order starts immediately, and ***ends in 12 months***…" (WAWD No. 2:23-cv-01829-MLP, Dkt. No. 1 at 56)

29.     Defendant has not provided Plaintiff proof that, prior to October 21, 2023, Owen petitioned for renewal of the allegedly valid Order beyond one year.  (*See* RCW 7.105.315(2)(b)

30.     Defendant has not provided Plaintiff proof that Defendant, by and through Counsel Mack, is not acting as proxy for Owen to now take an untenable position asserting that Plaintiff is subject to RCW Title 26 domestic relations whilst Defendant asserts that it can, as proxy for Owen, deny Plaintiff the "full and equal access to the education…records of [A.R.W.] absent a court order to the contrary." (*See* RCW 26.09.225(1))

31.     Defendant has not provided Plaintiff proof that, ***if*** the Order were valid and currently in effect under RCW Title 26, Defendant would not be prohibited from denying Plaintiff full and equal access to the education of records of A.R.W. pursuant to RCW 26.09.225(1).

32.     Plaintiff emailed Counsel Mack on November 29, 2023, to remind Ms. Mack that Defendant's assertion of domestic relations and a valid Order therefrom would require compliance with RCW 26.09.225(1), which states in part, "Neither parent may veto the access requested by the other parent."

33.     Defendant has not provided Plaintiff proof that Owen and her fellow prostitute girlfriend, Magalie E. Lerman ("Lerman"), are not currently violating RCW 9A.40.060(3) by concealing A.R.W. from Plaintiff outside of Washington state.

34.     Defendant has not provided Plaintiff proof that "[A.R.W. does] not wish to be located by [Defendant].

PETITION FOR WRIT OF MANDAMUS
SEATTLE PUBLIC SCHOOLS RCW 28A.605.030
Page 7 of 13

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0162**

35.     On February 14, 2023, A.R.W. signed an Affidavit and power-of-attorney, witnessed by three adults including a college professor who tutored A.R.W. at Plaintiff's home throughout the 2020-2021 school year, recounting the lies and crimes perpetrated by Owen and Lerman, and authorizing Plaintiff to seek legal representation for A.R.W. to end the child abuse and imprisonment of A.R.W. by Owen and Lerman.  (WAWD No. 2:23-cv-01392-JNW Dkt. No. 13-2 at 48-54)

36.     Owen and Lerman are concealing A.R.W. due to their concern that A.R.W. would speak to a legal advocate, acting on behalf of A.R.W., to expose Owen's and Lerman's perjury, threats, custodial interference, theft, attempted extortion, fraud, child abuse, abusive litigation, and prostitution: in other words, Owen and Lerman are concealing A.R.W. in order to prolong the concealment and ongoing commission of their crimes.

37.     Defendant has not provided Plaintiff proof that Russ is not aiding and abetting Owen and Lerman in the violation of RCW 9A.40.060(3) to conceal A.R.W. from Plaintiff in violation of the First and Ninth Amendments to the United States Constitution.

38.     Defendant has not provided Plaintiff proof that Counsel Mack is not aiding and abetting Owen and Lerman in the violation of RCW 9A.40.060(3) to conceal A.R.W. from Defendant in violation of the First and Ninth Amendments to the United States Constitution.

39.     Defendant has not provided Plaintiff proof that Mr. Gregory Narver is not aiding and abetting Owen and Lerman in the violation of RCW 9A.40.060(3) to conceal A.R.W. from Defendant in violation of the First and Ninth Amendments to the United States Constitution.

## V.     ARGUMENT FOR ISSUING WRIT

### A.  Arrest of Criminal Conduct

PETITION FOR WRIT OF MANDAMUS
SEATTLE PUBLIC SCHOOLS RCW 28A.605.030
Page 8 of 13

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

40.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs with the same force and effect as if fully set forth herein.

41.     Public servants are guilty of official misconduct when they deprive another person of a lawful right or privilege, whether an act is committed under color of law or the public servant refrains from performing a duty imposed upon him or her by law.  *See* RCW 9A.80.010.

42.     On September 23, 2021, Booker denied Plaintiff's right as the father of A.R.W. to review ***any*** education records of A.R.W.

43.     By redacting the school records of A.R.W., Defendant, Narver, and Counsel Mack are knowingly and willfully aiding and abetting Owen and Lerman to conceal which school A.R.W. is currently attending.

44.     By redacting the school record of A.R.W., Defendant, Narver, and Counsel Mack are preventing Plaintiff from accessing the school records of A.R.W. from the school which A.R.W. currently attends.

45.     By redacting the school records of A.R.W., Defendant, Narver, and counsel Mack are aiding and abetting Owen and Lerman to conceal A.R.W. from Plaintiff in violation of RCW 9A.40.060(3), a class C felony.

**B.  Absence of Remedy**

46.     The Writ must be issued upon affidavit on the application of Plaintiff when there is not a plain, speedy and adequate remedy at law pursuant to RCW 7.16.170.

47.     As Defendant has refused for more than two years to provide Plaintiff with full and equal access to A.RW.'s school records, there is not a plain and speedy remedy other than application for Writ of Mandamus.

PETITION FOR WRIT OF MANDAMUS
SEATTLE PUBLIC SCHOOLS RCW 28A.605.030
Page 9 of 13

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

0164

48.      As Defendant hired Pacifica Law Group to file Complaint in WAWD No. 23:2-cv-01829-JNW to defy compliance with RCW 28A.605.020, a Writ of Mandamus is the only adequate remedy at law to compel Defendant's compliance.

**C.  Alternative Writ**

49.      Plaintiff seeks an alternative Writ of Mandamus commanding Defendant, immediately after receipt of the writ to comply with RCW 28A.605.020 and provide Plaintiff with the unredacted records of Plaintiff's son, A.R.W., or to expeditiously show cause before the court why Defendant has not done so pursuant to RCW 7.16.180.

**D.  Notice of Application**

50.      Plaintiff shall serve Defendant notice of application at least ten days prior to filing the Petition for Writ of Mandamus with the King County Superior Court office of the clerk pursuant to RCW 7.16.190, thereby affording Defendant adequate time to comply with RCW 28A.605.020 or show cause before the Court why Defendant has not done so.

**E.  Answer**

51.      On the day on which the application for writ is noticed, Defendant may show cause by answer, under oath, made in the same manner as an answer to a complaint in a civil action, pursuant to RCW 7.16.200.

**F.  Plaintiff Reserves Right to Countervail Answer**

52.      Plaintiff hereby reserves his right to countervail Defendant's answer by proof, either in direct denial or by way of avoidance, pursuant to RCW 7.16.220.

**G.  Hearing**

53.      If no answer be made by Defendant, the Court must hear the case on the papers of Plaintiff pursuant to RCW 7.16.250.  Plaintiff waives his right to trial by jury.

PETITION FOR WRIT OF MANDAMUS
SEATTLE PUBLIC SCHOOLS RCW 28A.605.030
Page 10 of 13

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1

2

**H. Damages, Fees, Costs**

54.     Pursuant to RCW 7.16.260 Plaintiff is entitled to recover damages and costs he has sustained related to the denial of his right to the full and equal access of his son's school records for more than two years, as well as the time and expense of bringing this action as the remedy of last resort.

55.     Pursuant to RCW 42.56.550, if Plaintiff prevails upon the Court's examination, Plaintiff "shall be awarded all costs, including reasonable [legal] fees, incurred in connection with such action.  In addition, it shall be within the discretion of the court to award [Plaintiff] an amount not to exceed one hundred dollars for each day that [Plaintiff] was denied the right to inspect [A.R.W.'s school records]."

56.     Defendant has, to date, denied Plaintiff full and equal access to A.R.W.'s records for eight hundred and five days: at a cost not to exceed $100 per day, Defendant is liable to Plaintiff for damages up to $80,500.  As the violations by Defendant of RCW 28A.605.030 were done knowingly and willfully, and have been perpetrated in violation of Plaintiff's First Amendment protected right of association with his own son, and in conspiracy with Owen and Lerman to violate RCW 9A.40.060(3), Plaintiff is entitled to the maximum amount of $80,500.

## VI.     RELIEF REQUESTED

*WHEREFORE,* upon his verified statements herein Plaintiff moves this honorable Court to grant a Writ of Mandamus compelling Defendant, and officials employed by Defendant, to produce all unredacted records related to A.R.W. in the possession of Defendant in accordance with RCW 28A.605.030 and pursuant to 7.16.150, *et seq.*  Pursuant to RCW 7.16.180, this petition seeks an alternative writ commanding Seattle Public Schools, immediately after the receipt of the

PETITION FOR WRIT OF MANDAMUS
SEATTLE PUBLIC SCHOOLS RCW 28A.605.030
Page 11 of 13

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

writ, to comply with RCW 28A.605.030 or show cause before the Court within ten (10) days of notice of application why Defendant has not complied with RCW 28A.605.030.

Plaintiff seeks an award of $80,500 against Defendant, as well as reasonable fees and costs related to the instant Writ of Mandamus.

## VERIFICATION

I, Kurt Benshoof, do hereby declare that the foregoing is true and correct to the best of my knowledge under penalty of perjury in the State of Washington.

Executed this 7th day of December in the year 2023, in the city of Seattle, in the county of King, in the state of Washington.

By: _____s/ Kurt Benshoof_____
Kurt Benshoof *Pro Se*

1716 N 128th Street
Seattle, WA 98133
Phone: (206) 460-4202
Email: kurtbenshoof@gmail.com

PETITION FOR WRIT OF MANDAMUS
SEATTLE PUBLIC SCHOOLS RCW 28A.605.030
Page 12 of 13

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0167**

1

2

**CERTIFICATION OF SERVICE**

3

Plaintiff hereby certifies that on December 22, 2023, Plaintiff did give notice by e-filing

4

into the King County e-filing system and by email to the addresses listed below.

5

6

**Attorney For Defendant Jessica Owen:**
Blair M. Russ, WSBA #40374

7

1000 Second Avenue
Suite 3660

8

Seattle, WA 98104
Email: bmr@tbr-law.com

9

**Attorney for Defendant Nathan Cliber:**

10

Kyle Rekofke, WSBA #49327
701 Fifth Avenue

11

Suite 2100
Seattle, WA 98104

12

Email: krekofke@grsm.com

13

14

**Attorney for Defendants**
**Magalie Lerman and Owen Hermsen:**

15

Moshe Y. Admon, WSBA #50325
300 Lenora Street

16

Suite 4008
Seattle, WA 98121

17

Email: jeff@admonlaw.com

18

19

DATED:  December 22, 2023

20

Signed:  ___s/ Kurt Benshoof_____

21

22

Kurt Benshoof, *Pro Se*

23

24

25

26

PETITION FOR WRIT OF MANDAMUS
SEATTLE PUBLIC SCHOOLS RCW 28A.605.030
Page 13 of 13

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0168**

1

2

Hon. Marshall Ferguson

3

4

5

6

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

7

IN AND FOR THE COUNTY OF KING

8

9

10
KURT A. BENSHOOF *Pro Se,*

CASE NO.

11
                                    Plaintiff,

PETITIONER'S SUMMARY RE:
PETITION FOR WRIT OF MANDAMUS

12
                    v.

WRM - 2

13
SEATTLE PUBLIC SCHOOLS,

Re: SEATTLE PUBLIC SCHOOLS;
RCW 28A.605.030

14
                                    Defendant.

15

16

## I.    INTRODUCTION

17

18
COMES NOW Plaintiff Kurt Benshoof ("Benshoof"), in accordance with this Court's

Order Restricting Abusive Litigation of Kurt Benshoof ("Order"), summarizing Benshoof's

19

20
Petition for Writ of Mandamus Re: Seattle Public Schools; RCW 28A.605.030.

## II.    SUMMARY

21

22
The Petition for Writ of Mandamus evinces that Seattle Public Schools has violated RCW

23
28A.605.030 for more than two years by denying Benshoof the full and equal access to the

24
records of his minor son, A.R.W.

25

26
SUMMARY OF PETITION FOR WRIT OF MANDAMUS
RE: SEATTLE PUBLIC SCHOOLS; RCW 28A.605.030
Page 1 of 3

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**0169**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Benshoof seeks the Writ to compel Seattle Public Schools, and officials in the employ of Seattle Public Schools, to comply with state law including, but not limited to, RCW 28A.605.030.

## VERIFICATION

I, Affiant Kurt Benshoof, do hereby declare that the foregoing is true and correct to the best of my knowledge under penalty of perjury in the State of Washington, and am competent to testify to the matters stated herein. Executed this 7th day of December in the year 2023, in the City of Seattle, in the county of King, in the state of Washington.

By: _____s/ Kurt Benshoof_____
        Kurt Benshoof *Pro Se*

1716 N 128th Street
Seattle, WA 98133
Phone: (206) 460-4202
Email: kurtbenshoof@gmail.com

SUMMARY OF PETITION FOR WRIT OF MANDAMUS
RE: SEATTLE PUBLIC SCHOOLS; RCW 28A.605.030
Page 2 of 3

Kurt Benshoof, Plaintiff
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1

2

## CERTIFICATION OF SERVICE

3

I, Kurt Benshoof, hereby certify that on December 22, 2023, I did serve notice upon

4

counsels for Defendants by e-filing in King County Superior Court Case No. 22-2-15958-8 the

5

Petition for Writ of Mandamus Re: Seattle Public Schools; RCW 28A.605.030, and this

6

Summary of Petition for Writ of Mandamus Re: Seattle Public Schools; RCW 28A.605.030,

7

and by emailing to addresses listed below:

8

9

**Attorney For Defendant Jessica Owen:**     **Attorney for Defendant Nathan Cliber:**
Blair M. Russ, WSBA #40374                   Kyle Rekofke, WSBA #49327

10

1000 Second Avenue                           701 Fifth Avenue
Suite 3660                                   Suite 2100

11

Seattle, WA 98104                            Seattle, WA 98104
Email: bmr@tbr-law.com                       Email: krekofke@grsm.com

12

13

**Attorney for Defendants**

14

**Magalie Lerman and Owen Hermsen:**
Moshe Y. Admon, WSBA #50325

15

300 Lenora Street
Suite 4008

16

Seattle, WA 98121
Email: jeff@admonlaw.com

17

18

19

DATED:  December 22, 2023

20

Signed:    s/ Kurt Benshoof

21

Kurt Benshoof, *Pro Se*

22

1716 N 128th ST
Seattle, WA 98133

23

(206) 460-4202

24

25

26

SUMMARY OF PETITION FOR WRIT OF MANDAMUS          Kurt Benshoof, Plaintiff
RE: SEATTLE PUBLIC SCHOOLS; RCW 28A.605.030       1716 N 128th ST
Page 3 of 3                                        Seattle, Washington 98133
                                                   (206) 460-4202
                                                   kurtbenshoof@gmail.com

## 0171

Messages - Owen Hermsen Hermsen

> Or propane like

Ankheg oil.

1/27/22, 6:24 AM

> Loved "Ankheg oil."

> Of greatest import to myself and my son is that, after nearly five months of forcible separation based upon provable lies and hearsay, that we are rejoined in physical reality.

> I have provided her attorney with the requisite proof of court ordered classes, and further delay is further abuse to both my son and myself.

> I requested of Jade six months ago that she provide me with her financial claims. Six months is absurd, even from a dirigible.

Well, I can't speak to that. I can say though that the current muddle is me trying to find an agreeable solution for both of you that prevents you both going to court and making things likely way worse for both parties. I've got the day off tomorrow and you'll have the numbers then. Gonna put your adjusted tuition numbers in and you'll have the amount for the Fj.

Each of you sees this as an inseparable whole and yourself as the injured party. To make it solvable you can work things into slightly more manageable bites (even just two big settle-ups should do it), and you're both going to have to set grievance aside during and after. On the hopeful side, each of you seems capable of that during non-frustrated moments.

> Potential always abounds, awaiting its stage call. Brother Owen.

1/29/22, 3:06 PM

Hey Kurt, sent you a Google Doc with settlement proposal for the FJ and framework for the house and legal stuff.

Please review and let me know if you are okay with the first step. We can resolve that and work on the second step in the next couple weeks.

> Cool.
> I have Zoom with ▮▮▮▮ at 330 but will get back to you afterwards

Okeydokey.

**311**

Exported from Seraph's Phone (FFWG1JT0N72J) on 4/29/23, 4:03 PM with iMazing by DigiDNA. Database date when extracted: 4/29/23, 3:50 PM

Page 13 of 71

0172
Page 804

Messages - Owen Hermsen Hermsen

> So that I understand correctly, if I pay Jade $19,107.80 she will return my FJ Cruiser and sign over the title, and if I don't pay her $19,107.80, she will continue to keep my FJ Cruiser (that I already paid her for in fiull many months ago) and refuse to sign over the title?
>
> Is this correct?

> Second question—-do you know what Jade omitted the cash payments that I handed her in 2020 that totaled AT LEAST $20,000? (I have to check my records. It may be $22,000.)

> *why not what

Yes, although I can't speak to anything paid for previously besides what's on that agreement.

She's asking for the first set of outstanding payments to be settled for $19K, before dealing with the other stuff that's more contentious (and I put a bunch of her stuff in that second set too, to get this done soon).

Those are in the value of the vehicle I assume. I could add the value of the vehicle and any previous payments but that would assumably wash out in the end yeah?

> It appears that she is trying to pretend I didn't give her &20,000 or $22,0000 cash last year for the mortgage 😂

I'll ask her about that. I understood that this is the outstanding part of the mortgage.

> She refinanced the house around September of 2020 against my wishes and I need to see her verified mortgage payments between August 2019 and November 2019 because I think there was a grace period between refinancing in which no mortgage payments were required or made

> She's lying BIG TIME. I'm still digging through my paperwork, but just the following is enough to illustrate this.
>
> 8/27/19. $1000 cash .
>
> 10/28/20 I paid her $10,000 cash.
>
> 5/31/21 I paid her $12,000 in money orders.
>
> I also paid her almost $4,693.34 via cashiers check in 7/31/2020 so that she could lie to her lender and say I was renting my house.
>
> 11/1/2019 i paid her $1000 money order

> Looks like we need to go to court if that's how dishonest she wants to be.

## 312

Exported from Seraph's Phone (FFWG1JT0N72J) on 4/29/23, 4:03 PM with iMazing by DigiDNA. Database date when extracted: 4/29/23, 3:50 PM

Page 14 of 71

0173
Page 805

Messages - Owen Hermsen Hermsen

> Her "Kurt owes me $14,811.44" for "household bills" apparently includes the mortgage, as there is no way she paid $29,000 in groceries and clothes and miscellany that I owe her half of.
>
> And then she goes on to charge me for the mortgage on top of that?
>
> LMFAO.

> I don't negotiate with liars

> I have zoom with A[████] at 4pm. After that I will call you to discuss some things that, for today, are better not put in writing.

> If you can obtain the internet log in information for the loan care account so that I can verify the house payments that would be great

> I am more than happy to pay Jade for the insurance on my FJ. Beyond that, I can only laugh

Okay, I'll let her know all that.

I'll get pdfs of whatever you need.

I'm at an appointment 5-6:30, can call you after.

> Wordup, Brother Owen

1/29/22, 6:53 PM

> Still on Zoom with A[████]

Okeydokey. I'm booked the rest of the evening, won't have my laptop with me to take notes. I'll try you again Sunday or Monday.

> Can I call you in 5mins?

.313

Exported from Seraph's Phone (FFWG1JT0N72J) on 4/29/23, 4:03 PM with iMazing by DigiDNA. Database date when extracted: 4/29/23, 3:50 PM

Page 15 of 71

0174
Page 806

Messages - Owen Hermsen Hermsen

1/29/22, 8:29 PM

The $14,811 for "household bills" between June 2019 and July 2020 is going to require documentation. The notion that she spent $29,000 —— more than $2,000 per month—on shared food and clothes for A▇▇▇▇ and some Xmas presents (and a new back hatch for her canopy) is laughable.

But if we're going to get into the details as a condition of having my FJ Cruiser returned, I have thousands of dollars of similar expenditures to toss into this game.

The funny thing is, stealing my car and demanding payment for OTHER things as a condition of the return of stolen property may actually be felony extortion.

Oops.

I will have to look through my cel messages, but I already gave Jade some household receipts back in 2019 that she may have failed to enter into her accounting from June 2019-July 2020.

And as she was feeding Justice for much of 2019 out of our "shared groceries" the groceries will need to be split accordingly.

1/30/22, 3:16 PM

Due to Jade's cats, I'm also getting cost estimates for reupholstering both kitchen booths, the drywall upstairs, the damaged kitchen cabinet doors, and getting the cat door removed from the front door.

This isn't my first rodeo in life. I've been more than patient, competent honest, and I am always fair, even with those who have attacked me with lies, threats and theft.

She can return my FJ Cruiser by 9pm Monday 1/31/2022, and hand over the title, or we can litigate every last crime and detail in court. It's up to her. Brother Owen.

If she chooses the second option, she will be buried in legal expenses before it even gets to a judgment for compensatory and punitive damages

I can write and litigate a Writ of Replevin and a state or federal lawsuit by myself. She can't.

.314

Exported from Seraph's Phone (FFWG1JT0N72J) on 4/29/23, 4:03 PM with iMazing by DigiDNA. Database date when extracted: 4/29/23, 3:50 PM

Page 16 of 71

0175
Page 807

Messages - Owen Hermsen Hermsen



"What day is today?" asked Pooh

"It's the day we burn this motherfucker to the ground." squeaked Piglet

"My favorite day." said Pooh

1/31/22, 9:32 PM

Hey Kurt, I conveyed all that to Jade.

She replies that she does have receipts for everything on the document I sent you, and can share them as part of either settlement or court or whatever, if that would make a difference.

She also says the offer of $19,107.80 still stands until Friday Feb 4th. After that she'll sell the car. She said to tell you she would much rather resolve things satisfactorily for both of you.

Personally I think you're going to make that amount up in the house part of the separation tally, and it's not a bad deal when looking at the rest of what's going to get worked out between you (most of your claims went into the second part category, and it sounds like you have more to add).

But I am not you, or Jade, and have to respect whatever you two each choose.

Anyways, there's the info. I'm headed to bed, will be available in the morning.

2/1/22, 8:53 AM

Is it Hermson or Hermsen?

Hermsen

2/1/22, 5:32 PM

Selling stolen property?  That's funny.

.315

Exported from Seraph's Phone (FFWG1JT0N72J) on 4/29/23, 4:03 PM with iMazing by DigiDNA. Database date when extracted: 4/29/23, 3:50 PM

Page 17 of 71

0176
Page 808

1

```
 1              IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

 2                   IN AND FOR THE COUNTY OF KING

 3      _____

 4      KURT BENSHOOF,                    )
                                          )   COA Appeal No. 86466-1-I
 5                Plaintiff,              )   Cause No. 22-2-15958-8 SEA
                                          )
 6      v.                                )
                                          )
 7      NATHAN CLIBER, JESSICA OWEN,      )
        MAGALIE LERMAN,                    )
 8                                        )
                  Defendant.              )
 9      _____

10                     MOTION HEARINGS - VIA ZOOM

11             The Honorable Marshall Ferguson Presiding

12                        January 27, 2023
                          March 17, 2023
13      _____

14

15

16

17

18

19

20

21

22

23      TRANSCRIBED BY:      Reed Jackson Watkins
                             Court-Certified Transcription
24                           206.624.3005

25
```

**0177**

```
 1                    A P P E A R A N C E S

 2

 3   On Behalf of Plaintiff pro se:

 4   KURT BENSHOOF

 5   1716 North 128th Street

 6   Seattle, Washington 98133

 7

 8   On Behalf of Defendant Cliber:

 9   KYLE REKOFKE

10   Gordon Rees Scully Mansukhani

11   701 Fifth Avenue, Suite 2100

12   Seattle, Washington 98104-7084

13

14   On Behalf of Defendant Owen:

15   ANTHONY S. MARINELLA

16   BLAIR RUSS

17   Tomlinson Bomsztyk Russ

18   1000 Second Avenue, Suite 3660

19   Seattle, Washington 98104

20

21   On Behalf of Defendant Lerman and Hermsen:

22   MOSHE Y. ADMON

23   Admon Law Firm, PLLC

24   300 Lenora Street, Number 4008

25   Seattle, Washington 98121
```

1                I N D E X   O F   P R O C E E D I N G S

2

3    PROCEEDINGS                                                  PAGE

4    All proceedings commence.................................    4

5    January 27, 2023, proceedings commence..................    4

6    Argument................................................   10

7    Ruling by the Court.....................................  104

8    January 27, 2023, proceedings concluded.................  110

9

10   March 17, 2023, proceedings commence....................  111

11   Argument................................................  112

12   Ruling by the Court.....................................  140

13   March 17, 2023, proceedings concluded...................  147

14

15

16

17

18

19

20

21

22

23

24

25

**0179**

```
 1                            -o0o-

 2                       January 27, 2023

 3

 4      THE BAILIFF:  Benshoof v. Nathan Cliber, et al., Cause

 5    Number 22-2-15958-8 SEA.

 6      For the record, this morning, will the petitioner please

 7    introduce yourself.

 8      THE COURT:  Zoom indicates that Mr. Benshoof, and I hope

 9    I'm pronouncing that correctly, is still connecting to

10    audio.  I'm not sure what the problem would be on his end.

11    That's how I -- there's a chat indicating that plaintiff is

12    logged in but isn't yet connecting audio/video.

13      Give plaintiff a moment here.  Looks like perhaps he has

14    established an audio connection.

15      Mr. Benshoof, are you there?

16      Still having audio problems.

17      Well, Madam Bailiff, why don't we check the other folks

18    in.

19      THE BAILIFF:  All right.  And, all, if I miss anyone, just

20    please let us know.

21      So let's start with counsel -- respondent's counsel for

22    Cliber.

23      MR. REKOFKE:  Good morning, Your Honor.  This is Kyle

24    Rekofke on behalf of Mr. Cliber.

25      THE BAILIFF:  And respondent's counsel for Ms. Owen?
```

 1          MR. MARINELLA:  Good morning, Your Honor.  This is Anthony

 2      Marinella for Ms. Owen.

 3          THE COURT:  And, Madam Bailiff, just a point of order, in

 4      dependency it was respondents.  Now that we're back handling

 5      civil matters, it would be defendant's counsel.

 6          THE BAILIFF:  Defendant's counsel.

 7          THE COURT:  Yep.

 8          THE BAILIFF:  Okay.  All right.  Thank you.

 9          THE COURT:  Yep.

10          THE BAILIFF:  And have we missed anyone?  If so, please

11      introduce yourself.

12          MR. ADMON:  Yes, good morning.  This is Moshe Admon on

13      behalf of Defendants Lerman and Ownsen -- and Hermsen.  I'm

14      sorry.  Owen Hermsen.

15          THE BAILIFF:  All right.

16          MR. RUSS:  And good morning.  For the record, Blair Russ

17      also appearing on behalf of Ms. Owen, but I am not arguing

18      today.

19          THE BAILIFF:  All right.  And is there anyone else may

20      have missed introducing yourself?

21          THE COURT:  Is Mr. Benshoof with us, in terms of his audio

22      connection?

23          Mr. Benshoof, are you there?

24          If you are responding, we cannot hear you.  We also cannot

25      see you.

**0181**

 1          Mr. Benshoof, if you are there -- I see that you're still

 2     on Zoom.  I don't know what the status of your audio

 3     connection is.  If you could respond in the chat to let us

 4     know your status, that would be helpful; otherwise, you do

 5     run the risk, sir, that we may proceed despite your status

 6     or situation.  It's unclear whether you're actually having

 7     any audio or visual difficulties with your technology or

 8     not.

 9          Counsel, have any of you received any communication from

10     the plaintiff regarding this morning's hearing?

11          MR. REKOFKE:  Your Honor, I just -- he sent an email to

12     your judicial assistant asking for the Zoom link, but that's

13     the only communication I've seen from him this morning.

14          THE COURT:  All right.  Well, I pressed the button on Zoom

15     asking the plaintiff to start his video.  I don't know

16     whether he has a video-capable device.

17          He is still with us on Zoom, but he's either unable to

18     hear or intentionally not answering the Court.  He's not

19     answering in the chat.  And at this point, I'm inclined to

20     handle this in one of two ways.  Either just simply proceed,

21     regardless of Mr. Benshoof's status, or to briefly recess to

22     give the plaintiff just a little bit of additional time to

23     sort out whatever technology issues that might be presenting

24     an obstacle here.

25          I think I'm inclined to take the latter approach,

**0182**

1      especially if the Court is going to grant any kind of

2      dispositive relief, which has been requested, then I'd

3      rather err on the side of giving Mr. Benshoof a little bit

4      more time to sort out his technology issues and contact the

5      court.

6          So, Mr. Benshoof, if you can hear me, again, this is Judge

7      Ferguson.  I encourage you to reach out to my bailiff via

8      email or to further communicate with us via chat to let us

9      know what's going on with your technology.  I don't know

10     whether you are in close proximity to the courthouse, but

11     you're welcome to come down to the courthouse and attend

12     this proceeding in person, if it will not delay the

13     proceeding substantially.

14         So let us know what's going on.  We're going to recess

15     until 8:45 so we can see -- give Mr. Benshoof a little bit

16     more time to communicate with the Court.

17         All right.  We're at recess.

18                          (Recess)

19         THE COURT:  All right.  Let's go back on the record.

20     Thank you, Mr. Court Clerk.

21         We are back on the record in the matter of Benshoof v.

22     Cliber, et al.  The time is 8:46.  The Court has not

23     received any further communication from Mr. Benshoof,

24     although Mr. Benshoof is still on Zoom.  I see a tile with a

25     screen label of "Kurt Benshoof."

**0183**

1           Mr. Benshoof, are you there?  Can you hear me?  If so,

2      please respond.

3           The video is turned off.  I'm requesting that Mr. Benshoof

4      start the video.  I'm also requesting that Mr. Benshoof

5      communicate with the Court via the chat function.  Normally,

6      I don't permit that.  But in this instance, to clarify his

7      technology issues, I'm asking him to do that.

8           Have any counsel received any further communication from

9      the plaintiff?  Mr. Rekofke?

10          MR. REKOFKE:  No, Your Honor.

11          THE COURT:  Mr. Admon?

12          MR. ADMON:  No, Your Honor.

13          THE COURT:  Mr. Russ?

14          MR. MARINELLA:  Speaking for Ms. Owen, Your Honor, no, I

15     have not received anything.

16          THE COURT:  All right.  Thank you.

17          Then unless counsel have any other concerns or objections,

18     for that matter, I'm inclined to proceed.  My -- frankly, my

19     concern is that Mr. Benshoof, who asked to participate via

20     Zoom, is now attempting to delay the proceedings by

21     manufacturing an unspecified technical obstacle to

22     proceeding.  He has not made any attempt to communicate with

23     the Court or with the parties about what's going on with his

24     situation.  He is here on Zoom.  The Court has been

25     conducting Zoom proceedings for almost three years now at

**0184**

1     this point, and in the Court's experience, it is very rare

2     for a party to participate via Zoom, encounter technical

3     difficulties, and then have absolutely no means whatsoever

4     of communicating with anyone about what's going on.  Usually

5     they reach out to one of the other parties or the bailiff

6     and provide some explanation about what's happening.

7      So that is the Court's concern here.

8      Mr. Marinella, Mr. Admon, are you prepared to proceed?

9      MR. MARINELLA:  Yes, Your Honor.  And, for the record,

10    Your Honor, I think it's important to state that at

11    8:30 a.m., Mr. Benshoof texted everyone in the chat function

12    saying "Hello, plaintiff is logged in but isn't yet

13    connecting audio and video."

14     At 8:31 he then said "Received and thank you."

15     I'm assuming he was speaking to your bailiff.

16     THE COURT:  Well, that -- that response was my bailiff

17    responding to him.

18     MR. MARINELLA:  Understood.  And, for the record, he also

19    emailed the Court at least four times yesterday,

20    consecutively.  So I just want to put that on the record,

21    Your Honor, to have a clear record that he does know the

22    Court's email address and he has been regularly

23    communicating with the Court and with counsel.

24     THE COURT:  Agreed.

25     Mr. Rekofke, are you prepared to proceed?

**0185**

1      MR. REKOFKE:  I am, Your Honor.  And if I can make a brief

2      request.  I -- would you entertain my motion first?  I have

3      a mediation that starts at 9:00 and the associate that was

4      going to cover that just recently left our firm.  So I

5      accidentally got double-booked this morning.

6      THE COURT:  I see.

7      Any objection?

8      MR. MARINELLA:  No, Your Honor.

9      THE COURT:  All right.  So, Mr. Rekofke, we'll commence

10     with your client's motion, whenever you're ready.

11     MR. REKOFKE:  Thank you, Your Honor.

12     On behalf of Mr. Cliber, we're here today asking this

13     Court to dismiss the complaint filed against Mr. Cliber

14     pursuant to the protections of the Uniform Public Expression

15     Protection Act, which I'll called UPEPA for brevity's sake.

16     There's basically three elements under UPEPA toward

17     dismissal, required for dismissal.  So the first is that the

18     moving party, Mr. Cliber, establishes UPEPA bias.  The

19     second is that the nonmoving party, Mr. Benshoof, is unable

20     to establish that UPEPA does not apply.  And then, finally,

21     we make a showing that we're entitled to dismissal under the

22     standards incorporated by the statute, which basically

23     amount to the CR 12 standard and the summary judgment

24     standard.

25     So the first showing we need to make is that UPEPA

**0186**

1    applies, and based on the pleadings it clearly does.  This

2    claim brought against Mr. Cliber is for abuse of process.

3    Mr. Benshoof expressly plead that this cause arose out of

4    what we termed the domestic violence action and the

5    parentage action.  Those are two actions which involved

6    Mr. Owen -- or Ms. Owen and Mr. Benshoof.

7      My client, Mr. Cliber, represented Ms. Owen in the

8    parentage action.  He was not involved in the domestic

9    violence action, at least in a formal representation, you

10   know, filed a notice of appearance type of way.

11     So UPEPA expressly stated under Section 010 -- or

12   4.105.010(2)(a), that the statute applies to communications

13   made in judicial proceedings.  So the communications were

14   the judicial proceedings in the parentage action.

15     THE COURT:  So, Mr. Rekofke, I'm going to stop you here

16   because I want to ask a question --

17     MR. REKOFKE:  Sure.

18     THE COURT:  -- that I think might apply to all of the

19   UPEPA claims here.

20     There is some case law cited in Owen's motion materials

21   suggesting that the anti-SLAPP statute is intended to

22   address speech that concerns matters of public concern,

23   relating to matters of political, social, or other concerns

24   to the community.

25     And I wonder whether this is the sort of scenario that was

1          intended to be covered by the anti-SLAPP statute especially

2          where the legislature in 2020 passed the Abusive Litigation

3          Act, which is RCW Chapter 26.51.  As I was researching the

4          materials for today's hearing, I came across that statute

5          and I came across a very recent 2022 Court of Appeals'

6          ruling about the Abusive Litigation Act that made me wonder

7          whether the legislature intended to address these sorts of

8          scenarios with that statute rather than the anti-SLAPP

9          statute.

10          MR. REKOFKE:  To the first part of the question,

11          Your Honor, we looked at this and I decided to move under

12          this statute because in 010, provision (2) says, [As read]

13          Except as otherwise provided in subsection (3) of this

14          section, this chapter applies to a cause of action asserted

15          in a civil action against a person based on a person's --

16          and then the next parent -- (a) communication in a

17          legislative, executive, or judicial, administrative, or

18          other governmental proceeding.

19          So to me it seemed fairly broad.  Any communication that's

20          at issue in civil action later asserted that of an

21          underlying civil action.  I'll be frank with you.  I

22          haven't -- I didn't -- I was focused on the scope of this

23          motion.  My brief recollection, and I could be wrong here,

24          is that that was the -- the abusive litigation statute may

25          require some sort of intimate relationship.  And I could be

1      off base there, but if that is true, Mr. Cliber wouldn't

2      have that relationship with Mr. Benshoof.

3        THE COURT:  So --

4        MR. REKOFKE:  That's why we proceeded under this statute.

5        THE COURT:  Which makes sense.  Which makes sense.

6      However, there's a decision that came out of Division I in

7      November of 2022, and I realize that's a very new case.

8      It's called Kuhlmeyer, Kuhlmeyer v. Latour.  And what

9      happened in that case seems very, very similar to this case,

10     where you had a -- a male parent, a father, who lost in

11     assorted proceedings in family law.  That case is -- there

12     was an order under -- I think it was 26.09, finding that the

13     father was a risk to the mother, but it wasn't a DVPO.  The

14     father -- so the father sued the mother and kind of anyone

15     connected with the mother, including mother's counsel, and

16     then also filed a series of lawsuits in state and federal

17     court.

18       The trial court dismissed not only the claims against the

19     mother, the intimate partner, but also everyone else.  And

20     it wasn't actually specifically under the statute.  It was

21     under the court's inherent authority to manage litigation.

22     And that the other -- the father in that case basically

23     argued these aren't intimate partners, these are just other

24     parties that I sued, and the Court of Appeals affirmed the

25     trial court saying, well, this is clearly abusive litigation

**0189**

1        and the court has inherent authority to manage litigation.

2        So we're applying the Abusive Litigation Act, but there's

3        also this other inherent authority of the court.

4          And as I was reading Kuhlmeyer and as I was reading that

5        statute, especially in light of the party's current request

6        for a vexatious litigant order, I was more -- kind of the --

7        the gravity of that statute kind of drew me toward that

8        statute rather than UPEPA.

9          I'm not saying that your argument is wrong in how you're

10       applying the anti-SLAPP statute here, but let me -- I wanted

11       to run a hypothetical by you, Mr. Rekofke, because I -- I

12       have a concern about the argument that the parties are

13       making here.

14         Let's say you had someone who made a false claim, a

15       clearly false claim, that someone was a child molester or a

16       child rapist or some horrible claim to the police, and as a

17       result of the claim, another -- the victim lost his job, was

18       evicted, could not find additional housing, there was

19       tremendous reputational damage, and the person who was

20       falsely accused wanted to bring a defamation claim against

21       the person who said that they were, you know, a rapist or a

22       child molester or something like that.

23         What you seem to be arguing is that the person who made

24       that false claim would be immune from civil suit for

25       defamation because they made that claim to the police, and

**0190**

1    you couldn't bring a defamation claim if you were accused of

2    being a child molester because all that person did was file

3    a police report.

4      Is that true?  Does the anti-SLAPP statute prevent civil

5    liability for defamation, even in an extreme case like that?

6      MR. REKOFKE:  Well, I think it wouldn't make you immune

7    from that claim.  It would -- there'd be a question of

8    whether UPEPA applies, and I think UPEPA could apply to the

9    scenario that you are, so it could get you under the

10   protections of this statute.

11     But unless you can prove that you're entitled to

12   dismissal -- so if you had good facts about reputational

13   harm about how this was false, you would never get summary

14   judgment that we're asking for under this statute.  You may

15   have a -- oh, I'm sorry, Your Honor.  I think Mr. Benshoof

16   just entered the chat.

17     THE COURT:  Mr. Benshoof, we have made multiple efforts to

18   get you on Zoom.  Are you with us?  Can you hear me?

19     So Mr. Benshoof wrote in the chat:  Is there a reason my

20   video isn't working yet?  This feels a little bit like an ex

21   parte situation as I see that all the attorneys and the

22   Honorable Marshall Ferguson have their video on.

23     That is correct, Mr. Benshoof.  We have been waiting for

24   you to respond.  I have asked you to reach out to Madam

25   Bailiff.  It's clear that you had the ability to communicate

**0191**

1    with the Court, but you haven't done so this morning.  I'm
2    not sure you can hear me now, but you are able to chat.  I
3    don't know why your video isn't working.  I'm going to
4    respond in the chat, which I ordinarily would not do.  I'm
5    going to ask you to either call in or reach out to Madam
6    Bailiff.
7       All right.  I have responded to the plaintiff,
8    Mr. Benshoof:  Please call my bailiff at (206) 477-1513 or
9    email the bailiff regarding your participation in this
10   hearing.
11      There is an Artrexis Lives [phonetic] or lives in the
12   waiting room.  Does anyone know who that would be?
13      MR. REKOFKE:  No, Your Honor.
14      THE COURT:  All right.  This matter is open to the public,
15   so I will admit whomever that might be.  Wondering if it's
16   Mr. Benshoof.
17      Good morning to the individual joining this proceeding
18   with screen name Artrexis Lives.
19      And that person has fallen off the Zoom or left the Zoom
20   voluntarily.
21      Again, Mr. -- the screen name "Kurt Benshoof" is still
22   with us in this proceeding.  Mr. Benshoof replied "thank
23   you" to the Court's chat message.  And we'll hit the pause
24   button here to see if Mr. Benshoof contacts Madam Bailiff.
25      All right.  It does sound like, from what I'm hearing in

**0192**

1       the background, that someone has called Madam Bailiff,

2       though she -- it sounds like she's having some difficulty

3       hearing that caller.

4          I've just sent a message in the chat to Mr. Benshoof

5       indicating that he may also call in to Zoom using his phone,

6       using the Zoom dial-in information in the link that's

7       provided to him.

8          Just a moment.

9          MR. RUSS:  And, excuse me, Your Honor.  I know I shouldn't

10      be speaking today, but would the Court mind providing the

11      cite for the Coleman [phonetic] case so we can take a look

12      at that?

13         THE COURT:  Sure.

14         MR. RUSS:  If it's convenient.

15         THE COURT:  Sure.  In just a moment.

16         Madam Bailiff, it did sound like someone was calling the

17      court a moment ago; is that correct?

18         THE BAILIFF:  Yes, Your Honor.  And I did answer the

19      phone.  I said hello four times.  There was no one on the

20      line.  I sent an email to Mr. Benshoof about two minutes ago

21      and copied counsel and asked him if he would just send an

22      email.  And then there is a message in the chat that he left

23      bailiff a voice mail.

24         Is the bailiff allowed --

25         THE COURT:  All right.  So Mr. Benshoof, again, has

**0193**

1     messaged -- left a message in the chat writing, "I left the

2     bailiff a VM," for voice mail.  "Has the bailiff allowed my

3     video to work yet?  The start video icon is not showing as

4     able to be activated on my computer, which seems to indicate

5     that the bailiff may not have granted me permission for

6     video feed."

7        The bailiff is not controlling your video, Mr. Benshoof,

8     if you can hear me.

9        His Zoom tile now indicates that he's connecting to audio.

10       I will state for the record that I am controlling which

11    parties are muted or which parties have access.  I have not

12    restricted Mr. Benshoof's video access in any way or his

13    audio access.

14       I'm sorry, Madam Bailiff?

15       THE BAILIFF:  There's no indication that the Court has

16    received a voice mail.

17       THE COURT:  Thank you.

18       The citation on the Kuhlmeyer case, Kuhlmeyer is spalled

19    K-u-h-l-m-e-y-e-r.

20       We've got a phone number joining us now.  It's

21    (206) 460-4202.  If that is Mr. Benshoof, would you identify

22    yourself.  And if you -- you might need to press star 6 to

23    unmute yourself.  If you're joining us by phone, press star

24    6 to unmute yourself.

25       Hello?

1        MR. BENSHOOF:  Yes.  This is Mr. Benshoof.  Is there --

2    hello?  Can you hear me?

3        THE COURT:  I can.  This is Judge Ferguson.  Can you hear

4    me?

5        MR. BENSHOOF:  Hello.  Good morning, Judge Ferguson.  I

6    can hear you finally.

7        THE COURT:  All right.  Good.  So to answer your chat, it

8    is not the bailiff who is controlling the Zoom controls.  I

9    am.  I have not put any restrictions on your video access or

10    your audio access.  I don't know why you're not able to join

11    us by video.  Everyone else is.  I believe it is technical

12    issues on your end, not this end.

13        MR. BENSHOOF:  Oh, yeah.  I've never had a problem on Zoom

14    like this ever, but okay.  I'm not a computer expert, so I

15    have to claim some ignorance.

16        THE COURT:  Okay.

17        MR. BENSHOOF:  But I -- I -- so it's my preference,

18    Your Honor, that I be able to as fully participate as

19    possible, and I understand if you wish to proceed because --

20    for whatever reason, but I would merely wish to note an

21    exception that I'm objecting to my lack of access today.

22        THE COURT:  All right.  So noted.  I will point out that

23    we waited until 8:45 -- this matter was set to start at

24    8:30.  We waited until 8:45 to give you time to sort out

25    whatever obstacle was in your way of participating through

**0195**

 1    video.  Your Zoom tile indicates that you're still

 2    connecting to audio, so I don't know what your audio issues

 3    are.  None of the other parties have had any audio or video

 4    access difficulties this morning.  I am able to hear you

 5    loud and clear by phone, but we have been making great

 6    efforts to get you to join us by Zoom, and I don't know what

 7    the obstacle would be to you joining by video.

 8        Do you have -- do you have a video-capable device?

 9        MR. BENSHOOF:  Yes, yes.  Just so you know, Your Honor,

10    I've been using this exact computer for over -- for two

11    years to attend Zoom hearings in several municipal courts,

12    in King County District Court, in King County Superior, and

13    I've never encountered a situation like this.

14        THE COURT:  Okay.

15        MR. BENSHOOF:  So I don't know what to tell you,

16    Your Honor.

17        THE COURT:  Are you on a laptop or desktop?

18        MR. BENSHOOF:  It's a laptop, sir.

19        THE COURT:  And it has a -- does it have a built-in web

20    cam or like a portable or wireless web cam?

21        MR. BENSHOOF:  I'm on a Mac laptop.  It has a built-in

22    camera.  It's normally just click, click, and it works, you

23    know.

24        THE COURT:  All right.  When I hit -- when I press the

25    button on Zoom, "ask to start video," you should get a cue

**0196**

```
 1        to start your video.  Do you get that?  On your --

 2         MR. BENSHOOF:  Yeah.  And I click on it and it still

 3        (inaudible).  Here, I'm --

 4         THE COURT:  Have you gone to your video settings to test

 5        your video settings?

 6         MR. BENSHOOF:  Well, nothing's ever -- I don't even use

 7        this computer except for Zoom, except for this very thing,

 8        so -- so, like, nothing's changed, you know.  I use this

 9        regularly for court hearings.  I've done nothing with the

10        computer --

11         THE COURT:  Okay.

12         MR. BENSHOOF:  -- so.

13         THE COURT:  It looks like you might be joining with

14        another device; is that correct?  Because there's two Kurt

15        Benshoofs on Zoom now.

16         MR. BENSHOOF:  Oh, I -- yeah.  I was just trying multiple

17        paths to see if I could get it to work.

18         THE COURT:  I see.

19         MR. BENSHOOF:  But -- oh, wait, wait.

20        Can you see me now?  No.

21         THE COURT:  No.

22         MR. BENSHOOF:  Well, yeah, I -- I don't know what else to

23        tell you.  I gave it my best shot.

24         THE COURT:  All right.  We're going to move on.  Again, I

25        don't know what the issues are, but the other participants
```

**0197**

 1    have been able to participate by video and I'm not -- I'm

 2    not doing anything to block your video.

 3        MR. BENSHOOF:  I trust you, Your Honor.

 4        THE COURT:  All right.  The Court was discussing with

 5    Mr. Rekofke Defendant Cliber's motion and the claim under --

 6    for dismissal under UPEPA.

 7        Mr. Rekofke.

 8        MR. REKOFKE:  Thanks, Your Honor.

 9        I think to pick back up where we left off, about your

10    hypothetical, about how potentially somebody accused of

11    something horrific, such as being a child molester or

12    something, would be immune based on my argument.  And just

13    to close the loop on that, that's not true.  I think

14    depending on whether or not the claim had been -- or there

15    has been a crime committed, you may be able to get out of

16    UPEPA all together.

17        THE COURT:  Sure.

18        MR. REKOFKE:  Even if you could get under the UPEPA and

19    say that it applies because the communication happened to a

20    law enforcement agency and somehow the nonmoving party

21    couldn't apply -- couldn't establish UPEPA didn't apply,

22    you'd still have to get through the summary judgment/CR 12

23    dismissal.  So if the evidence was as strong as your

24    hypothetical suggested, there's no way that that party would

25    get the motion granted, and then it would just proceed in

1       the course of a normal defamation claim, you know, outside

2       the confines of UPEPA.

3         And then just briefly, I did have a chance to look at the

4       Kuhlmeyer case, just quickly, and so then that pointed me to

5       the abusive litigation action, which is RCW 26.51.  And my

6       memory was right.  You do have to have an intimate partner

7       relationship to get under that statute.

8         So Mr. Cliber wouldn't have that with Mr. Benshoof and

9       would not be able to avail himself of those protections

10      found in 26.51.

11        THE COURT:  Well, under the statute, yes.  But if you look

12      further down in that opinion -- let me open the opinion here

13      real quick.

14        Let's see.  Further down in the opinion, there's a section

15      entitled "Dismissal of nonLatour Defendants," and that's the

16      section where the nonintimate partner defendants move for

17      dismissal, the trial court dismissed, and the Court of

18      Appeals affirmed here under the inherent power argument.

19        So you're right, it's not under the ALA, but it's under

20      the inherent power aspect of the ruling.

21        And I only bring that up because of the -- and I think

22      you're -- let me see.  You're right about the statute.  I

23      only brought that up because of the request here for a

24      vexatious litigant order, which I don't think your client's

25      actually making.  Is that right?

**0199**

```
1          MR. REKOFKE:  We joined in that request.  That wasn't
2      specifically in our motion, but we would certainly join that
3      request.
4          THE COURT:  I see.  Okay.
5          MR. REKOFKE:  Should I move on?
6          THE COURT:  Go ahead.  Yes.
7          MR. REKOFKE:  Do you have anything else, Your Honor?
8          THE COURT:  Yep.
9          MR. REKOFKE:  Okay.  So I think at this point we're on the
10     second element required for dismissal under UPEPA, which is
11     Mr. Benshoof is afforded the opportunity to establish the
12     statute doesn't apply.
13         His only argument is that it doesn't apply because
14     Mr. Cliber committed a crime against him, which would
15     provide an exception to UPEPA applicability, but there's no
16     evidence and Mr. Cliber has not committed a crime against
17     Mr. Benshoof.
18         In terms of what was submitted to the Court, there were
19     complaints brought to the attention of law enforcement
20     agencies by Mr. Benshoof, but there's no conviction.
21     There's no -- it's just a bare-bones complaint to a law
22     enforcement agency.  It doesn't establish that a crime has
23     been committed.
24         And so if all it took to strip the protections of UPEPA
25     was an unverified complaint to a law enforcement agency,
```

1    this statute would have no teeth because you could simply

2    get around it by just filing any sort of frivolous or

3    nonfrivolous complaint to a law enforcement agency.

4       So I don't think Mr. Benshoof's argument carries the day

5    there.  So I think UPEPA clearly applies and that just leads

6    us to the question of, okay, are we entitled to dismissal

7    under either the CR 12 standard or the summary judgment

8    standards from CR 56?  And I think the answer to that is

9    clearly yes, really under either of the standards, any of

10    the standards.

11       The closest Mr. Benshoof really gets to alleging something

12    that could form the basis of an abuse of process claim is

13    that the parentage action was instituted at least in part to

14    coerce him out of money.  That's not true.  There's no

15    evidence that that's true.  But even if it was true, there's

16    a case that was cited in our materials that says that abuse

17    of process requires something after the institution of the

18    case.

19       So even if you institute a case with a horrible, malicious

20    motive, that can't form the basis, can't support an abuse of

21    process claim.  So the only feasible thing in Mr. Benshoof's

22    complaint still doesn't meet that bar.  And to the extent

23    that you could argue it does, there's no evidence of it.

24       So whether you want to apply CR 12 and look at the

25    allegations or you want to look at his evidence, the result

1    is going to remain the same in that this -- these facts,

2    quote unquote, can't support an abuse of process claim, even

3    if they were true.

4      And then kind of finally to wrap up and supplement that,

5    there's a clear case that basically says if -- there's no

6    liability for abuse of process if nothing was done other

7    than just carrying the case out to its regular -- through

8    its regular course of proceedings to its end.  And

9    Mr. Benshoof has no evidence that anything other than that

10   happened.

11     The parentage case was fully adjudicated over a year.

12   There was a guardian ad litem involved.  The final orders

13   were entered in October.  There's no evidence of any

14   extrajudicial process that was for an ulterior purpose, and

15   those are all required elements to bring an abuse of process

16   claim.  So not only are those not really even alleged,

17   there's certainly no evidence of them.

18     So for those reasons, I would submit that Mr. Cliber's met

19   his burden for dismissal, that UPEPA applies and that this

20   Court should dismiss Mr. Benshoof's complaint against

21   Mr. Cliber.

22     THE COURT:  All right.  Thank you.

23     Mr. Benshoof, you might not have heard this, but we

24   actually -- we're starting with Mr. Cliber's motion, so you

25   haven't missed anything with regard to Defendant Owen's

**0202**

1    motion or any other motion.  This is the first motion we've

2    been discussing.

3      And so what is your response to Defendant Cliber's motion?

4      MR. BENSHOOF:  Was that Mr. Rekofke speaking, Your Honor?

5      THE COURT:  Correct.

6      MR. BENSHOOF:  Yeah.

7      Well, I'm smiling, but you can't get that on video, so...

8      Yeah.  As far as Mr. Cliber goes and the arguments of

9    Mr. Rekofke, first of all, I will quickly address the

10   allegations of vexatious litigation, which would be funny,

11   but, you know, I realize that there's a chance that the

12   Court could believe defense counsel.  And the reality of it

13   is that the only vexatious litigation, the only barratry,

14   and the only abuse of process that has occurred has been on

15   the part of Ms. Owen.

16     This started in the summer, in August of 2021, where

17   Ms. Owen falsely accused me of withholding our son from her,

18   which I -- in the family court case, both 21-2-11149-8 and

19   21-5-00680-6 -- I provided sworn statements, and there's

20   text messages to show it, that at no time was I withholding

21   my son from her; that I welcomed her over to the house to

22   sit down, have a family discussion.  She refused to come

23   over and sit down and talk to our son together as a

24   family --

25     THE COURT:  So, Mr. Benshoof, I'm going to --

**0203**

```
 1       MR. BENSHOOF:  -- and instead --

 2       THE COURT:  Mr. Benshoof, I'm going to interrupt you --

 3       MR. BENSHOOF:  Okay.

 4       THE COURT:  -- because I do want to hear from you about

 5    Ms. Owen's actions, but right now I'd like to --

 6       MR. BENSHOOF:  Oh, sorry.

 7       THE COURT:  -- limit your response to Defendant Cliber's

 8    motion.

 9       MR. BENSHOOF:  Thank you.  Thank you, Your Honor.  You're

10    right.  Mr. Cliber.

11       So there's nothing in RCW 4.105.010(3)(a) subsection (iv)

12    that says that a conviction is required for me to cite that

13    as -- as a way to dismiss defense counsel's attempt to

14    defend the case.

15       It merely says "against a person named in a civil suit

16    brought by a victim of a crime against a perpetrator."

17       Mr. Rekofke falsely stated that there's -- there's no

18    evidence of such.  I beg to differ because not only have I

19    provided sworn affidavits attesting to what Mr. Cliber did,

20    what Mr. Cliber said, and the statutes that he violated, I

21    provided those to both the Seattle Police Department and the

22    King County Sheriff's Office.  I had them legally served on

23    Captain Ryan Abbott out of the Shoreline King County

24    Sheriff's Office.

25       And as it -- I'm not sure if it's cited in all of my
```

**0204**

 1    amended complaints, but it's definitely cited in my sworn

 2    affidavit of January 17th of this year, in which I provide

 3    the case number that the King County sheriff -- that

 4    actually Captain Ryan Abbott texted me when he said we've

 5    done an incident report, but because it happened in Seattle

 6    city limits and they have primary jurisdiction, not

 7    exclusive, but primary, we're forwarding it to the Seattle

 8    police to let them handle it.

 9        Unfortunately, I have over two years of evidence that the

10    Seattle Police Department refuses to act on any criminal

11    complaint that I go to them with regardless of how heinous

12    it is.

13        So I've done everything I can, but, as I said, a

14    conviction is not required pursuant to subsection (3)(a)(iv)

15    of the UPEPA act.

16        And Mr. Rekofke also alleged that -- that there was no

17    verified complaint.  I provided verified complaints to the

18    prosecutor's office.  They've refused to act directly and

19    have said that I had to go through law enforcement; so I did

20    that.

21        There's -- I -- you can't get a more verified complaint

22    than me swearing under penalty of perjury and having it

23    notarized by a notary of the state.

24        And Mr. Rekofke also alleges that there isn't enough

25    evidence.  Well, I think the Court is well aware, as are

**0205**

1    defense counsel, that actions that constitute a conspiracy

2    by their very nature of their secrecy, there isn't going to

3    be smoking gun evidence, shall we say, at the initiation of

4    civil litigation.

5    THE COURT:  Mr. Benshoof, I'm -- I want to ask you a

6    straightforward question.

7    What is the crime that Mr. -- that Mr. Cliber allegedly

8    committed?

9    MR. BENSHOOF:  Well, there's several of them, sir.  He

10    made false and misleading statements in Case Number

11    21-5-00680.  Mr. Cliber is an attorney.  He knows very well

12    that if you're going to state something that you don't have

13    firsthand personal knowledge of, you qualify it by stating

14    that somebody else told me this or I saw --

15    THE COURT:  So, Mr. Benshoof, I'm going to -- I want to

16    ask you a more direct question.  So you're saying a lawyer

17    who makes a misleading statement in litigation is guilty of

18    a crime?

19    MR. BENSHOOF:  He lied about me, and I will pull up the

20    statute for you, sir.

21    THE COURT:  So what is the crime?

22    MR. BENSHOOF:  Yeah.  RCW 9 -- sorry.  I'm pulling up --

23    THE COURT:  I mean, what is the -- not the statute, but

24    what is the name of the crime?  Like theft, murder --

25    MR. BENSHOOF:  False and misleading statements to a public

**0206**

1    servant, Your Honor.

2        THE COURT:  Okay.  I gotcha.

3        MR. BENSHOOF:  There's others.

4        THE COURT:  And --

5        MR. BENSHOOF:  That's in 9A.76.175.  So he -- he made

6    numerous statements like that, some of which are detailed in

7    the criminal complaint for Mr. Cliber, which I believe is

8    Exhibit C in my exhibits.

9        You know, just a few examples of those are he stated that

10   I -- that I recklessly endangered my child.  He stated that

11   I had refused to be acknowledged as my child's father.  He

12   said that I was a DV abuser.  And, you know, it was

13   hilarious at the time because he made that false and

14   slanderous statement without any evidence.  And even

15   Commissioner Holloway corrected him and said, Mr. Benshoof

16   is not a domestic violence perpetrator, unquote.

17       So, I mean --

18       THE COURT:  So --

19       MR. BENSHOOF:  -- Mr. Cliber's statement --

20       THE COURT -- Mr. Benshoof --

21       MR. BENSHOOF:  -- and --

22       THE COURT:  Mr. Benshoof, I -- you filed a 10-page

23   response to Cliber's motion.  I did not see anything that

24   you're -- you're referencing a statement by Judge Holloway.

25   That's not in your response materials.  And even if it were,

**0207**

1    I just don't understand how a lawyer making arguments about

2    legal theories or facts in the case in a family law

3    proceeding, some of which frankly sound like opinions, some

4    of which sound like just making arguments for his client,

5    I'm having trouble understanding how you think that that is

6    a crime that triggers the crime exception under UPEPA.

7      MR. BENSHOOF:  Okay.  So RCW 9A.72.080, [As read]

8    Statement of what one does not know to be true.  Every

9    unqualified statement of that which one does not know to be

10   true is equivalent to a statement of that which he or she

11   knows to be false.

12     That's under the -- 9A.72 is -- is the perjury section.

13     THE COURT:  So, Mr. Benshoof, let me ask you this.  So if

14   you make a statement today that I conclude is not credible

15   or it is factually incorrect, are you committing a crime

16   because you've said something false to me in court?

17     MR. BENSHOOF:  Potentially.  It depends upon the

18   circumstances, sir.

19     THE COURT:  Okay.

20     MR. BENSHOOF:  Like, if I'm -- if I'm -- if I'm making

21   statements in court, I mean, I -- I will qualify them, just

22   as I do in all of my sworn affidavits and my filings.  I try

23   to be very persnickety about ensuring that if I'm stating

24   something that it's an opinion, that I'm clear about that.

25   And I'll say something such as, "based upon plaintiff's

**0208**

1    information and belief," "to the best of my knowledge."

2    Right?

3      But that's not what Mr. Cliber was doing, and he was

4    slandering me.  But, big picture, it's worse than that.  And

5    this is detailed in my first -- my first amended complaint,

6    which is the -- the petition to decide parentage, which

7    Cliber and Owen filed on -- or at least signed on

8    September 21st of 2021, that states in there numerous

9    demonstrably false statements, such as there is no presumed

10    parent.  Okay?

11      And the very next day -- so even if we're to assume that

12    Mr. Cliber is a lazy, incompetent attorney, which I don't

13    think he is.  I think he's a smart man.  I think he knows

14    family court law very well and he's very detail-oriented.

15    But even if he hadn't done his due diligence and checked on

16    what Ms. Owen stated in her declarations in the first

17    restraining order hearing heard by Commissioner Schaefer, it

18    was obvious that 24 hours after filing, so after the

19    petition to decide parentage was signed by Ms. Owen and

20    Mr. Cliber, 24 hours later, Ms. Owen submits a declaration

21    stating that I've acted as my son's father for 12 years.

22      Well, those are mutually exclusive.  There can't be -- I

23    can't simultaneously act as his father his entire life and

24    there's no presumed parent.  And I -- you know, while I have

25    not proved it beyond a reasonable doubt, the threshold isn't

**0209**

1    that high.  The threshold is merely based upon the set of

2    facts, is it possible that Mr. Cliber engaged in -- in

3    falsely averring that the documents he and Ms. Owen were

4    filing were true.  And Mr. Cliber knew very well what he was

5    doing.

6       And I would like to point out circumstantial evidence that

7    after I discovered what Cliber and Owen had done, months

8    later of course, because I'm sifting through everything, I

9    afforded Mr. Cliber and Ms. Owen the opportunity to amend

10   what con- -- what amounted to perjurious court filings.

11   Mr. Cliber refused to.  Ms. Owen refused to, which is a

12   violation of the rules of professional conduct.

13      So even if Mr. Cliber somehow was an idiot and lazy and

14   had no idea what he was doing in September of 2021, he did

15   not amend the false statements and filings when I informed

16   him of it and gave him the opportunity to do so, which shows

17   his negligence.  It shows his intent.  And, frankly, it's

18   jaw dropping, Your Honor, that a licensed attorney would

19   conduct himself in this manner when an innocent child is

20   being used as a pawn.

21      THE COURT:  Okay.  Any further argument, Mr. Benshoof?

22   Just with respect -- with regard to Mr. Cliber's motion.

23      MR. BENSHOOF:  Yep.  My notes here.  Plenty of evidence of

24   perjury.

25      Yeah.  I've -- between the exhibits detailing crimes,

**0210**

1    Exhibits A through G, and what has been pled in the -- the

2    first complaint and the plaintiff's first amended complaint,

3    there is ample evidence that meets the threshold that there

4    is the very real probability that Mr. Cliber knowingly and

5    willfully engaged in actions that constitute crimes to

6    deceive the court.

7        THE COURT:  Thank you.

8        MR. BENSHOOF:  And, frankly, his attorney now,

9    Mr. Rekofke, is helping to continue this pattern of

10   behavior.  Thank you, Your Honor.

11       THE COURT:  Thank you.  Mr. Rekofke, reply?

12       MR. REKOFKE:  Just briefly, Your Honor.

13       The only relevant point I heard Mr. Benshoof, for the

14   purposes of my motion -- I obviously disagree with a lot of

15   what he said -- was this idea that he doesn't need proof of

16   a conviction to make that provision, like, exception in

17   4.105 apply.

18       So basically he's right.  It doesn't say that there's an

19   express requirement for a conviction.  But then it becomes a

20   matter of statutory interpretation, and I think we cited in

21   our brief that, you know, one of the canons of statutory

22   interpretation is avoiding absurd results.

23       And so I'd come back to the same issue that I raised

24   previously is that there has to be more than just a

25   verified, unverified, whatever complaint he filed.

**0211**

1    Obviously no one's done anything with those complaints.  He

2    admitted to yourself that apparently he must have filed so

3    many or something, I don't know, but he said they won't

4    pursue the complaints.  So just by the virtue of the passage

5    of time, I think, shows that these complaints aren't being

6    taken seriously.

7       And so to strip, like in Mr. Cliber's position, of all the

8    protections of UPEPA just based on one complaint from one

9    person with no other evidence would be an absurd result for

10   the application of that.

11      So I would submit to this Court that the proper statutory

12   interpretation of that term, "victim," would require at

13   least a conviction of a crime in order to apply to strip

14   those protections.

15      Then just I also heard a reference, it's "possible" he

16   committed a crime.  That's not good enough.  He needs to

17   prove that UPEPA doesn't apply.  And saying something's

18   possible does not meet the burden of proving that a -- even

19   by a preponderance of the evidence that the statute doesn't

20   apply.

21      And so, finally, there's a lot of references he made to

22   his amended complaint.  That complaint is not operative.

23   He's filed a motion for leave to amend.  But anything that

24   he -- I would move to strike anything that he referenced in

25   regard to his amended complaint because it's not before this

**0212**

1        Court.

2          So for those reasons, I think the Court should find that

3        UPEPA applies and, you know, for the reasons discussed

4        previously, that we're entitled to dismissal under the

5        summary judgment standards or the CR 12 standard

6        incorporated into UPEPA.

7          THE COURT:  All right.  Thank you.

8          I think I'd like to hear Defendant Owen's motion next.

9          MR. MARINELLA:  Thank you, Your Honor.  Can you hear me?

10         THE COURT:  I can.

11         MR. MARINELLA:  Good morning, Your Honor.  Defendant Owen

12       requests the Court grant her special motion or, in the

13       alternative, dismiss the -- Mr. Benshoof's complaint

14       pursuant to CR 12(c) or summary judgment, CR 56.

15         As you know, Ms. Owen's special motion for expedited

16       relief is fairly extensive, but I'll try to keep this short,

17       to the extent that I can.

18         Given the pleadings, I know the Court is well aware of the

19       facts in this matter.  I won't do a deep dive into those,

20       unless you would like me to, sir.  This suit obviously

21       arises primarily -- the vast majority of claims made against

22       Ms. Owen and the claims are abuse of process, defamation,

23       and coercion, they arise from protected communications made

24       by Ms. Owen regarding the party's child in common.  And

25       those communications were made, as we've already discussed,

**0213**

1     as Mr. Rekofke has discussed, those communications were

2     primarily made to police personnel and in previously

3     adjudicated judicial proceedings, family law matters, the

4     parentage matter that was mentioned by Mr. Rekofke.

5       I won't address -- I mentioned the claim of coercion that

6     was made against Ms. Owen in the operative complaint here.

7     I won't go into that, unless the Court would like me to.

8     It's not a civil cause of action in Washington nor does

9     Mr. Benshoof even care to address it in his response.

10      First, this action fits squarely under UPEPA.  Ms. Owen --

11    if three elements are met, the Court must dismiss, with

12    prejudice, a cause of action such as this one.  First,

13    Ms. Owen must establish that UPEPA applies.  It certainly

14    does.  We've established that in our motion.  I hope to

15    establish that here today.

16      Second, Mr. Benshoof, he has failed to show, as

17    Mr. Rekofke has stated, that UPEPA does not apply.  I

18    believe there are 12, if I'm not mistaken, exceptions or

19    ways to get out from under UPEPA.  He tries to establish

20    one, and he fails to do so, whether in his response -- or in

21    his complaint -- excuse me -- or in his response to

22    Ms. Owen's motion.

23      And, three, Mr. Benshoof fails to establish a prima facie

24    case as to each element of his causes of action.  And,

25    again, as Mr. Rekofke said, that fits under whether that's

**0214**

1    the standard of CR 12(c), a summary judgment motion, or a

2    12(b)(6) motion.

3        First, Ms. Owen absolutely meets the standards for

4    dismissal under UPEPA or any of the other standards I just

5    mentioned.  And, second, Mr. Benshoof cannot nor has he met

6    his burden of proof that any exception to UPEPA applies in

7    this case.

8        THE COURT:  Mr. Marinella, I want to interrupt and ask you

9    the question that I asked Mr. Rekofke about the Spratt v.

10   Toft case that you cite in your motion materials.  Is this

11   case a matter of -- does it relate to a matter of political,

12   social, or other concern to the community?  Does there need

13   to be some kind of -- I don't know -- elevated or broader

14   relevance to the community of the underlying matter, beyond

15   a parentage dispute or a dispute over a vehicle?

16       MR. MARINELLA:  No, I don't believe so, Your Honor.

17       In this case, defamation -- defamation is a claim that

18   fits under UPEPA, and that's what we -- that's what we're

19   arguing and that's what we believe to be the case, based on

20   that matter that we cite, Spratt, and the statute itself,

21   Your Honor.

22       THE COURT:  Why is that?  Why does defamation fall under

23   UPEPA?

24       MR. MARINELLA:  Well, in this case, Your Honor, it falls

25   under UPEPA because the communications, with the exception

**0215**

1        of alleged communications that were made to the child in

2        common, although that is not addressed in Mr. Benshoof's

3        response, but back to your question, the communications were

4        made to law enforcement personnel, government officials

5        under the statute, and in judicial proceedings.  As

6        Mr. Rekofke stated, many of the allegedly false or

7        defamatory or -- yeah -- false or defamatory statements made

8        by Ms. Owen were made pursuant to judicial proceedings, and

9        that fits squarely under UPEPA.

10         And then making -- making statements to the police also

11       fits squarely under UPEPA.  Those are -- those are immune

12       from liability in a civil suit.

13         THE COURT:  Okay.

14         MR. MARINELLA:  And going back into, you know, trying

15       to -- Mr. Benshoof's argument that he's been the victim of a

16       crime, that's been -- that's been spoken of already today.

17       My argument is the exact same, essentially, as

18       Mr. Rekofke's.  He's not established that he's been the

19       victim of any crime.  He's just making bald assertions that

20       he has been the victim of a crime.  He's presented no actual

21       evidence.  And although the statute does not say that

22       Ms. Owen must be convicted or arrested or anything like

23       that, the result of saying that she has committed some crime

24       against him without anything else would be absurd.  That

25       would not be productive under that particular statute or

**0216**

1      make any sense whatsoever, Your Honor.

2          And further, going back to statements to the police,

3      Mr. Benshoof's claims fail as a matter of law pursuant to

4      RCW 4.24.510.  That statute grants immunity for actions

5      based on any communications to government agencies.  He does

6      not even address that in his response, as he doesn't address

7      many things that were in our -- Ms. Owen's 28-page motion.

8          If not under the UPEPA standard, if not dismissed under

9      that standard, Your Honor, Mr. Benshoof's complaint, whether

10     evaluated under CR 12(c) or CR 56 should also be dismissed.

11     Mr. Benshoof does not and cannot assert a single viable

12     claim against Ms. Owen.  He's not done that in his operative

13     complaint.

14         THE COURT:  I want to -- Mr. Marinella, I want to pause

15     for a second on the argument under 4.24.510.  I want to

16     bring up the hypothetical that I raised to Mr. Rekofke.  You

17     know, you've got a false claim that someone's a child

18     molester or a child rapist or something really horrendous

19     like that, made to a police official.  Someone loses their

20     job over it.  They lose their housing.  Maybe their marriage

21     falls apart.  There's all kinds of reputational damage.

22     Turns out the claim is completely and utterly false.

23         Is your claim that under 4.24.510, the false complaint has

24     immunity from any civil proceeding for defamation?

25         MR. MARINELLA:  I don't know if it would be for any, but I

**0217**

1      do believe, in this case, we don't have statements from --

2      like, in your hypothetical, we don't have statements that

3      are so grotesque or out of bounds and against Mr. Benshoof

4      that would -- that would rise to your hypothetical.  I will

5      say, I would have to do further research to answer your

6      question completely.  I don't know, off the top of my head,

7      an exact answer.

8        I do know that to prove actual malice, Mr. Benshoof has to

9      do more to establish that, that Ms. Owen knew what she was

10     saying was false and grotesque or that -- and I do --

11     THE COURT:  Well, but, I mean, the argument here is that

12     that statute provides absolute immunity.  And so the

13     question of whether it's grotesque or not would seem to be

14     moot or pointless because it doesn't matter whether it's a

15     small lie or a big lie, if it's an absolute immunity, that's

16     it's an absolute immunity.  Right?

17       MR. MARINELLA:  Right.  And -- yes.  And, here, I believe

18     it is absolute.  If you make a statement to the police, and

19     here Ms. Owen's statements she believes and we believe were

20     true, even if false, they're absolutely immune because

21     you're making that statement to police officers.

22     THE COURT:  Okay.

23       MR. MARINELLA:  First, and going back to why

24     Mr. Benshoof's complaint fails under either CR 12(c) or

25     CR 56, just as a preliminary matter and not addressed in his

1     response, Mr. Benshoof failed to plead that he sent any

2     correction notice under RCW 7.96.040.  Such a notice is

3     required to maintain an action of defamation, Your Honor.

4     To be adequate, the notice requires specification of the

5     statement alleged to be false and defamatory and the time

6     and place of publication.  That is missing entirely from

7     Mr. Benshoof's operative complaint.  And, again, it's not

8     addressed in his response whatsoever.

9      Regarding statements to -- the only statements in his

10    complaint, which would not fit under UPEPA, Mr. Benshoof

11    cites to certain statements, and he uses exact quotes but

12    fails to give any sources of those statements.  Those are

13    statements Ms. Owen allegedly made to their child in common.

14    He does not address this in his response whatsoever.  And,

15    in fact, as we stated, as Ms. Owen stated in her reply, his

16    only reference to defamation, which was one of the three

17    causes of action in his operative complaint, his only

18    reference to defamation was in his opening paragraph, I

19    believe, and it mentioned that he did not want to --

20    essentially, he did not want to address it with the Court

21    because he wanted to save the Court's resources.  That

22    simply isn't good enough to answer all of the analysis

23    Ms. Owen provided in her motion on defamation.  So I won't

24    address that further, the comments to the child's -- the

25    child in common.

```
 1            I won't do a deep dive into summary judgment and the case
 2       law.  Simply, Mr. Benshoof fails to prove -- to set forth
 3       any elements of defamation.  There are four different
 4       elements.  He's not identified a single false and defamatory
 5       communication, nor can he point to such communication which
 6       is unprivileged in this matter.  Again, except for comments
 7       to the child, which are -- could be dismissed under other
 8       means.  Mr. Benshoof simply cannot establish the elements of
 9       defamation and that claim should be dismissed as a matter of
10       law.
11          It's the same -- the same argument goes for his abuse of
12       process claim.  Ms. Owen provided detailed analysis of this
13       claim.  Mr. Benshoof, again, failed to address this in his
14       response.  I believe his response of -- was all of four or
15       five pages to respond to a 28-page motion, and it just
16       simply did not include much of the law and even the facts
17       presented by Ms. Owen.
18          As a general rule, under the abuse of process claim that
19       he alleges, witnesses in judicial proceedings are absolutely
20       immune from suit based on the testimony in those
21       proceedings, and that's from Bruce v. Byrne-Stevens.  There
22       are many other cases as well that could be cited to make
23       that same argument, you know.
24          Ms. Owen moved -- as the prevailing party, if that's the
25       determination today, she is entitled to attorneys' fees.
```

**0220**

 1       Mr. Benshoof's response -- his response to this was I

 2     believe a few sentences or a sentence at most.  She's simply

 3     entitled to fees under RCW 41.05.090 subsection (1).  It

 4     explicitly states that the prevailing party is entitled to

 5     fees.

 6       And the Court should also award sanctions against

 7     Mr. Benshoof, pursuant to CR 11 and/or RCW 4.84.185.  He

 8     does not address this section of Ms. Owen's motion in his

 9     response, and he simply -- he's filed a baseless complaint

10     here, Your Honor.

11       And, again, going into the vexatious litigation portion,

12     which he brought up immediately, this Court, under

13     RCW 2.28.010, absolutely has the power to provide for the

14     orderly conduct of proceedings before it.

15       As the Court knows from the facts herein, this particular

16     suit is one of several in the past calender year.  I believe

17     at least five cases Mr. Benshoof has brought against

18     Ms. Owen, the counsels involved in this matter, and he's

19     made -- he's made significant or several threats to opposing

20     counsel about -- not physical threats, Your Honor, but

21     threats to engage in further litigation.  He even -- which

22     included a quote, Your Honor.  He asked in an email, after

23     his federal case, which we cite to in our motion, he asked,

24     and I quote:  Was there legal chatter after I filed a

25     federal lawsuit September 9, 2022?  Did anybody consider the

**0221**

1    possibility that I may have filed that lawsuit and allowed

2    it to be dismissed and then let the dust settle in order to

3    provoke reactive communications among potential defendants

4    that could later be obtained through discovery?

5      All of his actions, whether in this matter or in other

6    ones, including a 300-page complaint filed in federal court,

7    the one I just mentioned, the Court -- the Court would

8    absolutely have a right to put -- enter an order of

9    vexatious litigation against Mr. Benshoof, and they do so.

10     For these reasons, Your Honor, we ask that the Court grant

11    Ms. Owen's motion, or, in the alternative, judgment on the

12    pleadings or summary judgment, award her attorneys' fees and

13    costs, statutory damages of $10,000, award sanctions against

14    Mr. Benshoof, and finally enjoin Mr. Benshoof from engaging

15    in further vexatious litigation.

16     Thank you, Your Honor.

17     THE COURT:  Thank you.  And I apologize, Mr. Rekofke.  You

18    said earlier you needed to get to I think a mediation.  I

19    don't know that I'm going to be able to release you, because

20    I think some of the arguments overlap between the parties'

21    various motions.

22     MR. REKOFKE:  That's okay, Your Honor.  I'm attempting to

23    do both at the same time, but I'm listening, in case you

24    need anything else from me.

25     THE COURT:  All right.

**0222**

1          MR. RUSS:  And, Your Honor, for the record -- I'm sorry --

2    Blair Russ, appearing for Ms. Owen.  May I answer one

3    question that the Court asked both Mr. Rekofke and

4    Mr. Marinella with authority and leave it at that and give

5    Mr. Benshoof a chance to respond?  Because I believe this is

6    something the Court wants to know about the hypothetical

7    that I'd like to answer.

8          THE COURT:  Proceed, Mr. Russ.

9          MR. RUSS:  Thank you, Your Honor.

10         And I think the Court's question was, what if somebody

11   essentially reports allegations to law enforcement in bad

12   faith and terrible consequences follow?  Is that still

13   immune?

14         And the answer is unequivocally yes.  There's no hedging

15   about that, and the Court can find that answer by looking at

16   the legislative history of RCW 4.24.510.  The statute was

17   amended to remove the requirement of good faith.  And, in

18   fact, it was changed so that if the party bringing the

19   motion could show a lack of bad faith, they could get the

20   $10,000 penalty.

21         And there's subsequent authority that has looked at the

22   anti-SLAPP statute, specifically finding that the statute

23   applies regardless of a finding of good faith.  I can give

24   the Court a couple of cites if that's helpful.

25         THE COURT:  Well, unless that was in the material, then I

**0223**

1       don't think that's fair to Mr. Benshoof.

2        MR. RUSS:  I appreciate that, Your Honor.  I can't

3       remember; so I'll refrain from doing that.  But that is the

4       answer.  The case law is abundantly clear, that bad faith is

5       still -- the statute still applies, even in bad faith.

6        Thank you for allowing me to interject.

7        THE COURT:  All right.

8        MR. MARINELLA:  And, Your Honor, we did discuss that in

9       our reply to Mr. Benshoof's response, because he did bring

10      it up for the first time, I believe, in his response.

11       THE COURT:  I think you might be right.  Just a moment.  I

12      want to go back through my notes on the reply.

13       MR. MARINELLA:  And if it helps the Court, it's in

14      section --

15       THE COURT:  Yeah.  No.  That's right.  I see that.  Yep.

16       So what were the authorities you were going to discuss,

17      Mr. Russ?  It might actually be here.

18       MR. RUSS:  They very well may be the same authorities.

19      There's a Western District of Washington case that addresses

20      the amendment.  It's 2005 Westlaw 1172437.

21       THE COURT:  Sanai?

22       MR. RUSS:  That's correct.

23       THE COURT:  Okay.  That is cited in the reply.  Yep.

24       MR. RUSS:  Okay.  Very good.  Thank you, Your Honor.

25       THE COURT:  All right.  Mr. Benshoof?

**0224**

1        MR. BENSHOOF:  Yes, Your Honor.  Do I get to talk now?

2        THE COURT:  Yes, sir.

3        MR. BENSHOOF:  Okay.  Well, I will start off with

4    addressing Mr. Russ's certainty, that case law and the

5    statute and legislative intent is this -- this impenetrable

6    bubble.

7        My reading, and I just pulled this up off the Internet, of

8    RCW 4.24.500, Good faith communications, Legislative

9    findings, and Purpose.  It says, [As read] The purpose of

10   RCW 4.24.500 through 4.24.520 is to protect individuals who

11   make good-faith reports to appropriate governmental bodies.

12       So I don't have the case law knowledge that Mr. Russ does,

13   but it appears that our Revised Code of Washington clearly

14   states that it's to protect good-faith reports.  And while I

15   haven't gone to exhaustive, extensive detail in how the

16   statements of Ms. Owen weren't in good faith, plaintiff

17   definitely has done enough to show that there was

18   considerable communication from Ms. Owen that were knowingly

19   and willfully false, malicious, and slanderous.

20       And I think it's important to step back when we're

21   considering what sorts of communications could be slanderous

22   and put plaintiff in a horrible light.

23       So we're in Seattle.  It's one of the wokest cities in the

24   country.  And if we -- if we look at the -- my complaint for

25   tort, some of the words that are listed in there are "I'm

**0225**

1    crazy, violent, dangerous, a threat to society.  I'm a

2    racist, white supremacist, misogynist and abuser."

3      Well, I think -- I mean, most of us attending this hearing

4    are guys, and we already know that because there was an

5    imbalance in the last 50 years, as far as how men and women

6    were allowed to behave, that our society has tried to

7    rebalance that, which we've seen with the MeToo movement,

8    you know, presuming that the woman is telling the truth.

9      And I think there's been some great stride in family court

10   to try to make sure that females are protected.  Right?

11   Because of the history that we've had as a society.

12     But, you know, within the context of what we're dealing

13   with the last two years, I know for a fact this -- just

14   saying, oh, "he's a racist," like, the person's almost

15   guilty.

16     One of my former best friends on the police department

17   said you can't even text me something that has any -- it

18   can't have a joke that has anything to do with a black

19   person or a transgender because, he's like, I'll literally

20   get fired, even if it's not making fun of the person.

21   Like -- and so we're walking on egg shells in this city.

22     So I think it's disingenuous for Mr. Russ or Tony --

23   sorry, I forget Tony's last name -- Marinella to imply or

24   assert that Ms. Owen repeatedly, telling police that I'm

25   this racist, white supremacist, violent child abuser.  And

**0226**

1     then let's throw on top of this, oh, Mr. Benshoof is a crazy

2     anti-masker and anti-vaxxer.

3       For those of us who have been living in the city the last

4     three years, I think it's obvious, in hindsight, that just

5     by themselves, those were pejorative, segregationist, and

6     discriminatory terms that -- that, you know, brought out,

7     like, visible hatred in people.  And I can speak from

8     personal experience that I was subjected to physical assault

9     and all sorts of stuff just because somebody was like, oh,

10    well, he's not wearing a mask.  Right?

11      So -- and, you know, this lawsuit isn't about what's

12    happening right now in the city.  Like, people are aware now

13    that masks actually didn't do anything to mitigate the

14    transmission of a virus.  But back in 2021, this is right

15    around the time that the Mayor Durkan was mandating that all

16    of the police officers get a vaccine, which meant that the

17    only officers that were there to take complaints from

18    Ms. Owen were officers who subjected themselves to

19    experimental vaccination.

20      And so at the time, in fall -- summer and fall of 2021,

21    for Ms. Owen to simply say, oh, he's this horrible

22    anti-vaxxer was, like, bad enough, although I realize that

23    wasn't the worst of statements.

24      So to get back to addressing physically some of the stuff,

25    so good faith is not a protective qualifier for -- it's not

**0227**

1    a protective umbrella for Ms. Owen to make -- to knowingly

2    and willfully make statements which she knows are absolutely

3    false and that are going to -- that are discriminatory and

4    going to prejudice either law enforcement or family court

5    judges or commissioners to, basically, treat me unfairly,

6    which I think the evidence has shown happened.

7        And Tony was saying that -- that they've met --

8        THE COURT:  Mr. Benshoof.

9        MR. BENSHOOF:  -- all three prongs --

10       THE COURT:  Mr. Benshoof.

11       MR. BENSHOOF:  Yep.

12       THE COURT:  I prefer that we use last names.  It will make

13   the record -- it will keep the record more clear.

14       MR. BENSHOOF:  I forgot (inaudible).  Sorry, sir.  Can you

15   repeat what his last name is?

16       THE COURT:  Marinella.

17       MR. BENSHOOF:  Okay.  Okay.  Sorry, Mr. Marinella.  I

18   always forget.  Thank you.

19       So Mr. Marinella asserted that they had met all three

20   prongs.  And, you know, I've said this before, but I'll say

21   it again, one of those prongs is that there's the exception

22   under 4.105.010, subsection (4)(a) [sic] (iv), where I am

23   clearly the victim of multiple crimes, knowingly and

24   willfully perpetrated by Ms. Owen.  I added -- I added some

25   more details in the declaration that I submitted in support

**0228**

```
 1      on January 17th, and -- and I would also like to bring
 2      attention to the Court that not only does subsection (iv)
 3      apply, which is when, you know, I'm bringing it as a victim
 4      of a crime against the perpetrator Owen, but in my
 5      affidavit, I also go into more detail that subsection (vii)
 6      [sic] applies as well, which is a suit at common law,
 7      because what Ms. Owen and I had throughout most of our
 8      parenting lives together, was we had an amicable, functional
 9      parenting arrangement, nontraditional, of course, but the --
10      the reason that I was willing to go through every possible
11      hoop and, you know, get a house together, even though we
12      weren't always dating, was I always thought that -- that our
13      common law parenting agreement was prioritizing our son.
14          So --
15          THE COURT:  I'm sorry.  Which exception are you talking
16      about?  You said suit under common law?  So which --
17          MR. BENSHOOF:  Yeah.  So -- okay.  Yep, Your Honor.  Let
18      me pull that up.  So -- so RCW 4.105 --
19          THE COURT:  Right.
20          MR. BENSHOOF:  -- .010.
21          THE COURT:  (3)(a)?
22          MR. BENSHOOF:  (a) -- yeah -- (3)(vii).  The (vii), that's
23      the one for common law.
24          THE COURT:  That says "brought under the insurance code or
25      arising out of an insurance contract."
```

**0229**

1              MR. BENSHOOF:  Sorry.  Let me --

2              THE COURT:  Do you mean subpart --

3              MR. BENSHOOF:  Well, I'm glad --

4              THE COURT:  Do you mean roman numeral viii, brought on a

5      common law fraud claim?

6              MR. BENSHOOF:  Yes.  Is that eight?

7              THE COURT:  Yes, sir.

8              MR. BENSHOOF:  Oh, I'm sorry.  I said seven.  Yes.  Roman

9      numeral viii, not vii.

10         Yes.  So in -- in that affidavit that I filed on the 17th,

11     because I realized that the Court may not have under

12     consideration my second amended complaint, because the

13     motion for leave to amend hadn't happened, that the sworn

14     affidavit that's notarized, that I filed on the 17th or 18th

15     for the this hearing, goes into detail about how Ms. Owen

16     and I had agreement -- we had a parenting agreement at

17     common law.  Right?  There was never any parenting

18     proceedings or plan.  There was no court or state

19     involvement prior to her initiating -- trying to get a

20     temporary restraining order against me in August of 2021.

21         So for -- for the first 12 years of our son's life, we had

22     acted under that common law parenting agreement, and there

23     had never been a problem with it.  I had every reason to

24     believe that we were both going to continue honoring that

25     common law parenting agreement.


**0230**

1          So, you know, there's that additional exception to the

2      claim of litigation privilege because not only did Ms. Owen

3      violate that agreement at common law, but we had an

4      agreement at common law regarding my FJ Cruiser.  Right?

5      Like, we -- Ms. Owen and I had a trusting relationship.

6      Like, I trusted her with -- with not having my name on

7      things because we had years of experience where she had my

8      back, I had her back, you know.

9          THE COURT:  But, Mr. Benshoof, I have --

10         MR. BENSHOOF:  I'm sorry that --

11         THE COURT:  -- I have to say regarding this common law

12     fraud exception claim, I didn't see anywhere --

13         MR. BENSHOOF:  Yes, sir.

14         THE COURT:  -- in your first amended complaint, and I

15     don't think I saw anything in your response on this motion

16     outlining the -- I think from memory it's an either eight-

17     or nine-part test for common law fraud, and you would need

18     to establish that there are facts --

19         MR. BENSHOOF:  Yes.

20         THE COURT:  -- supporting all of those potential claims.

21     And I -- look, regarding the affidavit that you filed on

22     January 17th, I did not review that for today's hearing.  It

23     was not at all clear that that was a response to the motion.

24     When you -- when there's a motion pending, I do not go back

25     and read everything that's ever been filed in the court

**0231**

1    file.  I read the motion pleadings and matters that are

2    captioned as a response or a reply, and then all of the

3    exhibits that might be attached.  I don't go back and review

4    everything that's been filed since the first day of the

5    lawsuit.

6        So -- and that document, I've got it up on my screen here

7    now, it's captioned as "Affidavit of Complaining Witness,"

8    and then at the bottom it's captioned in the footer as

9    "Verified Criminal Complaint."  So it was -- and there's

10   nothing on the first page to indicate that this was somehow

11   a response to any of the pending motions.

12       So it's a 69-page document that you filed on January 17,

13   2023.  I have not reviewed that because it was not part of

14   the motion pleadings, as far as I knew or my bailiff knew.

15       MR. BENSHOOF:  Oh, I -- I'm sorry if I didn't inform the

16   Court that that was -- that that was for this hearing as

17   supporting documents for my response.

18       There is -- if you have it up on your computer, there --

19   there should be a 15-page document within that that's --

20   that's declaration of -- plaintiff's declaration.

21       Sorry.  It's affidavit of Kurt Benshoof, plaintiff.  It's

22   a 16-page document.

23       THE COURT:  Yeah.  I see that.  I haven't read it, but I

24   do see that.

25       MR. BENSHOOF:  Okay.

**0232**

1      THE COURT:  And my general impression -- my general

2      impression, Mr. Benshoof, is that that is a document where

3      you are alleging that there are -- there have occurred

4      violations of the criminal code.  Is that right?

5      MR. BENSHOOF:  There are -- yeah.  There are some

6      allegations in that -- in that total 69 pages, yes,

7      Your Honor.

8      THE COURT:  Okay.  Proceed.

9      MR. BENSHOOF:  Okay.  And, for the record, I apologize for

10     how confusing all of this is.  I'm sure it's a nightmare as

11     a judge to try and sort through all of this.  So I

12     appreciate your patience and understanding.

13     So at least going by what's in the record so far submitted

14     by plaintiff that has been sworn -- sworn to and notarized

15     under penalty of perjury, there has been both violations

16     of -- there's been fraud at common law committed by

17     Ms. Owen, which I provided enough evidence to -- to

18     substantiate that, and there are other crimes that Ms. Owen

19     has committed, such as she possessed my -- after her

20     fiancée, Ms. Lerman, stole my car on January -- or on

21     September 3rd of 2021, Ms. Owen then kept it in her garage

22     at her house for eight months and, through her friend,

23     Mr. Hermsen, acting as her power of attorney proxy,

24     attempted to extort $19,000 from me and threatened to sell

25     my car because she'd refused to put -- you know, hand over

**0233**

1       the title.  She threatened to sell my car if I didn't give

2       her $19,000.

3         So it's kind of jaw-dropping, honestly, Your Honor, that

4       defense counsels are asserting that there isn't -- there

5       isn't sufficient evidence to date that Ms. Owen -- that

6       Ms. Owen hasn't committed numerous crimes against me.  And,

7       again, I'll go back to --

8       THE COURT:  So, Mr. Benshoof, I'm going to -- I'm going to

9       interrupt you here because I want to pause on that, the

10      argument about the FJ Cruiser.  Because you spent -- you've

11      spent a lot of time in your pleadings addressing alleged

12      false statements about the vehicle.

13        What --

14      MR. BENSHOOF:  Yep.

15      THE COURT:  What specifically is the false statement by

16      Defendant Owen that gives rise to a defamation claim?

17      MR. BENSHOOF:  Thank you.  Sorry.  Thanks for reeling me

18      in.

19        The false statements -- false and misleading statements,

20      violation of RCW 9A.76.175, is that she repeatedly told --

21      THE COURT:  Wait, wait, wait.  Stop, stop, stop.  Before

22      you -- before you go on, you changed -- in your answer, you

23      changed the conditions of my question.  My question wasn't

24      what false statement violated the criminal code; it was what

25      false statement supports a defamation claim.

**0234**

1       MR. BENSHOOF:  Thank you.  Thank you, Your Honor.

2       She -- she impugned my character and slandered me

3    regarding the FJ by knowingly and willfully leading the

4    police to believe that I was a criminal with no rights to

5    the vehicle.

6       So although she didn't -- she may not have explicitly

7    said, "he stole my car," that was what Ms. Owen clearly

8    intended the police to believe.

9       THE COURT:  Well, what did she say?

10      MR. BENSHOOF:  And that's what --

11      Well, so, I only -- I don't have everything yet, but, for

12   example, in her first temporary restraining order petition,

13   which was heard by Commissioner Schaefer, she told, under

14   oath to the court in her petition, in the ex parte, that the

15   vehicle was hers and that I was supposed to give it back.

16      So --

17      THE COURT:  Well, let me -- again --

18      MR. BENSHOOF:  She wasn't --

19      THE COURT:  -- let me -- I understand there are alleged

20   statements she made to the court.

21      You make a specific claim that she made a defamatory

22   statement to the police.  So what was it to the police?

23      MR. BENSHOOF:  Oh.  Sorry.  I've got -- I've got my

24   complaint right here.

25      Well, you mean specifically regarding the FJ Cruiser?

**0235**

```
 1          THE COURT:  Yes.

 2          MR. BENSHOOF:  Or just any defamation?

 3          THE COURT:  The statement she made --

 4          MR. BENSHOOF:  Well --

 5          THE COURT:  -- to the police about the FJ Cruiser.

 6          MR. BENSHOOF:  So -- so I have to infer right now because

 7      I haven't got all of the documents.  Like, the Seattle

 8      Police Department is months and months behind on providing

 9      document requests.  So I have a public records request that

10      is, like, nine months old to get the body cam video about

11      what she said to police, and I'm still waiting for that.

12          THE COURT:  So is the answer you don't know?

13          MR. BENSHOOF:  (Inaudible) -- well, I can -- about the FJ

14      Cruiser specific, she --

15          THE COURT:  I mean --

16          MR. BENSHOOF:  -- she led them to believe -- it's

17      inferences, yes.  I'm -- it's --

18          THE COURT:  Go ahead.

19          MR. BENSHOOF:  She -- she falsely and misleadingly

20      convinced the police that I was in unlawful possession of

21      the vehicle.

22          THE COURT:  Okay.  But you just said you're inferring that

23      because the police did something, but I'm asking you a

24      different question.  What did she -- what false statement

25      did she make to the police?  It sounds like you don't know.
```

**0236**

1       MR. BENSHOOF: She said it was hers. She said my FJ

2    Cruiser was hers. And she said that I was in unlawful

3    possession of it. And she accused -- she said that I had --

4    that I had violated a court order, a temporary court order

5    from -- in the first temporary restraining order hearing,

6    and that is -- that was the proximal cause of Ms. Lerman

7    then stealing my car right in front of the police, because

8    Ms. Lerman and Ms. Owen had -- had lied, they had slandered

9    me about what I had done and that I had -- that it was my

10   car. Right? They effectively called me a car thief; that I

11   had stolen her car.

12       THE COURT: All right. I don't see that they told the

13   police that you were a car thief. I didn't see that

14   statement either in your complaint or in any of the evidence

15   brought before the court. Where -- where would I find that?

16       MR. BENSHOOF: I'm looking here right now.

17   Yeah. So -- so 53 -- page 6 of Complaint for Tort.

18       THE COURT: Okay.

19       MR. BENSHOOF: Sorry. Of the Amended Complaint for Tort.

20       THE COURT: Yep.

21       MR. BENSHOOF: Page 6, number 53, it says, [As read] Based

22   upon false and misleading statements of Defendants Owen and

23   Lerman, the defamed plaintiff, SPD officers allowed

24   Defendant Lerman to steal plaintiff's FJ Cruiser.

25       So --

**0237**

1   THE COURT:  I mean, I -- well, let me stop you right there

2   because I'm -- I got you -- are you looking at your second

3   amended complaint or your first amended complaint?

4   MR. BENSHOOF:  First amended, sir.

5   THE COURT:  And which paragraph, again?

6   MR. BENSHOOF:  It's number 53 on page 6.

7   THE COURT:  Okay.  My -- the paragraph 53, 5-3, in my

8   version starts "On September 6, 2021, Defendant Lerman

9   complained in a Facebook post"?

10   MR. BENSHOOF:  That's number 55 on mine.

11   THE COURT:  Okay.  I'm looking at the version that got

12   filed on October 11, 2022, by you.  I'm not sure what

13   version you're looking at.

14   MR. BENSHOOF:  Yeah.  That's part of the frustration,

15   Your Honor.  Like, I would love to be able to go to the

16   clerk's office and, you know, get the court docket and make

17   sure that everything's in alignment, and I've been unable to

18   do that.  But just --

19   THE COURT:  This is your -- this is your complaint,

20   Mr. Benshoof.  I don't know why you wouldn't have a copy of

21   your own complaint.

22   MR. BENSHOOF:  Well, that's what I'm looking at is a copy

23   of my Owen complaint.  But if you go back a couple -- I

24   don't know.  So do you see where it says "On or around

25   September 3, 2021, Defendants Owen and Lerman slandered

**0238**

1    plaintiff by telling SPD officers that plaintiff had

2    kidnapped the stepson"?

3    THE COURT:  Ah, yes.  In my -- in my copy, that's

4    paragraph 50, 5-0.

5    MR. BENSHOOF:  Okay.  So the statement right after that,

6    does it say, "Based upon the false and misleading statements

7    of Defendants Owen and Lerman, that defamed plaintiff, SPD

8    officers allowed Defendant Lerman to steal plaintiff's FJ

9    Cruiser"?

10   THE COURT:  Right.  I see that.  But it doesn't identify

11   the false statement.  It just presumes that that happened.

12   MR. BENSHOOF:  Yes.

13   THE COURT:  Right.  So what are the false statements?

14   MR. BENSHOOF:  So, like, prior -- well, so prior to that,

15   like -- I don't know -- like four paragraphs prior, it says,

16   "Defendants Owen and Lerman told SPD that plaintiff's FJ

17   Cruiser was Defendant Owen's."

18   THE COURT:  I see that.  That's paragraph 47.

19   MR. BENSHOOF:  Yeah.  So plaintiff acknowledges that

20   that's not an explicitly slanderous statement.  But what is

21   obvious -- what is implicit within that is that if

22   Mr. Benshoof has possession of the FJ Cruiser, he's a car

23   thief.

24   THE COURT:  So I think -- what I think I -- what I think I

25   just heard is that that is not a slanderous statement.  Is

**0239**

```
1      that correct?
2        So let's say that Defendant Owen is absolutely wrong.  She
3      has no claim to the title of the vehicle, but she believes
4      that she does because she's -- even you admit in your
5      pleadings that she was the registered owner of the vehicle.
6      You contend you're entitled to the vehicle because you paid
7      off the debt that was held by a lienholder, but she contends
8      she has registered title.  She tells the police, "It's my
9      vehicle.  This guy Benshoof has no claim whatsoever."
10       That's not a slanderous or defamatory statement.  It might
11     be wrong, you know, legally, but it sounds like you agree,
12     that's not a defamatory statement.  Is that right?
13       MR. BENSHOOF:  I'm not agreeing that it's not defamatory.
14     We're talking about explicit and implicit.  Right?  Like,
15     Ms. Owen knowingly and willfully defamed my character by
16     leading the police to believe that I had stolen her car.
17       And the text messages, when she initially threatened me at
18     the outset of this, on August 15th of 2021, she said in the
19     text messages, "I don't care that it's yours.  I'm going
20     to" -- you know, like, "either, you know, give me money or
21     I'm going to take your car back."  Right?
22       And then that's exactly what she proceeded to do, which
23     was to communicate to police, to lead them to believe that I
24     was a car thief, and that I was unlawfully possessing her
25     car, and that I had kidnapped her child.
```

**0240**

1          Well, let's add it all together.  Now the police believe
2     that I'm a car thief, a kidnapper, a racist, a white
3     supremacist, a child abuser, a domestic violence
4     perpetrator, and that I'm a tinfoil hat-wearing crazy
5     conspiracy theorist who doesn't want to have my breathing
6     restricted by a face mask, and I don't want to have my child
7     subjected to a Pfizer experiment.
8        Like, when you put that in totality, that's, like, what
9     else -- what else could she have possibly said?  That I'm a
10    pedophile too?  I mean, that's about the only thing she
11    didn't include.
12       Like, in no normal world would the police have let
13    Ms. Lerman steal my car in front of them if they weren't
14    already so prejudiced by the knowing and willful slanderous
15    statements of Ms. Owen.  Right?  I mean --
16    THE COURT:  Well, but it sounds like you're just assuming
17    that that's what happened.  You're just assuming that of
18    course the police let her leave with the FJ Cruiser because
19    Ms. Owen said all these terrible things.  I don't really see
20    that there's any evidence of that at all.  I mean, it just
21    sounds like there's -- there are two parties making disputed
22    claims to a vehicle, and the police let one party leave with
23    the vehicle and they didn't really make any determination
24    either way about who they felt owned it or who they felt was
25    right or wrong.  I'm having difficulty grasping the

**0241**

1    defamation here.

2    MR. BENSHOOF:  Okay.  So I guess I can put it in these

3    terms to show how extremely prejudiced Ms. Owen has made the

4    police through her false -- through her slanderous, defaming

5    statements.  Right?

6    Like, because she said that I was a kidnapper, that I had

7    kidnapped her -- our son, even though I had from the court

8    clerk the whole denial order from Commissioner Schaefer,

9    even though I had that in my hands to hand to Officer Ladd

10    [phonetic], didn't care.  He was arresting me anyways.

11    Right?

12    Like, that's -- that's --

13    THE COURT:  Well, what were you -- what were you

14    arrested --

15    MR. BENSHOOF:  (Inaudible).

16    THE COURT:  What were you arrested for, Mr. Benshoof?

17    MR. BENSHOOF:  So he said that I was in violation of --

18    like, he called me up on my cell phone and he's like,

19    "You've kidnapped your son."

20    And I'm like, "What are you talking about?  The hearing --

21    the hearing was adjudicated hours ago."

22    And he's like, "Well, that's not what the computer says.

23    You kidnapped your son and you're -- you know, you need to

24    hand over the kid and the car."

25    And I'm like, "It's my car.  It's my" -- like, "my kid."

**0242**

```
 1          THE COURT:  Well, no, I'm sorry.  What -- what crime were
 2      you arrested for?  Did the officer tell you what you were
 3      being arrested for?
 4          MR. BENSHOOF:  I can't remember.
 5          THE COURT:  Well, what was your understanding?
 6          MR. BENSHOOF:  Custodial inter --
 7          THE COURT:  Custodial interference?  Were you -- were
 8      you --
 9        MR. BENSHOOF:  I under -- he said that I -- he said that I
10      was in violation of the -- of the temporary restraining
11      order.  And I was like, "No.  The final order was already
12      adjudicated hours ago."
13        And he tried to say, "Well, my computer doesn't show that
14      yet."
15        And I was like, "It doesn't matter what the computer says.
16      It matters," like -- and I even sent him pictures of the
17      denial order in advance of seeing him, because I could tell
18      he had been so prejudiced by Ms. Owen's lies that he was --
19      he was going to take me to jail no matter what, because
20      Ms. Owen was the victim, and I'm a kidnapping car thief,
21      child abuser, racist, white supremacist, anti-vaxxer.
22          THE COURT:  I see.
23          MR. BENSHOOF:  So --
24          THE COURT:  Were you -- were you --
25          MR. BENSHOOF:  -- (inaudible).
```

**0243**

```
 1        THE COURT:  Were you charged with a crime, Mr. Benshoof?
 2        MR. BENSHOOF:  I was arrested.  They -- they did not
 3     proceed with anything.  I was never charged, no.
 4      And to show you the corruption, even though I handed that
 5     denial order that I got from the court to Officer Ladd,
 6     he -- he made no mention of it in the police report and
 7     acted like it didn't exist, which is why I filed an OPA
 8     complaint against him because he -- his report was one big
 9     false and misleading statement that a judge would use to
10     rule upon.  Right?
11      Like, he omitted the most relevant evidence there, which
12     was the denial order had been issued seven hours prior.
13     So anyway --
14     THE COURT:  So --
15     MR. BENSHOOF:  -- getting back to --
16     THE COURT:  Mr. Benshoof, what about the -- what about the
17     immunity argument?  And, really, I want to ask about the
18     broader policy argument.  And that is, that the statute
19     protects people who perhaps in the heat of the moment
20     express unfair opinions about their spouses or about someone
21     they're complaining against when they tell the police about
22     an alleged crime.
23      So the alleged crime might be violation of a no contact
24     order, but then the complainant might say, "and, you know,
25     my ex is a racist and a domestic violence abuser and
```

**0244**

1      anti-vaxxer and crazy and" ... doesn't the statute protect

2      people who make complaints to the police but then might say

3      some intemperate things about the other person?

4          MR. BENSHOOF:  I absolutely agree that it does in some

5      situations, and I think the Court asked a very good

6      question, specifically referring to "heat of the moment."

7      And that has been one of my arguments this entire time is

8      that this wasn't just a heat-of-the-moment thing.

9          So -- because I think that -- that the good faith -- the

10     good-faith protection and the heat-of-the-moment, like,

11     because we have human nature.  Right?

12         So, yes, there does need to be some protections, but when

13     we have evidence, as we do in this case, that Ms. Owen spent

14     months repeating the same lies over and over and over, I

15     don't think defense counsel can any way argue that it was a

16     heat-of-the-moment situation or that it should be covered

17     under good faith.  Because, like, heat of the moment does

18     not last a year.  I mean, I understand that some people can

19     be very temperamental for a long time, but the law is not

20     written to cover a heat-of-the-moment vengeance trip that

21     lasts a year and a half.  So I don't think that applies.

22         THE COURT:  I see.

23         MR. BENSHOOF:  Yeah.  Oh, and so I do, like, also want to

24     address defense counsel's attempt to basically craft this

25     legal umbrella under which attorneys and their clients can

**0245**

1    lie with absolute impunity.  And I -- I baited Mr. Admon a

2    little bit by giving him an example in an email to show him

3    how absurd it was that -- that Russ -- Mr. Russ, Mr. Admon,

4    and Mr. Rekofke were all essentially making the argument

5    that anything said to law enforcement, anything said in a

6    judicial proceeding, anything said to an attorney is

7    protected and is immune from a claim of defamation.

8        And so I gave all three of those attorneys, in an email, a

9    hypothetical example.  And I said it was a hypothetical, and

10   it was a ridiculous hypothetical, to make a point so that

11   they couldn't come back later and say, oh my gosh,

12   Mr. Benshoof threatened me.  And the hypothetical was

13   basically something like, hey, guys, if I -- if I kidnapped

14   all of your wives and sent them to Ukraine and sold them for

15   organ harvesting, with your logic, I can sit -- you know, if

16   I threatened to do that in an email, with your logic, I

17   could -- I'm immune from -- from a tort claim against you

18   because it was in an email related to a judicial proceeding.

19   I'm like, don't you see how absurd that is?

20       And then of course, Mr. -- you know, so I believe that

21   defense counsel know very well, both from my court filings

22   and my private email communications with them, that there's

23   plenty of evidence substantiating the exception under UPEPA

24   where I'm the victim of a crime -- looking at my notes

25   here -- and to address Mr. Marinella's assertion that my

**0246**

1    claims of being a victim must be meaningless because the

2    police haven't done anything yet.  That's a straw man

3    argument.

4      I think everybody's aware that the police department is

5    understaffed.  That's exhibited by the fact that record

6    requests are taking, you know, a year longer than they're

7    required by law.

8      And -- and Mr. Marinella also asserted that there's no

9    other witnesses besides me.  That's not true.  That's false.

10   Daniel Heller, senior citizen who acted as process server,

11   personally witnessed some of the defamation that occurred.

12     THE COURT:  Well, but I have not seen a declaration -- I'm

13   sorry, Mr. Benshoof.  I have not seen a declaration from the

14   person you just mentioned.

15     MR. BENSHOOF:  Oh, okay.  Then -- then we can strike that,

16   if that's not evidence before the Court.

17     THE COURT:  Well, but let me ask you.  Why?  Why don't I

18   have a declaration from that individual if they're a witness

19   to a crime?

20     MR. BENSHOOF:  Well, Mr. Heller and another process server

21   friend, Molly Anderson, I actually went with both of them to

22   the East Precinct so that they could file police reports

23   about being threatened and intimidated and harassed by

24   Ms. Owen and Ms. Lerman, including baseball bats and threats

25   of, you know, getting the process servers arrested.


**0247**

1     And it's going to sound ridiculous, but the truth is, I

2     went to the East Precinct.  We went to the desk sergeant and

3     the desk sergeant accused me of harassing Ms. Owen and

4     Ms. Lerman.

5     THE COURT:  Mr. Benshoof, you misunderstand.  I'm not

6     asking where's the police report from Mr. Heller.  I'm

7     asking, where is a declaration attached to your response?

8     Did you reach out to Mr. Heller and say, "Would you sign a

9     declaration under penalty of perjury attesting to what --

10     the crime that you witnessed?"

11     MR. BENSHOOF:  At this point, both Mr. Heller and

12     Ms. Anderson are so afraid of what Ms. Lerman or Ms. Owen

13     might do, they're scared to be involved.  And that's the

14     same thing that's been going on with a lot of friends.  They

15     are literally scared to do anything because they've seen

16     enough of what they're capable of and they're afraid.

17     THE COURT:  I see.  All right.  Anything further on

18     Defendant Owen's motion?

19     MR. BENSHOOF:  Let's see.  Oh, yeah.  Mr. Marinella

20     mentioned that I hadn't exhaustively, extensively responded

21     to every one of their points in their 28 pages.  And,

22     frankly, plaintiff's position is that I've already said

23     enough.

24     I think that defense counsels are trying to confuse the

25     court and obfuscate plaintiff's claims with, you know, all

**0248**

1    this case law and these assertions that, you know, UPEPA

2    covers everything, absolute immunity.

3      So, you know -- and I don't know a bunch of case law, but

4    I think what I filed into the record so far is sufficient to

5    establish that I've been the victim of defamation, and that

6    that defamation by Ms. Owen and others has been a proximate

7    cause of harm that I've suffered, such as having my son

8    taken away, having my car stolen.  Like, I don't care about

9    money, but having my son taken.  Like, there's no more --

10   there's no more -- there's no worse harm and damage than

11   having somebody's defamation take away your child.

12     THE COURT:  But it sounds to me, with all due respect,

13   Mr. Benshoof -- and I can hear the emotion in your voice.  I

14   want to acknowledge that.  But it sounds to me that you're

15   using this action for defamation and abuse of process to

16   relitigate what happened in the parentage action.  Is that

17   correct?

18     MR. BENSHOOF:  No, sir.  No.  I am -- I'm not trying to

19   relitigate anything.  I'm trying to -- let me -- I'm trying

20   to address the harms that have happened.

21     THE COURT:  Right.  But it sounds like what you're saying

22   is --

23     MR. BENSHOOF:  You --

24     THE COURT:  -- Ms. Owen lied in the parentage action and

25   her attorneys lied, I lost my son, and I'm entitled to

**0249**

1    redress.  Right?

2       MR. BENSHOOF:  I was defamed by Ms. Owen and there were

3    damages that were a direct result of her defamation.  And,

4    you know, for the Court's information, do I -- am I working

5    on a motion to vacate the entire family court case?  Yes.

6    But it's not prepared to be filed yet.

7       So I have more than one intention in this.  That case

8    should be vacated because it was barratrous in the first

9    place.  Yes, there was abuse of process because Ms. Owen

10   used -- used the -- I mean, the petition to decide parentage

11   was fraudulently filed and it contains perjury.  Like,

12   there's mutually exclusive material statements of fact in

13   the petition to decide parentage from 9/21/21 and her sworn

14   declaration from 9/22/21.

15      THE COURT:  Okay.  Mr. Benshoof, even if I give you the

16   benefit of the argument of that -- on that, the action on

17   the petition was where you were to litigate that.  If you

18   thought -- if you thought in the petition -- if you thought

19   the petition was totally false, then that action was where

20   you were supposed to litigate that; right?

21      MR. BENSHOOF:  I had no idea that it was false.  Like, I'm

22   not an attorney.  I had an attorney at the time.  He didn't

23   even realize the perjury that was -- that was going on.

24   Like, I didn't know that it was -- that it was false.  I

25   didn't know that there was perjury in it until many months

**0250**

```
 1        later, you know.  Like, last April or May of 2022.
 2            THE COURT:  Well, but again --
 3            MR. BENSHOOF:  And I tried to --
 4            THE COURT:  -- again, Mr. Benshoof, let's say your --
 5        again, let's assume for the sake of argument you're
 6        absolutely right.  You didn't know at the time that lies are
 7        being told.  Now you've got new evidence to show that what
 8        happened at the parentage action was all lies and you can
 9        prove it.
10            There are remedies under the court rules for bringing that
11        to the court's attention.  It seems like what you've done
12        instead is bring a defamation and abuse of process lawsuit
13        to address the alleged falsehoods that you believe occurred
14        at the parentage action.
15            Is that what's ultimately going on here?
16            MR. BENSHOOF:  To answer that question, Your Honor, when
17        you -- when you say that there were -- there was actions I
18        could have done, are you referring to within family court?
19        Because I -- is that what you're referring to?
20            THE COURT:  Well, I can't give you legal advice.  But it
21        is not uncommon in legal actions for parties to discover
22        evidence that they could not have known about before that
23        directly contradicts what happened during a trial.  And
24        there are procedures by which you can bring that to the
25        court's attention.
```

**0251**

1      Now, you might not -- the court might not -- the court

2      might not agree with you.  The court might decide that you

3      should have brought that evidence to the court's attention

4      before.  But there's a way to get that done is what I'm

5      saying.

6      MR. BENSHOOF:  Right.  And I attempted that, Your Honor.

7      And, you know, I'm not here to say anything disparaging

8      about anybody, but what I did attempt was I -- in the family

9      court case, 21-5-00680-6, after I discovered this, I filed a

10     motion to show cause because I felt that I had enough

11     evidence, which I included in the motion, that the court

12     needed to have a hearing to see why Mr. Cliber and Ms. Owen

13     shouldn't be held in contempt for all of the perjury and

14     false statements and barratry and abuse of process that I

15     found.

16     And I don't know why, but instead of presiding Judge

17     Keenan at least allowing me a hearing, which should be

18     protected by my First Amendment right to petition, he sua

19     sponte struck the order.

20     So, you know, I tried to address all of this stuff

21     repeatedly for months in family court, and, in all honesty

22     and sincerity, the only conclusion that I could come to

23     after months and months and months and months of this, of

24     trying within that court case with Judge Keenan, was that

25     there was some prejudice that was preventing me from being

**0252**

```
 1    able to have my grievances heard and the truth come to
 2    light.  And I'll just leave it at that, but I tried.
 3       The only reason -- like, I was trying up through, you
 4    know, July.  I mean, I even tried filing a petition for
 5    habeas corpus.  Like, I was calling CPS.  I was calling
 6    everybody.  And I've -- you know, like, I have better things
 7    to do with my life than try to write lawsuits and figure out
 8    how to litigate.  Like, this has all been in response to
 9    what has been done to my son.  Right?
10       Like, I don't care what's happened to me.  But, like, I
11    have -- I have to make my claims as the person with
12    standing.  Like --
13       THE COURT:  So, Mr. Benshoof, let me -- let me just --
14       MR. BENSHOOF:  I don't know what else to do.
15       THE COURT:  Again, I can tell this is a very emotional
16    proceeding for you, Mr. Benshoof.
17       Let me -- let me offer a comment.  And let's pause for a
18    second so you could collect -- collect yourself.  I want to
19    take a moment here.  Let me know when you're ready to
20    proceed.
21       MR. BENSHOOF:  Sorry, baby.  Don't worry about me.
22    Go ahead, Your Honor.
23       THE COURT:  All right.  Thank you, Mr. Benshoof.
24    So, look, I've never met you.  I don't know you.  I don't
25    know the first thing about you.  I've read things about
```

**0253**

1        alleged statements by Ms. Owen, about how you claim that she

2        said that you're a racist or a white supremacist or an

3        abuser or a crazy person.  I don't know whether any of

4        that's true or not.  And I'm not here to pass judgment about

5        your character.

6           I don't know what happened in front of Commissioner

7        Schaefer or Judge Keenan, but I strongly suspect that they

8        took the same view that I do, that we are neutral judicial

9        officers.  We don't know the parties.  We don't know whether

10       aspersions on their character made by someone else are true

11       or not.

12          And so at least as to these proceedings, I can assure you

13       that I am not sitting here judging you as a terrible person,

14       as an abuser or white supremacist and that's why I'm going

15       to make my ruling one way or the other.  That's not what's

16       happening here.  I'm trying to determine the grounds for

17       your legal claims.  That's really what I'm trying to do.

18       And I'm trying to adjudicate these motions.

19          So I think I've heard enough -- oh, go ahead,

20       Mr. Benshoof.

21          MR. BENSHOOF:  I just wanted to say I understand and

22       (inaudible).

23          THE COURT:  Okay.  I think I've heard enough in response.

24       I did want to give Mr. Marinella an opportunity to reply.

25          MR. MARINELLA:  Thank you, Your Honor.  Can you hear me?


**0254**

1            THE COURT:  I can.

2            MR. MARINELLA:  First, Your Honor, there's a lot to unpack

3       here, but I'll try to be speedy.

4            I do not know what Mr. Benshoof is talking about regarding

5       a witness to any crimes, or he mentioned some service and

6       baseball bats.  I have no idea what that is referring to.

7       That was not me.  But the only place witness -- the word

8       "witness" even shows up in our reply is when I state,

9       "Benshoof's realleged assertion that his filed sworn

10      exhibits as a complaining witness does nothing to establish

11      that he has been the victim of any crime."

12           So I just wanted to make that clear on the record.

13           Mr. Benshoof in his response is now intermixing previously

14      filed complaints and causes of action.  To be clear,

15      defamation must be a statement of fact, not whatever

16      Mr. Benshoof is now trying to establish here regarding the

17      FJ Cruiser and that point of the conversation that you

18      guys -- that you just had.

19           Mr. Benshoof must plead and prove an actual false

20      communication.  He has not done that.  He has not done that

21      today.  Certainly he did not do that in his pleadings.  He's

22      not done that in his response to Ms. Owen's motion.

23           Any false statement must have been made to someone other

24      than law enforcement or in a judicial proceeding.  That's in

25      our motion.  That's according to RCW 4.24.510 in the common

**0255**

1      law privilege for statements made pertinent to the subject

2      of judicial proceedings.  Those are all immune.  And that's

3      in McNeal v. Allen, also cited in our -- in Ms. Owen's

4      motion.

5        THE COURT:  Real quick.  What about Mr. Benshoof's

6      reference to 4.24.500 and the good faith -- good faith

7      language there?

8        MR. MARINELLA:  That as expressed earlier by Mr. Russ,

9      that good faith -- that good faith is no longer required,

10     and that was taken out of the statute, Your Honor.

11       THE COURT:  Well --

12       MR. MARINELLA:  In immunity --

13       THE COURT:  I mean, I see it in the statute.  I mean, on

14     the State legislature's web page for the RCW.  I -- I don't

15     know if it's been taken out just by case law.  Is that what

16     you meant?

17       MR. MARINELLA:  No.  It exists in that particular statute.

18     But when communications, such as you were just discussing

19     with him, regarding the FJ Cruiser, all of the

20     communications he alleges were defamatory from Ms. Owen were

21     to police officers.

22       THE COURT:  Right.

23       MR. MARINELLA:  And that is absolutely immune.

24     To continue, Your Honor, unless you had anything further?

25       THE COURT:  Nope.  Go ahead.

1              MR. MARINELLA:   Immunity, and this is from Bailey.  It was

2        also cited in Phoenix Trading, and it is in our briefs.

3        Immunity under section 4.24.510 does not require a showing

4        of good faith.

5           In Bailey, the plaintiff's argument in that case, that

6        immunity under that statute did not apply because the

7        defendant could not meet the good-faith requirement

8        contained in 500, which you just mentioned, Your Honor.

9        That argument by the plaintiff was flatly rejected by the

10       Court of Appeals.  And the Court of Appeals in

11       determining -- in making that determination stated that

12       Ms. Bailey is incorrect.

13          The 2002 amendments brought Washington law in line with

14       these court decisions, which recognized that the

15       United States Constitution protects advocacy to government

16       regardless of content or motive, so long as it is designed

17       to have some effect on government decision-making.  That's

18       as clear as can be, Your Honor.  That is also cited in Akmal

19       v. Cingular Wireless and another case we already mentioned

20       wherein defendants are entitled to immunity even if the

21       statements in question were made in bad faith or are

22       defamatory, per se.  That's in Sanai.

23          Some of the claims that Mr. Benshoof is now arguing or

24       included in his operative complaint -- there are several

25       complaints out there, but the operative one filed on I

**0257**

1       believe you said October 11th, some of those claims have

2       already been dismissed with prejudice.  He has no -- he has

3       not asserted a common law fraud claim in this action, but he

4       alludes to it as if it's somehow connected to this action.

5       That's just not the case.

6          The matter involving the FJ Cruiser, which I believe was

7       filed in March, has since been dismissed.  And at the time

8       he filed that complaint, Your Honor, you discussed the title

9       with him.  That was in Ms. Owen's name.  The title was in

10      Ms. Owen's name and she was the registered owner.  But even

11      if that wasn't the case, that matter has now been dismissed.

12         THE COURT:  Although, to be fair, that was -- that was

13      solely a replevin action, if I recall correctly.  I don't

14      think there was a claim for damages, or am I wrong about

15      that?

16         MR. MARINELLA:  I don't recall, Your Honor.  At that time,

17      I was -- I was not working on that case, but I do not

18      believe there was any damages claimed.

19         THE COURT:  All right.  Proceed.

20         MR. MARINELLA:  Oh, and just to -- in sum, Your Honor, he

21      has not established that UPEPA does not apply.  He cannot

22      establish his claims under the protections of UPEPA or under

23      CR 12(c) or a motion for summary judgment, and we ask that

24      you would grant Ms. Owen's motion in its entirety.

25         Thank you.

**0258**

1      THE COURT:  All right.  Thank you.

2      That brings us to the joinder by Lerner -- I'm sorry --

3  Lerman and Hermsen.

4      I'm sorry.  Was someone jumping in?

5      MR. ADMON:  Yes.  That's me, Your Honor.

6      THE COURT:  Oh, Mr. -- so, Mr. Benshoof, the Court has

7  heard argument on Defendant Owen's motion.  We've heard the

8  initial argument, your response and reply.  So now we're

9  going to move on to Lerner [sic] and Hermsen.

10     MR. ADMON:  And thank you for that, Your Honor.  I'd like

11  to touch on a few points here.  I'd like to first address

12  the question that you posed to the -- to parties here

13  regarding the exclusions to the communications, the

14  immunities.  And you posed a hypothetical, which I think was

15  a good one.  I think to understand that we need to just sort

16  of look at the history of UPEPA.  And UPEPA, actually, it

17  replaced RCW 4.24.525, which our Supreme Court held in Davis

18  v. Cox was unconstitutional.  It didn't replace the other

19  RCWs under 4.24 et seq., and so those cases stand.

20     And in our reply, we've cited quite a few cases that

21  address the issue of immunity.  And the purpose of immunity

22  is so there's no chilling effect.  Right?  I mean, the

23  legislature had to make a decision, and the idea is that

24  individuals should not be afraid to report because, if an

25  individual can get sued for reporting to an agency, if there

**0259**

1    is the threat of a lawsuit from making a report to an

2    agency, even if the facts may not be completely false, if

3    somebody has an impression that something bad is happening,

4    then, as a society, we need to be able to function.  And if

5    somebody feels that there is something wrong, ongoing say,

6    for example, with a child, they shouldn't be afraid to

7    report to CPS.  And that's why these immunities are in

8    place, because we don't want to create a chilling effect.

9    Because if lawsuits are allowed to be filed for everybody

10   that makes a complaint, no one's going to want to make a

11   complaint because no one's going to want to spend the time

12   and the effort and the money defending these lawsuits.

13       Now, your question about a heinous act is actually

14   completely on point.  I was researching this as you were

15   asking that question.  There's a case directly on point.

16   It's a Division I case.  It's called K.M.P, by and through

17   Pinho, v. Big Brothers Big Sisters of Puget Sound.  It's

18   February 2, 2021.  And that case addresses something very,

19   very similar to what you've asked.

20       THE COURT:  I'm sorry.  Which -- which Court?  Which

21   court, Mr. Admon?

22       MR. ADMON:  It's a Division I case.

23       THE COURT:  Thank you.

24       MR. ADMON:  And it's the Washington Appellate Reporter --

25   let me get you that case.  16 Wn.App.2d 475, K.M.P., by and

**0260**

1    through Pinho, P-i-n-h-o, plaintiff, verse Big Brother Big

2    Sisters of Puget Sound.

3        And there's a footnote in that case, Footnote 20.  And in

4    that case there was -- there were allegations of sexual

5    abuse against a child.  And the court found that the

6    plaintiff is entitled to immunity under RCW 4.24.510.

7        There's another case on point, which is Brawley v.

8    Rouhfar, that's a Division I case as well.  That's 2011,

9    Washington Appellate Reporter.  I think that's a --

10    actually, that may be an unreported case.  But it's also --

11    it talks about there being an absolute immunity.

12    THE COURT:  Well, if it's unreported and before 2011, then

13    it wouldn't fall under GR 14.1.

14    MR. ADMON:  But that K.M.P. case addresses your issue.

15    And I think there's that implication and that statute is

16    clear.  And the purpose of that statute is, again, to

17    re-emphasize, to prevent what's happening here, so that

18    people can report, and then it's up to the agency to make a

19    determination.

20        There's also something I want to address as well here.  In

21    the last rounds of questions, you asked Mr. Benshoof very

22    patiently about this thing with the FJ Cruiser and his

23    claims that these are defamatory statements.  There's a lot

24    of case law on defamation in Washington, and we have some

25    very clear case law that -- and I'll -- I can cite two cases

**0261**

1    here.  As a matter of law, a defamation claim cannot be

2    based on allegedly disparaging connotations that are not

3    apparent from the words themselves.  And that's in Lee v.

4    The Columbian.

5       And there's another case, which is right on point.  The

6    defamatory character of the language used must be certain

7    and apparent from the words themselves.  And that's Sims v.

8    Kiro.  And here we don't have that.  We just don't have

9    that.

10      I think the other thing which is important to point out,

11   and I know you've read our joinder, which was briefed.

12   You've read our reply about, you know, Mr. Benshoof is

13   accusing -- he's making all these accusations that people

14   are breaking the law.  You know, we've got some declarations

15   in our reply that show that Mr. Benshoof is taking the law

16   into his Owen hands.  He's walking into people's homes

17   trying to serve them.  You know, he's made this argument

18   that if a statement is made to a court that is untrue, that

19   is a crime.  He made a statement here today that, you know,

20   people are afraid of providing declarations.  They've seen

21   enough of what their -- of what the defendants are capable

22   of doing, so they're afraid.

23      So by Mr. Benshoof's Owen argument and his Owen logic, he

24   just committed a crime.  I mean, there's an immunity to say

25   things to courts.  There's an immunity to say things to -- I

**0262**

1      mean, these are not crimes.  People are entitled to express

2      their opinions.

3        I think what's most deeply concerning here is that

4      Mr. Benshoof, who is bright, he's articulate, and he's

5      clearly suffering emotionally, we heard it in his voice, and

6      I empathize with that, and he wants to be heard, but this

7      isn't the forum.  This isn't the forum to be heard, as I

8      believe the court expressed.  That should have been done in

9      prior proceedings.  You can't just go and sue everybody in

10     your path.

11       And one of the reasons for that is our profession is a

12     self-regulating one.  Every attorney that's here has to

13     answer to the Bar.  We have regulations that we have to

14     follow.  We have to bring meritorious claims and

15     contentions, according to RPC 3.1.

16       We even have to deal more gently with individuals that are

17     not attorneys.  We have to be hypersensitive and

18     hypervigilant to them.  Mr. Benshoof is not bound to those

19     rules and regulations.  I mean, he's off going, serving

20     people, wearing balaclavas, you know, completely dressed in

21     a -- in a black-clad outfit with eye mask on, which is in

22     our declarations that we provided in our reply.  You know,

23     he's out here suing people.  He's out here suing judges.

24       The reason we're before this Court is because this Court

25     is the only mechanism to regulate that kind of behavior.

**0263**

1    There's -- if an attorney were to engage in this type of

2    behavior, that attorney would not be practicing for a very

3    long time, and that attorney would also likely be sent to

4    some treatment.  That's not the case here, and that's why

5    we're here, because Mr. Benshoof wants to be heard.  This is

6    not the place.  And his actions are extremely damaging to

7    the defendants and everybody that's in his path.  And I --

8    I'd like to leave it at that.

9      Thank you for your time, for allowing me the time to

10    speak, Your Honor.

11    THE COURT:  Thank you.

12      Any response, Mr. Benshoof?

13      MR. BENSHOOF:  Well, I would like to thank -- was that

14    Mr. Admon?

15      THE COURT:  Yes, sir.

16      MR. BENSHOOF:  I would like to say once again, I

17    appreciate the gaslighting of Mr. Admon.  And Mr. Admon

18    references -- he tries to portray plaintiff as this

19    reckless, unstable person who's harming his clients and that

20    plaintiff has -- you know, is dressing like a criminal and

21    walking into people's homes.

22      I didn't take the time to waste paper and the Court's time

23    previously to respond to this nonsense, but I'll bring it up

24    since that's what he left on.

25      I went out of my way to try to email with defense counsels

**0264**

1    and point out in my replies to their UPEPA exception

2    letters, their notices, I believe they're called, and show

3    that the exception's baloney and we're just drawing this

4    out, why don't we resolve this?

5      I tried to point out to them honestly and forthrightly, as

6    I do everything, because I do not lie, cheat, or steal, even

7    my worst enemy, and I pointed out that plaintiff is allowed

8    limited discovery as a means to defend against a motion to

9    dismiss under the UPEPA.  And they -- they weren't

10    accommodating.

11     So I did some research and I found out about a precipe for

12    subpoena.  I managed to get those signed by the court clerk,

13    who looked at them, and I thought I was doing everything

14    properly because I was informed by an attorney that normally

15    attorneys have the power to just issue a subpoena.  So I did

16    the work to figure out how to do that as a pro se litigant

17    and thought I was doing everything by the book.

18     And I was having trouble serving Mr. Hermsen, because he

19    was lying and saying that he moved to France and a bunch of

20    other nonsense, and I found out that reading CR 4, that with

21    just a subpoena, I don't have to have a process server

22    serve.  And because Mr. Hermsen was hiding out, it's like it

23    probably would have cost me $500 to get him served.

24     So I walked up to his house.  A friend of his was on the

25    porch.  I said "Is this 613 13th?"  A friend of Hermsen's

**0265**

1    says, "I'm not sure.  Let's go in and find out."

2        I was welcomed in.  I don't walk into people's houses

3    ever.  I didn't even step on my kid's mom's property when

4    she was withholding him.

5        So, you know, I just --

6        THE COURT:  Mr. Benshoof --

7        MR. BENSHOOF:  -- (inaudible).

8        THE COURT:  Mr. Benshoof, in that -- in that scenario,

9    were you wearing a balaclava?

10       MR. BENSHOOF:  Yeah.

11       THE COURT:  And did you -- did you have also have eye

12   black on?

13       MR. BENSHOOF:  Well, if you're on Zoom, you would

14   understand that I wear eyeliner.  I don't wear --

15       THE COURT:  Well --

16       MR. BENSHOOF:  -- eye black.

17       THE COURT:  Yeah.  But I wasn't -- I wasn't -- I wasn't

18   asking about -- I wasn't asking about eyeliner, but I was

19   asking about eye black.

20       Did you have eye black on that day?

21       MR. BENSHOOF:  I've never -- are you talking like football

22   players wear?

23       THE COURT:  So --

24       MR. BENSHOOF:  I don't even know what eye black is.  I've

25   never owned or possessed or used anything other than that

**0266**

1    eyeliner and eye shadow.

2    THE COURT:  That's not really answering my question.

3    MR. BENSHOOF:  I'll --

4    THE COURT:  But I don't want to get hung up on the

5    definition of eye black, because it sounds like you don't --

6    maybe don't want to directly answer that question.  But if

7    you do, were you wearing some kind of eye blackening

8    substance around your eyes, in addition to the balaclava?

9    MR. BENSHOOF:  Absolutely not.  I never have any time

10    in -- in years.  Maybe I did as a child.

11    No.  I was simply wearing warm winter clothing and I have,

12    you know, some ski gear and -- like, I've done a lot of

13    bicycling.  I have a thin balaclava that I wear because I

14    have a bald head, and so I don't have any hair on my neck,

15    unless I'm wearing a wig, and I like to keep my neck warm.

16    And it's a way -- like, I wasn't trying to look like a

17    criminal.  It was winter.

18    THE COURT:  I understand you might not have been trying

19    to, Mr. Benshoof, can you at least understand how it may

20    appear threatening to have someone wearing all black with a

21    black balaclava walk into your house unannounced at least?

22    MR. BENSHOOF:  Look -- well, sure.  But I'll paint the

23    picture for you, which is -- like, I'm the least threatening

24    person anybody's ever met.  I have never spanked a child.

25    I've never yelled at a child.  I've never been in a fight in

1      my life.  I've never pushed a woman, hit a woman, raised a

2      hand at a woman, nothing.  I'm a gamer nerd who plays D & D.

3        Mr. Hermsen and I know each other very well for years.  I

4      was so intimidating -- that's a joke -- that when I walked

5      in and all I did was follow his friend in and I -- and I

6      tossed the subpoena on the ground and started walking out.

7        Mr. Hermsen clearly wasn't afraid of me because he came at

8      me screaming and his friends had to hold him back.  All I

9      did was say --

10     THE COURT:  Well --

11     MR. BENSHOOF:  -- are you threatening --

12     THE COURT:  Right.

13     MR. BENSHOOF:  I'm not scaring and intimidating anybody.

14     Like --

15     THE COURT:  I -- I --

16     MR. BENSHOOF:  -- I'm the victim.

17     THE COURT:  So, Mr. Benshoof, I --

18     MR. BENSHOOF:  I'm trying to --

19     THE COURT:  Look, I don't want to go too far down this

20     road of arguing about what happened when you attempted to

21     serve a document.  But I'll -- I will say this.

22       I've only been a judge for a little over four years at

23     this point.  The most frightening and risky types of parties

24     that I've been involved with are not murderers and rapists

25     and people who are criminally insane.  Really, for the most

**0268**

1    part, the scariest narratives I've been involved with as a

2    judge involve family law matters where one side has lost and

3    perceived that they've lost everything, perceived that they

4    have nothing to lose, and have articulated that they are

5    willing to do anything to restore what they've lost.  Those

6    are some of the most dangerous legal proceedings I have ever

7    been a part of.

8      And so -- and it doesn't matter how big the person is, how

9    threatening they might look, or whether you'd want to run

10   into them in a dark alley or not.  Those are very high-risk

11   legal proceedings from a kind of personal violence

12   standpoint.

13     So you might think that you don't pose a very threatening

14   figure, and I understand that.  But in the context of

15   everything that's happened, in the context of what seems to

16   be a highly contentious and disputed long-term family law

17   dispute, your actions could potentially have been perceived

18   as very threatening.  I wasn't there.

19     MR. BENSHOOF:  Well --

20     THE COURT:  I don't know.  But I -- and I want to put the

21   debate to bed.  But I just wanted to offer that commentary.

22     MR. BENSHOOF:  Thank you, Your Honor.

23     So to address Mr. Admon, plaintiff understands and agrees

24   that that can be true for many circumstances.  But

25   defendants know that I'm an absolute pacifist in all

**0269**

1     regards.  And I'll leave it at that.

2         THE COURT:  All right.

3         MR. BENSHOOF:  The -- sorry.  Did Your Honor want to say

4     something?

5         THE COURT:  No, no, no.  Go ahead.

6         MR. BENSHOOF:  Mr. Admon was bringing up one half of the

7     SLAPP issue, which is the statutes are written to protect

8     First Amendment right to free speech, but I think that

9     defense counsel are trying to mislead and hide the fact that

10    there's more than one element for our First Amendment and

11    that we have to have a balancing between the different

12    components of the First Amendment.

13        And what I'm referring to is the other side of defendants'

14    right to free speech, which I still believe needs to be in

15    good faith, is plaintiff's right to petition for redress of

16    his grievances.  And, you know, I was trying to look through

17    the RCW 4.24.500 and 510 to see if Mr. Admon is twisting

18    things about the legislative intent, and I've heard repeated

19    insertions -- assertions from defense counsels that the new

20    and improved intent of this is that it's absolute and good

21    faith doesn't matter anymore.

22        And it's my position that unless there's proof to the

23    contrary, the fact that our state legislators --

24    legislature's website today right now says explicitly that

25    it's protecting individuals making good-faith reports I

**0270**

1    think is what we need to go on.

2       And I think the Court is well aware that skilled, slick

3    attorneys love to come before a court, especially in a

4    complicated case like this, and pull out one-liners from a

5    case knowing that neither the court nor a single pro se

6    litigant has the time to dig through the case law and point

7    out that, like, oh, well, that was -- you know, that really

8    wasn't what they were talking about.

9       So without clear evidence to the contrary, I --

10   plaintiff's position is that we need to go with the stated

11   legislative intent that's on the court's -- on our State

12   website currently, and I think it also fits --

13      THE COURT:  Well, but, Mr. Benshoof, let me -- let me --

14      MR. BENSHOOF:  -- less common --

15      THE COURT:  Mr. Benshoof, let me push back a little bit.

16      So the legislature passes laws.  The courts interpret the

17   laws.  Mr. -- well, the defendants collectively have

18   provided court decisions that interpret the law in such a

19   way that they argued this Court should conclude that

20   statements made to government entities are protected so long

21   as that statement is designed to have some effect on

22   government decision-making, and that it doesn't -- whether

23   it's in good faith or bad faith is not the question.  The

24   question is whether the statement made to the government

25   entity was intended to impact government decision-making.

**0271**

1           Is that court decision or -- are those court opinions

2     wrong?  Do you have any other court authority?

3           MR. BENSHOOF:  I just checked my pockets and I'm fresh out

4     of court authority.  But I would point out that if defense

5     counsels are making the argument that their client's

6     statements were used to impact government decision-making, I

7     think, once again, defense counsels are trying to stretch --

8     stretch the protections, trying to hide -- trying to provide

9     their clients with immunity from this.

10          And the -- the statements that were defaming in nature

11    made by defendants were not made as part of some

12    communication involving government decision-making.

13          THE COURT:  Well, why do you say that?  Because it -- the

14    statements were made to the police and in the courts and to

15    your child.  So excluding the statements made to the child,

16    what about the statements made to police and the courts?

17    Aren't those statements made to impact government

18    decision-making?

19          MR. BENSHOOF:  If -- I guess it depends how broad are we

20    going to call government decision-making?  Because

21    government decision-making could include -- could be

22    referencing the state legislature making decisions on our

23    laws.  It could reference, you know, the CDC making

24    decision-making.  Like, I'm not sure what -- like, how broad

25    is this umbrella of government decision-making?

**0272**

1        If we go back to UPEPA and RCW, you know, 4.105.010,

2    there's many different subsections.  Some of the subsections

3    are talking about if you're a news organization or if you're

4    doing performance art, right?  Like, everything isn't

5    considered the same under UPEPA.

6        THE COURT:  Well, right.  But the legislature's language

7    in UPEPA, Mr. Benshoof, the language of UPEPA seems pretty

8    broad.  Right?  It says that the chapter applies to a

9    lawsuit asserted in a civil -- or cause of action asserted

10   in a civil action against a person, like Defendant Owen,

11   based upon the person's communication in a judicial

12   proceeding.  That's pretty broad.

13       MR. BENSHOOF:  Sure.

14       THE COURT:  So that would suggest to me the legislature

15   intended it to have a broad scope.

16       MR. BENSHOOF:  Potentially broad, yes.  But, again, even

17   under the -- under subsection (3)(a), it says "except when

18   (b) of this section applies."

19       THE COURT:  Right.

20       MR. BENSHOOF:  This chapter does not apply to a cause --

21   right.

22       So, you know, defense counsels have tried to argue that

23   merely because a statement was made in -- as part of a

24   judicial proceeding, that it's absolute immunity, and that

25   is absolute baloney because what they are arguing is that

**0273**

1      RCW 9A.72 is irrelevant.  What they are arguing by
2      misleadingly asserting that any -- anything said in a
3      judicial proceeding is protected by UPEPA is absurd.  I
4      can't believe they're making it because we have laws called
5      perjury for making false statements in court.  For them to
6      argue that somebody can't be accused of perjury and then
7      sued as a defendant for their perjury because UPEPA protects
8      them is -- it's absurd.  You know, give me --
9         THE COURT:  But, Mr. Admon -- I'm sorry, Mr. Admon.
10        Mr. Benshoof, why is it absurd?  Because if the court were
11     to adopt your argument, well, then, couldn't anyone sue
12     someone who brings a family law action or a protection order
13     action and just claim that it was all perjury, and then
14     someone like Defendant Owen would have to take the time and
15     expense and hire a lawyer and defend themselves?
16        I mean, it just seems like any time someone loses a family
17     law case or a protection order case, well, then the loser
18     could sue the other party in a totally different lawsuit,
19     kind of like what you're doing, claiming that it was all
20     perjury and that was a crime, and, therefore, UPEPA doesn't
21     apply.
22        I mean, every losing party -- not every losing party.  But
23     a lot of losing parties would start to do that if the Court
24     were to adopt your interpretation.  Isn't that right,
25     Mr. Benshoof?

**0274**

1          MR. BENSHOOF:  I understand, Your Honor, that that is one

2     of the stated intents from the little bit that I've managed

3     to read about what the concern of was -- of was from the

4     state legislature.  And, again, more importantly our state

5     legislatures are trying to protect our First Amendment

6     rights.  Right?  They don't want to create a chilling effect

7     for the -- specifically the example of somebody who is

8     reporting a crime in good faith.  Okay?

9          But I -- I have seen nowhere that -- that anybody has

10    intended UPEPA to infringe upon the First Amendment right to

11    petition for redress in that -- like, I understand that

12    the -- that there's a concern, right, that -- theoretically

13    at least -- that the courts would somehow fill up with

14    cross-claims and counterclaims about perjury.  That is a

15    theory and a concern that we don't actually have evidence

16    for.  And I don't think it's in the best interests of our

17    legal system or people's rights to honestly and sincerely

18    petition for redress when they've been victims of crimes.

19    Right?  This isn't just a simple, like, oh, she said I was

20    an asshole, so I'm going to sue her for calling me an

21    asshole.

22         Like, what -- the case that plaintiff has brought, this

23    doesn't get brought all the time because it's usually never

24    this ridiculously bad over months and months and months and

25    months.  Right?  Like, so, there has -- there has to be

**0275**

1    exceptions for -- for UPEPA allowing egregious circumstances

2    that have harmed a plaintiff to still bring causes of action

3    against people who harmed the plaintiff.  Right?  And that's

4    all I'm doing -- all I'm doing.

5      Like, if we're going to look at the reality of -- of would

6    we theoretically have our court filled with a whole bunch of

7    counterclaims and cross-claims, I don't think that makes

8    logical sense.  And the simple reason I will give for it is

9    this.  Lawyers are too expensive.  People, families are

10    destitute and broken from family courts most of the time.

11    They don't have time and money to come litigating, like, oh,

12    well, they said I'm fat, or they said that, because the

13    attorneys for both sides will say, look, that's going to get

14    nowhere.  You're going to spend a bunch of -- a whole bunch

15    of money, probably, and there's no guarantee that one side

16    is going to win or another.

17      The only reason somebody like me is bringing a cause of

18    action like this is because the evidence is so extensive and

19    over so much time that nobody with sincerity can make the

20    argument that, like, oh, well, yeah, you know, she was --

21    she was just emotional that day.  And, like, oh, they didn't

22    really mean it that way.  No.  This has been perpetrated,

23    and they've tried to cover it up and deny it for almost a

24    year and a half.

25      Like, I made all my good faith -- like, we shouldn't be

**0276**

```
 1          here because I have tried privately to say let's just settle
 2          this.  Let's just get mediation.  Like, I don't want to sue
 3          anybody.  Like, the only -- you know, so are the courts
 4          going to fill up with people like me?  No, because it's
 5          taken everything I can to even get to this point.  Like,
 6          there aren't a whole bunch of people out there who have been
 7          through the ringer that are still standing enough to try to
 8          protect their kids like I am because they get ground up
 9          before they ever get to this point.
10            So, no, the courts aren't going to fill up.  And I'm tired
11          of listening to defense counsels gaslight me and try to
12          protect their clients.  I know they know what their clients
13          did for the record.  And that's -- do I have one more close?
14          No.
15            I'll leave it at that, Your Honor.  I'm sorry if I got
16          frustrated.
17            THE COURT:  Thank you, Mr. Benshoof.
18            Reply, Mr. Admon?
19            MR. ADMON:  Yeah.  And I'll keep it brief, Judge.
20            You know, it's interesting Mr. Benshoof keeps talking
21          about defense counsel.  He's mentioned the word defense
22          counsel here probably over a hundred times.  This isn't
23          about defense counsel.  This is about the defendants.
24          And -- and it's also -- it really sticks out to me that
25          Mr. Benshoof just made the statement, he realizes, he said,
```

```
 1      lawyers are too expensive.  There are four lawyers appearing

 2      here today.  And there's this Court's precious time, I mean,

 3      with all the burdens that the Court has on it.

 4        He understands the costs that he's inflicting on these

 5      folks.  Four attorneys in a three-hour hearing dealing with

 6      motion after motion and lawsuits.  He stated that he doesn't

 7      have time to research case law.  He's had a lot of time to

 8      file a lot of lawsuits, file a lot of motions, serve

 9      subpoenas on multiple parties.

10        You know, he -- he really clearly understands what he's

11      doing based on what he's saying.  I mean, he's saying one

12      thing, but then he's saying another.  It's just like him

13      saying that he doesn't like wearing, you know, masks, but

14      he's wearing balaclavas.  I mean, these things don't

15      really -- they don't fit.

16        The other thing that I don't think he understands is, you

17      know, in defamation and libel law, we have this terminology

18      called the Streisand effect.  And the Streisand effect comes

19      from the unsuccessful efforts of Barbara Streisand, the

20      singer and the actress, to conceal her mansion in

21      California.  And she filed a whole bunch of lawsuits about

22      it.  She didn't want anybody to know her address.  And she

23      made it public.  Now the whole world knows her address.

24        You know, Mr. Benshoof is complaining about the

25      individuals going to -- to these agencies, like the police
```

**0278**

1    or to the -- and complaining.  For anybody to find those

2    records, they would have to do public records requests.

3    They would have to get very, very detailed.

4      Instead, what he's doing is he's coming to court and he's

5    filing lawsuits on the public record that anybody can

6    access.  I mean, if anyone's harming Mr. Benshoof it's

7    Mr. Benshoof.

8      And, you know, the fact that he understands that, quote,

9    lawyers are too expensive, and, yet, he's dragging this

10   issue out over and over and he's forcing so many individuals

11   to hire so many lawyers because they want a barrier between

12   them and him so they're not harassed, I think, shows his

13   clear intention.

14     And even though he is, you know, suffering and he is

15   emotional from what had happened to him.  And, again, I do

16   empathize with it.  I hear the pain in his voice.  And I

17   really do empathize with that, having practiced family law a

18   long time in the past, it's terrible.  But he understands

19   what he's doing.  And when you've got an individual sending

20   emails out saying "in the event I'm assassinated," and then

21   making these hypotheticals, as he stated on the record, that

22   he's going to abduct our wives, defense counsels' wives,

23   ship them to the Ukraine, and sell them to DynCorp for organ

24   harvesting or sex trafficking, I think that raises enormous

25   red flags and is frightening.  It's frightening from the

**0279**

1    point of view of defendants and, frankly, it's frightening

2    from the point of view of defense counsel.

3      And Mr. Benshoof is lucid.  He understands what he's

4    doing.  He realizes the costs that are involved.  He used

5    the word in front of this -- on the record today, that he

6    was "baiting" me.

7      You know, Mr. Benshoof needs to be stopped.  He needs to

8    be stopped.  He needs to be found to be a frivolous -- a

9    filer of frivolous lawsuits.  He should be sanctioned for

10   his behavior.  He needs to learn that there needs to be an

11   end.  And if he wants to reform the RCWs, he can run for

12   office.  You know, we all have that ability.  He can go and

13   run for office and try to legislate.  But he shouldn't be

14   legislating in the courts, and he shouldn't be costing so

15   much pain and so much expenses to people and taking up this

16   Court's time as he doing it.  Thank you.

17     THE COURT:  All right.  Thank you.

18     All right.  I've heard from all of the parties on all of

19   the motions and that will conclude the argument on the

20   motions.

21     Let me address them each in turn here.  Just a moment.

22     So we heard Defendant Cliber's motion first.  I'll address

23   that one first because I believe the only claim asserted

24   against Defendant Cliber was for abuse of process.

25          (Unrelated audio not transcribed)


**0280**

1       THE COURT:  I'm sorry.  Mr. Rekofke, I -- that was you.

2       MR. REKOFKE:  It was, Your Honor.  I apologize.  Sorry

3    about that.

4       THE COURT:  All right.  I lost my place a little bit here.

5    I'm going to try to recover.

6       I was addressing Mr. Cliber's motion.  I'm granting the

7    motion to dismiss under UPEPA.  I conclude that UPEPA

8    applies to the claim.  I conclude that both under CR 12 and

9    CR 56 not only has Mr. Benshoof failed to assert facts

10    sufficient to establish a claim for abuse of process against

11    Defendant Cliber, even under the summary judgment standard,

12    I find that there's no genuine issue as to any material fact

13    relating to any such claim.

14       I, therefore, dismiss the claims by plaintiff against

15    Mr. Cliber.  Regarding the fee request -- just a moment --

16    under RCW 4.105.090, as the prevailing party, I am granting

17    attorneys' fees to Mr. Cliber.

18       Turning to Defendant Owen's motion as well as Defendants

19    Lerman's and Hermsen's joinder in that motion, first of all,

20    I agree with the moving party that coercion is not a

21    cognizable civil claim in Washington.  All claims for

22    coercion are dismissed.  And that's really under a 12(b)(6)

23    standard.  That's not under UPEPA.

24       Regarding the claims for defamation and abuse of process

25    as to the remaining defendants, I agree that UPEPA applies

**0281**

```
 1    to those claims.  I agree that under CR 12 -- CR 12(c) or
 2    CR 56 standard, dismissal of the abuse of process claims is
 3    proper.  The defendant -- I'm sorry -- the plaintiff,
 4    Mr. Benshoof, has not alleged facts supporting there was any
 5    kind of either improper purpose in commencing any of the
 6    proceedings against him or during those proceedings some
 7    kind of improper or unusual act that amounts to an abuse of
 8    process.  There's simply no such fact sufficiently pled, and
 9    so the abuse of process claims against all other defendants
10    are dismissed.
11       Turning to the defamation claim, I, likewise, find that
12    UPEPA applies to that claim as to all defendants.  I find
13    that the alleged statements to law enforcement and
14    statements made during the course of litigation are subject
15    to the absolute privilege under 4.24.510, and, therefore,
16    Mr. Benshoof is incapable of establishing an essential
17    element of his defamation claims against any of the
18    defendants and under CR 12(c) and CR 56 can and should be
19    dismissed for defamation as to the remaining defendants.
20       Because the defendants are the prevailing parties, I do
21    find that they are entitled to attorneys' fees under
22    RCW 4.105.090.
23       There's also the claim for -- I believe there's a claim
24    for damages under 4.24.510.  Just a moment.  4.24.510
25    indicated that a person prevailing upon the defense provided
```

1    for in this section is entitled to recover expenses and

2    reasonable attorneys' fees incurred in establishing the

3    defense, and, in addition, shall receive statutory damages

4    of $10,000.

5        And so I don't believe I have discretion in the award or

6    the amount.  And so in addition to attorneys' fees and

7    costs, I award to Defendants Owen, Lerman, and Hermsen

8    statutory damages in the amount of $10,000.

9        Actually, I -- I'm backing up in my head.  Did I address

10   4.24.510 as to Defendant Cliber as well?

11       No, because that was only abuse of process.  So I'm not

12   awarding $10,000 to Defendant Cliber.

13       Regarding the parties' request for a vexatious litigant

14   order, I'm denying that request.  And it's mainly for

15   procedural reason.  That request was basically tacked onto a

16   dispositive motion.  It was not captioned as a motion for a

17   request for such an order.  That is a major ask of the

18   Court, to restrict someone's access to the Court and bar

19   them from bringing further litigation of any kind, without

20   the Court's permission.  I'm not saying that the Court would

21   not grant that type of request, but it needs to be brought

22   separately rather than tacked onto another motion where it's

23   not expressly captioned as such.  And Mr. Benshoof would

24   need to have an opportunity to more fully respond to that

25   request.

**0283**

1       And so the request is denied without prejudice to bringing

2       a future motion if the parties so desire.

3       If the parties would prepare a proposed order, I think one

4       order would be preferable.  But if the parties feel that

5       that should be two orders, I'm amenable to that as well.

6       I'll review it when it's been finalized.  You can email it

7       to Madam Bailiff when it's ready.

8       Is there any further clarification or information needed

9       to finalize such an order?

10      MR. MARINELLA:  Did you mention, Your Honor, that these

11      causes of action that you dismissed are with prejudice?

12      THE COURT:  Correct.  All of the dismissals are with

13      prejudice.  These are dismissals on the merits.

14      MR. MARINELLA:  Thank you, Your Honor.

15      THE COURT:  You're welcome.

16      Unless there is further clarification needed, unless

17      there's anything else the Court can do for the parties right

18      now, this matter is concluded.  Have a good morning,

19      everyone.

20      MR. BENSHOOF:  Your Honor?

21      THE COURT:  Oh, yes, sir.  Mr. Benshoof?  Go ahead.

22      MR. BENSHOOF:  Yeah.  Hey, Judge Ferguson, I just wanted

23      to say that I really appreciate you taking so much time to

24      look through this and to do your best to be an impartial

25      trier of fact, and I ran into a situation with Judge

**0284**

1    Ferguson [sic] where she dismissed a lawsuit with prejudice.

2    I just wanted to make sure that this is a dismissal without

3    prejudice, correct, Your Honor?

4        THE COURT:  You said Judge Ferguson.  Did you mean Judge

5    Robertson?

6        MR. BENSHOOF:  Sorry.  Judge Robertson.  Yes, sir.

7        THE COURT:  Well, as I just indicated, these would be

8    dismissals with prejudice under UPEPA.

9        MR. BENSHOOF:  Oh, okay.  And then is the -- I also wanted

10    to note for the record, for appeal, that I have not been

11    able to access the court clerk's office, and I have not been

12    able to access the court's clerk office either in person or

13    by mail, because the local post office has denied me access

14    repeatedly without a mask, and, as such, I was unable to get

15    my second amended complaint to the Court for consideration.

16    And so the Court has apparently neither considered that nor

17    my motion to leave to amend CR 15.

18        So I just wanted to get those objections on the record for

19    my next stop, which will be appellate court.

20        And I wish blessings upon all of you, and hopefully 2023

21    will be a year of truth and unity in our community and our

22    country.

23        THE COURT:  Well, thank you for that, Mr. Benshoof.  I

24    actually appreciate you bringing up your motions.  The Court

25    did receive from you several motions.  They were not noted

**0285**

1    to be heard, and I -- I know that may sound like kind of

2    clerical minutia, but sometimes parties have difficulty

3    understanding this, especially parties who are not

4    attorneys.

5        When you file a motion in the court file, that does not

6    trigger anything happening, in terms of getting a hearing,

7    unless it's accompanied by a note for motion, because what

8    that note for motion does is it tells the court that you

9    want a hearing on the specific date, and maybe with oral

10   argument and maybe without oral argument.

11       But if all you do is file your motion, with no note for

12   motion, it's not going to get heard.  It's just going to sit

13   in the court file.  There's no alarm bell that goes off

14   telling me that you filed a motion, if you don't note it for

15   a hearing.

16       So to the extent this matter proceeds forward, if you

17   bring any other motions, I just wanted to let you know that

18   you need to include a note for motion.  And there is a note

19   for motion on the court's website.  Offhand, I can't tell

20   you exactly where, but I know it's on there.

21       MR. BENSHOOF:  Thank you, Your Honor.

22       THE COURT:  All right.  You're welcome, Mr. Benshoof.

23       All right.  That concludes this matter.  Yeah.  Thanks.

24            (January 27, 2023, proceedings concluded)

25

**0286**

```
1                          -oOo-

2                     March 17, 2023

3

4        THE BAILIFF:  If you could please turn on your cameras, we

5     can go ahead and get started.

6        Superior Court for the State of Washington, In and For the

7     County of King, is in session.  The Honorable Marshall

8     Ferguson presiding.

9        Your Honor, this is Kurt Benshoof v. Nathan Cliber, et

10    al., Cause Number 22-2-15958-8 SEA.

11       For the record, this morning, will the plaintiff please

12    introduce yourself.

13       MR. BENSHOOF:  My name is Kurt Benshoof, plaintiff.

14       THE BAILIFF:  Thank you.

15       And defendants, please, one at a time.

16       MR. RUSS:  And for the record, good morning.  Blair Russ

17    appearing on behalf of Jessica Owen.  Also present is

18    Anthony Marinella from my office.

19       THE BAILIFF:  Thank you.

20       MR. REKOFKE:  Good morning, Your Honor.  This is Kyle

21    Rekofke on behalf of Defendant Cliber.  I'm just observing

22    today, though.

23       THE BAILIFF:  All right.  Your Honor, I believe we are

24    ready, if we have not missed anyone.

25       THE COURT:  Looks like we've got everyone.
```

**0287**

1           All right.  So we're here on cross motions for summary

2      judgment as to Mr. Benshoof's declaratory judgment action

3      claim.  I think the appropriate order of argument will be to

4      start with Defendant Owen, I believe Owen filed first, first

5      in time.  Everybody will have a full opportunity to be

6      heard.  I don't have another matter immediately after this

7      one, and so I don't have a time crunch.  I don't want to

8      have this hearing go on forever, but everyone will have an

9      opportunity to present all of your arguments.

10          All right.  Mr. Russ, you're arguing for Defendant Owen;

11     is that correct?

12          MR. RUSS:  That is correct, Your Honor.

13          THE COURT:  Whenever you're ready.

14          MR. RUSS:  Thank you.  And I will be brief, just given the

15     extraordinary nature of the relief sought here.

16          We've laid out in our motion and our response the legal

17     reasons why the Court should dismiss this.  They're

18     procedural in nature, for the most part.  They relate to

19     standing and just the absence of justiciable controversy,

20     res judicata, and the fact that there's another action

21     that's already adjudicated some of these issues.

22          So those concepts are not only entirely straightforward

23     and the Court's probably very well acquainted with them, but

24     they're not responded to in Mr. Benshoof's briefing.

25          If there's specific issues that I can address or elaborate

**0288**

1    on, I'd be happy to do so, but I do think they are

2    self-explanatory.

3      I think that what's sort of striking here about this

4    motion is that this is, one, not the first time that

5    Mr. Benshoof has brought relief in order to circumvent the

6    ruling of another judge in a family law case.  That's one.

7      Two, essentially what Mr. Benshoof is asking for is so

8    extraordinary that it really just undercuts the basic tenets

9    of the adversarial system and the separation of powers.

10   He's essentially asking a superior court judge to undo all

11   of the procedures in process that are associated with

12   adjudicating family law issues in family law court, to undo

13   whatever legislative determinations and executive

14   determinations that have been made with regard to

15   vaccination and whether that's appropriate or not.

16     I don't think the Court needs a whole lot of guidance to

17   understand that the role of a superior court judge is to

18   adjudicate rights and responsibilities between parties in

19   this case, and there are none here for this Court to

20   adjudicate.

21     So if there's anything else I can add, I'm certainly happy

22   to do so, but I do think that this is an entirely

23   straightforward dismissal in total.

24     THE COURT:  All right.  Thank you, Mr. Russ.  I don't

25   think I have any questions for you.

**0289**

 1          I think I have more questions for Mr. Benshoof's position.
 2      Mr. Benshoof, good morning.
 3          MR. BENSHOOF:  Good morning, Your Honor.  Did you want to
 4      start with questions, Your Honor, or would you like me to
 5      first address Mr. Russ's statements?
 6          THE COURT:  Well, is Mr. Russ correct, that what you're
 7      really trying to do here is circumvent -- circumvent Judge
 8      Keenan's ruling in the family court matter?  You're trying
 9      to undo the parenting plan?
10          I mean, is Mr. Russ correct about that, that that is your
11      objective?
12          MR. BENSHOOF:  No, Your Honor.  And I thought that I
13      adequately addressed Mr. Russ's assertions in my reply,
14      but -- just to make sure that all of that is before the
15      Court today.
16          THE COURT:  Well, I -- I read everything you wrote,
17      Mr. Benshoof.
18          MR. BENSHOOF:  Okay.
19          THE COURT:  Just so you know.
20          MR. BENSHOOF:  Okay.  Yeah.  So the simple answer is no.
21      And I tried to point out to Mr. Russ that res judicata does
22      not apply because this question was never brought before
23      Commissioner Holloway or Judge Keenan in the family matter.
24      And so there's -- there's -- because of that, there's no
25      ruling I'm trying to circumvent.

**0290**

1    THE COURT:  So I guess my question is, Mr. Benshoof,

2    should you have brought it before either Judge Keenan or the

3    commissioner?

4    MR. BENSHOOF:  From my understanding, the -- the limited

5    statutory authority of an Article I court, such as the

6    family court, doesn't have the authority to hear such a

7    matter.  So --

8    THE COURT:  Then why do I?  Because the family court is

9    superior court.  It's the same court.  It's just a

10    department within the superior court, like juvenile court or

11    the criminal department or the civil department.

12    So if they didn't have authority to rule on this issue,

13    how could I have authority?

14    MR. BENSHOOF:  Well, according to RCW I think it's 7.24,

15    which includes the Declaratory Judgment Act, a King County

16    Superior Court judge clearly, according to my reading -- you

17    know, I'm not an attorney.  I didn't go to law school, so --

18    but I've read through all of the declaratory judgment

19    statutes in the Revised Code of Washington, and clearly a

20    sitting judge in a King County Superior Court case, such as

21    this, has the authority.

22    THE COURT:  Well, but, I mean, Judge Keenan is a King

23    County Superior Court judge.  So why didn't he have

24    authority?

25    MR. BENSHOOF:  Well, so I understand that -- that -- like

**0291**

1      I've heard this from a lot of people, that King -- that King

2      County family court is part of King County Superior Court,

3      and the inference that's made there is that it's an

4      Article III court.  But, like, it's patently obviously that

5      it can't be legally an Article III court because, for

6      example, it -- it does not allow the right to trial by jury.

7      And the only courts that can deny a right to trial by jury

8      are Article I courts, from my understanding.

9      So I understand that nobody likes to call it an Article I

10     court.  Nobody likes to say this.  You know, if it walks

11     like a duck and talks like a duck, it's an administrative

12     proceeding for people who are in contractual privity with

13     the state via a marriage license or domestic partnership.

14     But by all -- from simple observation, it couldn't be an

15     Article III court and legally deny the right to trial by

16     jury.

17     So I think the only logical inference that can be made

18     legally is to conclude that King County family court, while

19     it's in the King County Superior Courthouse, is not acting

20     as an Article III court.

21     THE COURT:  All right.  Well, I think you're confusing the

22     law that the superior court applies in family law matters

23     with the constitutional nature of the court.  It's the exact

24     same court.  And the fact is there are simply some matters

25     where parties are entitled to a jury, criminal law matter,

**0292**

```
 1    obviously, and then some matters where you're not entitled
 2    to a jury.  Some family law matters, dependency matters,
 3    there are -- administrative law matters, certain kinds of
 4    cases where the court is sitting as an appellate court of
 5    like a municipal or lower court.  There are a lot of
 6    different examples.
 7       But in each of those cases, if a Superior Court judge is
 8    hearing that matter, then it's the Superior Court, a
 9    constitutional court in the state of Washington, a court of
10    general jurisdiction, that is hearing that matter.  And
11    Judge Keenan or I, if I'm in family court, have all the
12    powers of a Superior Court judge at all times.
13       MR. BENSHOOF:  Okay.  I mean, it's -- it's -- I guess,
14    from my understanding, this is only an issue with regards to
15    the question of whether I either could or should have
16    brought this question previously.  Is that correct?
17       THE COURT:  Right.  Well, I mean, but that's a significant
18    question.  Right?  I mean, if the vaccine occurred in -- I
19    think it was 2021, the month is escaping me, but prior to
20    Judge Keenan's ruling on the parentage matter, and if your
21    basic claim is that Ms. Owen did something that violated the
22    child's rights or medical rights in some way, then arguably
23    you could have and should have brought that to the Court's
24    attention in the parentage matter rather than this matter.
25    At least that's one argument.
```

**0293**

1        MR. BENSHOOF:  Yeah.  And so I think this also -- you

2    know, not to split hairs here, but I just want to make sure

3    that we're all on the same page.  The petition for

4    declaratory judgment is not a claim where I'm -- I'm not

5    seeking damages from anybody.  I'm not -- the declaratory

6    judgment is not ascribing fault.  It's merely seeking an

7    affirmation on a point of law.

8        THE COURT:  Well, I -- I know what a Declaratory Judgment

9    Act --

10        MR. BENSHOOF:  Oh, okay.

11        THE COURT:  -- claim is.  But why does that make a

12    difference?

13        MR. BENSHOOF:  So, I mean, if we go back to the -- when

14    the family court was initiated, and leaving aside the fact

15    that there was perjury involved in its initiation, the --

16    there was clearly a bias on the part of the court at that

17    time to disregard anything that was contrary to the

18    propaganda that was coming out of the CDC, our media, the

19    mayor, and, you know, it was -- it was quite evident back

20    then, and I think even more so as the months have gone by,

21    that most -- most people simply did not understand that

22    the -- the Pfizer injection was not only experimental, but

23    that it was still in clinical trials.

24        So while I did include some -- some information as to

25    those facts in my sworn declaration for the temporary

**0294**

1     restraining order hearing that occurred before Commissioner

2     Holloway on October 25th of 2021, that was all disregarded.

3     It was -- and I was effectively treated like a crazy person

4     for even questioning the safety, the efficacy, the legality,

5     whether or not it was experimental.

6        So it's not that I didn't try to raise some of these

7     issues, but they were -- not only were they ignored, but I

8     was treated like a crazy threat to my Owen child for not

9     wanting to inject my son with an experimental chemical.

10    THE COURT:  But that's just it, Mr. Benshoof.  And I think

11    that goes to at least part of the argument here is that you

12    did raise those issues before another court.  And I saw that

13    you argued in your reply brief that the court not only

14    disregarded your views but also relied on perjury by

15    Ms. Owen, that's part of your claim as well.

16       But if that -- if that is what happened and you raised

17    these issues and that other court wrongfully disregarded

18    them or wrongfully relied on perjury or made some other kind

19    of error, then arguably your remedy is to appeal that

20    outcome, not to file a new lawsuit, bring a DJ action before

21    me, and then try to get basically the same result or the

22    same outcome.  It's to appeal the mistakes of the other

23    court.  Right?

24    MR. BENSHOOF:  Well, but the -- I think the clear thing --

25    the thing that we really need to bear in mind here is I'm

**0295**

```
1        coming before the Court seeking the Court's declaration that

2        informed consent is a legal requirement to inject a

3        12-year-old with an experimental Pfizer shot.  That's --

4        that's all.  It's not -- it's just a point of law.  One

5        might even say that it's -- it's so obvious that any

6        competent adult, even without a legal degree --

7          THE COURT:  So --

8          MR. BENSHOOF:  -- should, you know --

9          THE COURT:  -- I want to ask you some questions about

10       that, Mr. Benshoof, because it -- what you claim is totally

11       and completely obvious is not entirely obvious to me.  And

12       let me give you an example.

13         If I have a child with a broken arm and I need to take the

14       child to the hospital, what you seem to be arguing is that

15       what I need to do as a parent is learn about all the

16       treatment options for a broken arm, learn about their

17       effectiveness and potential downsides, risks, and side

18       effects, explain them to my child with a broken arm, and

19       then get my child's consent to have that broken arm treated

20       at the hospital before I can, as a parent, authorize the

21       doctors to do anything.

22         I mean, isn't what you're arguing true of a broken arm or

23       experimental cancer treatment for a child with leukemia or a

24       vaccine for an infant?  How -- I just don't -- that's not

25       common sense to me or that's not -- it doesn't comport with
```

**0296**

1    my everyday experience, that a parent has to explain medical

2    treatment to their child and get the child's consent before

3    treatment can be administered.  Parents don't do that.

4        Is that what you're arguing?

5        MR. BENSHOOF:  I'm not arguing that relative to your

6    examples.  And so the --

7        THE COURT:  Well, right.  But you're arguing for the COVID

8    vaccine, for the Pfizer vaccine, that Ms. Owen was required

9    to do that; right?

10       MR. BENSHOOF:  Well, there's two clear distinctions that I

11   would like to present to the Court on this matter.

12       THE COURT:  Okay.

13       MR. BENSHOOF:  The most accurate corollary is that -- that

14   I've thought of so far -- is if my son had 20/20 vision and

15   if there was -- there was no history of glaucoma in either

16   my side of the familiar or his mother's, would it not be

17   absurd if his mother unilaterally decided to subject our son

18   to an experimental, meaning it hasn't been proven safe or

19   effective, if she were to subject him to an experimental

20   glaucoma treatment.  Like that would be absurd.  Like, you

21   don't subject children to treatments for things they don't

22   have.  And --

23       THE COURT:  Well, but -- but -- but vaccines are different

24   because they're a preventative measure.  They're not -- so

25   the example you gave, I don't know why we need to reach for

**0297**

1    some other medical treatment when we have other vaccines.

2    You know, measles, diphtheria, tetanus.  I mean, you seem to

3    be saying that a parent would need to explain to their

4    3-year-old why they need a mumps or a measles vaccine, and

5    they would need to explain all the risks and potential

6    consequences and side effects, and then get that

7    3-year-old's consent before getting a measles vaccine.

8        MR. BENSHOOF:  No.  And I appreciate that you brought up

9    the example of vaccination because we've gone through a

10   broken arm and cancer.

11       THE COURT:  Right.

12       MR. BENSHOOF:  With broken arm and cancer, like, the child

13   either has a broken arm that needs to be set or they have

14   cancer and they need it to be treated, which neither of

15   those actually applied in this case because our son had

16   already got COVID, had very, very mild symptoms and

17   recovered, which results in natural immunity, which -- you

18   know, I have video of Anthony Fauci saying "there's no

19   better immunity than natural immunity."

20       So then if we go on to the third example or issue here of

21   vaccines, I think that's a good question to raise.  And

22   there's a very clear distinction between, say, a measles

23   vaccine or, you know, a -- a Polio vaccine -- right? -- and

24   the Pfizer shots.  And --

25       THE COURT:  Well, so I might give -- I might cede that

**0298**

1           point to you, Mr. Benshoof, just for the sake of argument.

2           But where I'm struggling here is to find some authority in

3           the law that requires a parent to do all the research about

4           a vaccine to determine its effectiveness and its risks and

5           then a law that would then require the parent to then

6           explain that, all of that information, to the child

7           before -- and then get the child's consent before the parent

8           can then have the child vaccinated.

9             Where is the law that requires that?

10            MR. BENSHOOF:  Right.

11            So, first of all, I think that's -- that's a question that

12          Mr. Russ raised, and that's actually getting a little bit

13          ahead of actually where we're at because Mr. Russ, and I

14          think Ms. Owen, are concerned about the legal implications

15          if we all do acknowledge what should be axiomatic, which is

16          with a medical experiment.  Right?

17            THE COURT:  Well, but let me -- let me interrupt here,

18          Mr. Benshoof, because as a court, I don't enforce axioms or

19          common sense or what people think should be the case.  I

20          enforce the law.  And so we might -- I might reach an

21          agreement with you, just in conversation, that parents

22          should inform their children about risks of vaccination and

23          so forth.  Or maybe not even all children, but children over

24          a certain age, 12 or 10 or whatever it is.  I might agree

25          with you conversationally.

**0299**

1    But in order for me to grant a declaratory judgment, and

2    that's putting aside all the issues about standing and

3    justiciability for now, in order to enter a declaratory

4    judgment setting forth the law, then there needs to be some

5    legal authority for me to enter such a declaratory judgment,

6    beyond just agreeing in conversation about what the world

7    should be like.

8    So I need some legal authority for your position,

9    Mr. Benshoof.  So where is it?

10    MR. BENSHOOF:  Right.  So I -- I listed the Code of

11    Federal Regulations in my motion.  I listed the -- the

12    Nuremberg Code, which, although there's some

13    misunderstanding about whether or not the Nuremberg Code is

14    controlling law in the United States, federal appellate

15    courts have held that it is indeed controlling law via the

16    Code of Federal Regulations, and there's federal case law

17    supporting that.

18    And the clear distinction here is that, you know, I

19    totally agree with the Court and opposing counsel, that if

20    we were talking about a vaccine, which according to state

21    law, which I cited RCW 7.290.010, subsection (10), if it

22    were, by definition in our state law, a vaccine that had

23    been -- received full FDA approval, which means it would

24    have been tested for safety, for efficacy, and it would have

25    been proven by a completion of a clinical trial that it was

**0300**

1    safe and effective at what it was marketed at doing, then of

2    course I would agree that a parent doesn't -- wouldn't, in

3    that situation, need to explain to their 3-year-old or their

4    12-year-old why they're getting a vaccination, because the

5    parent is acting in the role of steward and caregiver.

6      But we have a clear distinction here.  This isn't a

7    vaccine, according to state law.  It's an experimental

8    medical treatment.  It's still in the phase 3 of a clinical

9    trial, and it's well adopted in the public record, like you

10   can -- like, I cited the trial from the CDC.gov website,

11   that it is still in an ongoing trial.  And the only thing

12   that it was even trialed for, this is according to our Owen

13   government website, was whether or not it reduces symptoms.

14     So --

15   THE COURT:  Right.  But, Mr. Benshoof, I guess my question

16   would be, where is the law that says a parent has to be

17   aware of this?  Has to do research?  You know, we have a new

18   flu vaccine every single year because the flu virus mutates

19   all the time, and so they issue new flu vaccines.

20     Where is the law that says, for example, a parent has to

21   research whether a flu vaccine has been safely tested for

22   its efficacy or properly approved by the FDA or some other

23   authority or a parent has to look into the circumstances

24   about the latest COVID vaccine or some other vaccine that's

25   recommended for their child and has to be absolutely certain

**0301**

1      that this is not experimental or subject to some other kind

2      of review or that's it's flawed in some way?

3         What authority says a parent has to figure out the status

4      of a vaccine before deciding whether, in good faith, to have

5      their child receive it?

6         MR. BENSHOOF:  Well, the highest controlling law, which

7      has not been overturned and is controlling and respected

8      throughout the world, is the Nuremberg Code.  It requires

9      for medical experimentation, which this is, it requires the

10     informed consent of the test subject.  It requires that --

11     that any alternative treatment be presented as a possibility

12     and a host of other things.

13        And so --

14        THE COURT:  So you're saying that parents in deciding

15     whether to vaccinate their children with the latest version

16     of whatever vaccine we're talking about need to comply with

17     the Nuremberg Code?

18        MR. BENSHOOF:  Well, Your Honor, I would once again draw a

19     clear distinction between vaccination, which is with a

20     vaccine, which this is not, according to state law --

21        THE COURT:  Right.  But, Mr. Benshoof, I -- I need to take

22     my 5-year-old in for a vaccine.  I don't know anything -- I

23     don't have a 5-year-old, but let's say that I still had a

24     5-year-old.  I need to take him in for a vaccine.  I know

25     nothing about whatever vaccine the doctor is recommending,

**0302**

1    but I've got a doctor saying, oh, it's time for your kid's

2    such-and-such vaccine.

3      How would I know whether the vaccine is legally a vaccine,

4    as you're saying, or part of a trial?

5      Most parents would have no way of knowing.  Right?  But

6    you're saying they need to comply with the Nuremberg Code,

7    nonetheless.  Is that right?

8      MR. BENSHOOF:  No.  It's not just the parents.  The -- you

9    know, for example, in the situation with the pharmacist who

10    works at a Fred Meyers in Lake City that did both

11    injections, who I spoke to, it's also a legal requirement

12    for any health care professional, who is administering an

13    experimental product --

14      THE COURT:  Well, that's fine.

15      MR. BENSHOOF:  -- to --

16      THE COURT:  But your declaratory judgment action and all

17    of your motion pleading is saying Ms. Owen didn't inform

18    A.R.W.  Owen didn't tell A.R.W. about this.  Your DJ action

19    is against Ms. Owen, not some health care professional.

20      MR. BENSHOOF:  Right.  And, well, it's really not even

21    about -- I tried to write -- I mean, I know there's some

22    statements of fact that makes it sound like I'm, you know,

23    trying to ascribe blame to Ms. Owen.  But to be clear, in

24    the instant action, the declaration that I'm seeking is that

25    informed consent is a legal requirement to inject

**0303**

1    plaintiff's minor son with an experimental Pfizer gene

2    therapy product.  It's not -- it's not a -- it's not calling

3    out Ms. Owen in this declaration.  It's not naming the

4    pharmacist.  It's merely asking the Court to affirm that

5    informed consent is a legal requirement.

6      It's for another day and another court to potentially

7    argue and consider whether or not informed consent was

8    obtained.  But that's a separate issue.  I'm just seeking a

9    declaration that informed consent --

10    THE COURT:  But --

11    MR. BENSHOOF:  -- was a requirement.

12    THE COURT:  But the -- it sounds like you want a

13   declaration against the whole world?  I mean, because it

14   sounds like you're backing away from the claim that this is

15   a declaratory judgment action directed at Ms. Owen and this

16   is, rather, an action to get the Court's declaration

17   generally that informed consent was required somehow

18   involving everyone from medical professionals to Ms. Owen to

19   potentially others.  Is that what you're saying?

20    MR. BENSHOOF:  Well, I mean, there's -- you can draw

21   inferences or implications from the requested declaratory

22   statement, but, you know, whether Ms. Owen took my son in or

23   whether her fiancée did and whether the pharmacist at Fred

24   Meyers or a doctor at Children's Hospital was involved,

25   the -- the question is the same:  Was informed consent a

**0304**

1    legal requirement to inject my son with an experimental

2    Pfizer gene therapy treatment because it's not a vaccine?

3        THE COURT:  Okay.  So next question is how do you have

4    standing to argue any of this?  You don't have any parental

5    rights or custodial parental rights currently as to A.R.W.,

6    so how do you have standing?

7        MR. BENSHOOF:  Well, going to look at parental rights, I

8    had full parental rights when he was injected in -- on

9    July 11th of 2021.  So although there's been -- there's been

10   the family court adjudication that allegedly has suspended

11   or abridged my rights, there's been no allegation that I

12   didn't have full rights, as my son's father at the time it

13   was injected.

14      And then looking forward, there's a hearing before Chief

15   Judge Sean O'Donnell on Tuesday the 21st of this month where

16   I'm seeking to vacate the family court case under CR 60,

17   subsection (b)(4) and (11), for, as I allege, the fraud.

18      So looking forward, even though I understand --

19   THE COURT:  Wait.  What fraud?

20      MR. BENSHOOF:  Well, there was -- there's perjury.

21   THE COURT:  Right.

22      MR. BENSHOOF:  Because you have two material statements

23   that are contradictory, it's perjury, right, when it's sworn

24   under oath.  So --

25   THE COURT:  Is the perjury -- is the perjury related to

**0305**

1          the injection of your son?

2             MR. BENSHOOF:  There is some perjury of that, but more

3          specifically the reason I'm moving for a motion to vacate is

4          the initial parentage action, which was used to fraudulently

5          get the family court's jurisdiction, was obtained through a

6          perjurious and barratrous petition to decide parentage,

7          where there wasn't actually a justiciable cause of action.

8          There was no -- there was nothing in controversy.  It was

9          fabricated out of thin air.

10            THE COURT:  All right.  So, I mean, I guess I come back to

11         my earlier question of if you admit that you raised issues

12         surrounding the injection in the family court action and

13         that action is ongoing and you intend to have Judge

14         O'Donnell review that case, then why on earth would the

15         Court entertain an action here related to those past events,

16         when you've already raised them in another court before a

17         different judge?

18            MR. BENSHOOF:  Yeah.  So to be clear, I haven't -- I never

19         raised this question in family court, and I withdrew -- I

20         filed a notice of withdrawal from that summer of last year

21         because my -- my motions pointing out that my due process

22         rights were being infringed upon or abrogated, it -- I -- it

23         wasn't, I don't believe, considered appropriately.  I tried

24         to raise the issue through a show cause motion last year,

25         that it was all based on fraud.

**0306**

1    So I -- I ended up filing a notice of withdrawal, and

2    there -- there was subsequent hearings, to which I was not

3    provided notice and opportunity to respond to pursuant to

4    CR 4.  Separate issue.  And so I'm not actually -- I made it

5    very clear in my motion to vacate that is going before Judge

6    O'Donnell, that I filed that motion by special appearance.

7    I'm not -- I haven't re-signed up for E-filing.  I'm not --

8    the Court doesn't -- my position is the Court never -- never

9    had a valid cause of action for jurisdiction, so I have no

10   intention of, like, going back into that case to argue it

11   within the limited -- you know, under Title 26, which is the

12   controlling statutory authority for family court.

13   THE COURT:  So you have a claim that the court lacked

14   personal jurisdiction over you?

15   MR. BENSHOOF:  It had subject matter jurisdiction -- it

16   lacked subject matter jurisdiction for sure, because under

17   RCW 26.26A.435, subsection (2), it makes it quite clear that

18   in a --

19   THE COURT:  So I don't -- I don't want to go too far down

20   that.  My question was only about personal jurisdiction.

21   Your argument in the other court was about subject matter

22   jurisdiction?

23   MR. BENSHOOF:  Well, and personal jurisdiction after I

24   filed the notice of withdrawal, yes.

25   THE COURT:  All right.  I'm not sure how -- I'm not sure

**0307**

```
 1        how it's frankly fair, Mr. Benshoof, that you're bringing a

 2        lawsuit in this court, several lawsuits, but then

 3        simultaneously claiming that the court lacks personal

 4        jurisdiction over you.  In other words, you want the court

 5        to do what you want, but when the court is acting in a way

 6        that you don't like, you claim that the court lacks

 7        jurisdiction over you.

 8          I mean, that's not totally self-contradictory, but I think

 9        companies and corporations make that argument sometimes, but

10        it does seem a little -- it does seem potentially

11        self-contradictory.

12          MR. BENSHOOF:  I'd be happy to address that, because --

13          THE COURT:  It doesn't -- for the purpose of this case, I

14        don't know that it matters, because I don't think there are

15        jurisdictional issues that we need to argue about this

16        morning.  But I just want to point out, I think it

17        potentially relates to the Court's concerns about vexatious

18        litigation.  And when I see individuals seeming to claim

19        that the court lacks personal jurisdiction over them for one

20        purpose but then they're suing, in this exact same court,

21        seeking the court's -- asking the court to do something and

22        clearly claiming that the court has jurisdiction to do

23        something for them, I have a problem with that.

24          MR. BENSHOOF:  Well, so -- right.  And I'm specifically

25        referring to personal jurisdiction through the lens of CR 4,
```

**0308**

1    service of process.  And so all I'm specifically referring

2    to in regards to personal jurisdiction is that Ms. Owen's

3    family attorney, Mr. Cliber, did not properly serve me --

4        THE COURT:  Okay.  I got it.  It's a failure of service

5    issue.  I see.  All right.  I got you.  That makes more

6    sense.

7        All right.  So I've been throwing questions at you,

8    Mr. Benshoof, and I want to make sure I give you an

9    opportunity to argue and not just answer my questions.

10       So if you have any further argument.

11       MR. BENSHOOF:  Well, I'm not here to argue.

12       THE COURT:  Well, I --

13       MR. BENSHOOF:  Yeah, I know.

14       THE COURT:  Yeah.  I don't mean argue argue, but offer

15   argument to the Court.

16       MR. BENSHOOF:  Thank you, Your Honor.

17       You know, I would say -- I'd incorporate by reference

18   everything that I've put in my documents as if fully

19   restated herein to save some of the Court's time.  And, you

20   know, just to briefly go over -- yeah.

21       Oh, the one thing I didn't get to is the question of

22   whether it's a justiciable issue before the Court given the

23   fact that I don't supposedly have any parenting rights right

24   now.  I had mentioned that one of the injections happened

25   before anybody said I didn't have parenting rights.

**0309**

1       And looking forward, I also believe that legally it's a

2       justiciable issue because there is a -- I believe the

3       grounds for a hopefully high likelihood that the family

4       court case will be dismissed on Tuesday, through my motion

5       to vacate.  And so looking forward, as soon as Ms. Owen and

6       I go back to honoring the parent agreement at common law

7       that we parented our son under for the first 12 years of his

8       life, you know, she may wish to have him injected with

9       further booster shots, and so this issue before the Court is

10      very important for the parenting and well being of my son,

11      because I would like to make sure that the law is followed

12      with regard to health care decisions for my son.

13    THE COURT:  Okay.  And I think that kind of gets to the

14      crux of the issue here, Mr. Benshoof, because what you seem

15      to be doing here, by your Owen admission, I think, is

16      getting a declaration of the Court that will enable you to

17      parent your child the way you want your child to be

18      parented.  That's what it seems -- you want this

19      declaration, that it's illegal to inject the child, so that

20      you could use that -- potentially use such a declaration to

21      prevent Ms. Owen from having the child injected with what

22      you deem to be an experimental vaccine.  Right?

23    MR. BENSHOOF:  Well, I haven't seen any evidence from

24      opposing counsels that the Pfizer 162b2 shot is not still in

25      a clinical trial.

**0310**

1      THE COURT:  Oh, no.  Again, I'll give you that, for the

2      sake of argument.  Let's just assume it's some experimental

3      treatment.

4        What you want this declaratory judgment for is to help you

5      parent your child the way you want the child to be parented.

6      Isn't that correct?

7        MR. BENSHOOF:  Well, everything I do in life is

8      (inaudible) son.

9        THE COURT:  I'm sorry.  You cut out there.  Can you repeat

10     that?

11       MR. BENSHOOF:  Oh.  I said everything that I do in my life

12     is with my son in mind.  So --

13       THE COURT:  That seems like an evasion, Mr. Benshoof.

14     I'll be honest, that seems like an evasion of my direct

15     question.

16       MR. BENSHOOF:  Oh.  Yeah.  I wasn't trying to do that,

17     Your Honor.

18       THE COURT:  Okay.

19       MR. BENSHOOF:  If I heard you correctly, the question is

20     am I seeking this declaration to assist me in parenting my

21     son going forward?

22       THE COURT:  Correct.

23       MR. BENSHOOF:  I think that's an accurate assessment and

24     Ms. -- so there's a family situation with Ms. Owen where she

25     doesn't necessarily like to believe what I have to say if it

1    controverts what she believes, even if she doesn't have any

2    basis in law or fact.  And so it's not that this just helps

3    me.  It would help Ms. Owen and any other parent similarly

4    situated to understand that legally, when we are taking care

5    of our children, who should be the most important thing in

6    our lives, that there is a legal requirement to -- for

7    parents to do due diligence, to ascertain that what they're

8    injecting in their kid is not experimental, and that it's

9    received full FDA approval.

10    And, you know, I understand that there's been some

11    implication or inference that what I'm suggesting is that

12    parents have to go to, you know, a monthlong medical course

13    or -- not at all.  Like, the simple things that I'm

14    suggesting are accessible on the Internet within a couple

15    minutes.  Right?

16    THE COURT:  Right.

17    But just to clarify, Mr. Benshoof, you understand that I

18    am not a legislature.  The purpose of a declaratory judgment

19    is not to issue proclamations for the benefit of the entire

20    public so that, as you say, other parents can rely on that

21    in parenting their children.  You understand that; correct?

22    MR. BENSHOOF:  Oh, yeah.  I'm just -- I was only bringing

23    up that point, Your Honor, just -- just to let you know

24    that, yes, of course specifically my concern is my child

25    here, but that a declaration on this point of law could be

**0312**

1    of service to other parents, and hopefully it would be of

2    service to Ms. Owen as well.

3        THE COURT:  All right.  Anything further?

4        MR. BENSHOOF:  So I think I've -- I have already addressed

5    standing, both past and future.  You know, I understand

6    opposing counsel's argument that they're trying to argue

7    that this is a res judicata matter; that it could or should

8    have been addressed in family court.  But, again, I wasn't

9    provided notice of hearing or opportunity for hearing in the

10   final order hearing.  So for that reason, among others, I

11   don't think that res judicata applies, because if a person

12   doesn't have notice and opportunity to be heard, it can't be

13   argued that res judicata applies when there was -- you know,

14   a trial was held in absentia.

15       THE COURT:  Well, but, again, Mr. Benshoof, if you're

16   claiming that there was some procedural defect in the other

17   case because of a lack of notice, I would suggest to you

18   that the remedy would be to seek an appeal of that case, not

19   to file a new case trying to seek essentially the same

20   relief or similar relief.  That's largely what the other

21   side is basically arguing; that if there was some flaw in

22   the UFC case, then your remedy was to appeal that, bring a

23   motion for reconsideration or whatever your remedy would be.

24   But it would be in that case, not a new action.

25       How do you respond to that?

**0313**

1      MR. BENSHOOF:  Well, what I said earlier, Your Honor, was

2      that under Title 26, it's my understanding that a family

3      court judge is not authorized to hear a petition for

4      declaratory judgment under RCW 7.24.  So, I mean, I haven't

5      ever heard of a declaratory judgment being brought or

6      adjudicated by a family court, and given all of the other

7      motions -- so, yeah, I honestly don't think that family

8      court is set up to hear such a petition; so, you know, I

9      never brought it because it doesn't seem to be the

10     appropriate court.

11     THE COURT:  Well, but family law is certainly set up to

12     hear claims that another parent has subjected a child to

13     improper medical care.  Right?

14     MR. BENSHOOF:  Oh, absolutely, Your Honor.  But this --

15     and I 100 percent agree with that, but I think it's

16     important.  My position is that the petition for declaratory

17     judgment is separate and distinct from the -- what you just

18     raised.

19     And, you know, I know that I've been accused by a lot of

20     people so far for trying to circumvent rulings and that I'm

21     somehow vexatious.  And I would just say for the record, as

22     I've said in my writings, that every action that I have

23     brought in the last year and a half has always been in

24     response to evidence that I saw that Ms. Owen or somebody

25     else was violating my rights or my son's rights.  And at

**0314**

1    every instance along the way in the last year and a half, I

2    have always tried to propose first mediation, then I've

3    subsequently proposed notice of claim and opportunity to

4    cure, imploring, you know, the parties to just sit down.

5    And, you know, I'm not going to claim to be a saint, but

6    I've tried to embody as much temperance and patience and

7    understanding with all parties as possible, but I have only

8    resorted to, you know, say, filing a petition for writ of

9    replevin after my car had been stolen for five or six months

10    and nobody was doing anything.

11       So all of the actions that I have brought have merely been

12    seeking redress for valid grievances.  Nobody has ever been

13    able to say that anything I've said is dishonest, because I

14    have been absolutely honest the entire time.  And all I've

15    really heard is just character assassinations and impugning

16    of my character.

17       And so in closing, Your Honor, I would say that I

18    appreciate you taking the time to hear this, and everything

19    I have done and said is absolutely from the bottom of my

20    heart.

21       THE COURT:  All right.  Thank you, Mr. Benshoof.

22    Reply, Mr. Russ?

23    Sorry.  You're muted, Mr. Russ.

24    MR. RUSS:  Excuse me, Your Honor.

25    I just said that I believe the Court has hit the

**0315**

1    procedural issues on the head here.  The approach would be

2    to go back to the family court, if you wanted to challenge

3    jurisdiction.  A lot of things I could say about the

4    validity of that judgment and why I think it's valid, just

5    based on what I've heard Mr. Benshoof say today.  But I

6    think, again, that issue is for another court.  And until

7    that judgment is somehow vacated, it's clearly a

8    straightforward application of res judicata, among -- which

9    is one of the most obvious, among the many other procedural

10   defects we have here today.

11      THE COURT:  All right.  Just a moment.

12      So I think there are a number of problems with

13   Mr. Benshoof's declaratory judgment action.  I think from

14   what I -- both from what I've read and from what I've heard

15   today in oral argument, including Mr. Benshoof's

16   acknowledgement that the purpose of a declaratory judgment

17   action is to enable him to parent his child in the way that

18   he believes is correct, that this really is -- even though

19   it's framed as a declaratory judgment action, separate and

20   apart from the proceedings in family court, ultimately in my

21   view this is an effort to circumvent Judge Keenan's ruling

22   in the parentage action.

23      Mr. Benshoof seems to be seeking a declaration from this

24   Court that Ms. Owen did something wrong or failed to do

25   something right in connection with having her son

**0316**

1    vaccinated.  Mr. Benshoof disputes that this is, in fact, a

2    vaccination; claims it's an experimental treatment and that

3    Ms. Owen failed to take sufficient steps to obtain informed

4    consent.  I think Mr. Benshoof's conception of informed

5    concept is not based on the law of the state of Washington,

6    to begin with, and I think it has pretty serious flaws in

7    reasoning.

8       I can see how he got there, through reading some of the

9    materials that are cited in his materials, that Code of

10   Federal Regulations and the Nuremberg Code and so forth, but

11   those things really relate to research experimentation,

12   using children as human subjects and so forth.

13      There is nothing in the law that I've read that imposes

14   upon a parent the obligation to inform themselves about the

15   nature of a vaccine or even, to give Mr. Benshoof credit, a

16   supposed vaccine, and then educate themselves about the

17   efficacy and risks of that injection, and then explain that

18   to a child and obtain the child's consent prior to getting a

19   vaccination.  I mean, just nothing in the law in the state

20   of Washington supports that, and I think there are just

21   simply kind of everyday commonsense problems, if that were

22   the law.

23      If parents were required to explain vaccines.  And I think

24   the fact is, if you were to try to get informed consent from

25   most children for a vaccine, they would refuse it because

**0317**

1      kids hate needles, and they don't want to be stuck by a

2      needle, and so they would probably never get vaccinated for

3      anything, if you left it up to them.  I'm broadly

4      generalizing here.  That's really not the basis for the

5      Court's ruling today.  But I just think there are

6      significant and obvious flaws with Mr. Benshoof's ruling --

7      reasoning in support of the declaratory judgment action that

8      he's requesting.

9         But, ultimately, I do find that he lacks standing to make

10     such a request because of the parenting decision by Judge

11     Keenan.  Mr. Benshoof claims, well, the -- you know, I had

12     parenting rights in 2021, when the injections occurred, and

13     that, I believe, is factually true.  But the parentage

14     action resolved all questions of custodial parental rights.

15        And Mr. Benshoof indicates that he raised this issue

16     before the court and the court, for whatever reason,

17     ultimately disagreed with him or disregarded his

18     information, relied on perjury, and Mr. Benshoof disagrees

19     with that outcome and so he's bringing this declaratory

20     judgment action.

21        To the extent there were procedural flaws in the UFC case,

22     whether having to do with notice or relying on inadmissible

23     or improper evidence or whatever they were, the remedy

24     clearly here is to seek review through post trial motions,

25     through the Court of Appeals, or other avenues, but not to

**0318**

1          simply commence a new action for a declaratory judgment on

2          the exact same issues, which, again, leads me to conclude

3          that res judicata does apply here.

4            We're talking about the same persons and parties.  We're

5          essentially talking about the same cause of action, which is

6          parentage of this child.  And the subject matter is the

7          same; the claim that one parent is doing something wrong in

8          connection with that child.  And the -- and there was a

9          final judgment on the merits as to parenting rights.

10           And so I am granting Defendant Owen's motion for summary

11         judgment on the declaratory judgment action and denying the

12         plaintiff's motion for summary judgment on the DJ action.

13           And so I'll need either one order or two orders on those

14         motions provided to my bailiff, and I'll get them entered

15         when they're ready.

16           MR. RUSS:  Okay.  And, Your Honor, we can present that.  I

17         think the one issue that I want to wrap up is that we're

18         getting close to the stage of a final judgment in this case.

19         I recognize that we've got findings of fact that need to be

20         presented by the 31st.  Maybe perhaps we would rope this in

21         to our findings of facts on the vexatious litigation order

22         and then treat that as a final judgment so that there's

23         finality here and we know there's no more motions or issues

24         that are going to be raised.

25           Just a suggestion.

**0319**

```
 1        THE COURT:  Well, since these are separate dispositive
 2   motions and I think the issues are pretty distinct from the
 3   vexatious litigant motion, I think I'd rather have separate
 4   orders.  I mean, if you need time to prepare those orders,
 5   I'm fine to give you, you know, up to 31st for these orders
 6   as well.  But I think my preference would be for separate
 7   orders.
 8      MR. RUSS:  Okay.  It's not a matter of time.  We could --
 9   I could certainly do it today.  I think the issue is, what I
10   would like to put in the proposed order, is that this is a
11   final judgment; that there are no more claims that are
12   remaining, other than the entry of the findings of fact on
13   the vexatious litigation order.  Of course the court retains
14   jurisdiction to enforce that order, but I want to get to a
15   point where we're clear that this has ended --
16      THE COURT:  Well --
17      MR. RUSS:  -- one way or another.
18      THE COURT:  -- that is my understanding.  Mr. Benshoof,
19   what is your response to that specific request?
20      My understanding was this was the final claim in the case.
21      MR. BENSHOOF:  There's -- there's the other thing that's
22   still in the original -- in the first amended complaint,
23   because the second amended complaint didn't get before the
24   Court.  The other thing in there was the petition for a
25   temporary injunction.  So --
```

**0320**

1      MR. RUSS:  Which has actually been addressed by our motion

2      to dismiss.

3      THE COURT:  I think that's right.  I saw that in the

4      motion as well.

5      Are there separate arguments that you would want to make

6      about the TRO claim, Mr. Benshoof?  Because I thought it was

7      tied closely to the declaratory judgment claim.

8      MR. BENSHOOF:  Well, Your Honor, the motion to vacate

9      scheduled for Tuesday the 21st before the Honorable Judge

10     O'Donnell for -- I guess my perspective is that that motion

11     brings enough evidence before the court for Judge O'Donnell

12     to consider whether to vacate that case; that if that isn't

13     sufficient to vacate the case, then I don't reasonably --

14     reasonably considering this, if that isn't enough to vacate

15     the case, then there's -- I see no point in bothering with

16     the petition for temporary injunction because I would think

17     that the same sort of ruling is going to happen.

18     And I don't -- I don't actually -- like, I've informed

19     counsels, like, I don't actually want to be in court.  I'm

20     just trying to protect my son.  So I think the thing that's

21     most efficient and most reasonable is if we -- is if I find

22     out if the motion to vacate is granted on Tuesday; and if it

23     is, things are resolved.  And if it isn't, I think it

24     renders the temporary injunction petition moot anyways.

25     THE COURT:  All right.  I'm sorry I'm not looking right at

**0321**

1    you.  I've got on my other screen here a copy of your -- not

2    a copy.  I've got your amended complaint, the first amended

3    complaint.  I'm looking through it here.

4       So this was my understanding.  My understanding of the

5    temporary injunction request -- and just to clarify, I'm

6    looking at pages 12 and 13 of your first amended

7    complaint -- was that Defendant's Cliber and Owen deceived

8    the family court, violated your rights as A.R.W.'s father,

9    because Defendant Owen subjected A.R.W. to this Pfizer

10   vaccine without informed consent.  Again, I know you dispute

11   that it's a vaccine.  And Ms. Owen poses a direct and

12   imminent threat to A.R.W.'s well being and safety.

13      And so my understanding, again, is that your injunction

14   claim was connected to the claim that Ms. Owen improperly

15   subjected your son to medical experimentation that, like the

16   declaratory judgment action, you were seeking an order of

17   this Court preventing her from doing something that you

18   disagree with as A.R.W.'s parent.  Is that correct?

19      MR. BENSHOOF:  Yeah.  And I think if I'm -- if I'm not

20   mistaken, I think I filed the first amended complaint on or

21   around October 11th, and chronologically, you know, I didn't

22   schedule a temporary (inaudible) on the 25th, you know, a

23   couple weeks later, Judge Keenan entered the final order.

24      And so even if we leave aside the issue of whether or not

25   I had notice and opportunity to be heard, I think what we

**0322**

```
 1      run into is that his final order basically rendered my

 2      petition moot for the temporary injunction because I didn't

 3      get it scheduled in time.

 4        THE COURT:  Okay.  So you're --

 5        MR. BENSHOOF:  So in that case, I think that res judicata

 6      probably would apply because I didn't get my petition heard

 7      in time.

 8        THE COURT:  Okay.  I think that's right.  And so this

 9      Court's order will be -- will serve as a dismissal of the

10      temporary injunction claim as well.  And -- which means that

11      this will be a final order in this case, unless,

12      Mr. Benshoof, you have any other arguments to the contrary.

13        MR. BENSHOOF:  I'm tired of arguing, Your Honor.

14        THE COURT:  Okay.  All right.  So, Mr. Russ, you may

15      include that in the order.

16        MR. RUSS:  Thank you, Your Honor.

17        THE COURT:  All right.  Unless there is anything else,

18      then I believe that concludes this matter.  Everyone have a

19      good morning.  Good to see you.  Hope -- Mr. Benshoof?

20        MR. BENSHOOF:  I just want to say -- yeah.  I just want to

21      say I appreciate the Court taking the time to hear this, and

22      I hope you have a good day.

23        THE COURT:  All right.  You too.  Take care.

24        MR. RUSS:  Thank you.

25              (March 17, 2023, proceedings concluded)
```

**0323**

```
 1                      C E R T I F I C A T E

 2

 3   STATE OF WASHINGTON          )

 4                                )

 5   COUNTY OF KING               )

 6

 7           I, the undersigned, do hereby certify under penalty

 8   of perjury that the foregoing court proceedings or legal

 9   recordings were transcribed under my direction as a certified

10   court reporter; and that the transcript is true and accurate to

11   the best of my knowledge and ability, including changes, if any,

12   made by the trial judge reviewing the transcript; that I received

13   the electronic recording in the proprietary court format; that I

14   am not a relative or employee of any attorney or counsel employed

15   by the parties hereto, nor financially interested in its outcome.

16           IN WITNESS WHEREOF, I have hereunto set my hand this

17   17th day of May, 2023.

18

19   _Debra Riggs Torres_____

20   s/ Debra Riggs Torres, RPR, CCR No. 20122368

21   Reed Jackson Watkins, LLC

22   800 Fifth Avenue, Suite 101-183

23   Seattle, Washington 98104

24   Telephone: (206) 624-3005

25   E-mail: info@rjwtranscripts.com
```

**0324**

```
 1

 2

 3

 4                     COURT OF APPEALS

 5                OF THE STATE OF WASHINGTON

 6                        DIVISION I

 7                         86466-1

 8   _____

 9   KURT BENSHOOF,                )

10                 Plaintiff,      )  King County Cause

11         vs.                     )  No. 22-2-15958-8 SEA

12   NATHAN CLIBER, et al.,        )

13                 Defendants.     )

14   _____

15        VERBATIM REPORT OF RECORDED PROCEEDING

16      BEFORE THE HONORABLE MARSHALL L. FERGUSON

17   _____

18                    FEBRUARY 29, 2024

19                    (Motion Hearing)

20

21

22

23

24            RECORDING TRANSCRIBED BY:

25        ELEANOR J. MITCHELL, RPR, CCR 3006
```

MITCHELL REALTIME REPORTING

1                        A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4    (Appearing Remotely)

5          KURT BENSHOOF, *Pro Se*
           1716 North 128th Street
6          Seattle, Washington 98133

7    FOR THE DEFENDANT NATHAN CLIBER:

8    (Appearing Remotely)

9          MICHAEL C. TRACY
           SARAH N. TURNER
10         Gordon & Rees Scully Mansukhani, LLP
           701 Fifth Avenue, Suite 2100
11         Seattle, Washington 98104-7084
           206.695.5135
12         mtracy@grsm.com
           sturner@grsm.com
13

14   FOR THE DEFENDANT JESSICA OWEN:

15         BLAIR M. RUSS
           PAIGE V. GAGLIARDI
16         Tomlinson Bomsztyk Russ
           1000 second Avenue, Suite 3660
17         Seattle, Washington 98104
           206.621.1871
18         bmr@tbr-law.com

19

20   FOR THE DEFENDANT MAGALIE LERMAN and OWEN HERMSEN:

21   (Appearing Remotely)

22         MOSHE Y. ADMON
           Admon Law Firm, PLLC
23         300 Lenora Street, Suite 4008
           Seattle, Washington 98121
24         206.739.8383
           jeff@admonlaw.com
25

3

PROCEEDINGS; February 29, 2024



1                        I N D E X

2                                                    PAGE

3    MOTION FOR CONTEMPT AND SANCTIONS                 5

4    COURT'S RULING                                   35

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## MITCHELL REALTIME REPORTING

```
 1                    AFTERNOON SESSION; FEBRUARY 29, 2024

 2                              --oOo--

 3

 4                    (Recording begins at 1:02 p.m.)

 5                    (Transcription begins at 1:02 p.m.)

 6

 7              THE BAILIFF:  -- on your video.  Thank you

 8    so much.

 9              THE COURT:  All right.  Ready, Madam

10    Bailiff.

11              THE BAILIFF:  All right.  Thank you.

12         Good afternoon.  Court is in session.

13         Your Honor, this is Kurt Benshoof v. Nathan

14    Cliber, et al., Cause No. 22-2-15958-8 SEA.

15              Plaintiff, representing yours- -- excuse me,

16    representing yourself, will you please introduce

17    yourself to the Court?

18              MR. BENSHOOF:  Yeah.  This is Kurt

19    Benshoof, Plaintiff, pro se.

20              THE BAILIFF:  Thank you.

21         Counsel, if I leave anyone out, please

22    correct -- please correct me.

23         Counsel for Nathan Cliber?

24              MR. TRACY:  Good afternoon.  Mike Tracy

25    for Nathan Cliber.  And Sarah Turner, my co-counsel, is
```

1   also here.

2               THE BAILIFF:  Okay.  Thank you.

3         Counsel for -- defendant counsel for Jessica

4   Owen.

5               MR. RUSS:  And good afternoon.  For the

6   record, Blair Russ, appearing on behalf of Ms. Owen.  I

7   also have Ms. Gagliardi in my office online as well.

8               THE BAILIFF:  Thank you.

9         Counsel for Magalie Lerman?

10              MR. ADMON:  Good afternoon.  Moshe Admon

11  on behalf of Magalie Lerman and Owen Hermsen.

12              THE BAILIFF:  Thank you.

13        And if we have not missed anyone, Your Honor,

14  we are ready.

15              THE COURT:  All right.  Thank you, Madam

16  Bailiff.

17              THE BAILIFF:  You're welcome.

18              THE COURT:  So unfortunately, we are here

19  because it appears to the Court that Mr. Benshoof may

20  be in violation of the Court's order entered back on

21  March 31, 2023, restricting abusive litigation filed by

22  Mr. Benshoof.

23        We are here on Mr. Cliber's motion for a

24  finding of contempt and for sanctions.  I have reviewed

25  that motion.  I've reviewed all of the materials

PROCEEDINGS; February 29, 2024

1    submitted in support of that motion.  I've reviewed

2    Mr. Benshoof's response and his cross-motion and all of

3    his materials, as well as the reply materials.

4          I want to state at the outset that there may

5    be other pending motions that have been filed in this

6    case, partic- -- in particular, by Mr. Benshoof.  We

7    are not here to have a free-for-all on all pending

8    motions.  We are only here addressing the sanctions --

9    the contempt and sanctions motion.

10         I had a few questions for the moving party,

11   and then I wanted Mr. Benshoof to give -- I wanted to

12   give Mr. Benshoof an opportunity to address his

13   opposition, which I've read and I'm familiar with his

14   positions.

15         And I -- I will say at the outset, I am highly

16   skeptical of Mr. Benshoof's positions.  I want to say

17   that my -- the order I entered back in March of 2023,

18   in my view anyway, was unequivocally clear and broad

19   that it applied to any and all future litigation by

20   Mr. Benshoof against the protected parties.  And

21   there's similar language throughout the order, and then

22   the Court laid out strict requirements that

23   Mr. Benshoof had to follow before bringing any new

24   actions against the protected parties; not just

25   lawsuits, but actions.

PROCEEDINGS; February 29, 2024

1         I will further add that, at least in one

2    instance, Mr. Benshoof filed a -- what he framed as an

3    answer and counterclaims in federal court but what was

4    clearly a third-party complaint directed at the pro- --

5    protected parties in my order.

6         Mr. Benshoof might have thought he was being

7    clever, but he's not -- I can tell him that he is not

8    the first person to try that trick to avoid the

9    mandatory requirements of Federal Rule 14, which

10   require service of a summons and complaint.  When you

11   do things like that, you can't just call it a

12   counterclaim when really what you're doing is

13   commencing a third-party complaint.

14         That -- that --

15         MR. BENSHOOF:  Objection.

16         THE COURT:  Mr. Ben- -- Mr. Benshoof, I --

17   I -- I absolutely  will give you an opportunity to

18   respond.  I just want to kind of cut to the chase here

19   about how I have viewed the materials that were

20   submitted to the Court.  I -- I know you have an

21   opposition.  You oppose all of these positions, and I

22   want to give you an opportunity to respond, and you'll

23   have that opportunity.  I promise you.

24         But, first, I'd like to hear from the moving

25   party or parties on the motion, starting with Mr. Tracy

1   and -- and Ms. Turner, who- -- I don't know who's going

2   to argue between the two of you.

3           MR. TRACY:  I'll be arguing today, Your

4   Honor.  Thank you.

5           In our view, this is really pretty

6   straightforward.  The order is very clear.  It simply

7   amounts to a series of yes-or-no questions.

8           And the first question is, when filing a new

9   action in federal court -- which is what our motion

10  concerns.  I know that some of the other parties deal

11  with a few other actions that extend beyond that, but

12  for ours, in particular, there's two actions in federal

13  court.

14          The first was filed directly by Mr. Benshoof

15  against a litany of defendants.  When he filed that, he

16  failed to file the leave motion, which is the first

17  requirement of the Court's order.  And then the second

18  part of that is filing a copy of the order.

19          Now, in that case, he did file a copy.  We

20  still do not feel that really meets the spirit of the

21  Court's order.  It was included as one of, frankly,

22  dozens of documents that were filed in a single

23  appendix.  It was about 2,000 pages long, kind of

24  included in the stack as opposed to acknowledging the

25  order directly or -- or its requirements.

```
1                    THE COURT:  Right.  It was buried, is --
2                    MR. TRACY:  Yeah.
3                    THE COURT:  -- is my impression.  It was
4        buried.
5                    MR. TRACY:  That -- thank you, Your Honor.
6        We agree.
7              For the second action, this is a declaratory
8        judgment action that was filed by Seattle School
9        District regarding some records concerning
10       Mr. Benshoof's child.  And as the Court noted, he
11       responded, brought a -- a variety of third-party claims
12       against many of the protected individuals here.
13             And in that action, he also failed to file the
14       leave motion and likewise did not file a copy of the
15       Court's order.  As a fair bit of time has passed since
16       we initially filed our motion, I just wanted to clarify
17       for the Court that, in both of those actions, because
18       Mr. Cliber was served with copies of the complaint and
19       summons, we have responded, filing motions to dismiss,
20       calling attention to the order and some of the actions
21       that it empowers other courts to take as well.
22             But at this point, it really just comes down
23       to whether he filed the leave motion or not.  He didn't
24       in either case.  And those cases continue on and have
25       caused quite a substantial cost, both of the individual
```

MITCHELL REALTIME REPORTING

1    defendants and of those courts and this court's

2    resources given Mr. Benshoof's failure to comply with

3    the order.

4            Now, in our materials, Your Honor, we left it

5    pretty open as far as what sanctions or findings of

6    contempt or jail time -- anything of that nature the

7    Court would enter.  Since we filed ours, Counsel for

8    Ms. Owen has filed their own sanctions motion, and --

9    but in their motion, they went into a little bit more

10   detail.

11           We would just state that we -- we do not

12   oppose any of the specific sanctions sought by

13   Ms. Owens, including the remedial sanctions under

14   RCW 7.21.010 and .030, which could include daily

15   sanctions until Mr. Benshoof complies with the order,

16   as well as a short amount of jail time.

17           THE COURT:  I will say jail time is

18   typically utilized to get -- to coerce compliance.  And

19   I'd -- I'd appreciate an explanation for how jail time

20   would serve that end and not be simply just kind of

21   punitive.  But thank you, Mr. Tracy.

22           All right.  Mr. Russ?

23           MR. RUSS:  And -- and thank you, Your

24   Honor.  For the record once again, Blair Russ,

25   appearing on behalf of Ms. Owen.

PROCEEDINGS; February 29, 2024

1     We -- we did file our own motion that was

2 substantially similar to Mr. Cliber's motion,

3 unsurprisingly, because the facts are relatively

4 similar and there's a lot of overlap there.  I -- I

5 think we spent a little bit more time talking about the

6 available options the Court might have in addressing

7 Mr. Benshoof's ongoing vexatious-litigant behavior.

8     I think what's also important for us to point

9 out that is unique to our motion is that, as this

10 Court's well aware, there's -- there's already been a

11 no contact order that's been issued in the custody

12 matter, which requires Mr. Benshoof to refrain from

13 contacting Ms. Owen.

14     We've supplied a declaration with close to

15 240 communications over a short period of time.  It's

16 just another continuation; in fact, I would say it's an

17 escalation of this abusive behavior that another judge

18 has told him he cannot engage with under threat of

19 crim- -- criminal penalties.

20     That has not deterred Mr. Benshoof, of course.

21 He -- as the Court also knows from hopefully other

22 filings that we've submitted, he's already out -- I

23 think he's got a $250,000 warrant.  I think the count

24 is maybe 91 criminal charges that stem from violating

25 Judge Keenan's order.

1          I -- I -- I don't think the -- the Court

2    necessarily is in a position to enforce an order of

3    another judge, but I think the importance of that

4    circumstance is Mr. Benshoof's willingness and

5    propensity to violate court orders continuously.

6          And -- and -- and I appreciate the Court's

7    comment that there are two sort of variations of

8    sanctions in this circumstance.  There's a remedial

9    sanction, which is designed to cajole or compel

10   compliance.  There's also a punitive sanction.

11         I think probably we are not in the appropriate

12   procedural posture for a punitive sanction.  We are,

13   however, in the appropriate procedural posture for a

14   remedial sanction.  And the reason being is that

15   Mr. Benshoof can curtail his violation of the Court

16   order by simply mo- -- calling the -- the

17   vexatious-litigant order to the attention of the judge

18   presiding over his federal court matters.

19         My understanding is they've both been

20   consolidated in front of Judge Whitehead, and he can

21   ask Judge Whitehead for leave to proceed prior to

22   taking any additional actions, if any, against the

23   defendants.  If he's unable to achieve that, he can

24   also dismiss that claim as a matter of right.

25         And -- and so he is in a position where he can

1    meet the Court's order, or at least curb his violation

2    of it.  A remedial sanction would be appropriate in

3    that circumstances.  We have suggested $1,000 per day

4    per defendant per action -- or, excuse me, per

5    protected party.  So that would include Mr. Admon,

6    Ms. Owen, Ms. Magalie, myself, Mr. Cliber.

7            I think that -- well, I'm sure there's others,

8    but at least there's those five off the top of my head,

9    plus two other action- -- you know, two actions

10   combined.  So it would equate to something like a

11   $10,000 sanction per day before he could -- he could

12   achieve compliance.

13           And I -- I -- I believe he can -- he can go

14   ahead and dismiss this as a matter of right under

15   CR 41.  So it shouldn't take him more than a day or two

16   to be able to do that.  He's definitely familiar with

17   the process for filing in federal court.

18           So if there's -- if there's anything else that

19   I can add or give the Court, happy to do so.

20           THE COURT:  Was jail time one of the

21   proposals, Mr. Russ?

22           MR. RUSS:  It -- it -- it was, Your Honor.

23   It was -- it was -- it was loosely -- it was loosely

24   suggested in sort of the -- the -- the spectrum of

25   available remedies the Court would have.  I think the

1    importance of jail time is that -- that in issuing your

2    order, you supplied the *Knight* warnings with it so that

3    Mr. Benshoof was on notice that jail time was a

4    prospect.  That has still not deterred yet.

5           And -- and jail time is a -- an appropriate

6    remedial sanction, as the Court knows.  It's -- it's --

7    it's allowable under the statute.  You don't have to

8    bring criminal charges like you might with a punitive

9    sanction.  It is -- it is permitted.

10                  THE COURT:  Yeah.

11                  MR. RUSS:  And folks that are in jail do

12    still have access to the federal court.  So I do

13    believe that, given the propensity to willfully violate

14    orders, putting Mr. Benshoof in custody until he

15    complies is -- would -- would, in fact, be an

16    appropriate exercise of the Court's discretion.

17                  THE COURT:  Thank you, Mr. Russ.

18           Mr. Admon?

19                  MR. ADMON:  I -- I have nothing to add,

20    Your Honor.

21                  THE COURT:  All right.

22           Well, Mr. Benshoof, you've heard what I've had

23    to say.  You've heard what the other parties have had

24    to say.  I've -- like I said, I've read your materials.

25                  What further information do you ha- -- or

1    argument do you have for the Court?

2                MR. BENSHOOF:  Well, first of all, I'd

3    like to say good day.  I didn't have the pleasure of

4    being on the video feed on the hearing back in January

5    of 2023.  And I would also like to thank you for being

6    forthright about your prejudice before the parties have

7    even had a chance to speak.

8                As -- as you've said, you've read through my

9    briefings.  And this -- this laughable kangaroo-court

10   action that's been going on for more than a year where

11   counsel were allowed to assert that I had engaged in

12   abusive litigation, I'll read for the record,

13   RCW 26.51.020, subsection (1)(a)(2).  It says that [as

14   read]:  The party who is filing -- and, in that case,

15   it was initially Ms. Owen, and there was a joinder --

16   has -- that I, as the alleged vexatious litigant, has

17   been found by a Court to have committed domestic

18   violence.

19               That's what the statute says.  My

20   understanding is that lawyers and courts are required

21   to follow the law.  I have -- no one has ever presented

22   evidence that a Court found me to have committed

23   domestic violence.  So the definition of domestic

24   violence -- or, sorry, the definition of abusive

25   litigation was falsely applied from the get-go.

═══ MITCHELL REALTIME REPORTING ═══

1          And then under RCW 26.51.030, the orders

2     restricting such alleged abusive litigation, which

3     doesn't apply to me, subsection (1) states that I would

4     have, quote, been found by the Court to have committed

5     domestic violence against the other party; in this

6     case, Owen.

7          That has never --

8               THE COURT:  Are you talking about my

9     order, Mr. Benshoof?  Are you -- is that -- you're

10    talking about the -- the abusive litigant order that I

11    entered in March of 2023?  You're saying that order

12    doesn't apply to you?

13               MR. BENSHOOF:  No.  What I'm --

14               THE COURT:  For --

15               MR. BENSHOOF:  -- saying is that, for the

16    attorneys to have even petitioned for an abusive -- for

17    an order restricting abusive litigation, a Court had to

18    have found that I committed domestic violence against

19    Ms. Owen.  If you actually read the record of King

20    County Superior Court Case No. 21-5-00680-6 SEA, I was

21    never found to have committed domestic violence.

22          What Mr. Cliber, who is a pathological liar

23    like his client, Ms. Owen -- the little game that he

24    played with Judge Keenan was alleging that I was a

25    credible threat.  And that allegation was upon one of

```
 1    my unlawful arrests, which was dismissed with

 2    prejudice.

 3                THE COURT:  All right.

 4                MR. BENSHOOF:  Now, the term, --

 5                THE COURT:  So, Mr. Benshoof, I --

 6                MR. BENSHOOF:  -- "credible threat" --

 7                THE COURT:  -- I will say that what you're

 8    doing now, the arguments you're making now, you can

 9    save for the Court of Appeals.  Because what you're

10    doing now is saying that I was wrong to enter the order

11    restricting your litigation.

12           You can believe that.  That's fine.  But I've

13    entered the order, and we're not relitigating that.  If

14    you think I was wrong, you can take it up with the

15    Court of Appeals.  And maybe you'd win there.

16           I think you already -- I think you have

17    appealed, but I'm not going to reverse my order at the

18    end of this hearing.  There's -- there's no chance of

19    that.  And so there's no point in trying to relitigate

20    the order that I entered.

21           The question here is whether you violated it.

22                MR. BENSHOOF:  Yeah.  And, Your Honor, I

23    am well aware that I have appealed the order of the

24    Court in the Washington State Court of Appeals,

25    Division I.  So we're all aware of that.
```

MITCHELL REALTIME REPORTING

1          THE COURT:  Okay.

2          MR. BENSHOOF:  And I am not here to move

3    for the vacation of that order, as fraudulent as it

4    was.  That's not the issue.  The reason that I am, for

5    the record, setting these facts is because I will be

6    getting a transcript.  And based upon the prejudicial

7    statements I've heard so far, whatever -- whatever

8    determination comes out of the Court today will also be

9    appealed to the Court of Appeals.

10          And the reason I'm raising this -- these

11   issues is not to relitigate what the Court and the

12   counsels present did previously.  It's to establish

13   that, when the Court issues its prejudicial ruling

14   today, either sanctioning me or issuing an arrest

15   warrant or whatever games we want to play -- that it is

16   on the record that the basis of this is known by all

17   parties present -- attorneys and the Court -- to be

18   based on fraud.  It's fraud upon fraud upon perjury.

19   And we all know that -- under *Throckmorton*, that

20   perjury and extrinsic fraud voids everything.

21          So while counsel and the Court wish to

22   continue with this ridiculous tautology that I am

23   disrespecting orders and -- and violating them, I will

24   quote from a U.S. Supreme Court case.

25          Quote [as read]:  An unconstitutional act is

PROCEEDINGS; February 29, 2024

1    not a law.  It confers no rights.  It imposes no

2    duties.  It affords no protection.  It creates no

3    office.  It is, in legal contemplation, as inoperative

4    as though it had never been passed.

5            That's *Norton v. Shelby County* --

6                THE COURT:  Right.  So, Mr. Benshoof --

7                MR. BENSHOOF:  -- 118 U.S. 425 (1886).

8                THE COURT:  -- until -- until you get an

9    order from the Court of Appeals saying that my order

10   was unconstitutional, it is a valid order, and you are

11   required to follow it.

12               MR. BENSHOOF:  Well, I understand that

13   that's the Court's position.  And my position is that

14   when we -- we all know it was obta- -- pain- --

15   obtained by fraud, it is yet another injustice.  Like,

16   this is the same game that's been going on for over two

17   and a half years.

18           Judge Keenan allowed, enabled, and facilitated

19   Nathan Cliber to suborn the perjury of Jessica Owen.

20   That is irrefutable, and Counsel won't even touch it

21   with a 10-foot pole.  Because --

22               THE COURT:  Sure.

23               MR. BENSHOOF:  -- they know it's a fact.

24   Okay?

25               THE COURT:  If it's irrefutable, then --

1    then --

2                    MR. BENSHOOF:  No, this is my time --

3                    THE COURT:  -- then I --

4                    MR. BENSHOOF:  -- isn't it, Your Honor?

5                    THE COURT:  Well, but I -- I want to

6    make --

7                    MR. BENSHOOF:  Why are you interrupting

8    me?

9                    THE COURT:  Well, I --

10                   MR. BENSHOOF:  You've asked me not to

11   interrupt you.

12                   THE COURT:  Right.  I'm interrupting

13   you --

14                   MR. BENSHOOF:  I'm going to ask you not to

15   interrupt me.

16                   THE COURT:  Because you --

17                   MR. BENSHOOF:  Thank you very much.

18                   THE COURT:  Well, I -- no, I can't.

19   Because at 2:00 o'clock, this hearing is going to end.

20   And I want to make sure that you address directly the

21   Court's concerns about whether you have violated this

22   order.

23        If you spend a lot of time arguing about --

24   about the past and your belief that the order is

25   fraudulent, you can -- you can waste your time and do

1  that.  I'm not going to reverse this order or -- or

2  vacate it.  So I -- I'm hoping you will directly

3  address the motion at hand, and I -- and I want to go

4  back to the beginning, actually: the reason why you

5  think my com- -- comments were so prejudicial.

6        I already decided that I'm going to grant the

7  motion.  I didn't need to hold this hearing.  This

8  hearing is at my discretion.  I had questions for the

9  moving party about the kind of sanctions they wanted

10  the Court to enter.

11        I did -- I do not need to hear oral argument

12  from you to grant this motion.  This was -- the motion

13  was filed without a request for oral argument, and I

14  was prepared to grant it without any oral argument.

15        I am permitting you to address the Court in

16  case there's more information that you think I should

17  know about before I formally grant the motion, and --

18  which is why I'm asking you to directly address the

19  motion and whether you violated the Court's order,

20  rather than spending your allotted time arguing about

21  the lead-up to the entry of my order and why you

22  believe it's fraudulent and unconstitutional.

23        Again, you're welcome to do that.  But if you

24  have information that's more dir- -- that more directly

25  answers my question as to whether you violated the

1    Court's order, I'd like to hear that.

2              MR. BENSHOOF:  Okay, Your Honor.  How many

3    minutes do I have to speak?

4              THE COURT:  Well, it's 1:23, and I need to

5    get back to the other matter at 2:00 o'clock.  I'd say

6    you have about 20 minutes.

7              MR. BENSHOOF:  Okay.  Thank you for

8    clarifying that, Your Honor.

9         It's my understanding, as a *pro se* litigant,

10   that once the Court decides to convene a hearing, which

11   the Court did, that I have a right to speak.  So how I

12   choose to spend that time and what statements and

13   evidence and law I think is relevant is my choice.  And

14   I would hope that all parties and the Court respects

15   that.

16             THE COURT:  There are limits.

17             MR. BENSHOOF:  So --

18             THE COURT:  But you may -- you may use

19   your time how you wish, Mr. Benshoof.

20             MR. BENSHOOF:  Thank you, Your Honor.  I

21   will also point out that I gave the Court the benefit

22   of the doubt that it had been fooled by counsels back

23   in January of 2023 that, despite the fact that Your

24   Honor had spent -- had just spent, I believe, a

25   two-year rotation in family court before this case

1    commenced, which is --

2                    THE COURT:  Do --

3                    MR. BENSHOOF:  -- why there was a delay --

4    that, despite that, I -- I gave the Court the benefit

5    of the doubt that maybe the Court just wasn't aware of

6    what the laws actually state.

7                    THE COURT:  So --

8                    MR. BENSHOOF:  And because --

9                    THE COURT:  -- just to correct you,

10   Mr. Benshoof, it was t- --

11                   MR. BENSHOOF:  I'm -- I'm talking, please.

12                   THE COURT:  -- it was --

13                   MR. BENSHOOF:  Thank you.

14                   THE COURT:  -- two years in dependency,

15   and I spent 20 years in a civil litigation practice.

16                   MR. BENSHOOF:  Thank you, Your Honor.

17                   THE COURT:  All right.

18                   MR. BENSHOOF:  So I gave the Court the

19   benefit of the doubt because, as I've stated in my

20   pleadings, I wasn't aware that opposing counsel were

21   moving under RCW 26.51 until months after the hearing

22   when I was able to obtain the transcript.

23           And, for the record, in that hearing, upon

24   further review, it was actually the Court that brought

25   up the *Kuhlmeyer* case, if I'm pronouncing that

PROCEEDINGS; February 29, 2024

1   correctly, and moving for an order restricting abusive

2   litigation under RCW 26.51.  So at present date,

3   plaintiff finds it hard to believe that the Court and

4   all opposing counsel were not fully aware prior to the

5   order being issued that this order was fraudulent.  It

6   was *void ab initio*.

7          And I've done my best to give everybody the

8   benefit of the doubt, everybody an opportunity to -- to

9   correct their errors, and I'm well aware that -- that

10  there is an appeal process for this.  But my position

11  is that any further attempts to enforce this order

12  constitute further fraud and [unintelligible] attempts

13  to silence me in violation of the First Amendment by

14  denying my right to redress under threats and

15  coercions.

16         Mr. Russ knows that Ms. Owen is a perjurer.

17  Mr. -- Mr. Tracy and Ms. Turner know that Mr. Cliber

18  suborned the perjury of Ms. Owen.  They've been served

19  lots of documents.

20         And so this whole clown show that I'm

21  supposedly the bad guy because I'm trying to protect my

22  son from ongoing abuse, and that I'm annoying and

23  somehow causing people problems because I keep speaking

24  the truth and trying to stop the ongoing abuse of my

25  son and the ongoing violations of state and federal

1    law, it's hard not to laugh when I hear attorneys and

2    judges continue this charade because that's all that it

3    is.

4              So to get back to the controlling law, as --

5    so that this is all on the record for the Court of

6    Appeals -- that's my purpose; it's not to change

7    anybody's opinions because it's obvious to plaintiff at

8    this point that attorneys and the Court have already

9    determined that they don't care about the law, they

10   don't care about the facts, they don't care about my

11   son, and the last thing they're going to let happen is

12   the fraud be admitted on the record.

13             So while parties and the Court may not wish to

14   admit it, I am going to further establish it for the

15   transcript for the Court of Appeals.  And -- and yeah.

16             So as I've said before the family court, even

17   if it had determined that I had committed domestic

18   violence, which it never did -- and if you read the

19   record, it shows that Ms. Owen actually committed

20   domestic violence.  I never did.

21             But the Court -- Mr. Keenan -- Judge Keenan

22   looked the other way on that, just like he looked the

23   other way on Mr. Cliber  suborning Ms. Owen's perjury,

24   just like Mr. Keenan -- Judge Keenan looked the other

25   way about the fact that Cliber brought a baritrous

1    [phonetic] petition to decide parentage, which was just

2    a ruse, because, as -- as Mr. Turner and Ms. Tracy are

3    well aware, Mr. Cliber is a family law attorney.  He

4    knows what RCW 26.26A.43A, subsection -- 435,

5    subsection (2) says.

6         It showed that the Court was collaterally

7    estopped and really should have invoked judicial

8    estoppel as soon as Mr. Cliber brought the parentage

9    action.  Because Ms. Owen's sworn statements, some of

10   which Mr. Cliber signed his name -- he undersigned his

11   name, which means, yes, there is proof he suborned her

12   perjury, Ms. Owen and Mr. Cliber were collaterally

13   estopped from Ms. Owen making materially -- mutually

14   exclusive material statements of fact between Case

15   Nos. 21-2-11149-8 and 21-5-00680-6.

16        That's exactly what she did.  But even more

17   hilarious, those statements, they were extrinsic and

18   collateral fraud.  Because what they did was she

19   took -- she took mutually exclusive positions, first

20   saying that I had acted as my son's father for all

21   12 years and that he was my child, 'cause he is, and

22   that we had lived together.

23        And then she -- then she had to take the

24   opposite position to make her parentage -- petition to

25   decide parentage seem plausible by saying that, Oh, no,

PROCEEDINGS; February 29, 2024

1   we had never lived together.  He's not the presumed

2   parent.  I don't know who the father is.  And he has no

3   parental rights.

4           It's a clown show.  So -- I hope that some of

5   you find it as funny as I do.  So e- -- as I was

6   saying, even if Judge Keenan had falsely claimed that I

7   had committed domestic violence, which he did not,

8   neither did Holloway, neither did any of the other

9   judges or commissioners.  Okay?

10          So no court has ever determined me to have

11  committed domestic violence.  That's irrefutable.  And

12  counsel here have yet to provide that proof because

13  they can't, and they know it.  And if I were them, I

14  would be embarrassed at this point.

15          But anyways, so even if I had committed

16  domestic violence, family court, Judge Keenan never had

17  jurisdiction.  I'm not saying that because I'm opposed

18  to the power of courts.  I'm saying it because any

19  first-year law student knows that a court only has

20  jurisdiction -- the authority to speak -- if it has

21  facts and matters in controversy before it which it is

22  duly authorized to adjudicate.

23          And as 26.26A.435, subsection (2) states --

24  and I will read it out for you [as read]:  A

25  presumption of parentage cannot be overcome after the

1  child attains four years of age.

2        They -- Judge Keenan did not have statutory

3  authority to hear anything or do anything.  And the

4  restraining orders that Judge Keenan issued, including

5  the final order, are also *void ab initio*.  Why?  Well,

6  let's -- let's look at RCW 26.09-point -- .050.  Sorry,

7  26.09-point -- yeah, .050.  And you'll find the same

8  thing in .060.

9        The Court had authority to issue a restraining

10  order under that statute in entering a de- -- decree of

11  dissolution of marriage or domestic partnership, legal

12  separation, or declaration of invalidity.  It was doing

13  none of those because, as I've said for two and --

14  well, two years, the Court never had evidence of

15  domestic relations.  It had no author- --

16              THE COURT:  Ten minutes remaining.

17              MR. BENSHOOF:  Thank you, Your Honor.  I'm

18  having fun.  I hope you are, too.

19        The Court never had authority to issue any

20  parenting plans as under RCW 26.09.004, subsections (3)

21  and (4), Permanent Parenting Plans and Temporary

22  Parenting Plans, just like the restraining orders under

23  26.09.050, subsection (1).  Those are -- those are

24  plans incorporated in any final decree or modification

25  of -- what's the magic words? -- dissolution of

1   marriage -- we were never married -- or domestic

2   partnership -- we were never in a domestic

3   partnership -- or a declaration of invalidity or a

4   legal separation.

5        So it's unfortunate.  I understand that the

6   Court and a- -- and counsel are maybe in an

7   uncomfortable position.  Because what annoying

8   Mr. Benshoof has done -- and I say "annoying" tongue in

9   cheek, because all I have been doing for two and a half

10  years is saying the facts and quoting the law.

11       What has been shown is that King County

12  Superior Court has been routinely violating the law,

13  violating people's rights.  I'm sure I'm not the only

14  one.

15       And we come to the final restraining order

16  granted by Judge Keenan on October 21st of 2022 based

17  upon the perjury by Jessica Owen, the suborning of her

18  perjury by Nathan Cliber, and Judge Keenan allowing,

19  enabling, and facilitating it.

20       And that restraining order says it ends in one

21  year or it ends on September 28, 2027.  Well, you don't

22  get to issue restraining orders for five years.  That's

23  not how the law works.  And it says Duration -- under

24  RCW 7.105, it says that they shall not be issued for

25  longer than one year.

1      Now, under RCW 7.105.315, subsection (2)(a),

2   it says, quote [as read]:  If a protection order

3   restrains the respondent from contacting the

4   respondent's children, the restraint must be for a

5   fixed period not to exceed one year.

6      Then it goes on to say this limina- --

7   limitation is not applic- -- applicable to protection

8   orders issued under RCW -- under Chapter 26.09.  I've

9   already documented why the Keenan Court never had

10  authority to issue anything -- parenting plan,

11  restraining orders, anything -- under 26.09.  So this

12  savings clause that shysters might want to cite as

13  reasons why Cliber and Keenan and Owen could issue a

14  restraining order that ends in 2027, that doesn't work.

15     So coming back around to the Court wishing to

16  issue so- -- you know, some sort of penalties or

17  sanctions for plaintiff continuing to cite the law,

18  state the facts, try to bring criminals to justice,

19  stop the ongoing fraud, and stop the ongoing abuse of

20  my son, well, let me come back to Mr. Russ bringing up

21  Judge Willie Gregory's restraining order that he

22  issued.  I believe it was on November 16th of 2022 in

23  Seattle Municipal Court Case No. 669329.

24     Now, I was there.  Nobody else was there.  So

25  [unintelligible] to consider.  And at that hearing,

1    I -- actually before the hearing, I filed a motion to

2    dismiss because I had irrefutable evidence, which

3    Seattle Municipal Court pros- -- City Prosecutor

4    Katrina Outland has not and cannot refuted that the

5    Court was proceeding without personal jurisdiction as

6    well as subject matter jurisdiction.

7          Why do I say that?  Because under

8    RCW 35.20.270, subsection (1) clearly states that a

9    municipality is required to -- to issue criminal

10   summons by personal service.  They don't do that.

11         And Ms. Outland later, in federal court -- or

12   no, sorry, sorry, in the -- in one of my writ- -- writs

13   of prohibition, King County Superior Court Case

14   No. 23-2-23749-8 -- in that she submitted a declaration

15   which admits that the City has a policy, custom,

16   practice, and procedure that they violate RCW 35.20.270

17   subsection (1).  That's just how they do it.  And

18   because they're the City, they get away with it.

19         And while I very much enjoyed the hour before

20   Judge Larrañaga, I think he was in a tough position as

21   a new judge because it would probably be professional

22   suicide for him to be the one judge that finally

23   acknowledges the facts and the law, which is that the

24   City of Seattle is an ongoing RICO crime syndicate,

25   which is another reason why people find me annoying

1  because I have the evidence of that.

2          So when Mr. Russ, amongst his many

3  prevarications, claimed that I had violated the,

4  quote/unquote, restraining order out of Seattle

5  Municipal Court issued by Judge Gregory, Judge Gregory

6  did not have jurisdiction to issue that.  I told them

7  on the record.

8          And it's coincidental that today in

9  Washington -- in Western Washington Case No. Two,

10  hyph- -- 2:23-CV-1392-JNW, today I filed an affidavit

11  of service against Judge Willie Gregory in his

12  individual capacity.  I filed a motion for entry of

13  default because Judge Gregory -- or, sorry, Willie

14  Gregory, in his individual capacity, he just hasn't

15  refuted any of his claims.

16          Now, why do you think Willie Gregory hasn't

17  refuted any of his claims?  Why do you think he ignored

18  the summons?  I wonder if anybody here is concerned

19  that city prosecutors, city judges --

20          Oh, did I mention that King County also failed

21  to answer the summons in that lawsuit.  Do you think it

22  could possibly be that all of these individuals are

23  faced with a difficult choice?  They either ignore the

24  summons and go in default, which is happening on a

25  daily basis, as happened with City of Seattle as

1   well --

2                  THE COURT:  Three --

3                  MR. BENSHOOF:  -- they're faced with the

4   tough choice because I've pled --

5                  THE COURT:  Three minutes.

6                  MR. BENSHOOF:  -- RICO allegations.  So

7   they're between a rock in a hard spot, Your Honor,

8   because if they answer the complaint and if they don't

9   get their motion to dismiss granted -- which good luck

10  with that -- then they're faced with videotaped

11  desposi- -- depositions under oath, and they're faced

12  with the prospect of taking the stand in a public

13  trial.

14           So it should come as no surprise that all of

15  these corrupt public officials and corrupt attorneys

16  and pathological liars like Ms. Owen, Ms. Lerman, and

17  Mr. Hermsen -- which I will remind the Court, their

18  s- -- their sworn affidavits last year that they

19  submitted, I submitted an affidavit in response,

20  pointing out point by point all of the perjury that --

21  that they committed.

22           But, of course, the Court doesn't care about

23  perjurers because, as long as you're lying about the

24  squeaky wheel, Mr. Benshoof, you can commit any crime

25  you want.  You can say any lie you want with impunity

1    because that's the clown-show world we live in.

2            So, you know, you may wish to get ahold of Dow

3    Constantine and ask him why the King County -- why I

4    motioned for entry of default.  Why didn't they answer

5    the complaint?  Why are all of these parties refusing

6    to answer summons?

7            So I find it hilarious when counsels -- when

8    counsel and judges accuse me of not respecting the law,

9    not respecting orders.  No, that's -- I'm laughing,

10   guys.

11           So I'm going to make this suggestion:  If you

12   guys all want to continue with this kangaroo-court

13   charade that I've ever lied about anything, that I have

14   ever violated any law, that I've ever violated any

15   valid order, then I suggest that you move for the death

16   penalty.

17           Oh, wait.  Sorry.  We rescinded that.

18   Probably 'cause there's so many pedophiles in the state

19   in positions of power, they really don't want that.  So

20   how about this?  Why don't you issue an order for --

21   for 10 years of imprisonment and let's make it a

22   million-dollars-per-day fine until I shut up.

23           That's my suggestion.  Thank you, Your Honor.

24                THE COURT:  Well, I don't know what I just

25   heard.  I heard -- but what I can say is that I heard

1   19 minutes of argument by Mr. Benshoof, none of which

2   had anything to do with the Court's order restricting

3   abusive litigation -- I mean, other than as

4   background -- and nothing directly addressing the

5   motion for sanctions and the contentions that that

6   order has been violated.

7          Everything else I heard related to a galaxy of

8   other legal actions and grievances that Mr. Benshoof

9   has that remarkably have not led to any judge agreeing

10  with him, in state or federal court at any level that

11  I'm aware of, although I could certainly be proven

12  wrong at the Court of Appeals.

13          MR. BENSHOOF:  That's called corruption,

14  Your Honor.

15          THE COURT:  I mean, it could be that every

16  judge in the state of Washington and the federal court

17  system is corrupted and prejudiced against you,

18  Mr. Benshoof.  But there are other possibilities that

19  you might consider as well.

20          Anything further, Mr. Tracy?

21          MR. TRACY:  No, Your Honor.  Thank you.

22          THE COURT:  All right.  The Court grants

23  the joint motions for contempt and for sanctions

24  against Mr. Benshoof for violating the Court's order

25  restricting his abusive litigation.  I do find that

1  he's in violation specifically in connection with his

2  filing of the two actions in federal court, the one

3  ending in 1392-JNW and the other ending in 01829-JHC.

4          My order required that Mr. Benshoof accomplish

5  a couple of things whenever he tried to bring a new

6  action against the protected parties to my order.  One

7  was file a copy of my order with those actions.  He did

8  in one case, but he buried it in hundreds or thousands

9  of pages of material so that it probably would not be

10 seen by the federal court judge.  But he didn't do so

11 in connection with the other action.

12         In neither action did he bring a motion for

13 permission to file the action in federal court, and in

14 that second action, although he characterized his

15 claims as counterclaims, they were definitely not

16 counterclaims.  He was suing the protected parties

17 under my order in federal court through a third-party

18 action.

19         It was within his power to comply with the

20 Court's order.  It was within his power to separately

21 file copies of my order in federal court.  He was -- it

22 was -- it was within his power to bring motions

23 requesting leave to file those claims, and he didn't do

24 it, and the Court has not heard anything today from

25 Mr. Benshoof explaining why.

1        And so accordingly, the Court orders the

2    following sanctions against him.  First, the moving

3    parties shall be entitled to their attorneys' fees in

4    bringing these sanctions motions, including the reply

5    briefing.

6        The Court will extend the expiration date of

7    the original order restricting abuse of litigation an

8    additional year.  The original term of the order, I

9    believe, was five years.  Let me see.

10        I should have highlighted this.  Where did I

11    put the expiration date here?  Oh, here it is on page 5

12    of my order.

13        Yes, and so it was originally five years from

14    the date of entry of the order, so March 31, 2028.  The

15    Court will extend that one year to March 31, 2029.  And

16    the reason for that is remedial.

17        Mr. Benshoof has forced the parties, the

18    protected parties, to spend many months dealing with

19    his new cases, this new abusive litigation in federal

20    court.  He's required the parties and their attorneys

21    to file this motion to seek remedial sanctions.  And

22    it's clear to the Court that he doesn't seem to have

23    any intention at all of complying with this Court's

24    order, which he views as fraudulent, notwithstanding

25    that the order has not been reversed by any Court of

1   Appeals.

2          The -- what I wanted to ask about in terms of

3   the sanctions is whether there is a basis for imposing

4   a daily sanction where I -- I think at least one of

5   those actions has been dismissed.  Is that -- is that

6   right?  I -- I -- have both of them -- have both of

7   them been dismissed?  I guess, is -- is it -- is it

8   moot at this point?

9          MR. TRACY:  Thank you, Your Honor.  Both

10  are actually still ongoing.  Both actions are -- have

11  pending motions to dismiss before Judge Whitehead.

12          THE COURT:  Okay.

13          MR. TRACY:  But he has not ordered on

14  either.

15          MR. RUSS:  And -- and, Your Honor, if I

16  may clarify, I believe those pending motions are just

17  for Mr. Cliber.  So Ms. Owen hasn't been served.  I

18  haven't been served.  So that, I guess --

19          MR. BENSHOOF:  Objection.  Ms. Owen was

20  served in a motion for entry of default.  So please

21  don't lie, Mr. Russ, although it is your --

22          MR. RUSS:  Right.  Well, I -- I guess

23  Mr. Benshoof's entitled to his opinion, but that --

24  that's my understanding.  So that -- those cases are

25  still pending as they relate to myself, Ms. Owen,

1  Ms. -- Mr. Admon, Ms. Lerman.

2              THE COURT:  All right.  And I -- I'm

3  wondering what the practical effect would be if the

4  Court were to impose a daily fine requiring

5  Mr. Benshoof to comply -- in other words, requiring him

6  to bring a motion for leave in the federal court?  I

7  guess my -- I guess my question is, Would that be

8  creating more work for you and your clients?  Would

9  that be -- potentially be creating more harm in having

10 to litigate that motion for leave?

11             I mean, the -- the action's already underway.

12             MR. TRACY:  Thanks, Judge Ferguson.  So

13 from Mr. Cliber's perspective, the -- the briefing on

14 the first filed action, the 01392, the briefing is

15 complete.  So forcing Mr. Benshoof to file the leave

16 motion I don't think, in our estimation, would really

17 add to our plate in that action.

18             The briefing for the other action will

19 conclude this week.  And so I -- I don't see that that

20 would cause us any additional, you know, delay or -- or

21 stress.  So...

22             And as Mr. Russ noted, only Mr. Cliber has

23 appeared and moved to dismiss.  So all of the other

24 affected individuals would still be part of those

25 actions even if we were successful on our motions.

```
 1              THE COURT:  Okay.  And then requiring
 2   Mr. Benshoof to separately file a copy of the -- of my
 3   order in those actions is -- would that impact the
 4   litigation in any way?  Have -- have the parties
 5   already litigated over that order in any way?  I
 6   guess --
 7              MR. RUSS:  So in -- in -- in both, Your
 8   Honor -- so in -- in the first action, you know, we --
 9   we dug through the pile and found it and cited to it in
10   our motion to dismiss.  And in the second action, we
11   actually filed a copy of it as part of our motion to
12   dismiss.
13          So it is in the record in both actions now,
14   though I will note that, when we filed this present
15   motion, we hadn't got to that stage in those other
16   litigation.  So they had not been filed at that point.
17              THE COURT:  All right.  Then I -- what I'm
18   inclined to do is award additional attorneys' fees for
19   the effort it took for you to bring the Court's abusive
20   litigation order to the federal court's attention.
21          In other words, I -- I -- at this point, I
22   don't think we need to rely on Mr. Benshoof to bring
23   that order to the Court's attention.  It's already been
24   done, and I think if I were to enter a daily fine to
25   get him to do that, a reviewing court might question
```

1     whether that was really necessary given that it's

2     already been -- already been brought to the federal

3     court's attention.

4          But I -- I think you and your clients are

5     entitled to be compensated for the time it took for you

6     to bring it to the federal court's attention.  And so

7     if you want to include your time in your fee petitions

8     for attorneys' fees for that work, the Court would

9     compensate the parties for that as a remedial sanction.

10         I would like the contempt order to clarify,

11    f- -- for the benefit of Mr. Benshoof, that, going

12    forward, the Court's requirements regarding filing a

13    leave motion and filing a copy of the Court's order

14    unequivocally applies to all claims, counterclaims,

15    third-party actions, cross-claims, any action of any

16    nature whatsoever against the parties protected by the

17    order.

18          This is not a new term that I'm adding to the

19    order.  The order already contained very broad language

20    covering every action of any na- -- of any kind

21    whatsoever.  But I would like this contempt order to

22    clarify that we'r- -- this specifically covers

23    counterclaims and third-party claims and cross-claims

24    and any other kind of claim.

25          And while I am not imposing jail time and I'm

1    not convening a further hearing and I'm not appointing

2    Mr. Benshoof a public defender, that we may be

3    escalating toward that type of a sanction, whether as a

4    remedial sanction or potentially, down the road, even

5    as a punitive sanction.  If -- if things get that bad,

6    jail time is a possibility, including the issuance of a

7    bench warrant.  But I'm not ordering that today.

8           Would you, Mr. Tracy or Mr. Russ, prepare an

9    order?  I --

10          MR. TRACY:  Yes, Your Honor.

11          THE COURT:  I did review the order that --

12   Mr. Tracy, that you submitted laying out the findings

13   of fact.  That does comport with the Court's oral

14   ruling here.  And so -- and so you could include that

15   language as well.

16          MR. TRACY:  Okay.

17          MR. RUSS:  And -- and, Your Honor, just

18   one issue for clarification I want to point out.  So

19   Ms. Owen nor myself nor Mr. Admon nor Ms. Lerman have

20   participated in the federal court action to this point.

21          We -- we do believe that your order had a very

22   good procedural requirement in it in that, before

23   proceeding against these persons covered by the order,

24   there would be some sort of leave sought from the

25   federal court.

1          Given we --

2               THE COURT:  I see.

3               MR. RUSS:  -- we haven't filed a motion,

4     it's -- by not -- by not requiring Mr. Benshoof to

5     comply with that aspect of the order, we still...

6               THE COURT:  That's a fair point, actually.

7     I -- that's a fair point.

8               MR. BENSHOOF:  Oh, yeah.  Good point.

9     Um-hmm.

10              THE COURT:  So, Mr. Russ, the Court will

11    amend its order specifically as to your client and

12    Mr. Lerman [as said].  And I don't recall if

13    Mr. Hermsen was a -- was also a party, but as to any

14    other parties who have not yet been served or have been

15    participating in federal court, if Mr. Benshoof intends

16    to proceed with -- to the extent that he intends to

17    proceed with those actions, then the Court will order

18    that he comply with the Court's order and bring a

19    motion requesting leave to pursue those actions in the

20    federal courts.

21              MR. BENSHOOF:  So I'm not clear on what --

22    is this -- this is an additional stipulation for new

23    actions or the Court is --

24              THE COURT:  So...

25              MR. BENSHOOF:  -- asserting the --

1              THE COURT:  Sure.

2              MR. BENSHOOF:  -- jurisdiction to

3     impose...

4              THE COURT:  Oh, no, no.  No, I'm -- I'm

5     happy to clarify, Mr. Benshoof.

6         So I'm looking at the action, just for

7     example, in the Western District of Washington under

8     Case No. 2:23-CV-01829-JHC.  That's the one where

9     you've brought third-party claims and tried to disguise

10    them as counterclaims against Mr. Cliber --

11             MR. BENSHOOF:  Objection.  I did not

12    disguise anything.  It's a joi- -- it -- I did a

13    joinder and a counterclaim.

14             THE COURT:  -- against Mr. Cliber --

15             MR. BENSHOOF:  So I -- I object

16    [unintelligible] --

17             THE COURT:  -- Ms. Lerman, Je- -- Jessica

18    Owen, and Mr. Russ.

19         In that case, I understand Mr. Russ to be

20    arguing that his client and perhaps others have not yet

21    been participating in that action, and -- but it is

22    still ongoing against them.

23         And so there's no -- for example, there's no

24    motion to dismiss them out of the action, is my

25    understanding.  And so --

 1                   MR. BENSHOOF:  That -- that is correct,

 2      Your Honor.  Because --

 3                   THE COURT:   Right.  And so, Mr. Benshoof,

 4      let me -- let me finish.  I'm explaining to you --

 5                   MR. BENSHOOF:  Okay.

 6                   THE COURT:  -- my order.  And because that

 7      is the case and because you have not yet complied with

 8      my order to seek leave from the federal court to sue

 9      them, I'm going to impose a daily sanction against you.

10           I'm going to give you some time to comply.

11      I'm going to -- I'm going to give you one week to

12      comply with the Court's order.  And that's one calendar

13      week.

14           I'm going to -- and then after that calendar

15      week expires, you -- the parties will be entitled to a

16      daily sanction of $250 for each day that you don't

17      comply with the Court's order.  And that's $250 per

18      party.  That's $250 for --

19           Mr. Russ, are -- you're a party yourself,

20      Mr. Russ, aren't you?

21                   MR. RUSS:  Apparently so.  Right.  I

22      haven't been served, but I -- I've been named.  I think

23      I've been named three times by Mr. Benshoof

24      [unintelligible].

25                   MR. BENSHOOF:  And so, Your Honor, are you

1    saying that -- that, despite the fact that, for

2    example, Ms. Owen was already served summons and

3    complaint signed for by her prostitute perjurer

4    girlfriend, Defendant Magalie Lerman --

5                    THE COURT:  Well, it's --

6                    MR. BENSHOOF:  -- that even though she was

7    served --

8                    THE COURT:  -- it's not --

9                    MR. BENSHOOF:  -- summons and complaint --

10                   THE COURT:  It -- it's not -- it's not a

11   service issue, Mr. Benshoof.  It's not even about --

12   the question isn't service.  You need the Court's

13   permission to pursue an action because I have entered

14   that abusive-litigation order against you.

15          And so you need to comply with my order and

16   bring a motion in federal court asking for that Court's

17   permission to proceed with the action against those

18   parties, and you have a week to come into compliance.

19   If you don't bring that motion in one week from today

20   in compliance with the Court's order, then sanctions

21   will accrue in the amount of $250 per party per day.

22          Now, if between now and then you dismiss all

23   the parties out of the lawsuit, then there will be no

24   sanctions.  If, between now and then, you -- you comply

25   with the Court's order and bring that motion, there

1    will be no daily sanction.  But if you don't bring that

2    order within a week, it's 250 per party per day.

3                    MR. RUSS:  And, Your Honor, just one other

4    point of clarification.  So -- and I -- I recognize the

5    procedural history is irregular here.

6              There are a total of two pending federal court

7    lawsuits where persons covered by the order are named

8    who have not moved to dismiss.  There was a previously

9    filed lawsuit that was assigned to Judge Jones that was

10   dismissed with prejudice.  It's already gone up on

11   appeal --

12                    THE COURT:  Right.

13                    MR. RUSS:  -- and it's been mandated.

14            So there -- there are -- there are currently

15   two actions pending.  Is it the Court's intention to

16   bring -- to require Mr. Benshoof to -- to bring a

17   motion to leave or -- and/or dismiss in both actions

18   that are still pending?

19                    THE COURT:  Yes.  And if you fi- --

20                    MR. RUSS:  And would it be two hundred --

21   excuse me.

22                    THE COURT:  And -- and also any new cases.

23   If he files -- if he's got a new case in the hopper

24   that I don't know about, then he shall bring a motion

25   in that case as well.

MITCHELL REALTIME REPORTING

1          MR. BENSHOOF:  So that's a good question,

2     Your Honor.  Thank you very much for bringing that to

3     my attention.

4          In the event, hypothetically, of course, that

5     I were to file for a federal injunction to enjoin the

6     Court and all parties from continuing what plaintiff

7     alleges to be ongoing fraud, are -- are you suggesting

8     that even if parties aren't named, but I'm only seeking

9     to enjoin the Court's enforcement of the order, should

10     I also -- is your position that the Court is requiring

11     me to file a motion for that as well or only when

12     parties named in the oral are in question?

13          THE COURT:  So I want to make sure I

14     understand.  If you go to federal court to get an

15     injunction to stop the enforcement of my order --

16          MR. BENSHOOF:  Right.

17          THE COURT:  -- and if you name the parties

18     to this lawsuit in that lawsuit, would my order apply?

19          MR. BENSHOOF:  No, no.  Sorry.  That

20     was -- I didn't mean to be confusing.  If the

21     injunction that I seek is only naming, you know, say,

22     King County Superior Court, is -- are you req- --

23     requesting that I file a motion for leave on that as

24     well or only when I name the defendants?

25          THE COURT:  Well, I can't really speculate

```
 1    about what your -- that lawsuit would look like.
 2               MR. BENSHOOF:  No.  Just a --
 3               THE COURT:  I --
 4               MR. BENSHOOF:  -- petition for injunction.
 5               THE COURT:  Right.  But I -- I don't know
 6    who you're going to name in that action.  If it were
 7    just King County, I'm not going to sit here and say
 8    that my order wouldn't apply.  It would -- it would be
 9    ten- -- it would depend on the claims that you're
10    actually asserting in your complaint.
11          Just because you caption it as against King
12    County, but then you make cla- --
13               MR. BENSHOOF:  Oh, so --
14               THE COURT:  -- but then you -- no, no, let
15    me --
16               MR. BENSHOOF:  So now, is -- is --
17               THE COURT:  Don't -- don't interrupt.
18               MR. BENSHOOF:  Is the order so broad that
19    even if --
20               THE COURT:  No.  Mr. -- Mr. Benshoof?
21    Mr. Benshoof?
22               MR. BENSHOOF:  -- I have defendants --
23               THE COURT:   I'm -- I'm -- I'm
24    explaining.
25               MR. BENSHOOF:  -- named in there --
```

```
 1              THE COURT:  I -- I -- you asked me a
 2    question.
 3              MR. BENSHOOF:  How big is it going to get,
 4    Your Honor?
 5              THE COURT:  Mr. Benshoof, you asked me a
 6    question, and I'm explaining.  Because you -- you will
 7    caption -- you -- you have a track record,
 8    Mr. Benshoof.  You will caption a case one way, but
 9    then when you look at the actual complaint, you're
10    actually claiming something different.
11              And so if you -- if you identified only King
12    County as a party but then you asserted claims against
13    all the defendants in your complaint, then my order
14    would apply.  My order applies to any litigation you
15    bring against the protected parties, regardless of how
16    you caption it.
17              You could caption it against Mickey Mouse, for
18    all I care.  But if you're bringing claims against all
19    of the protected parties in the complaint, it won't
20    matter that it's just captioned against Mickey Mouse.
21              MR. BENSHOOF:  For -- for clarification,
22    Your Honor, I mean, I'm just a *pro se* litigant with a
23    high school education, but my understanding is an
24    injunction -- under FRCP 65, it has to specifically
25    name the parties being enjoined.
```

1           So is it the Court's position that, even

2    though an FR 65 -- FRCP 65 petition for injunction is

3    required under the federal rules to specifically name

4    the parties being enjoined and the specific acts being

5    enjoined, and even in the event that I'm specifically

6    only asking for the federal court to enjoin King County

7    Superior Court from enforcing a -- a *void ab initio*

8    order --

9                THE COURT:  Right.

10                MR. BENSHOOF:  -- is the Court's position

11    that, if I even mention the parties in there, that

12    somehow this oral also applies?  Is that the Court's

13    position?

14                THE COURT:  So, Mr. Benshoof, what you're

15    doing right now is asking me for an advisory opinion.

16    If I do ec- --

17                MR. BENSHOOF:  Oh, I'm asking you for the

18    terms --

19                THE COURT:  So let -- no.  No, no.  No,

20    no, Mr. -- Mr. Benshoof?

21                MR. BENSHOOF:  -- because the terms keep

22    changing --

23                THE COURT:  Mr. Benshoof?

24                MR. BENSHOOF:  -- Your Honor.

25                THE COURT:  You -- Mr. Benshoof, what

1    you're saying is if I, Mr. Benshoof, do something in

2    the future, am I going to be in violation of the

3    Court's order?  And the answer is, I don't know.  We'll

4    have to see.  I can't give you an advisory opinion.

5                MR. BENSHOOF:  That's -- objection.  Void

6    for vagueness.  I asked you a very specific question --

7                THE COURT:  Right.

8                MR. BENSHOOF:   -- about specific terms,

9    and you're playing word games.  So --

10                THE COURT:  No.

11                MR. BENSHOOF:  I object --

12                THE COURT:  What I'm tell- -- what I'm

13    telling you is the --

14                MR. BENSHOOF:  I note my objection for

15    appeal.

16                THE COURT:  That -- that's fine,

17    Mr. Benshoof.  What I'm telling you is I'm not allowed

18    to do the very thing that you're asking me to do.  I'm

19    not allowed to give advisory opinions.  I'm not allowed

20    to tell parties, if you do something in the future,

21    here's how it's going to play out.

22                MR. BENSHOOF:  I did not ask for advice.

23    I asked about the specific terms of what you're --

24                THE COURT:  Right.

25                MR. BENSHOOF:   -- alleging you have the

1    authority to do.  So I -- I note my objection for

2    appeal.  Thank you very much.

3              THE COURT:  All right, Mr. Benshoof.

4         Mr. Tracy, Mr. Russ, will you be able to

5    finalize the order?

6              MR. TRACY:  We -- we can, Your Honor.  One

7    more point of clarification on the drafting:  Does the

8    $250 per day per person apply to each lawsuit?  In

9    other words, it's four hundred -- it's $500 per day if

10   he does nothing, but if he files one motion, it'd be

11   250 per day?  Am I understanding that correctly?

12             THE COURT:  The 250 is intended to be the

13   total.  So if he only partially complies and he doesn't

14   comply in the other lawsuit, the -- the maximum is 250

15   per party per day.  And if he doesn't comply --

16             MR. TRACY:  Okay.  And --

17             THE COURT:  Or if -- if he doesn't comply

18   in both lawsuits, same thing:  250 per party per day.

19             MR. TRACY:  So there basically are two

20   conditions to compliance: motion in both lawsuits or

21   dismissal in both lawsuits?

22             THE COURT:  Correct.

23             MR. TRACY:   Am I understanding that?

24             THE COURT:  Yep.

25             MR. TRACY:  Okay.  Well, we'll -- we'll

1    write that up.

2                    THE COURT:  All right.

3           All right.  I do need to get to my next

4    matter.  I'll look for the order.  Once it's been

5    finalized, I'll get it entered.

6           That concludes this matter.  Thank you.

7                MR. TRACY:  Thank you, Your Honor.

8                MR. ADMON:  Thank you.

9

10                   (Transcription ends at 2:07 p.m.)

11                   (Recording ends at 2:07 p.m.)

12                   *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

**TRANSCRIPTION CERTIFICATE**

1

2

3      I, ELEANOR J. MITCHELL, the undersigned Certified Court

4  Reporter in and for the State of Washington, do hereby

5  certify:

6      That the foregoing transcript was transcribed under my

7  direction; that the transcript is true and accurate to the

8  best of my knowledge and ability to hear the audio; that I am

9  not a relative or employee of any attorney or counsel employed

10  by the parties hereto; nor am I financially interested in the

11  event of the cause.

12

13      **WITNESS MY HAND and DIGITAL SIGNATURE** this 16th day of

14  May 2024.

ELEANOR J. MITCHELL, RPR
Washington Certified Court Reporter, CCR 3006

**0379**

1

2

3

4

5

6

7

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND OF THE COUNTY OF KING**

| | |
|---|---|
| KURT BENSHOOF, | NO.  22-2-15958-8 SEA |
| Plaintiff, | **ORDER RESTRICTING ABUSIVE LITIGATION OF KURT BENSHOOF** |
| v. | |
| NATHAN CLIBER, JESSICA OWEN, MAGALIE LERMAN, and OWEN HERMSEN | |
| Defendants. | |

This Court has determined that Kurt Benshoof is a vexatious litigant, that he has engaged in an extensive pattern of abusive litigation and weaponization of the court system against Defendants, and that Defendants are entitled to entry of an order restricting Mr. Benshoof's ability to file abusive legal actions against them, their friends and family, and their respective counsel.  *See* Dkt. #177 (Order Granting Defendants' Joint Motion for a Vexatious Litigant Order Against Plaintiff, And <u>Temporary</u> Order Restricting Abusive Litigation By Kurt Benshoof).  The Court incorporates that order by reference as if set forth fully herein and makes the following additional findings and final orders:

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 1



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907



## PRIOR ABUSIVE FILINGS BY MR. BENSHOOF

### King County Superior Court Cause No. 22-2-02932-3 SEA

1.   On March 1, 2022, Mr. Benshoof filed his first of several complaints against Ms. Owen arising from his claim that Ms. Owen had converted his Toyota FJ Cruiser, which was titled in Ms. Owen's name.

2.   After Ms. Owen voluntarily transferred title to Plaintiff, that matter was dismissed.

3.   However, and despite the vehicle being voluntarily transferred to him, Plaintiff continued to allege facts in this case (and others) regarding the vehicle.

### King County Superior Court Cause No. 22-2-03826-8 SEA

1.   On March 16, 2022, Plaintiff filed another complaint against Ms. Owen.

2.   In that complaint, Mr. Benshoof alleged claims of constructive fraud and infliction of emotional distress relating to a previously shared residence (titled in Ms. Owen's name). Further, and similar to the allegations alleged in this matter, Mr. Benshoof claimed that Ms. Owen wrongfully filed police reports against him.

3.   On June 24, 2022, Ms. Owen filed a motion to dismiss Mr. Benshoof's claims in that lawsuit pursuant to CR 12(c). Judge Robertson granted Ms. Owen's motion on July 22, 2022, and his claims were dismissed with prejudice. Judge Robertson determined Mr. Benshoof's claims were either time-barred or failed to state a claim upon which relief could be granted.

4.   As to the claims concerning Ms. Owen's communications with law enforcement, those were dismissed because they did not remotely rise to anything close to a viable cause of action.

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 2

**0381**

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907

5.      Additionally, Judge Robertson's order admonished Mr. Benshoof's filings as follows:

> Plaintiff improperly attempt[ed] to "amend" the complaint via a filing of an "amended" complaint coupled with what purports to be criminal allegations. These items were all filed on 7/15/22 without leave of this court. Plaintiff failed to comply with CR 15 to permit an amendment of the complaint. However, *even if* this amended complaint were to be considered, it falls under the same merits as above [time-barred & failure to state a claim upon which relief can be granted].
>
> Plaintiff's Response to this motion was improper and untimely, and Plaintiff failed to follow local rules regarding service of working copies to the Court. However, the response was given consideration by this Court as if it were filed timely. In this Response, Plaintiff failed to provide any legal basis to deny Defendant's motion [to dismiss].

**King County Superior Court Case No. 22-2-1112-7 SEA**

1.      On July 18, 2022, Mr. Benshoof filed an 85-page Petition for Writ of Habeas Corpus and named Mr. Cliber, Judge David Keenan, Commissioner Jason Holloway, Ms. Owen, Ms. Lerman, and one other individual as Respondents. The writ was denied three days after it was filed and the case was dismissed.

**King County District Court Cause No. 22CIV11976KCX**

1.      On August 2, 2022, Mr. Benshoof attempted to obtain an anti-harassment protection order against Mr. Cliber based on Mr. Cliber's representation of Ms. Owen in the Parentage Action. The court denied Mr. Benshoof's request.

**U.S District Court for the Western District of Washington Cause No. 2:22-cv-01281-LK and King County Superior Court Cause No. 22-2-15745-3 SEA**

1.      Following Judge Robertson's dismissal of his claims, Mr. Benshoof filed two other complaints against Ms. Owen on September 9, 2022, and September 29, 2022, respectively.

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 3

**0382**



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1048
P/ 206.921.1971  F/ 206.921.9907

1     2.     In the first of these two actions (the "Federal Action"), Mr. Benshoof filed a

2   litany of allegations against dozens of people, including all named Defendants here and multiple

3   sitting King County Superior Court Judges.

4     3.     On September 26, 2022, Judge Lauren King dismissed Mr. Benshoof's nearly

5   300-page complaint *sua sponte*.

6     4.     Three days later, Mr. Benshoof filed another action which was nothing short of

7   a re-filing on the exact same claims previously dismissed by Judge Robertson (King Co. Sup.

8   Ct. No. 22-2-15745-3).

9   **King County Superior Court Cause No. 22-2-15958-8 SEA (this case)**

10     1.     On October 3, 2022, Mr. Benshoof filed the present action.  When Ms. Owen

11   sought to consolidate this matter with the other matter assigned to Judge Robertson, Mr.

12   Benshoof filed an affidavit of prejudice.  This was a concerted effort to circumvent the prior

13   orders of the Superior Court.

14     2.     This case marked the fifth civil complaint filed by Mr. Benshoof against Ms.

15   Owen in a nine-month period.  In this action, Mr. Benshoof cited to the above-mentioned,

16   previously adjudicated matters, King County Superior Court Cause Nos. 21-5-00680-6 SEA

17   and 21-2-11149-8 SEA, alleging, among other things, "Defendants Cliber and Owen illegally

18   or improperly perverted the King County Family Court system against Plaintiff."

19     3.     When Ms. Owen and Mr. Cliber availed themselves of the protections found in

20   Ch. 4.105 RCW, Mr. Benshoof responded by threatening to file yet more litigation against the

21   same parties arising out of the same "facts".

22     4.     On March 17, 2023, this Court dismissed the one remaining claim asserted by

23   Mr. Benshoof after having previously dismissed all other claims.

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 4

**TOMLINSON
BOMSZTYK
RUSS**

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1048
P/ 206.621.1871   F/ 206.621.9907

1      Based on the factual findings above, this Court concludes that Mr. Benshoof has

2  engaged in an extensive pattern of abusive litigation and weaponization of the court system

3  against these defendants, their friends and family, and their attorneys. This pattern of abusive

4  litigation has taken a significant emotional and financial burden on the defendants.

5  Accordingly, the Court imposes the following filing restrictions against Mr. Benshoof.

6                                 **FILING RESTRICTIONS**

7      Based on the pattern of abusive litigation detailed above, the court enters the following

8  filing restrictions which will apply to any and all future litigation Mr. Benshoof may attempt

9  to bring. These restrictions shall be in effect for five (5) years from the date of the entry of

10  this order.

11      1.     Kurt Benshoof is hereby **ENJOINED AND RESTRAINED**, in both an

12  individual and in any representative capacity, from initiating any litigation whatsoever in any

13  Superior Court in the state of Washington against Defendants, their attorneys, their friends

14  and family, or any other person related or connected to Defendants (collectively, "Persons

15  Covered by This Order"), <u>unless</u> Mr. Benshoof first obtains advanced approval from this

16  Court.

17      2.     To obtain advance approval from this Court, Mr. Benshoof shall submit an

18  application to the undersigned Judge/Department 31 in the form of a one-page document, in

19  twelve-point type, that provides a summary of the parties involved and the proposed claims

20  or issues.[1]  The proposed complaint/petition shall be attached to the summary. No other

21

22

23

---

[1] Mr. Benshoof shall submit the application by filing it under the current case caption, King County Superior Court Case No. 22-2-15958-8 SEA, with copies served via e-mail on all parties and counsel of record.

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 5

**0384**

TOMLINSON
BOMSZTYK
RUSS

1900 Second Avenue, Suite 3650,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9807

1  exhibits or attachments may be included.  The Court may, at its discretion, request a response

2  from Persons Covered by This Order before ruling on Mr. Benshoof's application.

3      3.     Any new case against Persons Covered by This Order filed by Mr. Benshoof

4  with Court approval in King County Superior Court shall be assigned to the undersigned

5  judge/Department 31.

6      4.     If Mr. Benshoof seeks to commence a new action against Persons Covered by

7  This Order in a court *other than* a Superior Court, Mr. Benshoof must first bring a motion in

8  the other court for leave to proceed with the action.  The motion must be filed

9  contemporaneous to the filing of the complaint or petition.  The motion for leave must

10  demonstrate that good cause exists to permit the action to proceed given the claims raised in

11  the new complaint and Mr. Benshoof's past litigation abuses.  If the reviewing court finds

12  good cause has not been show for the action to proceed, it may dismiss the action with

13  prejudice.  If the reviewing court determines that sanctions are warranted, it may impose

14  sanctions at the same time the action is dismissed.  Mr. Benshoof shall have an opportunity to

15  explain in writing why sanctions should not be imposed in a post-dismissal motion for

16  reconsideration within ten (10) days of the dismissal.

17      5.     Mr. Benshoof shall submit a copy of this Order with any future lawsuit he files

18  or attempts to file in any court, including (but not limited to) any federal court.

19      6.     If Mr. Benshoof fails to abide by the terms of this Order, any party may move,

20  or the Court *sua sponte* may move, for a finding of contempt and sanctions.  A contempt

21  finding could result in the imposition of jail time as a sanction.  The Court has attached the

22  Knight warnings to this Order.

23

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 6

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1048
P/ 206.621.1871   F/ 206.621.9907

**0385**

1        DONE this 31st day of March, 2023.

2

3                                            The Hon. Marshall Ferguson

4    Presented by:

5    GORDON REES SCULLY MANSUKHANI, LLP

6    By: /s/ Kyle J. Rekofke
     Kyle J. Rekofke, WSBA #49327
7    Attorney for Defendant Nathan Cliber

8

9    TOMLINSON BOMSZTYK RUSS

     By: _____
10   Anthony S. Marinella, WSBA #55611
     Attorney for Defendant Jessica Owen

11

12

13   ADMON LAW FIRM , PLLC

     By:____/s/ Moshe Y. Admon_____
14   Moshe Y. Admon
     Attorney for Defendants Lerman and Hermsen

15

16

17

18

19

20

21

22

23

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 7

**0386**

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3500,
Seattle, Washington 98104-1045
P/ 206.621.1871   F/ 206.621.9907

# CONTEMPT "KNIGHT" WARNING

1. If this court finds you in contempt of court, jail time is an immediate possibility. Consequently, you have a right to counsel.

2. You may hire private counsel at your own expense, but the court is referring you to the Department of Public Defense (formerly the Office of Public Defense) where an attorney will be provided if you cannot afford to hire private counsel. It is your responsibility to contact the Department of Public Defense for screening. You are being provided with the contact information for the Department of Public Defense with this notice.

3. If you do not contact the Department of Public Defense or hire private counsel, your conduct will be deemed dilatory, which means you have failed to follow through on your obligation. As a consequence, the court can find that you have forfeited your right to an attorney.

4. If you are found to have forfeited your right to an attorney, the court will require you to proceed in the matter without representation by counsel. Without an attorney, you risk failing to assert defenses to contempt or effectively explaining to the court why you should not be held in contempt. Without an attorney you also may miss an opportunity to present information that could mitigate or make less severe any sanctions imposed if you are found to be in contempt. Given that I have advised you that a possible sanction for contempt is jail, I urge you seek counsel now.

King County Superior Court

**King County**

**Department of**
**PUBLIC DEFENSE**
*Upholding the Constitution,*
*one client at a time.*

**Important notice to defendants accused**
**of a crime or involved in a dependency action**

If you cannot afford a lawyer, you must be screened and determined eligible for a public defender. **There are two ways to be interviewed:**
1. **Call the King County Department of Public Defense (DPD) at (206) 477-9727**
*Monday through Friday from 8 a.m. to 5 p.m.*

2. **Report in person to a DPD screening office:**
**King County Courthouse, 516 3rd Ave, Room E-820, Seattle**
*Mondays and Wednesdays from 8 a.m. to 5 p.m.*

**Maleng Regional Justice Center, 401 4th Ave North, Kent, WA 98032**
**Room 1-B**
*Tuesdays and Wednesdays from 8 a.m. to 5 p.m.*
You can also email DPDScreening@kingcounty.gov to have a DPD screener contact you.

You will likely have a better outcome if you discuss your case with your attorney as soon as possible. To see if you qualify for a public defender, contact DPD immediately. Even if an attorney was originally assigned to you while you were in custody, you must still call DPD upon release to see if you continue to qualify. SCREEN EARLY! DON'T WAIT!

**Aviso importante a los acusados, acusado de un delito o**
**involucrados en un caso de dependencia**
Si usted no puede pagar a un abogado, debe ser entrevistado y
determinado elegible para tener un defensor público. Hay dos
maneras para hacer la entrevista:

**King County**

**Department of**
**PUBLIC DEFENSE**
*Upholding the Constitution,*
*one client at a time.*

1. Llame el Departamento del Condado de King de los
Defensores Publicos (DPD) en (206) 477-9727 el lunes al viernes desde a las 8:00 AM
– 5:00 PM
2. Aparecer en persona a la Oficina de Defensores Publicos a:
King County Courthouse, 516 3rd Ave, Seattle, WA 98104
**Los lunes y miercoles entre los horarios 8:00 AM – 5:00 PM**
Maleng Regional Justice Center, 401 4th Ave North, Kent, WA 98032
Sala 1-B
**Los martes y miercoles entre los horarios 8:00 AM – 5:00 PM**

Usted podria tener los mejores resultados si puede discutir sobre su caso con su abogado lo
mas pronto que sea posible. Para averiguar si usted califique por tener un defensor publico,
debe comunicarse con DPD inmediatamente aunque ha tenido un defensor publico mientras
usted estaba encarcelado, aun debe comunicarse con DPD cuando salga de la carcel para
averiguar si sigue ser elegible. Haga su entrevista pronto.
Usted tambien puede mandar un email a DPDScreening@kingcounty.gov para comunicarse con
uno de los entrevistadores.

King County Superior Court

**0388**

1

2

3

4

FILED
2024 MAR 01 02:30 PM    The Honorable Marshall Ferguson
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 22-2-15958-8 SEA

5

6

7

8

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

9

KURT BENSHOOF,

10

Plaintiff,

11

v.

12

NATHAN CLIBER, JESSICA OWEN and
MAGALIE LERMAN,

13

14

Defendants.

Case No. 22-2-15958-8 SEA

**ORDER FINDING OF CONTEMPT
AND IMPOSING SANCTIONS
AGAINST PLAINTIFF KURT
BENSHOOF**

15

16

17

18

19

This matter comes before the Court on Defendant Nathan Cliber's Motion for Finding of Contempt and Sanctions Against Plaintiff Kurt Benshoof ("Cliber's Motion"), Defendant Jessica Owen's Motion for Finding and Contempt and Sanctions Against Plaintiff Kurt Benshoof ("Owen's Motion"). The Court considered the arguments of the parties, the documents and pleadings on file herein, including the following:

20

- Cliber's Motion;

21

- The Declaration of Sarah N. Turner in Support of Cliber's Motion;

22

- Plaintiff's Opposition to Cliber's Motion;

23

- Defendant Nathan Cliber's Reply in Support of Cliber's Motion;

24

- Owen's Motion;

25

- The Declaration of Jessica Owen in Support of Owen's Motion;

26

- The Declaration of Paige Gagliardi in Support of Owen's Motion;

ORDER FINDING OF CONTEMPT AND IMPOSING
SANCTIONS AGAINST PLAINTIFF KURT BENSHOOF - 1

GORDON REES SCULLY
MANSUKHANI, LLP
Attorneys at Law
701 5th Avenue, Suite 2100
Seattle, Washington 98104
(206) 695-5100

**0389**

- The Declaration of Moshe Y. Admon in Support of Cliber's and Owen's Motions;

- Plaintiff's Opposition to Owen's Motion; and

- Defendant Jessica Owen's Reply in Support of Owen's Motion.

Based upon such review and consideration, the Court GRANTS both Cliber's Motion and Owen's Motion, and enters the following FINDINGS OF FACT and CONCLUSIONS OF LAW:

1.    Plaintiff has disregarded and failed to comply with this Court's Order Restricting Abusive Litigation of Kurt Benshoof (the "Abusive Litigation Order") (Dkt. 189) in his filing and attempted service of new claims and causes of action in Western District of Washington Case No. 2:23-cv-01392-JNW and Western District of Washington Case No. 2:23-cv-01829-JHC (now JNW) upon Defendants Nathan Cliber, Jessica Owen, and the other "Persons Covered by This Order" (as those persons are defined in the Abusive Litigation Order);

2.    Specifically, Plaintiff failed to file a contemporaneous motion for leave to proceed with his claims against Mr. Cliber, Jessica Owen and other Persons Covered by This Order (as those persons are defined in the Abusive Litigation Order) in both Case No. 2:23-cv-01392-JNW and Case No. 2:23-cv-01829-JHC, as required by the Abusive Litigation Order (at p. 6, ¶ 4);

3.    Plaintiff also failed to file a copy of the Abusive Litigation Order with the federal court in Case No. 2:23-cv-01829-JHC, as required by the Abusive Litigation Order (at p. 6, ¶ 5);

4.    In Case No. 2:23-cv-01392-JNW, Plaintiff did file a copy of the Abusive Litigation Order, but he did so by burying the order among 2,034 pages of exhibits to his complaint. Plaintiff filed a 184-page original complaint and later a 280-page amended complaint in Case No. 2:23-cv-01392-JNW. Plaintiff's 2,034-page exhibit filing occurred on September 26, 2023, seven calendar days after Plaintiff filed the original complaint. Within the 2,034 pages of exhibits, the Abusive Litigation Order can be found at Pages 563 through 571. Plaintiff buried the Abusive Litigation Order among numerous other exhibits to reduce the likelihood that the federal court would become aware of the order;

ORDER FINDING OF CONTEMPT AND
SANCTIONS AGAINST PLAINTIFF KURT BENSHOOF - 2

GORDON REES SCULLY
MANSUKHANI, LLP
Attorneys at Law
701 5th Avenue, Suite 2100
Seattle, Washington 98101
(206) 695-5100

5.      Plaintiff is in contempt of court for violating the Abusive Litigation Order.

6.      The Abusive Litigation Order warned Mr. Benshoof that if he "fails to abide by the terms this Order, any party may move, or the Court *sua sponte* may move, for a finding of contempt and sanctions.  A contempt finding could result in the imposition of jail time as a sanction." Abusive Litigation Order (p. 6, ¶ 6);

7.      The Abusive Litigation Order included the <u>Knight</u>[1] warnings as an attachment;

8.      The Abusive Litigation Order clearly and unequivocally states that the filing restrictions in the order "apply to any and all future litigation Mr. Benshoof may attempt to bring" against the protected persons.  Abusive Litigation Order, p. 5.  The order further states that Mr. Benshoof is "**ENJOINED AND RESTRAINED**…from initiating any litigation whatsoever in any Superior Court in the state of Washington… <u>unless</u> Mr. Benshoof first obtains advanced approval from this Court" and that "If Mr. Benshoof seeks to commence a new action…in a court *other than* a Superior Court, Mr. Benshoof must first bring a motion in the other court for leave to proceed with the action."  Id., p. 5, ¶ 1 and p. 6, ¶ 4.  Although the Abusive Litigation Order is clear and unambiguous, the Court now clarifies, as guidance for Mr. Benshoof, that terms like "any and all future litigation" and "new action" in the Abusive Litigation Order include all claims, counterclaims, crossclaims, third party actions, and any other claims whatsoever brought by Mr. Benshoof in any court against the "Persons Covered by This Order" as defined in the Abusive Litigation Order.

9.      Although the present Order does not include jail time as a sanction, any future violation(s) of the Abusive Litigation Order by Mr. Benshoof could potentially result in jail time as a remedial or punitive sanction.

///

///

---

[1] *State ex rel. Schmitz v. Knight*, 142 Wn. App. 291, 174 P.3d 1198 (2007).

ORDER FINDING OF CONTEMPT AND
SANCTIONS AGAINST PLAINTIFF KURT BENSHOOF - 3

GORDON REES SCULLY
MANSUKHANI, LLP
Attorneys at Law
701 5th Avenue, Suite 2100
Seattle, Washington  98104
(206) 695-5100

**0391**

Based upon the above findings of fact and conclusions of law, the Court ORDERS the following sanctions:

A.     Mr. Benshoof is ordered to pay the attorneys' fees and costs incurred by Defendants in bringing their respective motions for finding of contempt and sanctions against Mr. Benshoof, including supporting filings, declarations, and replies.  Defendants shall submit their respective fee petitions to the Court within **14 days** of this Order.

B.     Mr. Benshoof shall pay the attorneys' fees and costs incurred by Mr. Cliber in bringing the Abusive Litigation Order to the attention of the federal court in Western District of Washington Case No. 2:23-cv-01392-JNW and Western District of Washington Case No. 2:23-cv-01829-JHC (now JNW).  Mr. Cliber shall submit his fee petition to the Court within **14 days** of this Order.

C.     The Abusive Litigation Order's expiration date is extended by one year, to **March 31, 2029**.

D.     Mr. Benshoof shall file the leave motion ("Leave Motion") required by the Abusive Litigation Order in both Western District of Washington Case No. 2:23-cv-01392-JNW and Western District of Washington Case No. 2:23-cv-01829-JHC (now JNW) as to any and all Persons Covered by This Order, excluding Mr. Cliber, and including Moshe Admon, Owen Hermsen, Magalie Lerman, Jessica Owen, and Blair Russ (collectively, "Other Named Defendants Covered by this Order").  Such motion ("Leave Motion") shall be captioned "Motion for Leave to Proceed Against Certain Parties in Accordance with the Order Restricting the Abusive Litigation of Kurt Benshoof" and shall conspicuously identify the Abusive Litigation Order in the statement of facts.  Plaintiff shall attach a copy of the Abusive Litigation Order as an exhibit to a separately filed supporting declaration, appendix, or addendum to the Leave Motion.

E.     Upon filing the Leave Motions, Mr. Benshoof shall file proof in this action of such filings in the federal court cases.  Absent obtaining leave to proceed against the Other Named

ORDER FINDING OF CONTEMPT AND
SANCTIONS AGAINST PLAINTIFF KURT BENSHOOF - 4

GORDON REES SCULLY
MANSUKHANI, LLP
Attorneys at Law
701 5th Avenue, Suite 2100
Seattle, Washington  98104
(206) 695-5100

**0392**

Defendants Covered by this Order, Mr. Benshoof shall refrain from taking any action in pursuit of his claims against those individuals including but not limited to, attempting effectuate service and seeking affirmative relief in any form. To the extent necessary to comply with an impending deadline, Mr. Benshoof may seek to extend that deadline to an extent necessary to accommodate a ruling on the Leave Motion.

F.       **Beginning one calendar week from the entry of this Order, for each day Mr. Benshoof has failed to the file the Abusive Litigation Order's required leave motion in BOTH pending actions, or otherwise dismissed claims in those actions against the Other Named Defendants Covered by This Order, an ongoing remedial sanction shall be entered against him in the amount of $250 per day, per Other Defendant Covered by This Order.** Mr. Benshoof shall deposit such accrued amounts in the King County Superior Court Registry under this cause number and the Other Named Defendants may, at their option, apply for disbursement or seek to enter a judgment for any accrued amounts not so deposited.

G.       For any further legal proceedings filed by Mr. Benshoof in violation of the Abusive Litigation Order, he shall be assessed, in addition to any other sanction which may be imposed, a per diem sanction of $250.00 per day per Person Covered by the Order named as a defendant in such action.

DATED this 1st day of March, 2024.

_____
THE HONORABLE MARSHALL FERGUSON

ORDER FINDING OF CONTEMPT AND
SANCTIONS AGAINST PLAINTIFF KURT BENSHOOF - 5

GORDON REES SCULLY
MANSUKHANI, LLP
Attorneys at Law
701 5th Avenue, Suite 2100
Seattle, Washington 98101
(206) 695-5100

**0393**

King County Superior Court
Judicial Electronic Signature Page

Case Number:         22-2-15958-8
Case Title:          BENSHOOF VS CLIBER ET AL

Document Title:      ORDER  RE CONTEMPT SANCTIONS


Signed By:           Marshall Ferguson
Date:                March 01, 2024

_____

Judge:  Marshall Ferguson


This document is signed in accordance with the provisions in GR 30.

Certificate Hash:              A4ABB09C7C1D81F742E845B69E1C4CD6FEAA5E8C
Certificate effective date:    7/17/2023 2:21:34 PM
Certificate expiry date:       7/17/2028 2:21:34 PM
Certificate Issued by:         C=US, E=kcscefiling@kingcounty.gov, OU=KCDJA,
                               O=KCDJA, CN="Marshall Ferguson:
                               8skMktsk7hG1yuM6zbJ6iw=="

Page 6 of 6

**0394**