Hon. Pooja Vaddadi
Courtroom 902

IN THE MUNICIPAL COURT FOR THE CITY OF SEATTLE
KING COUNTY, STATE OF WASHINGTON

| | |
|---|---|
| CITY OF SEATTLE, | CASE NO.  656748 |
| Plaintiff, | |
| v. | MOTION TO DISMISS |
| KURT BENSHOOF, | |
| Alleged Defendant. | |

## I.    INTRODUCTION

COMES NOW Alleged Defendant Kurt Benshoof ("Benshoof") by Special Appearance, objecting to the City of Seattle's ("City") assertion of jurisdiction, and moving the Court to immediately dismiss the instant case for lack of *in personam* jurisdiction, lack of subject matter jurisdiction, and absence of statutory authority to proceed.

The Court should take note that the numerous unlawful arrests of Benshoof in 2020 were then used by Jessica R. Owen ("Owen"), the mother of Benshoof's minor son, A.R.W., as part of Owen's perjurious, barratrous scheme to seize total custody of their son in violation of

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1001**

Benshoof's right of association starting in 2021. Then, City officials allowed, enabled, facilitated and perpetrated additional unlawful arrests and malicious prosecutions derivative of Owen's family court perjury and barratry far worse than what occurred in *Burrill v. Burrill,* 56 Wash. P.3d 993 (2002).

## II.     VERIFIED STATEMENTS OF FACT

Benshoof avers the following statements and is prepared to testify to these facts in a court of law authorized and convened under the Washington Constitution. Benshoof incorporates by reference as if fully restated herein the following documents filed in U.S. District Court for the Western District of Washington Case No. 2:23-01392-JNW: Complaint (Dkt. #9) Exhibits (Dkt. #13-1; #13-2; and #13-3)

All *emphasis* that of Benshoof.

### A.  Benshoof's Religious Beliefs

Benshoof's religious beliefs precluded him from being coerced or forced to wear a face mask or face shield (collectively "face covering"). Benshoof's beliefs preclude injecting his body with a covid-19 "vaccine." In common parlance, "My body, my choice."

Benshoof's firmly held religious beliefs constitute a protected class, prohibited from discrimination and retaliation by government officials or private individuals in joint action with state actors, regardless of whether they Benshoof's beliefs are deemed heterodox or orthodox.

RCW 9.91.010 and Title II of the Civil Rights Act of 1964 prohibited government officials, or private individuals in joint action with state actors, from discriminating against Benshoof in violation of his Creed.

### B.  Benshoof's Disability

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 2 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1002**

Benshoof was sexually abused as a child by someone in a position of trust and authority; as such, demands by defendants that Benshoof restrict his breathing or cover his face were perceived by Benshoof as particularly *abusive* and *triggering.*

Benshoof has one, or more, invisible disabilities protected by Titles II and III of the Americans with Disabilities Act ("ADA"), as well as Washington laws against discrimination including, but not limited to, RCW 49.60.030.

## C. PCC Community Markets

On, or around, September 6, 2020, PCC Community Markets ("PCC") instituted a "No Mask, No Entry" policy. PCC employees asserted the authority to deny Benshoof in-store services as a public accommodation pursuant to Governor Inslee's covid proclamations.

PCC employees allowed the wearing of a face shield in lieu of a face mask.

Seattle Police Department ("SPD") officers and PCC employees believed that Benshoof was protesting the face covering proclamations, orders and policies of Washington State, King County, City of Seattle, and public accommodations such as PCC.

Benshoof informed PCC employees and SPD officers that he had a disability precluding him from being coerced to wear a face covering as a condition of entrance to PCC. Benshoof was offered a face shield in lieu of a face mask.

Benshoof declined the offer and reminded PCC employees that the Washington Department of Health informed the public in 2020 that "the use of face shields alone is currently viewed as serving no purpose or providing any protection from the transmission of COVID-19." (Dkt. #13-2 at 483)

Benshoof informed PCC employees and SPD officers that their offer to interchange face masks with face shields was *prima facie* evidence that PCC's "No Mask, No Entry" store policy

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 3 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1003**

was absurd, arbitrary and capricious, and discriminatory.  PCC employees and SPD officers refused to acknowledge this.

If not for Benshoof's class and disability, PCC employees: (1) would have served Benshoof at the deli; (2) would have served Benshoof at the checkout stand; (3) would not have set in motion a series of events which would foreseeably lead to the unlawful imprisonment of Benshoof; and (4) would have allowed Benshoof to use his credit card and thereupon engage in interstate commerce.

If not for Benshoof's class and disability: (1) SPD officers would not have interfered with Benshoof's shopping, nor accused him of any criminal law violation; nor (2) would CITY officials have used the U.S. Mail in furtherance of schemes to silence, seize or confine Benshoof.

If not for Benshoof belonging to a class of people whose beliefs precluded Benshoof from being coerced to wear a face covering, PCC employees in joint action with SPD officers and City officials would not have acted with intent to silence, restrain, seize, or confine Benshoof.

The following incidents at PCC Aurora comprise only a fraction of the times that Benshoof was denied service, harassed, stalked, restrained, threatened, confined, and otherwise subject to invidious discrimination in violation of state and federal laws.

### 1) October 3, 2020

On October 3, 2020, Benshoof entered PCC Aurora sans face covering, located at 7504 Aurora Ave North, Seattle, WA 98103.

When Benshoof approached the check-out stand he was denied check-out service.

PCC Person In Charge Tyler Goslin ("Goslin") approached Benshoof, stating, "I'm not going to have you go through one of my cashier registers, so if you want to just leave money, just leave it somewhere away from us, please."

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 4 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1004

Benshoof responded to Goslin, "Where would that be?"

Goslin answered, ***"Anywhere you'd like."***

As he did every instance that he was denied checkout service, Benshoof left cash payment for his groceries inside the store, plus a tip.  Benshoof did not receive change for his purchase.

Benshoof possesses video evidence of this conversation, as does the City since Benshoof provided it to former City prosecutor Sarah MacDonald in the Summer of 2021.

### 2)  *October 18, 2020: Civil Admonishment*

On October 18, 2020, Benshoof entered PCC Aurora sans face covering and shopped for groceries.

PCC manager Steve Mitchell, ("Mitchell") approached Benshoof, violating PCC's six-foot distancing policy, to hand Benshoof a trespass admonishment document. (Dkt. #31-2 at 291)

Benshoof declined Mitchell's offer and said, "No thanks."

Mitchell asserted that Benshoof was trespassed from PCC and subject to arrest.

Benshoof informed Mitchell that Benshoof would have to be violating a criminal law statute to be subject to criminal jurisdiction and arrest, and that Benshoof was not violating any law by shopping without a face covering.  Mitchell refused to acknowledge that a ***civil*** trespass admonishment cannot confer ***criminal*** jurisdiction.

Benshoof shopped for groceries, was denied deli service, was denied check-out service, was unable to use his credit card and engage in interstate commerce, and thereupon left cash payment for his groceries inside the store, plus a tip, but received no change.

### 3)  *SPD Incident 2020-304716*

On October 27, 2020, Benshoof entered PCC Aurora to buy groceries sans face covering. Manager Mike E. Fox ("Fox") demanded that Benshoof put on a face covering or leave.

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 5 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1005**

Benshoof shopped for groceries, was denied deli service, was denied check-out service, was unable to use his credit card and engage in interstate commerce, and thereupon left cash payment for his groceries inside the store, plus a tip, but received no change.

Fox approached Benshoof before Benshoof had exited the store. Fox appeared visibly irate to Benshoof; in sight and hearing of numerous employees and shoppers, Fox yelled at Benshoof, ***"Fuck you!"***

Sans mask, Benshoof visibly smiled at Fox and exited the store.

After Benshoof left PCC Aurora and drove home, SPD officers Nathan Lemberg #7456 ("Lemberg") and Douglas Beard #7459 ("Beard") responded to the 911 call by Fox.

In the offense report, Lemberg and Beard accused Benshoof of violating Seattle Municipal Code 12A.08.040(A); and 12A.08.060.

Lemberg and Beard were absent evidence that said codes are laws under which Benshoof was subject to criminal jurisdiction, arrest, and prosecution, pursuant to Wash. Const. art II §§ 18; 22; 32; art III § 12, art XI § 11.

Benshoof was charged with violating Seattle Municipal Code 12A.08.040(A) criminal trespass, and 12A.08.060 theft on November 13, 2020, in case no. 656749.

Case no. 656749 was tried in September 2021, yet Benshoof has not been sentenced.

### 4)  *Emails with Steve Mitchell*

On November 3, 2020, PCC Manager Steve Mitchell ("Mitchell") emailed Benshoof, asserting that Benshoof had been trespassed from all PCC stores because Benshoof would not comply with PCC's "no mask-no entry" policy. (Dkt. #13-2 at 293-95)

Mitchell alleged that 28 CFR § 36.208 authorized PCC to deny Benshoof entrance because of Mitchell's belief that Benshoof posed "a threat to the health and safety of others."

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 6 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1006**

Mitchell alleged that Benshoof shopping without a facemask authorized PCC employees to refuse Benshoof entrance to PCC stores pursuant to RCW 49.60.125: "behaviors... constituting a risk to....other persons can be grounds for refusal."

Mitchell did not provide Benshoof with reasonable judgment, nor the best available objective evidence, authorizing Mitchell to deny assert that Benshoof was a risk to others.

Mitchell's invidious discriminatory animus towards Benshoof's class, his disability, and his exercise of rights protected by the First amendment were a proximal cause of Mitchell denying Benshoof entrance to PCC stores.

### 5) *SPD Incident #2020-311598*

On November 4, 2020, Benshoof called 911 while standing outside Aurora PCC to report that PCC employees had been engaging in months of discrimination and harassment against him.

Benshoof alleged violations of his Civil Rights by employees of PCC, and prima facie evidence of an ongoing criminal conspiracy between PCC employees and City officials. Benshoof cited RCW 9.91.010.

SPD Officers Defendant Jonathan Kiehn #5849 ("Kiehn") and Michael Cruzan #5849 ("Cruzan") responded, meeting Benshoof in the parking lot to discuss Benshoof's complaints.

Benshoof informed Kiehn and Cruzan that RCW 49.60.030 prevented PCC from discriminating against Benshoof due to his disability by denying Benshoof his right to the full enjoyment of any public accommodation open to the public.

Benshoof provided Kiehn with printed copies of RCW 49.60.030, .040, RCW 9A.52.070, and RCW 9A.52.090, explaining that criminal trespass required *mens rea* to enter or remain unlawfully.

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 7 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1007**

Benshoof informed Kiehn that PCC's entrance sign stating, "No Mask, No Entry," was not a law, and that the conditions for entry discriminated against Benshoof's class, his disability, and his religious beliefs as a reverend of a church.

Benshoof informed Kiehn that RCW 9A.52.090(2) stipulated that it was a defense to any allegation of criminal trespass that public accommodation was open to the public and that Benshoof complied with all lawful conditions.

Benshoof informed Kiehn he had a disability precluding him from wearing a mask.

Benshoof informed Kiehn and Cruzan that it was a crime pursuant to RCW 9.91.010 for PCC employees to deny Benshoof's civil rights by discriminating against Benshoof's creed. Benshoof informed Kiehn and Cruzan that there was prima facie evidence that City officials were engaged in a criminal conspiracy, in joint action with businesses such as SPROUTS Farmers Market and PCC, to deny Benshoof's civil rights.

After speaking with Kiehn for approximately twenty minutes, Kiehn stated that he would not be arresting ***anyone,*** which gave Benshoof good cause to believe that Kiehn understood the law and Kiehn would not accuse Benshoof of criminal trespass for shopping without a mask.

Benshoof shopped for groceries, was denied deli service, was denied check-out service, was unable to use his credit card and engage in interstate commerce, and thereupon left cash payment for his groceries inside the store, plus a tip, but received no change.

When Benshoof exited PCC with his groceries, Kiehn and Goslin were conversing in the parking lot; thereupon, Benshoof had good cause to believe that Kiehn was explaining to Goslin that PCC could not discriminate against Benshoof for not wearing a face mask.

Because of Benshoof's good cause belief that Kiehn and Cruzan understood trespass law after being informed by Benshoof and provided supporting documentation, Benshoof excitedly

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 8 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1008**

texted several friends later that day to inform his friends that the persecution by SPD and the City Attorney's Office had finally ended.

In the subsequent SPD incident report, Kiehn recounted being informed by Benshoof that he is a pastor for a small home church, primarily serving the underprivileged and homeless.

Kiehn recounted that Benshoof stated that allowing public accommodations to arbitrarily discriminate was a slippery slope that could easily lead to a public accommodation denying service to *anyone* who looks like a homeless person by arguing that homeless people are dirty and have more germs.

Kiehn **consulted a Webster's dictionary** to conclude that PCC's sign stating, "No Mask, No Entry" was a lawful order requiring Benshoof's compliance; thereupon, Kiehn forward a criminal trespass complaint against Benshoof to the CITY Attorney's Office. (Dkt. 13-2 at 461-67)

On November 13, 2020, the City Attorney's Office filed a criminal complaint in SMC case no. 656748, charging Benshoof with violating 12A.08.040(A).

### 6) *SPD Incident 2020-314225*

On November 7, 2020, Benshoof entered PCC Aurora to buy groceries without a face covering and Manager Steve Mitchell demanded that Benshoof put on a face covering or leave.

Benshoof shopped for groceries, was denied check-out service, and left cash payment for his groceries inside the store, plus a tip, but received no change.

After Benshoof left PCC Aurora and drove home, SPD Officers Richard Lima #7760 ("Lima") and Nathan Shopay #7470 ("Shopay") responded to the 911 call by Steve Mitchell.

Lima wrote the offense report. Benshoof was later charged with violating Seattle Municipal Code 12A.08.040(A). Lima and Shopay were absent evidence that 12A.08.040(A)

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 9 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1009**

was a law under which Benshoof was subject to criminal jurisdiction, arrest, and prosecution, pursuant to Wash. Const. art II §§ 22; 32; art III § 12, art XI § 11.

On March 25, 2021, the CITY Attorney's Office filed a criminal complaint in case no. 656748, charging Benshoof with violating 12A.08.040(A).

### 7) *SPD Incident 2020-317337*

On November 11, 2020, Benshoof entered PCC Aurora to buy groceries without a mask and Mitchell demanded that Benshoof put on a face covering or leave.

Benshoof provided Mitchell with written Notice of Violation informing Mitchell that he, and other PCC employees, were violating Benshoof's rights under color of law, and may be subject to civil or criminal liability. (Dkt. #13-2 at 297)

Benshoof shopped for groceries, was denied deli service, was denied check-out service, was unable to use his credit card and engage in interstate commerce, and thereupon left cash payment for his groceries inside the store, plus a tip, but received no change.

After Benshoof left PCC Aurora, SPD Officers Richard Lima #7760 ("Lima") and Jacob Masterson #8350 ("Masterson") responded to the 911 call by Steve Mitchell.

Lima wrote the offense report, alleging that Benshoof committed criminal trespass.

On March 25, 2021, the City Attorney's Office filed a criminal complaint in case no. 656748, charging Benshoof with violating 12A.08.040(A). The prosecution is ongoing.

### 8) *SPD Incident 2020-323700*

On November 19, 2020, Benshoof entered PCC Aurora to buy groceries without a mask AND Manager Tyler Goslin demanded that Benshoof put on a face mask or leave.

Benshoof provided a store supervisor with a Notice of Violation to inform PCC employees were violating Benshoof's rights in joint action with SPD officers. (*Id.*)

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 10 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1010**

Benshoof shopped for groceries, was denied deli service, was denied check-out service, was unable to use his credit card and engage in interstate commerce, and thereupon left cash payment for his groceries inside the store, plus a tip, but received no change.

After Benshoof left PCC Aurora, SPD officers Richard Lima #7760 ("Lima") responded to the 911 call by Goslin.

Lima completed an offense report alleging Benshoof violated Seattle Municipal Code 12A.08.040(A).

On April 5, 2021, the City Attorney's Office filed a criminal complaint in case no. 656748, charging Benshoof with violating 12A.08.040(A).

**B.    Seattle Municipal Court Case No. 656748**

On November 13, 2020, Assistant City Attorney Daniel O'Brien (O'Brien) filed a criminal complaint related to SPD Incident no. 2020-311598 alleging that on November 4, 2020,

Benshoof violated SMC 12A.08.040(A) criminal trespass at PCC Natural Markets Aurora.

O'Brien did not provide evidence to the court of the City's compliance with legal service of criminal process upon Benshoof, pursuant to RCW 35.20.270(1).

O'Brien did not provide the court with evidence that SMC 12A.08.040(A) was a law applicable to Benshoof in accordance with Wash. Const. art II §§ 18; 22; 32; art III §12 that the City had the legislative power to enact, enforce, and prosecute Benshoof under Wash. Const. art XI § 11.

On November 24, 2020, the docket states, "Speedy trial rule waiver filed" and that a new commencement date of March 1, 2021, was set.

Neither White nor the City motioned for a continuance or consolidation of case no. 656748 nor 656749.  (Dkt. 13-2 at 491).

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 11 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1011**

On March 25, 2021, O'Brien filed an amended criminal complaint with two additional counts alleging Benshoof violated SMC 12A.08.040(A) at PCC Aurora.

On March 1, 2021, Benshoof was denied entrance to courtroom 1102 before Judge Faye Chess because Benshoof was not wearing a face covering.

On April 5, 2021, O'Brien filed his 2nd amended criminal complaint with a fourth count alleging Benshoof violated SMC 12A.08.040(A) at PCC Aurora on November 19, 2020.

On April 6, 2021, Benshoof was denied entrance to courtroom 1102 before Judge Catherine McDowall to argue Benshoof's motion to dismiss for lack of subject matter jurisdiction. (Dkt. 13-2 at 499-514; Dkt. 13-2 at 516-521; and Dkt. 13-2 at 523-529).

Benshoof appeared via WebEx and McDowall dismissed Benshoof's motion without providing findings of fact or conclusions of law.

On the morning of July 21, 2021, Benshoof appeared by WebEx before Gregory because armed court marshals continued to deny Benshoof entrance to courtrooms.

Gregory ordered Benshoof to appear in person in Seattle Municipal Court wearing covering, or by providing an exemption letter from a medical professional proving that Benshoof had a disability precluding him from wearing a face covering.

Benshoof reminded Gregory of RCW 49.60.040(7)(d) "Only for the purposes of qualifying for reasonable accommodation in employment, an impairment must be known or shown through an interactive process to exist in fact." Benshoof has never sought employment with the City.

Benshoof reminded Gregory that Wash. Const. art. I § 22 prohibited a public servant from denying a named defendant the right to appear in court.

On the afternoon of July 21, 2021, Benshoof appeared by WebEx before Crawford-Willis.

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 12 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1012

Benshoof reminded Crawford-Wills of RCW 49.60.040(7)(d) "Only for the purposes of qualifying for reasonable accommodation in employment, an impairment must be known or shown through an interactive process to exist in fact."

Benshoof reminded Crawford-Willis that Wash. Const. art. I § 22 prohibited a public servant from denying a named defendant the right to appear in court.

Crawford-Willis reiterated her demand that Benshoof comply with Gregory's demands.

Benshoof stated his belief that the CITY prosecutors and municipal judges were setting Benshoof up to be accused of "failure to appear" so that a failure to appear bench warrant could be issued for Benshoof's arrest.

Crawford-Harris asserted she could hold a trial *in absentia* if Benshoof did not comply with her and Gregory's demands.

On July 22, 2021, prior to SMC opening, Benshoof faxed documents to SMC to ensure that the record evidenced Benshoof's attempts to appear in court and comply with all laws, (Dkt. #13-3 at 73-80).

July 22, 2021, Crawford-Harris again denied Benshoof's right to appear in person in courtroom 1002 without a face covering; therefore, Benshoof appeared by WebEx video.

Crawford-Harris then prompted prosecutor Assistant City Attorney Sarah MacDonald ("MacDonald") by saying, "Don't you have something for me?"

Benshoof noticed MacDonald appeared startled at the question from Crawford-Willis.

MacDonald then proposed a $20,000 bench warrant which MacDonald moved the court to enter against Benshoof for "failure to appear".

Benshoof then informed MacDonald and Crawford-Willis that they were doing exactly what Benshoof predicted the previous day.

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 13 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1013**

Upon Benshoof's information and belief, prior to the court permitting Benshoof to connect via WebEx video to the courtroom at approximately 900am, MacDonald and Crawford-Willis engaged in *ex parte* communication regarding the intention of MacDonald to motion for a "failure to appear" bench warrant against Benshoof. *Ex parte* communications are prohibited under Washington Code of Judicial Conduct Rule 2.9.

Upon the motion of MacDonald for a $20,000 "failure to appear" bench warrant, Crawford-Willis issued bench warrant #990429244 in the amount of $10,000.

The worksheet filed in the record shows that the box for "Defendant Appeared" was checked= yet the docket entry states, "DEFENDANT NOT PRESENT." (Dkt. #13-2 at 537)

On August 25, 2021, Benshoof posted the $10,000 bail for bench warrant #990429244 through a friend, Daniel Heller, under duress, coercion, and threat of immediate arrest. (Dkt. #13-2 at 538)

On September 8, 2021, Benshoof appeared by WebEx before Judge Catherine McDowall ("McDowall") in courtroom 1101.

McDowall stated that Benshoof must appear in person on September 21, 2021, and that Benshoof must either wear a face covering or provide a face covering exemption letter from a health professional; otherwise, Benshoof would not be allowed into the courtroom and another "failure to appear" bench warrant would be issued.

On September 17, 2021, Benshoof submitted an exemption letter under threat, duress and coercion. (Dkt. #13-3 at 204).

The exemption letter enabled Benshoof to enter the courthouse and courtrooms, escorted by a SMC marshal, for the next three months.

On January 13, 2022, Benshoof and his friend, Daniel Haller entered SMC courtroom 1003 for a hearing before Gregory regarding the repeated denials of Benshoof's access to the courtrooms.

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 14 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1014

Armed marshals, acting under direct orders from Gregory, then forced Benshoof and Heller out of the courthouse because Benshoof was not wearing a face covering.

On January 19, 2022, Benshoof was denied access to courtroom 1002 before Crawford-Willis. Crawford-Willis stated that Benshoof's face covering exemption letter had been invalidated by "Omicron." Benshoof appeared via WebEx video.

Upon the motion of MacDonald for a $15,000 "failure to appear" bench warrant, bench warrant #990430984 in the amount of $10,000 was issued for Benshoof's arrest by Judge Crawford-Willis. (Dkt. #13-3 at 94)

On June 13, 2022, Benshoof's motion to quash the bench warrant #990430984 was granted.

On August 29, 2022, Benshoof was denied access to courtroom 1001 before Judge Gregory. Benshoof appeared by telephone. Benshoof and Assistant City Attorney Jacob Kelly relied upon their filed briefings. (Dkt. #13-3 at 97-101; Dkt. #13-3 at 107-117)

Typical of the cognitive dissonance exhibited by City officials for the previous three years, City Attorney Jacob Kelly asserted, "Nothing in [Judge Gregory's mask orders] actively denied any particular defendant, including Mr. Benshoof, from availing themselves of the ability to appear in their own defense."

Kelly believed that an arbitrary and capricious administrative order from a municipal court judge could supersede Wash. Const. art. I § 22. Kelly also believed that Title III of the ADA can be superseded by an arbitrary and capricious administrative order from a municipal judge.

Kelly and Gregory were well aware that the Department of Health guidelines they were allegedly following had stated in 2020 that a face shield **does nothing** to prevent the transmission of SARS CoV-2 because Benshoof had repeatedly informed them of this fact. Given the fact they both went to law school, both Kelly and Gregory understand what "arbitrary and capricious" means.

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 15 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1015

Typical of other kangaroo court proceedings which Benshoof has witnessed the previous three years, Gregory dismissed Benshoof's motion to dismiss without providing findings of fact or conclusions of law. **Ipse dixit, ipso facto**, the tautological maxim of tyrants.

Benshoof stated that he had nothing further to say and wished the Court and Kelly a good day.

After Benshoof disconnected from his telephone appearance, Judge Gregory issued bench warrant #990433484 in the amount of $15,000 for Benshoof's arrest for allegedly "exiting the hearing early."

On October 20, 2022, Benshoof's motion to quash bench warrant #990433484 was granted.

On July 28, 2023, Kelly motioned Chess for a $50,000 bench warrant because Benshoof was not physically present in the courtroom, despite Benshoof's public defender, Faiz Pirani present.

Chess issued bench warrant #990437507 in the amount of $25,000 for the arrest of Benshoof.

### III.    ISSUES WARRANTING MOTION

1. **Did guidelines promulgated from the CDC or FDA authorize Governor Inslee to authorize PCC or the City to deny Benshoof the entry to public accommodations?**

   No.  CDC and FDA guidelines could not endorse, denounce, or advise.

2. **Has the City failed to provide evidentiary support for its contention that a store's mask policy was a *lawful condition* invoking the criminal jurisdiction of the SPD?**

   Yes.  SPD Ofc. Kiehn consulted a *dictionary* to make his incorrect determination.

3. **Did the Civil Rights Act of 1964 prohibit City of Seattle from arresting, imprisoning and prosecuting Benshoof?**

   Yes.  This has been well established since *Hamm v. City of Rock Hill*.

4. **Because the Civil Rights Act of 1964 prohibited City of Seattle from arresting, imprisoning and prosecuting Benshoof for shopping sans mask in accordance with his religious beliefs, is Seattle Municipal Court case no. 656748 malicious prosecution constituting "bad faith, harassment, or extraordinary circumstances"?**

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 16 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1016

Yes.  It is "bad faith, harassment, and extraordinary circumstances" whenever a municipality violates a Congressional prohibition against the prosecution of an innocent person based upon the City's policy or widespread custom of discrimination against a person based upon their religious beliefs.

**5. Was Benshoof afforded the opportunity to raise constitutional and jurisdictional claims before Seattle Municipal Court?**

No.  Case no. 656748 has been a three-year sham proceeding with a pre-determined outcome from its inception, wherein no amount of factual evidence or citations of law mattered.  Raising an issue before a kangaroo court is a meaningless act of futility.

**6. Must the Court immediately dismiss Case No. 656748 in accordance with the United States Supreme Court holding in *Hamm v. City of Rock Hill*?**

Yes.  The holding of *Hamm* was unequivocal.

### IV.    ARGUMENT FOR GRANTING MOTION

To be valid and enforceable, a prosecution must be supported by three elements: (1) the court must have jurisdiction of the parties; (2) the court must have jurisdiction of the subject matter; and (3) the court must have the authority to render the particular judgment.

**A. Mask Policies**

*1) Gubernatorial Proclamations*

Governor Inslee's Proclamations were not general laws pursuant to Wash. Const. art II §§ 18; 22; 32; art III § 12.  The City did not provide evidence to the contrary, nor did the City provide evidence that Inslee was lawfully delegated emergency powers by which Inslee could violate Benshoof's religious beliefs by requiring Benshoof to wear a face covering to enter a public accommodation.

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 17 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1017**

City attorneys have repeatedly asserted that Benshoof denies that "police power" exists. This is a false and misleading argument by City attorneys employed to avoid and obscure

RCW 43.06.010(12) authorized Inslee pursuant to a "public disorder, disaster, energy emergency, or riot." Covid-19 was not a "public disorder, disaster, energy emergency, or riot." The authority to require personal protective devices is limited to "the jurisdiction where the individual or business performs work." *See* RCW 49.17.485(1) Benshoof has not operated a business or performed work in Seattle during the last four years subject to such statutes.

City judges and PCC employees understand by allowing Benshoof to enter courtrooms and stores with a face shield in lieu of a face mask, that they revealed the arbitrary and capricious nature of their policies. Mayor Durkan's face covering requirements were allegedly consistent with Washington Department of Health ("DoH") recommendations. (Dkt. #13-2 at 472) However, the DoH explicitly announced in 2020 that "the use of face shields alone is currently viewed as serving *no purpose* or providing any protection from the transmission of COVID-19." (Dkt. #13-2 at 483)

It is absurd to posit that FDA and CDC guidelines empowered Inslee, City officials, or PCC employees to endorse, advise, or require the use of personal protective equipment or treatments. "FDA is not a physician. It has authority to inform, announce, and apprise—but not to endorse, denounce, or advise." *Apter, et al., v Dept. of Health and Human Services,* No. 22-40802, at 24 (5th Cir. Sept. 1, 2023)

*2) ADA Protections*

Absent evidence, PCC employees falsely alleged that Benshoof posed a direct and imminent threat to the health of its employees because Benshoof shopped sans face covering. (Dkt. #13-2 at 293-4) PCC manager Steve Mitchell ("Mitchell") asserted that PCC had the right

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 18 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1018**

to refuse in store service to Benshoof if Benshoof wasn't wearing a face covering, pursuant to 28 CFR § 36.208 – Direct threat.  Benshoof was never provided with an "individualized assessment" as required under 28 CFR § 36.208.  (Dkt. #9 at 50) Benshoof informed Mitchell that PCC has "ZERO proof that I pose a threat to others."  (Dkt. #13-2 at 294)

Benshoof provided PCC employees with notice of claim in June 2022 evincing that the U.S. Supreme Court held such discrimination violative of the ADA, citing *Arline v. Nassau School District.* (Dkt. #13-2 at 321-2)

**B.  First Amendment Prohibitions Re: Religious Freedom**

As a corollary to illustrate the absurdity of the City's position, consider if a devout Muslim governor proclaimed that everyone entering a public accommodation over the age of two must wear a burka to protect everyone from demonic forces which Muslims believed to exist.

If the burka actually protected the wearer, why would Benshoof need to wear a burka? One need not be a legal scholar to understand that such a circumstance would be religious discrimination targeting non-Muslims on its face.  The City's position is no less ridiculous.

As Justice Robert H. Jackson wrote for the majority in *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."

A half century ago, in *Norwood v. Harrison*, 413 U.S. 455, 465 (1973), the Supreme Court reaffirmed what the Justices called an "axiomatic" principle of constitutional law. The Court set forth this principle categorically, without qualification or dissent.  The principle was this: government "***may not induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish.***" *Id.* (citation omitted).

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 19 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1019**

The *Norwood* principle fully applies to the First Amendment. As Justice Thomas recently stated, the government acts unconstitutionally if it "induces [a private entity] to take action the government itself would not be permitted to do, such as censor expression of a lawful viewpoint." *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring).

## C.  Civil Rights Act of 1964

Title II of the Civil Rights Act of 1964 prohibits the City and PCC from denying Benshoof the full enjoyment of any public accommodation because of Benshoof's creed, as does RCW 9.91.010, which Benshoof cited to SPD Ofc. Kiehn.  (Dkt. #9 at 51)

Illustrating the City's poor training of its police officers, Kiehn comically consulted a *Webster's dictionary* to conclude that PCC's "No Mask, No Entry" sign was a lawful order requiring Benshoof to comply.

However, considerable blame is attributable to the City Attorney's Office.  Kiehn's report documents that he only resorted to consulting a common dictionary after the City Attorney's Office refused to provide Kiehn legal guidance in determining whether Benshoof was correct.

"We hold that the convictions *must be vacated* and the *prosecutions dismissed*. The Civil Rights Act of 1964 forbids discrimination in places of public accommodation and removes peaceful attempts to be served on an equal basis from the category of punishable activities." *Hamm v. City of Rock Hill,* 379 U.S. 306 (1964)

The City stated that Benshoof "ignored the manager's admonition." (Dkt. 21 at 3) A *civil* trespass "admonition" by a PCC employee is governed by *civil* law.  It is a *civil* claim which must be pleaded in court in a *civil* action.  The state cannot take sides in a *civil* trespass dispute without violating the Equal Protection Clause of the Fourteenth Amendment.

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 20 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

1020

The City advised the public as early as May of 2020 that "…it is critical to note that ***there are valid reasons why some people can't wear face coverings – please do not discriminate*.**" (Dkt. #9 at 35) Despite Benshoof's valid reasons, including religious belief and disability, the City has acted in concert with PCC to discriminate and prosecute Benshoof for three years.

Pursuant to 42 U.S.C. § 2000a, "All persons shall be entitled to the full and equal enjoyment of the goods, services, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination on the ground of race, color, religion, or national origin."

**D.  Irreparable Harm**

There can be no question that the challenged prosecution and threats of arrest and indefinite imprisonment by City officials, if continued, will cause further irreparable harm, as Benshoof has been effectively imprisoned under color of law for months, unable to enter a courthouse or grocery store.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U. S. 347, 373 (1976)

**E.  Public Interest**

There is no conceivable threat to the public interest which could result from the Court immediately dismissing Case No. 656748 to prevent the City from continuing the malicious prosecution of Benshoof.  In fact, the public interest will be foreseeably harmed if the Court permits police and prosecutors to continue its practice and custom of violating the holding of *Hamm v. City of Rock Hill* forbidding trespass prosecutions against the actual victims of discrimination in places of public accommodation.

**F.  Bad Faith, Harassment, or Extraordinary Circumstances**

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 21 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1021**

Ignorance of the law and denial of incontrovertible facts is not the exclusive domain of City officials, unfortunately. Regarding Benshoof's motion for a preliminary injunction regarding SMC Case No. 656749, the U.S. District Court asserted that "Benshoof fails to establish bad faith, harassment, or extraordinary circumstances that would justify the Court setting aside abstention under *Younger*. As the City points out, Benshoof does not show harms beyond those "incidental to every criminal proceeding brought lawfully and in good faith." (Dkt. #29 at 9)

The prosecutions of municipal Case Nos. 656748 and 656749 are bald-faced malicious prosecutions and it is irrefutable that they were not brought lawfully, nor in good faith.

It is an absurdity to infer or assert that the City's refusal to vacate and dismiss malicious prosecutions which violate the holding of *Hamm v. City of Rock Hill* does not evidence the City's "bad faith, harassment, or extraordinary circumstances."

## G. Fourteenth Amendment

The Fourteenth Amendment prohibited the City and its officers from denying Benshoof the equal protection of the law and prohibited the City from taking sides in a ***civil*** dispute by deceptively asserting ***criminal*** jurisdiction when none existed.

The City Attorney's Office has known for years that it could not enforce mask policies either directly or by proxy. By early March 2021, SPD officers admitted that they had no criminal jurisdiction to enforce PCC's mask policies. When called to PCC Fremont in early March 2021, SPD Ofc. Parker informed PCC employees that Benshoof was not engaged in any unlawful activity by which the SPD could remove Benshoof from the store. PCC Fremont manager Zachary Cook then petitioned for a restraining order to prevent Benshoof from shopping in that store because, as Cook stated in King County District Court case no. 21CIV24845KCX, SPD

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 22 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1022**

officers could not lawfully prevent Benshoof from shopping in PCC stores without a face covering.

As the SPD acknowledged officers could not lawfully prevent Benshoof from shopping sans face covering at PCC or any other public accommodation in March 2021, the also SPD lacked legal authority to file a criminal trespass complaint against Benshoof in October 2020. ***Duh.***

Similarly, as the SPD could not lawfully prevent Benshoof from shopping sans face mask in October 2020, the City Attorney's Office has therefore engaged in the malicious prosecution of Benshoof in case no. 656748 for the last three years. ***Duh.***

Benshoof encountered similar willful ignorance in Shoreline between September 2020 and March 2021. Benshoof was repeatedly assaulted by employees of Central Market in Shoreline and given a notice of civil trespass admonishment nearly identical to the one produced by PCC.

Eventually Benshoof contacted Captain Ryan Abbot of the King County Sheriff's Office. Captain Abbot contacted the King County Prosecuting Attorney's Office on Benshoof's behalf to ascertain the law.

As opposed to the City Attorney's Office allowing or advising SPD Ofc. Kiehn to consult a Webster's dictionary for legal clarification, the King County Prosecuting Attorney's Office did their job as attorneys and advised Captain Abbot.

Captain Abbot called Benshoof back several days later and stated that the King County Attorneys had confirmed to him that Benshoof "knows the law very well" and that Benshoof was perfectly within his rights to shop in any public accommodation without a face covering. ***Duh.***

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 23 of 25

1023

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

## V.    REQUESTED RELIEF

*WHEREFORE*, Benshoof moves the Court to immediately dismiss Case No. 656748 with prejudice in accordance with the aforementioned facts and law.

## VERIFICATION

I, Affiant Kurt Benshoof, do hereby declare that the foregoing is true and correct to the best of my knowledge under penalty of perjury in the State of Washington, and am competent to testify to the matters stated herein.  Executed this 19th day of October in the year 2023, in the City of Seattle, in the county of King, in the state of Washington.


By:    s/ Kurt Benshoof
              Kurt Benshoof *Pro Se*


1716 N 128th Street
Seattle, WA 98133
Phone: (206) 460-4202
Email: kurtbenshoof@gmail.com

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 24 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1024**

# CERTIFICATION OF SERVICE

I, Kurt Benshoof, hereby certify that on October 19, 2023, I did effect service upon

CITY OF SEATTLE by emailing to the email addresses listed below:

**CITY OF SEATTLE:**
MOS_Legalservice@seattle.gov

**SEATTLE MUNICIPAL COURT:**
SMC_CTR_902@seattle.gov

**CITY OF SEATTLE Assistant Prosecuting Attorney:**
Katrina Outland, WSBA #54342
701 Fifth Ave
Suite 2050
Seattle, WA 98104
Email: Katrina.Outland@seattle.gov
Phone: (206) 684-7756

**CITY OF SEATTLE Assistant Prosecuting Attorney:**
William Cotter, WSBA #57838
701 Fifth Ave
Suite 2050
Seattle, WA 98104
Email: William.Cotter@seattle.gov
Phone: (206) 733-9614

DATED:  October 19, 2023

Signed:  ___s/ Kurt Benshoof___

Kurt Benshoof, *Pro Se*
1716 N 128th ST
Seattle, WA 98133
(206) 460-4202

MOTION TO DISMISS
SEATTLE MUNICIPAL CASE NO. 656748
Page 25 of 25

Kurt Benshoof, Benshoof
1716 N 128th ST
Seattle, Washington 98133
(206) 460-4202
kurtbenshoof@gmail.com

**1025**

1
2
3
4
5
6
7
8

SUPERIOR COURT FOR THE STATE OF WASHINGTON
IN THE COUNTY OF KING

9

KURT BENSHOOF,

10
                                    Plaintiff,                    NO.  22-2-15958-8 SEA
11
vs.                                                              DECLARATION OF NATHAN CLIBER
12
NATHAN CLIBER, JESSICA OWEN and
13  MAGALIE LERMAN, OWEN HERMSEN

14
                                    Defendants.
15

I, Nathan Cliber, state and declare as follows:
16
        1.      I am over the age of eighteen (18), competent to testify, and make this declaration
17
based on my personal knowledge.
18
        2.      I was co-defendant Jessica Owen's attorney of record in King County Case No.
19
21-5-00680-6 SEA (the "Parentage Action"). The Parentage Action is the only legal proceeding
20
in which I have represented Ms. Owen. The primary purpose of filing the Parentage Action was
21
to obtain court orders which would: (a) bring much needed structure and clear rules as to parental
22
decision making for the child shared by Ms. Owen and Mr. Benshoof; and (b) determine where
23
the child was supposed to be, with whom, and when.
24

25

DECLARATION OF NATHAN CLIBER  - 1

**GORDON REES SCULLY
MANSUKHANI, LLP**
701 Fifth Avenue, Suite 2100
Seattle, WA  98104
Telephone: (206) 695-5100
Facsimile: (206) 689-2822

**591**

**1026**

3.      In the past five months, Mr. Benshoof has filed four separate legal actions naming me personally as a defendant:

- In King County Case No. 22-2-1112-7 SEA (filed July 18, 2022), Mr. Benshoof filed an 85-page Petition for Writ of Habeas Corpus and named myself, Judge David Keenan, Commissioner Jason Holloway, Ms. Owen, Ms. Lerman, and another individual as Respondents.  The writ was denied three days after it was filed and the case was dismissed.

- In King County District Court Case 22CIV11976KCX (filed August 2, 2022) Mr. Benshoof attempted to obtain an anti-harassment protection order against me based on my representation of Ms. Owen in the Parentage Action.  The court denied Mr. Benshoof's request.

- In U.S. District Court for the Western District of Washington Case 2:22-cv-01281-LK (filed September 9, 2022), Mr. Benshoof filed a nearly 300-page complaint naming over 80 people as defendants, including myself, Ms. Owen, Mr. Hermsen, Ms. Lerman, multiple sitting King County Judges, Bill Gates, Dr. Anthony Fauci, and a host of others.  The allegations against myself arose out of my representation of Ms. Owen in the Parentage Action and were basically the same as those recently dismissed by this court in this case.  Mr. Benshoof's federal court case was dismissed *sua sponte* on September 29, 2022.

- This case.

4.      In addition to all of the lawsuits where Mr. Benshoof named me as a defendant, he also filed complaints with the Washington State Bar Association against myself and four other attorneys with my law firm.  The allegations in the Bar Complaints again arose out of my representation of Ms. Owen in the Parentage Action.  None of the complaints had any merit and they were summarily dismissed without even requiring a response. True and correct copies of

DECLARATION OF NATHAN CLIBER - 2

**592**

**GORDON REES SCULLY MANSUKHANI, LLP**
701 Fifth Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 695-5100
Facsimile: (206) 689-2822

1   the dismissal letters from the Office of Disciplinary Counsel sent to myself and two of the other

2   attorneys in my firm are attached as **Exhibit A** to this declaration.

3        5.    Over the course of my representation of Ms. Owen in the Parentage case, I

4   received hundreds of emails from Mr. Benshoof, at least several dozens of which were clearly

5   intended to be harassing or intimidating in nature. As a family law practitioner, I am accustomed

6   to this sort of behavior on occasion, but Mr. Benshoof stands out as extraordinarily prolific in

7   this regard. True and correct copies of some examples are attached as **Exhibit B** to this

8   declaration. Some of the examples that are particularly relevant to the defendants' joint motion

9   to designate Mr. Benshoof as a vexatious litigant include:

10      •   On February 2, 2022, Mr. Benshoof sent me a Word document of crimes that Ms.

11          Owen had (in Mr. Benshoof's opinion) committed and telling me that I "will be a

12          defendant in federal district court."

13      •   On July 13, 2022, Mr. Benshoof sent me an e-mail stating in part "If a third valid

14          BAR grievance against a dishonest lawyer caused their insurer to drop them, and

15          a second valid BAR grievance against every partner in their firm caused the firm

16          to lose any coverage they might have had, would a lawsuit filed AFTER the

17          termination of insurance coverage be covered by the policy?" He followed up

18          with another e-mail the same day stating "You should hire an attorney, Mr.

19          Cliber."

20      •   On July 26, 2022, Mr. Benshoof sent me an e-mail stating that he would no longer

21          participate in the Parentage Action because "Family Court has no valid

22          jurisdiction of [him] or [his] son", that the case was "barratrous", and that "[a]ny

23          and all actions, current and future, by you or Ms Owen to prevent me from being

24          with my son will be litigated involving claims of Custodial Interference, and

25

DECLARATION OF NATHAN CLIBER - 3

**593**               **1028**

**GORDON REES SCULLY MANSUKHANI, LLP**
701 Fifth Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 695-5100
Facsimile: (206) 689-2822

1    worse, regardless of what your fraudulent 'court orders' allegedly empower you

2    or Ms Owen to do."

3    6. ′    In addition to the abundant and threatening communications, I believe Mr.

4    Benshoof used the act of service of process as an alternate way to try to harass and intimidate

5    me.

6    • In King County District Court Case 22CIV11976KCX, Mr. Benshoof appeared

7    in-person at my workplace to serve me with pleadings on August 8, 2022. He had

8    brought a young woman with him. When I answered the door at my office, he

9    handed the pleadings to the young woman, who looked very unhappy, but handed

10    them to me. Mr. Benshoof said to me, as I went back into my office: "I'm the

11    dangerous guy."

12    • In U.S. District Court for the Western District of Washington Case 2:22-cv-01281-

13    LK, instead of having me served at work, he had an associate of his come to my

14    private residence to serve me. He clearly knew where my office was located since

15    he had previously served me there (as noted above). I never provided Mr.

16    Benshoof with my private address. The individual who served me with the

17    pleadings in this matter identified himself to me as Michael Bayles (who may go

18    by the alias of Kyrrah Nork). Before Mr. Bayles came to my door, my domestic

19    partner, Chelsea Cebara, received a harassing phone call from 206-661-1521 from

20    a man asking to know where I was. The call appeared on caller ID as belonging

21    to Kyrrah Nork, but several online searches show it belonging to Michael Bayles.

22    • In this case, an associate of Mr. Benshoof, Molly Anderson, came to my private

23    residence to serve me.

24    7.    While Mr. Benshoof is entitled to serve process, I feel certain that his decision to

25    do so at my home, and to contact me and my partner on our private phones, is intended to harass

DECLARATION OF NATHAN CLIBER - 4

**GORDON REES SCULLY
MANSUKHANI, LLP**
701 Fifth Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 695-5100
Facsimile: (206) 689-2822

.**594**

**1029**

1  and intimidate. Mr. Benshoof has absolutely no legitimate reason to contact Ms. Cebara. He

2  also could much more easily have served me and contacted me through my place of work. His

3  choice to invade my personal life required him to research and seek out my personal contact

4  information. I can imagine no legitimate reason for him to do so.

5      8.    Each lawsuit Mr. Benshoof files causes real hardship. My insurance policy carries

6  a $5,000 deductible no matter how frivolous the case is. My understanding is that the insurance

7  company can treat each separate lawsuit as a separate claim thereby triggering the $5,000

8  deductible in each case. Thankfully, the insurance company chose to treat the federal court case

9  and this case as the same claim, but there is no guarantee they will do so moving forward if and

10 when Mr. Benshoof files more lawsuits against me. Beyond the hard, actual costs, these lawsuits

11 constitute significant opportunity costs, as I have to spend time I could otherwise be working

12 reviewing drafts, compiling declarations like this one, and keeping up to date on developments

13 in the case.

14     9.    Finally, I reviewed the Affidavit of Azhrael Rune Walker, dated February 10,

15 2023, and filed in this case on February 15, 2023. I would note for the court that it expressly

16 states "It is my express wish that my dad initiates a lawsuit against my mom and her family

17 attorney on my behalf." I believe the reference to "family attorney" is me and this is a clear

18 statement from Mr. Benshoof that he intends to file another lawsuit against me. Given that he

19 has filed four other lawsuits against me in the past seven months, I have no reason to doubt that

20 he will carry out this threat if not designated a vexatious litigant.

21     //

22     //

23     //

24     //

25

DECLARATION OF NATHAN CLIBER - 5

**.595**

**1030**

**GORDON REES SCULLY
MANSUKHANI, LLP**
701 Fifth Avenue, Suite 2100
Seattle, WA  98104
Telephone: (206) 695-5100
Facsimile: (206) 689-2822

1

2

**THE HONORABLE MARSHALL FERGUSON**
Defs' Joint Motion for Vexatious Litigant Order
HEARING DATE: March 3, 2023
*With or Without Oral Argument*

3

4

5

6

7

**Superior Court of Washington, County of King**

8

KURT BENSHOOF

No. 22-2-15958-8 SEA

9

Plaintiff,

**DECLARATION OF MAGALIE**
**LERMAN IN SUPPPORT OF**
**DEFENDANTS' JOINT MOTION FOR A**
**VEXATIOUS LITIGANT ORDER**
**AGAINST PLAINTIFF**

10

v.

11

NATHAN CLIBER, ET AL.,

12

Defendants.

13

14

I, Magalie Lerman, declare and state as follows:

15

1.      I am a defendant in this case. I am over the age of 18 and competent to testify to the

16

matters set forth herein.

17

2.      I have been working as an anti-violence and anti-trafficking advocate for 13 years,

18

including providing expert testimony for Alameda County, CA, in a trafficking case. In all those

19

years, I've never seen nor experienced an abuser the likes of Kurt Benshoof.

20

3.      Benshoof was in a relationship with defendant Jade Owen. The two have a son

21

together, ▮▮▮▮. After their relationship ended, Jade and Benshoof still lived together in separate

22

rooms within the same house.

23

4.      Jade and I met in January 2019 and began dating in March of that year. She was

24

still living with Benshoof. I witnessed many red flags of abuse, including Jade's manifestation of

25

significant anxiety.

DECLARATION OF MAGALIE LERMAN IN SUPPPORT OF
DEFENDANTS' JOINT MOTION FOR A VEXATIOUS
LITIGANT ORDER AGAINST PLAINTIFF – 1

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

**597**

**1031**

5.    For the first six months of our relationship, I was able to hold my tongue, encouraging Jade to tell me more about Benshoof and her past with him. I learned a lot—much of which is documented in Jade's DVPO narrative—and slowly lost my social worker filter.

6.    Over the next year, I interacted with Benshoof because he was ostensibly Jade's roommate. I saw and experienced countless waves of abuse from him, including:

    a.  Calling me a "kyke,"

    b.  Picking up and effectively pimped out three young black women from Seattle's outdoor sex market and then throwing them out when they ceased to be useful to him,

    c.  Locking Jade's cat in a box with no air holes. If we hadn't come home when we did, the cat might have died,

    d.  Scaring Jade's son A█████'s friends, verbally harassing A█████'s friend's parents, and alienating A█████ from his peers,

    e.  Throwing out all the food that I'd brought or kept in the house and leaving the containers, etc., in the sink and on the ground for me to clean up,

    f.  Screaming at and intimidating Jade.

7.    I never did anything to instigate Benshoof's behavior. His moods were unpredictable, and everyone walked on eggshells around him. Through all of this, I tried to be cordial with him and keep my distance. I was scared of him.

8.    In the summer of 2020, I was hanging out in Jade's room when she came in noticeably shaken. She told me that Kurt was acting strangely, and she thought he was going to "do something." We brought A█████ into the room with us and spent the rest of the night locked inside. In the morning, Jade went to leave for work only to find that Kurt had shattered her car window. That's when I gave her an ultimatum—I wasn't going to go over there and didn't know if I could keep dating her if she continued living with Kurt. Three months later, Jade, A█████, and I moved into a house together.

DECLARATION OF MAGALIE LERMAN IN SUPPPORT OF
DEFENDANTS' JOINT MOTION FOR A VEXATIOUS
LITIGANT ORDER AGAINST PLAINTIFF  – 2

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

**598**

9.    I was naive to think that I was safer then. In actuality, helping distance Jade from Kurt's abuse brought me into it. Kurt saw A████ and Jade as his property and me as the ultimate threat – the person that had taken his property from him.

10.    Over the next year, Benshoof's violence increased in the following ways and with the following impacts:

a.    He claimed COVID-19 was a hoax. He took A████ to an anti-mask rally, and we all later caught COVID from him,

b.    He got kicked out of Sprouts and PCC for belligerently refusing to wear a mask. He later got a trespassing charge from Sprouts for trying again. Then, he brought a rifle to the Sprouts parking lot and paced back and forth for nearly thirty minutes in front of the security guard to intimidate him before getting arrested.

c.    He got arrested for driving erratically with A████ in the car. He tried to get in the police officer's face and was pushed to the ground and restrained. Jade and I had to go get A████, who was traumatized.

11.    In September 2021, Benshoof kidnapped A████ after he self-elected to get his first COVID-19 vaccine. Benshoof managed to convince A████ that his mother and I were trying to hurt him, wouldn't let him talk to us or anyone else we knew, and hid him in a house for three weeks. Jade and I worked with the police to get A████ back.

12.    Jade got a lawyer, filed a DVPO, and started child custody negotiations. That's when Benshoof started directly harassing me in the following ways:

a.    Calling me misogynistic names, such as a lying prostitute and duplicitous cunt—often to A████ in ways that I could hear him,

b.    Making threats to me like "Magalie has it coming," and "she better watch out,"

DECLARATION OF MAGALIE LERMAN IN SUPPPORT OF
DEFENDANTS' JOINT MOTION FOR A VEXATIOUS
LITIGANT ORDER AGAINST PLAINTIFF – 3

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

599

1033

c.  Filing bunk charges against Jade and me to drain us of sanity and resources instead of
simply participating in his custody child (he withdrew, and the judge mandated that
Jade take full custody),

d.  Sending his people that belong to his "church," where he is a pastor, which I consider
a cult, to my house at all hours of the night, often hiding in the bushes, to intimidate
and harass us. That happened at least ten (10) times until Benshoof started getting
arrested for violating his restraining order.

e.  In January 2023, we discovered that Benshoof had been violating his restraining order
and talking with A██████ on a chat application named Discord for nearly a year. A██████
ran away. Police surrounded Kurt's house, and A██████ came out.

13.     Beyond the physical harassment, Benshoof has sued me in at least **three** lawsuits.

14.     Most recently, on 2/13/23, Benshoof had me served with what appears to be, at first,
a petition for an Antiharassment Order [King County District Court Case No 23CIV02540KCX],
which the Court converted to a Domestic Violence Protective Order [King County Superior Court
Case No. 23-3-02503-2 SEA]. Three King County Sheriffs came to my home on the date I returned
from a one-month vacation from Puerto Rico. The only way Benshoof knew that I returned to
Washington was that he tracked me since I did not communicate with him.

15.     I had not communicated with Benshoof since May 8, 2023, when I sent him an
email telling him to stop physically stalking and cyberstalking me. Attached hereto as **Exhibit 1** is
a true and correct copy of that email exchange.

16.     Benshoof has no basis to file an antiharassment/DVPO petition against me, given
that he is the one that was stalking me, and given that I haven't communicated with him in ten (10)
months. Benshoof's This petition/lawsuit is yet another one of the many times he has used the
judicial system to harass and intimidate me.

17.     Unless this Court stops Benshoof, he will not stop.

DECLARATION OF MAGALIE LERMAN IN SUPPPORT OF
DEFENDANTS' JOINT MOTION FOR A VEXATIOUS
LITIGANT ORDER AGAINST PLAINTIFF  – 4

**600**

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

**1034**

18.    Benshoof's lawsuits have inflicted significant emotional and financial harm on me. I have temporarily moved away from Washington due to anxiety and fear of his harassment. I have also had to spend thousands of dollars on attorney fees to defend myself from his lawsuits.

19.    Benshoof has also caused the other defendants to pay enormous sums of money to defend themselves and caused them all significant anxiety and fear.

20.    Recently, my attorney informed me that Benshoof is threatening to file yet **another** lawsuit against me, this time on behalf of ARW.

21.    In light of the significant financial and emotional harm Besnfhoof has deliberately caused everyone that he has frivolously sued, I plead with this Court to enjoin him from ever filing another lawsuit against me, my friends, my family, my coworkers, my attorney, and the other defendants, their friends, their families, their coworkers, and their lawyers. Benshoof must be stopped, and his abuse of the courts must come to an end.

**I certify and declare under the penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge, information, and belief.**

DATED: February 14, 2023, at Seattle, WA.

*Magalie Lerman*
_____

Magalie Lerman

DECLARATION OF MAGALIE LERMAN IN SUPPPORT OF DEFENDANTS' JOINT MOTION FOR A VEXATIOUS LITIGANT ORDER AGAINST PLAINTIFF – 5

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

**1035**

**THE HONORABLE MARSHALL FERGUSON**
Defs' Joint Motion for Vexatious Litigant Order
HEARING DATE: March 3, 2023
*With or Without Oral Argument*

**Superior Court of Washington, County of King**

KURT BENSHOOF

Plaintiff,

v.

NATHAN CLIBER, ET AL.,

Defendants.

No. 22-2-15958-8 SEA

**DECLARATION OF OWEN HERMSEN IN SUPPPORT OF DEFENDANTS' JOINT MOTION FOR A VEXATIOUS LITIGANT ORDER AGAINST PLAINTIFF**

I, Owen Hermsen, declare and state as follows:

1.    I am a defendant in this case. I am over the age of 18 and competent to testify to the matters set forth herein.

2.    This declaration explains Mr. Benshoof's specific harassment against me, including:

a.  multiple frivolous legal actions already filed by Mr. Benshoof and dismissed,

b.  repeated threats of even more legal actions in the future, using other parties if necessary,

c.  repeated physical harassment at my home under the excuse of serving papers but going far beyond that legal requirement,

d.  harassing and threatening communications, and

e.  intentional financial harm to me by forcing me to incur significant legal costs

DECLARATION OF OWEN HERMSEN IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR A VEXATIOUS
LITIGANT ORDER AGAINST PLAINTIFF – 1

**603**

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

3.    The harassment via litigation has continued even after the dismissal of Benshoof's most recent complaint on January 27, 2023. He simply will not stop without a civil protection order to prevent him from filing anything else against me or his other targets. And if only I am protected, he will likely file against my counsel, witnesses, or personal associates as he has against Ms. Owen—which is how he dragged me into this in the first place.

4.    I plead that the Court protect me, my co-defendants, our counsel, our witnesses, and our families from further legal attack by Kurt Benshoof by restricting his ability to file any legal complaint or motion against us.

5.    Benshoof has attacked Ms. Owen and her co-defendants via litigation, using baseless and frequently ridiculous claims to harm them financially and emotionally. His complaints have been dismissed every time. I have been a defendant in **two** of these frivolous lawsuits, this instant action in Superior Court and one in Federal Court, 2:22-cv-01281-LK *Benshoof vs. Fauci et al.*

6.    Despite these dismissals, Benshoof has attempted to re-litigate the same claims over and over, sometimes using different jurisdictions, sometimes just refiling in the same jurisdiction: his latest attempts are to use his son as a litigant, with Benshoof filing on his behalf, as described in detail below.

7.    Benshoof has also targeted legal counsel, serving Ms. Owen and her co-defendants, threatening sanctions and other legal or professional actions to harm them, specifically seeking to intimidate them. For example, Ms. Owen's family court lawyer Nathan Cliber has been sued at length by Benshoof. My lawyer, Moshe Admon, has forwarded me communications from Mr. Benshoof with threats of sanctions despite doing nothing outside the normal conduct of defending me in Court. Benshoof also sued Mr. Russ, Mr. Tomlinson, and Mr. Marinella.

8.    I believe Benshoof's goal in frivolously attacking counsel is to make legal assistance more difficult and expensive to retain. Unfortunately, he has succeeded in this: the

DECLARATION OF OWEN HERMSEN IN SUPPPORT OF DEFENDANTS' JOINT MOTION FOR A VEXATIOUS LITIGANT ORDER AGAINST PLAINTIFF – 2

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

**604**

**1037**

lawyer I used for years refused to defend me against Benshoof when he learned that Benshoof harasses lawyers. Thankfully Moshe Admon took my case and represents me here, although at a higher cost, given his experience.

9.    In addition to myself, Benshoof attempted to sue Ms. Owen's dear friends Laura Rose Flynn, Saebyn Cooper, Dawn Samuelson, and others in Benshoof's federal lawsuit against *Fauci et. al.* Fortunately, the obvious insanity of that complaint got it dismissed quickly with no action required on those defendants' part.

10.    However, when Benshoof sued Ms. Owen's friends, I saw firsthand the stress and concern this caused them. I believe Benshoof's litigation tactics are also meant to exert further pressure and distress upon Ms. Owen. Benshoof seeks to estrange her from her support network and to increase her financial costs.

11.    I, too, am a very close friend of Ms. Owen. She and I have been friends for 20 years, traveled togeher many times, and always handled with our lives' challenges and joys with each others' support. As a particularly close friend of Ms. Owen, Benshoof has focused on trying to harm me financially by naming me as a defendant in various lawsuits. The financial and emotional labor involved in defending against Benshoof's constant attacks has strained my relationship with Ms. Owen, her son ████████ and her partner Magalie Lerman. It has been frustrating to confront the limited resources of time that a friend has to help me in my defense when she is fighting with all her time and strength against Benshoof's constant attacks against her from every quarter. Benshoof's attacks have severely limited our previously frequent time spent together and deeply affected our previously joyous friendship.

12.    In addition to suing the defendants' attorneys, Benshoof has sued police and witnesses to his previous crimes and arrests (for example, following his arrest for bringing a gun to a Sprouts market to threaten security staff in response to being ejected for refusing to wear a mask). He did so in the case 2:22-cv-01281-LK *Benshoof vs. Fauci et al.*, which he filed against

DECLARATION OF OWEN HERMSEN IN SUPPPORT OF
DEFENDANTS' JOINT MOTION FOR A VEXATIOUS
LITIGANT ORDER AGAINST PLAINTIFF – 3

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

605

1038

Seattle Police Department Officers Ryan Ellis, Rande Christensen, Gabriel Ladd, Trevor Willenberg, Yvonne Ortiz, Katrina Odell, Ashlie Clark, Bruce, Bauer, Chu, Hogg, Weiss, Williams, J. Wallace, and J. Alden. That is the only case I know of, but it is likely not the only case in which Benshoof has baselessly sued the police, likely costing the already overstretched department to incur unnecessary expenses—funds that can have much better uses.

13.     In the same *Benshoof vs. Fauci et al.* lawsuit, Benshoof sued King County Superior Court Judges Sean O'Donnell and David Keenan; Family Court Commissioners Paul Eagle and Brad Moore; Prosecutor Kathleen O'Brien; and, of course, Dr. Anthony Fauci, former Chief Medical Advisor to the President of United States.

14.     In text messages to me, Benshoof has even bragged about suing judges, saying: "I'm about to sue half the Judges in King County Municipal Court. Do you know how hard it is to get past judicial immunity? Very Hard... But guess what? I set them all up for major lawsuits, and, in their hubris, they fell for it. Cuz I'm just a silly conspiracy theorist pro se idiot [laugh-crying emoji]." Attached hereto as **Exhibit 1** is a true and correct copy of that text message.

15.     While this kind of activity may be familiar for a court system that frequently deals with the mentally unwell, they are very unnerving to a layperson like me.

**Benshoof's Threat of a New Lawsuit**

16.     Having been halted by the Court for the moment, Benshoof is now threatening to file **more** vexatious litigation against the same parties, supposedly on behalf of Benshoof and Ms. Owen's minor son, A.R.W. *See* **Admon Decl. EX A**—Benshoof's February 5, 2023, email to defense attorneys.

17.     Benshoof's use of his son to file lawsuits is deeply concerning.

18.     Unfortunately, even an illegitimate filing, such as one that Benshoof is threatening, will require lawyer time, expense, and expenditure of my own personal time, such as writing this instant Declaration.

DECLARATION OF OWEN HERMSEN IN SUPPPORT OF
DEFENDANTS' JOINT MOTION FOR A VEXATIOUS
LITIGANT ORDER AGAINST PLAINTIFF – 4

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

**606**

**1039**

19.    Even if the Court does block this specific filing, Benshoof is likely to try filing against Ms. Owen and me et al. through other means. He is likely to try every avenue he can unless they are specifically forbidden to him.

20.    For this reason, I ask that the Court bar Benshoof from filing against Ms. Owen, myself, our counsel, our witnesses, our families, our friends, etc. on behalf of himself and **any** party, not just his son Azhrael.

**Past Harassment by Benshoof**

21.    As I made the Court aware in a previous declaration [Dkt. 95], as did my friend Dr. Ivan Molton [Dkt. 96], on December 17, 2022, Benshoof trespassed into my home wearing a black balaclava to serve me papers. Benshoof was unhinged, traumatizing my friends and me with his unstable acts.

22.    However, that was not the first time Benshoof tried a stunt like that.

23.    On Sunday, October 16, 2022, Benshoof and one of his associates came to my house ostensibly to serve papers. My housemate opened the door and refused to take the papers.

24.    Benshoof photographed her without her permission while she was inside our house, was verbally rude to her in person, and then sent me a text with the photo and mocking text. Attached hereto as **Exhibit 2 p. 1** is a true and correct copy of the text message Benshoof sent me.

25.    He followed up days later with more texts speculating about the contents of my house, clearly to show that he was spending more time looking at the photo and considering my living situation. Attached hereto as **Exhibit 2 p. 2** is a true and correct copy of that text message Benshoof sent me.

26.    In addition to photographing my roommate and texting that to me, Mr. Benshoof harassed me for many months with a constant stream of unsolicited texts, often including threats to the legal wellbeing of Ms. Owen, Ms. Lerman, myself, various other friends, lawyers, and even

DECLARATION OF OWEN HERMSEN IN SUPPPORT OF
DEFENDANTS' JOINT MOTION FOR A VEXATIOUS
LITIGANT ORDER AGAINST PLAINTIFF – 5

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

**607**

King County judges, as previously described. It also included a great deal of false anti-vaccine propaganda.

27.    I had previously requested that he not send me this material. Unfortunately, I made that request only in verbal form, not written.

28.    Benshoof sent me 121 insane rambling SMS/text messages, videos, and audio recordings from March 11, 2022, to December 15, 2022. Many of them were several screens long. I did not reply to any of these to avoid inciting him, but I continued to monitor his activity watching for signs of escalating violence. I turned off the function that would notify him that his messages had been seen or read on my end.

29.    After months of this harassment, Benshoof messaged me on the Signal app so that he could see that I had read the message. As I went to erase it, he began harassing me directly via that medium.

30.    At that point on December 15th 2022, I finally blocked messages from Benshoof on all mediums. I sent him a final statement that he was not to come to the residence where he had been harassing me and photographing my housemate. However two days later on December 17th 2022 Benshoof intruded physically into my home wearing a balaclava.

31.    From the vast number of insane text messages Benshoof sent me, some really stood out as deeply perturbing.

32.    I want to make the Court aware of several text messages that were very unnerving. For example, Benshoof sent me a news article about a mob setting someone on fire for harming a child (he insists that Ms. Owen's vaccination of A̶b̶R̶ṉ̶'s child abuse and has repeatedly asked if I was "accessory to it."). Then he alleges we committed extortion against him. Attached hereto as **Exhibit 3** is a true and correct copy of that text message Benshoof sent me.

33.    While he claims to be "a pacifist" in his text message, he is not, and, to my knowledge, owns firearms despite being a felon with a bench warrant out right now for failure to

DECLARATION OF OWEN HERMSEN IN SUPPPORT OF
DEFENDANTS' JOINT MOTION FOR A VEXATIOUS
LITIGANT ORDER AGAINST PLAINTIFF – 6

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

608

surrender his weapons. The implication of the article's placement and his statement in the same message is clearly violent.

34.     Benshoof has sent several messages with barely-concealed threats like this over those months.

35.     Another example is a text message Benshoof sent calling me a "Fucking Retard." It also contains speculation about my physical location. Attached hereto as **Exhibit 4** is a true and correct copy of that text message. I include this text because it contains both those elements in a single message.

36.     Benshoof has been explicit that his suits are intended to create burdensome costs and financial harm to Ms. Owen and her co-defendants. Mr. Benshoof told their son A█████ R. W█████ this explicitly in text messages over the Discord messaging application during the 11 months he contacted the child over that medium in violation of the DVPO forbidding that. I understand Ms. Owen has downloaded and cataloged all those communications and attached them as exhibits to her declaration.

37.     Benshoof's plan has been successful. My legal costs defending against Benshoof have been over $5,000 within the last three months, which is most of what I earned from my job at that time. My savings are wiped out, and every new filing requires thousands of dollars in legal fees to defend against. The present filing for a will cost me and Ms. Lerman roughly $4,000.

38.     I have also spent hundreds of hours working to defend myself from Mr. Benshoof: consulting with counsel, discussing the attacks with Ms. Owen and Ms. Lerman, writing statements, researching the law, and gathering the resources needed for our counsel to present our defense. Fortunately, little of the material gathered has been needed because it is so evident that Benshoof's claims are baseless and his actions harmful.

DECLARATION OF OWEN HERMSEN IN SUPPPORT OF
DEFENDANTS' JOINT MOTION FOR A VEXATIOUS
LITIGANT ORDER AGAINST PLAINTIFF – 7

**609**

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

39.     Even the instant Declaration has taken me at least 8 hours to write. To do so, I have had to take time off of work, writing this in the few hours available before Benshoof files **yet another** round of legal attacks. That has cost me at least two hundred dollars in income.

40.     Sadly, recovering court-ordered legal costs will probably be difficult. Benshoof is an armed, unlicensed marijuana grower. He has no legal employment or income to leverage, and getting into his house to seize his assets would be extremely dangerous.

41.     Benshoof almost certainly has large resources of untaxed illegal cash hidden in various places (proceeds from his marijuana grow), but the chances of any of that being recovered are low. These resources allow him to spend vast amounts of time on further vexatious legal attacks.

42.     To my knowledge, if an attorney filed as many incessant, frivolous, factually and legally baseless lawsuits and motions as Benshoof, that attorney would likely face significant sanctions from the respective courts and the bar. Benshoof has been acting as his own lawyer and, as is apparent from his pleadings and motions, views himself as a legal genius with a more acute grasp of the law than all of our U.S. Supreme Court Justices combined. Nevertheless, Since Benshoof is not a lawyer, he does not have to answer to the bar and cannot be disbarred.

43.     Therefore, in light of the significant financial and emotional harm Benshoof has deliberately caused everyone in his crosshairs, I plead with this Court to enjoin him from ever filing another lawsuit against me, my friends, my family, my attorney, and the other defendants, their friends, their families, and their attorneys.

**I certify and declare under the penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge, information, and belief.**

DECLARATION OF OWEN HERMSEN IN SUPPPORT OF
DEFENDANTS' JOINT MOTION FOR A VEXATIOUS
LITIGANT ORDER AGAINST PLAINTIFF – 8

**610**

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

1    DATED: February 17, 2023, at Seattle, Washington.

2

3

4

5    _____

6    Owen Hermsen

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**611**

DECLARATION OF OWEN HERMSEN IN SUPPPORT OF
DEFENDANTS' JOINT MOTION FOR A VEXATIOUS
LITIGANT ORDER AGAINST PLAINTIFF – 9

ADMON LAW FIRM, PLLC
300 Lenora St., #4008
SEATTLE, WA 98121
PHONE: (206) 739-8383
FAX: (206) 494-0001

**1044**

M Gmail

**kurt benshoof <kurtbenshoof@gmail.com>**

## Parenting Plan
5 messages

**kurt benshoof** <kurtbenshoof@gmail.com>                              Tue, Feb 1, 2022 at 1:09 PM
To: Nathan <nathan@seattledivorceservices.com>

Brother Nathan,

Is there any update on the revision?

In spirit,
Kurt

**Nathan** <nathan@seattledivorceservices.com>                         Wed, Feb 2, 2022 at 2:23 PM
To: kurt benshoof <kurtbenshoof@gmail.com>

Ms. Owen and I are still discussing how to respond to your proposal.

Sincerely,

**Nathan Cliber**

Seattle Divorce Services

2317 NW Market St.

Seattle, WA  98107

206-784-3049

Nathan@SeattleDivorceServices.com

**NOTICE:**  This communication and the information contained within, along with any items attached as an enclosure,
are **privileged and confidential**.  This communication is intended solely for the use of the individual(s) named above.
If you are not one of the intended addressees or you believe you may have received this communication in error, you
are hereby notified that any consideration, dissemination or duplication of this communication is **strictly prohibited**.
In addition, unless you are the intended recipient, you shall not print, copy, retransmit, disseminate, or otherwise use
this information in any form without first receiving specific written permission from the author of this communication.  If
you have received this communication in error, please reply to the sender indicating that fact and delete this message
from your system immediately.

**IRS CIRCULAR 230 DISCLOSURE**: To ensure compliance with IRS requirements, we inform you that any advice
contained in this communication (including any attachments) is not intended or written to be used, and cannot be used,
for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.

[Quoted text hidden]

**kurt benshoof** <kurtbenshoof@gmail.com>                              Thu, Feb 3, 2022 at 9:29 AM
To: Nathan <nathan@seattledivorceservices.com>

**296**

Brother Nathan,

**1045**

I don't know your attorney rules for communications or whatever it's called, but if you are amenable to a phone call tomorrow, we might be able to make some progress together.

If you are just let me know a good time and number.  If not, no worries, brah.

In Spirit,
Kurt
[Quoted text hidden]

**Nathan** <nathan@seattledivorceservices.com>                                      Thu, Feb 3, 2022 at 9:54 AM
To: kurt benshoof <kurtbenshoof@gmail.com>
Cc: Sarah <Sarah@seattledivorceservices.com>

Mr. Benshoof,

I appreciate your desire to move the process forward, but I'm not able to proceed with substantive negotiations until such time as my client and I have decided what our next proposal will be.  I appreciate your patience.

That said, there is something you can do to help keep things moving smoothy.

I sent this to you previously but I think it got lost in the shuffle.  The Confirmation of Completion of Genetic testing is due in a week.  A draft is attached.  In this case, since everyone agrees that you're A████s biological and legal father, there's no need for genetic testing, but we do need to submit this document to the Court saying as much.

Please do, at your earliest convenience, sign this and return it to me so I can sign and submit it to the Court.

Thank you.

[Quoted text hidden]

   📄 **Owen - Conf. Genetic Testing - 2022-01-11.pdf**
    88K

**kurt benshoof** <kurtbenshoof@gmail.com>                                      Thu, Feb 3, 2022 at 6:03 PM
To: Nathan <nathan@seattledivorceservices.com>

Oh!  Sorry I didn't realize that needed signing.  I will get that over to you by the morning.
[Quoted text hidden]

.**297**

Home » Courts » King County Superior Court » Get Help & Information » COVID-19 Court Operations

# Court Operations During the COVID-19 Pandemic

العربية          中文          Soomaali          Español          Tiếng Việt

## Is court open?



Yes, although we have modified some of our operations.  Courthouse locations are here.  Be sure to verify the location prior to coming to court as many hearings are offered remotely or in a different location than before.

## How will you keep everyone safe?

Please participate by phone or video if encouraged to do so by the judge, or your attorney, and you have the necessary equipment.  To make sure you receive instructions from the court, please update your contact information.  Email addresses for program staff, judges and their bailiffs are here.

If you do come to court, you will be required to wear a mask or facial covering.  The Court will have masks available for use free of charge.  You will not be required to wear a mask if:



- You need to keep your mouth and nose clear for medical or mental health reasons;
- You are a child aged two years or less;
- You need your mouth to be visible because you are deaf or hard of hearing or are communicating with someone who is deaf or hard of hearing; or
- A judge permits you to temporarily remove the mask so that you can be heard clearly in the courtroom.

The Court will be enforcing social distancing rules.  You may sit or stand only in designated spaces.

Courthouse personnel are sanitizing surfaces regularly. The Court will have hand sanitizer and disinfecting cleaning supplies available to you in all public areas, including courtrooms and jury spaces.



**1047**

```
 1              IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

 2                    IN AND FOR THE COUNTY OF KING

 3   _____

 4   KURT BENSHOOF,                  )
                                     )   COA Appeal No. 85092-0-I
 5            Plaintiff,             )   Cause No. 22-2-15958-8 SEA
                                     )
 6   v.                              )
                                     )
 7   NATHAN CLIBER, JESSICA OWEN,    )
     MAGALIE LERMAN,                 )
 8                                   )
              Defendant.             )
 9   _____

10                  MOTION HEARING - VIA ZOOM

11        The Honorable Commissioner Mark Hillman Presiding

12                     December 19, 2022

13   _____

14                  MOTION HEARINGS - VIA ZOOM

15        The Honorable Marshall Ferguson Presiding

16                     January 27, 2023
                       March 17, 2023

17   _____

18

19

20

21

22

23

24   TRANSCRIBED BY:      Reed Jackson Watkins
                          Court-Certified Transcription
25                        206.624.3005
```

1                    A P P E A R A N C E S

2

3    On Behalf of Plaintiff pro se:

4    KURT BENSHOOF

5    1716 North 128th Street

6    Seattle, Washington 98133

7

8    On Behalf of Defendant Cliber:

9    KYLE REKOFKE

10   Gordon Rees Scully Mansukhani

11   701 Fifth Avenue, Suite 2100

12   Seattle, Washington 98104-7084

13

14   On Behalf of Defendant Owen:

15   ANTHONY S. MARINELLA

16   BLAIR RUSS

17   Tomlinson Bomsztyk Russ

18   1000 Second Avenue, Suite 3660

19   Seattle, Washington 98104

20

21   On Behalf of Defendant Lerman and Hermsen:

22   MOSHE Y. ADMON

23   Admon Law Firm, PLLC

24   300 Lenora Street, Number 4008

25   Seattle, Washington 98121

**1049**

1              I N D E X   O F   P R O C E E D I N G S

2

3    PROCEEDINGS                                              PAGE

4    All proceedings commence.................................   4

5    December 19, 2022, proceedings commence..................   4

6    December 19, 2022, proceedings concluded.................  10

7

8    January 27, 2023, proceedings commence...................  11

9    Argument.................................................  17

10   Ruling by the Court......................................  111

11   January 27, 2023, proceedings concluded..................  117

12

13   March 17, 2023, proceedings commence.....................  118

14   Argument.................................................  119

15   Ruling by the Court......................................  147

16   March 17, 2023, proceedings concluded....................  154

17

18

19

20

21

22

23

24

25


**1050**

1                                    -o0o-

2                            December 19, 2022

3

4        THE COURT:  All right.  Good afternoon.  This is

5     Commissioner Hillman.  This is our 2 o'clock matter.  I have

6     Benshoof v. Cliber and Owen and Lerman, King County Cause

7     Number 22-2-15958-8.

8        Who do we have here?

9        MR. MARINELLA:  Anthony Marinella, Your Honor,

10    representing Ms. Owen.

11       MR. REKOFKE:  Your Honor, my name's Kyle Rekofke, and I

12    represent Mr. Cliber.

13       THE COURT:  Okay.  So who is the moving party?  Both of

14    you?

15       MR. REKOFKE:  Yeah.  It's a joint, joint TRO request.

16       THE COURT:  Okay.  Well, there are many problems with this

17    motion.  So to start with, the order that you gave me is the

18    wrong order.  The ex parte department would only hear an

19    immediate injunction or restraining order.  That means it's

20    good for two weeks.  And you'd have to have a return hearing

21    built into that order that's been set up with your trial

22    judge, and I don't see that anywhere in your order that

23    you've got a date from your trial judge.

24       MR. REKOFKE:  I apologize it's not in the order,

25    Your Honor.  We do have a date.  It's January 27th.  And

**1051**

```
 1        it's so far out, I believe, because of the transfer of
 2        judges on the 17th.
 3          THE COURT:  Okay.  So that's the first problem.
 4          The second problem is I don't -- did you give the other
 5        party notice?
 6          MR. REKOFKE:  We did not, and we explained that in our
 7        papers.
 8          THE COURT:  I won't be signing the order then.
 9          MR. REKOFKE:  Okay.
10          THE COURT:  You have to give the other party notice.
11        Family law allows you to do it without notice, but this
12        isn't a family law case.
13          MR. REKOFKE:  Okay.  I guess we thought, as we read 65 --
14        CR 65(b), it said it could be given without notice as long
15        as the parties certify the reasons why notice wasn't given
16        in their motion.
17          THE COURT:  All right.  I'll go to my third problem with
18        this is the ex parte department can only issue an order if
19        you show imminent and irreparable harm.  I read your
20        materials.  I'm not sure you've shown that.
21          So the order is wrong.  You didn't give notice to the
22        other party.  And I'm certainly not satisfied that you can
23        have a hearing without notice.  I don't think you've met
24        that threshold.  But I'll let you argue that, if you want
25        to.  But I can't even sign the order you've given me.  And I
```

1    don't know that I can sign an order that's more than 14 days

2    out.  You'd have to give me some sort of statutory authority

3    that says I can sign an injunction more than -- that's good

4    for more than 14 days.

5       MR. REKOFKE:  I think, Your Honor, if you were to sign it,

6    we -- a proper order, we'd have to come back and extend it.

7    I don't think there is authority for you to sign it for more

8    than 14 days.  And it's just a function of the first

9    trial -- the first preliminary injunction hearing date that

10   we could get.

11      THE COURT:  Well, who is your trial judge?

12      MR. REKOFKE:  Judge Ferguson.

13      THE COURT:  Did you explain to Judge Ferguson's bailiff

14   what your motion was and that you -- your order would only

15   be good for 14 days?

16      MR. REKOFKE:  If -- since I don't feel (inaudible)

17   situation, because it sounds like you've read our materials,

18   we think that he rarely just files something if you let him

19   know what we're trying to do.  And Judge Ferguson's court

20   won't allow us to have any contact that he -- with their

21   court that he's not copied on.  So we'd request that,

22   generally speaking, a date for a preliminary injunction

23   hearing without divulging what it was about.

24      THE COURT:  If Judge Ferguson won't allow you to have any

25   court date without notifying him, why would I?

**1053**

1      MR. REKOFKE:  Okay.  Your Honor, I thought that the 65(b)

2   allows for notice -- it's a high burden.  I don't dispute

3   that.  But it allows for no notice and the temporary

4   restraining order when certain standards are met.

5      THE COURT:  If Judge Ferguson has entered an order that

6   doesn't allow you to present anything to Judge Ferguson

7   without giving the other -- him notice, I certainly won't be

8   doing that.  (Inaudible) --

9      MR. REKOFKE:  (Inaudible).

10     THE COURT:  -- has a really good reason for doing that.

11     MR. REKOFKE:  As far as I'm aware, it's just their court's

12  general practice.  I don't think that -- they don't know

13  anything about our specific situation, to my knowledge.

14     THE COURT:  All right.  Well, get me a proper order so

15  that if I do grant your motion, without notice, and I'm not

16  saying I will or will not.  I don't even have a proper order

17  before me.

18     MR. REKOFKE:  We considered that, Your Honor.

19     THE COURT:  I appreciate you -- you've got to at least go

20  to Judge Ferguson and tell -- (inaudible) -- you got to at

21  least go to Judge Ferguson's courtroom and see if you can

22  get a return hearing.

23     MR. REKOFKE:  Earlier than the one that we currently have?

24     THE COURT:  Yes.  Because the order that I could -- any

25  order I can issue is -- can only be good for 14 days under

**1054**

1          the court rule.

2          MR. REKOFKE:  I understand that.  And my understanding is

3      we can't get an earlier hearing date.  We can certainly try,

4      but our transfer to Judge Ferguson's court takes effect I

5      think the 17th of January.

6          THE COURT:  Well, who is your current judge?

7          MR. REKOFKE:  I believe it's Judge Robertson.

8          THE COURT:  Okay.  So why aren't you contacting Judge

9      Robertson's court?

10         MR. REKOFKE:  I believe we were told to motion in front of

11     Judge Ferguson's court because he'd be taking over, but

12     that's probably a step we should have explored, given the

13     nature of this relief.

14         THE COURT:  If you're seeking a preliminary injunction,

15     you have to follow the rules.  You have to get me a return

16     hearing date from your trial judge roughly 14 days from now.

17     If your current trial judge is Judge Robertson, you would go

18     to Judge Robertson.  If your trial judge after some date in

19     the future is Judge Ferguson, that's a different issue

20     altogether.

21         Why did Judge Ferguson issue an order saying you couldn't

22     note anything up before him without notifying the other

23     party?  Or was that just an email?

24         MR. REKOFKE:  It was just that we attempted to email his

25     judicial assistant, and the judicial assistant told us that

1    we needed to copy the plaintiff.  It wasn't a formal order.

2      THE COURT:  All right.  Get me a proper order.  You can --

3    I'll let you orally argue that you are somehow entitled to

4    this relief without giving the other side notice, if you

5    want to, or you can give the other side notice and we can

6    have a hearing and I can determine whether there will be an

7    imminent and irreparable harm caused if I don't enter this

8    order.  But I'm not going to do it at this point without

9    notice.  But if you want to argue that, once you get a

10   proper order before me, I can do that.  But --

11     MR. REKOFKE:  Okay.  I appreciate that.

12     THE COURT:  -- obviously giving him notice that you're

13   going to be in the ex parte department one day from the day

14   on this mo- -- or two days from the day on this motion for

15   an injunction, I don't know that he'd be able to file

16   anything that quickly.

17     If you want to get me a proper notice, if you wanted to

18   come back tomorrow afternoon, I can set you on my calendar

19   for tomorrow afternoon.

20     MR. REKOFKE:  Okay.

21     THE COURT:  So you just have to decide whether you're

22   going to give the other side notice.  Your risk is, if I say

23   I'm not going to let you have this hearing without notice to

24   the other side, then you may lose.  You may have to do it

25   all over again.  Right?

**1056**

1          MR. REKOFKE:  Right.

2          THE COURT:  Give notice, at least you pass that little

3     hurdle.

4          MR. REKOFKE:  Right.

5          THE COURT:  Okay.  But you need to reach out to your

6     current trial court and see if they can get you in because

7     what was the date that Judge Ferguson gave you again?

8          MR. REKOFKE:  January 27th.

9          THE COURT:  Yeah.  No, I'm not going to issue an order --

10    I'm not going to issue an injunction for basically six weeks

11    without notice to the other side.

12         MR. REKOFKE:  Okay.  Okay.

13         THE COURT:  So do you want me to put you on the calendar

14    for tomorrow?  You can get me another order with a date in

15    it from -- that's with Judge Robertson?

16         MR. REKOFKE:  Yes.  And then if we can't be under that

17    time frame, we can let the ex parte department know so we

18    don't waste your time tomorrow.  But we'll request a date

19    right away.

20         THE COURT:  All right.  I'll put -- I'll hold this until

21    tomorrow.  All right?

22         MR. REKOFKE:  Thank you.

23         THE COURT:  Thank you.

24         MR. MARINELLA:  Thank you.

25              (December 19, 2022, proceedings concluded)

**1057**

1                          -o0o-

2                    January 27, 2023

3

4        THE BAILIFF:  Benshoof v. Nathan Cliber, et al., Cause

5    Number 22-2-15958-8 SEA.

6        For the record, this morning, will the petitioner please

7    introduce yourself.

8        THE COURT:  Zoom indicates that Mr. Benshoof, and I hope

9    I'm pronouncing that correctly, is still connecting to

10   audio.  I'm not sure what the problem would be on his end.

11   That's how I -- there's a chat indicating that plaintiff is

12   logged in but isn't yet connecting audio/video.

13       Give plaintiff a moment here.  Looks like perhaps he has

14   established an audio connection.

15       Mr. Benshoof, are you there?

16       Still having audio problems.

17       Well, Madam Bailiff, why don't we check the other folks

18   in.

19       THE BAILIFF:  All right.  And, all, if I miss anyone, just

20   please let us know.

21       So let's start with counsel -- respondent's counsel for

22   Cliber.

23       MR. REKOFKE:  Good morning, Your Honor.  This is Kyle

24   Rekofke on behalf of Mr. Cliber.

25       THE BAILIFF:  And respondent's counsel for Ms. Owen?

**1058**

```
 1        MR. MARINELLA:  Good morning, Your Honor.  This is Anthony
 2    Marinella for Ms. Owen.
 3        THE COURT:  And, Madam Bailiff, just a point of order, in
 4    dependency it was respondents.  Now that we're back handling
 5    civil matters, it would be defendant's counsel.
 6        THE BAILIFF:  Defendant's counsel.
 7        THE COURT:  Yep.
 8        THE BAILIFF:  Okay.  All right.  Thank you.
 9        THE COURT:  Yep.
10        THE BAILIFF:  And have we missed anyone?  If so, please
11    introduce yourself.
12        MR. ADMON:  Yes, good morning.  This is Moshe Admon on
13    behalf of Defendants Lerman and Ownsen -- and Hermsen.  I'm
14    sorry.  Owen Hermsen.
15        THE BAILIFF:  All right.
16        MR. RUSS:  And good morning.  For the record, Blair Russ
17    also appearing on behalf of Ms. Owen, but I am not arguing
18    today.
19        THE BAILIFF:  All right.  And is there anyone else may
20    have missed introducing yourself?
21        THE COURT:  Is Mr. Benshoof with us, in terms of his audio
22    connection?
23        Mr. Benshoof, are you there?
24        If you are responding, we cannot hear you.  We also cannot
25    see you.
```

**1059**

1        Mr. Benshoof, if you are there -- I see that you're still

2    on Zoom.  I don't know what the status of your audio

3    connection is.  If you could respond in the chat to let us

4    know your status, that would be helpful; otherwise, you do

5    run the risk, sir, that we may proceed despite your status

6    or situation.  It's unclear whether you're actually having

7    any audio or visual difficulties with your technology or

8    not.

9        Counsel, have any of you received any communication from

10   the plaintiff regarding this morning's hearing?

11       MR. REKOFKE:  Your Honor, I just -- he sent an email to

12   your judicial assistant asking for the Zoom link, but that's

13   the only communication I've seen from him this morning.

14       THE COURT:  All right.  Well, I pressed the button on Zoom

15   asking the plaintiff to start his video.  I don't know

16   whether he has a video-capable device.

17       He is still with us on Zoom, but he's either unable to

18   hear or intentionally not answering the Court.  He's not

19   answering in the chat.  And at this point, I'm inclined to

20   handle this in one of two ways.  Either just simply proceed,

21   regardless of Mr. Benshoof's status, or to briefly recess to

22   give the plaintiff just a little bit of additional time to

23   sort out whatever technology issues that might be presenting

24   an obstacle here.

25       I think I'm inclined to take the latter approach,

**1060**

1    especially if the Court is going to grant any kind of

2    dispositive relief, which has been requested, then I'd

3    rather err on the side of giving Mr. Benshoof a little bit

4    more time to sort out his technology issues and contact the

5    court.

6        So, Mr. Benshoof, if you can hear me, again, this is Judge

7    Ferguson.  I encourage you to reach out to my bailiff via

8    email or to further communicate with us via chat to let us

9    know what's going on with your technology.  I don't know

10    whether you are in close proximity to the courthouse, but

11    you're welcome to come down to the courthouse and attend

12    this proceeding in person, if it will not delay the

13    proceeding substantially.

14        So let us know what's going on.  We're going to recess

15    until 8:45 so we can see -- give Mr. Benshoof a little bit

16    more time to communicate with the Court.

17        All right.  We're at recess.

18                        (Recess)

19        THE COURT:  All right.  Let's go back on the record.

20    Thank you, Mr. Court Clerk.

21        We are back on the record in the matter of Benshoof v.

22    Cliber, et al.  The time is 8:46.  The Court has not

23    received any further communication from Mr. Benshoof,

24    although Mr. Benshoof is still on Zoom.  I see a tile with a

25    screen label of "Kurt Benshoof."

**1061**

1       Mr. Benshoof, are you there?  Can you hear me?  If so,

2    please respond.

3       The video is turned off.  I'm requesting that Mr. Benshoof

4    start the video.  I'm also requesting that Mr. Benshoof

5    communicate with the Court via the chat function.  Normally,

6    I don't permit that.  But in this instance, to clarify his

7    technology issues, I'm asking him to do that.

8       Have any counsel received any further communication from

9    the plaintiff?  Mr. Rekofke?

10       MR. REKOFKE:  No, Your Honor.

11       THE COURT:  Mr. Admon?

12       MR. ADMON:  No, Your Honor.

13       THE COURT:  Mr. Russ?

14       MR. MARINELLA:  Speaking for Ms. Owen, Your Honor, no, I

15    have not received anything.

16       THE COURT:  All right.  Thank you.

17       Then unless counsel have any other concerns or objections,

18    for that matter, I'm inclined to proceed.  My -- frankly, my

19    concern is that Mr. Benshoof, who asked to participate via

20    Zoom, is now attempting to delay the proceedings by

21    manufacturing an unspecified technical obstacle to

22    proceeding.  He has not made any attempt to communicate with

23    the Court or with the parties about what's going on with his

24    situation.  He is here on Zoom.  The Court has been

25    conducting Zoom proceedings for almost three years now at

**1062**

1    this point, and in the Court's experience, it is very rare

2    for a party to participate via Zoom, encounter technical

3    difficulties, and then have absolutely no means whatsoever

4    of communicating with anyone about what's going on.  Usually

5    they reach out to one of the other parties or the bailiff

6    and provide some explanation about what's happening.

7       So that is the Court's concern here.

8       Mr. Marinella, Mr. Admon, are you prepared to proceed?

9       MR. MARINELLA:  Yes, Your Honor.  And, for the record,

10   Your Honor, I think it's important to state that at

11   8:30 a.m., Mr. Benshoof texted everyone in the chat function

12   saying "Hello, plaintiff is logged in but isn't yet

13   connecting audio and video."

14      At 8:31 he then said "Received and thank you."

15      I'm assuming he was speaking to your bailiff.

16      THE COURT:  Well, that -- that response was my bailiff

17   responding to him.

18      MR. MARINELLA:  Understood.  And, for the record, he also

19   emailed the Court at least four times yesterday,

20   consecutively.  So I just want to put that on the record,

21   Your Honor, to have a clear record that he does know the

22   Court's email address and he has been regularly

23   communicating with the Court and with counsel.

24      THE COURT:  Agreed.

25      Mr. Rekofke, are you prepared to proceed?

1063

1          MR. REKOFKE:  I am, Your Honor.  And if I can make a brief

2     request.  I -- would you entertain my motion first?  I have

3     a mediation that starts at 9:00 and the associate that was

4     going to cover that just recently left our firm.  So I

5     accidentally got double-booked this morning.

6          THE COURT:  I see.

7          Any objection?

8          MR. MARINELLA:  No, Your Honor.

9          THE COURT:  All right.  So, Mr. Rekofke, we'll commence

10    with your client's motion, whenever you're ready.

11         MR. REKOFKE:  Thank you, Your Honor.

12         On behalf of Mr. Cliber, we're here today asking this

13    Court to dismiss the complaint filed against Mr. Cliber

14    pursuant to the protections of the Uniform Public Expression

15    Protection Act, which I'll called UPEPA for brevity's sake.

16         There's basically three elements under UPEPA toward

17    dismissal, required for dismissal.  So the first is that the

18    moving party, Mr. Cliber, establishes UPEPA bias.  The

19    second is that the nonmoving party, Mr. Benshoof, is unable

20    to establish that UPEPA does not apply.  And then, finally,

21    we make a showing that we're entitled to dismissal under the

22    standards incorporated by the statute, which basically

23    amount to the CR 12 standard and the summary judgment

24    standard.

25         So the first showing we need to make is that UPEPA

**1064**

1       applies, and based on the pleadings it clearly does.  This

2       claim brought against Mr. Cliber is for abuse of process.

3       Mr. Benshoof expressly plead that this cause arose out of

4       what we termed the domestic violence action and the

5       parentage action.  Those are two actions which involved

6       Mr. Owen -- or Ms. Owen and Mr. Benshoof.

7          My client, Mr. Cliber, represented Ms. Owen in the

8       parentage action.  He was not involved in the domestic

9       violence action, at least in a formal representation, you

10      know, filed a notice of appearance type of way.

11         So UPEPA expressly stated under Section 010 -- or

12      4.105.010(2)(a), that the statute applies to communications

13      made in judicial proceedings.  So the communications were

14      the judicial proceedings in the parentage action.

15         THE COURT:  So, Mr. Rekofke, I'm going to stop you here

16      because I want to ask a question --

17         MR. REKOFKE:  Sure.

18         THE COURT:  -- that I think might apply to all of the

19      UPEPA claims here.

20         There is some case law cited in Owen's motion materials

21      suggesting that the anti-SLAPP statute is intended to

22      address speech that concerns matters of public concern,

23      relating to matters of political, social, or other concerns

24      to the community.

25         And I wonder whether this is the sort of scenario that was

1065

1       intended to be covered by the anti-SLAPP statute especially

2       where the legislature in 2020 passed the Abusive Litigation

3       Act, which is RCW Chapter 26.51.  As I was researching the

4       materials for today's hearing, I came across that statute

5       and I came across a very recent 2022 Court of Appeals'

6       ruling about the Abusive Litigation Act that made me wonder

7       whether the legislature intended to address these sorts of

8       scenarios with that statute rather than the anti-SLAPP

9       statute.

10       MR. REKOFKE:  To the first part of the question,

11      Your Honor, we looked at this and I decided to move under

12      this statute because in 010, provision (2) says, [As read]

13      Except as otherwise provided in subsection (3) of this

14      section, this chapter applies to a cause of action asserted

15      in a civil action against a person based on a person's --

16      and then the next parent -- (a) communication in a

17      legislative, executive, or judicial, administrative, or

18      other governmental proceeding.

19       So to me it seemed fairly broad.  Any communication that's

20      at issue in civil action later asserted that of an

21      underlying civil action.  I'll be frank with you.  I

22      haven't -- I didn't -- I was focused on the scope of this

23      motion.  My brief recollection, and I could be wrong here,

24      is that that was the -- the abusive litigation statute may

25      require some sort of intimate relationship.  And I could be

**1066**

1    off base there, but if that is true, Mr. Cliber wouldn't

2    have that relationship with Mr. Benshoof.

3      THE COURT:  So --

4      MR. REKOFKE:  That's why we proceeded under this statute.

5      THE COURT:  Which makes sense.  Which makes sense.

6    However, there's a decision that came out of Division I in

7    November of 2022, and I realize that's a very new case.

8    It's called Kuhlmeyer, Kuhlmeyer v. Latour.  And what

9    happened in that case seems very, very similar to this case,

10   where you had a -- a male parent, a father, who lost in

11   assorted proceedings in family law.  That case is -- there

12   was an order under -- I think it was 26.09, finding that the

13   father was a risk to the mother, but it wasn't a DVPO.  The

14   father -- so the father sued the mother and kind of anyone

15   connected with the mother, including mother's counsel, and

16   then also filed a series of lawsuits in state and federal

17   court.

18     The trial court dismissed not only the claims against the

19   mother, the intimate partner, but also everyone else.  And

20   it wasn't actually specifically under the statute.  It was

21   under the court's inherent authority to manage litigation.

22   And that the other -- the father in that case basically

23   argued these aren't intimate partners, these are just other

24   parties that I sued, and the Court of Appeals affirmed the

25   trial court saying, well, this is clearly abusive litigation

**1067**

1        and the court has inherent authority to manage litigation.

2        So we're applying the Abusive Litigation Act, but there's

3        also this other inherent authority of the court.

4          And as I was reading Kuhlmeyer and as I was reading that

5        statute, especially in light of the party's current request

6        for a vexatious litigant order, I was more -- kind of the --

7        the gravity of that statute kind of drew me toward that

8        statute rather than UPEPA.

9          I'm not saying that your argument is wrong in how you're

10       applying the anti-SLAPP statute here, but let me -- I wanted

11       to run a hypothetical by you, Mr. Rekofke, because I -- I

12       have a concern about the argument that the parties are

13       making here.

14         Let's say you had someone who made a false claim, a

15       clearly false claim, that someone was a child molester or a

16       child rapist or some horrible claim to the police, and as a

17       result of the claim, another -- the victim lost his job, was

18       evicted, could not find additional housing, there was

19       tremendous reputational damage, and the person who was

20       falsely accused wanted to bring a defamation claim against

21       the person who said that they were, you know, a rapist or a

22       child molester or something like that.

23         What you seem to be arguing is that the person who made

24       that false claim would be immune from civil suit for

25       defamation because they made that claim to the police, and

**1068**

1    you couldn't bring a defamation claim if you were accused of

2    being a child molester because all that person did was file

3    a police report.

4      Is that true?  Does the anti-SLAPP statute prevent civil

5    liability for defamation, even in an extreme case like that?

6      MR. REKOFKE:  Well, I think it wouldn't make you immune

7    from that claim.  It would -- there'd be a question of

8    whether UPEPA applies, and I think UPEPA could apply to the

9    scenario that you are, so it could get you under the

10    protections of this statute.

11      But unless you can prove that you're entitled to

12    dismissal -- so if you had good facts about reputational

13    harm about how this was false, you would never get summary

14    judgment that we're asking for under this statute.  You may

15    have a -- oh, I'm sorry, Your Honor.  I think Mr. Benshoof

16    just entered the chat.

17      THE COURT:  Mr. Benshoof, we have made multiple efforts to

18    get you on Zoom.  Are you with us?  Can you hear me?

19      So Mr. Benshoof wrote in the chat:  Is there a reason my

20    video isn't working yet?  This feels a little bit like an ex

21    parte situation as I see that all the attorneys and the

22    Honorable Marshall Ferguson have their video on.

23      That is correct, Mr. Benshoof.  We have been waiting for

24    you to respond.  I have asked you to reach out to Madam

25    Bailiff.  It's clear that you had the ability to communicate

**1069**

1    with the Court, but you haven't done so this morning.  I'm

2    not sure you can hear me now, but you are able to chat.  I

3    don't know why your video isn't working.  I'm going to

4    respond in the chat, which I ordinarily would not do.  I'm

5    going to ask you to either call in or reach out to Madam

6    Bailiff.

7        All right.  I have responded to the plaintiff,

8    Mr. Benshoof:  Please call my bailiff at (206) 477-1513 or

9    email the bailiff regarding your participation in this

10   hearing.

11       There is an Artrexis Lives [phonetic] or lives in the

12   waiting room.  Does anyone know who that would be?

13       MR. REKOFKE:  No, Your Honor.

14       THE COURT:  All right.  This matter is open to the public,

15   so I will admit whomever that might be.  Wondering if it's

16   Mr. Benshoof.

17       Good morning to the individual joining this proceeding

18   with screen name Artrexis Lives.

19       And that person has fallen off the Zoom or left the Zoom

20   voluntarily.

21       Again, Mr. -- the screen name "Kurt Benshoof" is still

22   with us in this proceeding.  Mr. Benshoof replied "thank

23   you" to the Court's chat message.  And we'll hit the pause

24   button here to see if Mr. Benshoof contacts Madam Bailiff.

25       All right.  It does sound like, from what I'm hearing in

**1070**

1        the background, that someone has called Madam Bailiff,

2        though she -- it sounds like she's having some difficulty

3        hearing that caller.

4         I've just sent a message in the chat to Mr. Benshoof

5        indicating that he may also call in to Zoom using his phone,

6        using the Zoom dial-in information in the link that's

7        provided to him.

8         Just a moment.

9         MR. RUSS:  And, excuse me, Your Honor.  I know I shouldn't

10        be speaking today, but would the Court mind providing the

11        cite for the Coleman [phonetic] case so we can take a look

12        at that?

13         THE COURT:  Sure.

14         MR. RUSS:  If it's convenient.

15         THE COURT:  Sure.  In just a moment.

16         Madam Bailiff, it did sound like someone was calling the

17        court a moment ago; is that correct?

18         THE BAILIFF:  Yes, Your Honor.  And I did answer the

19        phone.  I said hello four times.  There was no one on the

20        line.  I sent an email to Mr. Benshoof about two minutes ago

21        and copied counsel and asked him if he would just send an

22        email.  And then there is a message in the chat that he left

23        bailiff a voice mail.

24         Is the bailiff allowed --

25         THE COURT:  All right.  So Mr. Benshoof, again, has

**1071**

1     messaged -- left a message in the chat writing, "I left the

2     bailiff a VM," for voice mail.  "Has the bailiff allowed my

3     video to work yet?  The start video icon is not showing as

4     able to be activated on my computer, which seems to indicate

5     that the bailiff may not have granted me permission for

6     video feed."

7       The bailiff is not controlling your video, Mr. Benshoof,

8     if you can hear me.

9       His Zoom tile now indicates that he's connecting to audio.

10      I will state for the record that I am controlling which

11    parties are muted or which parties have access.  I have not

12    restricted Mr. Benshoof's video access in any way or his

13    audio access.

14      I'm sorry, Madam Bailiff?

15      THE BAILIFF:  There's no indication that the Court has

16    received a voice mail.

17      THE COURT:  Thank you.

18      The citation on the Kuhlmeyer case, Kuhlmeyer is spalled

19    K-u-h-l-m-e-y-e-r.

20      We've got a phone number joining us now.  It's

21    (206) 460-4202.  If that is Mr. Benshoof, would you identify

22    yourself.  And if you -- you might need to press star 6 to

23    unmute yourself.  If you're joining us by phone, press star

24    6 to unmute yourself.

25      Hello?

**1072**

1    MR. BENSHOOF:  Yes.  This is Mr. Benshoof.  Is there --

2    hello?  Can you hear me?

3    THE COURT:  I can.  This is Judge Ferguson.  Can you hear

4    me?

5    MR. BENSHOOF:  Hello.  Good morning, Judge Ferguson.  I

6    can hear you finally.

7    THE COURT:  All right.  Good.  So to answer your chat, it

8    is not the bailiff who is controlling the Zoom controls.  I

9    am.  I have not put any restrictions on your video access or

10    your audio access.  I don't know why you're not able to join

11    us by video.  Everyone else is.  I believe it is technical

12    issues on your end, not this end.

13    MR. BENSHOOF:  Oh, yeah.  I've never had a problem on Zoom

14    like this ever, but okay.  I'm not a computer expert, so I

15    have to claim some ignorance.

16    THE COURT:  Okay.

17    MR. BENSHOOF:  But I -- I -- so it's my preference,

18    Your Honor, that I be able to as fully participate as

19    possible, and I understand if you wish to proceed because --

20    for whatever reason, but I would merely wish to note an

21    exception that I'm objecting to my lack of access today.

22    THE COURT:  All right.  So noted.  I will point out that

23    we waited until 8:45 -- this matter was set to start at

24    8:30.  We waited until 8:45 to give you time to sort out

25    whatever obstacle was in your way of participating through

**1073**

1    video.  Your Zoom tile indicates that you're still

2    connecting to audio, so I don't know what your audio issues

3    are.  None of the other parties have had any audio or video

4    access difficulties this morning.  I am able to hear you

5    loud and clear by phone, but we have been making great

6    efforts to get you to join us by Zoom, and I don't know what

7    the obstacle would be to you joining by video.

8        Do you have -- do you have a video-capable device?

9        MR. BENSHOOF:  Yes, yes.  Just so you know, Your Honor,

10   I've been using this exact computer for over -- for two

11   years to attend Zoom hearings in several municipal courts,

12   in King County District Court, in King County Superior, and

13   I've never encountered a situation like this.

14       THE COURT:  Okay.

15       MR. BENSHOOF:  So I don't know what to tell you,

16   Your Honor.

17       THE COURT:  Are you on a laptop or desktop?

18       MR. BENSHOOF:  It's a laptop, sir.

19       THE COURT:  And it has a -- does it have a built-in web

20   cam or like a portable or wireless web cam?

21       MR. BENSHOOF:  I'm on a Mac laptop.  It has a built-in

22   camera.  It's normally just click, click, and it works, you

23   know.

24       THE COURT:  All right.  When I hit -- when I press the

25   button on Zoom, "ask to start video," you should get a cue

**1074**

1    to start your video.  Do you get that?  On your --

2    MR. BENSHOOF:  Yeah.  And I click on it and it still

3    (inaudible).  Here, I'm --

4    THE COURT:  Have you gone to your video settings to test

5    your video settings?

6    MR. BENSHOOF:  Well, nothing's ever -- I don't even use

7    this computer except for Zoom, except for this very thing,

8    so -- so, like, nothing's changed, you know.  I use this

9    regularly for court hearings.  I've done nothing with the

10   computer --

11   THE COURT:  Okay.

12   MR. BENSHOOF:  -- so.

13   THE COURT:  It looks like you might be joining with

14   another device; is that correct?  Because there's two Kurt

15   Benshoofs on Zoom now.

16   MR. BENSHOOF:  Oh, I -- yeah.  I was just trying multiple

17   paths to see if I could get it to work.

18   THE COURT:  I see.

19   MR. BENSHOOF:  But -- oh, wait, wait.

20   Can you see me now?  No.

21   THE COURT:  No.

22   MR. BENSHOOF:  Well, yeah, I -- I don't know what else to

23   tell you.  I gave it my best shot.

24   THE COURT:  All right.  We're going to move on.  Again, I

25   don't know what the issues are, but the other participants

**1075**

1    have been able to participate by video and I'm not -- I'm

2    not doing anything to block your video.

3      MR. BENSHOOF:  I trust you, Your Honor.

4      THE COURT:  All right.  The Court was discussing with

5    Mr. Rekofke Defendant Cliber's motion and the claim under --

6    for dismissal under UPEPA.

7      Mr. Rekofke.

8      MR. REKOFKE:  Thanks, Your Honor.

9      I think to pick back up where we left off, about your

10   hypothetical, about how potentially somebody accused of

11   something horrific, such as being a child molester or

12   something, would be immune based on my argument.  And just

13   to close the loop on that, that's not true.  I think

14   depending on whether or not the claim had been -- or there

15   has been a crime committed, you may be able to get out of

16   UPEPA all together.

17     THE COURT:  Sure.

18     MR. REKOFKE:  Even if you could get under the UPEPA and

19   say that it applies because the communication happened to a

20   law enforcement agency and somehow the nonmoving party

21   couldn't apply -- couldn't establish UPEPA didn't apply,

22   you'd still have to get through the summary judgment/CR 12

23   dismissal.  So if the evidence was as strong as your

24   hypothetical suggested, there's no way that that party would

25   get the motion granted, and then it would just proceed in

**1076**

1      the course of a normal defamation claim, you know, outside

2      the confines of UPEPA.

3        And then just briefly, I did have a chance to look at the

4      Kuhlmeyer case, just quickly, and so then that pointed me to

5      the abusive litigation action, which is RCW 26.51.  And my

6      memory was right.  You do have to have an intimate partner

7      relationship to get under that statute.

8        So Mr. Cliber wouldn't have that with Mr. Benshoof and

9      would not be able to avail himself of those protections

10     found in 26.51.

11       THE COURT:  Well, under the statute, yes.  But if you look

12     further down in that opinion -- let me open the opinion here

13     real quick.

14       Let's see.  Further down in the opinion, there's a section

15     entitled "Dismissal of nonLatour Defendants," and that's the

16     section where the nonintimate partner defendants move for

17     dismissal, the trial court dismissed, and the Court of

18     Appeals affirmed here under the inherent power argument.

19       So you're right, it's not under the ALA, but it's under

20     the inherent power aspect of the ruling.

21       And I only bring that up because of the -- and I think

22     you're -- let me see.  You're right about the statute.  I

23     only brought that up because of the request here for a

24     vexatious litigant order, which I don't think your client's

25     actually making.  Is that right?

**1077**

1          MR. REKOFKE:  We joined in that request.  That wasn't

2     specifically in our motion, but we would certainly join that

3     request.

4          THE COURT:  I see.  Okay.

5          MR. REKOFKE:  Should I move on?

6          THE COURT:  Go ahead.  Yes.

7          MR. REKOFKE:  Do you have anything else, Your Honor?

8          THE COURT:  Yep.

9          MR. REKOFKE:  Okay.  So I think at this point we're on the

10    second element required for dismissal under UPEPA, which is

11    Mr. Benshoof is afforded the opportunity to establish the

12    statute doesn't apply.

13         His only argument is that it doesn't apply because

14    Mr. Cliber committed a crime against him, which would

15    provide an exception to UPEPA applicability, but there's no

16    evidence and Mr. Cliber has not committed a crime against

17    Mr. Benshoof.

18         In terms of what was submitted to the Court, there were

19    complaints brought to the attention of law enforcement

20    agencies by Mr. Benshoof, but there's no conviction.

21    There's no -- it's just a bare-bones complaint to a law

22    enforcement agency.  It doesn't establish that a crime has

23    been committed.

24         And so if all it took to strip the protections of UPEPA

25    was an unverified complaint to a law enforcement agency,

**1078**

1    this statute would have no teeth because you could simply

2    get around it by just filing any sort of frivolous or

3    nonfrivolous complaint to a law enforcement agency.

4        So I don't think Mr. Benshoof's argument carries the day

5    there.  So I think UPEPA clearly applies and that just leads

6    us to the question of, okay, are we entitled to dismissal

7    under either the CR 12 standard or the summary judgment

8    standards from CR 56?  And I think the answer to that is

9    clearly yes, really under either of the standards, any of

10   the standards.

11       The closest Mr. Benshoof really gets to alleging something

12   that could form the basis of an abuse of process claim is

13   that the parentage action was instituted at least in part to

14   coerce him out of money.  That's not true.  There's no

15   evidence that that's true.  But even if it was true, there's

16   a case that was cited in our materials that says that abuse

17   of process requires something after the institution of the

18   case.

19       So even if you institute a case with a horrible, malicious

20   motive, that can't form the basis, can't support an abuse of

21   process claim.  So the only feasible thing in Mr. Benshoof's

22   complaint still doesn't meet that bar.  And to the extent

23   that you could argue it does, there's no evidence of it.

24       So whether you want to apply CR 12 and look at the

25   allegations or you want to look at his evidence, the result

**1079**

1    is going to remain the same in that this -- these facts,

2    quote unquote, can't support an abuse of process claim, even

3    if they were true.

4      And then kind of finally to wrap up and supplement that,

5    there's a clear case that basically says if -- there's no

6    liability for abuse of process if nothing was done other

7    than just carrying the case out to its regular -- through

8    its regular course of proceedings to its end.  And

9    Mr. Benshoof has no evidence that anything other than that

10   happened.

11     The parentage case was fully adjudicated over a year.

12   There was a guardian ad litem involved.  The final orders

13   were entered in October.  There's no evidence of any

14   extrajudicial process that was for an ulterior purpose, and

15   those are all required elements to bring an abuse of process

16   claim.  So not only are those not really even alleged,

17   there's certainly no evidence of them.

18     So for those reasons, I would submit that Mr. Cliber's met

19   his burden for dismissal, that UPEPA applies and that this

20   Court should dismiss Mr. Benshoof's complaint against

21   Mr. Cliber.

22     THE COURT:  All right.  Thank you.

23     Mr. Benshoof, you might not have heard this, but we

24   actually -- we're starting with Mr. Cliber's motion, so you

25   haven't missed anything with regard to Defendant Owen's

1    motion or any other motion.  This is the first motion we've

2    been discussing.

3        And so what is your response to Defendant Cliber's motion?

4        MR. BENSHOOF:  Was that Mr. Rekofke speaking, Your Honor?

5        THE COURT:  Correct.

6        MR. BENSHOOF:  Yeah.

7        Well, I'm smiling, but you can't get that on video, so...

8        Yeah.  As far as Mr. Cliber goes and the arguments of

9    Mr. Rekofke, first of all, I will quickly address the

10   allegations of vexatious litigation, which would be funny,

11   but, you know, I realize that there's a chance that the

12   Court could believe defense counsel.  And the reality of it

13   is that the only vexatious litigation, the only barratry,

14   and the only abuse of process that has occurred has been on

15   the part of Ms. Owen.

16       This started in the summer, in August of 2021, where

17   Ms. Owen falsely accused me of withholding our son from her,

18   which I -- in the family court case, both 21-2-11149-8 and

19   21-5-00680-6 -- I provided sworn statements, and there's

20   text messages to show it, that at no time was I withholding

21   my son from her; that I welcomed her over to the house to

22   sit down, have a family discussion.  She refused to come

23   over and sit down and talk to our son together as a

24   family --

25       THE COURT:  So, Mr. Benshoof, I'm going to --

**1081**

```
 1        MR. BENSHOOF:  -- and instead --

 2        THE COURT:  Mr. Benshoof, I'm going to interrupt you --

 3        MR. BENSHOOF:  Okay.

 4        THE COURT:  -- because I do want to hear from you about

 5    Ms. Owen's actions, but right now I'd like to --

 6        MR. BENSHOOF:  Oh, sorry.

 7        THE COURT:  -- limit your response to Defendant Cliber's

 8    motion.

 9        MR. BENSHOOF:  Thank you.  Thank you, Your Honor.  You're

10    right.  Mr. Cliber.

11        So there's nothing in RCW 4.105.010(3)(a) subsection (iv)

12    that says that a conviction is required for me to cite that

13    as -- as a way to dismiss defense counsel's attempt to

14    defend the case.

15        It merely says "against a person named in a civil suit

16    brought by a victim of a crime against a perpetrator."

17        Mr. Rekofke falsely stated that there's -- there's no

18    evidence of such.  I beg to differ because not only have I

19    provided sworn affidavits attesting to what Mr. Cliber did,

20    what Mr. Cliber said, and the statutes that he violated, I

21    provided those to both the Seattle Police Department and the

22    King County Sheriff's Office.  I had them legally served on

23    Captain Ryan Abbott out of the Shoreline King County

24    Sheriff's Office.

25        And as it -- I'm not sure if it's cited in all of my
```

**1082**

1   amended complaints, but it's definitely cited in my sworn

2   affidavit of January 17th of this year, in which I provide

3   the case number that the King County sheriff -- that

4   actually Captain Ryan Abbott texted me when he said we've

5   done an incident report, but because it happened in Seattle

6   city limits and they have primary jurisdiction, not

7   exclusive, but primary, we're forwarding it to the Seattle

8   police to let them handle it.

9       Unfortunately, I have over two years of evidence that the

10  Seattle Police Department refuses to act on any criminal

11  complaint that I go to them with regardless of how heinous

12  it is.

13      So I've done everything I can, but, as I said, a

14  conviction is not required pursuant to subsection (3)(a)(iv)

15  of the UPEPA act.

16      And Mr. Rekofke also alleged that -- that there was no

17  verified complaint.  I provided verified complaints to the

18  prosecutor's office.  They've refused to act directly and

19  have said that I had to go through law enforcement; so I did

20  that.

21      There's -- I -- you can't get a more verified complaint

22  than me swearing under penalty of perjury and having it

23  notarized by a notary of the state.

24      And Mr. Rekofke also alleges that there isn't enough

25  evidence.  Well, I think the Court is well aware, as are

**1083**

1     defense counsel, that actions that constitute a conspiracy

2     by their very nature of their secrecy, there isn't going to

3     be smoking gun evidence, shall we say, at the initiation of

4     civil litigation.

5       THE COURT:  Mr. Benshoof, I'm -- I want to ask you a

6     straightforward question.

7       What is the crime that Mr. -- that Mr. Cliber allegedly

8     committed?

9       MR. BENSHOOF:  Well, there's several of them, sir.  He

10    made false and misleading statements in Case Number

11    21-5-00680.  Mr. Cliber is an attorney.  He knows very well

12    that if you're going to state something that you don't have

13    firsthand personal knowledge of, you qualify it by stating

14    that somebody else told me this or I saw --

15      THE COURT:  So, Mr. Benshoof, I'm going to -- I want to

16    ask you a more direct question.  So you're saying a lawyer

17    who makes a misleading statement in litigation is guilty of

18    a crime?

19      MR. BENSHOOF:  He lied about me, and I will pull up the

20    statute for you, sir.

21      THE COURT:  So what is the crime?

22      MR. BENSHOOF:  Yeah.  RCW 9 -- sorry.  I'm pulling up --

23      THE COURT:  I mean, what is the -- not the statute, but

24    what is the name of the crime?  Like theft, murder --

25      MR. BENSHOOF:  False and misleading statements to a public

**1084**

1    servant, Your Honor.

2        THE COURT:  Okay.  I gotcha.

3        MR. BENSHOOF:  There's others.

4        THE COURT:  And --

5        MR. BENSHOOF:  That's in 9A.76.175.  So he -- he made

6    numerous statements like that, some of which are detailed in

7    the criminal complaint for Mr. Cliber, which I believe is

8    Exhibit C in my exhibits.

9        You know, just a few examples of those are he stated that

10   I -- that I recklessly endangered my child.  He stated that

11   I had refused to be acknowledged as my child's father.  He

12   said that I was a DV abuser.  And, you know, it was

13   hilarious at the time because he made that false and

14   slanderous statement without any evidence.  And even

15   Commissioner Holloway corrected him and said, Mr. Benshoof

16   is not a domestic violence perpetrator, unquote.

17       So, I mean --

18       THE COURT:  So --

19       MR. BENSHOOF:  -- Mr. Cliber's statement --

20       THE COURT -- Mr. Benshoof --

21       MR. BENSHOOF:  -- and --

22       THE COURT:  Mr. Benshoof, I -- you filed a 10-page

23   response to Cliber's motion.  I did not see anything that

24   you're -- you're referencing a statement by Judge Holloway.

25   That's not in your response materials.  And even if it were,

**1085**

1     I just don't understand how a lawyer making arguments about

2     legal theories or facts in the case in a family law

3     proceeding, some of which frankly sound like opinions, some

4     of which sound like just making arguments for his client,

5     I'm having trouble understanding how you think that that is

6     a crime that triggers the crime exception under UPEPA.

7         MR. BENSHOOF:  Okay.  So RCW 9A.72.080, [As read]

8     Statement of what one does not know to be true.  Every

9     unqualified statement of that which one does not know to be

10    true is equivalent to a statement of that which he or she

11    knows to be false.

12        That's under the -- 9A.72 is -- is the perjury section.

13        THE COURT:  So, Mr. Benshoof, let me ask you this.  So if

14    you make a statement today that I conclude is not credible

15    or it is factually incorrect, are you committing a crime

16    because you've said something false to me in court?

17        MR. BENSHOOF:  Potentially.  It depends upon the

18    circumstances, sir.

19        THE COURT:  Okay.

20        MR. BENSHOOF:  Like, if I'm -- if I'm -- if I'm making

21    statements in court, I mean, I -- I will qualify them, just

22    as I do in all of my sworn affidavits and my filings.  I try

23    to be very persnickety about ensuring that if I'm stating

24    something that it's an opinion, that I'm clear about that.

25    And I'll say something such as, "based upon plaintiff's

**1086**

1    information and belief," "to the best of my knowledge."

2    Right?

3      But that's not what Mr. Cliber was doing, and he was

4    slandering me.  But, big picture, it's worse than that.  And

5    this is detailed in my first -- my first amended complaint,

6    which is the -- the petition to decide parentage, which

7    Cliber and Owen filed on -- or at least signed on

8    September 21st of 2021, that states in there numerous

9    demonstrably false statements, such as there is no presumed

10    parent.  Okay?

11      And the very next day -- so even if we're to assume that

12    Mr. Cliber is a lazy, incompetent attorney, which I don't

13    think he is.  I think he's a smart man.  I think he knows

14    family court law very well and he's very detail-oriented.

15    But even if he hadn't done his due diligence and checked on

16    what Ms. Owen stated in her declarations in the first

17    restraining order hearing heard by Commissioner Schaefer, it

18    was obvious that 24 hours after filing, so after the

19    petition to decide parentage was signed by Ms. Owen and

20    Mr. Cliber, 24 hours later, Ms. Owen submits a declaration

21    stating that I've acted as my son's father for 12 years.

22      Well, those are mutually exclusive.  There can't be -- I

23    can't simultaneously act as his father his entire life and

24    there's no presumed parent.  And I -- you know, while I have

25    not proved it beyond a reasonable doubt, the threshold isn't

**1087**

1    that high.  The threshold is merely based upon the set of

2    facts, is it possible that Mr. Cliber engaged in -- in

3    falsely averring that the documents he and Ms. Owen were

4    filing were true.  And Mr. Cliber knew very well what he was

5    doing.

6      And I would like to point out circumstantial evidence that

7    after I discovered what Cliber and Owen had done, months

8    later of course, because I'm sifting through everything, I

9    afforded Mr. Cliber and Ms. Owen the opportunity to amend

10    what con- -- what amounted to perjurious court filings.

11    Mr. Cliber refused to.  Ms. Owen refused to, which is a

12    violation of the rules of professional conduct.

13      So even if Mr. Cliber somehow was an idiot and lazy and

14    had no idea what he was doing in September of 2021, he did

15    not amend the false statements and filings when I informed

16    him of it and gave him the opportunity to do so, which shows

17    his negligence.  It shows his intent.  And, frankly, it's

18    jaw dropping, Your Honor, that a licensed attorney would

19    conduct himself in this manner when an innocent child is

20    being used as a pawn.

21      THE COURT:  Okay.  Any further argument, Mr. Benshoof?

22    Just with respect -- with regard to Mr. Cliber's motion.

23      MR. BENSHOOF:  Yep.  My notes here.  Plenty of evidence of

24    perjury.

25      Yeah.  I've -- between the exhibits detailing crimes,

**1088**

```
1      Exhibits A through G, and what has been pled in the -- the
2      first complaint and the plaintiff's first amended complaint,
3      there is ample evidence that meets the threshold that there
4      is the very real probability that Mr. Cliber knowingly and
5      willfully engaged in actions that constitute crimes to
6      deceive the court.
7          THE COURT:  Thank you.
8          MR. BENSHOOF:  And, frankly, his attorney now,
9      Mr. Rekofke, is helping to continue this pattern of
10     behavior.  Thank you, Your Honor.
11         THE COURT:  Thank you.  Mr. Rekofke, reply?
12         MR. REKOFKE:  Just briefly, Your Honor.
13         The only relevant point I heard Mr. Benshoof, for the
14     purposes of my motion -- I obviously disagree with a lot of
15     what he said -- was this idea that he doesn't need proof of
16     a conviction to make that provision, like, exception in
17     4.105 apply.
18         So basically he's right.  It doesn't say that there's an
19     express requirement for a conviction.  But then it becomes a
20     matter of statutory interpretation, and I think we cited in
21     our brief that, you know, one of the canons of statutory
22     interpretation is avoiding absurd results.
23         And so I'd come back to the same issue that I raised
24     previously is that there has to be more than just a
25     verified, unverified, whatever complaint he filed.
```

**1089**

1      Obviously no one's done anything with those complaints.  He

2      admitted to yourself that apparently he must have filed so

3      many or something, I don't know, but he said they won't

4      pursue the complaints.  So just by the virtue of the passage

5      of time, I think, shows that these complaints aren't being

6      taken seriously.

7        And so to strip, like in Mr. Cliber's position, of all the

8      protections of UPEPA just based on one complaint from one

9      person with no other evidence would be an absurd result for

10     the application of that.

11       So I would submit to this Court that the proper statutory

12     interpretation of that term, "victim," would require at

13     least a conviction of a crime in order to apply to strip

14     those protections.

15       Then just I also heard a reference, it's "possible" he

16     committed a crime.  That's not good enough.  He needs to

17     prove that UPEPA doesn't apply.  And saying something's

18     possible does not meet the burden of proving that a -- even

19     by a preponderance of the evidence that the statute doesn't

20     apply.

21       And so, finally, there's a lot of references he made to

22     his amended complaint.  That complaint is not operative.

23     He's filed a motion for leave to amend.  But anything that

24     he -- I would move to strike anything that he referenced in

25     regard to his amended complaint because it's not before this

**1090**

1    Court.

2      So for those reasons, I think the Court should find that

3    UPEPA applies and, you know, for the reasons discussed

4    previously, that we're entitled to dismissal under the

5    summary judgment standards or the CR 12 standard

6    incorporated into UPEPA.

7      THE COURT:  All right.  Thank you.

8      I think I'd like to hear Defendant Owen's motion next.

9      MR. MARINELLA:  Thank you, Your Honor.  Can you hear me?

10     THE COURT:  I can.

11     MR. MARINELLA:  Good morning, Your Honor.  Defendant Owen

12   requests the Court grant her special motion or, in the

13   alternative, dismiss the -- Mr. Benshoof's complaint

14   pursuant to CR 12(c) or summary judgment, CR 56.

15     As you know, Ms. Owen's special motion for expedited

16   relief is fairly extensive, but I'll try to keep this short,

17   to the extent that I can.

18     Given the pleadings, I know the Court is well aware of the

19   facts in this matter.  I won't do a deep dive into those,

20   unless you would like me to, sir.  This suit obviously

21   arises primarily -- the vast majority of claims made against

22   Ms. Owen and the claims are abuse of process, defamation,

23   and coercion, they arise from protected communications made

24   by Ms. Owen regarding the party's child in common.  And

25   those communications were made, as we've already discussed,

**1091**

1        as Mr. Rekofke has discussed, those communications were

2        primarily made to police personnel and in previously

3        adjudicated judicial proceedings, family law matters, the

4        parentage matter that was mentioned by Mr. Rekofke.

5          I won't address -- I mentioned the claim of coercion that

6        was made against Ms. Owen in the operative complaint here.

7        I won't go into that, unless the Court would like me to.

8        It's not a civil cause of action in Washington nor does

9        Mr. Benshoof even care to address it in his response.

10         First, this action fits squarely under UPEPA.  Ms. Owen --

11       if three elements are met, the Court must dismiss, with

12       prejudice, a cause of action such as this one.  First,

13       Ms. Owen must establish that UPEPA applies.  It certainly

14       does.  We've established that in our motion.  I hope to

15       establish that here today.

16         Second, Mr. Benshoof, he has failed to show, as

17       Mr. Rekofke has stated, that UPEPA does not apply.  I

18       believe there are 12, if I'm not mistaken, exceptions or

19       ways to get out from under UPEPA.  He tries to establish

20       one, and he fails to do so, whether in his response -- or in

21       his complaint -- excuse me -- or in his response to

22       Ms. Owen's motion.

23         And, three, Mr. Benshoof fails to establish a prima facie

24       case as to each element of his causes of action.  And,

25       again, as Mr. Rekofke said, that fits under whether that's

**1092**

1    the standard of CR 12(c), a summary judgment motion, or a

2    12(b)(6) motion.

3        First, Ms. Owen absolutely meets the standards for

4    dismissal under UPEPA or any of the other standards I just

5    mentioned.  And, second, Mr. Benshoof cannot nor has he met

6    his burden of proof that any exception to UPEPA applies in

7    this case.

8        THE COURT:  Mr. Marinella, I want to interrupt and ask you

9    the question that I asked Mr. Rekofke about the Spratt v.

10   Toft case that you cite in your motion materials.  Is this

11   case a matter of -- does it relate to a matter of political,

12   social, or other concern to the community?  Does there need

13   to be some kind of -- I don't know -- elevated or broader

14   relevance to the community of the underlying matter, beyond

15   a parentage dispute or a dispute over a vehicle?

16       MR. MARINELLA:  No, I don't believe so, Your Honor.

17       In this case, defamation -- defamation is a claim that

18   fits under UPEPA, and that's what we -- that's what we're

19   arguing and that's what we believe to be the case, based on

20   that matter that we cite, Spratt, and the statute itself,

21   Your Honor.

22       THE COURT:  Why is that?  Why does defamation fall under

23   UPEPA?

24       MR. MARINELLA:  Well, in this case, Your Honor, it falls

25   under UPEPA because the communications, with the exception

**1093**

1   of alleged communications that were made to the child in

2   common, although that is not addressed in Mr. Benshoof's

3   response, but back to your question, the communications were

4   made to law enforcement personnel, government officials

5   under the statute, and in judicial proceedings.  As

6   Mr. Rekofke stated, many of the allegedly false or

7   defamatory or -- yeah -- false or defamatory statements made

8   by Ms. Owen were made pursuant to judicial proceedings, and

9   that fits squarely under UPEPA.

10    And then making -- making statements to the police also

11   fits squarely under UPEPA.  Those are -- those are immune

12   from liability in a civil suit.

13    THE COURT:  Okay.

14    MR. MARINELLA:  And going back into, you know, trying

15   to -- Mr. Benshoof's argument that he's been the victim of a

16   crime, that's been -- that's been spoken of already today.

17   My argument is the exact same, essentially, as

18   Mr. Rekofke's.  He's not established that he's been the

19   victim of any crime.  He's just making bald assertions that

20   he has been the victim of a crime.  He's presented no actual

21   evidence.  And although the statute does not say that

22   Ms. Owen must be convicted or arrested or anything like

23   that, the result of saying that she has committed some crime

24   against him without anything else would be absurd.  That

25   would not be productive under that particular statute or

**1094**

1       make any sense whatsoever, Your Honor.

2           And further, going back to statements to the police,

3       Mr. Benshoof's claims fail as a matter of law pursuant to

4       RCW 4.24.510.  That statute grants immunity for actions

5       based on any communications to government agencies.  He does

6       not even address that in his response, as he doesn't address

7       many things that were in our -- Ms. Owen's 28-page motion.

8           If not under the UPEPA standard, if not dismissed under

9       that standard, Your Honor, Mr. Benshoof's complaint, whether

10      evaluated under CR 12(c) or CR 56 should also be dismissed.

11      Mr. Benshoof does not and cannot assert a single viable

12      claim against Ms. Owen.  He's not done that in his operative

13      complaint.

14          THE COURT:  I want to -- Mr. Marinella, I want to pause

15      for a second on the argument under 4.24.510.  I want to

16      bring up the hypothetical that I raised to Mr. Rekofke.  You

17      know, you've got a false claim that someone's a child

18      molester or a child rapist or something really horrendous

19      like that, made to a police official.  Someone loses their

20      job over it.  They lose their housing.  Maybe their marriage

21      falls apart.  There's all kinds of reputational damage.

22      Turns out the claim is completely and utterly false.

23          Is your claim that under 4.24.510, the false complaint has

24      immunity from any civil proceeding for defamation?

25          MR. MARINELLA:  I don't know if it would be for any, but I

**1095**

1  do believe, in this case, we don't have statements from --

2  like, in your hypothetical, we don't have statements that

3  are so grotesque or out of bounds and against Mr. Benshoof

4  that would -- that would rise to your hypothetical.  I will

5  say, I would have to do further research to answer your

6  question completely.  I don't know, off the top of my head,

7  an exact answer.

8    I do know that to prove actual malice, Mr. Benshoof has to

9  do more to establish that, that Ms. Owen knew what she was

10  saying was false and grotesque or that -- and I do --

11    THE COURT:  Well, but, I mean, the argument here is that

12  that statute provides absolute immunity.  And so the

13  question of whether it's grotesque or not would seem to be

14  moot or pointless because it doesn't matter whether it's a

15  small lie or a big lie, if it's an absolute immunity, that's

16  it's an absolute immunity.  Right?

17    MR. MARINELLA:  Right.  And -- yes.  And, here, I believe

18  it is absolute.  If you make a statement to the police, and

19  here Ms. Owen's statements she believes and we believe were

20  true, even if false, they're absolutely immune because

21  you're making that statement to police officers.

22    THE COURT:  Okay.

23    MR. MARINELLA:  First, and going back to why

24  Mr. Benshoof's complaint fails under either CR 12(c) or

25  CR 56, just as a preliminary matter and not addressed in his

**1096**

1    response, Mr. Benshoof failed to plead that he sent any

2    correction notice under RCW 7.96.040.  Such a notice is

3    required to maintain an action of defamation, Your Honor.

4    To be adequate, the notice requires specification of the

5    statement alleged to be false and defamatory and the time

6    and place of publication.  That is missing entirely from

7    Mr. Benshoof's operative complaint.  And, again, it's not

8    addressed in his response whatsoever.

9      Regarding statements to -- the only statements in his

10   complaint, which would not fit under UPEPA, Mr. Benshoof

11   cites to certain statements, and he uses exact quotes but

12   fails to give any sources of those statements.  Those are

13   statements Ms. Owen allegedly made to their child in common.

14   He does not address this in his response whatsoever.  And,

15   in fact, as we stated, as Ms. Owen stated in her reply, his

16   only reference to defamation, which was one of the three

17   causes of action in his operative complaint, his only

18   reference to defamation was in his opening paragraph, I

19   believe, and it mentioned that he did not want to --

20   essentially, he did not want to address it with the Court

21   because he wanted to save the Court's resources.  That

22   simply isn't good enough to answer all of the analysis

23   Ms. Owen provided in her motion on defamation.  So I won't

24   address that further, the comments to the child's -- the

25   child in common.

**1097**

1         I won't do a deep dive into summary judgment and the case

2    law.  Simply, Mr. Benshoof fails to prove -- to set forth

3    any elements of defamation.  There are four different

4    elements.  He's not identified a single false and defamatory

5    communication, nor can he point to such communication which

6    is unprivileged in this matter.  Again, except for comments

7    to the child, which are -- could be dismissed under other

8    means.  Mr. Benshoof simply cannot establish the elements of

9    defamation and that claim should be dismissed as a matter of

10   law.

11        It's the same -- the same argument goes for his abuse of

12   process claim.  Ms. Owen provided detailed analysis of this

13   claim.  Mr. Benshoof, again, failed to address this in his

14   response.  I believe his response of -- was all of four or

15   five pages to respond to a 28-page motion, and it just

16   simply did not include much of the law and even the facts

17   presented by Ms. Owen.

18        As a general rule, under the abuse of process claim that

19   he alleges, witnesses in judicial proceedings are absolutely

20   immune from suit based on the testimony in those

21   proceedings, and that's from Bruce v. Byrne-Stevens.  There

22   are many other cases as well that could be cited to make

23   that same argument, you know.

24        Ms. Owen moved -- as the prevailing party, if that's the

25   determination today, she is entitled to attorneys' fees.

**1098**

1    Mr. Benshoof's response -- his response to this was I

2    believe a few sentences or a sentence at most.  She's simply

3    entitled to fees under RCW 41.05.090 subsection (1).  It

4    explicitly states that the prevailing party is entitled to

5    fees.

6       And the Court should also award sanctions against

7    Mr. Benshoof, pursuant to CR 11 and/or RCW 4.84.185.  He

8    does not address this section of Ms. Owen's motion in his

9    response, and he simply -- he's filed a baseless complaint

10   here, Your Honor.

11      And, again, going into the vexatious litigation portion,

12   which he brought up immediately, this Court, under

13   RCW 2.28.010, absolutely has the power to provide for the

14   orderly conduct of proceedings before it.

15      As the Court knows from the facts herein, this particular

16   suit is one of several in the past calender year.  I believe

17   at least five cases Mr. Benshoof has brought against

18   Ms. Owen, the counsels involved in this matter, and he's

19   made -- he's made significant or several threats to opposing

20   counsel about -- not physical threats, Your Honor, but

21   threats to engage in further litigation.  He even -- which

22   included a quote, Your Honor.  He asked in an email, after

23   his federal case, which we cite to in our motion, he asked,

24   and I quote:  Was there legal chatter after I filed a

25   federal lawsuit September 9, 2022?  Did anybody consider the

**1099**

1      possibility that I may have filed that lawsuit and allowed

2      it to be dismissed and then let the dust settle in order to

3      provoke reactive communications among potential defendants

4      that could later be obtained through discovery?

5         All of his actions, whether in this matter or in other

6      ones, including a 300-page complaint filed in federal court,

7      the one I just mentioned, the Court -- the Court would

8      absolutely have a right to put -- enter an order of

9      vexatious litigation against Mr. Benshoof, and they do so.

10        For these reasons, Your Honor, we ask that the Court grant

11     Ms. Owen's motion, or, in the alternative, judgment on the

12     pleadings or summary judgment, award her attorneys' fees and

13     costs, statutory damages of $10,000, award sanctions against

14     Mr. Benshoof, and finally enjoin Mr. Benshoof from engaging

15     in further vexatious litigation.

16        Thank you, Your Honor.

17        THE COURT:  Thank you.  And I apologize, Mr. Rekofke.  You

18     said earlier you needed to get to I think a mediation.  I

19     don't know that I'm going to be able to release you, because

20     I think some of the arguments overlap between the parties'

21     various motions.

22        MR. REKOFKE:  That's okay, Your Honor.  I'm attempting to

23     do both at the same time, but I'm listening, in case you

24     need anything else from me.

25        THE COURT:  All right.

**1100**

1    MR. RUSS:  And, Your Honor, for the record -- I'm sorry --

2    Blair Russ, appearing for Ms. Owen.  May I answer one

3    question that the Court asked both Mr. Rekofke and

4    Mr. Marinella with authority and leave it at that and give

5    Mr. Benshoof a chance to respond?  Because I believe this is

6    something the Court wants to know about the hypothetical

7    that I'd like to answer.

8    THE COURT:  Proceed, Mr. Russ.

9    MR. RUSS:  Thank you, Your Honor.

10   And I think the Court's question was, what if somebody

11   essentially reports allegations to law enforcement in bad

12   faith and terrible consequences follow?  Is that still

13   immune?

14   And the answer is unequivocally yes.  There's no hedging

15   about that, and the Court can find that answer by looking at

16   the legislative history of RCW 4.24.510.  The statute was

17   amended to remove the requirement of good faith.  And, in

18   fact, it was changed so that if the party bringing the

19   motion could show a lack of bad faith, they could get the

20   $10,000 penalty.

21   And there's subsequent authority that has looked at the

22   anti-SLAPP statute, specifically finding that the statute

23   applies regardless of a finding of good faith.  I can give

24   the Court a couple of cites if that's helpful.

25   THE COURT:  Well, unless that was in the material, then I

**1101**

 1          don't think that's fair to Mr. Benshoof.

 2          MR. RUSS:  I appreciate that, Your Honor.  I can't

 3     remember; so I'll refrain from doing that.  But that is the

 4     answer.  The case law is abundantly clear, that bad faith is

 5     still -- the statute still applies, even in bad faith.

 6          Thank you for allowing me to interject.

 7          THE COURT:  All right.

 8          MR. MARINELLA:  And, Your Honor, we did discuss that in

 9     our reply to Mr. Benshoof's response, because he did bring

10     it up for the first time, I believe, in his response.

11          THE COURT:  I think you might be right.  Just a moment.  I

12     want to go back through my notes on the reply.

13          MR. MARINELLA:  And if it helps the Court, it's in

14     section --

15          THE COURT:  Yeah.  No.  That's right.  I see that.  Yep.

16          So what were the authorities you were going to discuss,

17     Mr. Russ?  It might actually be here.

18          MR. RUSS:  They very well may be the same authorities.

19     There's a Western District of Washington case that addresses

20     the amendment.  It's 2005 Westlaw 1172437.

21          THE COURT:  Sanai?

22          MR. RUSS:  That's correct.

23          THE COURT:  Okay.  That is cited in the reply.  Yep.

24          MR. RUSS:  Okay.  Very good.  Thank you, Your Honor.

25          THE COURT:  All right.  Mr. Benshoof?

**1102**

1          MR. BENSHOOF:  Yes, Your Honor.  Do I get to talk now?

2          THE COURT:  Yes, sir.

3          MR. BENSHOOF:  Okay.  Well, I will start off with

4     addressing Mr. Russ's certainty, that case law and the

5     statute and legislative intent is this -- this impenetrable

6     bubble.

7       My reading, and I just pulled this up off the Internet, of

8     RCW 4.24.500, Good faith communications, Legislative

9     findings, and Purpose.  It says, [As read] The purpose of

10    RCW 4.24.500 through 4.24.520 is to protect individuals who

11    make good-faith reports to appropriate governmental bodies.

12      So I don't have the case law knowledge that Mr. Russ does,

13    but it appears that our Revised Code of Washington clearly

14    states that it's to protect good-faith reports.  And while I

15    haven't gone to exhaustive, extensive detail in how the

16    statements of Ms. Owen weren't in good faith, plaintiff

17    definitely has done enough to show that there was

18    considerable communication from Ms. Owen that were knowingly

19    and willfully false, malicious, and slanderous.

20      And I think it's important to step back when we're

21    considering what sorts of communications could be slanderous

22    and put plaintiff in a horrible light.

23      So we're in Seattle.  It's one of the wokest cities in the

24    country.  And if we -- if we look at the -- my complaint for

25    tort, some of the words that are listed in there are "I'm

**1103**

1          crazy, violent, dangerous, a threat to society.  I'm a
2          racist, white supremacist, misogynist and abuser."
3            Well, I think -- I mean, most of us attending this hearing
4          are guys, and we already know that because there was an
5          imbalance in the last 50 years, as far as how men and women
6          were allowed to behave, that our society has tried to
7          rebalance that, which we've seen with the MeToo movement,
8          you know, presuming that the woman is telling the truth.
9            And I think there's been some great stride in family court
10         to try to make sure that females are protected.  Right?
11         Because of the history that we've had as a society.
12           But, you know, within the context of what we're dealing
13         with the last two years, I know for a fact this -- just
14         saying, oh, "he's a racist," like, the person's almost
15         guilty.
16           One of my former best friends on the police department
17         said you can't even text me something that has any -- it
18         can't have a joke that has anything to do with a black
19         person or a transgender because, he's like, I'll literally
20         get fired, even if it's not making fun of the person.
21         Like -- and so we're walking on egg shells in this city.
22           So I think it's disingenuous for Mr. Russ or Tony --
23         sorry, I forget Tony's last name -- Marinella to imply or
24         assert that Ms. Owen repeatedly, telling police that I'm
25         this racist, white supremacist, violent child abuser.  And

1       then let's throw on top of this, oh, Mr. Benshoof is a crazy

2       anti-masker and anti-vaxxer.

3         For those of us who have been living in the city the last

4       three years, I think it's obvious, in hindsight, that just

5       by themselves, those were pejorative, segregationist, and

6       discriminatory terms that -- that, you know, brought out,

7       like, visible hatred in people.  And I can speak from

8       personal experience that I was subjected to physical assault

9       and all sorts of stuff just because somebody was like, oh,

10      well, he's not wearing a mask.  Right?

11        So -- and, you know, this lawsuit isn't about what's

12      happening right now in the city.  Like, people are aware now

13      that masks actually didn't do anything to mitigate the

14      transmission of a virus.  But back in 2021, this is right

15      around the time that the Mayor Durkan was mandating that all

16      of the police officers get a vaccine, which meant that the

17      only officers that were there to take complaints from

18      Ms. Owen were officers who subjected themselves to

19      experimental vaccination.

20        And so at the time, in fall -- summer and fall of 2021,

21      for Ms. Owen to simply say, oh, he's this horrible

22      anti-vaxxer was, like, bad enough, although I realize that

23      wasn't the worst of statements.

24        So to get back to addressing physically some of the stuff,

25      so good faith is not a protective qualifier for -- it's not

1    a protective umbrella for Ms. Owen to make -- to knowingly

2    and willfully make statements which she knows are absolutely

3    false and that are going to -- that are discriminatory and

4    going to prejudice either law enforcement or family court

5    judges or commissioners to, basically, treat me unfairly,

6    which I think the evidence has shown happened.

7       And Tony was saying that -- that they've met --

8       THE COURT:  Mr. Benshoof.

9       MR. BENSHOOF:  -- all three prongs --

10      THE COURT:  Mr. Benshoof.

11      MR. BENSHOOF:  Yep.

12      THE COURT:  I prefer that we use last names.  It will make

13   the record -- it will keep the record more clear.

14      MR. BENSHOOF:  I forgot (inaudible).  Sorry, sir.  Can you

15   repeat what his last name is?

16      THE COURT:  Marinella.

17      MR. BENSHOOF:  Okay.  Okay.  Sorry, Mr. Marinella.  I

18   always forget.  Thank you.

19      So Mr. Marinella asserted that they had met all three

20   prongs.  And, you know, I've said this before, but I'll say

21   it again, one of those prongs is that there's the exception

22   under 4.105.010, subsection (4)(a) [sic] (iv), where I am

23   clearly the victim of multiple crimes, knowingly and

24   willfully perpetrated by Ms. Owen.  I added -- I added some

25   more details in the declaration that I submitted in support

1    on January 17th, and -- and I would also like to bring

2    attention to the Court that not only does subsection (iv)

3    apply, which is when, you know, I'm bringing it as a victim

4    of a crime against the perpetrator Owen, but in my

5    affidavit, I also go into more detail that subsection (vii)

6    [sic] applies as well, which is a suit at common law,

7    because what Ms. Owen and I had throughout most of our

8    parenting lives together, was we had an amicable, functional

9    parenting arrangement, nontraditional, of course, but the --

10   the reason that I was willing to go through every possible

11   hoop and, you know, get a house together, even though we

12   weren't always dating, was I always thought that -- that our

13   common law parenting agreement was prioritizing our son.

14       So --

15       THE COURT:  I'm sorry.  Which exception are you talking

16   about?  You said suit under common law?  So which --

17       MR. BENSHOOF:  Yeah.  So -- okay.  Yep, Your Honor.  Let

18   me pull that up.  So -- so RCW 4.105 --

19       THE COURT:  Right.

20       MR. BENSHOOF:  -- .010.

21       THE COURT:  (3)(a)?

22       MR. BENSHOOF:  (a) -- yeah -- (3)(vii).  The (vii), that's

23   the one for common law.

24       THE COURT:  That says "brought under the insurance code or

25   arising out of an insurance contract."

```
1          MR. BENSHOOF:  Sorry.  Let me --

2          THE COURT:  Do you mean subpart --

3          MR. BENSHOOF:  Well, I'm glad --

4          THE COURT:  Do you mean roman numeral viii, brought on a

5     common law fraud claim?

6          MR. BENSHOOF:  Yes.  Is that eight?

7          THE COURT:  Yes, sir.

8          MR. BENSHOOF:  Oh, I'm sorry.  I said seven.  Yes.  Roman

9     numeral viii, not vii.

10         Yes.  So in -- in that affidavit that I filed on the 17th,

11    because I realized that the Court may not have under

12    consideration my second amended complaint, because the

13    motion for leave to amend hadn't happened, that the sworn

14    affidavit that's notarized, that I filed on the 17th or 18th

15    for the this hearing, goes into detail about how Ms. Owen

16    and I had agreement -- we had a parenting agreement at

17    common law.  Right?  There was never any parenting

18    proceedings or plan.  There was no court or state

19    involvement prior to her initiating -- trying to get a

20    temporary restraining order against me in August of 2021.

21         So for -- for the first 12 years of our son's life, we had

22    acted under that common law parenting agreement, and there

23    had never been a problem with it.  I had every reason to

24    believe that we were both going to continue honoring that

25    common law parenting agreement.
```

1          So, you know, there's that additional exception to the

2     claim of litigation privilege because not only did Ms. Owen

3     violate that agreement at common law, but we had an

4     agreement at common law regarding my FJ Cruiser.  Right?

5     Like, we -- Ms. Owen and I had a trusting relationship.

6     Like, I trusted her with -- with not having my name on

7     things because we had years of experience where she had my

8     back, I had her back, you know.

9          THE COURT:  But, Mr. Benshoof, I have --

10         MR. BENSHOOF:  I'm sorry that --

11         THE COURT:  -- I have to say regarding this common law

12    fraud exception claim, I didn't see anywhere --

13         MR. BENSHOOF:  Yes, sir.

14         THE COURT:  -- in your first amended complaint, and I

15    don't think I saw anything in your response on this motion

16    outlining the -- I think from memory it's an either eight-

17    or nine-part test for common law fraud, and you would need

18    to establish that there are facts --

19         MR. BENSHOOF:  Yes.

20         THE COURT:  -- supporting all of those potential claims.

21    And I -- look, regarding the affidavit that you filed on

22    January 17th, I did not review that for today's hearing.  It

23    was not at all clear that that was a response to the motion.

24    When you -- when there's a motion pending, I do not go back

25    and read everything that's ever been filed in the court

1    file.  I read the motion pleadings and matters that are

2    captioned as a response or a reply, and then all of the

3    exhibits that might be attached.  I don't go back and review

4    everything that's been filed since the first day of the

5    lawsuit.

6       So -- and that document, I've got it up on my screen here

7    now, it's captioned as "Affidavit of Complaining Witness,"

8    and then at the bottom it's captioned in the footer as

9    "Verified Criminal Complaint."  So it was -- and there's

10   nothing on the first page to indicate that this was somehow

11   a response to any of the pending motions.

12      So it's a 69-page document that you filed on January 17,

13   2023.  I have not reviewed that because it was not part of

14   the motion pleadings, as far as I knew or my bailiff knew.

15      MR. BENSHOOF:  Oh, I -- I'm sorry if I didn't inform the

16   Court that that was -- that that was for this hearing as

17   supporting documents for my response.

18      There is -- if you have it up on your computer, there --

19   there should be a 15-page document within that that's --

20   that's declaration of -- plaintiff's declaration.

21      Sorry.  It's affidavit of Kurt Benshoof, plaintiff.  It's

22   a 16-page document.

23      THE COURT:  Yeah.  I see that.  I haven't read it, but I

24   do see that.

25      MR. BENSHOOF:  Okay.

1    THE COURT:  And my general impression -- my general

2    impression, Mr. Benshoof, is that that is a document where

3    you are alleging that there are -- there have occurred

4    violations of the criminal code.  Is that right?

5    MR. BENSHOOF:  There are -- yeah.  There are some

6    allegations in that -- in that total 69 pages, yes,

7    Your Honor.

8    THE COURT:  Okay.  Proceed.

9    MR. BENSHOOF:  Okay.  And, for the record, I apologize for

10   how confusing all of this is.  I'm sure it's a nightmare as

11   a judge to try and sort through all of this.  So I

12   appreciate your patience and understanding.

13   So at least going by what's in the record so far submitted

14   by plaintiff that has been sworn -- sworn to and notarized

15   under penalty of perjury, there has been both violations

16   of -- there's been fraud at common law committed by

17   Ms. Owen, which I provided enough evidence to -- to

18   substantiate that, and there are other crimes that Ms. Owen

19   has committed, such as she possessed my -- after her

20   fiancée, Ms. Lerman, stole my car on January -- or on

21   September 3rd of 2021, Ms. Owen then kept it in her garage

22   at her house for eight months and, through her friend,

23   Mr. Hermsen, acting as her power of attorney proxy,

24   attempted to extort $19,000 from me and threatened to sell

25   my car because she'd refused to put -- you know, hand over

1    the title.  She threatened to sell my car if I didn't give

2    her $19,000.

3        So it's kind of jaw-dropping, honestly, Your Honor, that

4    defense counsels are asserting that there isn't -- there

5    isn't sufficient evidence to date that Ms. Owen -- that

6    Ms. Owen hasn't committed numerous crimes against me.  And,

7    again, I'll go back to --

8        THE COURT:  So, Mr. Benshoof, I'm going to -- I'm going to

9    interrupt you here because I want to pause on that, the

10   argument about the FJ Cruiser.  Because you spent -- you've

11   spent a lot of time in your pleadings addressing alleged

12   false statements about the vehicle.

13       What --

14       MR. BENSHOOF:  Yep.

15       THE COURT:  What specifically is the false statement by

16   Defendant Owen that gives rise to a defamation claim?

17       MR. BENSHOOF:  Thank you.  Sorry.  Thanks for reeling me

18   in.

19       The false statements -- false and misleading statements,

20   violation of RCW 9A.76.175, is that she repeatedly told --

21       THE COURT:  Wait, wait, wait.  Stop, stop, stop.  Before

22   you -- before you go on, you changed -- in your answer, you

23   changed the conditions of my question.  My question wasn't

24   what false statement violated the criminal code; it was what

25   false statement supports a defamation claim.

1          MR. BENSHOOF:  Thank you.  Thank you, Your Honor.

2          She -- she impugned my character and slandered me

3     regarding the FJ by knowingly and willfully leading the

4     police to believe that I was a criminal with no rights to

5     the vehicle.

6          So although she didn't -- she may not have explicitly

7     said, "he stole my car," that was what Ms. Owen clearly

8     intended the police to believe.

9          THE COURT:  Well, what did she say?

10         MR. BENSHOOF:  And that's what --

11         Well, so, I only -- I don't have everything yet, but, for

12    example, in her first temporary restraining order petition,

13    which was heard by Commissioner Schaefer, she told, under

14    oath to the court in her petition, in the ex parte, that the

15    vehicle was hers and that I was supposed to give it back.

16         So --

17         THE COURT:  Well, let me -- again --

18         MR. BENSHOOF:  She wasn't --

19         THE COURT:  -- let me -- I understand there are alleged

20    statements she made to the court.

21         You make a specific claim that she made a defamatory

22    statement to the police.  So what was it to the police?

23         MR. BENSHOOF:  Oh.  Sorry.  I've got -- I've got my

24    complaint right here.

25         Well, you mean specifically regarding the FJ Cruiser?

1        THE COURT:  Yes.

2        MR. BENSHOOF:  Or just any defamation?

3        THE COURT:  The statement she made --

4        MR. BENSHOOF:  Well --

5        THE COURT:  -- to the police about the FJ Cruiser.

6        MR. BENSHOOF:  So -- so I have to infer right now because

7    I haven't got all of the documents.  Like, the Seattle

8    Police Department is months and months behind on providing

9    document requests.  So I have a public records request that

10   is, like, nine months old to get the body cam video about

11   what she said to police, and I'm still waiting for that.

12       THE COURT:  So is the answer you don't know?

13       MR. BENSHOOF:  (Inaudible) -- well, I can -- about the FJ

14   Cruiser specific, she --

15       THE COURT:  I mean --

16       MR. BENSHOOF:  -- she led them to believe -- it's

17   inferences, yes.  I'm -- it's --

18       THE COURT:  Go ahead.

19       MR. BENSHOOF:  She -- she falsely and misleadingly

20   convinced the police that I was in unlawful possession of

21   the vehicle.

22       THE COURT:  Okay.  But you just said you're inferring that

23   because the police did something, but I'm asking you a

24   different question.  What did she -- what false statement

25   did she make to the police?  It sounds like you don't know.

```
 1          MR. BENSHOOF:  She said it was hers.  She said my FJ
 2     Cruiser was hers.  And she said that I was in unlawful
 3     possession of it.  And she accused -- she said that I had --
 4     that I had violated a court order, a temporary court order
 5     from -- in the first temporary restraining order hearing,
 6     and that is -- that was the proximal cause of Ms. Lerman
 7     then stealing my car right in front of the police, because
 8     Ms. Lerman and Ms. Owen had -- had lied, they had slandered
 9     me about what I had done and that I had -- that it was my
10     car.  Right?  They effectively called me a car thief; that I
11     had stolen her car.
12          THE COURT:  All right.  I don't see that they told the
13     police that you were a car thief.  I didn't see that
14     statement either in your complaint or in any of the evidence
15     brought before the court.  Where -- where would I find that?
16          MR. BENSHOOF:  I'm looking here right now.
17     Yeah.  So -- so 53 -- page 6 of Complaint for Tort.
18          THE COURT:  Okay.
19          MR. BENSHOOF:  Sorry.  Of the Amended Complaint for Tort.
20          THE COURT:  Yep.
21          MR. BENSHOOF:  Page 6, number 53, it says, [As read] Based
22     upon false and misleading statements of Defendants Owen and
23     Lerman, the defamed plaintiff, SPD officers allowed
24     Defendant Lerman to steal plaintiff's FJ Cruiser.
25          So --
```

1    THE COURT:  I mean, I -- well, let me stop you right there

2    because I'm -- I got you -- are you looking at your second

3    amended complaint or your first amended complaint?

4    MR. BENSHOOF:  First amended, sir.

5    THE COURT:  And which paragraph, again?

6    MR. BENSHOOF:  It's number 53 on page 6.

7    THE COURT:  Okay.  My -- the paragraph 53, 5-3, in my

8    version starts "On September 6, 2021, Defendant Lerman

9    complained in a Facebook post"?

10    MR. BENSHOOF:  That's number 55 on mine.

11    THE COURT:  Okay.  I'm looking at the version that got

12    filed on October 11, 2022, by you.  I'm not sure what

13    version you're looking at.

14    MR. BENSHOOF:  Yeah.  That's part of the frustration,

15    Your Honor.  Like, I would love to be able to go to the

16    clerk's office and, you know, get the court docket and make

17    sure that everything's in alignment, and I've been unable to

18    do that.  But just --

19    THE COURT:  This is your -- this is your complaint,

20    Mr. Benshoof.  I don't know why you wouldn't have a copy of

21    your own complaint.

22    MR. BENSHOOF:  Well, that's what I'm looking at is a copy

23    of my Owen complaint.  But if you go back a couple -- I

24    don't know.  So do you see where it says "On or around

25    September 3, 2021, Defendants Owen and Lerman slandered

1          plaintiff by telling SPD officers that plaintiff had

2          kidnapped the stepson"?

3           THE COURT:  Ah, yes.  In my -- in my copy, that's

4          paragraph 50, 5-0.

5           MR. BENSHOOF:  Okay.  So the statement right after that,

6          does it say, "Based upon the false and misleading statements

7          of Defendants Owen and Lerman, that defamed plaintiff, SPD

8          officers allowed Defendant Lerman to steal plaintiff's FJ

9          Cruiser"?

10          THE COURT:  Right.  I see that.  But it doesn't identify

11         the false statement.  It just presumes that that happened.

12          MR. BENSHOOF:  Yes.

13          THE COURT:  Right.  So what are the false statements?

14          MR. BENSHOOF:  So, like, prior -- well, so prior to that,

15         like -- I don't know -- like four paragraphs prior, it says,

16         "Defendants Owen and Lerman told SPD that plaintiff's FJ

17         Cruiser was Defendant Owen's."

18          THE COURT:  I see that.  That's paragraph 47.

19          MR. BENSHOOF:  Yeah.  So plaintiff acknowledges that

20         that's not an explicitly slanderous statement.  But what is

21         obvious -- what is implicit within that is that if

22         Mr. Benshoof has possession of the FJ Cruiser, he's a car

23         thief.

24          THE COURT:  So I think -- what I think I -- what I think I

25         just heard is that that is not a slanderous statement.  Is

1        that correct?

2          So let's say that Defendant Owen is absolutely wrong.  She

3        has no claim to the title of the vehicle, but she believes

4        that she does because she's -- even you admit in your

5        pleadings that she was the registered owner of the vehicle.

6        You contend you're entitled to the vehicle because you paid

7        off the debt that was held by a lienholder, but she contends

8        she has registered title.  She tells the police, "It's my

9        vehicle.  This guy Benshoof has no claim whatsoever."

10         That's not a slanderous or defamatory statement.  It might

11       be wrong, you know, legally, but it sounds like you agree,

12       that's not a defamatory statement.  Is that right?

13         MR. BENSHOOF:  I'm not agreeing that it's not defamatory.

14       We're talking about explicit and implicit.  Right?  Like,

15       Ms. Owen knowingly and willfully defamed my character by

16       leading the police to believe that I had stolen her car.

17         And the text messages, when she initially threatened me at

18       the outset of this, on August 15th of 2021, she said in the

19       text messages, "I don't care that it's yours.  I'm going

20       to" -- you know, like, "either, you know, give me money or

21       I'm going to take your car back."  Right?

22         And then that's exactly what she proceeded to do, which

23       was to communicate to police, to lead them to believe that I

24       was a car thief, and that I was unlawfully possessing her

25       car, and that I had kidnapped her child.

1          Well, let's add it all together.  Now the police believe

2      that I'm a car thief, a kidnapper, a racist, a white

3      supremacist, a child abuser, a domestic violence

4      perpetrator, and that I'm a tinfoil hat-wearing crazy

5      conspiracy theorist who doesn't want to have my breathing

6      restricted by a face mask, and I don't want to have my child

7      subjected to a Pfizer experiment.

8          Like, when you put that in totality, that's, like, what

9      else -- what else could she have possibly said?  That I'm a

10     pedophile too?  I mean, that's about the only thing she

11     didn't include.

12         Like, in no normal world would the police have let

13     Ms. Lerman steal my car in front of them if they weren't

14     already so prejudiced by the knowing and willful slanderous

15     statements of Ms. Owen.  Right?  I mean --

16     THE COURT:  Well, but it sounds like you're just assuming

17     that that's what happened.  You're just assuming that of

18     course the police let her leave with the FJ Cruiser because

19     Ms. Owen said all these terrible things.  I don't really see

20     that there's any evidence of that at all.  I mean, it just

21     sounds like there's -- there are two parties making disputed

22     claims to a vehicle, and the police let one party leave with

23     the vehicle and they didn't really make any determination

24     either way about who they felt owned it or who they felt was

25     right or wrong.  I'm having difficulty grasping the

1      defamation here.

2          MR. BENSHOOF:  Okay.  So I guess I can put it in these

3      terms to show how extremely prejudiced Ms. Owen has made the

4      police through her false -- through her slanderous, defaming

5      statements.  Right?

6          Like, because she said that I was a kidnapper, that I had

7      kidnapped her -- our son, even though I had from the court

8      clerk the whole denial order from Commissioner Schaefer,

9      even though I had that in my hands to hand to Officer Ladd

10     [phonetic], didn't care.  He was arresting me anyways.

11     Right?

12         Like, that's -- that's --

13         THE COURT:  Well, what were you -- what were you

14     arrested --

15         MR. BENSHOOF:  (Inaudible).

16         THE COURT:  What were you arrested for, Mr. Benshoof?

17         MR. BENSHOOF:  So he said that I was in violation of --

18     like, he called me up on my cell phone and he's like,

19     "You've kidnapped your son."

20         And I'm like, "What are you talking about?  The hearing --

21     the hearing was adjudicated hours ago."

22         And he's like, "Well, that's not what the computer says.

23     You kidnapped your son and you're -- you know, you need to

24     hand over the kid and the car."

25         And I'm like, "It's my car.  It's my" -- like, "my kid."

1          THE COURT:  Well, no, I'm sorry.  What -- what crime were
2     you arrested for?  Did the officer tell you what you were
3     being arrested for?
4          MR. BENSHOOF:  I can't remember.
5          THE COURT:  Well, what was your understanding?
6          MR. BENSHOOF:  Custodial inter --
7          THE COURT:  Custodial interference?  Were you -- were
8     you --
9          MR. BENSHOOF:  I under -- he said that I -- he said that I
10    was in violation of the -- of the temporary restraining
11    order.  And I was like, "No.  The final order was already
12    adjudicated hours ago."
13       And he tried to say, "Well, my computer doesn't show that
14    yet."
15       And I was like, "It doesn't matter what the computer says.
16    It matters," like -- and I even sent him pictures of the
17    denial order in advance of seeing him, because I could tell
18    he had been so prejudiced by Ms. Owen's lies that he was --
19    he was going to take me to jail no matter what, because
20    Ms. Owen was the victim, and I'm a kidnapping car thief,
21    child abuser, racist, white supremacist, anti-vaxxer.
22         THE COURT:  I see.
23         MR. BENSHOOF:  So --
24         THE COURT:  Were you -- were you --
25         MR. BENSHOOF:  -- (inaudible).

```
 1         THE COURT:  Were you charged with a crime, Mr. Benshoof?
 2         MR. BENSHOOF:  I was arrested.  They -- they did not
 3    proceed with anything.  I was never charged, no.
 4         And to show you the corruption, even though I handed that
 5    denial order that I got from the court to Officer Ladd,
 6    he -- he made no mention of it in the police report and
 7    acted like it didn't exist, which is why I filed an OPA
 8    complaint against him because he -- his report was one big
 9    false and misleading statement that a judge would use to
10    rule upon.  Right?
11         Like, he omitted the most relevant evidence there, which
12    was the denial order had been issued seven hours prior.
13         So anyway --
14         THE COURT:  So --
15         MR. BENSHOOF:  -- getting back to --
16         THE COURT:  Mr. Benshoof, what about the -- what about the
17    immunity argument?  And, really, I want to ask about the
18    broader policy argument.  And that is, that the statute
19    protects people who perhaps in the heat of the moment
20    express unfair opinions about their spouses or about someone
21    they're complaining against when they tell the police about
22    an alleged crime.
23         So the alleged crime might be violation of a no contact
24    order, but then the complainant might say, "and, you know,
25    my ex is a racist and a domestic violence abuser and
```

1    anti-vaxxer and crazy and" ... doesn't the statute protect

2    people who make complaints to the police but then might say

3    some intemperate things about the other person?

4        MR. BENSHOOF:  I absolutely agree that it does in some

5    situations, and I think the Court asked a very good

6    question, specifically referring to "heat of the moment."

7    And that has been one of my arguments this entire time is

8    that this wasn't just a heat-of-the-moment thing.

9        So -- because I think that -- that the good faith -- the

10   good-faith protection and the heat-of-the-moment, like,

11   because we have human nature.  Right?

12       So, yes, there does need to be some protections, but when

13   we have evidence, as we do in this case, that Ms. Owen spent

14   months repeating the same lies over and over and over, I

15   don't think defense counsel can any way argue that it was a

16   heat-of-the-moment situation or that it should be covered

17   under good faith.  Because, like, heat of the moment does

18   not last a year.  I mean, I understand that some people can

19   be very temperamental for a long time, but the law is not

20   written to cover a heat-of-the-moment vengeance trip that

21   lasts a year and a half.  So I don't think that applies.

22       THE COURT:  I see.

23       MR. BENSHOOF:  Yeah.  Oh, and so I do, like, also want to

24   address defense counsel's attempt to basically craft this

25   legal umbrella under which attorneys and their clients can

1     lie with absolute impunity.  And I -- I baited Mr. Admon a

2     little bit by giving him an example in an email to show him

3     how absurd it was that -- that Russ -- Mr. Russ, Mr. Admon,

4     and Mr. Rekofke were all essentially making the argument

5     that anything said to law enforcement, anything said in a

6     judicial proceeding, anything said to an attorney is

7     protected and is immune from a claim of defamation.

8       And so I gave all three of those attorneys, in an email, a

9     hypothetical example.  And I said it was a hypothetical, and

10    it was a ridiculous hypothetical, to make a point so that

11    they couldn't come back later and say, oh my gosh,

12    Mr. Benshoof threatened me.  And the hypothetical was

13    basically something like, hey, guys, if I -- if I kidnapped

14    all of your wives and sent them to Ukraine and sold them for

15    organ harvesting, with your logic, I can sit -- you know, if

16    I threatened to do that in an email, with your logic, I

17    could -- I'm immune from -- from a tort claim against you

18    because it was in an email related to a judicial proceeding.

19    I'm like, don't you see how absurd that is?

20      And then of course, Mr. -- you know, so I believe that

21    defense counsel know very well, both from my court filings

22    and my private email communications with them, that there's

23    plenty of evidence substantiating the exception under UPEPA

24    where I'm the victim of a crime -- looking at my notes

25    here -- and to address Mr. Marinella's assertion that my

1     claims of being a victim must be meaningless because the

2     police haven't done anything yet.  That's a straw man

3     argument.

4        I think everybody's aware that the police department is

5     understaffed.  That's exhibited by the fact that record

6     requests are taking, you know, a year longer than they're

7     required by law.

8        And -- and Mr. Marinella also asserted that there's no

9     other witnesses besides me.  That's not true.  That's false.

10    Daniel Heller, senior citizen who acted as process server,

11    personally witnessed some of the defamation that occurred.

12       THE COURT:  Well, but I have not seen a declaration -- I'm

13    sorry, Mr. Benshoof.  I have not seen a declaration from the

14    person you just mentioned.

15       MR. BENSHOOF:  Oh, okay.  Then -- then we can strike that,

16    if that's not evidence before the Court.

17       THE COURT:  Well, but let me ask you.  Why?  Why don't I

18    have a declaration from that individual if they're a witness

19    to a crime?

20       MR. BENSHOOF:  Well, Mr. Heller and another process server

21    friend, Molly Anderson, I actually went with both of them to

22    the East Precinct so that they could file police reports

23    about being threatened and intimidated and harassed by

24    Ms. Owen and Ms. Lerman, including baseball bats and threats

25    of, you know, getting the process servers arrested.

1       And it's going to sound ridiculous, but the truth is, I

2       went to the East Precinct.  We went to the desk sergeant and

3       the desk sergeant accused me of harassing Ms. Owen and

4       Ms. Lerman.

5       THE COURT:  Mr. Benshoof, you misunderstand.  I'm not

6       asking where's the police report from Mr. Heller.  I'm

7       asking, where is a declaration attached to your response?

8       Did you reach out to Mr. Heller and say, "Would you sign a

9       declaration under penalty of perjury attesting to what --

10      the crime that you witnessed?"

11      MR. BENSHOOF:  At this point, both Mr. Heller and

12      Ms. Anderson are so afraid of what Ms. Lerman or Ms. Owen

13      might do, they're scared to be involved.  And that's the

14      same thing that's been going on with a lot of friends.  They

15      are literally scared to do anything because they've seen

16      enough of what they're capable of and they're afraid.

17      THE COURT:  I see.  All right.  Anything further on

18      Defendant Owen's motion?

19      MR. BENSHOOF:  Let's see.  Oh, yeah.  Mr. Marinella

20      mentioned that I hadn't exhaustively, extensively responded

21      to every one of their points in their 28 pages.  And,

22      frankly, plaintiff's position is that I've already said

23      enough.

24      I think that defense counsels are trying to confuse the

25      court and obfuscate plaintiff's claims with, you know, all

1    this case law and these assertions that, you know, UPEPA

2    covers everything, absolute immunity.

3      So, you know -- and I don't know a bunch of case law, but

4    I think what I filed into the record so far is sufficient to

5    establish that I've been the victim of defamation, and that

6    that defamation by Ms. Owen and others has been a proximate

7    cause of harm that I've suffered, such as having my son

8    taken away, having my car stolen.  Like, I don't care about

9    money, but having my son taken.  Like, there's no more --

10   there's no more -- there's no worse harm and damage than

11   having somebody's defamation take away your child.

12     THE COURT:  But it sounds to me, with all due respect,

13   Mr. Benshoof -- and I can hear the emotion in your voice.  I

14   want to acknowledge that.  But it sounds to me that you're

15   using this action for defamation and abuse of process to

16   relitigate what happened in the parentage action.  Is that

17   correct?

18     MR. BENSHOOF:  No, sir.  No.  I am -- I'm not trying to

19   relitigate anything.  I'm trying to -- let me -- I'm trying

20   to address the harms that have happened.

21     THE COURT:  Right.  But it sounds like what you're saying

22   is --

23     MR. BENSHOOF:  You --

24     THE COURT:  -- Ms. Owen lied in the parentage action and

25   her attorneys lied, I lost my son, and I'm entitled to

1   redress.  Right?

2      MR. BENSHOOF:  I was defamed by Ms. Owen and there were

3   damages that were a direct result of her defamation.  And,

4   you know, for the Court's information, do I -- am I working

5   on a motion to vacate the entire family court case?  Yes.

6   But it's not prepared to be filed yet.

7      So I have more than one intention in this.  That case

8   should be vacated because it was barratrous in the first

9   place.  Yes, there was abuse of process because Ms. Owen

10  used -- used the -- I mean, the petition to decide parentage

11  was fraudulently filed and it contains perjury.  Like,

12  there's mutually exclusive material statements of fact in

13  the petition to decide parentage from 9/21/21 and her sworn

14  declaration from 9/22/21.

15     THE COURT:  Okay.  Mr. Benshoof, even if I give you the

16  benefit of the argument of that -- on that, the action on

17  the petition was where you were to litigate that.  If you

18  thought -- if you thought in the petition -- if you thought

19  the petition was totally false, then that action was where

20  you were supposed to litigate that; right?

21     MR. BENSHOOF:  I had no idea that it was false.  Like, I'm

22  not an attorney.  I had an attorney at the time.  He didn't

23  even realize the perjury that was -- that was going on.

24  Like, I didn't know that it was -- that it was false.  I

25  didn't know that there was perjury in it until many months

1    later, you know.  Like, last April or May of 2022.

2       THE COURT:  Well, but again --

3       MR. BENSHOOF:  And I tried to --

4       THE COURT:  -- again, Mr. Benshoof, let's say your --

5    again, let's assume for the sake of argument you're

6    absolutely right.  You didn't know at the time that lies are

7    being told.  Now you've got new evidence to show that what

8    happened at the parentage action was all lies and you can

9    prove it.

10      There are remedies under the court rules for bringing that

11   to the court's attention.  It seems like what you've done

12   instead is bring a defamation and abuse of process lawsuit

13   to address the alleged falsehoods that you believe occurred

14   at the parentage action.

15      Is that what's ultimately going on here?

16      MR. BENSHOOF:  To answer that question, Your Honor, when

17   you -- when you say that there were -- there was actions I

18   could have done, are you referring to within family court?

19   Because I -- is that what you're referring to?

20      THE COURT:  Well, I can't give you legal advice.  But it

21   is not uncommon in legal actions for parties to discover

22   evidence that they could not have known about before that

23   directly contradicts what happened during a trial.  And

24   there are procedures by which you can bring that to the

25   court's attention.

1       Now, you might not -- the court might not -- the court

2       might not agree with you.  The court might decide that you

3       should have brought that evidence to the court's attention

4       before.  But there's a way to get that done is what I'm

5       saying.

6          MR. BENSHOOF:  Right.  And I attempted that, Your Honor.

7       And, you know, I'm not here to say anything disparaging

8       about anybody, but what I did attempt was I -- in the family

9       court case, 21-5-00680-6, after I discovered this, I filed a

10      motion to show cause because I felt that I had enough

11      evidence, which I included in the motion, that the court

12      needed to have a hearing to see why Mr. Cliber and Ms. Owen

13      shouldn't be held in contempt for all of the perjury and

14      false statements and barratry and abuse of process that I

15      found.

16         And I don't know why, but instead of presiding Judge

17      Keenan at least allowing me a hearing, which should be

18      protected by my First Amendment right to petition, he sua

19      sponte struck the order.

20         So, you know, I tried to address all of this stuff

21      repeatedly for months in family court, and, in all honesty

22      and sincerity, the only conclusion that I could come to

23      after months and months and months and months of this, of

24      trying within that court case with Judge Keenan, was that

25      there was some prejudice that was preventing me from being

1        able to have my grievances heard and the truth come to

2        light.  And I'll just leave it at that, but I tried.

3            The only reason -- like, I was trying up through, you

4        know, July.  I mean, I even tried filing a petition for

5        habeas corpus.  Like, I was calling CPS.  I was calling

6        everybody.  And I've -- you know, like, I have better things

7        to do with my life than try to write lawsuits and figure out

8        how to litigate.  Like, this has all been in response to

9        what has been done to my son.  Right?

10           Like, I don't care what's happened to me.  But, like, I

11       have -- I have to make my claims as the person with

12       standing.  Like --

13           THE COURT:  So, Mr. Benshoof, let me -- let me just --

14           MR. BENSHOOF:  I don't know what else to do.

15           THE COURT:  Again, I can tell this is a very emotional

16       proceeding for you, Mr. Benshoof.

17           Let me -- let me offer a comment.  And let's pause for a

18       second so you could collect -- collect yourself.  I want to

19       take a moment here.  Let me know when you're ready to

20       proceed.

21           MR. BENSHOOF:  Sorry, baby.  Don't worry about me.

22       Go ahead, Your Honor.

23           THE COURT:  All right.  Thank you, Mr. Benshoof.

24           So, look, I've never met you.  I don't know you.  I don't

25       know the first thing about you.  I've read things about

1     alleged statements by Ms. Owen, about how you claim that she

2     said that you're a racist or a white supremacist or an

3     abuser or a crazy person.  I don't know whether any of

4     that's true or not.  And I'm not here to pass judgment about

5     your character.

6        I don't know what happened in front of Commissioner

7     Schaefer or Judge Keenan, but I strongly suspect that they

8     took the same view that I do, that we are neutral judicial

9     officers.  We don't know the parties.  We don't know whether

10    aspersions on their character made by someone else are true

11    or not.

12       And so at least as to these proceedings, I can assure you

13    that I am not sitting here judging you as a terrible person,

14    as an abuser or white supremacist and that's why I'm going

15    to make my ruling one way or the other.  That's not what's

16    happening here.  I'm trying to determine the grounds for

17    your legal claims.  That's really what I'm trying to do.

18    And I'm trying to adjudicate these motions.

19       So I think I've heard enough -- oh, go ahead,

20    Mr. Benshoof.

21       MR. BENSHOOF:  I just wanted to say I understand and

22    (inaudible).

23       THE COURT:  Okay.  I think I've heard enough in response.

24    I did want to give Mr. Marinella an opportunity to reply.

25       MR. MARINELLA:  Thank you, Your Honor.  Can you hear me?

1        THE COURT:  I can.

2        MR. MARINELLA:  First, Your Honor, there's a lot to unpack

3    here, but I'll try to be speedy.

4        I do not know what Mr. Benshoof is talking about regarding

5    a witness to any crimes, or he mentioned some service and

6    baseball bats.  I have no idea what that is referring to.

7    That was not me.  But the only place witness -- the word

8    "witness" even shows up in our reply is when I state,

9    "Benshoof's realleged assertion that his filed sworn

10   exhibits as a complaining witness does nothing to establish

11   that he has been the victim of any crime."

12       So I just wanted to make that clear on the record.

13       Mr. Benshoof in his response is now intermixing previously

14   filed complaints and causes of action.  To be clear,

15   defamation must be a statement of fact, not whatever

16   Mr. Benshoof is now trying to establish here regarding the

17   FJ Cruiser and that point of the conversation that you

18   guys -- that you just had.

19       Mr. Benshoof must plead and prove an actual false

20   communication.  He has not done that.  He has not done that

21   today.  Certainly he did not do that in his pleadings.  He's

22   not done that in his response to Ms. Owen's motion.

23       Any false statement must have been made to someone other

24   than law enforcement or in a judicial proceeding.  That's in

25   our motion.  That's according to RCW 4.24.510 in the common

1    law privilege for statements made pertinent to the subject

2    of judicial proceedings.  Those are all immune.  And that's

3    in McNeal v. Allen, also cited in our -- in Ms. Owen's

4    motion.

5     THE COURT:  Real quick.  What about Mr. Benshoof's

6    reference to 4.24.500 and the good faith -- good faith

7    language there?

8     MR. MARINELLA:  That as expressed earlier by Mr. Russ,

9    that good faith -- that good faith is no longer required,

10    and that was taken out of the statute, Your Honor.

11     THE COURT:  Well --

12     MR. MARINELLA:  In immunity --

13     THE COURT:  I mean, I see it in the statute.  I mean, on

14    the State legislature's web page for the RCW.  I -- I don't

15    know if it's been taken out just by case law.  Is that what

16    you meant?

17     MR. MARINELLA:  No.  It exists in that particular statute.

18    But when communications, such as you were just discussing

19    with him, regarding the FJ Cruiser, all of the

20    communications he alleges were defamatory from Ms. Owen were

21    to police officers.

22     THE COURT:  Right.

23     MR. MARINELLA:  And that is absolutely immune.

24     To continue, Your Honor, unless you had anything further?

25     THE COURT:  Nope.  Go ahead.

```
1        MR. MARINELLA:  Immunity, and this is from Bailey.  It was
2    also cited in Phoenix Trading, and it is in our briefs.
3    Immunity under section 4.24.510 does not require a showing
4    of good faith.
5        In Bailey, the plaintiff's argument in that case, that
6    immunity under that statute did not apply because the
7    defendant could not meet the good-faith requirement
8    contained in 500, which you just mentioned, Your Honor.
9    That argument by the plaintiff was flatly rejected by the
10   Court of Appeals.  And the Court of Appeals in
11   determining -- in making that determination stated that
12   Ms. Bailey is incorrect.
13       The 2002 amendments brought Washington law in line with
14   these court decisions, which recognized that the
15   United States Constitution protects advocacy to government
16   regardless of content or motive, so long as it is designed
17   to have some effect on government decision-making.  That's
18   as clear as can be, Your Honor.  That is also cited in Akmal
19   v. Cingular Wireless and another case we already mentioned
20   wherein defendants are entitled to immunity even if the
21   statements in question were made in bad faith or are
22   defamatory, per se.  That's in Sanai.
23       Some of the claims that Mr. Benshoof is now arguing or
24   included in his operative complaint -- there are several
25   complaints out there, but the operative one filed on I
```

```
1     believe you said October 11th, some of those claims have
2     already been dismissed with prejudice.  He has no -- he has
3     not asserted a common law fraud claim in this action, but he
4     alludes to it as if it's somehow connected to this action.
5     That's just not the case.
6        The matter involving the FJ Cruiser, which I believe was
7     filed in March, has since been dismissed.  And at the time
8     he filed that complaint, Your Honor, you discussed the title
9     with him.  That was in Ms. Owen's name.  The title was in
10    Ms. Owen's name and she was the registered owner.  But even
11    if that wasn't the case, that matter has now been dismissed.
12       THE COURT:  Although, to be fair, that was -- that was
13    solely a replevin action, if I recall correctly.  I don't
14    think there was a claim for damages, or am I wrong about
15    that?
16       MR. MARINELLA:  I don't recall, Your Honor.  At that time,
17    I was -- I was not working on that case, but I do not
18    believe there was any damages claimed.
19       THE COURT:  All right.  Proceed.
20       MR. MARINELLA:  Oh, and just to -- in sum, Your Honor, he
21    has not established that UPEPA does not apply.  He cannot
22    establish his claims under the protections of UPEPA or under
23    CR 12(c) or a motion for summary judgment, and we ask that
24    you would grant Ms. Owen's motion in its entirety.
25       Thank you.
```

1          THE COURT:  All right.  Thank you.

2          That brings us to the joinder by Lerner -- I'm sorry --

3     Lerman and Hermsen.

4          I'm sorry.  Was someone jumping in?

5          MR. ADMON:  Yes.  That's me, Your Honor.

6          THE COURT:  Oh, Mr. -- so, Mr. Benshoof, the Court has

7     heard argument on Defendant Owen's motion.  We've heard the

8     initial argument, your response and reply.  So now we're

9     going to move on to Lerner [sic] and Hermsen.

10         MR. ADMON:  And thank you for that, Your Honor.  I'd like

11    to touch on a few points here.  I'd like to first address

12    the question that you posed to the -- to parties here

13    regarding the exclusions to the communications, the

14    immunities.  And you posed a hypothetical, which I think was

15    a good one.  I think to understand that we need to just sort

16    of look at the history of UPEPA.  And UPEPA, actually, it

17    replaced RCW 4.24.525, which our Supreme Court held in Davis

18    v. Cox was unconstitutional.  It didn't replace the other

19    RCWs under 4.24 et seq., and so those cases stand.

20         And in our reply, we've cited quite a few cases that

21    address the issue of immunity.  And the purpose of immunity

22    is so there's no chilling effect.  Right?  I mean, the

23    legislature had to make a decision, and the idea is that

24    individuals should not be afraid to report because, if an

25    individual can get sued for reporting to an agency, if there

1       is the threat of a lawsuit from making a report to an

2       agency, even if the facts may not be completely false, if

3       somebody has an impression that something bad is happening,

4       then, as a society, we need to be able to function.  And if

5       somebody feels that there is something wrong, ongoing say,

6       for example, with a child, they shouldn't be afraid to

7       report to CPS.  And that's why these immunities are in

8       place, because we don't want to create a chilling effect.

9       Because if lawsuits are allowed to be filed for everybody

10      that makes a complaint, no one's going to want to make a

11      complaint because no one's going to want to spend the time

12      and the effort and the money defending these lawsuits.

13        Now, your question about a heinous act is actually

14      completely on point.  I was researching this as you were

15      asking that question.  There's a case directly on point.

16      It's a Division I case.  It's called K.M.P, by and through

17      Pinho, v. Big Brothers Big Sisters of Puget Sound.  It's

18      February 2, 2021.  And that case addresses something very,

19      very similar to what you've asked.

20        THE COURT:  I'm sorry.  Which -- which Court?  Which

21      court, Mr. Admon?

22        MR. ADMON:  It's a Division I case.

23        THE COURT:  Thank you.

24        MR. ADMON:  And it's the Washington Appellate Reporter --

25      let me get you that case.  16 Wn.App.2d 475, K.M.P., by and

1    through Pinho, P-i-n-h-o, plaintiff, verse Big Brother Big

2    Sisters of Puget Sound.

3      And there's a footnote in that case, Footnote 20.  And in

4    that case there was -- there were allegations of sexual

5    abuse against a child.  And the court found that the

6    plaintiff is entitled to immunity under RCW 4.24.510.

7      There's another case on point, which is Brawley v.

8    Rouhfar, that's a Division I case as well.  That's 2011,

9    Washington Appellate Reporter.  I think that's a --

10    actually, that may be an unreported case.  But it's also --

11    it talks about there being an absolute immunity.

12      THE COURT:  Well, if it's unreported and before 2011, then

13    it wouldn't fall under GR 14.1.

14      MR. ADMON:  But that K.M.P. case addresses your issue.

15    And I think there's that implication and that statute is

16    clear.  And the purpose of that statute is, again, to

17    re-emphasize, to prevent what's happening here, so that

18    people can report, and then it's up to the agency to make a

19    determination.

20      There's also something I want to address as well here.  In

21    the last rounds of questions, you asked Mr. Benshoof very

22    patiently about this thing with the FJ Cruiser and his

23    claims that these are defamatory statements.  There's a lot

24    of case law on defamation in Washington, and we have some

25    very clear case law that -- and I'll -- I can cite two cases

1           here.  As a matter of law, a defamation claim cannot be

2           based on allegedly disparaging connotations that are not

3           apparent from the words themselves.  And that's in Lee v.

4           The Columbian.

5             And there's another case, which is right on point.  The

6           defamatory character of the language used must be certain

7           and apparent from the words themselves.  And that's Sims v.

8           Kiro.  And here we don't have that.  We just don't have

9           that.

10            I think the other thing which is important to point out,

11          and I know you've read our joinder, which was briefed.

12          You've read our reply about, you know, Mr. Benshoof is

13          accusing -- he's making all these accusations that people

14          are breaking the law.  You know, we've got some declarations

15          in our reply that show that Mr. Benshoof is taking the law

16          into his Owen hands.  He's walking into people's homes

17          trying to serve them.  You know, he's made this argument

18          that if a statement is made to a court that is untrue, that

19          is a crime.  He made a statement here today that, you know,

20          people are afraid of providing declarations.  They've seen

21          enough of what their -- of what the defendants are capable

22          of doing, so they're afraid.

23            So by Mr. Benshoof's Owen argument and his Owen logic, he

24          just committed a crime.  I mean, there's an immunity to say

25          things to courts.  There's an immunity to say things to -- I

1     mean, these are not crimes.  People are entitled to express

2     their opinions.

3      I think what's most deeply concerning here is that

4     Mr. Benshoof, who is bright, he's articulate, and he's

5     clearly suffering emotionally, we heard it in his voice, and

6     I empathize with that, and he wants to be heard, but this

7     isn't the forum.  This isn't the forum to be heard, as I

8     believe the court expressed.  That should have been done in

9     prior proceedings.  You can't just go and sue everybody in

10    your path.

11     And one of the reasons for that is our profession is a

12    self-regulating one.  Every attorney that's here has to

13    answer to the Bar.  We have regulations that we have to

14    follow.  We have to bring meritorious claims and

15    contentions, according to RPC 3.1.

16     We even have to deal more gently with individuals that are

17    not attorneys.  We have to be hypersensitive and

18    hypervigilant to them.  Mr. Benshoof is not bound to those

19    rules and regulations.  I mean, he's off going, serving

20    people, wearing balaclavas, you know, completely dressed in

21    a -- in a black-clad outfit with eye mask on, which is in

22    our declarations that we provided in our reply.  You know,

23    he's out here suing people.  He's out here suing judges.

24     The reason we're before this Court is because this Court

25    is the only mechanism to regulate that kind of behavior.

1       There's -- if an attorney were to engage in this type of

2       behavior, that attorney would not be practicing for a very

3       long time, and that attorney would also likely be sent to

4       some treatment.  That's not the case here, and that's why

5       we're here, because Mr. Benshoof wants to be heard.  This is

6       not the place.  And his actions are extremely damaging to

7       the defendants and everybody that's in his path.  And I --

8       I'd like to leave it at that.

9         Thank you for your time, for allowing me the time to

10      speak, Your Honor.

11      THE COURT:  Thank you.

12        Any response, Mr. Benshoof?

13      MR. BENSHOOF:  Well, I would like to thank -- was that

14      Mr. Admon?

15      THE COURT:  Yes, sir.

16      MR. BENSHOOF:  I would like to say once again, I

17      appreciate the gaslighting of Mr. Admon.  And Mr. Admon

18      references -- he tries to portray plaintiff as this

19      reckless, unstable person who's harming his clients and that

20      plaintiff has -- you know, is dressing like a criminal and

21      walking into people's homes.

22        I didn't take the time to waste paper and the Court's time

23      previously to respond to this nonsense, but I'll bring it up

24      since that's what he left on.

25        I went out of my way to try to email with defense counsels

1    and point out in my replies to their UPEPA exception

2    letters, their notices, I believe they're called, and show

3    that the exception's baloney and we're just drawing this

4    out, why don't we resolve this?

5      I tried to point out to them honestly and forthrightly, as

6    I do everything, because I do not lie, cheat, or steal, even

7    my worst enemy, and I pointed out that plaintiff is allowed

8    limited discovery as a means to defend against a motion to

9    dismiss under the UPEPA.  And they -- they weren't

10   accommodating.

11     So I did some research and I found out about a precipe for

12   subpoena.  I managed to get those signed by the court clerk,

13   who looked at them, and I thought I was doing everything

14   properly because I was informed by an attorney that normally

15   attorneys have the power to just issue a subpoena.  So I did

16   the work to figure out how to do that as a pro se litigant

17   and thought I was doing everything by the book.

18     And I was having trouble serving Mr. Hermsen, because he

19   was lying and saying that he moved to France and a bunch of

20   other nonsense, and I found out that reading CR 4, that with

21   just a subpoena, I don't have to have a process server

22   serve.  And because Mr. Hermsen was hiding out, it's like it

23   probably would have cost me $500 to get him served.

24     So I walked up to his house.  A friend of his was on the

25   porch.  I said "Is this 613 13th?"  A friend of Hermsen's

1        says, "I'm not sure.  Let's go in and find out."

2         I was welcomed in.  I don't walk into people's houses

3        ever.  I didn't even step on my kid's mom's property when

4        she was withholding him.

5         So, you know, I just --

6         THE COURT:  Mr. Benshoof --

7         MR. BENSHOOF:  -- (inaudible).

8         THE COURT:  Mr. Benshoof, in that -- in that scenario,

9        were you wearing a balaclava?

10        MR. BENSHOOF:  Yeah.

11        THE COURT:  And did you -- did you have also have eye

12       black on?

13        MR. BENSHOOF:  Well, if you're on Zoom, you would

14       understand that I wear eyeliner.  I don't wear --

15        THE COURT:  Well --

16        MR. BENSHOOF:  -- eye black.

17        THE COURT:  Yeah.  But I wasn't -- I wasn't -- I wasn't

18       asking about -- I wasn't asking about eyeliner, but I was

19       asking about eye black.

20        Did you have eye black on that day?

21        MR. BENSHOOF:  I've never -- are you talking like football

22       players wear?

23        THE COURT:  So --

24        MR. BENSHOOF:  I don't even know what eye black is.  I've

25       never owned or possessed or used anything other than that

 1    eyeliner and eye shadow.

 2      THE COURT:  That's not really answering my question.

 3      MR. BENSHOOF:  I'll --

 4      THE COURT:  But I don't want to get hung up on the

 5    definition of eye black, because it sounds like you don't --

 6    maybe don't want to directly answer that question.  But if

 7    you do, were you wearing some kind of eye blackening

 8    substance around your eyes, in addition to the balaclava?

 9      MR. BENSHOOF:  Absolutely not.  I never have any time

10    in -- in years.  Maybe I did as a child.

11      No.  I was simply wearing warm winter clothing and I have,

12    you know, some ski gear and -- like, I've done a lot of

13    bicycling.  I have a thin balaclava that I wear because I

14    have a bald head, and so I don't have any hair on my neck,

15    unless I'm wearing a wig, and I like to keep my neck warm.

16    And it's a way -- like, I wasn't trying to look like a

17    criminal.  It was winter.

18      THE COURT:  I understand you might not have been trying

19    to, Mr. Benshoof, can you at least understand how it may

20    appear threatening to have someone wearing all black with a

21    black balaclava walk into your house unannounced at least?

22      MR. BENSHOOF:  Look -- well, sure.  But I'll paint the

23    picture for you, which is -- like, I'm the least threatening

24    person anybody's ever met.  I have never spanked a child.

25    I've never yelled at a child.  I've never been in a fight in

1       my life.  I've never pushed a woman, hit a woman, raised a

2       hand at a woman, nothing.  I'm a gamer nerd who plays D & D.

3         Mr. Hermsen and I know each other very well for years.  I

4       was so intimidating -- that's a joke -- that when I walked

5       in and all I did was follow his friend in and I -- and I

6       tossed the subpoena on the ground and started walking out.

7         Mr. Hermsen clearly wasn't afraid of me because he came at

8       me screaming and his friends had to hold him back.  All I

9       did was say --

10      THE COURT:  Well --

11      MR. BENSHOOF:  -- are you threatening --

12      THE COURT:  Right.

13      MR. BENSHOOF:  I'm not scaring and intimidating anybody.

14      Like --

15      THE COURT:  I -- I --

16      MR. BENSHOOF:  -- I'm the victim.

17      THE COURT:  So, Mr. Benshoof, I --

18      MR. BENSHOOF:  I'm trying to --

19      THE COURT:  Look, I don't want to go too far down this

20      road of arguing about what happened when you attempted to

21      serve a document.  But I'll -- I will say this.

22        I've only been a judge for a little over four years at

23      this point.  The most frightening and risky types of parties

24      that I've been involved with are not murderers and rapists

25      and people who are criminally insane.  Really, for the most

1        part, the scariest narratives I've been involved with as a

2        judge involve family law matters where one side has lost and

3        perceived that they've lost everything, perceived that they

4        have nothing to lose, and have articulated that they are

5        willing to do anything to restore what they've lost.  Those

6        are some of the most dangerous legal proceedings I have ever

7        been a part of.

8          And so -- and it doesn't matter how big the person is, how

9        threatening they might look, or whether you'd want to run

10        into them in a dark alley or not.  Those are very high-risk

11        legal proceedings from a kind of personal violence

12        standpoint.

13          So you might think that you don't pose a very threatening

14        figure, and I understand that.  But in the context of

15        everything that's happened, in the context of what seems to

16        be a highly contentious and disputed long-term family law

17        dispute, your actions could potentially have been perceived

18        as very threatening.  I wasn't there.

19          MR. BENSHOOF:  Well --

20          THE COURT:  I don't know.  But I -- and I want to put the

21        debate to bed.  But I just wanted to offer that commentary.

22          MR. BENSHOOF:  Thank you, Your Honor.

23          So to address Mr. Admon, plaintiff understands and agrees

24        that that can be true for many circumstances.  But

25        defendants know that I'm an absolute pacifist in all

 1    regards.  And I'll leave it at that.

 2        THE COURT:  All right.

 3        MR. BENSHOOF:  The -- sorry.  Did Your Honor want to say

 4    something?

 5        THE COURT:  No, no, no.  Go ahead.

 6        MR. BENSHOOF:  Mr. Admon was bringing up one half of the

 7    SLAPP issue, which is the statutes are written to protect

 8    First Amendment right to free speech, but I think that

 9    defense counsel are trying to mislead and hide the fact that

10    there's more than one element for our First Amendment and

11    that we have to have a balancing between the different

12    components of the First Amendment.

13        And what I'm referring to is the other side of defendants'

14    right to free speech, which I still believe needs to be in

15    good faith, is plaintiff's right to petition for redress of

16    his grievances.  And, you know, I was trying to look through

17    the RCW 4.24.500 and 510 to see if Mr. Admon is twisting

18    things about the legislative intent, and I've heard repeated

19    insertions -- assertions from defense counsels that the new

20    and improved intent of this is that it's absolute and good

21    faith doesn't matter anymore.

22        And it's my position that unless there's proof to the

23    contrary, the fact that our state legislators --

24    legislature's website today right now says explicitly that

25    it's protecting individuals making good-faith reports I

1    think is what we need to go on.

2      And I think the Court is well aware that skilled, slick

3    attorneys love to come before a court, especially in a

4    complicated case like this, and pull out one-liners from a

5    case knowing that neither the court nor a single pro se

6    litigant has the time to dig through the case law and point

7    out that, like, oh, well, that was -- you know, that really

8    wasn't what they were talking about.

9      So without clear evidence to the contrary, I --

10   plaintiff's position is that we need to go with the stated

11   legislative intent that's on the court's -- on our State

12   website currently, and I think it also fits --

13     THE COURT:  Well, but, Mr. Benshoof, let me -- let me --

14     MR. BENSHOOF:  -- less common --

15     THE COURT:  Mr. Benshoof, let me push back a little bit.

16     So the legislature passes laws.  The courts interpret the

17   laws.  Mr. -- well, the defendants collectively have

18   provided court decisions that interpret the law in such a

19   way that they argued this Court should conclude that

20   statements made to government entities are protected so long

21   as that statement is designed to have some effect on

22   government decision-making, and that it doesn't -- whether

23   it's in good faith or bad faith is not the question.  The

24   question is whether the statement made to the government

25   entity was intended to impact government decision-making.

1      Is that court decision or -- are those court opinions

2      wrong?  Do you have any other court authority?

3      MR. BENSHOOF:  I just checked my pockets and I'm fresh out

4      of court authority.  But I would point out that if defense

5      counsels are making the argument that their client's

6      statements were used to impact government decision-making, I

7      think, once again, defense counsels are trying to stretch --

8      stretch the protections, trying to hide -- trying to provide

9      their clients with immunity from this.

10      And the -- the statements that were defaming in nature

11      made by defendants were not made as part of some

12      communication involving government decision-making.

13      THE COURT:  Well, why do you say that?  Because it -- the

14      statements were made to the police and in the courts and to

15      your child.  So excluding the statements made to the child,

16      what about the statements made to police and the courts?

17      Aren't those statements made to impact government

18      decision-making?

19      MR. BENSHOOF:  If -- I guess it depends how broad are we

20      going to call government decision-making?  Because

21      government decision-making could include -- could be

22      referencing the state legislature making decisions on our

23      laws.  It could reference, you know, the CDC making

24      decision-making.  Like, I'm not sure what -- like, how broad

25      is this umbrella of government decision-making?

1          If we go back to UPEPA and RCW, you know, 4.105.010,

2      there's many different subsections.  Some of the subsections

3      are talking about if you're a news organization or if you're

4      doing performance art, right?  Like, everything isn't

5      considered the same under UPEPA.

6          THE COURT:  Well, right.  But the legislature's language

7      in UPEPA, Mr. Benshoof, the language of UPEPA seems pretty

8      broad.  Right?  It says that the chapter applies to a

9      lawsuit asserted in a civil -- or cause of action asserted

10     in a civil action against a person, like Defendant Owen,

11     based upon the person's communication in a judicial

12     proceeding.  That's pretty broad.

13         MR. BENSHOOF:  Sure.

14         THE COURT:  So that would suggest to me the legislature

15     intended it to have a broad scope.

16         MR. BENSHOOF:  Potentially broad, yes.  But, again, even

17     under the -- under subsection (3)(a), it says "except when

18     (b) of this section applies."

19         THE COURT:  Right.

20         MR. BENSHOOF:  This chapter does not apply to a cause --

21     right.

22         So, you know, defense counsels have tried to argue that

23     merely because a statement was made in -- as part of a

24     judicial proceeding, that it's absolute immunity, and that

25     is absolute baloney because what they are arguing is that

 1      RCW 9A.72 is irrelevant.  What they are arguing by

 2      misleadingly asserting that any -- anything said in a

 3      judicial proceeding is protected by UPEPA is absurd.  I

 4      can't believe they're making it because we have laws called

 5      perjury for making false statements in court.  For them to

 6      argue that somebody can't be accused of perjury and then

 7      sued as a defendant for their perjury because UPEPA protects

 8      them is -- it's absurd.  You know, give me --

 9       THE COURT:  But, Mr. Admon -- I'm sorry, Mr. Admon.

10       Mr. Benshoof, why is it absurd?  Because if the court were

11      to adopt your argument, well, then, couldn't anyone sue

12      someone who brings a family law action or a protection order

13      action and just claim that it was all perjury, and then

14      someone like Defendant Owen would have to take the time and

15      expense and hire a lawyer and defend themselves?

16       I mean, it just seems like any time someone loses a family

17      law case or a protection order case, well, then the loser

18      could sue the other party in a totally different lawsuit,

19      kind of like what you're doing, claiming that it was all

20      perjury and that was a crime, and, therefore, UPEPA doesn't

21      apply.

22       I mean, every losing party -- not every losing party.  But

23      a lot of losing parties would start to do that if the Court

24      were to adopt your interpretation.  Isn't that right,

25      Mr. Benshoof?

1          MR. BENSHOOF:  I understand, Your Honor, that that is one

2     of the stated intents from the little bit that I've managed

3     to read about what the concern of was -- of was from the

4     state legislature.  And, again, more importantly our state

5     legislatures are trying to protect our First Amendment

6     rights.  Right?  They don't want to create a chilling effect

7     for the -- specifically the example of somebody who is

8     reporting a crime in good faith.  Okay?

9          But I -- I have seen nowhere that -- that anybody has

10    intended UPEPA to infringe upon the First Amendment right to

11    petition for redress in that -- like, I understand that

12    the -- that there's a concern, right, that -- theoretically

13    at least -- that the courts would somehow fill up with

14    cross-claims and counterclaims about perjury.  That is a

15    theory and a concern that we don't actually have evidence

16    for.  And I don't think it's in the best interests of our

17    legal system or people's rights to honestly and sincerely

18    petition for redress when they've been victims of crimes.

19    Right?  This isn't just a simple, like, oh, she said I was

20    an asshole, so I'm going to sue her for calling me an

21    asshole.

22         Like, what -- the case that plaintiff has brought, this

23    doesn't get brought all the time because it's usually never

24    this ridiculously bad over months and months and months and

25    months.  Right?  Like, so, there has -- there has to be

1  exceptions for -- for UPEPA allowing egregious circumstances

2  that have harmed a plaintiff to still bring causes of action

3  against people who harmed the plaintiff.  Right?  And that's

4  all I'm doing -- all I'm doing.

5    Like, if we're going to look at the reality of -- of would

6  we theoretically have our court filled with a whole bunch of

7  counterclaims and cross-claims, I don't think that makes

8  logical sense.  And the simple reason I will give for it is

9  this.  Lawyers are too expensive.  People, families are

10  destitute and broken from family courts most of the time.

11  They don't have time and money to come litigating, like, oh,

12  well, they said I'm fat, or they said that, because the

13  attorneys for both sides will say, look, that's going to get

14  nowhere.  You're going to spend a bunch of -- a whole bunch

15  of money, probably, and there's no guarantee that one side

16  is going to win or another.

17    The only reason somebody like me is bringing a cause of

18  action like this is because the evidence is so extensive and

19  over so much time that nobody with sincerity can make the

20  argument that, like, oh, well, yeah, you know, she was --

21  she was just emotional that day.  And, like, oh, they didn't

22  really mean it that way.  No.  This has been perpetrated,

23  and they've tried to cover it up and deny it for almost a

24  year and a half.

25    Like, I made all my good faith -- like, we shouldn't be

1    here because I have tried privately to say let's just settle

2    this.  Let's just get mediation.  Like, I don't want to sue

3    anybody.  Like, the only -- you know, so are the courts

4    going to fill up with people like me?  No, because it's

5    taken everything I can to even get to this point.  Like,

6    there aren't a whole bunch of people out there who have been

7    through the ringer that are still standing enough to try to

8    protect their kids like I am because they get ground up

9    before they ever get to this point.

10    So, no, the courts aren't going to fill up.  And I'm tired

11    of listening to defense counsels gaslight me and try to

12    protect their clients.  I know they know what their clients

13    did for the record.  And that's -- do I have one more close?

14    No.

15    I'll leave it at that, Your Honor.  I'm sorry if I got

16    frustrated.

17    THE COURT:  Thank you, Mr. Benshoof.

18    Reply, Mr. Admon?

19    MR. ADMON:  Yeah.  And I'll keep it brief, Judge.

20    You know, it's interesting Mr. Benshoof keeps talking

21    about defense counsel.  He's mentioned the word defense

22    counsel here probably over a hundred times.  This isn't

23    about defense counsel.  This is about the defendants.

24    And -- and it's also -- it really sticks out to me that

25    Mr. Benshoof just made the statement, he realizes, he said,

1      lawyers are too expensive.  There are four lawyers appearing

2      here today.  And there's this Court's precious time, I mean,

3      with all the burdens that the Court has on it.

4        He understands the costs that he's inflicting on these

5      folks.  Four attorneys in a three-hour hearing dealing with

6      motion after motion and lawsuits.  He stated that he doesn't

7      have time to research case law.  He's had a lot of time to

8      file a lot of lawsuits, file a lot of motions, serve

9      subpoenas on multiple parties.

10       You know, he -- he really clearly understands what he's

11      doing based on what he's saying.  I mean, he's saying one

12      thing, but then he's saying another.  It's just like him

13      saying that he doesn't like wearing, you know, masks, but

14      he's wearing balaclavas.  I mean, these things don't

15      really -- they don't fit.

16       The other thing that I don't think he understands is, you

17      know, in defamation and libel law, we have this terminology

18      called the Streisand effect.  And the Streisand effect comes

19      from the unsuccessful efforts of Barbara Streisand, the

20      singer and the actress, to conceal her mansion in

21      California.  And she filed a whole bunch of lawsuits about

22      it.  She didn't want anybody to know her address.  And she

23      made it public.  Now the whole world knows her address.

24       You know, Mr. Benshoof is complaining about the

25      individuals going to -- to these agencies, like the police

```
 1        or to the -- and complaining.  For anybody to find those
 2        records, they would have to do public records requests.
 3        They would have to get very, very detailed.
 4          Instead, what he's doing is he's coming to court and he's
 5        filing lawsuits on the public record that anybody can
 6        access.  I mean, if anyone's harming Mr. Benshoof it's
 7        Mr. Benshoof.
 8          And, you know, the fact that he understands that, quote,
 9        lawyers are too expensive, and, yet, he's dragging this
10        issue out over and over and he's forcing so many individuals
11        to hire so many lawyers because they want a barrier between
12        them and him so they're not harassed, I think, shows his
13        clear intention.
14          And even though he is, you know, suffering and he is
15        emotional from what had happened to him.  And, again, I do
16        empathize with it.  I hear the pain in his voice.  And I
17        really do empathize with that, having practiced family law a
18        long time in the past, it's terrible.  But he understands
19        what he's doing.  And when you've got an individual sending
20        emails out saying "in the event I'm assassinated," and then
21        making these hypotheticals, as he stated on the record, that
22        he's going to abduct our wives, defense counsels' wives,
23        ship them to the Ukraine, and sell them to DynCorp for organ
24        harvesting or sex trafficking, I think that raises enormous
25        red flags and is frightening.  It's frightening from the
```

1       point of view of defendants and, frankly, it's frightening

2       from the point of view of defense counsel.

3         And Mr. Benshoof is lucid.  He understands what he's

4       doing.  He realizes the costs that are involved.  He used

5       the word in front of this -- on the record today, that he

6       was "baiting" me.

7         You know, Mr. Benshoof needs to be stopped.  He needs to

8       be stopped.  He needs to be found to be a frivolous -- a

9       filer of frivolous lawsuits.  He should be sanctioned for

10      his behavior.  He needs to learn that there needs to be an

11      end.  And if he wants to reform the RCWs, he can run for

12      office.  You know, we all have that ability.  He can go and

13      run for office and try to legislate.  But he shouldn't be

14      legislating in the courts, and he shouldn't be costing so

15      much pain and so much expenses to people and taking up this

16      Court's time as he doing it.  Thank you.

17        THE COURT:  All right.  Thank you.

18        All right.  I've heard from all of the parties on all of

19      the motions and that will conclude the argument on the

20      motions.

21        Let me address them each in turn here.  Just a moment.

22        So we heard Defendant Cliber's motion first.  I'll address

23      that one first because I believe the only claim asserted

24      against Defendant Cliber was for abuse of process.

25               (Unrelated audio not transcribed)

1     THE COURT:  I'm sorry.  Mr. Rekofke, I -- that was you.

2     MR. REKOFKE:  It was, Your Honor.  I apologize.  Sorry

3     about that.

4     THE COURT:  All right.  I lost my place a little bit here.

5     I'm going to try to recover.

6     I was addressing Mr. Cliber's motion.  I'm granting the

7     motion to dismiss under UPEPA.  I conclude that UPEPA

8     applies to the claim.  I conclude that both under CR 12 and

9     CR 56 not only has Mr. Benshoof failed to assert facts

10    sufficient to establish a claim for abuse of process against

11    Defendant Cliber, even under the summary judgment standard,

12    I find that there's no genuine issue as to any material fact

13    relating to any such claim.

14    I, therefore, dismiss the claims by plaintiff against

15    Mr. Cliber.  Regarding the fee request -- just a moment --

16    under RCW 4.105.090, as the prevailing party, I am granting

17    attorneys' fees to Mr. Cliber.

18    Turning to Defendant Owen's motion as well as Defendants

19    Lerman's and Hermsen's joinder in that motion, first of all,

20    I agree with the moving party that coercion is not a

21    cognizable civil claim in Washington.  All claims for

22    coercion are dismissed.  And that's really under a 12(b)(6)

23    standard.  That's not under UPEPA.

24    Regarding the claims for defamation and abuse of process

25    as to the remaining defendants, I agree that UPEPA applies

1    to those claims.  I agree that under CR 12 -- CR 12(c) or

2    CR 56 standard, dismissal of the abuse of process claims is

3    proper.  The defendant -- I'm sorry -- the plaintiff,

4    Mr. Benshoof, has not alleged facts supporting there was any

5    kind of either improper purpose in commencing any of the

6    proceedings against him or during those proceedings some

7    kind of improper or unusual act that amounts to an abuse of

8    process.  There's simply no such fact sufficiently pled, and

9    so the abuse of process claims against all other defendants

10   are dismissed.

11      Turning to the defamation claim, I, likewise, find that

12   UPEPA applies to that claim as to all defendants.  I find

13   that the alleged statements to law enforcement and

14   statements made during the course of litigation are subject

15   to the absolute privilege under 4.24.510, and, therefore,

16   Mr. Benshoof is incapable of establishing an essential

17   element of his defamation claims against any of the

18   defendants and under CR 12(c) and CR 56 can and should be

19   dismissed for defamation as to the remaining defendants.

20      Because the defendants are the prevailing parties, I do

21   find that they are entitled to attorneys' fees under

22   RCW 4.105.090.

23      There's also the claim for -- I believe there's a claim

24   for damages under 4.24.510.  Just a moment.  4.24.510

25   indicated that a person prevailing upon the defense provided

1      for in this section is entitled to recover expenses and

2      reasonable attorneys' fees incurred in establishing the

3      defense, and, in addition, shall receive statutory damages

4      of $10,000.

5        And so I don't believe I have discretion in the award or

6      the amount.  And so in addition to attorneys' fees and

7      costs, I award to Defendants Owen, Lerman, and Hermsen

8      statutory damages in the amount of $10,000.

9        Actually, I -- I'm backing up in my head.  Did I address

10     4.24.510 as to Defendant Cliber as well?

11       No, because that was only abuse of process.  So I'm not

12     awarding $10,000 to Defendant Cliber.

13       Regarding the parties' request for a vexatious litigant

14     order, I'm denying that request.  And it's mainly for

15     procedural reason.  That request was basically tacked onto a

16     dispositive motion.  It was not captioned as a motion for a

17     request for such an order.  That is a major ask of the

18     Court, to restrict someone's access to the Court and bar

19     them from bringing further litigation of any kind, without

20     the Court's permission.  I'm not saying that the Court would

21     not grant that type of request, but it needs to be brought

22     separately rather than tacked onto another motion where it's

23     not expressly captioned as such.  And Mr. Benshoof would

24     need to have an opportunity to more fully respond to that

25     request.

1    And so the request is denied without prejudice to bringing

2    a future motion if the parties so desire.

3    If the parties would prepare a proposed order, I think one

4    order would be preferable.  But if the parties feel that

5    that should be two orders, I'm amenable to that as well.

6    I'll review it when it's been finalized.  You can email it

7    to Madam Bailiff when it's ready.

8    Is there any further clarification or information needed

9    to finalize such an order?

10    MR. MARINELLA:  Did you mention, Your Honor, that these

11    causes of action that you dismissed are with prejudice?

12    THE COURT:  Correct.  All of the dismissals are with

13    prejudice.  These are dismissals on the merits.

14    MR. MARINELLA:  Thank you, Your Honor.

15    THE COURT:  You're welcome.

16    Unless there is further clarification needed, unless

17    there's anything else the Court can do for the parties right

18    now, this matter is concluded.  Have a good morning,

19    everyone.

20    MR. BENSHOOF:  Your Honor?

21    THE COURT:  Oh, yes, sir.  Mr. Benshoof?  Go ahead.

22    MR. BENSHOOF:  Yeah.  Hey, Judge Ferguson, I just wanted

23    to say that I really appreciate you taking so much time to

24    look through this and to do your best to be an impartial

25    trier of fact, and I ran into a situation with Judge

1       Ferguson [sic] where she dismissed a lawsuit with prejudice.

2       I just wanted to make sure that this is a dismissal without

3       prejudice, correct, Your Honor?

4        THE COURT:  You said Judge Ferguson.  Did you mean Judge

5       Robertson?

6        MR. BENSHOOF:  Sorry.  Judge Robertson.  Yes, sir.

7        THE COURT:  Well, as I just indicated, these would be

8       dismissals with prejudice under UPEPA.

9        MR. BENSHOOF:  Oh, okay.  And then is the -- I also wanted

10      to note for the record, for appeal, that I have not been

11      able to access the court clerk's office, and I have not been

12      able to access the court's clerk office either in person or

13      by mail, because the local post office has denied me access

14      repeatedly without a mask, and, as such, I was unable to get

15      my second amended complaint to the Court for consideration.

16      And so the Court has apparently neither considered that nor

17      my motion to leave to amend CR 15.

18       So I just wanted to get those objections on the record for

19      my next stop, which will be appellate court.

20       And I wish blessings upon all of you, and hopefully 2023

21      will be a year of truth and unity in our community and our

22      country.

23       THE COURT:  Well, thank you for that, Mr. Benshoof.  I

24      actually appreciate you bringing up your motions.  The Court

25      did receive from you several motions.  They were not noted

1    to be heard, and I -- I know that may sound like kind of
2    clerical minutia, but sometimes parties have difficulty
3    understanding this, especially parties who are not
4    attorneys.
5        When you file a motion in the court file, that does not
6    trigger anything happening, in terms of getting a hearing,
7    unless it's accompanied by a note for motion, because what
8    that note for motion does is it tells the court that you
9    want a hearing on the specific date, and maybe with oral
10   argument and maybe without oral argument.
11       But if all you do is file your motion, with no note for
12   motion, it's not going to get heard.  It's just going to sit
13   in the court file.  There's no alarm bell that goes off
14   telling me that you filed a motion, if you don't note it for
15   a hearing.
16       So to the extent this matter proceeds forward, if you
17   bring any other motions, I just wanted to let you know that
18   you need to include a note for motion.  And there is a note
19   for motion on the court's website.  Offhand, I can't tell
20   you exactly where, but I know it's on there.
21       MR. BENSHOOF:  Thank you, Your Honor.
22       THE COURT:  All right.  You're welcome, Mr. Benshoof.
23       All right.  That concludes this matter.  Yeah.  Thanks.
24           (January 27, 2023, proceedings concluded)
25

```
 1                          -o0o-

 2                      March 17, 2023

 3

 4        THE BAILIFF:  If you could please turn on your cameras, we

 5     can go ahead and get started.

 6        Superior Court for the State of Washington, In and For the

 7     County of King, is in session.  The Honorable Marshall

 8     Ferguson presiding.

 9        Your Honor, this is Kurt Benshoof v. Nathan Cliber, et

10     al., Cause Number 22-2-15958-8 SEA.

11        For the record, this morning, will the plaintiff please

12     introduce yourself.

13        MR. BENSHOOF:  My name is Kurt Benshoof, plaintiff.

14        THE BAILIFF:  Thank you.

15        And defendants, please, one at a time.

16        MR. RUSS:  And for the record, good morning.  Blair Russ

17     appearing on behalf of Jessica Owen.  Also present is

18     Anthony Marinella from my office.

19        THE BAILIFF:  Thank you.

20        MR. REKOFKE:  Good morning, Your Honor.  This is Kyle

21     Rekofke on behalf of Defendant Cliber.  I'm just observing

22     today, though.

23        THE BAILIFF:  All right.  Your Honor, I believe we are

24     ready, if we have not missed anyone.

25        THE COURT:  Looks like we've got everyone.
```

1          All right.  So we're here on cross motions for summary

2     judgment as to Mr. Benshoof's declaratory judgment action

3     claim.  I think the appropriate order of argument will be to

4     start with Defendant Owen, I believe Owen filed first, first

5     in time.  Everybody will have a full opportunity to be

6     heard.  I don't have another matter immediately after this

7     one, and so I don't have a time crunch.  I don't want to

8     have this hearing go on forever, but everyone will have an

9     opportunity to present all of your arguments.

10         All right.  Mr. Russ, you're arguing for Defendant Owen;

11    is that correct?

12         MR. RUSS:  That is correct, Your Honor.

13         THE COURT:  Whenever you're ready.

14         MR. RUSS:  Thank you.  And I will be brief, just given the

15    extraordinary nature of the relief sought here.

16         We've laid out in our motion and our response the legal

17    reasons why the Court should dismiss this.  They're

18    procedural in nature, for the most part.  They relate to

19    standing and just the absence of justiciable controversy,

20    res judicata, and the fact that there's another action

21    that's already adjudicated some of these issues.

22         So those concepts are not only entirely straightforward

23    and the Court's probably very well acquainted with them, but

24    they're not responded to in Mr. Benshoof's briefing.

25         If there's specific issues that I can address or elaborate

1    on, I'd be happy to do so, but I do think they are

2    self-explanatory.

3      I think that what's sort of striking here about this

4    motion is that this is, one, not the first time that

5    Mr. Benshoof has brought relief in order to circumvent the

6    ruling of another judge in a family law case.  That's one.

7      Two, essentially what Mr. Benshoof is asking for is so

8    extraordinary that it really just undercuts the basic tenets

9    of the adversarial system and the separation of powers.

10   He's essentially asking a superior court judge to undo all

11   of the procedures in process that are associated with

12   adjudicating family law issues in family law court, to undo

13   whatever legislative determinations and executive

14   determinations that have been made with regard to

15   vaccination and whether that's appropriate or not.

16     I don't think the Court needs a whole lot of guidance to

17   understand that the role of a superior court judge is to

18   adjudicate rights and responsibilities between parties in

19   this case, and there are none here for this Court to

20   adjudicate.

21     So if there's anything else I can add, I'm certainly happy

22   to do so, but I do think that this is an entirely

23   straightforward dismissal in total.

24     THE COURT:  All right.  Thank you, Mr. Russ.  I don't

25   think I have any questions for you.

1          I think I have more questions for Mr. Benshoof's position.

2      Mr. Benshoof, good morning.

3          MR. BENSHOOF:  Good morning, Your Honor.  Did you want to

4      start with questions, Your Honor, or would you like me to

5      first address Mr. Russ's statements?

6          THE COURT:  Well, is Mr. Russ correct, that what you're

7      really trying to do here is circumvent -- circumvent Judge

8      Keenan's ruling in the family court matter?  You're trying

9      to undo the parenting plan?

10         I mean, is Mr. Russ correct about that, that that is your

11     objective?

12         MR. BENSHOOF:  No, Your Honor.  And I thought that I

13     adequately addressed Mr. Russ's assertions in my reply,

14     but -- just to make sure that all of that is before the

15     Court today.

16         THE COURT:  Well, I -- I read everything you wrote,

17     Mr. Benshoof.

18         MR. BENSHOOF:  Okay.

19         THE COURT:  Just so you know.

20         MR. BENSHOOF:  Okay.  Yeah.  So the simple answer is no.

21     And I tried to point out to Mr. Russ that res judicata does

22     not apply because this question was never brought before

23     Commissioner Holloway or Judge Keenan in the family matter.

24     And so there's -- there's -- because of that, there's no

25     ruling I'm trying to circumvent.

1    THE COURT:  So I guess my question is, Mr. Benshoof,

2    should you have brought it before either Judge Keenan or the

3    commissioner?

4    MR. BENSHOOF:  From my understanding, the -- the limited

5    statutory authority of an Article I court, such as the

6    family court, doesn't have the authority to hear such a

7    matter.  So --

8    THE COURT:  Then why do I?  Because the family court is

9    superior court.  It's the same court.  It's just a

10   department within the superior court, like juvenile court or

11   the criminal department or the civil department.

12   So if they didn't have authority to rule on this issue,

13   how could I have authority?

14   MR. BENSHOOF:  Well, according to RCW I think it's 7.24,

15   which includes the Declaratory Judgment Act, a King County

16   Superior Court judge clearly, according to my reading -- you

17   know, I'm not an attorney.  I didn't go to law school, so --

18   but I've read through all of the declaratory judgment

19   statutes in the Revised Code of Washington, and clearly a

20   sitting judge in a King County Superior Court case, such as

21   this, has the authority.

22   THE COURT:  Well, but, I mean, Judge Keenan is a King

23   County Superior Court judge.  So why didn't he have

24   authority?

25   MR. BENSHOOF:  Well, so I understand that -- that -- like

1    I've heard this from a lot of people, that King -- that King

2    County family court is part of King County Superior Court,

3    and the inference that's made there is that it's an

4    Article III court.  But, like, it's patently obviously that

5    it can't be legally an Article III court because, for

6    example, it -- it does not allow the right to trial by jury.

7    And the only courts that can deny a right to trial by jury

8    are Article I courts, from my understanding.

9    So I understand that nobody likes to call it an Article I

10    court.  Nobody likes to say this.  You know, if it walks

11    like a duck and talks like a duck, it's an administrative

12    proceeding for people who are in contractual privity with

13    the state via a marriage license or domestic partnership.

14    But by all -- from simple observation, it couldn't be an

15    Article III court and legally deny the right to trial by

16    jury.

17    So I think the only logical inference that can be made

18    legally is to conclude that King County family court, while

19    it's in the King County Superior Courthouse, is not acting

20    as an Article III court.

21    THE COURT:  All right.  Well, I think you're confusing the

22    law that the superior court applies in family law matters

23    with the constitutional nature of the court.  It's the exact

24    same court.  And the fact is there are simply some matters

25    where parties are entitled to a jury, criminal law matter,

1      obviously, and then some matters where you're not entitled

2      to a jury.  Some family law matters, dependency matters,

3      there are -- administrative law matters, certain kinds of

4      cases where the court is sitting as an appellate court of

5      like a municipal or lower court.  There are a lot of

6      different examples.

7        But in each of those cases, if a Superior Court judge is

8      hearing that matter, then it's the Superior Court, a

9      constitutional court in the state of Washington, a court of

10     general jurisdiction, that is hearing that matter.  And

11     Judge Keenan or I, if I'm in family court, have all the

12     powers of a Superior Court judge at all times.

13       MR. BENSHOOF:  Okay.  I mean, it's -- it's -- I guess,

14     from my understanding, this is only an issue with regards to

15     the question of whether I either could or should have

16     brought this question previously.  Is that correct?

17       THE COURT:  Right.  Well, I mean, but that's a significant

18     question.  Right?  I mean, if the vaccine occurred in -- I

19     think it was 2021, the month is escaping me, but prior to

20     Judge Keenan's ruling on the parentage matter, and if your

21     basic claim is that Ms. Owen did something that violated the

22     child's rights or medical rights in some way, then arguably

23     you could have and should have brought that to the Court's

24     attention in the parentage matter rather than this matter.

25     At least that's one argument.

 1          MR. BENSHOOF:  Yeah.  And so I think this also -- you

 2     know, not to split hairs here, but I just want to make sure

 3     that we're all on the same page.  The petition for

 4     declaratory judgment is not a claim where I'm -- I'm not

 5     seeking damages from anybody.  I'm not -- the declaratory

 6     judgment is not ascribing fault.  It's merely seeking an

 7     affirmation on a point of law.

 8          THE COURT:  Well, I -- I know what a Declaratory Judgment

 9     Act --

10          MR. BENSHOOF:  Oh, okay.

11          THE COURT:  -- claim is.  But why does that make a

12     difference?

13          MR. BENSHOOF:  So, I mean, if we go back to the -- when

14     the family court was initiated, and leaving aside the fact

15     that there was perjury involved in its initiation, the --

16     there was clearly a bias on the part of the court at that

17     time to disregard anything that was contrary to the

18     propaganda that was coming out of the CDC, our media, the

19     mayor, and, you know, it was -- it was quite evident back

20     then, and I think even more so as the months have gone by,

21     that most -- most people simply did not understand that

22     the -- the Pfizer injection was not only experimental, but

23     that it was still in clinical trials.

24          So while I did include some -- some information as to

25     those facts in my sworn declaration for the temporary

1          restraining order hearing that occurred before Commissioner

2          Holloway on October 25th of 2021, that was all disregarded.

3          It was -- and I was effectively treated like a crazy person

4          for even questioning the safety, the efficacy, the legality,

5          whether or not it was experimental.

6            So it's not that I didn't try to raise some of these

7          issues, but they were -- not only were they ignored, but I

8          was treated like a crazy threat to my Owen child for not

9          wanting to inject my son with an experimental chemical.

10           THE COURT:  But that's just it, Mr. Benshoof.  And I think

11         that goes to at least part of the argument here is that you

12         did raise those issues before another court.  And I saw that

13         you argued in your reply brief that the court not only

14         disregarded your views but also relied on perjury by

15         Ms. Owen, that's part of your claim as well.

16           But if that -- if that is what happened and you raised

17         these issues and that other court wrongfully disregarded

18         them or wrongfully relied on perjury or made some other kind

19         of error, then arguably your remedy is to appeal that

20         outcome, not to file a new lawsuit, bring a DJ action before

21         me, and then try to get basically the same result or the

22         same outcome.  It's to appeal the mistakes of the other

23         court.  Right?

24           MR. BENSHOOF:  Well, but the -- I think the clear thing --

25         the thing that we really need to bear in mind here is I'm

1    coming before the Court seeking the Court's declaration that

2    informed consent is a legal requirement to inject a

3    12-year-old with an experimental Pfizer shot.  That's --

4    that's all.  It's not -- it's just a point of law.  One

5    might even say that it's -- it's so obvious that any

6    competent adult, even without a legal degree --

7    THE COURT:  So --

8    MR. BENSHOOF:  -- should, you know --

9    THE COURT:  -- I want to ask you some questions about

10   that, Mr. Benshoof, because it -- what you claim is totally

11   and completely obvious is not entirely obvious to me.  And

12   let me give you an example.

13   If I have a child with a broken arm and I need to take the

14   child to the hospital, what you seem to be arguing is that

15   what I need to do as a parent is learn about all the

16   treatment options for a broken arm, learn about their

17   effectiveness and potential downsides, risks, and side

18   effects, explain them to my child with a broken arm, and

19   then get my child's consent to have that broken arm treated

20   at the hospital before I can, as a parent, authorize the

21   doctors to do anything.

22   I mean, isn't what you're arguing true of a broken arm or

23   experimental cancer treatment for a child with leukemia or a

24   vaccine for an infant?  How -- I just don't -- that's not

25   common sense to me or that's not -- it doesn't comport with

1          my everyday experience, that a parent has to explain medical

2          treatment to their child and get the child's consent before

3          treatment can be administered.  Parents don't do that.

4             Is that what you're arguing?

5             MR. BENSHOOF:  I'm not arguing that relative to your

6          examples.  And so the --

7             THE COURT:  Well, right.  But you're arguing for the COVID

8          vaccine, for the Pfizer vaccine, that Ms. Owen was required

9          to do that; right?

10            MR. BENSHOOF:  Well, there's two clear distinctions that I

11         would like to present to the Court on this matter.

12            THE COURT:  Okay.

13            MR. BENSHOOF:  The most accurate corollary is that -- that

14         I've thought of so far -- is if my son had 20/20 vision and

15         if there was -- there was no history of glaucoma in either

16         my side of the familiar or his mother's, would it not be

17         absurd if his mother unilaterally decided to subject our son

18         to an experimental, meaning it hasn't been proven safe or

19         effective, if she were to subject him to an experimental

20         glaucoma treatment.  Like that would be absurd.  Like, you

21         don't subject children to treatments for things they don't

22         have.  And --

23            THE COURT:  Well, but -- but -- but vaccines are different

24         because they're a preventative measure.  They're not -- so

25         the example you gave, I don't know why we need to reach for

1        some other medical treatment when we have other vaccines.

2        You know, measles, diphtheria, tetanus.  I mean, you seem to

3        be saying that a parent would need to explain to their

4        3-year-old why they need a mumps or a measles vaccine, and

5        they would need to explain all the risks and potential

6        consequences and side effects, and then get that

7        3-year-old's consent before getting a measles vaccine.

8            MR. BENSHOOF:  No.  And I appreciate that you brought up

9        the example of vaccination because we've gone through a

10       broken arm and cancer.

11           THE COURT:  Right.

12           MR. BENSHOOF:  With broken arm and cancer, like, the child

13       either has a broken arm that needs to be set or they have

14       cancer and they need it to be treated, which neither of

15       those actually applied in this case because our son had

16       already got COVID, had very, very mild symptoms and

17       recovered, which results in natural immunity, which -- you

18       know, I have video of Anthony Fauci saying "there's no

19       better immunity than natural immunity."

20           So then if we go on to the third example or issue here of

21       vaccines, I think that's a good question to raise.  And

22       there's a very clear distinction between, say, a measles

23       vaccine or, you know, a -- a Polio vaccine -- right? -- and

24       the Pfizer shots.  And --

25           THE COURT:  Well, so I might give -- I might cede that

1          point to you, Mr. Benshoof, just for the sake of argument.

2          But where I'm struggling here is to find some authority in

3          the law that requires a parent to do all the research about

4          a vaccine to determine its effectiveness and its risks and

5          then a law that would then require the parent to then

6          explain that, all of that information, to the child

7          before -- and then get the child's consent before the parent

8          can then have the child vaccinated.

9            Where is the law that requires that?

10           MR. BENSHOOF:  Right.

11           So, first of all, I think that's -- that's a question that

12         Mr. Russ raised, and that's actually getting a little bit

13         ahead of actually where we're at because Mr. Russ, and I

14         think Ms. Owen, are concerned about the legal implications

15         if we all do acknowledge what should be axiomatic, which is

16         with a medical experiment.  Right?

17           THE COURT:  Well, but let me -- let me interrupt here,

18         Mr. Benshoof, because as a court, I don't enforce axioms or

19         common sense or what people think should be the case.  I

20         enforce the law.  And so we might -- I might reach an

21         agreement with you, just in conversation, that parents

22         should inform their children about risks of vaccination and

23         so forth.  Or maybe not even all children, but children over

24         a certain age, 12 or 10 or whatever it is.  I might agree

25         with you conversationally.

1        But in order for me to grant a declaratory judgment, and

2        that's putting aside all the issues about standing and

3        justiciability for now, in order to enter a declaratory

4        judgment setting forth the law, then there needs to be some

5        legal authority for me to enter such a declaratory judgment,

6        beyond just agreeing in conversation about what the world

7        should be like.

8        So I need some legal authority for your position,

9        Mr. Benshoof.  So where is it?

10        MR. BENSHOOF:  Right.  So I -- I listed the Code of

11        Federal Regulations in my motion.  I listed the -- the

12        Nuremberg Code, which, although there's some

13        misunderstanding about whether or not the Nuremberg Code is

14        controlling law in the United States, federal appellate

15        courts have held that it is indeed controlling law via the

16        Code of Federal Regulations, and there's federal case law

17        supporting that.

18        And the clear distinction here is that, you know, I

19        totally agree with the Court and opposing counsel, that if

20        we were talking about a vaccine, which according to state

21        law, which I cited RCW 7.290.010, subsection (10), if it

22        were, by definition in our state law, a vaccine that had

23        been -- received full FDA approval, which means it would

24        have been tested for safety, for efficacy, and it would have

25        been proven by a completion of a clinical trial that it was

 1      safe and effective at what it was marketed at doing, then of

 2      course I would agree that a parent doesn't -- wouldn't, in

 3      that situation, need to explain to their 3-year-old or their

 4      12-year-old why they're getting a vaccination, because the

 5      parent is acting in the role of steward and caregiver.

 6         But we have a clear distinction here.  This isn't a

 7      vaccine, according to state law.  It's an experimental

 8      medical treatment.  It's still in the phase 3 of a clinical

 9      trial, and it's well adopted in the public record, like you

10      can -- like, I cited the trial from the CDC.gov website,

11      that it is still in an ongoing trial.  And the only thing

12      that it was even trialed for, this is according to our Owen

13      government website, was whether or not it reduces symptoms.

14         So --

15      THE COURT:  Right.  But, Mr. Benshoof, I guess my question

16      would be, where is the law that says a parent has to be

17      aware of this?  Has to do research?  You know, we have a new

18      flu vaccine every single year because the flu virus mutates

19      all the time, and so they issue new flu vaccines.

20         Where is the law that says, for example, a parent has to

21      research whether a flu vaccine has been safely tested for

22      its efficacy or properly approved by the FDA or some other

23      authority or a parent has to look into the circumstances

24      about the latest COVID vaccine or some other vaccine that's

25      recommended for their child and has to be absolutely certain

1    that this is not experimental or subject to some other kind

2    of review or that's it's flawed in some way?

3      What authority says a parent has to figure out the status

4    of a vaccine before deciding whether, in good faith, to have

5    their child receive it?

6      MR. BENSHOOF:  Well, the highest controlling law, which

7    has not been overturned and is controlling and respected

8    throughout the world, is the Nuremberg Code.  It requires

9    for medical experimentation, which this is, it requires the

10    informed consent of the test subject.  It requires that --

11    that any alternative treatment be presented as a possibility

12    and a host of other things.

13      And so --

14      THE COURT:  So you're saying that parents in deciding

15    whether to vaccinate their children with the latest version

16    of whatever vaccine we're talking about need to comply with

17    the Nuremberg Code?

18      MR. BENSHOOF:  Well, Your Honor, I would once again draw a

19    clear distinction between vaccination, which is with a

20    vaccine, which this is not, according to state law --

21      THE COURT:  Right.  But, Mr. Benshoof, I -- I need to take

22    my 5-year-old in for a vaccine.  I don't know anything -- I

23    don't have a 5-year-old, but let's say that I still had a

24    5-year-old.  I need to take him in for a vaccine.  I know

25    nothing about whatever vaccine the doctor is recommending,

```
1        but I've got a doctor saying, oh, it's time for your kid's

2        such-and-such vaccine.

3          How would I know whether the vaccine is legally a vaccine,

4        as you're saying, or part of a trial?

5          Most parents would have no way of knowing.  Right?  But

6        you're saying they need to comply with the Nuremberg Code,

7        nonetheless.  Is that right?

8          MR. BENSHOOF:  No.  It's not just the parents.  The -- you

9        know, for example, in the situation with the pharmacist who

10        works at a Fred Meyers in Lake City that did both

11        injections, who I spoke to, it's also a legal requirement

12        for any health care professional, who is administering an

13        experimental product --

14          THE COURT:  Well, that's fine.

15          MR. BENSHOOF:  -- to --

16          THE COURT:  But your declaratory judgment action and all

17        of your motion pleading is saying Ms. Owen didn't inform

18        A.R.W.  Owen didn't tell A.R.W. about this.  Your DJ action

19        is against Ms. Owen, not some health care professional.

20          MR. BENSHOOF:  Right.  And, well, it's really not even

21        about -- I tried to write -- I mean, I know there's some

22        statements of fact that makes it sound like I'm, you know,

23        trying to ascribe blame to Ms. Owen.  But to be clear, in

24        the instant action, the declaration that I'm seeking is that

25        informed consent is a legal requirement to inject
```

1          plaintiff's minor son with an experimental Pfizer gene

2          therapy product.  It's not -- it's not a -- it's not calling

3          out Ms. Owen in this declaration.  It's not naming the

4          pharmacist.  It's merely asking the Court to affirm that

5          informed consent is a legal requirement.

6            It's for another day and another court to potentially

7          argue and consider whether or not informed consent was

8          obtained.  But that's a separate issue.  I'm just seeking a

9          declaration that informed consent --

10         THE COURT:  But --

11         MR. BENSHOOF:  -- was a requirement.

12         THE COURT:  But the -- it sounds like you want a

13         declaration against the whole world?  I mean, because it

14         sounds like you're backing away from the claim that this is

15         a declaratory judgment action directed at Ms. Owen and this

16         is, rather, an action to get the Court's declaration

17         generally that informed consent was required somehow

18         involving everyone from medical professionals to Ms. Owen to

19         potentially others.  Is that what you're saying?

20         MR. BENSHOOF:  Well, I mean, there's -- you can draw

21         inferences or implications from the requested declaratory

22         statement, but, you know, whether Ms. Owen took my son in or

23         whether her fiancée did and whether the pharmacist at Fred

24         Meyers or a doctor at Children's Hospital was involved,

25         the -- the question is the same:  Was informed consent a

```
 1        legal requirement to inject my son with an experimental

 2        Pfizer gene therapy treatment because it's not a vaccine?

 3          THE COURT:  Okay.  So next question is how do you have

 4        standing to argue any of this?  You don't have any parental

 5        rights or custodial parental rights currently as to A.R.W.,

 6        so how do you have standing?

 7          MR. BENSHOOF:  Well, going to look at parental rights, I

 8        had full parental rights when he was injected in -- on

 9        July 11th of 2021.  So although there's been -- there's been

10        the family court adjudication that allegedly has suspended

11        or abridged my rights, there's been no allegation that I

12        didn't have full rights, as my son's father at the time it

13        was injected.

14          And then looking forward, there's a hearing before Chief

15        Judge Sean O'Donnell on Tuesday the 21st of this month where

16        I'm seeking to vacate the family court case under CR 60,

17        subsection (b)(4) and (11), for, as I allege, the fraud.

18          So looking forward, even though I understand --

19          THE COURT:  Wait.  What fraud?

20          MR. BENSHOOF:  Well, there was -- there's perjury.

21          THE COURT:  Right.

22          MR. BENSHOOF:  Because you have two material statements

23        that are contradictory, it's perjury, right, when it's sworn

24        under oath.  So --

25          THE COURT:  Is the perjury -- is the perjury related to
```

1      the injection of your son?

2      MR. BENSHOOF:  There is some perjury of that, but more

3      specifically the reason I'm moving for a motion to vacate is

4      the initial parentage action, which was used to fraudulently

5      get the family court's jurisdiction, was obtained through a

6      perjurious and barratrous petition to decide parentage,

7      where there wasn't actually a justiciable cause of action.

8      There was no -- there was nothing in controversy.  It was

9      fabricated out of thin air.

10      THE COURT:  All right.  So, I mean, I guess I come back to

11      my earlier question of if you admit that you raised issues

12      surrounding the injection in the family court action and

13      that action is ongoing and you intend to have Judge

14      O'Donnell review that case, then why on earth would the

15      Court entertain an action here related to those past events,

16      when you've already raised them in another court before a

17      different judge?

18      MR. BENSHOOF:  Yeah.  So to be clear, I haven't -- I never

19      raised this question in family court, and I withdrew -- I

20      filed a notice of withdrawal from that summer of last year

21      because my -- my motions pointing out that my due process

22      rights were being infringed upon or abrogated, it -- I -- it

23      wasn't, I don't believe, considered appropriately.  I tried

24      to raise the issue through a show cause motion last year,

25      that it was all based on fraud.

1          So I -- I ended up filing a notice of withdrawal, and

2     there -- there was subsequent hearings, to which I was not

3     provided notice and opportunity to respond to pursuant to

4     CR 4.  Separate issue.  And so I'm not actually -- I made it

5     very clear in my motion to vacate that is going before Judge

6     O'Donnell, that I filed that motion by special appearance.

7     I'm not -- I haven't re-signed up for E-filing.  I'm not --

8     the Court doesn't -- my position is the Court never -- never

9     had a valid cause of action for jurisdiction, so I have no

10    intention of, like, going back into that case to argue it

11    within the limited -- you know, under Title 26, which is the

12    controlling statutory authority for family court.

13      THE COURT:  So you have a claim that the court lacked

14    personal jurisdiction over you?

15      MR. BENSHOOF:  It had subject matter jurisdiction -- it

16    lacked subject matter jurisdiction for sure, because under

17    RCW 26.26A.435, subsection (2), it makes it quite clear that

18    in a --

19      THE COURT:  So I don't -- I don't want to go too far down

20    that.  My question was only about personal jurisdiction.

21      Your argument in the other court was about subject matter

22    jurisdiction?

23      MR. BENSHOOF:  Well, and personal jurisdiction after I

24    filed the notice of withdrawal, yes.

25      THE COURT:  All right.  I'm not sure how -- I'm not sure

```
 1        how it's frankly fair, Mr. Benshoof, that you're bringing a
 2        lawsuit in this court, several lawsuits, but then
 3        simultaneously claiming that the court lacks personal
 4        jurisdiction over you.  In other words, you want the court
 5        to do what you want, but when the court is acting in a way
 6        that you don't like, you claim that the court lacks
 7        jurisdiction over you.
 8          I mean, that's not totally self-contradictory, but I think
 9        companies and corporations make that argument sometimes, but
10        it does seem a little -- it does seem potentially
11        self-contradictory.
12          MR. BENSHOOF:  I'd be happy to address that, because --
13          THE COURT:  It doesn't -- for the purpose of this case, I
14        don't know that it matters, because I don't think there are
15        jurisdictional issues that we need to argue about this
16        morning.  But I just want to point out, I think it
17        potentially relates to the Court's concerns about vexatious
18        litigation.  And when I see individuals seeming to claim
19        that the court lacks personal jurisdiction over them for one
20        purpose but then they're suing, in this exact same court,
21        seeking the court's -- asking the court to do something and
22        clearly claiming that the court has jurisdiction to do
23        something for them, I have a problem with that.
24          MR. BENSHOOF:  Well, so -- right.  And I'm specifically
25        referring to personal jurisdiction through the lens of CR 4,
```

```
 1        service of process.  And so all I'm specifically referring
 2        to in regards to personal jurisdiction is that Ms. Owen's
 3        family attorney, Mr. Cliber, did not properly serve me --
 4          THE COURT:  Okay.  I got it.  It's a failure of service
 5        issue.  I see.  All right.  I got you.  That makes more
 6        sense.
 7          All right.  So I've been throwing questions at you,
 8        Mr. Benshoof, and I want to make sure I give you an
 9        opportunity to argue and not just answer my questions.
10          So if you have any further argument.
11          MR. BENSHOOF:  Well, I'm not here to argue.
12          THE COURT:  Well, I --
13          MR. BENSHOOF:  Yeah, I know.
14          THE COURT:  Yeah.  I don't mean argue argue, but offer
15        argument to the Court.
16          MR. BENSHOOF:  Thank you, Your Honor.
17          You know, I would say -- I'd incorporate by reference
18        everything that I've put in my documents as if fully
19        restated herein to save some of the Court's time.  And, you
20        know, just to briefly go over -- yeah.
21          Oh, the one thing I didn't get to is the question of
22        whether it's a justiciable issue before the Court given the
23        fact that I don't supposedly have any parenting rights right
24        now.  I had mentioned that one of the injections happened
25        before anybody said I didn't have parenting rights.
```

 1          And looking forward, I also believe that legally it's a
 2     justiciable issue because there is a -- I believe the
 3     grounds for a hopefully high likelihood that the family
 4     court case will be dismissed on Tuesday, through my motion
 5     to vacate.  And so looking forward, as soon as Ms. Owen and
 6     I go back to honoring the parent agreement at common law
 7     that we parented our son under for the first 12 years of his
 8     life, you know, she may wish to have him injected with
 9     further booster shots, and so this issue before the Court is
10     very important for the parenting and well being of my son,
11     because I would like to make sure that the law is followed
12     with regard to health care decisions for my son.
13     THE COURT:  Okay.  And I think that kind of gets to the
14     crux of the issue here, Mr. Benshoof, because what you seem
15     to be doing here, by your Owen admission, I think, is
16     getting a declaration of the Court that will enable you to
17     parent your child the way you want your child to be
18     parented.  That's what it seems -- you want this
19     declaration, that it's illegal to inject the child, so that
20     you could use that -- potentially use such a declaration to
21     prevent Ms. Owen from having the child injected with what
22     you deem to be an experimental vaccine.  Right?
23     MR. BENSHOOF:  Well, I haven't seen any evidence from
24     opposing counsels that the Pfizer 162b2 shot is not still in
25     a clinical trial.

```
 1        THE COURT:  Oh, no.  Again, I'll give you that, for the
 2     sake of argument.  Let's just assume it's some experimental
 3     treatment.
 4        What you want this declaratory judgment for is to help you
 5     parent your child the way you want the child to be parented.
 6     Isn't that correct?
 7        MR. BENSHOOF:  Well, everything I do in life is
 8     (inaudible) son.
 9        THE COURT:  I'm sorry.  You cut out there.  Can you repeat
10     that?
11        MR. BENSHOOF:  Oh.  I said everything that I do in my life
12     is with my son in mind.  So --
13        THE COURT:  That seems like an evasion, Mr. Benshoof.
14     I'll be honest, that seems like an evasion of my direct
15     question.
16        MR. BENSHOOF:  Oh.  Yeah.  I wasn't trying to do that,
17     Your Honor.
18        THE COURT:  Okay.
19        MR. BENSHOOF:  If I heard you correctly, the question is
20     am I seeking this declaration to assist me in parenting my
21     son going forward?
22        THE COURT:  Correct.
23        MR. BENSHOOF:  I think that's an accurate assessment and
24     Ms. -- so there's a family situation with Ms. Owen where she
25     doesn't necessarily like to believe what I have to say if it
```

1    controverts what she believes, even if she doesn't have any

2    basis in law or fact.  And so it's not that this just helps

3    me.  It would help Ms. Owen and any other parent similarly

4    situated to understand that legally, when we are taking care

5    of our children, who should be the most important thing in

6    our lives, that there is a legal requirement to -- for

7    parents to do due diligence, to ascertain that what they're

8    injecting in their kid is not experimental, and that it's

9    received full FDA approval.

10        And, you know, I understand that there's been some

11    implication or inference that what I'm suggesting is that

12    parents have to go to, you know, a monthlong medical course

13    or -- not at all.  Like, the simple things that I'm

14    suggesting are accessible on the Internet within a couple

15    minutes.  Right?

16        THE COURT:  Right.

17        But just to clarify, Mr. Benshoof, you understand that I

18    am not a legislature.  The purpose of a declaratory judgment

19    is not to issue proclamations for the benefit of the entire

20    public so that, as you say, other parents can rely on that

21    in parenting their children.  You understand that; correct?

22        MR. BENSHOOF:  Oh, yeah.  I'm just -- I was only bringing

23    up that point, Your Honor, just -- just to let you know

24    that, yes, of course specifically my concern is my child

25    here, but that a declaration on this point of law could be

1      of service to other parents, and hopefully it would be of

2      service to Ms. Owen as well.

3        THE COURT:  All right.  Anything further?

4        MR. BENSHOOF:  So I think I've -- I have already addressed

5      standing, both past and future.  You know, I understand

6      opposing counsel's argument that they're trying to argue

7      that this is a res judicata matter; that it could or should

8      have been addressed in family court.  But, again, I wasn't

9      provided notice of hearing or opportunity for hearing in the

10     final order hearing.  So for that reason, among others, I

11     don't think that res judicata applies, because if a person

12     doesn't have notice and opportunity to be heard, it can't be

13     argued that res judicata applies when there was -- you know,

14     a trial was held in absentia.

15       THE COURT:  Well, but, again, Mr. Benshoof, if you're

16     claiming that there was some procedural defect in the other

17     case because of a lack of notice, I would suggest to you

18     that the remedy would be to seek an appeal of that case, not

19     to file a new case trying to seek essentially the same

20     relief or similar relief.  That's largely what the other

21     side is basically arguing; that if there was some flaw in

22     the UFC case, then your remedy was to appeal that, bring a

23     motion for reconsideration or whatever your remedy would be.

24     But it would be in that case, not a new action.

25       How do you respond to that?

1    MR. BENSHOOF:  Well, what I said earlier, Your Honor, was

2    that under Title 26, it's my understanding that a family

3    court judge is not authorized to hear a petition for

4    declaratory judgment under RCW 7.24.  So, I mean, I haven't

5    ever heard of a declaratory judgment being brought or

6    adjudicated by a family court, and given all of the other

7    motions -- so, yeah, I honestly don't think that family

8    court is set up to hear such a petition; so, you know, I

9    never brought it because it doesn't seem to be the

10   appropriate court.

11   THE COURT:  Well, but family law is certainly set up to

12   hear claims that another parent has subjected a child to

13   improper medical care.  Right?

14   MR. BENSHOOF:  Oh, absolutely, Your Honor.  But this --

15   and I 100 percent agree with that, but I think it's

16   important.  My position is that the petition for declaratory

17   judgment is separate and distinct from the -- what you just

18   raised.

19   And, you know, I know that I've been accused by a lot of

20   people so far for trying to circumvent rulings and that I'm

21   somehow vexatious.  And I would just say for the record, as

22   I've said in my writings, that every action that I have

23   brought in the last year and a half has always been in

24   response to evidence that I saw that Ms. Owen or somebody

25   else was violating my rights or my son's rights.  And at

1      every instance along the way in the last year and a half, I

2      have always tried to propose first mediation, then I've

3      subsequently proposed notice of claim and opportunity to

4      cure, imploring, you know, the parties to just sit down.

5      And, you know, I'm not going to claim to be a saint, but

6      I've tried to embody as much temperance and patience and

7      understanding with all parties as possible, but I have only

8      resorted to, you know, say, filing a petition for writ of

9      replevin after my car had been stolen for five or six months

10     and nobody was doing anything.

11       So all of the actions that I have brought have merely been

12     seeking redress for valid grievances.  Nobody has ever been

13     able to say that anything I've said is dishonest, because I

14     have been absolutely honest the entire time.  And all I've

15     really heard is just character assassinations and impugning

16     of my character.

17       And so in closing, Your Honor, I would say that I

18     appreciate you taking the time to hear this, and everything

19     I have done and said is absolutely from the bottom of my

20     heart.

21       THE COURT:  All right.  Thank you, Mr. Benshoof.

22       Reply, Mr. Russ?

23       Sorry.  You're muted, Mr. Russ.

24       MR. RUSS:  Excuse me, Your Honor.

25       I just said that I believe the Court has hit the

1    procedural issues on the head here.  The approach would be

2    to go back to the family court, if you wanted to challenge

3    jurisdiction.  A lot of things I could say about the

4    validity of that judgment and why I think it's valid, just

5    based on what I've heard Mr. Benshoof say today.  But I

6    think, again, that issue is for another court.  And until

7    that judgment is somehow vacated, it's clearly a

8    straightforward application of res judicata, among -- which

9    is one of the most obvious, among the many other procedural

10    defects we have here today.

11      THE COURT:  All right.  Just a moment.

12      So I think there are a number of problems with

13    Mr. Benshoof's declaratory judgment action.  I think from

14    what I -- both from what I've read and from what I've heard

15    today in oral argument, including Mr. Benshoof's

16    acknowledgement that the purpose of a declaratory judgment

17    action is to enable him to parent his child in the way that

18    he believes is correct, that this really is -- even though

19    it's framed as a declaratory judgment action, separate and

20    apart from the proceedings in family court, ultimately in my

21    view this is an effort to circumvent Judge Keenan's ruling

22    in the parentage action.

23      Mr. Benshoof seems to be seeking a declaration from this

24    Court that Ms. Owen did something wrong or failed to do

25    something right in connection with having her son

1    vaccinated.  Mr. Benshoof disputes that this is, in fact, a

2    vaccination; claims it's an experimental treatment and that

3    Ms. Owen failed to take sufficient steps to obtain informed

4    consent.  I think Mr. Benshoof's conception of informed

5    concept is not based on the law of the state of Washington,

6    to begin with, and I think it has pretty serious flaws in

7    reasoning.

8      I can see how he got there, through reading some of the

9    materials that are cited in his materials, that Code of

10   Federal Regulations and the Nuremberg Code and so forth, but

11   those things really relate to research experimentation,

12   using children as human subjects and so forth.

13     There is nothing in the law that I've read that imposes

14   upon a parent the obligation to inform themselves about the

15   nature of a vaccine or even, to give Mr. Benshoof credit, a

16   supposed vaccine, and then educate themselves about the

17   efficacy and risks of that injection, and then explain that

18   to a child and obtain the child's consent prior to getting a

19   vaccination.  I mean, just nothing in the law in the state

20   of Washington supports that, and I think there are just

21   simply kind of everyday commonsense problems, if that were

22   the law.

23     If parents were required to explain vaccines.  And I think

24   the fact is, if you were to try to get informed consent from

25   most children for a vaccine, they would refuse it because

1    kids hate needles, and they don't want to be stuck by a

2    needle, and so they would probably never get vaccinated for

3    anything, if you left it up to them.  I'm broadly

4    generalizing here.  That's really not the basis for the

5    Court's ruling today.  But I just think there are

6    significant and obvious flaws with Mr. Benshoof's ruling --

7    reasoning in support of the declaratory judgment action that

8    he's requesting.

9      But, ultimately, I do find that he lacks standing to make

10    such a request because of the parenting decision by Judge

11    Keenan.  Mr. Benshoof claims, well, the -- you know, I had

12    parenting rights in 2021, when the injections occurred, and

13    that, I believe, is factually true.  But the parentage

14    action resolved all questions of custodial parental rights.

15      And Mr. Benshoof indicates that he raised this issue

16    before the court and the court, for whatever reason,

17    ultimately disagreed with him or disregarded his

18    information, relied on perjury, and Mr. Benshoof disagrees

19    with that outcome and so he's bringing this declaratory

20    judgment action.

21      To the extent there were procedural flaws in the UFC case,

22    whether having to do with notice or relying on inadmissible

23    or improper evidence or whatever they were, the remedy

24    clearly here is to seek review through post trial motions,

25    through the Court of Appeals, or other avenues, but not to

1       simply commence a new action for a declaratory judgment on

2       the exact same issues, which, again, leads me to conclude

3       that res judicata does apply here.

4         We're talking about the same persons and parties.  We're

5       essentially talking about the same cause of action, which is

6       parentage of this child.  And the subject matter is the

7       same; the claim that one parent is doing something wrong in

8       connection with that child.  And the -- and there was a

9       final judgment on the merits as to parenting rights.

10        And so I am granting Defendant Owen's motion for summary

11      judgment on the declaratory judgment action and denying the

12      plaintiff's motion for summary judgment on the DJ action.

13        And so I'll need either one order or two orders on those

14      motions provided to my bailiff, and I'll get them entered

15      when they're ready.

16        MR. RUSS:  Okay.  And, Your Honor, we can present that.  I

17      think the one issue that I want to wrap up is that we're

18      getting close to the stage of a final judgment in this case.

19      I recognize that we've got findings of fact that need to be

20      presented by the 31st.  Maybe perhaps we would rope this in

21      to our findings of facts on the vexatious litigation order

22      and then treat that as a final judgment so that there's

23      finality here and we know there's no more motions or issues

24      that are going to be raised.

25        Just a suggestion.

1           THE COURT:  Well, since these are separate dispositive

2     motions and I think the issues are pretty distinct from the

3     vexatious litigant motion, I think I'd rather have separate

4     orders.  I mean, if you need time to prepare those orders,

5     I'm fine to give you, you know, up to 31st for these orders

6     as well.  But I think my preference would be for separate

7     orders.

8         MR. RUSS:  Okay.  It's not a matter of time.  We could --

9     I could certainly do it today.  I think the issue is, what I

10    would like to put in the proposed order, is that this is a

11    final judgment; that there are no more claims that are

12    remaining, other than the entry of the findings of fact on

13    the vexatious litigation order.  Of course the court retains

14    jurisdiction to enforce that order, but I want to get to a

15    point where we're clear that this has ended --

16        THE COURT:  Well --

17        MR. RUSS:  -- one way or another.

18        THE COURT:  -- that is my understanding.  Mr. Benshoof,

19    what is your response to that specific request?

20        My understanding was this was the final claim in the case.

21        MR. BENSHOOF:  There's -- there's the other thing that's

22    still in the original -- in the first amended complaint,

23    because the second amended complaint didn't get before the

24    Court.  The other thing in there was the petition for a

25    temporary injunction.  So --

1      MR. RUSS:  Which has actually been addressed by our motion

2   to dismiss.

3      THE COURT:  I think that's right.  I saw that in the

4   motion as well.

5      Are there separate arguments that you would want to make

6   about the TRO claim, Mr. Benshoof?  Because I thought it was

7   tied closely to the declaratory judgment claim.

8      MR. BENSHOOF:  Well, Your Honor, the motion to vacate

9   scheduled for Tuesday the 21st before the Honorable Judge

10   O'Donnell for -- I guess my perspective is that that motion

11   brings enough evidence before the court for Judge O'Donnell

12   to consider whether to vacate that case; that if that isn't

13   sufficient to vacate the case, then I don't reasonably --

14   reasonably considering this, if that isn't enough to vacate

15   the case, then there's -- I see no point in bothering with

16   the petition for temporary injunction because I would think

17   that the same sort of ruling is going to happen.

18      And I don't -- I don't actually -- like, I've informed

19   counsels, like, I don't actually want to be in court.  I'm

20   just trying to protect my son.  So I think the thing that's

21   most efficient and most reasonable is if we -- is if I find

22   out if the motion to vacate is granted on Tuesday; and if it

23   is, things are resolved.  And if it isn't, I think it

24   renders the temporary injunction petition moot anyways.

25      THE COURT:  All right.  I'm sorry I'm not looking right at

**1199**

1      you.  I've got on my other screen here a copy of your -- not

2      a copy.  I've got your amended complaint, the first amended

3      complaint.  I'm looking through it here.

4        So this was my understanding.  My understanding of the

5      temporary injunction request -- and just to clarify, I'm

6      looking at pages 12 and 13 of your first amended

7      complaint -- was that Defendant's Cliber and Owen deceived

8      the family court, violated your rights as A.R.W.'s father,

9      because Defendant Owen subjected A.R.W. to this Pfizer

10     vaccine without informed consent.  Again, I know you dispute

11     that it's a vaccine.  And Ms. Owen poses a direct and

12     imminent threat to A.R.W.'s well being and safety.

13       And so my understanding, again, is that your injunction

14     claim was connected to the claim that Ms. Owen improperly

15     subjected your son to medical experimentation that, like the

16     declaratory judgment action, you were seeking an order of

17     this Court preventing her from doing something that you

18     disagree with as A.R.W.'s parent.  Is that correct?

19       MR. BENSHOOF:  Yeah.  And I think if I'm -- if I'm not

20     mistaken, I think I filed the first amended complaint on or

21     around October 11th, and chronologically, you know, I didn't

22     schedule a temporary (inaudible) on the 25th, you know, a

23     couple weeks later, Judge Keenan entered the final order.

24       And so even if we leave aside the issue of whether or not

25     I had notice and opportunity to be heard, I think what we

**1200**

```
 1        run into is that his final order basically rendered my

 2        petition moot for the temporary injunction because I didn't

 3        get it scheduled in time.

 4         THE COURT:  Okay.  So you're --

 5         MR. BENSHOOF:  So in that case, I think that res judicata

 6        probably would apply because I didn't get my petition heard

 7        in time.

 8         THE COURT:  Okay.  I think that's right.  And so this

 9        Court's order will be -- will serve as a dismissal of the

10        temporary injunction claim as well.  And -- which means that

11        this will be a final order in this case, unless,

12        Mr. Benshoof, you have any other arguments to the contrary.

13         MR. BENSHOOF:  I'm tired of arguing, Your Honor.

14         THE COURT:  Okay.  All right.  So, Mr. Russ, you may

15        include that in the order.

16         MR. RUSS:  Thank you, Your Honor.

17         THE COURT:  All right.  Unless there is anything else,

18        then I believe that concludes this matter.  Everyone have a

19        good morning.  Good to see you.  Hope -- Mr. Benshoof?

20         MR. BENSHOOF:  I just want to say -- yeah.  I just want to

21        say I appreciate the Court taking the time to hear this, and

22        I hope you have a good day.

23         THE COURT:  All right.  You too.  Take care.

24         MR. RUSS:  Thank you.

25              (March 17, 2023, proceedings concluded)
```

**1201**

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF WASHINGTON          )

 4                                 )

 5    COUNTY OF KING               )

 6

 7              I, the undersigned, do hereby certify under penalty

 8    of perjury that the foregoing court proceedings or legal

 9    recordings were transcribed under my direction as a certified

10    court reporter; and that the transcript is true and accurate to

11    the best of my knowledge and ability, including changes, if any,

12    made by the trial judge reviewing the transcript; that I received

13    the electronic recording in the proprietary court format; that I

14    am not a relative or employee of any attorney or counsel employed

15    by the parties hereto, nor financially interested in its outcome.

16              IN WITNESS WHEREOF, I have hereunto set my hand this

17    17th day of May, 2023.

18

19    Debra Riggs Torres

20    s/ Debra Riggs Torres, RPR, CCR No. 20122368

21    Reed Jackson Watkins, LLC

22    800 Fifth Avenue, Suite 101-183

23    Seattle, Washington 98104

24    Telephone: (206) 624-3005

25    E-mail: info@rjwtranscripts.com
```

**1202**

The Honorable Marshall Ferguson
Hearing Date: March 3, 2023
*Without* Oral Argument

## SUPERIOR COURT OF THE STATE OF WASHINGTON
## FOR KING COUNTY

KURT BENSHOOF,

                Plaintiff,

v.

NATHAN CLIBER, JESSICA OWEN,
MAGALIE LERMAN, and OWEN
HERMSEN

                Defendants.

NO. 22-2-15958-8 SEA

ORDER GRANTING DEFENDANTS'
JOINT MOTION FOR A VEXATIOUS
LITIGANT ORDER AGAINST
PLAINTIFF, AND TEMPORARY ORDER
RESTRICTING ABUSIVE LITIGATION
BY KURT BENSHOOF

*[Clerk's Action Required]*

This matter came before the Court on the motion of Defendants Jessica Owen, Nathan Cliber, Magalie Lerman, and Owen Hermsen's ("Defendants") Joint Motion for a Vexatious Litigant Order against Plaintiff ("Motion"). The Court considered the records and files herein, including:

    a)    Defendants' Joint Motion;

    b)    Declaration of Anthony S. Marinella,

    c)    Declaration of Nathan Cliber;

    d)    Declaration of Moshe Admon;

    e)    Declaration of Magalie Lerman;

    f)    Declaration of Owen Hermsen;

ORDER GRANTING JOINT MOTION
AND TEMPORARY ORDER
RESTRICTING ABUSIVE LITIGATION
BY KURT BENSHOOF - 1

1203



JUDGE MARSHALL FERGUSON
KING COUNTY SUPERIOR COURT
516 THIRD AVENUE
SEATTLE WA 98104
(206) 477-1513

g)     Plaintiff's Response to Defendants' Joint Motion for a Vexatious Litigant Order Against Plaintiff;

h)     Plaintiff's Fourth Affidavit;

i)     Affidavit of Kurt Benshoof, Plaintiff;

j)     Affidavit of A█████R██W████;

k)     Defendants' Reply in Support of their Joint Motion for a Vexatious Litigant Order Against Plaintiff;

l)     The Reply Declaration of Kyle J. Rekofke; and

m)     The Supplemental Declaration of Moshe Admon.

Being otherwise fully advised on the matter, the COURT HEREBY ORDERS:

1.     Defendants' Joint Motion is GRANTED. The Court concludes that Plaintiff Kurt Benshoof is a vexatious litigant, that he has engaged in an extensive pattern of abusive litigation and weaponization of the court system against Defendants, and that Defendants are entitled to entry of an order restricting Mr. Benshoof's ability to file further abusive legal actions against them.

2.     **No later than noon on Friday, March 31, 2023**, Defendants shall submit for the Court's review a separate proposed order captioned "Order Restricting Abusive Litigation Of Kurt Benshoof". The Court intends that the prefiling restrictions contained in such proposed order will replace and supersede the prefiling restrictions contained in this Order which, as set forth below, only *temporarily* restrict Mr. Benshoof's ability to file new litigation against Defendants. All Defendants in the instant lawsuit shall be identified as the protected parties in the proposed order. Pursuant to *DeLong v. Hennessey*, 912 F.2d 1144 (9ᵗʰ Cir. 1990) and other

ORDER GRANTING JOINT MOTION
AND TEMPORARY ORDER
RESTRICTING ABUSIVE LITIGATION
BY KURT BENSHOOF - 2

JUDGE MARSHALL FERGUSON
KING COUNTY SUPERIOR COURT
516 THIRD AVENUE
SEATTLE WA 98104
(206) 477-1513

authorities cited in Defendants' Motion, the proposed order shall list all of Mr. Benshoof's abusive case filings and set forth substantive findings of fact regarding the frivolous and vexatious nature of his filings. The proposed order should contain the prefiling restrictions set forth below and should indicate that the duration of the prefiling restrictions against Mr. Benshoof will be five (5) years from the date of entry. The Court will review the proposed order and may revise it prior to entry.

3.     While the Court awaits the finalization of the above-referenced proposed order, and to prevent Mr. Benshoof from filing further abusive lawsuits against Defendants in the meantime, the Court temporarily imposes the following prefiling restrictions, which are in effect immediately and shall not expire until 11:59 p.m. on March 31, 2023.

4.     Kurt Benshoof is hereby **ENJOINED AND RESTRAINED,** in both an individual and in any representative capacity, from initiating any litigation whatsoever in any Superior Court in the state of Washington against Defendants, their attorneys, their friends and family, or any other person related or connected to Defendants (collectively, "Persons Covered by This Order"), unless Mr. Benshoof first obtains advance approval from this Court.

5.     To obtain advance approval from this Court, Mr. Benshoof shall submit an application to the undersigned Judge/Department 31 in the form of a one-page document, in twelve-point type, that provides a summary of the parties involved and the proposed claims or issues.[1] The proposed complaint/petition shall be attached to the summary. No other exhibits

---

[1] Mr. Benshoof shall submit the application by filing it under the current case caption, King County Superior Court Case No. 22-2-15958-8 SEA, with copies served on all parties and counsel of record.

ORDER GRANTING JOINT MOTION
AND TEMPORARY ORDER
RESTRICTING ABUSIVE LITIGATION
BY KURT BENSHOOF - 3

**1205**

JUDGE MARSHALL FERGUSON
KING COUNTY SUPERIOR COURT
516 THIRD AVENUE
SEATTLE WA 98104
(206) 477-1513

1  or attachments may be included.  The Court may, at its discretion, request a response from

2  Persons Covered by This Order before ruling on Mr. Benshoof's application.

3      6.    Any new case against Persons Covered by This Order filed by Mr. Benshoof

4  with Court approval in King County Superior Court shall be assigned to the undersigned

5  judge/Department 31.

6

7      7.    If Mr. Benshoof seeks to commence a new action against Persons Covered by

8  This Order in a court *other than* a Superior Court, Mr. Benshoof must first bring a motion in

9  the other court for leave to proceed with the action.  The motion must be filed contemporaneous

10 to the filing of the complaint or petition.  The motion for leave must demonstrate that good

11 cause exists to permit the action to proceed given the claims raised in the new complaint and

12 Mr. Benshoof's past litigation abuses.  If the reviewing court finds that good cause has not been

13 shown for the action to proceed, it may dismiss the action with prejudice.  If the reviewing court

14 determines that sanctions are warranted, it may impose sanctions at the same time the action is

15 dismissed.  Mr. Benshoof shall have an opportunity to explain in writing why sanctions should

16 not be imposed in a post-dismissal motion for reconsideration within ten (10) days of the

17 dismissal.

18

19     8.    Mr. Benshoof shall submit a copy of this Order with any future lawsuit he files

20 or attempts to file on or before March 31, 2023 in <u>any</u> court, including (but not limited to) any

21 federal court.

22

23     9.    Only the prefiling restrictions contained in this Order shall expire on March 31,

24 2023.  All other provisions of this Order shall remain in effect thereafter.

25 ///

ORDER GRANTING JOINT MOTION
AND TEMPORARY ORDER
RESTRICTING ABUSIVE LITIGATION
BY KURT BENSHOOF - 4

JUDGE MARSHALL FERGUSON
KING COUNTY SUPERIOR COURT
516 THIRD AVENUE
SEATTLE WA 98104
(206) 477-1513

**1206**

10.     If Mr. Benshoof fails to abide by the terms of this Order, any party may move, or the Court *sua sponte* may move, for a finding of contempt and sanctions.  A contempt finding could result in the imposition of jail time as a sanction.   The Court has attached the <u>Knight</u> warnings to this Order.

DATED this 3rd day of March, 2023.

Judge Marshall Ferguson
King County Superior Court

ORDER GRANTING JOINT MOTION
AND TEMPORARY ORDER
RESTRICTING ABUSIVE LITIGATION
BY KURT BENSHOOF - 5

JUDGE MARSHALL FERGUSON
KING COUNTY SUPERIOR COURT
516 THIRD AVENUE
SEATTLE WA 98104
(206) 477-1513

1207

# CONTEMPT "KNIGHT" WARNING

1. If this court finds you in contempt of court, jail time is an immediate possibility.  Consequently, you have a right to counsel.

2. You may hire private counsel at your own expense, but the court is referring you to the Department of Public Defense (formerly the Office of Public Defense) where an attorney will be provided if you cannot afford to hire private counsel.  It is your responsibility to contact the Department of Public Defense for screening.  You are being provided with the contact information for the Department of Public Defense with this notice.

3. If you do not contact the Department of Public Defense or hire private counsel, your conduct will be deemed dilatory, which means you have failed to follow through on your obligation.  As a consequence, the court can find that you have forfeited your right to an attorney.

4. If you are found to have forfeited your right to an attorney, the court will require you to proceed in the matter without representation by counsel.  Without an attorney, you risk failing to assert defenses to contempt or effectively explaining to the court why you should not be held in contempt.  Without an attorney you also may miss an opportunity to present information that could mitigate or make less severe any sanctions imposed if you are found to be in contempt.  Given that I have advised you that a possible sanction for contempt is jail, I urge you seek counsel now.

King County Superior Court

**1208**

**King County**

Department of
**PUBLIC DEFENSE**
*Upholding the Constitution,
one client at a time.*

**Important notice to defendants accused
of a crime or involved in a dependency action**

If you cannot afford a lawyer, you must be screened and determined eligible for a public defender. **There are two ways to be interviewed:**
1. **Call the King County Department of Public Defense (DPD) at (206) 477-9727**
   *Monday through Friday from 8 a.m. to 5 p.m.*

2. **Report in person to a DPD screening office:**
**King County Courthouse, 516 3rd Ave, Room E-820, Seattle**
*Mondays and Wednesdays from 8 a.m. to 5 p.m.*

**Maleng Regional Justice Center, 401 4th Ave North, Kent, WA 98032
Room 1-B**
*Tuesdays and Wednesdays from 8 a.m. to 5 p.m.*
You can also email DPDScreening@kingcounty.gov to have a DPD screener contact you.

You will likely have a better outcome if you discuss your case with your attorney as soon as possible. To see if you qualify for a public defender, contact DPD immediately. Even if an attorney was originally assigned to you while you were in custody, you must still call DPD upon release to see if you continue to qualify. SCREEN EARLY! DON'T WAIT!

**Aviso importante a los acusados, acusado de un delito o
involucrados en un caso de dependencia**

**King County**

Department of
**PUBLIC DEFENSE**
*Upholding the Constitution,
one client at a time.*

Si usted no puede pagar a un abogado, debe ser entrevistado y determinado elegible para tener un defensor público. Hay dos maneras para hacer la entrevista:
1. Llame el Departamento del Condado de King de los Defensores Publicos (DPD) en (206) 477-9727 el lunes al viernes desde a las  8:00 AM – 5:00 PM

2. Aparecer en  persona a la Oficina de Defensores Publicos a:
King County Courthouse, 516 3rd Ave, Seattle, WA 98104
**Los lunes y miercoles entre los horarios  8:00 AM – 5:00 PM**
Maleng Regional Justice Center, 401 4th Ave North, Kent, WA 98032
Sala 1-B
**Los martes y miercoles entre los horarios  8:00 AM – 5:00 PM**

Usted podria tener los mejores resultados si puede discutir sobre su caso con su abogado lo mas pronto que sea posible. Para averiguar si usted califique por tener un defensor publico, debe comunicarse con DPD inmediatamente aunque ha tenido un defensor publico mientras usted estaba encarcelado, aun debe comunicarse con DPD cuando salga de la carcel para averiguar si sigue ser eligible. Haga su entrevista pronto.
Usted tambien puede mandar un email a DPDScreening@kingcounty.gov para comunicarse con uno de los entrevistadores.

King County Superior Court

**1209**

1

2

3

4

5

6

7

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND OF THE COUNTY OF KING**

8   KURT BENSHOOF,                          NO.  22-2-15958-8 SEA

9                          Plaintiff,        **ORDER RESTRICTING ABUSIVE
                                            LITIGATION OF KURT BENSHOOF**
    v.

10

11  NATHAN CLIBER, JESSICA OWEN,
    MAGALIE LERMAN, and OWEN
    HERMSEN

12

13                          Defendants.

14        This Court has determined that Kurt Benshoof is a vexatious litigant, that he has

15  engaged in an extensive pattern of abusive litigation and weaponization of the court system

16  against Defendants, and that Defendants are entitled to entry of an order restricting Mr.

17  Benshoof's ability to file abusive legal actions against them, their friends and family, and their

18  respective counsel. *See* Dkt. #177 (Order Granting Defendants' Joint Motion for a Vexatious

19  Litigant Order Against Plaintiff, And <u>Temporary</u> Order Restricting Abusive Litigation By Kurt

20  Benshoof).  The Court incorporates that order by reference as if set forth fully herein and makes

21  the following additional findings and final orders:

22

23

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 1



**TOMLINSON
BOMSZTYK
RUSS**

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P/ 206.621.1871   F/ 206.621.9907



**1210**

**PRIOR ABUSIVE FILINGS BY MR. BENSHOOF**

**King County Superior Court Cause No. 22-2-02932-3 SEA**

1.     On March 1, 2022, Mr. Benshoof filed his first of several complaints against Ms. Owen arising from his claim that Ms. Owen had converted his Toyota FJ Cruiser, which was titled in Ms. Owen's name.

2.     After Ms. Owen voluntarily transferred title to Plaintiff, that matter was dismissed.

3.     However, and despite the vehicle being voluntarily transferred to him, Plaintiff continued to allege facts in this case (and others) regarding the vehicle.

**King County Superior Court Cause No. 22-2-03826-8 SEA**

1.     On March 16, 2022, Plaintiff filed another complaint against Ms. Owen.

2.     In that complaint, Mr. Benshoof alleged claims of constructive fraud and infliction of emotional distress relating to a previously shared residence (titled in Ms. Owen's name). Further, and similar to the allegations alleged in this matter, Mr. Benshoof claimed that Ms. Owen wrongfully filed police reports against him.

3.     On June 24, 2022, Ms. Owen filed a motion to dismiss Mr. Benshoof's claims in that lawsuit pursuant to CR 12(c). Judge Robertson granted Ms. Owen's motion on July 22, 2022, and his claims were dismissed with prejudice. Judge Robertson determined Mr. Benshoof's claims were either time-barred or failed to state a claim upon which relief could be granted.

4.     As to the claims concerning Ms. Owen's communications with law enforcement, those were dismissed because they did not remotely rise to anything close to a viable cause of action.

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 2

**1211**

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1048
P/ 206.621.1871   F/ 206.621.9907

5.      Additionally, Judge Robertson's order admonished Mr. Benshoof's filings as follows:

> Plaintiff improperly attempt[ed] to "amend" the complaint via a filing of an "amended" complaint coupled with what purports to be criminal allegations. These items were all filed on 7/15/22 without leave of this court. Plaintiff failed to comply with CR 15 to permit an amendment of the complaint. However, *even if* this amended complaint were to be considered, it falls under the same merits as above [time-barred & failure to state a claim upon which relief can be granted].

> Plaintiff's Response to this motion was improper and untimely, and Plaintiff failed to follow local rules regarding service of working copies to the Court. However, the response was given consideration by this Court as if it were filed timely. In this Response, Plaintiff failed to provide any legal basis to deny Defendant's motion [to dismiss].

**King County Superior Court Case No. 22-2-1112-7 SEA**

1.      On July 18, 2022, Mr. Benshoof filed an 85-page Petition for Writ of Habeas Corpus and named Mr. Cliber, Judge David Keenan, Commissioner Jason Holloway, Ms. Owen, Ms. Lerman, and one other individual as Respondents. The writ was denied three days after it was filed and the case was dismissed.

**King County District Court Cause No. 22CIV11976KCX**

1.      On August 2, 2022, Mr. Benshoof attempted to obtain an anti-harassment protection order against Mr. Cliber based on Mr. Cliber's representation of Ms. Owen in the Parentage Action. The court denied Mr. Benshoof's request.

**U.S District Court for the Western District of Washington Cause No. 2:22-cv-01281-LK and King County Superior Court Cause No. 22-2-15745-3 SEA**

1.      Following Judge Robertson's dismissal of his claims, Mr. Benshoof filed two other complaints against Ms. Owen on September 9, 2022, and September 29, 2022, respectively.

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 3



TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1046
P / 206.621.1871   F / 206.621.9907

**1212**

1    2.    In the first of these two actions (the "Federal Action"), Mr. Benshoof filed a

2 litany of allegations against dozens of people, including all named Defendants here and multiple

3 sitting King County Superior Court Judges.

4    3.    On September 26, 2022, Judge Lauren King dismissed Mr. Benshoof's nearly

5 300-page complaint *sua sponte*.

6    4.    Three days later, Mr. Benshoof filed another action which was nothing short of

7 a re-filing on the exact same claims previously dismissed by Judge Robertson (King Co. Sup.

8 Ct. No. 22-2-15745-3).

9 **King County Superior Court Cause No. 22-2-15958-8 SEA (this case)**

10    1.    On October 3, 2022, Mr. Benshoof filed the present action.  When Ms. Owen

11 sought to consolidate this matter with the other matter assigned to Judge Robertson, Mr.

12 Benshoof filed an affidavit of prejudice.  This was a concerted effort to circumvent the prior

13 orders of the Superior Court.

14    2.    This case marked the fifth civil complaint filed by Mr. Benshoof against Ms.

15 Owen in a nine-month period.  In this action, Mr. Benshoof cited to the above-mentioned,

16 previously adjudicated matters, King County Superior Court Cause Nos. 21-5-00680-6 SEA

17 and 21-2-11149-8 SEA, alleging, among other things, "Defendants Cliber and Owen illegally

18 or improperly perverted the King County Family Court system against Plaintiff."

19    3.    When Ms. Owen and Mr. Cliber availed themselves of the protections found in

20 Ch. 4.105 RCW, Mr. Benshoof responded by threatening to file yet more litigation against the

21 same parties arising out of the same "facts".

22    4.    On March 17, 2023, this Court dismissed the one remaining claim asserted by

23 Mr. Benshoof after having previously dismissed all other claims.

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 4

**TOMLINSON
BOMSZTYK
RUSS**

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1048
P/ 206.621.1871  F/ 206.621.9907

1    Based on the factual findings above, this Court concludes that Mr. Benshoof has

2 engaged in an extensive pattern of abusive litigation and weaponization of the court system

3 against these defendants, their friends and family, and their attorneys.  This pattern of abusive

4 litigation has taken a significant emotional and financial burden on the defendants.

5 Accordingly, the Court imposes the following filing restrictions against Mr. Benshoof.

6                                   **FILING RESTRICTIONS**

7    Based on the pattern of abusive litigation detailed above, the court enters the following

8 filing restrictions which will apply to any and all future litigation Mr. Benshoof may attempt

9 to bring.  These restrictions shall be in effect for five (5) years from the date of the entry of

10 this order.

11    1.    Kurt Benshoof is hereby **ENJOINED AND RESTRAINED**, in both an

12 individual and in any representative capacity, from initiating any litigation whatsoever in any

13 Superior Court in the state of Washington against Defendants, their attorneys, their friends

14 and family, or any other person related or connected to Defendants (collectively, "Persons

15 Covered by This Order"), <u>unless</u> Mr. Benshoof first obtains advanced approval from this

16 Court.

17    2.    To obtain advance approval from this Court, Mr. Benshoof shall submit an

18 application to the undersigned Judge/Department 31 in the form of a one-page document, in

19 twelve-point type, that provides a summary of the parties involved and the proposed claims

20 or issues.[1]  The proposed complaint/petition shall be attached to the summary.  No other

21

22

23 ---

[1] Mr. Benshoof shall submit the application by filing it under the current case caption, King County Superior Court Case No. 22-2-15958-8 SEA, with copies served via e-mail on all parties and counsel of record.

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 5

**1214**

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1048
P/ 206.621.1871  F/ 206.621.9907

1    exhibits or attachments may be included.  The Court may, at its discretion, request a response

2    from Persons Covered by This Order before ruling on Mr. Benshoof's application.

3        3.    Any new case against Persons Covered by This Order filed by Mr. Benshoof

4    with Court approval in King County Superior Court shall be assigned to the undersigned

5    judge/Department 31.

6        4.    If Mr. Benshoof seeks to commence a new action against Persons Covered by

7    This Order in a court *other than* a Superior Court, Mr. Benshoof must first bring a motion in

8    the other court for leave to proceed with the action.  The motion must be filed

9    contemporaneous to the filing of the complaint or petition.  The motion for leave must

10   demonstrate that good cause exists to permit the action to proceed given the claims raised in

11   the new complaint and Mr. Benshoof's past litigation abuses.  If the reviewing court finds

12   good cause has not been show for the action to proceed, it may dismiss the action with

13   prejudice.  If the reviewing court determines that sanctions are warranted, it may impose

14   sanctions at the same time the action is dismissed.  Mr. Benshoof shall have an opportunity to

15   explain in writing why sanctions should not be imposed in a post-dismissal motion for

16   reconsideration within ten (10) days of the dismissal.

17       5.    Mr. Benshoof shall submit a copy of this Order with any future lawsuit he files

18   or attempts to file in any court, including (but not limited to) any federal court.

19       6.    If Mr. Benshoof fails to abide by the terms of this Order, any party may move,

20   or the Court *sua sponte* may move, for a finding of contempt and sanctions.  A contempt

21   finding could result in the imposition of jail time as a sanction.  The Court has attached the

22   Knight warnings to this Order.

23

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 6

**1215**

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3660,
Seattle, Washington 98104-1048
P/ 206.621.1871   F/ 206.621.9907

1          DONE this 31st day of March, 2023.

2

3                                 The Hon. Marshall Ferguson

4  Presented by:

5  GORDON REES SCULLY MANSUKHANI, LLP

6  By: */s/ Kyle J. Rekofke*
    Kyle J. Rekofke, WSBA #49327
7  Attorney for Defendant Nathan Cliber

8

9  TOMLINSON BOMSZTYK RUSS

    By: _____
10 Anthony S. Marinella, WSBA #55611
    Attorney for Defendant Jessica Owen
11

12

13 ADMON LAW FIRM , PLLC

    By: _____*/s/ Moshe Y. Admon*_____
14 Moshe Y. Admon
    Attorney for Defendants Lerman and Hermsen
15

16

17

18

19

20

21

22

23

ORDER RESTRICTING ABUSIVE LITIGATION OF KURT
BENSHOOF - 7

**1216**

TOMLINSON
BOMSZTYK
RUSS

1000 Second Avenue, Suite 3500,
Seattle, Washington 98104-1049
P/ 206.621.1871   F/ 206.621.9907

# CONTEMPT "KNIGHT" WARNING

1. If this court finds you in contempt of court, jail time is an immediate possibility. Consequently, you have a right to counsel.

2. You may hire private counsel at your own expense, but the court is referring you to the Department of Public Defense (formerly the Office of Public Defense) where an attorney will be provided if you cannot afford to hire private counsel. It is your responsibility to contact the Department of Public Defense for screening. You are being provided with the contact information for the Department of Public Defense with this notice.

3. If you do not contact the Department of Public Defense or hire private counsel, your conduct will be deemed dilatory, which means you have failed to follow through on your obligation. As a consequence, the court can find that you have forfeited your right to an attorney.

4. If you are found to have forfeited your right to an attorney, the court will require you to proceed in the matter without representation by counsel. Without an attorney, you risk failing to assert defenses to contempt or effectively explaining to the court why you should not be held in contempt. Without an attorney you also may miss an opportunity to present information that could mitigate or make less severe any sanctions imposed if you are found to be in contempt. Given that I have advised you that a possible sanction for contempt is jail, I urge you seek counsel now.

King County Superior Court

**1217**

**King County**

**Department of**
**PUBLIC DEFENSE**
*Upholding the Constitution,*
*one client at a time.*

**Important notice to defendants accused**
**of a crime or involved in a dependency action**

If you cannot afford a lawyer, you must be screened and determined eligible for a public defender. **There are two ways to be interviewed:**

**1.Call the King County Department of Public Defense (DPD) at (206) 477-9727**
*Monday through Friday from 8 a.m. to 5 p.m.*

**2.Report in person to a DPD screening office:**
**King County Courthouse, 516 3rd Ave, Room E-820, Seattle**
*Mondays and Wednesdays from 8 a.m. to 5 p.m.*

**Maleng Regional Justice Center, 401 4th Ave North, Kent, WA 98032**
**Room 1-B**
*Tuesdays and Wednesdays from 8 a.m. to 5 p.m.*

You can also email DPDScreening@kingcounty.gov to have a DPD screener contact you.

You will likely have a better outcome if you discuss your case with your attorney as soon as possible. To see if you qualify for a public defender, contact DPD immediately. Even if an attorney was originally assigned to you while you were in custody, you must still call DPD upon release to see if you continue to qualify. SCREEN EARLY! DON'T WAIT!

**Aviso importante a los acusados, acusado de un delito o**
**involucrados en un caso de dependencia**

**King County**

**Department of**
**PUBLIC DEFENSE**
*Upholding the Constitution,*
*one client at a time.*

Si usted no puede pagar a un abogado, debe ser entrevistado y determinado elegible para tener un defensor público. Hay dos maneras para hacer la entrevista:

1.Llame el Departamento del Condado de King de los
Defensores Publicos (DPD) en (206) 477-9727 el lunes al viernes desde a las 8:00 AM
– 5:00 PM

2.Aparecer en persona a la Oficina de Defensores Publicos a:
King County Courthouse, 516 3rd Ave, Seattle, WA 98104
**Los lunes y miercoles entre los horarios 8:00 AM – 5:00 PM**
Maleng Regional Justice Center, 401 4th Ave North, Kent, WA 98032
Sala 1-B
**Los martes y miercoles entre los horarios 8:00 AM – 5:00 PM**

Usted podria tener los mejores resultados si puede discutir sobre su caso con su abogado lo mas pronto que sea posible. Para averiguar si usted califique por tener un defensor publico, debe comunicarse con DPD inmediatamente aunque ha tenido un defensor publico mientras usted estaba encarcelado, aun debe comunicarse con DPD cuando salga de la carcel para averiguar si sigue ser elegible. Haga su entrevista pronto.

Usted tambien puede mandar un email a DPDScreening@kingcounty.gov para comunicarse con uno de los entrevistadores.

King County Superior Court

**1218**

The Honorable Marshall Ferguson

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

KURT BENSHOOF,

        Plaintiff,

    v.

NATHAN CLIBER, JESSICA OWEN and
MAGALIE LERMAN,

        Defendants.

Case No. 22-2-15958-8 SEA

**ORDER FINDING OF CONTEMPT
AND IMPOSING SANCTIONS
AGAINST PLAINTIFF KURT
BENSHOOF**

This matter comes before the Court on Defendant Nathan Cliber's Motion for Finding of Contempt and Sanctions Against Plaintiff Kurt Benshoof ("Cliber's Motion"), Defendant Jessica Owen's Motion for Finding and Contempt and Sanctions Against Plaintiff Kurt Benshoof ("Owen's Motion"). The Court considered the arguments of the parties, the documents and pleadings on file herein, including the following:

- Cliber's Motion;
- The Declaration of Sarah N. Turner in Support of Cliber's Motion;
- Plaintiff's Opposition to Cliber's Motion;
- Defendant Nathan Cliber's Reply in Support of Cliber's Motion;
- Owen's Motion;
- The Declaration of Jessica Owen in Support of Owen's Motion;
- The Declaration of Paige Gagliardi in Support of Owen's Motion;

ORDER FINDING OF CONTEMPT AND IMPOSING
SANCTIONS AGAINST PLAINTIFF KURT BENSHOOF - 1

GORDON REES SCULLY
MANSUKHANI, LLP
Attorneys at Law
701 5th Avenue, Suite 2100
Seattle, Washington  98104
(206) 695-5100

- The Declaration of Moshe Y. Admon in Support of Cliber's and Owen's Motions;

- Plaintiff's Opposition to Owen's Motion; and

- Defendant Jessica Owen's Reply in Support of Owen's Motion.

Based upon such review and consideration, the Court GRANTS both Cliber's Motion and Owen's Motion, and enters the following FINDINGS OF FACT and CONCLUSIONS OF LAW:

1.  Plaintiff has disregarded and failed to comply with this Court's Order Restricting Abusive Litigation of Kurt Benshoof (the "Abusive Litigation Order") (Dkt. 189) in his filing and attempted service of new claims and causes of action in Western District of Washington Case No. 2:23-cv-01392-JNW and Western District of Washington Case No. 2:23-cv-01829-JHC (now JNW) upon Defendants Nathan Cliber, Jessica Owen, and the other "Persons Covered by This Order" (as those persons are defined in the Abusive Litigation Order);

2.  Specifically, Plaintiff failed to file a contemporaneous motion for leave to proceed with his claims against Mr. Cliber, Jessica Owen and other Persons Covered by This Order (as those persons are defined in the Abusive Litigation Order) in both Case No. 2:23-cv-01392-JNW and Case No. 2:23-cv-01829-JHC, as required by the Abusive Litigation Order (at p. 6, ¶ 4);

3.  Plaintiff also failed to file a copy of the Abusive Litigation Order with the federal court in Case No. 2:23-cv-01829-JHC, as required by the Abusive Litigation Order (at p. 6, ¶ 5);

4.  In Case No. 2:23-cv-01392-JNW, Plaintiff did file a copy of the Abusive Litigation Order, but he did so by burying the order among 2,034 pages of exhibits to his complaint. Plaintiff filed a 184-page original complaint and later a 280-page amended complaint in Case No. 2:23-cv-01392-JNW. Plaintiff's 2,034-page exhibit filing occurred on September 26, 2023, seven calendar days after Plaintiff filed the original complaint. Within the 2,034 pages of exhibits, the Abusive Litigation Order can be found at Pages 563 through 571. Plaintiff buried the Abusive Litigation Order among numerous other exhibits to reduce the likelihood that the federal court would become aware of the order;

ORDER FINDING OF CONTEMPT AND
SANCTIONS AGAINST PLAINTIFF KURT BENSHOOF - 2

GORDON REES SCULLY
MANSUKHANI, LLP
Attorneys at Law
701 5th Avenue, Suite 2100
Seattle, Washington  98104
(206) 695-5100

5.      Plaintiff is in contempt of court for violating the Abusive Litigation Order.

6.      The Abusive Litigation Order warned Mr. Benshoof that if he "fails to abide by the terms this Order, any party may move, or the Court *sua sponte* may move, for a finding of contempt and sanctions.  A contempt finding could result in the imposition of jail time as a sanction." Abusive Litigation Order (p. 6, ¶ 6);

7.      The Abusive Litigation Order included the <u>Knight</u>[1] warnings as an attachment;

8.      The Abusive Litigation Order clearly and unequivocally states that the filing restrictions in the order "apply to any and all future litigation Mr. Benshoof may attempt to bring" against the protected persons.  Abusive Litigation Order, p. 5.  The order further states that Mr. Benshoof is "**ENJOINED AND RESTRAINED**…from initiating any litigation whatsoever in any Superior Court in the state of Washington… <u>unless</u> Mr. Benshoof first obtains advanced approval from this Court" and that "If Mr. Benshoof seeks to commence a new action…in a court *other than* a Superior Court, Mr. Benshoof must first bring a motion in the other court for leave to proceed with the action."  Id., p. 5, ¶ 1 and p. 6, ¶ 4.  Although the Abusive Litigation Order is clear and unambiguous, the Court now clarifies, as guidance for Mr. Benshoof, that terms like "any and all future litigation" and "new action" in the Abusive Litigation Order include all claims, counterclaims, crossclaims, third party actions, and any other claims whatsoever brought by Mr. Benshoof in any court against the "Persons Covered by This Order" as defined in the Abusive Litigation Order.

9.      Although the present Order does not include jail time as a sanction, any future violation(s) of the Abusive Litigation Order by Mr. Benshoof could potentially result in jail time as a remedial or punitive sanction.

///

///

---

[1] *State ex rel. Schmitz v. Knight*, 142 Wn. App. 291, 174 P.3d 1198 (2007).

ORDER FINDING OF CONTEMPT AND
SANCTIONS AGAINST PLAINTIFF KURT BENSHOOF - 3

GORDON REES SCULLY
MANSUKHANI, LLP
Attorneys at Law
701 5th Avenue, Suite 2100
Seattle, Washington  98104
(206) 695-5100

**1221**

Based upon the above findings of fact and conclusions of law, the Court ORDERS the following sanctions:

A.      Mr. Benshoof is ordered to pay the attorneys' fees and costs incurred by Defendants in bringing their respective motions for finding of contempt and sanctions against Mr. Benshoof, including supporting filings, declarations, and replies.  Defendants shall submit their respective fee petitions to the Court within **14 days** of this Order.

B.      Mr. Benshoof shall pay the attorneys' fees and costs incurred by Mr. Cliber in bringing the Abusive Litigation Order to the attention of the federal court in Western District of Washington Case No. 2:23-cv-01392-JNW and Western District of Washington Case No. 2:23-cv-01829-JHC (now JNW).  Mr. Cliber shall submit his fee petition to the Court within **14 days** of this Order.

C.      The Abusive Litigation Order's expiration date is extended by one year, to **March 31, 2029**.

D.      Mr. Benshoof shall file the leave motion ("Leave Motion") required by the Abusive Litigation Order in both Western District of Washington Case No. 2:23-cv-01392-JNW and Western District of Washington Case No. 2:23-cv-01829-JHC (now JNW) as to any and all Persons Covered by This Order, excluding Mr. Cliber, and including Moshe Admon, Owen Hermsen, Magalie Lerman, Jessica Owen, and Blair Russ (collectively, "Other Named Defendants Covered by this Order").  Such motion ("Leave Motion") shall be captioned "Motion for Leave to Proceed Against Certain Parties in Accordance with the Order Restricting the Abusive Litigation of Kurt Benshoof" and shall conspicuously identify the Abusive Litigation Order in the statement of facts.  Plaintiff shall attach a copy of the Abusive Litigation Order as an exhibit to a separately filed supporting declaration, appendix, or addendum to the Leave Motion.

E.      Upon filing the Leave Motions, Mr. Benshoof shall file proof in this action of such filings in the federal court cases.  Absent obtaining leave to proceed against the Other Named

ORDER FINDING OF CONTEMPT AND
SANCTIONS AGAINST PLAINTIFF KURT BENSHOOF - 4

GORDON REES SCULLY
MANSUKHANI, LLP
Attorneys at Law
701 5th Avenue, Suite 2100
Seattle, Washington  98104
(206) 695-5100

Defendants Covered by this Order, Mr. Benshoof shall refrain from taking any action in pursuit of his claims against those individuals including but not limited to, attempting effectuate service and seeking affirmative relief in any form.  To the extent necessary to comply with an impending deadline, Mr. Benshoof may seek to extend that deadline to an extent necessary to accommodate a ruling on the Leave Motion.

F.     **Beginning one calendar week from the entry of this Order, for each day Mr. Benshoof has failed to the file the Abusive Litigation Order's required leave motion in BOTH pending actions, or otherwise dismissed claims in those actions against the Other Named Defendants Covered by This Order, an ongoing remedial sanction shall be entered against him in the amount of $250 per day, per Other  Defendant Covered by This Order**.  Mr. Benshoof shall deposit such accrued amounts in the King County Superior Court Registry under this cause number and the Other Named Defendants may, at their option, apply for disbursement or seek to enter a judgment for any accrued amounts not so deposited.

G.     For any further legal proceedings filed by Mr. Benshoof in violation of the Abusive Litigation Order, he shall be assessed, in addition to any other sanction which may be imposed, a per diem sanction of $250.00 per day per Person Covered by the Order named as a defendant in such action.

DATED this 1st day of March, 2024.

_____
THE HONORABLE MARSHALL FERGUSON

ORDER FINDING OF CONTEMPT AND
SANCTIONS AGAINST PLAINTIFF KURT BENSHOOF - 5

GORDON REES SCULLY
MANSUKHANI, LLP
Attorneys at Law
701 5th Avenue, Suite 2100
Seattle, Washington 98104
(206) 695-5100

**1223**

King County Superior Court
Judicial Electronic Signature Page

Case Number:        22-2-15958-8
Case Title:         BENSHOOF VS CLIBER ET AL

Document Title:     ORDER  RE CONTEMPT SANCTIONS

Signed By:          Marshall Ferguson
Date:               March 01, 2024

Judge:  Marshall Ferguson

This document is signed in accordance with the provisions in GR 30.

Certificate Hash:            A4ABB09C7C1D81F742E845B69E1C4CD6FEAA5E8C
Certificate effective date:  7/17/2023 2:21:34 PM
Certificate expiry date:     7/17/2028 2:21:34 PM
Certificate Issued by:       C=US, E=kcscefiling@kingcounty.gov, OU=KCDJA,
                             O=KCDJA, CN="Marshall Ferguson:
                             8skMktsk7hG1yuM6zbJ6iw=="

Page 6 of 6

1224

1

2

3

4                    COURT OF APPEALS

5                OF THE STATE OF WASHINGTON

6                      DIVISION I

7                      86466-1

8    _____

9    KURT BENSHOOF,                )

10                  Plaintiff,     ) King County Cause

11        vs.                      ) No. 22-2-15958-8 SEA

12   NATHAN CLIBER, et al.,        )

13                  Defendants.    )

14   _____

15        VERBATIM REPORT OF RECORDED PROCEEDING

16      BEFORE THE HONORABLE MARSHALL L. FERGUSON

17   _____

18                    FEBRUARY 29, 2024

19                    (Motion Hearing)

20

21

22

23

24              RECORDING TRANSCRIBED BY:

25        ELEANOR J. MITCHELL, RPR, CCR 3006

MITCHELL REALTIME REPORTING

7829 Center Boulevard SE, Suite 247, Snoqualmie, Washington 98065

425.503.3645

1225

```
 1                A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4   (Appearing Remotely)

 5        KURT BENSHOOF, Pro Se
          1716 North 128th Street
 6        Seattle, Washington 98133

 7   FOR THE DEFENDANT NATHAN CLIBER:

 8   (Appearing Remotely)

 9        MICHAEL C. TRACY
          SARAH N. TURNER
10        Gordon & Rees Scully Mansukhani, LLP
          701 Fifth Avenue, Suite 2100
11        Seattle, Washington 98104-7084
          206.695.5135
12        mtracy@grsm.com
          sturner@grsm.com
13

14   FOR THE DEFENDANT JESSICA OWEN:

15        BLAIR M. RUSS
          PAIGE V. GAGLIARDI
16        Tomlinson Bomsztyk Russ
          1000 second Avenue, Suite 3660
17        Seattle, Washington 98104
          206.621.1871
18        bmr@tbr-law.com

19

20   FOR THE DEFENDANT MAGALIE LERMAN and OWEN HERMSEN:

21   (Appearing Remotely)

22        MOSHE Y. ADMON
          Admon Law Firm, PLLC
23        300 Lenora Street, Suite 4008
          Seattle, Washington 98121
24        206.739.8383
          jeff@admonlaw.com
25
```

## MITCHELL REALTIME REPORTING

PROCEEDINGS; February 29, 2024



1                    I N D E X

2                                              PAGE

3  MOTION FOR CONTEMPT AND SANCTIONS              5

4  COURT'S RULING                               35

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              AFTERNOON SESSION; FEBRUARY 29, 2024

2                      --oOo--

3

4                  (Recording begins at 1:02 p.m.)

5                  (Transcription begins at 1:02 p.m.)

6

7              THE BAILIFF:  -- on your video.  Thank you

8    so much.

9              THE COURT:  All right.  Ready, Madam

10   Bailiff.

11             THE BAILIFF:  All right.  Thank you.

12        Good afternoon.  Court is in session.

13        Your Honor, this is *Kurt Benshoof v. Nathan*

14   *Cliber, et al.*, Cause No. 22-2-15958-8 SEA.

15             Plaintiff, representing yours- -- excuse me,

16   representing yourself, will you please introduce

17   yourself to the Court?

18             MR. BENSHOOF:  Yeah.  This is Kurt

19   Benshoof, Plaintiff, *pro se*.

20             THE BAILIFF:  Thank you.

21        Counsel, if I leave anyone out, please

22   correct -- please correct me.

23        Counsel for Nathan Cliber?

24             MR. TRACY:  Good afternoon.  Mike Tracy

25   for Nathan Cliber.  And Sarah Turner, my co-counsel, is

1    also here.

2                    THE BAILIFF:  Okay.  Thank you.

3            Counsel for -- defendant counsel for Jessica

4    Owen.

5                    MR. RUSS:  And good afternoon.  For the

6    record, Blair Russ, appearing on behalf of Ms. Owen.  I

7    also have Ms. Gagliardi in my office online as well.

8                    THE BAILIFF:  Thank you.

9            Counsel for Magalie Lerman?

10                   MR. ADMON:  Good afternoon.  Moshe Admon

11   on behalf of Magalie Lerman and Owen Hermsen.

12                   THE BAILIFF:  Thank you.

13           And if we have not missed anyone, Your Honor,

14   we are ready.

15                   THE COURT:  All right.  Thank you, Madam

16   Bailiff.

17                   THE BAILIFF:  You're welcome.

18                   THE COURT:  So unfortunately, we are here

19   because it appears to the Court that Mr. Benshoof may

20   be in violation of the Court's order entered back on

21   March 31, 2023, restricting abusive litigation filed by

22   Mr. Benshoof.

23           We are here on Mr. Cliber's motion for a

24   finding of contempt and for sanctions.  I have reviewed

25   that motion.  I've reviewed all of the materials

1    submitted in support of that motion.  I've reviewed

2    Mr. Benshoof's response and his cross-motion and all of

3    his materials, as well as the reply materials.

4            I want to state at the outset that there may

5    be other pending motions that have been filed in this

6    case, partic- -- in particular, by Mr. Benshoof.  We

7    are not here to have a free-for-all on all pending

8    motions.  We are only here addressing the sanctions --

9    the contempt and sanctions motion.

10           I had a few questions for the moving party,

11   and then I wanted Mr. Benshoof to give -- I wanted to

12   give Mr. Benshoof an opportunity to address his

13   opposition, which I've read and I'm familiar with his

14   positions.

15           And I -- I will say at the outset, I am highly

16   skeptical of Mr. Benshoof's positions.  I want to say

17   that my -- the order I entered back in March of 2023,

18   in my view anyway, was unequivocally clear and broad

19   that it applied to any and all future litigation by

20   Mr. Benshoof against the protected parties.  And

21   there's similar language throughout the order, and then

22   the Court laid out strict requirements that

23   Mr. Benshoof had to follow before bringing any new

24   actions against the protected parties; not just

25   lawsuits, but actions.

PROCEEDINGS; February 29, 2024

1    I will further add that, at least in one
2    instance, Mr. Benshoof filed a -- what he framed as an
3    answer and counterclaims in federal court but what was
4    clearly a third-party complaint directed at the pro- --
5    protected parties in my order.
6        Mr. Benshoof might have thought he was being
7    clever, but he's not -- I can tell him that he is not
8    the first person to try that trick to avoid the
9    mandatory requirements of Federal Rule 14, which
10   require service of a summons and complaint.  When you
11   do things like that, you can't just call it a
12   counterclaim when really what you're doing is
13   commencing a third-party complaint.
14       That -- that --
15           MR. BENSHOOF:  Objection.
16           THE COURT:  Mr. Ben- -- Mr. Benshoof, I --
17   I -- I absolutely  will give you an opportunity to
18   respond.  I just want to kind of cut to the chase here
19   about how I have viewed the materials that were
20   submitted to the Court.  I -- I know you have an
21   opposition.  You oppose all of these positions, and I
22   want to give you an opportunity to respond, and you'll
23   have that opportunity.  I promise you.
24       But, first, I'd like to hear from the moving
25   party or parties on the motion, starting with Mr. Tracy

PROCEEDINGS; February 29, 2024

1   and -- and Ms. Turner, who- -- I don't know who's going

2   to argue between the two of you.

3                   MR. TRACY:  I'll be arguing today, Your

4   Honor.  Thank you.

5                   In our view, this is really pretty

6   straightforward.  The order is very clear.  It simply

7   amounts to a series of yes-or-no questions.

8                   And the first question is, when filing a new

9   action in federal court -- which is what our motion

10  concerns.  I know that some of the other parties deal

11  with a few other actions that extend beyond that, but

12  for ours, in particular, there's two actions in federal

13  court.

14                  The first was filed directly by Mr. Benshoof

15  against a litany of defendants.  When he filed that, he

16  failed to file the leave motion, which is the first

17  requirement of the Court's order.  And then the second

18  part of that is filing a copy of the order.

19                  Now, in that case, he did file a copy.  We

20  still do not feel that really meets the spirit of the

21  Court's order.  It was included as one of, frankly,

22  dozens of documents that were filed in a single

23  appendix.  It was about 2,000 pages long, kind of

24  included in the stack as opposed to acknowledging the

25  order directly or -- or its requirements.

```
 1                    THE COURT:  Right.  It was buried, is --

 2                    MR. TRACY:  Yeah.

 3                    THE COURT:  -- is my impression.  It was

 4    buried.

 5                    MR. TRACY:  That -- thank you, Your Honor.

 6    We agree.

 7              For the second action, this is a declaratory

 8    judgment action that was filed by Seattle School

 9    District regarding some records concerning

10    Mr. Benshoof's child.  And as the Court noted, he

11    responded, brought a -- a variety of third-party claims

12    against many of the protected individuals here.

13              And in that action, he also failed to file the

14    leave motion and likewise did not file a copy of the

15    Court's order.  As a fair bit of time has passed since

16    we initially filed our motion, I just wanted to clarify

17    for the Court that, in both of those actions, because

18    Mr. Cliber was served with copies of the complaint and

19    summons, we have responded, filing motions to dismiss,

20    calling attention to the order and some of the actions

21    that it empowers other courts to take as well.

22              But at this point, it really just comes down

23    to whether he filed the leave motion or not.  He didn't

24    in either case.  And those cases continue on and have

25    caused quite a substantial cost, both of the individual
```

PROCEEDINGS; February 29, 2024

1   defendants and of those courts and this court's

2   resources given Mr. Benshoof's failure to comply with

3   the order.

4           Now, in our materials, Your Honor, we left it

5   pretty open as far as what sanctions or findings of

6   contempt or jail time -- anything of that nature the

7   Court would enter.  Since we filed ours, Counsel for

8   Ms. Owen has filed their own sanctions motion, and --

9   but in their motion, they went into a little bit more

10  detail.

11          We would just state that we -- we do not

12  oppose any of the specific sanctions sought by

13  Ms. Owens, including the remedial sanctions under

14  RCW 7.21.010 and .030, which could include daily

15  sanctions until Mr. Benshoof complies with the order,

16  as well as a short amount of jail time.

17          THE COURT:  I will say jail time is

18  typically utilized to get -- to coerce compliance.  And

19  I'd -- I'd appreciate an explanation for how jail time

20  would serve that end and not be simply just kind of

21  punitive.  But thank you, Mr. Tracy.

22          All right.  Mr. Russ?

23          MR. RUSS:  And -- and thank you, Your

24  Honor.  For the record once again, Blair Russ,

25  appearing on behalf of Ms. Owen.

1    We -- we did file our own motion that was

2   substantially similar to Mr. Cliber's motion,

3   unsurprisingly, because the facts are relatively

4   similar and there's a lot of overlap there.  I -- I

5   think we spent a little bit more time talking about the

6   available options the Court might have in addressing

7   Mr. Benshoof's ongoing vexatious-litigant behavior.

8    I think what's also important for us to point

9   out that is unique to our motion is that, as this

10   Court's well aware, there's -- there's already been a

11   no contact order that's been issued in the custody

12   matter, which requires Mr. Benshoof to refrain from

13   contacting Ms. Owen.

14    We've supplied a declaration with close to

15   240 communications over a short period of time.  It's

16   just another continuation; in fact, I would say it's an

17   escalation of this abusive behavior that another judge

18   has told him he cannot engage with under threat of

19   crim- -- criminal penalties.

20    That has not deterred Mr. Benshoof, of course.

21   He -- as the Court also knows from hopefully other

22   filings that we've submitted, he's already out -- I

23   think he's got a $250,000 warrant.  I think the count

24   is maybe 91 criminal charges that stem from violating

25   Judge Keenan's order.

1        I -- I -- I don't think the -- the Court

2   necessarily is in a position to enforce an order of

3   another judge, but I think the importance of that

4   circumstance is Mr. Benshoof's willingness and

5   propensity to violate court orders continuously.

6        And -- and -- and I appreciate the Court's

7   comment that there are two sort of variations of

8   sanctions in this circumstance.  There's a remedial

9   sanction, which is designed to cajole or compel

10  compliance.  There's also a punitive sanction.

11       I think probably we are not in the appropriate

12  procedural posture for a punitive sanction.  We are,

13  however, in the appropriate procedural posture for a

14  remedial sanction.  And the reason being is that

15  Mr. Benshoof can curtail his violation of the Court

16  order by simply mo- -- calling the -- the

17  vexatious-litigant order to the attention of the judge

18  presiding over his federal court matters.

19       My understanding is they've both been

20  consolidated in front of Judge Whitehead, and he can

21  ask Judge Whitehead for leave to proceed prior to

22  taking any additional actions, if any, against the

23  defendants.  If he's unable to achieve that, he can

24  also dismiss that claim as a matter of right.

25       And -- and so he is in a position where he can

1    meet the Court's order, or at least curb his violation

2    of it.   A remedial sanction would be appropriate in

3    that circumstances.   We have suggested $1,000 per day

4    per defendant per action -- or, excuse me, per

5    protected party.   So that would include Mr. Admon,

6    Ms. Owen, Ms. Magalie, myself, Mr. Cliber.

7            I think that -- well, I'm sure there's others,

8    but at least there's those five off the top of my head,

9    plus two other action- -- you know, two actions

10   combined.   So it would equate to something like a

11   $10,000 sanction per day before he could -- he could

12   achieve compliance.

13           And I -- I -- I believe he can -- he can go

14   ahead and dismiss this as a matter of right under

15   CR 41.   So it shouldn't take him more than a day or two

16   to be able to do that.   He's definitely familiar with

17   the process for filing in federal court.

18           So if there's -- if there's anything else that

19   I can add or give the Court, happy to do so.

20              THE COURT:   Was jail time one of the

21   proposals, Mr. Russ?

22              MR. RUSS:   It -- it -- it was, Your Honor.

23   It was -- it was -- it was loosely -- it was loosely

24   suggested in sort of the -- the -- the spectrum of

25   available remedies the Court would have.   I think the

1    importance of jail time is that -- that in issuing your

2    order, you supplied the *Knight* warnings with it so that

3    Mr. Benshoof was on notice that jail time was a

4    prospect.  That has still not deterred yet.

5           And -- and jail time is a -- an appropriate

6    remedial sanction, as the Court knows.  It's -- it's --

7    it's allowable under the statute.  You don't have to

8    bring criminal charges like you might with a punitive

9    sanction.  It is -- it is permitted.

10                   THE COURT:  Yeah.

11                   MR. RUSS:  And folks that are in jail do

12   still have access to the federal court.  So I do

13   believe that, given the propensity to willfully violate

14   orders, putting Mr. Benshoof in custody until he

15   complies is -- would -- would, in fact, be an

16   appropriate exercise of the Court's discretion.

17                   THE COURT:  Thank you, Mr. Russ.

18          Mr. Admon?

19                   MR. ADMON:  I -- I have nothing to add,

20   Your Honor.

21                   THE COURT:  All right.

22          Well, Mr. Benshoof, you've heard what I've had

23   to say.  You've heard what the other parties have had

24   to say.  I've -- like I said, I've read your materials.

25                   What further information do you ha- -- or

```
 1    argument do you have for the Court?
 2              MR. BENSHOOF:  Well, first of all, I'd
 3    like to say good day.  I didn't have the pleasure of
 4    being on the video feed on the hearing back in January
 5    of 2023.  And I would also like to thank you for being
 6    forthright about your prejudice before the parties have
 7    even had a chance to speak.
 8              As -- as you've said, you've read through my
 9    briefings.  And this -- this laughable kangaroo-court
10    action that's been going on for more than a year where
11    counsel were allowed to assert that I had engaged in
12    abusive litigation, I'll read for the record,
13    RCW 26.51.020, subsection (1)(a)(2).  It says that [as
14    read]:  The party who is filing -- and, in that case,
15    it was initially Ms. Owen, and there was a joinder --
16    has -- that I, as the alleged vexatious litigant, has
17    been found by a Court to have committed domestic
18    violence.
19              That's what the statute says.  My
20    understanding is that lawyers and courts are required
21    to follow the law.  I have -- no one has ever presented
22    evidence that a Court found me to have committed
23    domestic violence.  So the definition of domestic
24    violence -- or, sorry, the definition of abusive
25    litigation was falsely applied from the get-go.
```

1    And then under RCW 26.51.030, the orders

2    restricting such alleged abusive litigation, which

3    doesn't apply to me, subsection (1) states that I would

4    have, quote, been found by the Court to have committed

5    domestic violence against the other party; in this

6    case, Owen.

7    That has never --

8    THE COURT:  Are you talking about my

9    order, Mr. Benshoof?  Are you -- is that -- you're

10    talking about the -- the abusive litigant order that I

11    entered in March of 2023?  You're saying that order

12    doesn't apply to you?

13    MR. BENSHOOF:  No.  What I'm --

14    THE COURT:  For --

15    MR. BENSHOOF:  -- saying is that, for the

16    attorneys to have even petitioned for an abusive -- for

17    an order restricting abusive litigation, a Court had to

18    have found that I committed domestic violence against

19    Ms. Owen.  If you actually read the record of King

20    County Superior Court Case No. 21-5-00680-6 SEA, I was

21    never found to have committed domestic violence.

22    What Mr. Cliber, who is a pathological liar

23    like his client, Ms. Owen -- the little game that he

24    played with Judge Keenan was alleging that I was a

25    credible threat.  And that allegation was upon one of

1    my unlawful arrests, which was dismissed with

2    prejudice.

3                  THE COURT:  All right.

4                  MR. BENSHOOF:  Now, the term, --

5                  THE COURT:  So, Mr. Benshoof, I --

6                  MR. BENSHOOF:  -- "credible threat" --

7                  THE COURT:  -- I will say that what you're

8    doing now, the arguments you're making now, you can

9    save for the Court of Appeals.  Because what you're

10   doing now is saying that I was wrong to enter the order

11   restricting your litigation.

12            You can believe that.  That's fine.  But I've

13   entered the order, and we're not relitigating that.  If

14   you think I was wrong, you can take it up with the

15   Court of Appeals.  And maybe you'd win there.

16            I think you already -- I think you have

17   appealed, but I'm not going to reverse my order at the

18   end of this hearing.  There's -- there's no chance of

19   that.  And so there's no point in trying to relitigate

20   the order that I entered.

21            The question here is whether you violated it.

22                  MR. BENSHOOF:  Yeah.  And, Your Honor, I

23   am well aware that I have appealed the order of the

24   Court in the Washington State Court of Appeals,

25   Division I.  So we're all aware of that.

1          THE COURT:  Okay.

2          MR. BENSHOOF:  And I am not here to move

3     for the vacation of that order, as fraudulent as it

4     was.  That's not the issue.  The reason that I am, for

5     the record, setting these facts is because I will be

6     getting a transcript.  And based upon the prejudicial

7     statements I've heard so far, whatever -- whatever

8     determination comes out of the Court today will also be

9     appealed to the Court of Appeals.

10         And the reason I'm raising this -- these

11    issues is not to relitigate what the Court and the

12    counsels present did previously.  It's to establish

13    that, when the Court issues its prejudicial ruling

14    today, either sanctioning me or issuing an arrest

15    warrant or whatever games we want to play -- that it is

16    on the record that the basis of this is known by all

17    parties present -- attorneys and the Court -- to be

18    based on fraud.  It's fraud upon fraud upon perjury.

19    And we all know that -- under *Throckmorton*, that

20    perjury and extrinsic fraud voids everything.

21         So while counsel and the Court wish to

22    continue with this ridiculous tautology that I am

23    disrespecting orders and -- and violating them, I will

24    quote from a U.S. Supreme Court case.

25         Quote [as read]:  An unconstitutional act is

1  not a law.  It confers no rights.  It imposes no

2  duties.  It affords no protection.  It creates no

3  office.  It is, in legal contemplation, as inoperative

4  as though it had never been passed.

5          That's *Norton v. Shelby County* --

6                  THE COURT:  Right.  So, Mr. Benshoof --

7                  MR. BENSHOOF:  -- 118 U.S. 425 (1886).

8                  THE COURT:  -- until -- until you get an

9  order from the Court of Appeals saying that my order

10 was unconstitutional, it is a valid order, and you are

11 required to follow it.

12                 MR. BENSHOOF:  Well, I understand that

13 that's the Court's position.  And my position is that

14 when we -- we all know it was obta- -- pain- --

15 obtained by fraud, it is yet another injustice.  Like,

16 this is the same game that's been going on for over two

17 and a half years.

18          Judge Keenan allowed, enabled, and facilitated

19 Nathan Cliber to suborn the perjury of Jessica Owen.

20 That is irrefutable, and Counsel won't even touch it

21 with a 10-foot pole.  Because --

22                 THE COURT:  Sure.

23                 MR. BENSHOOF:  -- they know it's a fact.

24 Okay?

25                 THE COURT:  If it's irrefutable, then --

1   then --

2           MR. BENSHOOF:  No, this is my time --

3           THE COURT:  -- then I --

4           MR. BENSHOOF:  -- isn't it, Your Honor?

5           THE COURT:  Well, but I -- I want to

6   make --

7           MR. BENSHOOF:  Why are you interrupting

8   me?

9           THE COURT:  Well, I --

10          MR. BENSHOOF:  You've asked me not to

11  interrupt you.

12          THE COURT:  Right.  I'm interrupting

13  you --

14          MR. BENSHOOF:  I'm going to ask you not to

15  interrupt me.

16          THE COURT:  Because you --

17          MR. BENSHOOF:  Thank you very much.

18          THE COURT:  Well, I -- no, I can't.

19  Because at 2:00 o'clock, this hearing is going to end.

20  And I want to make sure that you address directly the

21  Court's concerns about whether you have violated this

22  order.

23          If you spend a lot of time arguing about --

24  about the past and your belief that the order is

25  fraudulent, you can -- you can waste your time and do

1    that.  I'm not going to reverse this order or -- or

2    vacate it.  So I -- I'm hoping you will directly

3    address the motion at hand, and I -- and I want to go

4    back to the beginning, actually: the reason why you

5    think my com- -- comments were so prejudicial.

6           I already decided that I'm going to grant the

7    motion.  I didn't need to hold this hearing.  This

8    hearing is at my discretion.  I had questions for the

9    moving party about the kind of sanctions they wanted

10   the Court to enter.

11          I did -- I do not need to hear oral argument

12   from you to grant this motion.  This was -- the motion

13   was filed without a request for oral argument, and I

14   was prepared to grant it without any oral argument.

15          I am permitting you to address the Court in

16   case there's more information that you think I should

17   know about before I formally grant the motion, and --

18   which is why I'm asking you to directly address the

19   motion and whether you violated the Court's order,

20   rather than spending your allotted time arguing about

21   the lead-up to the entry of my order and why you

22   believe it's fraudulent and unconstitutional.

23          Again, you're welcome to do that.  But if you

24   have information that's more dir- -- that more directly

25   answers my question as to whether you violated the

1    Court's order, I'd like to hear that.

2                MR. BENSHOOF:  Okay, Your Honor.  How many

3    minutes do I have to speak?

4                THE COURT:  Well, it's 1:23, and I need to

5    get back to the other matter at 2:00 o'clock.  I'd say

6    you have about 20 minutes.

7                MR. BENSHOOF:  Okay.  Thank you for

8    clarifying that, Your Honor.

9          It's my understanding, as a *pro se* litigant,

10   that once the Court decides to convene a hearing, which

11   the Court did, that I have a right to speak.  So how I

12   choose to spend that time and what statements and

13   evidence and law I think is relevant is my choice.  And

14   I would hope that all parties and the Court respects

15   that.

16               THE COURT:  There are limits.

17               MR. BENSHOOF:  So --

18               THE COURT:  But you may -- you may use

19   your time how you wish, Mr. Benshoof.

20               MR. BENSHOOF:  Thank you, Your Honor.  I

21   will also point out that I gave the Court the benefit

22   of the doubt that it had been fooled by counsels back

23   in January of 2023 that, despite the fact that Your

24   Honor had spent -- had just spent, I believe, a

25   two-year rotation in family court before this case

1  commenced, which is --

2           THE COURT:  Do --

3           MR. BENSHOOF:  -- why there was a delay --

4  that, despite that, I -- I gave the Court the benefit

5  of the doubt that maybe the Court just wasn't aware of

6  what the laws actually state.

7           THE COURT:  So --

8           MR. BENSHOOF:  And because --

9           THE COURT:  -- just to correct you,

10 Mr. Benshoof, it was t- --

11          MR. BENSHOOF:  I'm -- I'm talking, please.

12          THE COURT:  -- it was --

13          MR. BENSHOOF:  Thank you.

14          THE COURT:  -- two years in dependency,

15 and I spent 20 years in a civil litigation practice.

16          MR. BENSHOOF:  Thank you, Your Honor.

17          THE COURT:  All right.

18          MR. BENSHOOF:  So I gave the Court the

19 benefit of the doubt because, as I've stated in my

20 pleadings, I wasn't aware that opposing counsel were

21 moving under RCW 26.51 until months after the hearing

22 when I was able to obtain the transcript.

23          And, for the record, in that hearing, upon

24 further review, it was actually the Court that brought

25 up the *Kuhlmeyer* case, if I'm pronouncing that

1  correctly, and moving for an order restricting abusive

2  litigation under RCW 26.51.  So at present date,

3  plaintiff finds it hard to believe that the Court and

4  all opposing counsel were not fully aware prior to the

5  order being issued that this order was fraudulent.  It

6  was *void ab initio*.

7         And I've done my best to give everybody the

8  benefit of the doubt, everybody an opportunity to -- to

9  correct their errors, and I'm well aware that -- that

10  there is an appeal process for this.  But my position

11  is that any further attempts to enforce this order

12  constitute further fraud and [unintelligible] attempts

13  to silence me in violation of the First Amendment by

14  denying my right to redress under threats and

15  coercions.

16         Mr. Russ knows that Ms. Owen is a perjurer.

17  Mr. -- Mr. Tracy and Ms. Turner know that Mr. Cliber

18  suborned the perjury of Ms. Owen.  They've been served

19  lots of documents.

20         And so this whole clown show that I'm

21  supposedly the bad guy because I'm trying to protect my

22  son from ongoing abuse, and that I'm annoying and

23  somehow causing people problems because I keep speaking

24  the truth and trying to stop the ongoing abuse of my

25  son and the ongoing violations of state and federal

1    law, it's hard not to laugh when I hear attorneys and

2    judges continue this charade because that's all that it

3    is.

4            So to get back to the controlling law, as --

5    so that this is all on the record for the Court of

6    Appeals -- that's my purpose; it's not to change

7    anybody's opinions because it's obvious to plaintiff at

8    this point that attorneys and the Court have already

9    determined that they don't care about the law, they

10   don't care about the facts, they don't care about my

11   son, and the last thing they're going to let happen is

12   the fraud be admitted on the record.

13           So while parties and the Court may not wish to

14   admit it, I am going to further establish it for the

15   transcript for the Court of Appeals.  And -- and yeah.

16           So as I've said before the family court, even

17   if it had determined that I had committed domestic

18   violence, which it never did -- and if you read the

19   record, it shows that Ms. Owen actually committed

20   domestic violence.  I never did.

21           But the Court -- Mr. Keenan -- Judge Keenan

22   looked the other way on that, just like he looked the

23   other way on Mr. Cliber  suborning Ms. Owen's perjury,

24   just like Mr. Keenan -- Judge Keenan looked the other

25   way about the fact that Cliber brought a baritrous

1  [phonetic] petition to decide parentage, which was just

2  a ruse, because, as -- as Mr. Turner and Ms. Tracy are

3  well aware, Mr. Cliber is a family law attorney.  He

4  knows what RCW 26.26A.43A, subsection -- 435,

5  subsection (2) says.

6         It showed that the Court was collaterally

7  estopped and really should have invoked judicial

8  estoppel as soon as Mr. Cliber brought the parentage

9  action.  Because Ms. Owen's sworn statements, some of

10 which Mr. Cliber signed his name -- he undersigned his

11 name, which means, yes, there is proof he suborned her

12 perjury, Ms. Owen and Mr. Cliber were collaterally

13 estopped from Ms. Owen making materially -- mutually

14 exclusive material statements of fact between Case

15 Nos. 21-2-11149-8 and 21-5-00680-6.

16        That's exactly what she did.  But even more

17 hilarious, those statements, they were extrinsic and

18 collateral fraud.  Because what they did was she

19 took -- she took mutually exclusive positions, first

20 saying that I had acted as my son's father for all

21 12 years and that he was my child, 'cause he is, and

22 that we had lived together.

23        And then she -- then she had to take the

24 opposite position to make her parentage -- petition to

25 decide parentage seem plausible by saying that, Oh, no,

1    we had never lived together.  He's not the presumed

2    parent.  I don't know who the father is.  And he has no

3    parental rights.

4          It's a clown show.  So -- I hope that some of

5    you find it as funny as I do.  So e- -- as I was

6    saying, even if Judge Keenan had falsely claimed that I

7    had committed domestic violence, which he did not,

8    neither did Holloway, neither did any of the other

9    judges or commissioners.  Okay?

10          So no court has ever determined me to have

11   committed domestic violence.  That's irrefutable.  And

12   counsel here have yet to provide that proof because

13   they can't, and they know it.  And if I were them, I

14   would be embarrassed at this point.

15          But anyways, so even if I had committed

16   domestic violence, family court, Judge Keenan never had

17   jurisdiction.  I'm not saying that because I'm opposed

18   to the power of courts.  I'm saying it because any

19   first-year law student knows that a court only has

20   jurisdiction -- the authority to speak -- if it has

21   facts and matters in controversy before it which it is

22   duly authorized to adjudicate.

23          And as 26.26A.435, subsection (2) states --

24   and I will read it out for you [as read]:  A

25   presumption of parentage cannot be overcome after the

1    child attains four years of age.

2           They -- Judge Keenan did not have statutory

3    authority to hear anything or do anything.  And the

4    restraining orders that Judge Keenan issued, including

5    the final order, are also *void ab initio*.  Why?  Well,

6    let's -- let's look at RCW 26.09-point -- .050.  Sorry,

7    26.09-point -- yeah, .050.  And you'll find the same

8    thing in .060.

9           The Court had authority to issue a restraining

10   order under that statute in entering a de- -- decree of

11   dissolution of marriage or domestic partnership, legal

12   separation, or declaration of invalidity.  It was doing

13   none of those because, as I've said for two and --

14   well, two years, the Court never had evidence of

15   domestic relations.  It had no author- --

16                   THE COURT:  Ten minutes remaining.

17                   MR. BENSHOOF:  Thank you, Your Honor.  I'm

18   having fun.  I hope you are, too.

19          The Court never had authority to issue any

20   parenting plans as under RCW 26.09.004, subsections (3)

21   and (4), Permanent Parenting Plans and Temporary

22   Parenting Plans, just like the restraining orders under

23   26.09.050, subsection (1).  Those are -- those are

24   plans incorporated in any final decree or modification

25   of -- what's the magic words? -- dissolution of

1    marriage -- we were never married -- or domestic

2    partnership -- we were never in a domestic

3    partnership -- or a declaration of invalidity or a

4    legal separation.

5         So it's unfortunate.  I understand that the

6    Court and a- -- and counsel are maybe in an

7    uncomfortable position.  Because what annoying

8    Mr. Benshoof has done -- and I say "annoying" tongue in

9    cheek, because all I have been doing for two and a half

10   years is saying the facts and quoting the law.

11        What has been shown is that King County

12   Superior Court has been routinely violating the law,

13   violating people's rights.  I'm sure I'm not the only

14   one.

15        And we come to the final restraining order

16   granted by Judge Keenan on October 21st of 2022 based

17   upon the perjury by Jessica Owen, the suborning of her

18   perjury by Nathan Cliber, and Judge Keenan allowing,

19   enabling, and facilitating it.

20        And that restraining order says it ends in one

21   year or it ends on September 28, 2027.  Well, you don't

22   get to issue restraining orders for five years.  That's

23   not how the law works.  And it says Duration -- under

24   RCW 7.105, it says that they shall not be issued for

25   longer than one year.

1          Now, under RCW 7.105.315, subsection (2)(a),

2     it says, quote [as read]:  If a protection order

3     restrains the respondent from contacting the

4     respondent's children, the restraint must be for a

5     fixed period not to exceed one year.

6          Then it goes on to say this limina- --

7     limitation is not applic- -- applicable to protection

8     orders issued under RCW -- under Chapter 26.09.  I've

9     already documented why the Keenan Court never had

10    authority to issue anything -- parenting plan,

11    restraining orders, anything -- under 26.09.  So this

12    savings clause that shysters might want to cite as

13    reasons why Cliber and Keenan and Owen could issue a

14    restraining order that ends in 2027, that doesn't work.

15         So coming back around to the Court wishing to

16    issue so- -- you know, some sort of penalties or

17    sanctions for plaintiff continuing to cite the law,

18    state the facts, try to bring criminals to justice,

19    stop the ongoing fraud, and stop the ongoing abuse of

20    my son, well, let me come back to Mr. Russ bringing up

21    Judge Willie Gregory's restraining order that he

22    issued.  I believe it was on November 16th of 2022 in

23    Seattle Municipal Court Case No. 669329.

24         Now, I was there.  Nobody else was there.  So

25    [unintelligible] to consider.  And at that hearing,

1    I -- actually before the hearing, I filed a motion to

2    dismiss because I had irrefutable evidence, which

3    Seattle Municipal Court pros- -- City Prosecutor

4    Katrina Outland has not and cannot refuted that the

5    Court was proceeding without personal jurisdiction as

6    well as subject matter jurisdiction.

7             Why do I say that?  Because under

8    RCW 35.20.270, subsection (1) clearly states that a

9    municipality is required to -- to issue criminal

10   summons by personal service.  They don't do that.

11            And Ms. Outland later, in federal court -- or

12   no, sorry, sorry, in the -- in one of my writ- -- writs

13   of prohibition, King County Superior Court Case

14   No. 23-2-23749-8 -- in that she submitted a declaration

15   which admits that the City has a policy, custom,

16   practice, and procedure that they violate RCW 35.20.270

17   subsection (1).  That's just how they do it.  And

18   because they're the City, they get away with it.

19            And while I very much enjoyed the hour before

20   Judge Larrañaga, I think he was in a tough position as

21   a new judge because it would probably be professional

22   suicide for him to be the one judge that finally

23   acknowledges the facts and the law, which is that the

24   City of Seattle is an ongoing RICO crime syndicate,

25   which is another reason why people find me annoying

1    because I have the evidence of that.

2            So when Mr. Russ, amongst his many

3    prevarications, claimed that I had violated the,

4    quote/unquote, restraining order out of Seattle

5    Municipal Court issued by Judge Gregory, Judge Gregory

6    did not have jurisdiction to issue that.  I told them

7    on the record.

8            And it's coincidental that today in

9    Washington -- in Western Washington Case No. Two,

10   hyph- -- 2:23-CV-1392-JNW, today I filed an affidavit

11   of service against Judge Willie Gregory in his

12   individual capacity.  I filed a motion for entry of

13   default because Judge Gregory -- or, sorry, Willie

14   Gregory, in his individual capacity, he just hasn't

15   refuted any of his claims.

16           Now, why do you think Willie Gregory hasn't

17   refuted any of his claims?  Why do you think he ignored

18   the summons?  I wonder if anybody here is concerned

19   that city prosecutors, city judges --

20           Oh, did I mention that King County also failed

21   to answer the summons in that lawsuit.  Do you think it

22   could possibly be that all of these individuals are

23   faced with a difficult choice?  They either ignore the

24   summons and go in default, which is happening on a

25   daily basis, as happened with City of Seattle as

```
 1   well --
 2                THE COURT:  Three --
 3                MR. BENSHOOF:  -- they're faced with the
 4   tough choice because I've pled --
 5                THE COURT:  Three minutes.
 6                MR. BENSHOOF:  -- RICO allegations.  So
 7   they're between a rock in a hard spot, Your Honor,
 8   because if they answer the complaint and if they don't
 9   get their motion to dismiss granted -- which good luck
10   with that -- then they're faced with videotaped
11   desposi- -- depositions under oath, and they're faced
12   with the prospect of taking the stand in a public
13   trial.
14         So it should come as no surprise that all of
15   these corrupt public officials and corrupt attorneys
16   and pathological liars like Ms. Owen, Ms. Lerman, and
17   Mr. Hermsen -- which I will remind the Court, their
18   s- -- their sworn affidavits last year that they
19   submitted, I submitted an affidavit in response,
20   pointing out point by point all of the perjury that --
21   that they committed.
22         But, of course, the Court doesn't care about
23   perjurers because, as long as you're lying about the
24   squeaky wheel, Mr. Benshoof, you can commit any crime
25   you want.  You can say any lie you want with impunity
```

1    because that's the clown-show world we live in.

2          So, you know, you may wish to get ahold of Dow

3    Constantine and ask him why the King County -- why I

4    motioned for entry of default.  Why didn't they answer

5    the complaint?  Why are all of these parties refusing

6    to answer summons?

7          So I find it hilarious when counsels -- when

8    counsel and judges accuse me of not respecting the law,

9    not respecting orders.  No, that's -- I'm laughing,

10   guys.

11         So I'm going to make this suggestion:  If you

12   guys all want to continue with this kangaroo-court

13   charade that I've ever lied about anything, that I have

14   ever violated any law, that I've ever violated any

15   valid order, then I suggest that you move for the death

16   penalty.

17         Oh, wait.  Sorry.  We rescinded that.

18   Probably 'cause there's so many pedophiles in the state

19   in positions of power, they really don't want that.  So

20   how about this?  Why don't you issue an order for --

21   for 10 years of imprisonment and let's make it a

22   million-dollars-per-day fine until I shut up.

23         That's my suggestion.  Thank you, Your Honor.

24              THE COURT:  Well, I don't know what I just

25   heard.  I heard -- but what I can say is that I heard

1    19 minutes of argument by Mr. Benshoof, none of which

2    had anything to do with the Court's order restricting

3    abusive litigation -- I mean, other than as

4    background -- and nothing directly addressing the

5    motion for sanctions and the contentions that that

6    order has been violated.

7            Everything else I heard related to a galaxy of

8    other legal actions and grievances that Mr. Benshoof

9    has that remarkably have not led to any judge agreeing

10   with him, in state or federal court at any level that

11   I'm aware of, although I could certainly be proven

12   wrong at the Court of Appeals.

13           MR. BENSHOOF:  That's called corruption,

14   Your Honor.

15           THE COURT:  I mean, it could be that every

16   judge in the state of Washington and the federal court

17   system is corrupted and prejudiced against you,

18   Mr. Benshoof.  But there are other possibilities that

19   you might consider as well.

20           Anything further, Mr. Tracy?

21           MR. TRACY:  No, Your Honor.  Thank you.

22           THE COURT:  All right.  The Court grants

23   the joint motions for contempt and for sanctions

24   against Mr. Benshoof for violating the Court's order

25   restricting his abusive litigation.  I do find that

1    he's in violation specifically in connection with his

2    filing of the two actions in federal court, the one

3    ending in 1392-JNW and the other ending in 01829-JHC.

4           My order required that Mr. Benshoof accomplish

5    a couple of things whenever he tried to bring a new

6    action against the protected parties to my order.  One

7    was file a copy of my order with those actions.  He did

8    in one case, but he buried it in hundreds or thousands

9    of pages of material so that it probably would not be

10   seen by the federal court judge.  But he didn't do so

11   in connection with the other action.

12          In neither action did he bring a motion for

13   permission to file the action in federal court, and in

14   that second action, although he characterized his

15   claims as counterclaims, they were definitely not

16   counterclaims.  He was suing the protected parties

17   under my order in federal court through a third-party

18   action.

19          It was within his power to comply with the

20   Court's order.  It was within his power to separately

21   file copies of my order in federal court.  He was -- it

22   was -- it was within his power to bring motions

23   requesting leave to file those claims, and he didn't do

24   it, and the Court has not heard anything today from

25   Mr. Benshoof explaining why.

1    And so accordingly, the Court orders the

2   following sanctions against him.  First, the moving

3   parties shall be entitled to their attorneys' fees in

4   bringing these sanctions motions, including the reply

5   briefing.

6        The Court will extend the expiration date of

7   the original order restricting abuse of litigation an

8   additional year.  The original term of the order, I

9   believe, was five years.  Let me see.

10       I should have highlighted this.  Where did I

11  put the expiration date here?  Oh, here it is on page 5

12  of my order.

13       Yes, and so it was originally five years from

14  the date of entry of the order, so March 31, 2028.  The

15  Court will extend that one year to March 31, 2029.  And

16  the reason for that is remedial.

17       Mr. Benshoof has forced the parties, the

18  protected parties, to spend many months dealing with

19  his new cases, this new abusive litigation in federal

20  court.  He's required the parties and their attorneys

21  to file this motion to seek remedial sanctions.  And

22  it's clear to the Court that he doesn't seem to have

23  any intention at all of complying with this Court's

24  order, which he views as fraudulent, notwithstanding

25  that the order has not been reversed by any Court of

1    Appeals.

2             The -- what I wanted to ask about in terms of

3    the sanctions is whether there is a basis for imposing

4    a daily sanction where I -- I think at least one of

5    those actions has been dismissed.  Is that -- is that

6    right?  I -- I -- have both of them -- have both of

7    them been dismissed?  I guess, is -- is it -- is it

8    moot at this point?

9             MR. TRACY:  Thank you, Your Honor.  Both

10   are actually still ongoing.  Both actions are -- have

11   pending motions to dismiss before Judge Whitehead.

12             THE COURT:  Okay.

13             MR. TRACY:  But he has not ordered on

14   either.

15             MR. RUSS:  And -- and, Your Honor, if I

16   may clarify, I believe those pending motions are just

17   for Mr. Cliber.  So Ms. Owen hasn't been served.  I

18   haven't been served.  So that, I guess --

19             MR. BENSHOOF:  Objection.  Ms. Owen was

20   served in a motion for entry of default.  So please

21   don't lie, Mr. Russ, although it is your --

22             MR. RUSS:  Right.  Well, I -- I guess

23   Mr. Benshoof's entitled to his opinion, but that --

24   that's my understanding.  So that -- those cases are

25   still pending as they relate to myself, Ms. Owen,

1    Ms. -- Mr. Admon, Ms. Lerman.

2              THE COURT:  All right.  And I -- I'm

3    wondering what the practical effect would be if the

4    Court were to impose a daily fine requiring

5    Mr. Benshoof to comply -- in other words, requiring him

6    to bring a motion for leave in the federal court?  I

7    guess my -- I guess my question is, Would that be

8    creating more work for you and your clients?  Would

9    that be -- potentially be creating more harm in having

10   to litigate that motion for leave?

11             I mean, the -- the action's already underway.

12             MR. TRACY:  Thanks, Judge Ferguson.  So

13   from Mr. Cliber's perspective, the -- the briefing on

14   the first filed action, the 01392, the briefing is

15   complete.  So forcing Mr. Benshoof to file the leave

16   motion I don't think, in our estimation, would really

17   add to our plate in that action.

18             The briefing for the other action will

19   conclude this week.  And so I -- I don't see that that

20   would cause us any additional, you know, delay or -- or

21   stress.  So...

22             And as Mr. Russ noted, only Mr. Cliber has

23   appeared and moved to dismiss.  So all of the other

24   affected individuals would still be part of those

25   actions even if we were successful on our motions.

1              THE COURT:  Okay.  And then requiring

2   Mr. Benshoof to separately file a copy of the -- of my

3   order in those actions is -- would that impact the

4   litigation in any way?  Have -- have the parties

5   already litigated over that order in any way?  I

6   guess --

7              MR. RUSS:  So in -- in -- in both, Your

8   Honor -- so in -- in the first action, you know, we --

9   we dug through the pile and found it and cited to it in

10  our motion to dismiss.  And in the second action, we

11  actually filed a copy of it as part of our motion to

12  dismiss.

13         So it is in the record in both actions now,

14  though I will note that, when we filed this present

15  motion, we hadn't got to that stage in those other

16  litigation.  So they had not been filed at that point.

17             THE COURT:  All right.  Then I -- what I'm

18  inclined to do is award additional attorneys' fees for

19  the effort it took for you to bring the Court's abusive

20  litigation order to the federal court's attention.

21         In other words, I -- I -- at this point, I

22  don't think we need to rely on Mr. Benshoof to bring

23  that order to the Court's attention.  It's already been

24  done, and I think if I were to enter a daily fine to

25  get him to do that, a reviewing court might question

1  whether that was really necessary given that it's

2  already been -- already been brought to the federal

3  court's attention.

4          But I -- I think you and your clients are

5  entitled to be compensated for the time it took for you

6  to bring it to the federal court's attention.  And so

7  if you want to include your time in your fee petitions

8  for attorneys' fees for that work, the Court would

9  compensate the parties for that as a remedial sanction.

10         I would like the contempt order to clarify,

11  f- -- for the benefit of Mr. Benshoof, that, going

12  forward, the Court's requirements regarding filing a

13  leave motion and filing a copy of the Court's order

14  unequivocally applies to all claims, counterclaims,

15  third-party actions, cross-claims, any action of any

16  nature whatsoever against the parties protected by the

17  order.

18         This is not a new term that I'm adding to the

19  order.  The order already contained very broad language

20  covering every action of any na- -- of any kind

21  whatsoever.  But I would like this contempt order to

22  clarify that we'r- -- this specifically covers

23  counterclaims and third-party claims and cross-claims

24  and any other kind of claim.

25         And while I am not imposing jail time and I'm

1    not convening a further hearing and I'm not appointing

2    Mr. Benshoof a public defender, that we may be

3    escalating toward that type of a sanction, whether as a

4    remedial sanction or potentially, down the road, even

5    as a punitive sanction.  If -- if things get that bad,

6    jail time is a possibility, including the issuance of a

7    bench warrant.  But I'm not ordering that today.

8            Would you, Mr. Tracy or Mr. Russ, prepare an

9    order?  I --

10            MR. TRACY:  Yes, Your Honor.

11            THE COURT:  I did review the order that --

12    Mr. Tracy, that you submitted laying out the findings

13    of fact.  That does comport with the Court's oral

14    ruling here.  And so -- and so you could include that

15    language as well.

16            MR. TRACY:  Okay.

17            MR. RUSS:  And -- and, Your Honor, just

18    one issue for clarification I want to point out.  So

19    Ms. Owen nor myself nor Mr. Admon nor Ms. Lerman have

20    participated in the federal court action to this point.

21            We -- we do believe that your order had a very

22    good procedural requirement in it in that, before

23    proceeding against these persons covered by the order,

24    there would be some sort of leave sought from the

25    federal court.

MITCHELL REALTIME REPORTING

7829 Center Boulevard SE, Suite 247, Snoqualmie, Washington 98065

425.503.3645

**1266**

```
 1              Given we --
 2                    THE COURT:  I see.
 3                    MR. RUSS:  -- we haven't filed a motion,
 4     it's -- by not -- by not requiring Mr. Benshoof to
 5     comply with that aspect of the order, we still...
 6                    THE COURT:  That's a fair point, actually.
 7     I -- that's a fair point.
 8                    MR. BENSHOOF:  Oh, yeah.  Good point.
 9     Um-hmm.
10                    THE COURT:  So, Mr. Russ, the Court will
11     amend its order specifically as to your client and
12     Mr. Lerman [as said].  And I don't recall if
13     Mr. Hermsen was a -- was also a party, but as to any
14     other parties who have not yet been served or have been
15     participating in federal court, if Mr. Benshoof intends
16     to proceed with -- to the extent that he intends to
17     proceed with those actions, then the Court will order
18     that he comply with the Court's order and bring a
19     motion requesting leave to pursue those actions in the
20     federal courts.
21                    MR. BENSHOOF:  So I'm not clear on what --
22     is this -- this is an additional stipulation for new
23     actions or the Court is --
24                    THE COURT:  So...
25                    MR. BENSHOOF:  -- asserting the --
```

```
 1                    THE COURT:  Sure.
 2                    MR. BENSHOOF:  -- jurisdiction to
 3    impose...
 4                    THE COURT:  Oh, no, no.  No, I'm -- I'm
 5    happy to clarify, Mr. Benshoof.
 6            So I'm looking at the action, just for
 7    example, in the Western District of Washington under
 8    Case No. 2:23-CV-01829-JHC.  That's the one where
 9    you've brought third-party claims and tried to disguise
10    them as counterclaims against Mr. Cliber --
11                    MR. BENSHOOF:  Objection.  I did not
12    disguise anything.  It's a joi- -- it -- I did a
13    joinder and a counterclaim.
14                    THE COURT:  -- against Mr. Cliber --
15                    MR. BENSHOOF:  So I -- I object
16    [unintelligible] --
17                    THE COURT:  -- Ms. Lerman, Je- -- Jessica
18    Owen, and Mr. Russ.
19            In that case, I understand Mr. Russ to be
20    arguing that his client and perhaps others have not yet
21    been participating in that action, and -- but it is
22    still ongoing against them.
23            And so there's no -- for example, there's no
24    motion to dismiss them out of the action, is my
25    understanding.  And so --
```

1          MR. BENSHOOF:  That -- that is correct,
2    Your Honor.  Because --
3          THE COURT:   Right.  And so, Mr. Benshoof,
4    let me -- let me finish.  I'm explaining to you --
5          MR. BENSHOOF:  Okay.
6          THE COURT:  -- my order.  And because that
7    is the case and because you have not yet complied with
8    my order to seek leave from the federal court to sue
9    them, I'm going to impose a daily sanction against you.
10         I'm going to give you some time to comply.
11   I'm going to -- I'm going to give you one week to
12   comply with the Court's order.  And that's one calendar
13   week.
14         I'm going to -- and then after that calendar
15   week expires, you -- the parties will be entitled to a
16   daily sanction of $250 for each day that you don't
17   comply with the Court's order.  And that's $250 per
18   party.  That's $250 for --
19         Mr. Russ, are -- you're a party yourself,
20   Mr. Russ, aren't you?
21         MR. RUSS:  Apparently so.  Right.  I
22   haven't been served, but I -- I've been named.  I think
23   I've been named three times by Mr. Benshoof
24   [unintelligible].
25         MR. BENSHOOF:  And so, Your Honor, are you

1   saying that -- that, despite the fact that, for

2   example, Ms. Owen was already served summons and

3   complaint signed for by her prostitute perjurer

4   girlfriend, Defendant Magalie Lerman --

5               THE COURT:  Well, it's --

6               MR. BENSHOOF:  -- that even though she was

7   served --

8               THE COURT:  -- it's not --

9               MR. BENSHOOF:  -- summons and complaint --

10              THE COURT:  It -- it's not -- it's not a

11  service issue, Mr. Benshoof.  It's not even about --

12  the question isn't service.  You need the Court's

13  permission to pursue an action because I have entered

14  that abusive-litigation order against you.

15              And so you need to comply with my order and

16  bring a motion in federal court asking for that Court's

17  permission to proceed with the action against those

18  parties, and you have a week to come into compliance.

19  If you don't bring that motion in one week from today

20  in compliance with the Court's order, then sanctions

21  will accrue in the amount of $250 per party per day.

22              Now, if between now and then you dismiss all

23  the parties out of the lawsuit, then there will be no

24  sanctions.  If, between now and then, you -- you comply

25  with the Court's order and bring that motion, there

```
 1   will be no daily sanction.  But if you don't bring that

 2   order within a week, it's 250 per party per day.

 3                   MR. RUSS:  And, Your Honor, just one other

 4   point of clarification.  So -- and I -- I recognize the

 5   procedural history is irregular here.

 6              There are a total of two pending federal court

 7   lawsuits where persons covered by the order are named

 8   who have not moved to dismiss.  There was a previously

 9   filed lawsuit that was assigned to Judge Jones that was

10   dismissed with prejudice.  It's already gone up on

11   appeal --

12                   THE COURT:  Right.

13                   MR. RUSS:  -- and it's been mandated.

14           So there -- there are -- there are currently

15   two actions pending.  Is it the Court's intention to

16   bring -- to require Mr. Benshoof to -- to bring a

17   motion to leave or -- and/or dismiss in both actions

18   that are still pending?

19                   THE COURT:  Yes.  And if you fi- --

20                   MR. RUSS:  And would it be two hundred --

21   excuse me.

22                   THE COURT:  And -- and also any new cases.

23   If he files -- if he's got a new case in the hopper

24   that I don't know about, then he shall bring a motion

25   in that case as well.
```

1            MR. BENSHOOF:  So that's a good question,

2    Your Honor.  Thank you very much for bringing that to

3    my attention.

4            In the event, hypothetically, of course, that

5    I were to file for a federal injunction to enjoin the

6    Court and all parties from continuing what plaintiff

7    alleges to be ongoing fraud, are -- are you suggesting

8    that even if parties aren't named, but I'm only seeking

9    to enjoin the Court's enforcement of the order, should

10   I also -- is your position that the Court is requiring

11   me to file a motion for that as well or only when

12   parties named in the oral are in question?

13           THE COURT:  So I want to make sure I

14   understand.  If you go to federal court to get an

15   injunction to stop the enforcement of my order --

16           MR. BENSHOOF:  Right.

17           THE COURT:  -- and if you name the parties

18   to this lawsuit in that lawsuit, would my order apply?

19           MR. BENSHOOF:  No, no.  Sorry.  That

20   was -- I didn't mean to be confusing.  If the

21   injunction that I seek is only naming, you know, say,

22   King County Superior Court, is -- are you req- --

23   requesting that I file a motion for leave on that as

24   well or only when I name the defendants?

25           THE COURT:  Well, I can't really speculate

1    about what your -- that lawsuit would look like.

2                    MR. BENSHOOF:  No.  Just a --

3                    THE COURT:  I --

4                    MR. BENSHOOF:  -- petition for injunction.

5                    THE COURT:  Right.  But I -- I don't know

6    who you're going to name in that action.  If it were

7    just King County, I'm not going to sit here and say

8    that my order wouldn't apply.  It would -- it would be

9    ten- -- it would depend on the claims that you're

10   actually asserting in your complaint.

11           Just because you caption it as against King

12   County, but then you make cla- --

13                    MR. BENSHOOF:  Oh, so --

14                    THE COURT:  -- but then you -- no, no, let

15   me --

16                    MR. BENSHOOF:  So now, is -- is --

17                    THE COURT:  Don't -- don't interrupt.

18                    MR. BENSHOOF:  Is the order so broad that

19   even if --

20                    THE COURT:  No.  Mr. -- Mr. Benshoof?

21   Mr. Benshoof?

22                    MR. BENSHOOF:  -- I have defendants --

23                    THE COURT:   I'm -- I'm -- I'm

24   explaining.

25                    MR. BENSHOOF:  -- named in there --

```
 1                    THE COURT:  I -- I -- you asked me a
 2      question.
 3                    MR. BENSHOOF:  How big is it going to get,
 4      Your Honor?
 5                    THE COURT:  Mr. Benshoof, you asked me a
 6      question, and I'm explaining.  Because you -- you will
 7      caption -- you -- you have a track record,
 8      Mr. Benshoof.  You will caption a case one way, but
 9      then when you look at the actual complaint, you're
10      actually claiming something different.
11                    And so if you -- if you identified only King
12      County as a party but then you asserted claims against
13      all the defendants in your complaint, then my order
14      would apply.  My order applies to any litigation you
15      bring against the protected parties, regardless of how
16      you caption it.
17                    You could caption it against Mickey Mouse, for
18      all I care.  But if you're bringing claims against all
19      of the protected parties in the complaint, it won't
20      matter that it's just captioned against Mickey Mouse.
21                    MR. BENSHOOF:  For -- for clarification,
22      Your Honor, I mean, I'm just a *pro se* litigant with a
23      high school education, but my understanding is an
24      injunction -- under FRCP 65, it has to specifically
25      name the parties being enjoined.
```

```
 1              So is it the Court's position that, even
 2    though an FR 65 -- FRCP 65 petition for injunction is
 3    required under the federal rules to specifically name
 4    the parties being enjoined and the specific acts being
 5    enjoined, and even in the event that I'm specifically
 6    only asking for the federal court to enjoin King County
 7    Superior Court from enforcing a -- a void ab initio
 8    order --
 9              THE COURT:  Right.
10              MR. BENSHOOF:  -- is the Court's position
11    that, if I even mention the parties in there, that
12    somehow this oral also applies?  Is that the Court's
13    position?
14              THE COURT:  So, Mr. Benshoof, what you're
15    doing right now is asking me for an advisory opinion.
16    If I do ec- --
17              MR. BENSHOOF:  Oh, I'm asking you for the
18    terms --
19              THE COURT:  So let -- no.  No, no.  No,
20    no, Mr. -- Mr. Benshoof?
21              MR. BENSHOOF:  -- because the terms keep
22    changing --
23              THE COURT:  Mr. Benshoof?
24              MR. BENSHOOF:  -- Your Honor.
25              THE COURT:  You -- Mr. Benshoof, what
```

```
1   you're saying is if I, Mr. Benshoof, do something in

2   the future, am I going to be in violation of the

3   Court's order?  And the answer is, I don't know.  We'll

4   have to see.  I can't give you an advisory opinion.

5               MR. BENSHOOF:  That's -- objection.  Void

6   for vagueness.  I asked you a very specific question --

7               THE COURT:  Right.

8               MR. BENSHOOF:  -- about specific terms,

9   and you're playing word games.  So --

10              THE COURT:  No.

11              MR. BENSHOOF:  I object --

12              THE COURT:  What I'm tell- -- what I'm

13  telling you is the --

14              MR. BENSHOOF:  I note my objection for

15  appeal.

16              THE COURT:  That -- that's fine,

17  Mr. Benshoof.  What I'm telling you is I'm not allowed

18  to do the very thing that you're asking me to do.  I'm

19  not allowed to give advisory opinions.  I'm not allowed

20  to tell parties, if you do something in the future,

21  here's how it's going to play out.

22              MR. BENSHOOF:  I did not ask for advice.

23  I asked about the specific terms of what you're --

24              THE COURT:  Right.

25              MR. BENSHOOF:  -- alleging you have the
```

1   authority to do.  So I -- I note my objection for

2   appeal.  Thank you very much.

3               THE COURT:  All right, Mr. Benshoof.

4         Mr. Tracy, Mr. Russ, will you be able to

5   finalize the order?

6               MR. TRACY:  We -- we can, Your Honor.  One

7   more point of clarification on the drafting:  Does the

8   $250 per day per person apply to each lawsuit?  In

9   other words, it's four hundred -- it's $500 per day if

10  he does nothing, but if he files one motion, it'd be

11  250 per day?  Am I understanding that correctly?

12              THE COURT:  The 250 is intended to be the

13  total.  So if he only partially complies and he doesn't

14  comply in the other lawsuit, the -- the maximum is 250

15  per party per day.  And if he doesn't comply --

16              MR. TRACY:  Okay.  And --

17              THE COURT:  Or if -- if he doesn't comply

18  in both lawsuits, same thing:  250 per party per day.

19              MR. TRACY:  So there basically are two

20  conditions to compliance: motion in both lawsuits or

21  dismissal in both lawsuits?

22              THE COURT:  Correct.

23              MR. TRACY:   Am I understanding that?

24              THE COURT:  Yep.

25              MR. TRACY:  Okay.  Well, we'll -- we'll

1    write that up.

2                    THE COURT:  All right.

3           All right.  I do need to get to my next

4    matter.  I'll look for the order.  Once it's been

5    finalized, I'll get it entered.

6           That concludes this matter.  Thank you.

7               MR. TRACY:  Thank you, Your Honor.

8               MR. ADMON:  Thank you.

9

10                    (Transcription ends at 2:07 p.m.)

11                    (Recording ends at 2:07 p.m.)

12                    *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **TRANSCRIPTION CERTIFICATE**

2

3    I, ELEANOR J. MITCHELL, the undersigned Certified Court

4    Reporter in and for the State of Washington, do hereby

5    certify:

6    That the foregoing transcript was transcribed under my

7    direction; that the transcript is true and accurate to the

8    best of my knowledge and ability to hear the audio; that I am

9    not a relative or employee of any attorney or counsel employed

10    by the parties hereto; nor am I financially interested in the

11    event of the cause.

12

13    **WITNESS MY HAND and DIGITAL SIGNATURE** this 16th day of

14    May 2024.

15

16

17    ELEANOR J. MITCHELL, RPR
      Washington Certified Court Reporter, CCR 3006

18

19

20

21

22

23

24

25

**FILED**
KING COUNTY, WASHINGTON

MAR − 8 2022

SUPERIOR COURT CLERK

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

No. 22-0-12050-1

IN THE MATTER OF THE RESPONSE BY
KING COUNTY SUPERIOIR COURT TO THE
PUBLIC HEALTH EMERGENCY IN
WASHINGTON STATE

**EMERGENCY ORDER 36 RE:
PUBLIC HEALTH, RE: MASKING**

This matter comes before the Court on the public health emergency in Washington State. This Order is based upon the Washington State Supreme Court's February 19, 2021 Order. **All parties and persons are encouraged to monitor the King County Superior Court website at** https://www.kingcounty.gov/courts/superior-court.aspx **for updates.**

**The Court finds and concludes as follows:**

1. Covid cases, hospitalizations, and deaths have dropped precipitously in recent weeks from the extremely high levels of the Covid Omicron variant spike. Though numbers have fallen dramatically, on average there were 263 new cases in King County over the past seven days. This seven-day average of new cases exceeds the level of cases from the end of the Delta variant surge in November 2021.

2. On March 12, 2022, the State of Washington and King County will lift most indoor mask mandates.

3. Members of the public access indoor public spaces based on personal choice and on a voluntary basis. Examples include stores, restaurants, event venues, and gyms. But in many instances, courthouses are different.

Emergency Order 36 re: Public Health, Re: Masking
- 1 of 3

**1280**

4. Some persons come to the King County Superior Court voluntarily, but many others are required to come by need, by summons, by arrest, by subpoena, or other circumstances, or because their significant rights are at stake.

5. Some of these persons choose to be vaccinated and some do not. The Court must allow access to everyone who comes to court. The Court lacks the personnel to ask the general public who enter our courthouse locations whether they have been vaccinated.

6. During court proceedings, particularly in-person jury trials, it is common for large numbers of persons to gather in one courtroom.

7. The Court continues to consult with professors from the University of Washington, School of Public Health. The Court makes all final public health decisions with respect to the operation of the Court and the Courthouses.

**IT IS ORDERED:**

1. This order is effective March 12, 2022.

2. All persons over the age of three must wear a facial covering at all times regardless of vaccination status while in (i) courtrooms, or (ii) areas where court business is conducted with members of the public at the Maleng Regional Justice Center, the King County Courthouse, the Clark Children and Family Justice Center, or Harborview ITA Court. Masking signage will be posted accordingly.

3. In all other public areas of the Maleng Regional Justice Center, the King County Courthouse, the Clark Children and Family Justice Center, or Harborview ITA Court, all persons over the age of three are strongly encouraged, but not required, to wear a facial covering while in public areas of these court facilities.

4. Court employees who work in the Maleng Regional Justice Center, the King County Courthouse, the Clark Children and Family Justice Center, or Harborview

Emergency Order 36 re: Public Health, Re: Masking
- 2 of 3

**1281**

ITA Court are strongly encouraged, but not required, to wear facial coverings when in private court offices, chambers, or non-public areas.

5. This Order shall be subject to revision at any time as the public health situation changes.

This Order supersedes Emergency Order #32.

**IT IS SO ORDERED:**

Dated: March 8, 2022

JUDGE PATRICK OISHI
Presiding Judge

Emergency Order 36 re: Public Health, Re: Masking
- 3 of 3

Chief UFC Judge Aimee Sutton
December 30, 2024, 300pm

**With Oral Argument**

IN THE SUPERIOR COURT OF KING COUNTY
IN THE STATE OF WASHINGTON

| | |
|---|---|
| *In re:* | |
| JESSICA R. OWEN, | Case No. 21-5-00680-6 SEA |
| Petitioner, | |
| and | MOTION FOR ORDER TO SHOW CAUSE AND ORDER TO VACATE FINAL ORDERS |
| KURT A. BENSHOOF, | |
| Respondent. | CR 60(b)(3)(4)(5)(11) LFLR 5(e)(2) |

## I.    RELIEF REQUESTED

Alleged Respondent Kurt Benshoof ("Benshoof"), by Special Appearance and not generally, respectfully moves the Court for the following: (1) an Order to Show Cause requiring Jessica R. Owen ("Owen") to appear and show cause why the court should not grant Benshoof's Motion; and (2) an Order vacating all Final Orders dated October 21, 2022.

## II.    SWORN STATEMENT OF FACTS

Benshoof declares the following statements under penalty of perjury, averments to which Benshoof is prepared to testify under oath.    Benshoof

AND ORDER TO VACATE FINAL ORDERS
Page 1 of 20

22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

1283

incorporates by reference as if fully restated herein the following documents: (1) Declaration of A.R.W. (0077-0079); (2) Benshoof's writs of prohibition (0093-0149); (3) Benshoof's petition for writ of habeas corpus (0004-0019); and (4) Frank's Motion (Ex. 0266-0338).

1.     Benshoof has never spanked A.R.W. nor yelled at his son.

2.     A.R.W. stated his desire to live with Benshoof five days per week, as detailed in the Guardian ad Litem report, and that "he wants this case to be over." (Ex. 0203 ¶1)

3.     Between September 2022 and January 23, 2023, Benshoof and A.R.W. used the Discord messaging app to exercise their First Amendment right of familial association.  Benshoof sent his son funny memes to keep A.R.W. from killing himself. (Ex. #0088)

4.     On January 23, 2023, A.R.W. again ran away from Owen's house to return to Benshoof. (Ex. #0079 ¶42) When the police arrived at Benshoof's home, Ofc. Nathan Hughes refused to look at Benshoof's evidence of Owen's perjury, fraud, threats, kidnapping, extortion, and theft.  Police again forced A.R.W. to return to Owen's. (Ex. #0078 ¶¶43-44)

5.     On March 14, 2023, City prosecutor Katrina Outland ("Outland") filed eighty-nine (89) charges of "domestic violence" because Benshoof texted with A.R.W. and Outland obtained $250,000 warrant #990435958 from Judge Faye Chess.

MOTION FOR ORDER TO SHOW CAUSE
AND ORDER TO VACATE FINAL ORDERS
Page 2 of 20

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

1284

6.      Outland possessed evidence of texts from A.R.W. to Benshoof which evidenced that A.R.W.: (1) wants to escape Owen's house to be with Benshoof; (2) believes Owen is suffering from mental illness; (3) heard Owen and Lerman state their intent to extort Benshoof for $100,000; and (4) wants Benshoof to continue and expedite litigation against Owen and Lerman to facilitate A.R.W. returning home to Benshoof.  A.R.W. told his father, "Just keep hitting them." (Ex. #0085).

7.      On September 26, 2023, City attorneys were served with further proof of A.R.W.'s statements, all of which confirm Benshoof's sworn statements.   The affidavit of A.R.W. was signed before three adult witnesses on February 10, 2023. (Ex. #0077-0079)

## A.  SMC No. 671384 – Owen Perjury

### 1) Withholding of A.R.W.

8.      In her March 13, 2023, declaration, Owen claimed that she "had not been able to have any contact at all with [A.R.W.] for almost three weeks" between August 15, 2021, and September 3, 2021, and that Benshoof violated the twelve-year parenting agreement by causing "a total absence of communication between A.R.W. and me during that nearly three-week period…" (Ex. #0225 ¶1),

9.      During the prosecution's questioning of Owen on September 24, 2024, in SMC Case No. 671384 Owen testified that after Benshoof picked A.R.W. up from Owen's house on August 15, 2021, that Owen "didn't hear from [A.R.W.] for…you know…nineteen days."

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

**1285**

10.    Under cross examination by Benshoof on September 24, 2024, Owen admitted that she repeatedly communicated with A.R.W. between August 15, 2021, and September 3, 2021.  Owen testified that Benshoof "offered for me to come to [Benshoof's] house to…and explain…have a family meeting and explain why it was that I had been lying to our son and had chosen to harm him by getting him vaccinated.  And that's when I decided to go to the courts to get help."

11.    Under cross examination by Benshoof on September 24, 2024, Benshoof asked, "Earlier today, Ms. Owen, you acknowledged in testimony that you spoke to [A.R.W.] on or around August 21, [2021].  Do you recall that Ms. Owen?"  Owen replied, "I do."

### 2) *Physical Abuse of A.R.W.*

12.    In her March 13, 2023, declaration, Owen claimed, "I do not hit my son or believe in corporal punishment." (Ex. 0228 ¶1)

13.    Under cross examination by Benshoof on September 24, 2024, in SMC Case No. 671384, Owen was asked, "Did you ever spank our son?"  Owen testified, "Yes."

14.    Under cross examination by Benshoof on September 24, 2024, Benshoof asked Owen, "Did I ever spank our son?"  Owen replied, "No."

15.    Under cross examination by Benshoof on September 24, 2024, Owen was asked, "Did I ever yell at our son?"  Owen replied, "Yes."  Benshoof followed up by asking, "What time?  Name once, please."  Owen testified, "I don't recall the specific

MOTION FOR ORDER TO SHOW CAUSE
AND ORDER TO VACATE FINAL ORDERS
Page 4 of 20

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

**1286**

dates that you have yelled at our son." Benshoof then asked Owen, "When did I ever yell at our son? Please give one example." Owen testified, "I can't recall a specific time where you yelled at him."

### 3) Biological Father

16.    Under cross examination by Benshoof on September 24, 2024, Owen was asked, "Have you ever had any doubt since you discovered that you were pregnant in August of 2008 that our son was conceived in your bedroom on my birthday, July 18, 2008?" Owen replied, "Not really, no." Benshoof asked for clarification, "What was that?" Owen testified, "Unfortunately, no."

### 4) Acknowledgment of Fatherhood

17.    Under cross examination by Benshoof on September 24, 2024, Owen was asked, "Do you understand what a petition to decide parentage is?" Owen testified, "Yes, I do. We needed you to sign the birth certificate so that…it was as far as my lawyer understood it, it was a very ambiguous grey area where I acknowledged that you were the only person that I could have had a baby with at that time." Benshoof then asked, "How do you reconcile that with the fact that in your declaration in your petition to decide parentage you stated that you weren't sure if I was the father?" Owen testified, "I don't."

18.    In her September 2021 declaration and petition to decide parentage, Owen stated under penalty of perjury that Benshoof "has, at all times, refused to sign an Acknowledgement of Parentage or otherwise agree to legal recognition as a parent

MOTION FOR ORDER TO SHOW CAUSE
AND ORDER TO VACATE FINAL ORDERS
Page 5 of 20

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

1287

of [A.R.W.]" (Ex. #0059) and that many times since A.R.W. was born "Kurt has refused my requests that he sign an acknowledgement of parentage." (Ex. #0042 ¶5)

19.    Under cross examination by Benshoof on September 24, 2024, Owen was asked, "Did I text you on or about September 14, 2021, stating 'put me on [A.R.W.'s] birth certificate'?" Owen testified, "Yes, you did."

20.    On September 18, 2021, Benshoof texted Owen, "The fact that you refuse to amend [A.R.W.'s] birth certificate to reflect my legal name is prima facie evidence of your current and ongoing attempt to fraudulently assert sole legal custody of our child and deny me my parental rights to our son." Owen then blocked Benshoof's phone number.

21.    Under cross examination by Benshoof on September 24, 2024, Owen was asked, "You spoke of an acknowledgment of parentage, alleging that I refused to sign an acknowledgement of parentage. Can you tell me when you ever presented me with an acknowledgement of parentage to sign---ever?" Owen replied, "Multiple times. I don't have the exact dates.

22.    "Can you state a year that you presented an acknowledgement of parentage that I allegedly refused to sign?" Owen testified, "I know for sure that I presented it in the year our son was born [2009]." Benshoof then asked Owen, "Can you name a year after the year our son was born [2009] that you presented an acknowledgement of parentage to me that I refused to sign?" Owen testified, "No."

MOTION FOR ORDER TO SHOW CAUSE
AND ORDER TO VACATE FINAL ORDERS
Page 6 of 20

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

1288

### 5) *Father's Rights*

23.    Owen and Magalie Lerman ("Lerman") repeatedly claimed that Benshoof had no parental rights as the father of A.R.W.  In her Facebook post on September 6, 2021, Lerman stated that Benshoof had no "rights to my stepson even though he isn't on the birth certificate or any other legal documents." (Ex. #0256 ¶1)

24.    Lerman and Owen are not married or in a legal domestic partnership.  Benshoof is listed as the father on the birth certificate of A.R.W.  (Ex. #0264)

25.    Under cross examination by Benshoof on September 24, 2024, Owen was asked, "Were you the only one who thought that I had no rights to my son?  Did your partner, Magalie Lerman, also believe that I had no rights to my son?"  Owen testified, "I never believed that you had no rights to our son.  I still don't."

26.    Benshoof then stated, "For the record, you just stated under that that you've never said that I didn't have rights to my son.  Interestingly, you said exactly that---under oath---which I would like to present evidence [of] to the court."  Benshoof then presented Owen's September 2021 sworn statements from KCSC No. 21-5-00680-6 and asked Owen, "Can you read what it says?"  Owen read aloud, "Kurt currently has no legal right to any tie with my son whatsoever…his parenting rights do not exist and cannot be affected by a restraining order."

### 6) *Prostitution*

27.    On or around February 8, 2023, Owen stated under penalty of perjury during deposition by attorney Ann LoGerfo in KCSC No. 22-2-03826-8 that she quit

MOTION FOR ORDER TO SHOW CAUSE
AND ORDER TO VACATE FINAL ORDERS
Page 7 of 20

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

1289

prostituting in 2018.  On September 24, 2024, Owen testified that she was worked as a prostitute for the previous twenty years.

## B.  SMC No. 671384 - Ellis Perjury

### 1)  *Witness Interview*

28.    On September 3, 2024, Benshoof conducted a witness interview of SPD Det. Ryan Ellis at the Regional Justice Center with Outland and King County prosecutor Stephanie Brennan ("Brennan") present.

29.    Benshoof asked Ellis to cite the statute or court order which authorized Ellis to ignore the requirement to personally serve Benshoof the Final Orders and Weapons Surrender.  Ellis stated that he could not recall that statute or court order.  When Benshoof asked Outland and Brennan to cite the authorizing statute or court order, they refused to answer.

### 2)  *Trial Testimony*

30.    Under direct examination by Outland, Ellis claimed that on November 15, 2022, he legally served Benshoof the Final Restraining Order and Order to Surrender and Prohibit Weapons, and that he was authorized to ignore the explicit personal service requirement because the courts authorized him to serve Benshoof by email due to Covid.

31.    The Proof of Service filed by Ellis into KSCS No 21-5-00680-6 on November 15, 2022, stated: "***Important!***  *Do not use electronic service if your case*

MOTION FOR ORDER TO SHOW CAUSE
AND ORDER TO VACATE FINAL ORDERS
Page 8 of 20

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

**1290**

*involves the surrender of firearms…"* (Ex. #0244)  Ellis checked the box stating that

he served an Order to Surrender and Prohibit Weapons. (Ex. #0245),

32.    On cross-examination, Benshoof asked Ellis to cite the court order which

authorized Ellis to ignore the personal service requirement.  Ellis could not cite any

court order.

33.    Washington Supreme Court Order 25700-B-615 (4)(a) explicitly

required personal service involving weapons surrender (Ex. #0157), nor did King

County Superior Court Emergency Order #32 waive the requirement personal

service. (Ex. #0250-0252).

# III.  STATEMENT OF ISSUES

1.  **Is there irrefutable evidence of Owen's collateral and extrinsic fraud foundational to the instant case which requires granting relief from all orders granted in the instant case pursuant to CR 60(b)4?**

    Yes.

2.  **Does Owen's perjury and extrinsic fraud in Seattle Municipal Court constitute "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 59(b)?**

    Yes.  Proof of Owen's perjury occurred on September 24, 2024.

3.  **Do the interests of justice, the integrity of our courts, and the well-being of Benshoof's minor son require the granting of relief from all orders in accordance with CR 60(b)11?**

    Yes.

4.  **Was the Final Restraining Order void pursuant to CR 60(b)(5) and ripe for vacating because restraining orders issued under RCW 26.09 only apply in**

MOTION FOR ORDER TO SHOW CAUSE
AND ORDER TO VACATE FINAL ORDERS
Page 9 of 20

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

**dissolution actions and Benshoof and Owen were never parties to a marriage or dissolution action?**

Yes.  See *State v. Thomas*, 35 Wn.App. 598 (Wash. App. 1983)

# IV.   EVIDENCE RELIED UPON

Benshoof relies upon Exhibit pages 0001-0336.

# V.  AUTHORITY

## A.  Parenting Agreement at Common Law

34.    Owen repeatedly admitted the existence of the 12-year parenting agreement at Common Law between Owen and Benshoof.

35.    On August 21, 2021, Owen stated under penalty of perjury that "I have had a verbal agreement with Kurt that we split time with my son 50/50." (Ex. #0024).

36.    On March 13, 2024, Owen stated under penalty of perjury in her declaration in SMC Case No. 671384 that she and Benshoof had a "long-standing unwritten agreement to share custody of [A.R.W.] on an alternate-weeks basis." (Ex. #0222 ¶2).

37.    Upon Benshoof's information and belief, Outland helped prepare and file Owen's declaration to obtain a $250,000 warrant for Benshoof's arrest.  This arrest warrant was used by Ellis to obtain a general warrant enabling SPD SWAT to break into Benshoof's home church on July 3, 3024, based upon Owen's perjury and false statements to police, prosecutors, and judges.

MOTION FOR ORDER TO SHOW CAUSE
AND ORDER TO VACATE FINAL ORDERS
Page 10 of 20

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

**1292**

## B. Absence of Family Court Jurisdiction

### 1) No Domestic Relations

38.    Family courts are delegated limited statutory authority under RCW Title 26 to adjudicate issues in controversy involving *domestic relations*. "Domestic relations" between Benshoof and Owen ever existed, as they have never been parties to a marriage or legal domestic partnership.  (Ex. #0008-0012)

39.    "It is axiomatic that the statutory definition of the term excludes unstated meanings of that term. *Colautti* v. *Franklin*, 439 U.S. 379, 392, n. 10 (1979)." *Meese v. Keene*, 481 U.S. 465, 484-85 (1987) "As judges it is our duty to construe legislation as it is written, not as it might be read by a layman, or as it might be understood by someone who has not even read it." *Id.*

### 2) Owen Estopped

40.    Owen' sworn statements in KCSC Nos. 21-2-11149-8 and 21-5-00680-6 set forth that Benshoof: (1) *is* the biological father of A.R.W. (Ex. #0022), yet was *not* the biological father of A.R.W. (Ex. #0059); (2) *had lived* with A.R.W. since birth, yet had *never* lived with A.R.W. (Ex. #0059), and (3) Benshoof "had always insisted that A.R.W. was his" (Ex. #0042) and "acted as [A.R.W.'s] father for [A.R.W.'s] whole life (Ex. #0041), yet had *never* held out A.R.W. as his son (Ex. #0059).

41.    The doctrines of collateral and judicial estoppel precluded Owen making the foregoing inconsistent material statements of fact.

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

**1293**

42.     On August 21, 2021, Owen stated under penalty of perjury that she and Benshoof were: "parents of a child (Ex. #0021), and that A.R.W. was related to Benshoof as "his child" (Ex. #0022).

43.     On August 21, 2021, Owen stated under penalty of perjury that Benshoof "is currently preventing my son from speaking to me or coming home." (Ex. #0024).

### 3) No Justiciable Issue

44.     A.R.W. was twelve years old when Owen filed her petition to decide parentage in September 2021.

45.     Under RCW 26.26A.435(2), family court could not overcome Benshoof's presumption of fatherhood after A.R.W. turned four-years-old **unless** Benshoof (1) was not the genetic father of A.R.W.; (2) had never lived with A.R.W.; and (3) had never held A.R.W. out as his son. (Ex. #0011 ¶33)

46.     Owen's own sworn statements precluded family court's limited jurisdiction statutory authority to overcome Benshoof's presumption of fatherhood pursuant to RCW 26.26A.425.  Owen stated under penalty of perjury that Benshoof was not "already presumed to be a parent... by **holding out.**" (Ex. #0059 ¶8)

47.     Cliber and Owen brought a fraudulent parentage action.  Bringing a false suit at law or in equity violates RCW 9.12, and an attorney may be disbarred from practicing law.

MOTION FOR ORDER TO SHOW CAUSE
AND ORDER TO VACATE FINAL ORDERS
Page 12 of 20

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

1294

### 4) Orders Void ab initio

48.    Benshoof and Owen were never party to a dissolution of marriage or domestic partnership, legal separation, or declaration of invalidity.

49.    "In entering a decree of dissolution of marriage or domestic partnership, legal separation, or declaration of invalidity, the court shall determine the marital or domestic partnership status of the parties, make provision for a parenting plan for any minor child of the marriage or domestic partnership" and "make provision for any necessary continuing restraining orders." RCW 26.09.050(1) "RCW 26.09.050 authorizes a trial court to issue restraining orders in dissolution decrees." *State v. Wingard,* No. 21498-2-111, at 3 (Wash. App. 2004)

50.    A restraining order issued under RCW 26.09.060(1)(a) is limited to "a proceeding for: [d]issolution of marriage or domestic partnership, legal separation, or a declaration of invalidity."

> **"Affirmative words are often, in their operation, negative of other objects than those affirmed, and, in this case, a negative or exclusive sense must be given to them or they have no operation at all."**
> *Marbury v. Madison,* 5 U.S. 1 Cranch 137, 174 (1803)

51.    "By its terms, RCW 26.09.300 only applies in dissolution actions." *State v. Thomas*, 35 Wn. App. 598, 606 (Wash. Ct. App. 1983) *Expressio unius est exclusio arlterius.*

52.    Judgments must be dismissed, regardless of timeliness, if jurisdiction is deficient. *Mitchell v. Kitsap County*, 59 Wash. App. 177, 180-81, 797 P2d 516 (1990) (collateral challenge to jurisdiction of pro tem judge granting summary judgment

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

**1295**

properly raised on appeal) (citing *Allied Fidelity Ins. Co. v. Ruth*, 57 Wash.App. 783, 790, 790 P2d 206 (1990)); *Jaffe and Asher v. Van Brunt*, 158 F.R.D. 278 (S.D.N.Y.1994)

53.    Family court did not have jurisdiction to issue the orders on October 21, 2022.  "Jurisdiction is the power of the court to decide a given question.  Jurisdiction does not depend upon the way the question may be decided." *State v. Mackintosh,* 167 P.1090, 98 Wash. 438 (Wash. 1917)    Even a congressionally enacted "law repugnant to the constitution is void; and that courts, as well as other departments, are bound by that instrument." *Marbury v. Madison,* 5 U.S. 1 Cranch 137, 180 (1803)

### 5) *Fraud*

54.    Cliber suborned Owen's perjury to create the fraudulent pretense of family court jurisdiction when it had been known since August 2008 that Benshoof was the biological father of A.R.W.  "There is no question of the general doctrine that fraud vitiates the most solemn contracts, documents, and even judgments." *United States v. Throckmorton*, 98 U.S. 61, 64 (1878)

55.    The extrinsic and collateral fraud included Cliber suborning Owen's perjury to falsely assert that family court was statutorily authorized to adjudicate a petition to decide parentage, with Owen and Cliber  "purposely keeping [Benshoof] in ignorance of the [invalidity]" of the restraining orders.  *Burke v. Bladine,* 99 Wash. 383, 394 (1918) "Adopting the language of *Pico v. Cohn*, 91 Cal. 129, 25 Pac. 970, 27

MOTION FOR ORDER TO SHOW CAUSE
AND ORDER TO VACATE FINAL ORDERS
Page 14 of 20

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

1296

Pac. 537, 13 L.R.A. 336, 25 Am. St. Rep. 159.***In all such instances, the unsuccessful party is really prevented, by the fraudulent contrivances of his adversary, from having a trial[.]"

56.     The fraud perpetrated by Cliber and Owen rendered all orders issued by family court in case no. 21-5-00680-6 void.

### 6)  *Money Laundering*

57.     Cliber, Franklin-Bihary, and Russ all had an interest in concealing Owen's prostitution in order to avoid criminal liability for violating RCW 9A.83.020 by receiving payment from Owen's prostitution income, *supra* at ¶27.

## C.  Seattle Municipal Court Fraud

### 1)  *No Personal Jurisdiction*

58.     City prosecutor Katrina Outland ("Outland") ignored the statutory requirement for obtaining personal jurisdiction under RCW 35.20.270(1), refusing to provide evidence of compliance and legal service when Benshoof objected on the record.  (Ex. #0110)

> **"Execution of process and the performance of duty by constituted officers must not be thwarted. But these agents, servants of a government and a society whose existence and strength comes from these constitutional safeguards, are <u>serving law when they respect, not override, these guarantees.</u>"**
> *Miller v. United States*, 230 F.2d 486, 490 (5th Cir. 1956)

59.     "All criminal and civil process issuing out of courts created under this title shall be directed to the chief of police of the City served by the court and/or to

MOTION FOR ORDER TO SHOW CAUSE
AND ORDER TO VACATE FINAL ORDERS
Page 15 of 20

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

the sheriff of the county in which the court is held and/or the warrant officers and be by them executed according to law in any county of this state." RCW 35.20.270(1)

> ***A court has an "independent <u>obligation</u> to determine whether subject-matter jurisdiction exists, even when no party challenges it."***
> *Hertz Corp v. Friend,* 559 U.S. 77, 94 (2010)

60.    On December 27, 2023, Outland implicitly admitted the City's practice and widespread customs of violating 35.20.270(1) by mailing criminal summons. (Ex. #0161-153)

61.    By violating RCW 35.20.270(1), Seattle Municipal Court failed to obtain personal jurisdiction to prosecute Benshoof.  (Ex. #0090 ¶5; #0110 ¶¶4-7)

62.    When Benshoof challenged the City's practice and widespread custom of violating RCW 35.20.270(1) in KCSC No. 23-2-23752-8, the City claimed that RCW 2.04.190 authorized the City to ignore state law to claim jurisdiction.

63.    RCW 2.04.190 only authorizes "the supreme court, superior courts, and district courts of the state." "Under the Constitution, judges have power to say what the law is, not what it should be. The people who ratified the Constitution authorized courts to exercise "neither force nor will but merely judgment." The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton)" *Obergefell v. Hodges*, 576 U.S. 644, 686 (2015)

### 2)  No Subject Matter Jurisdiction

64.    Seattle Municipal Court is a court of limited jurisdiction.

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

65.     A King County family court protection order violation allegation "must be transferred" to superior court when a "superior court has exercised jurisdiction over a proceeding involving the parties." RCW 7.105.010(1)(a).  (Ex. #0090 ¶6; #0147 ¶4; #0148 ¶4)

66.     "If any tribunal finds absence of proof of jurisdiction over a person and subject matter, the case must be dismissed."  *Louisville R.R. v Motley,* 211 US 149, 29 S. Ct. 42 (1908)

67.     Under state law, only King County Superior Court would be authorized to hear allegations that Benshoof violated an allegedly valid family court restraining order issued in KCSC case no. 21-5-00680-6.

### 3) *Due Process Violations*

68.     When Benshoof demanded the City produce evidence before the court showing the City's compliance with RCW 35.20.270(1) and RCW 7.105.050(1), Benshoof was removed from the court by marshals.

69.     Benshoof was denied his right to call witnesses to testify and was prevented from appearing during jury selection and pre-trial motions, in violation of Wash. Const. art I § 10; 22.

70.     The Due Process Clause entitles a person to an impartial and disinterested tribunal. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of due process: the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

**1299**

individuals in the decision-making process. *Carey v. Piphus,* 435 U.S. 247, 259-262, 266-267 (1978)

71.     The foregoing prevented Benshoof "from presenting all of his case to the court." *United States v. Throckmorton*, 98 U.S. 61, 66 (1878)

## D.  Malicious Prosecutions

72.     The City was without personal or subject matter jurisdiction to proceed against Benshoof in Seattle Municipal Court.  It is a violation of RCW 9.62.010 for City officials to "maliciously and without probable cause therefor, cause or attempt to cause another to be arrested or proceeded against for any crime of which [Benshoof] is innocent."

## E.  Res Judicata Inapplicable

73.     There is abundant evidence to doubt the quality, extensiveness, and fairness of proceedings in Seattle Municipal and King County courts.  Benshoof has not had a full and fair opportunity in any court to expose Owen's ongoing fraud.

74.      "Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana v. United States,* supra, at 164, n.11, 99 S.Ct., at 979, n.11. Cf. *Gibson v. Berryhill,* 411 U.S. 564 (1973).  *Kremer v. Chem. Const. Corp.,* 456 U.S. 461, 480–81 (1982)

75.     We have previously recognized that the judicially created doctrine of collateral estoppel does not apply when the party against whom the earlier decision is asserted did not have a "full and fair opportunity" to litigate the claim *481 or issue,

MOTION FOR ORDER TO SHOW CAUSE
AND ORDER TO VACATE FINAL ORDERS
Page 18 of 20

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

**1300**

*Allen v. McCurry,* 449 U.S., at 95, 101 S.Ct., at 415; *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 328–329, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971). *Kremer* at 480-481.

76.    The primary exception to this general rule is that we do not give preclusive effect to judgments rendered in proceedings that fail to comply with the minimum standards of due process. In other words, the party against whom preclusion is urged must have had a "full and fair opportunity" to litigate his claim. See *Kremer,* 456 U.S. at 480–82. *Clements v. Airport Auth. of Washoe Cnty.,* 69 F.3d 321, 328 (9th Cir. 1995)

# VERIFICATION

I, Kurt Benshoof, do hereby declare that the foregoing is true and correct to the best of my knowledge under penalty of perjury in the State of Washington.  Executed this 2nd of December in the year 2024, in the city of Seattle, in the county of King, in the state of Washington.

This motion contains 4,168 words in compliance with LCR 7(b)(5)(B)(vi).

By:  _____/s/ Kurt A. Benshoof_____
Kurt Benshoof, Alleged Respondent

22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

MOTION FOR ORDER TO SHOW CAUSE
AND ORDER TO VACATE FINAL ORDERS
Page 19 of 20

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

**1301**

# CERTIFICATE OF SERVICE

Alleged Respondent Kurt Benshoof hereby certifies that on December 2, 2024, he did electronically file the foregoing Motion to Show Cause and to Vacate Final Orders with the Clerk of Court by using the e-filing system and by USPS certified mail to the address listed below:

**Petitioner Jessica R. Owen**
7511 Greenwood Ave N
#317
Seattle, WA 98103
Phone: (206) 427-6170

DATED:  December 2, 2024

Signed:   ___/s/ Kurt A. Benshoof_____
                Kurt Benshoof, Alleged Respondent

Kurt Benshoof, Alleged Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

**1302**

FILED
2024 DEC 20 12:20 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 21-5-00680-6 SEA

### Superior Court of Washington, County of King

| | |
|---|---|
| In re:<br><br>Petitioner/s *(person/s who started this case)*:<br><br>    JESSICA R. OWEN,<br><br><br>And Respondent/s *(other party/parties)*:<br><br>    KURT A. BENSHOOF. | No. **21-5-00680-6 SEA**<br><br>Responsive Declaration of Jessica R. Owen re Respondent's 2nd CR 60 Motion to Vacate (DCLR) |

## Responsive Declaration of Jessica R. Owen re Respondent's 2nd CR 60 Motion to Vacate

My name is JESSICA R. OWEN.  I am the Petitioner in the original Parentage case and the responding party in this, the 2nd CR60 motion brought by Respondent.

This motion is not properly before this court.  Kurt brought it in violation of both the *Order Restricting Abusive Litigation of Kurt Benshoof* issued on March 3 & 31, 2024 under KCSC #22-2-15958-8 SEA[1], and the *Order Denying Respondent's Motion to Vacate* issued on March 24, 2023 under this cause number: 21-5-00680-6 SEA.

**I REQUEST THAT** Kurt's CR60 motion be denied with prejudice, and that he be fined $5,00, found in contempt, and put in jail based on the terms of those orders.

**ALTERNATIVELY, i**f the Court does decide that Kurt's motion to vacate should be considered on its merits, I request a 60 day continuance to allow me time to secure counsel and

---

[1] The March 3, 2023 order was titled *Order Granting Defendants' Joint Motion for a Vexatious Litigant Order Against [Kurt Benshoof], and Temporary Order Restricting Abusive Litigation by Kurt Benshoof.* That order was made final on March 31, 2023 under the title *Order Restricting Abusive Litigation of Kurt Benshoof.*

Doc ID: a5bea2b67ba54c0c70298e38f840bb309a55a68d

prepare a substantive response to the 350+ pages of pleadings submitted by Kurt for this motion.

1) I originally filed this case on or about September 23, 2021. Over the following years, during and after completion of the case, Kurt engaged in astonishing amounts of abusive litigation.[2]

2) After not filing a Response to the Petition, and explicitly "withdrawing as Respondent" in this matter, Kurt was found in default on September 27, 2022. **Attachment A** 002-004.

3) Final orders in this Parentage action, including a five-year Restraining Order were entered on October 21, 2022. **Attachments B, C, & D** 005-010, 011-017, & 018-024.

4) On March 3, 2023, as part of a separate litigation initiated by Kurt (suing myself, my partner, my friend, *and* my former attorney) under KCSC #22-2-15958-8 SEA, Kurt was named a Vexatious Litigant and his ability to file new motions and actions was severely limited. **Attachment E** 025-032.

5) The original *Order Granting...[the] Vexatious Litigant Order* says, among other things, that Kurt is not allowed to initiate "any litigation whatsoever in any Superior Court in...Washington" against myself and the other defendants in that action. **Attachment E** on 028, section 4. Before he's allowed to do so, he has to apply for permission from Judge Ferguson. **Attachment E** on 028, section 5. It also says that if he fails to abide by the terms of that order, the Court may "*sua sponte*" find him in contempt, issue sanctions, and even impose jail time. **Attachment E** on 030, section 10.

6) On that same day (March 3, 2023), Kurt obtained an Order to Show Cause for his *first* CR 60 Motion to Vacate. **Attachment F** 033-035.

---

[2] A record of the extent of his abusive litigation during just that first year was filed by my former attorney on or about October 5, 2022 under the title *Vexatious Filings by Respondent*. I didn't include it here because it's hundreds of pages long.

Optional Form (05/2016)
**FL All Family 135**
Declaration
p. 2 of 5
**1304**

Doc ID: a5bea2b67ba54c0c70298e38f840bb309a55a68d

7) On March 24, 2023, Judge O'Donnell (then chief UFC) *denied* Kurt's Motion *with prejudice*. **Attachment G** on 038. In addition to denying with prejudice, Judge O'Donnell made explicit findings saying that the Parentage action was not improper and noted that Kurt removed *himself* from the process ahead of the Default. **Attachment G** on 038, ln 12-18. He also made it explicit that the CR60 motion was frivolous and imposed sanctions. **Attachment G** on 038, ln 22-32 & 46-48. He also made it explicit that Kurt is not allowed to initiate any further "Petitions, Motions, or other litigation under this cause number" consistent with the terms of Judge Ferguson's Vexatious Litigant order. **Attachment G** on 038, ln. 39-44.

8) On March 31, 2023, Judge Ferguson issued a full, five-year *Order Restricting Abusive Litigation of Kurt Benshoof*. **Attachment H** 041-050. The full Order adopted substantially the same restrictions and requirements as had the preliminary Temporary Order to that effect. **Attachment H** on 046-047. This included contempt and possible jail time as a sanction for violation of the order.

9) On March 1, 2024, Kurt was found in contempt for violating the *Order Restricting Abusive Litigation of Kurt Benshoof*. **Attachments I** on 052-057. He was financially penalized for it. **Attachments I** on 056. I don't expect to ever see that money.

10) On July 3, 2024, Kurt was arrested and put in jail on multiple charges of stalking, violating the restraining order, and many other criminal acts. He was held in custody until a little after his first trial.

11) On August 26, 2024, Kurt's appeal of the Vexatious Litigant Order was denied. **Attachment J** 058-072.

12) On September 27, 2024, after a trial at the Municipal Court, Kurt was found guilty of 81 criminal counts. Sentencing for these is set for January 2024.

13) Kurt is still set for trial at King County Superior Court on the pending felony charges against him.

---

Optional Form *(05/2016)*
**FL All Family 135**

Declaration
p. 3 of 5
**1305**

Doc ID: a5bea2b67ba54c0c70298e38f840bb309a55a68d

14) For some reason, on November 27, 2024, Kurt was released on home monitoring.

15) It was only days after his release before he filed this Motion to Vacate without any efforts to observe the filing restrictions set on him under the Vexatious Litigant order. In addition to this he has filed a motion for an order to show cause to vacate the vexatious litigant order and an order of dismissal in Judge Ferguson's court despite the fact that he has failed to file the Abusive Litigation Order's required leave motion in all three pending actions.

This Motion by Kurt isn't properly before the Court.  He is required by Judge Ferguson's *Order Restricting Abusive Litigation of Kurt Benshoof* to ask permission before filing anything against me.  He didn't include anything showing that Judge Ferguson had granted him that permission.  I feel certain he didn't ask.

In addition to denying Kurt's first CR 60 Motion *with prejudice*, Judge O'Donnell made it extremely clear that any future motions or petitions in this case were bound by the Vexatious Litigant Order.

This Court has already considered vacating the final orders in this case and declined to do so with prejudice.  This Motion shouldn't be considered by the Court because it's already been denied.

But Kurt also blatantly violated the *Order Restricting Abusive Litigation of Kurt Benshoof* by bringing this motion without asking Judge Ferguson for permission first.  This Motion isn't properly before the Court unless it has Judge Ferguson's go-ahead.

The whole point of restricting Kurt's abusive litigation was to protect me and the people who have helped me from having to deal with things exactly like this.  It's expensive, emotionally and mentally exhausting, and time consuming.  By simply responding to Kurt's innumerable and frivolous lawsuits I have incurred significant debt.  This was part of Kurt's intent when he began his abusive litigation in 2021.  I have received no relief, either, despite him being sanctioned in multiple courts.

Optional Form *(05/2016)*
FL All Family 135

Declaration
p. 4 of 5
**1306**

Doc ID: a5bea2b67ba54c0c70298e38f840bb309a55a68d

The *Order Restricting Abusive Litigation of Kurt Benshoof* gives the Court permission to find Kurt in Contempt.  It explicitly allows for penalties for contempt to include jail time.  He's already been found in contempt once and financially penalized.  Despite that, as soon as he got out of jail, *while being court monitored*, the first thing he did was file something new to harass me with.  In addition to the continual stress this has put on me financially and emotionally I also continue to fear for my safety and for the safety of people that have supported me through this arduous experience.

Financial penalties mean nothing to Kurt.  I beg the Court to not only deny his CR 60 Motion to Vacate, but to find him in contempt for bringing it in the first place, and to penalize him $5000 for doing so, along with ordering jail time.  I need the Court to help protect me from Kurt.

I declare under penalty of perjury under the laws of the state of Washington that the facts I have provided on this form (and any attachments) are true.

Signed on Date:    12 / 20 / 2024

JESSICA R. OWEN

*Warning!*  Documents filed with the court are available for anyone to see unless they are sealed.  Financial, medical, and confidential reports, as described in General Rule 22, **must** be sealed so they can only be seen by the court, the other party, and the lawyers in your case.  Seal those documents by filing them separately, using a *Sealed* cover sheet (form FL All Family 011, 012, or 013).  You may ask for an order to seal other documents

Optional Form *(05/2016)*
FL All Family 135

Declaration
p. 5 of 5

1307

Doc ID: a5bea2b67ba54c0c70298e38f840bb309a55a68d

FILED
2024 DEC 23 09:00 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 21-5-00680-6 SEA

Chief UFC Judge Aimee Sutton
December 30, 2024, 300pm
*With Oral Argument*

# IN THE SUPERIOR COURT OF KING COUNTY
# IN THE STATE OF WASHINGTON

| | |
|---|---|
| JESSICA R. OWEN, | Case No.  21-5-00680-6 SEA |
| Petitioner, | RESPONDENT'S REPLY TO |
| and | RESPONSE TO MOTION FOR ORDER TO VACATE |
| KURT A. BENSHOOF, | ORDERS AND JUDGMENTS |
| Respondent. | |

## I.    INTRODUCTION & RELIEF REQUESTED

Alleged Respondent Kurt Benshoof ("Benshoof") replies to Petitioner Jessica Owen's ("Owen") Declaration in Response (Document 275) to Benshoof's Motion to Vacate (Document 268).  As the only issue before the Court is Owen's perjury and extrinsic fraud, and because Owen did not even attempt to deny Benshoof's exhaustively detailed sworn allegations, Owen has tacitly admitted as true all the aforesaid allegations and the Court must grant Benshoof Motion to Vacate.

Without a scintilla of remorse for her perjury, fraud, and kidnapping of Benshoof's son, Owen continues to deceive the Court, hoping to unlawfully imprison

RESPONDENT'S REPLY RE: MOTION FOR
ORDER TO VACATE ORDERS & JUDGMENTS
KCSC No. 21-5-00680-6 SEA
Page 1 of 8

Kurt Benshoof, Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

Benshoof under the Order Restricting Abuse Litigation ("ORAL"), which she obtained through similar fraud and for which Benshoof is bringing a Motion to Vacate before Judge Ferguson, scheduled for January 24, 2025. (KCSC No. 22-2-15958-8)  Even if the ORAL had not been obtained by Owen's fraud, it is neither properly before the Court, nor does it prohibit Benshoof from filing a *motion* into an *existing* case.

Owen, by lying to cut off all contact between Benshoof and A.R.W. "created a danger of serious psychological damage to [A.R.W.]" *Marriage of Burrill*, 113 Wn. App. 863, 872 (Wash. Ct`. App. 2002)  Owen's callous premeditation and feigned parental concern were clear from the beginning, as she stated under oath on September 22, 2021 that she "hates what [separating A.R.W. from Benshoof] will do to A.R.W., who loves Kurt tremendously." (Respondent Exhibit #0047 ¶1; Document 258) Yet that is precisely what Owen has done to A.R.W. for more than three years.

## II.    SWORN STATEMENT OF FACTS

Benshoof declares the following statements under penalty of perjury, averments to which Benshoof is prepared to testify.

## A.  Tacit Admission of Perjury & Fraud

1.    Owen refused to refute Benshoof's offer of proof that Owen committed perjury in the instant case and Seattle Municipal Court. (Document No. 268, ¶¶1-33)

2.    Owen refused to refute Benshoof's offer of proof and argument that Owen perpetrated perjury and extrinsic fraud across multiple court cases to deny

RESPONDENT'S REPLY RE: MOTION FOR
ORDER TO VACATE ORDERS & JUDGMENTS
KCSC No. 21-5-00680-6 SEA
Page 2 of 8

Kurt Benshoof, Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

1309

Benshoof a full and fair opportunity to expose Owen's perjury and fraud. (Document No. 268, ¶¶54-56; 58-71)

3.    Upon Benshoof's information and belief, Owen's premeditation and feigned concern were clear from the beginning, as she stated under oath on September 22, 2021, that she "hates what [separating A.R.W. from Benshoof] will do to A.R.W., who loves Kurt tremendously." (Respondent Exhibit #0047 ¶1; Document 258)

4.    The Order Restricting Abusive Litigation by Kurt Benshoof ("ORAL") and Contempt Order were granted by Judge Marshall Ferguson in KCSC No. 22-2-15958-8, a court of general jurisdiction. (KCSC No. 22-2-15958-8: Document 189 and 319)

5.    The Contempt Order explicitly stated, "Although the [ORAL] is clear and unambiguous, the Court now clarifies, as guidance for Mr. Benshoof, that terms like "any and all future litigation"…in the [ORAL] include all claims, counterclaims, crossclaims, third party actions, and any other claims whatsoever brought by Mr. Benshoof…against the "Persons Covered by This Order"…" (Petitioner Exhibit #054; #8; Document 275)

# III.  STATEMENT OF ISSUES

**1. Did Owen refuse to deny the irrefutable evidence of collateral and extrinsic fraud foundational to this case which requires granting relief from all orders, pursuant to CR 60(b)4?**

Yes.  Owen refused to deny her perjury and fraud.

RESPONDENT'S REPLY RE: MOTION FOR
ORDER TO VACATE ORDERS & JUDGMENTS
KCSC No. 21-5-00680-6 SEA
Page 3 of 8

Kurt Benshoof, Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

1310

**2. Did Owen refuse to deny that her perjury and extrinsic fraud in Seattle Municipal Court constituted "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 59(b)?**

Yes.  Owen did not deny that proof of Owen's perjury occurred on September 24, 2024, which Benshoof could not have discovered earlier by due diligence.

## IV.   EVIDENCE RELIED UPON

Benshoof relies upon: (1) Respondent's Motion to Vacate Orders; (2) (Document 268) Respondent Exhibit pages 0001-0336 (Document 268).

## V.  AUTHORITY

### A.  Family Court Fraud

6.      Owen, by refusing to refute Benshoof's proof of Owen's perjury and extrinsic fraud, is deemed to have tacitly admitted her perjury and fraud.  "[T]he doctrine of estoppel by silence and acquiescence rest[s] upon the equitable maxim that, where a man has been silent when in conscience he should have spoken, he shall be barred from speaking when conscience requires him to be silent." *Boe v. Prentice Packing & Storage Co.*, 172 Wn. 514 (Wash. 1933) As the doctrine of equitable estoppel prohibits Owen from refuting the proof of her perjury and fraud, Owen has no defense to Benshoof's Motion to Vacate.

### B.  ORAL & Contempt Order

7.      Unable to deny her perjury and fraud, Owen's remaining ruse is to unrepentantly employ *ad hominem* and straw man arguments, attempting to

RESPONDENT'S REPLY RE: MOTION FOR
ORDER TO VACATE ORDERS & JUDGMENTS
KCSC No. 21-5-00680-6 SEA
Page 4 of 8

Kurt Benshoof, Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

1311

unlawfully imprison Benshoof by claiming that Benshoof violated orders Owen fraudulently obtained from Judge Ferguson. Aside from Owen's fresh attempts at fraud upon the Court, there are numerous problems with her ruse which render it moot.

8. The Contempt Order explicitly stated, "Although the [ORAL] is clear and unambiguous, the Court now clarifies, as guidance for Mr. Benshoof, that terms like "any and all future litigation"…in the [ORAL] include all claims, counterclaims, crossclaims, third party actions, and any other claims whatsoever brought by Mr. Benshoof…against the "Persons Covered by This Order"…" (Petitioner Exhibit #054; #8) Benshoof's Motion to Vacate is not a "claim, counterclaim, crossclaim, third party action, [or] any other *claim*." It is a *motion* filed into an *existing* case, not a newly filed lawsuit or petition.

9. Even if the ORAL had not been obtained through Owen's perjury and fraud, and even if Benshoof had filed a new lawsuit—a *claim*—against Owen, her request that this Court imprison Benshoof would be improper for several reasons. First, a motion for an order of contempt for an alleged violation of a court order must be brought before the issuing judge, which in Owen's imaginary scenario would be Judge Ferguson. Second, a show cause order would need to be filed by Owen. Third, Benshoof would be entitled under the Due Process Clause to a jury trial before an impartial judge to adjudicate such a contempt hearing.

RESPONDENT'S REPLY RE: MOTION FOR
ORDER TO VACATE ORDERS & JUDGMENTS
KCSC No. 21-5-00680-6 SEA
Page 5 of 8

Kurt Benshoof, Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

**1312**

## C. Delay Tactics

10.     Owen's request for a sixty (60) day continuance is unwarranted and prejudicial to Benshoof and A.R.W.  The absence of Owen's former family law attorney, Nathan Cliber ("Cliber"), is noteworthy.  Because Cliber has been caught red-handed suborning the perjury of Owen, Cliber has obviously concluded that it is better for him to remain silent and out-of-sight and be thought a corrupt and cretinous attorney, than to make an appearance and remove all doubt.  It goes without saying that, if Cliber **could** state **anything** in Owen's defense, he would have submitted a declaration with his typical prevarications.

11.     Similarly, Owen's current attorney in other cases, Blair Russ, has chosen not to appear for the same reasons that Cliber has gone MIA.  It is a reasonable conclusion that Owen cannot, and will not, find any attorney in Washington foolish enough to file an appearance and attempt to defend Owen's perjury and fraud: the indefensible is not defensible.

## D. Arrest

12.     As Owen raised the issue of imprisonment in her Response (Document 275, pg. 1 ¶3), it is worth noting that the Court is duly authorized to order Owen's immediate arrest, considering the irrefutable proof of her perjury, which is a class B felony pursuant to RCW 9A.72.020.

**RCW 9.72.090 Committal of witness—Detention of documents.**
Whenever it shall appear probable to a judge, magistrate, or other officer lawfully authorized to conduct any hearing, proceeding or investigation, that a person who has testified before such judge, magistrate, or officer has

RESPONDENT'S REPLY RE: MOTION FOR
ORDER TO VACATE ORDERS & JUDGMENTS
KCSC No. 21-5-00680-6 SEA
Page 6 of 8

Kurt Benshoof, Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

committed perjury in any testimony so given, or offered any false evidence, he or she may, by order or process for that purpose, immediately commit such person to jail or take a recognizance for such person's appearance to answer such charge. In such case such judge, magistrate, or officer may detain any book, paper, document, record or other instrument produced before him or her or direct it to be delivered to the prosecuting attorney.

## VERIFICATION

I, Kurt Benshoof, do hereby declare that the foregoing is true and correct to the best of my knowledge under penalty of perjury in the State of Washington.  Executed this 21st of December in the year 2024, in the city of Mountlake Terrace, in the county of Snohomish, in the state of Washington.

This motion contains 1,318 words in compliance with LCR 7(b)(5)(B)(vi).

By: _____/s/ Kurt A. Benshoof_____
Kurt Benshoof, Plaintiff

RESPONDENT'S REPLY RE: MOTION FOR
ORDER TO VACATE ORDERS & JUDGMENTS
KCSC No. 21-5-00680-6 SEA
Page 7 of 8

Kurt Benshoof, Respondent
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
Email: kurtbenshoof@gmail.com

**1314**

1
2

The Honorable Tana Lin
United States District Judge

3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10
11
12

KURT A. BENSHOOF, et al.

               Plaintiff,

v.

CITY OF SHORELINE, et al.,

               Defendants.

)
)
)
)
)
)
)
)
)
)

No. 2:24-cv-00343-TL

SHORELINE AND KING COUNTY
DEFENDANTS' OPPOSITION TO
EMERGENCY REQUEST TO STAY

*Noted for October 23, 2024*

13
14
15
16
17
18
19
20

      Plaintiff Benshoof filed this lawsuit on March 11, 2024. Dkt. 14.[1] Benshoof was granted in forma pauperis status. Dkt. 13. Defendants King County, Deputy Akers, and Thompson (hereinafter "King County Defendants") answered the complaint on May 31, 2024. Dkt. 27. Defendant City of Shoreline answered the complaint on July 1, 2024. Dkt. 46. Defendants Town & County Markets and Fagan filed a motion to dismiss pursuant to FRCP 12(b) that was renoted by this Court for September 30, 2024. Dkt. 43, 57. Defendant Shoreline and King County Defendants filed a motion to dismiss pursuant to FRCP 12(c) on August 30, 2024, which was noted for September 30, 2024. Dkt. 59.

21
22

      In July, Benshoof was arrested and remains in jail in King County pending various criminal charges in Seattle Municipal Court and King County Superior Court. Dkt 62. In an 11-page

23

---

[1] Plaintiff Gage has been dismissed from this lawsuit by this Court for failure to prosecute after she failed to respond to the Court's Order to Show Cause. Dkts. 56, 63.

SHORELINE AND KING COUNTY DEFENDANTS'
OPPOSITION TO EMERGENCY REQUEST FOR STAY
[No. 3:24-cv-00343-TL] - 1

**Leesa Manion (she/her)**
Prosecuting Attorney
CIVIL DIVISION, Litigation Section
701 5th Avenue, Suite 600
Seattle, Washington 98104
(206) 477-1120  Fax (206) 296-0191

1    handwritten motion citing legal authority, Benshoof moved to stay this matter indefinitely until he

2    is released from jail. *Id.*  Shoreline and King County Defendants opposed the stay, as did the other

3    defendants. Dkts. 64, 65. On October 2, 2024, Benshoof filed a new "emergency" motion to stay.

4    Dkt. 67.

5         While the new pleading purports to contain Benshoof's signature, it also purports to have

6    been drafted and is signed by a person named Urve Maggitti, who does not appear to be a licensed

7    attorney and apparently lives in Pennsylvania. Washington law prohibits the unauthorized practice

8    of law. Rev. Code of Wash. § 2.48.180. A person that prepares legal forms is practicing law. *State*

9    *v. Hunt*, 75 Wash. App. 795, 802, 880 P.2d 96 (1994).  Courts generally strike pleadings filed by

10   individuals engaged in the unauthorized practice of law. *See e.g. Seco v. Homestead Apartments*,

11   2024 WL 3566592, at *1 (W.D. Wash. July 29, 2024) (collecting cases). To the extent that the

12   emergency request to stay has been prepared and filed by a person not authorized to practice law,

13   it should be stricken.

14        To the extent that the emergency request can be considered to have been prepared and filed

15   by Benshoof himself, it should be denied for the reasons previously set forth in Shoreline and King

16   County Defendants' opposition to the previous motion to stay. An indefinite stay of the

17   proceedings would be prejudicial to the defendants and there is no basis to stay this lawsuit

18   indefinitely. Moreover, the emergency request primarily presents irrelevant arguments challenging

19   the state and municipal criminal charges currently pending against Benshoof. While the motion

20   states that Benshoof has no access to a computer, the internet or email, Benshoof has since filed a

21   notice of electronic registration with a new email address. Dkt. 68. Thus, it is unclear whether his

22   previous assertion that he has no access to a computer, internet or email remains true.

23

SHORELINE AND KING COUNTY DEFENDANTS'
OPPOSITION TO EMERGENCY REQUEST FOR STAY
[No. 3:24-cv-00343-TL] - 2

**1316**

Leesa Manion (she/her)
Prosecuting Attorney
CIVIL DIVISION, Litigation Section
701 5th Avenue, Suite 600
Seattle, Washington 98104
(206) 477-1120  Fax (206) 296-0191

1    This Court renoted Town and Country's motion to dismiss for September 30, giving

2    Benshoof an additional two months to respond. Benshoof has not requested any further reasonable

3    extension of time to respond. Benshoof has filed substantive pleadings in other federal civil cases

4    in that period. *See e.g. Benshoof v. Admon, et al.,* 2:23-cv-1392-JNW, Dkts. 262, 263; *Benshoof v.*

5    *Warden*, 2:24-cv-1110-JNW-SKV, Dkt. 20. Staying this case indefinitely is not warranted and

6    would prejudice Defendants' rights. Benshoof's emergency request for a stay should be denied.

7    *I certify that this Memorandum contains 570 words in compliance with Local Civil Rules.*

8    DATED this 16th day of October, 2024.

9                                    LEESA MANION (she/her)
                                     King County Prosecuting Attorney
10

11    By: _____

12    ANN SUMMERS, WSBA #21509
      Senior Deputy Prosecuting Attorney
      Attorneys for Defendants Shoreline & King County
13    701 5th Avenue, Suite 600
      Seattle, WA 98104
14    Phone: (206) 477-1120/Fax: (206) 296-0191
      ann.summers@kingcounty.gov

15

16

17

18

19

20

21

22

23

SHORELINE AND KING COUNTY DEFENDANTS'
OPPOSITION TO EMERGENCY REQUEST FOR STAY
[No. 3:24-cv-00343-TL] - 3

**1317**

Leesa Manion (she/her)
Prosecuting Attorney
CIVIL DIVISION, Litigation Section
701 5th Avenue, Suite 600
Seattle, Washington 98104
(206) 477-1120  Fax (206) 296-0191

1

## <u>CERTIFICATE OF FILING AND SERVICE</u>

2

I hereby certify that on October 16, 2024, I electronically filed the foregoing document

3

with the Clerk of the Court using the CM/ECF E-filing system which will send automatic

4

notification to the following:

5

Kurt A. Benshoof
kurtbenshoof1@gmail.com

6

***Pro Se Plaintiff***

7

I also hereby certify that on October 16, 2024, I sent the same via US Postal Service to the

8

following:

9

Kurt A. Benshoof
B/A 2024-008067

10

King County Correctional Facility
500 Fifth Ave.

11

Seattle, WA 98104

12

13

I declare under penalty of perjury under the laws of the United States of America and the

State of Washington that the foregoing is true and correct.

14

DATED this 16ᵗʰ day of October, 2024.

15

16

_____
RAFAEL A. MUNOZ-CINTRON

17

Paralegal I – Litigation Section

18

King County Prosecuting Attorney's Office

19

20

21

22

23

SHORELINE AND KING COUNTY DEFENDANTS'
OPPOSITION TO EMERGENCY REQUEST FOR STAY
[No. 3:24-cv-00343-TL] - 4

**1318**

**Leesa Manion (she/her)**
Prosecuting Attorney
CIVIL DIVISION, Litigation Section
701 5ᵗʰ Avenue, Suite 600
Seattle, Washington 98104
(206) 477-1120  Fax (206) 296-0191

Hon. James L. Robart

U.S. District Court
Western District of Washington

Kurt Benshoof, et al,

        Petitioner,

vs.

Warden, King County Jail,

        Respondent.

No. 2:24-cv-01110-JLR-SKV

Petition for Writ of
Habeas Corpus
28 USC § 2241

___ FILED ___ ENTERED
___ LODGED ___ RECEIVED

AUG 06 2024    RE

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

## I. Introduction

Petitioner Kurt Benshoof ("Benshoof") hereby petitions for a writ of habeas corpus ad subjiciendum pursuant to the common law and 28 U.S.C. §2241, challenging the pre-trial detention unlawfully perpetrated by King County and City of Seattle. See Dominguez V. Kernan, 906 F. 3d 1127, 1135 (9th Cir. 2018)

## II. Statement of Facts

1) Beginning in September 2020, King County ("County") and City of Seattle ("City") officials began enforcing retaliatory customs or widespread practices against Benshoof because Benshoof's religious beliefs proscribed being coerced to wear a face covering and proscribed allowing Benshoof's

NAWD 2:24-CV-01110-JLR-SKV

then twelve-year-old son, A.R.W., to be injected with an Emergency Use Authorization ("EUA") experimental ~~Bio~~ Pfizer BioNTech 16262 gene therapy treatment.

2) The City continues, almost FOUR YEARS LATER, to prosecute Benshoof for shopping at Puget Consumers Co-Op ("PCC") without a face covering, including $25,000 bail, in case no. 656748.

3) In August-September of 2021, City and County officials began aiding and abetting Jessica R. Owen and Magalie E. Lerman' in their violations of state and federal felony crimes.

4) Owen and Lerman kidnapped A.R.W. on September 3, 2021 and stole Benshoof's 2011 Toyota FJ Cruiser, Owen and Lerman then conspired to extort Benshoof of $19,000 for the return of his FJ Cruiser and to see A.R.W. again.

5) Owen then acted to conceal the aforesaid crimes by initiating KCSC No. 21-5-00690-6.

**1320**



**700 Broadway East**
**Seattle, WA, 98102**
**(206) 329-7445**

Terminal: 5146M600MIX03
8/6/2024 15:17
Receipt #: 51467RS1116
Type: Purchase

| Qty | Description | Amount |
|-----|-------------|--------|
| 18 | ES B&W S/S White 8.5 x11 | 3.96 |
| 18 | Self Serve Scan 8.5x11/14, 11x17 | 9.90 |

| | | |
|--|--|--|
| SubTotal | | 13.86 |
| District tax | | 0.21 |
| City tax | | 0.32 |
| County tax | | 0.00 |
| State tax | | 0.90 |
| Total | USD | $15.29 |

Acct #:************7210
VISA DEBIT
Chip Read
Auth No.: 054401
Mode: Issuer
AID: A0000000031010
NO CVM
CVM Result: 5F0002
TVR: 8000008000
IAD: 0601120360A000
TSI: 6800
ARC: 00
APPROVED

The Cardholder agrees to pay the Issuer
of the charge card in accordance with
the agreement between the Issuer and
the Cardholder.



## Tell us how we did and get $7 off your next purchase of $40 or more print products*

## Take the survey by scanning the QR code below or visit
## www.fedex.com/welisten



### Offer expires 6/30/2025

*Terms & Conditions
$7 off print order of $40.00 or more. Discount applies to orders placed in a FedEx Office® store or online through Office.FedEx.com. Offer is valid at time of purchase only, no cash value and may not be discounted or credited toward past or future purchases; discount cannot be used in combination with custom-bid orders, other coupons, or discounts, including account pricing. Discount not valid on the following products and services: finishing-only orders; digital, passport or mounted photo; self-service print, fax, scan, or shred; products provided by third party sites not hosted by FedEx Office. Does not apply to packing, shipping, rush, or delivery charges. Does not apply to retail products. No cash value. Offer void where prohibited or restricted by law. Products, services, and hours may vary by location. TM use promo SKU 40269 for Business Printing Services such as FPM. © 2023 FedEx. All rights reserved."

By submitting your project to FedEx Office or by making a purchase in a FedEx Office store, you agree to all FedEx Office terms and conditions, including limitations of liability.

Request a copy of our terms and conditions from a team member or visit **fedex.com/officeserviceterms** for details.

6) Family attorney Nathan L. Cliber suborned the perjury of Owen by making inconsistent material statements of fact under oath.

7) Between KCSC Nos. 21-2-11149-8SEA and 21-5-00680-6SEA, only four weeks apart, Owen stated under oath that: (1) A.R.W <u>was</u> related to Benshoof as his son, and <u>was not</u> Benshoof's son; (2) Benshoof <u>had</u> held out A.R.W. as his son for all twelve years of A.R.W.'s life, and <u>had never</u> held A.R.W. out as his son; and that Benshoof <u>had</u> lived with A.R.W. all twelve years, but <u>had not</u> lived with A.R.W. during all twelve years.

8) Despite the aforesaid perjury, Owen was allowed to proceed with her Petition to Decide Parentage, which was a ruse to obtain a restraining order against Benshoof to conceal and immunize Owen's and Lerman's kidnapping of A.R.W.

**1322**

9) King County Judge David Keenan denied Benshoof's repeated attempts to dismiss KCSC No. 21-5-00690-6, denied Benshoof's attempts to seek redress of Owen's perjury and kidnapping, and denied Benshoof's ability to even appear in court to confront Owen and Owen's perjury.

10) On October 21, 2022, Keenan granted Owen a void ab initio EX PARTE restraining order, allegedly criminalizing any contact between Benshoof and A.R.W.

11) The Final Restraining Order stated it "Ends in twelve months" or "Ends on September 28, 2027."

12) Benshoof moved to vacate the fraudulent KCSC No. 21-5-00690-6, moved for injunctions, petitioned for habeas relief, and sued the persons responsible for the ongoing kidnapping of A.R.W. including, but not limited to, Owen, Leman, Cliber, and Keenan in WAWD No. 2:23-cv-1392-JNW. (See Related Cases)

**1323**

13) A.R.W. repeatedly tried running away from Owen and Lerman, yet Seattle Police refused to act upon Benshoof's proof of Owen's perjury,

14) On July 6, 2022 and January 23, 2023, Seattle Police officers forced A.R.W. to leave Benshoof's home and return to Owen and Lerman.

15) On February 10, 2023, A.R.W. signed a power-of-attorney and declaration in front of three adult witnesses, explicitly authorizing Benshoof to seek redress on behalf of A.R.W. to end the ongoing kidnapping an child abuse of A.R.W. (See WAWD No. 2323-cv-1392-JNW, Docket # 13-2 pg 48-54)

16) A.R.W. confirmed that Owen had repeatedly lied to police and judges to kidnap A.R.W and to maliciously extort Benshoof, steal Benshoof's car, and defraud Benshoof of his equity ownership in this home, located at 1716 N. 128th St, Seattle, WA 98133.

**1324**

NAWD 2:24-cv-0110-JLR-SKV                    PAGE 5 OF 16

17) On or around November 16, 2022, the City attempted to prosecute Benshoof in Seattle Municipal Court ("SMC") No. 669329 for allegedly violating the void ab initio Final Restraining Order signed by Keenan on October 21, 2022.

18) Benshoof moved to dismiss via Special Appearance because the City had not obtained personal jurisdiction pursuant to RCW 35.20.270 ('), nor did the City have authority pursuant to RCW 7.105.050 (1)(a)(d).

19) Judge Willie Gregory ignored the City's absence of personal and subject matter jurisdiction and issued $10,000 bail.

20) On March 14, 2023, Judge Faye Chess acted without personal or subject matter jurisdiction, supra at 18, to grant a $250,000 arrest warrant upon the presentment of eighty-nine "domestic violence" charges from prosecutor Katrina Outland in SMC No. 671384.

21) Gregory, Chess and Outland are appellees in Ninth Circuit No. 24-4223.

22) On July 3, approximately fifteen SWAT detonated flashbang grenades at Benshoof's home church, located at 1716 N 128th Street, Seattle, WA 98133.

23) SWAT busted out numerous windows, shooting chemical weapons cannisters throughout Benshoof's home church and destroyed Benshoof's basement door.

24) SWAT also had a helicopter over Benshoof's home church and utilized drones and a robot inside Benshoof's home church, rendering his home church unlivable and unusable.

25) The alleged search warrant obtained by SPD Detective Ryan Ellis was obtained by Ellis knowingly and wilfully making false and misleading statements including, but not limited to, claiming that Benshoof had weapons inside his home.

26) Benshoof did not possess any weapons and had repeatedly provided Ellis sworn proof that Benshoof had surrendered any and all weapons.

27) Since July 3, 2024, Benshoof has been denied Pro Se materials and computer access, including paper, envelopes, stamps.

28) Since July 3, 2024, Benshoof has repeatedly attempted to report felony crimes as a victim witness and jail staff have stated Benshoof has no right to report felony crimes as a victim witness.

29) Jail staff have threatened to put Benshoof in the psyche ward for Benshoof attempting to dial 911 from the jail cell phone.

29) Since July 3, 2024, Benshoof has been denied ANY private phone calls with Benshoof's chosen counsel or advisors.

30) Since July 3, 2024, the City has been in possession of Benshoof's cell phones and computers without lawful authority.

31) Benshoof's phones and computers contain communications protected by attorney-client privilege, as well as evidence of crimes perpetrated by County and City officials over the previous four years.

**1327**

# III. Argument & Authority

32) Domestic relations exception does not apply. This petition in no way seeks a decree regarding child support or child custody pursuant to "domestic relations." See Ankenbrant v. Richards, 504 U.S. 689, 706-07 (1992)

33) Benshoof has the right to take testimony and determine facts de novo and is entitled to a plenary hearing. Townsend v. Sain, 372, U.S. 293, 311 (1963); Little v. Rhay, 509 P.2d, 8 Wn App 725, at 730 (Wash App. 1973).

34) Deference to KCSC No. 21-5-00680-6 is inapplicable "[b]ecause our review proceeds under §2241." Gouveia v. Espinda, 926 F.3d 1102, at 1111 (9th Cir. 2019)

35) Rooker-Feldman is inapplicable to this habeas petition. See Gouveia at 1108,

36) The custody of Benshoof does not bear the presumption of validity. Dominguez v. Kernan, 906 F.3d 1127 (9th Cir. 2018)

**1328**

37) § 2241 confers jurisdiction to the Court for any petition raising a double-jeopardy challenge to pending trials in State courts. "Habeas lies to enforce the right of personal liberty; when that right is denied and a person is confined, the federal court has the power to release him. Indeed, it has no other power... it can only act on the body of the petitioner." Gouveia v. Espinda, 926 F.3d 1102, 1109 (9th Cir, 2019) citing Fay v. Noia, 372 U.S. 391, 430-431 (1963) See also Harrison v. Gillespie, 640 F.3d 888, 896 (9th Cir 2011)(en banc).

38) King County and City of Seattle are violating the Double Jeopardy Clause by attempting to prosecute Benshoof for the same alleged crimes of Stalking and Evading a Police Officer.

39) The prosecutions by the City and County are malicious, in violation of RCW 9.62, as they a derivative of the perjury and fraud

perpetrated by Nathan Cliber suborning the perjury of Jessica Owen, including their collateral and extrinsic fraud through their initiating KCSC No. 21-5-00680-6. The malicious prosecutions of Benshoof violate the Fruits of The Poisonous Tree Doctrine.

40) The City and County have denied Benshoof his right to challenge the validity of Search Warrant SW 24-O-62121-3, which was used to break into Benshoof's home church, kidnap Benshoof under color of law, and unlawfully imprison Benshoof for more than FOUR WEEKS.

41) Without access to the search warrant application, Benshoof has been denied his right to an evidentiary hearing in which Benshoof would prove the falsity and reckless disregard for the truth perpetrated by Det. Ryan Ellis, ~~See United States v.~~ ~~Evans, 786 F.3d 779 (9th Cir.)~~ See Franks v. Delaware, 438 U.S. 154, at 171 (1978).

**1330**

42) King County and City officials cannot be trusted to police their own actions behind a veil of secrecy. KCSC No. SW 24-0-62121-3 has been sealed to the public for weeks. "Self scrutiny is a lofty ideal, but its exaltation reaches new heights if we expect a district attorney to prosecute himself or his associates for well-meaning violations of the search and seizure clause during a raid the District Attorney or his associates have ordered."

43) The assault upon Benshoof's home church constituted a violation of 18 U.S.C. § 247, and the kidnapping of Benshoof, in violation of 18 U.S.C. § 1201, may result in the death penalty under 18 U.S.C. § 247 (d)(1), for those found guilty.

44) King County Superior Court clerk, the clerks of all three divisions of the Washington Court of Appeals, and the Washington Supreme Court have all refused to docket the petition for habeas corpus filed by Benshoof's friend, Brett Fountain.

45) The refusals by King County officials to docket Brett Fountain's habeas petition constitute further violations of state law under RCW 7.36 and Wash. Const. art I § 13 and U.S. Const. art I § 9 cl. 2.

46) The City's ongoing "maskless shopping" prosecutions of Benshoof in SMC No. 656748 violate the Civil Rights Act of 1964 and numerous U.S. Supreme Court cases.

"It is the right to equal service in [public accommodations] and the right to be free of prosecution for asserting that right — not the right to have a trespass prosecution reversed — that the present prosecutions threaten," State of Georgia v. Rachel, 384 U.S. 780, 807 (1966)

See also Hamm v. City of Rock Hill, 379 U.S. 306 (1964)

47) The $500,000 bail by King County and approximately $360,000 by City of Seattle violate the Eighth Amendment to the United States Constitution. Benshoof is actually innocent of all charges and A.R.W. and Benshoof are the only actual victims of crimes being perpetrated by Jessica R. Owen, Magalie E. Lerman, and their accessories.

Petitioner Kurt Benshoof states the foregoing under penalty of perjury of the laws of United States this First day of August 2024 in the city of Seattle, the county of King, in the state of Washington.

Kurt A Benshoof
Kurt Benshoof, Petitioner Pro Se

~~6465~~ RELATED CASES.

US Supreme Court

    23-7523
    23-7607
    23A 933
    23-6090

9th Circuit Court of Appeals

    24-4394
    24-4223
    24-3765
    24-3053
    24-1958
    24-952
    23-35418

U.S. District Court Western Washington

    2:24-mc-0043-JNW
    2:24-cv-~~0382-JNW~~-00382-JNW
    2:24-cv-00343-TL
    2:24-cv-00808-JHC
    2:23-cv-1829-JNW
    2:23-cv-1392-JNW
    2:23-cv-00751-RAJ

Washington Court of Appeals

    86466-1-I
    86467-0-I  (consolidated case number)
    85092-0-I

**1334**

JAND 2:24-cv-01110-JLR-SKV     PAGE 15 OF 16

# RELATED CASES

KING COUNTY SUPERIOR COURT

24-1-02680-7

SW 24-0-62121-3

23-2-23749-8

23-2-23752-8

23-2-23761-7

23-2-23764-1

22-2-15958-8

22-2-11112-7

21-5-00680-6

21-2-11149-8

SEATTLE MUNICIPAL COURT

656927        669329        676463
662870        671384        676492
656748        675317
656749        675405
              676175
              676207
              676216

**1335**

Hon. James L. Robart

U.S. District Court
Western District of Washington

Kurt Benshoof, et al.
          Petitioner,

vs.

Warden, King County Jail,
          Respondent.

No. 2:24-cv-01110-JLR-SKV

PETIONER'S NOTICE OF
REFUSAL OF MAGISTRATE
JUDGE

LCR 73

FILED          ENTERED
LODGED          RECEIVED

AUG 06 2024                    RE

BY
AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

BE IT NOTED that Petitioner Kurt Benshoof
does not consent to a magistrate judge conducting
any portion of these proceedings under LCR 73.

Be it further noted that Respondent is denying
Benshoof envelopes, stamps, paper, a pencil
sharpener and computer access, nor will
Respondent certify the sum of money which
Petitioner has on his jail account for
his In Forma Pauperis application.

Signed this 1st day of August 2024.

Kurt A. Benshoof

NAND No. 2:24-cv-01110-JLR-SKV

**1336**

PAGE 1 OF 1

## CERTIFICATION OF FILING

The undersigned certifies under penalty of perjury under the laws of the United States that on this 6th day of August 2024, I, Molly Anderson, on behalf of Kurt Benshoof, filed a true and correct copy of the foregoing document with the court clerk of the U.S. District Court, Western District of Washington. The earliest date the foregoing document could be retrieved from Petitioner was the 5th day of August 2024 because Petitioner is incarcerated.

Molly Anderson

**1337**

No. 24-5188

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

*In re* Mr. KURT A. BENSHOOF,

*Petitioner-Appellant,*

v.

U.S. DISTRICT COURT FOR THE WESTERN
DISTRICT OF WASHINGTON, SEATTLE,

*Respondent,*

SEATTLE SCHOOL DISTRICT NO.1, *et al.,*

*Real Parties in Interest.*

---

CIRCUIT RULE 27-3 EMERGENCY MOTION FOR
PEREMPTORY WRIT OF INJUNCTION

---

*In re* WRIT OF HABEAS CORPUS
From United States Court for
The Western District of Washington

---

Kurt A. Benshoof, *pro se*
22701 42nd Place West
Mountlake Terrace, WA 98043
Phone: (425) 553-8112
kurtbenshoof@gmail.com

**1338**

## RELIEF SOUGHT

Appellant Kurt Benshoof ("Benshoof") respectfully requests that the Court mandate that District Court forthwith adjudicate Benshoof's Amended Petition for Writ of Habeas Corpus. Benshoof has been unlawfully imprisoned for more than five months, yet for the previous five months District Court has refused to: (1) forthwith award the writ; (2) issue an order directing the Warden to show cause why the writ should not be granted; or (3) dismiss the petition if it appears from the application that Benshoof is not entitled thereto, pursuant to 28 U.S.C. § 2243.

## ISSUES PRESENTED

Beginning in 2020, City of Seattle ("City") and King County ("County") officials retaliated in joint action with privates businesses against Benshoof because his religious beliefs proscribed him from being coerced to wear a face mask, and because Benshoof opposed having his (then) eleven-year-old son subjected to an ongoing Pfizer clinical trial for a gene therapy which was neither "safe" nor "effective" nor a "vaccine" pursuant to RCW 70.290.010(10). Despite retaliatory and malicious prosecutions in violation of the Civil Rights Act of 1964, Benshoof's beliefs

1

**1339**

remained firmly held.  When Benshoof sought redress of his grievances, the retaliation increased.  City and County officials acted in concert to render criminal assistance to the perjuring prostitutes who kidnapped Benshoof's son, stole his car, and conspired to indefinitely imprison him under color of law *for texting his own son.*

Unfortunately, the custom and widespread practice of Respondent has been to first gaslight the violations of Benshoof's rights by tautologically claiming federal domestic relations exception, despite no evidence before any court of: (1) family court jurisdiction; nor (2) "domestic relations" pursuant to RCW Title 26.  Similarly, Respondent asserted *Younger* abstention, claiming that the City had a compelling local interest in maliciously prosecuting Benshoof, despite no evidence that Seattle Municipal Court had obtained personal jurisdiction over Benshoof pursuant to RCW 35.20.270(1), nor was statutorily authorized to claim subject matter jurisdiction pursuant to RCW 7.105.050(1)(a)(d). When the gaslighting could not plausibly be supported by either facts or law, Respondent resorted to administrative nonfeasance: refusing adjudicate Benshoof's habeas petition for *five months and counting.*

The questions presented are:

2

**1340**

1.    Whether Respondent must be ordered to forthwith comply with 28 U.S.C. §2243, which states, "A court, justice or judge entertaining an application for a writ of habeas corpus shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled thereto."

2. Whether Respondent's refusal to comply with the statutory requirements of 28 U.S.C. §2243, *supra,* constitutes *administrative* nonfeasance, contradistinguished from a discretionary *judicial* act.

## PARTIES

Appellant Kurt A. Benshoof ("Benshoof") is reverend of a humble home church.  Benshoof was petitioner in the Supreme Court of the United States, was appellant in the Ninth Circuit Court of Appeals, was petitioner and is co-plaintiff in the United States District Court for the Western District of Washington, was petitioner in the Washington State Supreme Court, is appellant in the Washington State Court of Appeals, was plaintiff in King County Superior Court, and was defendant in

Seattle Municipal Court.

Respondent U.S. District Court was respondent in the Ninth Circuit Court of Appeals, Nos. 24-1958; 24-3053.

## JURISDICTION

Pursuant to FRAP 8(a)(2) and U.S.C. § 1651 the Court has jurisdiction to grant Benshoof injunctive relief.

Pursuant to 28 U.S.C. § 1291 this Court has jurisdiction to adjudicate federal questions involving constitutional violations of Benshoof's rights.

Pursuant to 28 U.S.C. § 1292 this Court has jurisdiction to adjudicate an interlocutory injunctive order directly related to the appealable issues in the instant case.

4

**1342**

# Table of Contents

PARTIES .................................................................................................. 3

JURISDICTION ....................................................................................... 4

TABLE OF AUTHORITIES ..................................................................... 6

STATEMENT OF THE CASE .................................................................. 9

  A. Background – Unlawful Imprisonment .............................................. 9
  B. Wash. Const. art I § 13 Suspended ................................................. 10
  C. U.S. Const. art. I § 9 Cl. 2 Suspended ........................................... 11
    1) *9th Circuit No. 24-4394* ............................................................ 11
    2) *District Court Habeas Petitions* .............................................. 12
  D. Moving In District Court Impracticable ......................................... 13

REASONS INJUNCTION SHOULD ISSUE ........................................... 13

I.   BENSHOOF WILL EVENTUALLY PREVAIL ON MERITS ................. 14

  A.  Prima Facia Case ......................................................................... 14
  B.  Supremacy Clause ........................................................................ 14
  C.  Equitable Right – 42 U.S.C. § 1983 .............................................. 15

II.  BENSHOOF SUFFERING IRREPARABLE HARM ............................. 16

  A.  First Amendment Violations ......................................................... 17
  B.  Due Process Violations Undeniable ............................................. 18

III.  INJURY TO BENSHOOF OUTWEIGHS RISK TO RESPONDENT ... 19

IV.  INJUNCTION NOT ADVERSE TO PUBLIC INTEREST .................... 22

V.   THE EQUITIES ENTIRELY FAVOR INJUNCTIVE RELIEF ............. 24

**1343**

# TABLE OF AUTHORITIES

## Cases

*Baird v. Bonta,*
        81 F.4th 1036 (9th Cir. 2023) ................................................................ 20

*Carey v. Piphus,*
        435 U.S. 247 (1978)) ................................................................ 18

*Citizens for Responsible Energy, Inc. v. NRC,*
        479 U.S. 1312 (1986) ................................................................ 12

*Elrod v. Burns,*
        427 U.S. 347 (1976) ................................................................ 16, 20

*Erickson v. Pardus,*
        551 U.S. 89 (2007) ................................................................ 14

*Ex Parte Young,*
        209 U.S. 123 (1908) ................................................................ 16

*Fellowship of Christian Athletes v. San Jose Sch. Dist. et al.,*
        No. 22-15827 (9th Cir. 2023) ................................................................ 17, 21

*First Pentecostal Church v. City of Holly Springs,*
        959 F.3d 669 (5th Cir. 2020) ................................................................ 18

*Fulton v. City of Philadelphia,*
        141 S.Ct. 1868 (2021) ................................................................ 17, 15

*Gomez v. Toledo,*
        446 U.S. 635 (1980) ................................................................ 14

*Gonzoales v. O Centro Espirita Beneficente Uniao do Vegetal,*
        546 U.S. 418 (2006) ................................................................ 14

*Harris v. Roderick,*
        126 F.3d 1189, 1199 (9th Cir. 1997) ................................................................ 19

*Little Sisters of the Poor Home v. Sebelius,*
        571 US 1171 (2014) ................................................................ 14

6

**1344**

*Mirabelli v. Olson,*
    2:23-cv-00768-BEN-WVG (S.D. Cal. Sep. 14, 2023) ...................................... 21

*Mitchum v. Foster,*
    407 U.S. 225 (1972) ........................................................................... 15, 23

*New York Times Co. v. United States,*
    403 U.S. 713 (1971) ................................................................................... 16

*Niken v. Holder,*
    556 U.S. 418 (2009) ................................................................................... 21

*Ohio Citizens for Responsible Energy, Inc. v. NRC,*
    479 U.S. 1312 (1986) ................................................................................. 13

*Parratt v. Taylor,*
    451 U.S. 527 (1981) ................................................................................... 14

*Puerto Rico Aqueduct Sewer Auth. v. Metcalf Eddy,*
    506 U.S. 139 (1993) ................................................................................... 16

*Riley's Am. Heritage Farms v. Elsasser,*
    32 F.4th 707 (9th Cir. 2022) ..................................................................... 21

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974) ................................................................................... 14

*Thomas v. Review Bd. of Ind. Employment Security Div.,*
    450 U.S. 707 (1981) ................................................................................... 18

*West Virginia State Board of Education. v. Barnette,*
    319 U.S. 624 (1943) ................................................................................... 17

## Constitutional Provisions

United States Constitution
    Art. I, § 9 Cl. 2 ........................................................................................ 20

United States Constitution
    Art. VI, Para. 2 ......................................................................................... 14

United States Constitution
    First Amendment ................................................................................ *passim*

United States Constitution
    Fourteenth Amendment ............................................................... *passim*

Washington State Constitution
    Art I, § 13 ......................................................................................... *passim*

Washington State Constitution
    Art IV, § 4 ........................................................................................ *passim*

Washington State Constitution
    Art IV, § 6 ........................................................................................ *passim*

## Federal Codes & Rules

United States Code, Title 28 § 1651 ........................................................... 13

United States Code, Title 28 § 2243 ........................................................... 18

## STATEMENT OF THE CASE

Benshoof's incorporates by reference as if fully restated herein his Amended Petition for Writ of Habeas Corpus ("Amended Habeas"), attached hereto as an exhibit for the Court's reference. (WAWD No. 2:24-cv-1110-JNW; Dkt. #23)

The perjury, fraud, kidnapping, and the rendering of criminal assistance by Counterclaim Defendants-Appellees, which was detailed in Benshoof's Amended Counterclaim (WAWD No. 2:23-cv-1829; Dkt. #32), was a direct and proximate cause of Benshoof's ongoing unlawful imprisonment for the previous five months.

## A. Background – Unlawful Imprisonment

After years of escalating discrimination and retaliation against Benshoof for the exercise of his religious beliefs and his forthright attempts to expose systemic corruption, thirty-five (35) Seattle police and SWAT and the King County Guardian One helicopter stormed Benshoof's home church with a facially invalid search warrant (Amended Habeas ¶¶60-89; 237-269) in a dawn raid on July 3, 2024. It was a concerted attempt to silence Benshoof by indefinitely imprisoning him and preventing him from litigating any of his state and federal lawsuits.

**1347**

After spending nearly five months in jail, the last three weeks of which were in solitary confinement where Benshoof was eventually denied access to even use a telephone, members of Benshoof's church freed Benshoof by posting the $420,000 bail. (Amended Habeas ¶122)

Finally able to write and file his own documents, Benshoof composed a 145 page Amended Petition for Writ of Habeas Corpus, filed on December 16, 2024. (WAWD No. 2:24-cv-1110-JNW; Dkt. #23) along with 640 pages of exhaustively cited exhibits. (*Id.,* Dkt. #23-1)

## B. Wash. Const. art I § 13 Suspended

Benshoof and his next friends repeatedly sought habeas relief in every level of state court. The King County Superior Court Clerk simply refused to docket one habeas petition, in violation of Wash. Const. art. I § 13 and art. IV § 6. (Amended Habeas ¶421) Incredulously, King County Superior Court Judge Suzanne Parisien claimed that Benshoof's next friends did not have the right to file a habeas petition on Benshoof's behalf while Benshoof was being imprisoned without paper, envelopes or postage, despite the Washington Constitution expressly stating otherwise. (Amended Habeas ¶203)

The Washington State Supreme Court Clerk effectively suspended Wash. Const. art. I § 13 and art. IV § 4 by converting the habeas petitions into "Personal Restraint Petitions." (Amended Habeas ¶¶205-206)   The Clerk pretended that the habeas petitions were brought under the court's *appellate* jurisdiction, as opposed to the court's *original* jurisdiction to challenge Benshoof's pre-trial detention.   Through this ruse, Benshoof was brought to trial before any Washington court would consider the unlawful pre-trial restraints upon his liberty.

## C.  U.S. Const. art. I § 9 Cl. 2 Suspended

### 1) *9th Circuit No. 24-4394*

After Benshoof was unlawfully imprisoned in King County jail on July 3, 2024, and denied paper, envelopes and postage with which to petition for habeas relief, Tate Prows ("Prows") filed a next friend habeas petition (9th Cir. No. 24-4394; DktEntry No. 1) pursuant to Fed.R.Civ.P. 17(c) because Prows had good cause to believe that a habeas petition to district court would be stonewalled.

9th Circuit Commissioner Lisa Fitzgerald exercised her authority under 28 U.S.C. § 2241(b) and transferred the petition to district court,

11

**1349**

not knowing that Respondent would refuse to adjudicate the petition for the next five months.  (*Id.*, DktEntry No. 4)

### 2) District Court Habeas Petitions

More than a week after Commissioner Fitzgerald transferred Prows' habeas petition, the district court finally docketed the petition on July 26, 2024.  (WAWD No. 2:24-cv-1110-JNW; Dkt. #4)

After Benshoof obtained scratch paper and a three-inch golf pencil, he wrote his own habeas petition in jail.  Though he was denied access to envelopes and postage, he handed his petition to a friend sitting in the gallery of Seattle Municipal Court on August 5, 2024.  Benshoof's friend then filed it on his behalf with the U.S. District Court Clerk on August 6, 2024.  (WAWD No. 2:24-cv-1110-JNW; Dkt. #7)

Another next friend of Benshoof's, Benny Blanchard ("Blanchard"), filed a habeas petition in district court which the Clerk "accidentally" docketed as a *miscellaneous* action. (WAWD No. 2:24-mc-00043-JNW.) As Prows and Blanchard had good cause to believe that district court officials were colluding to prevent any adjudication of the three federal habeas petitions, Blanchard filed a mandamus petition to compel

Respondent's performance of office to issue a writ of habeas corpus. (9th Cir. No.24-3765) Blanchard's mandamus was summarily dismissed.

## D. Moving In District Court Impracticable

Pursuant to the requirement of FRAP 8(a)(2)(A)(i), Benshoof has reason to believe and does believe that moving in the district court is not only impracticable but guaranteed to cause further irreparable harm to Benshoof through Respondent's continued nonfeasance. Respondent has been unresponsive to Benshoof's emails to chambers regarding the adjudication of his Amended Habeas.

## REASONS INJUNCTION SHOULD ISSUE

The All Writs Act, 28 U.S.C. § 1651(a), authorizes all courts established by an Act of Congress to issue an injunction when (1) the circumstances presented are "critical and exigent"; (2) the legal rights at issue are "indisputably clear"; and (3) injunctive relief is "necessary or appropriate in aid of the Court's jurisdiction." *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312 (1986) (Scalia, J., in chambers) (citations and alterations omitted). The Court also has discretion to issue an injunction "based on all the circumstances of the case," without its order "be[ing] construed as an expression of the Court's

views on the merits" of the underlying claim. *Little Sisters of the Poor Home for the Aged v. Sebelius*, 571 U.S. 1171 (2014)

## I.    Benshoof Will Eventually Prevail on Merits

### A. Prima Facia Case

The court must treat the complaint's factual matter as true and construe Benshoof's complaint in the light most favorable to Benshoof "even if doubtful in fact." See *Erickson vs. Pardus,* 551 U.S. 89 (2007); *Scheuer vs. Rhodes,* 416 U.S. 232, 236 (1974). To establish a prima facie case under 42 U.S.C. § 1983, plaintiffs must allege two elements: (1) the action occurred "under color of law" and (2) the action is a deprivation of a constitutional right or a federal statutory right. *Parratt vs. Taylor,* 451 U.S. 527, 535 (1981), *Gomez vs. Toledo,* 446 U.S. 635, 640 (1980); 22 see also, e.g., *Groman vs. Township of Manalapan,* 47 F.3d 628, 633 (3rd Cir. 1995).

### B. Supremacy Clause

"This Constitution, and the laws of the United States which shall be made in pursuance thereof," take precedence over Respondent's presumed authority to effectively suspend U.S. Const. art. I § 9 Cl. 2.

Respondent and "the *judges in every state shall be bound thereby."* United States Constitution, Article VI, Paragraph 2.

By refusing to adjudicate Benshoof's habeas petition for five months, Respondent is violating the First Amendment by denying Benshoof's right to petition for redress of his grievances, which is not justified by "interests of the highest order"—a so called, "compelling" interest—nor can it be argued that Respondent's nonfeasance is "narrowly tailored" to achieve those interests. *See Fulton v. CITY of Phila.*, 141 S. Ct. at 1881; *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429-30 (2006) (government bears the burden to satisfy strict scrutiny even at the preliminary injunction phase).

## C. Equitable Right – 42 U.S.C. § 1983

An Act of Congress, 42 U.S.C. § 1983, expressly authorizes a "suit in equity" to redress "the deprivation," under color of state law, "of any rights, privileges, or immunities secured by the Constitution…" *Mitchum v. Foster,* 407 U.S. 225, 226 (1972).

Applying *Ex parte Young* requires a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and

seeks relief properly characterized as prospective." *Puerto Rico Aqueduct Sewer Auth. v. Metcalf Eddy,* 506 U.S. 139 (1993)

> "The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the State, are clothed with some duty in regard to the enforcement of the laws of the State, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action."

*Ex parte Young,* 209 U.S. at 156

## II.    Benshoof Suffering Irreparable Harm

Benshoof has been subjected to unprecedented retaliation for over two years for telling the truth and trying to care for his son. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *New York Times Co. v. United States,* 403 U. S. 713 (1971); *Elrod v. Burns,* 427 U.S. 347 (1976)

As a direct and proximate result of the City's malicious prosecutions, unlawful imprisonment, and more than one million dollars in warrants and bail, Benshoof has been unable to see his son, hold church, work, drive, travel, or even go grocery shopping.  In concert, municipal, county, state, and federal law enforcement officers have

refused to even take Benshoof's complaints as a firsthand victim witness to countless felonies.

## A.  First Amendment Violations

Respondent has no compelling reason to abrogate Benshoof's right to petition for habeas relief, which seeks to arrest the violations of his right of familial association with A.R.W. and his right to freely exercise his religious beliefs. "[F]reedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 639 (1943)

"Nor may the government 'act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.'" *Fellowship of Christian Athletes*, 2023 WL 5946036, at *38 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S.Ct. 1719, 1731 (2018)).  "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Fulton* v. City of Philadelphia, 141 S.Ct. at

1876 (quoting *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 714 (1981)).

The widespread retaliation against Benshoof for the exercise of his religious is being perpetrated for one simple reason: corrupt public officials cannot tolerate an honest man exposing their malfeasance, misfeasance and nonfeasance. *See First Pentecostal Church of Holly Springs v. City of Holly Springs*, 959 F.3d 669, 670-71 (5th Cir. 2020) (Willett, J., concurring in grant of injunction pending appeal) ("Singling out [Benshoof for his religious beliefs]—and *only* [Benshoof], it seems— cannot possibly be squared with the First Amendment." (emphasis in original)); *see also S. Bay*, 140 S. Ct. at 1615.

## B. Due Process Violations Undeniable

The Due Process Clause entitles a person to an impartial and disinterested tribunal. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of due process: the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision-making process.[1]

---

[1] *See Carey v. Piphus*, 435 U.S. 247, 259–262, 266–267 (1978)

In September 2024, City prosecutors violated due process elements of a fair hearing, including Benshoof's right: (1) to be present during *voi dire*; (2) to call *any* witnesses in his defense; (3) to present exculpatory evidence in his defense; and (4) to be present in court during the testimony of the prosecution's witnesses.  In other words, prosecutorial and judicial misconduct so egregious that it would shock the conscience of citizens living in a banana republic or totalitarian regime.  Despite the foregoing facts, Respondent can be expected to continue rendering assistance to the City's due process violations until this Court grants Benshoof injunctive relief.

### III.   Injury to Benshoof Outweighs Risk to Respondent

Appellees, Respondent, and County and City officials have acted in parallel to set in motion a series of events by which Benshoof would be maliciously prosecuted and unlawfully imprisoned under color of law. "When [Appellees] conspired to construct a false story about the events that took place...they deliberately set in motion a series of events that they anticipated (or should have anticipated) would lead to [Benshoof's] arrest, and [ ] trial [ ]. Not only did [Appellees] set the events in motion but, according to the complaint, they voluntarily provided crucial

19

**1357**

information, false though it was, at every step of the proceeding." *Harris v. Roderick,* 126 F.3d 1189, 1199 (9th Cir. 1997)

While Benshoof is not currently behind bars after the $420,000 bail was posted after nearly five months in jail, he is currently imprisoned on electronic home detention, violating his liberty.

Enjoining Respondent to adjudicate Benshoof's Amended Habeas Petition poses no risk to Respondent or the public whatsoever. Denying Benshoof his right to petition for redress will continue inflicting irreparable harm on him and his minor son, A.R.W., who continues to be kidnapped by his perjuring abusers, Appellees Jessica Owen and Magalie Lerman. U.S. Const. art. I § 9 Cl. 2 states that "the privilege of the writ of habeas corpus cannot be suspended, except in cases of rebellion or invasion when public safety requires it." Respondent's refusal to adjudicate Benshoof's petition is a *de facto* suspension of U.S. Const. art. I § 9 Cl. 2.

"[A] finding that the plaintiff is likely to succeed on the merits of [a constitutional] claim sharply tilts in the plaintiff's favor both the irreparable harm factor and the merged public interest and balance of harms factors." *Baird v. Bonta,* 2023 U.S. App. LEXIS 23760, *15

(citations omitted). It is black letter law that the deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976); see also *Fellowship of Christian Athletes,* 2023 WL 5946036, at *56 (describing the principle as "axiomatic"). Moreover, "'irreparable harm is relatively easy to establish in a First Amendment case' because the party seeking the injunction 'need only demonstrate the existence of a colorable First Amendment claim.'" *Id. Mirabelli v. Olson, 3:23-cv-00768-BEN-WVG, 29-30 (S.D. Cal. Sep. 14, 2023)*

"[T]he public interest is always furthered by enjoining unconstitutional policies. *Riley's Am. Heritage Farms v. Elsasser,* 32 F.4th 707, 731 (9th Cir. 2022) ("it is always in the public interest to prevent the violation of a party's constitutional rights.") *Id.,* at 30. The Ninth Circuit evaluates "these factors on a sliding scale, such 'that a stronger showing of one element may offset a weaker showing of another.' When the balance of equities 'tips sharply in the plaintiff's favor,' the plaintiff must raise only 'serious questions' on the merits—a lesser showing than likelihood of success." *Fellowship of Christian Athletes v.*

*San Jose Unified School District et al, No.* 22-15827, 2023 WL 5946036,
at *35 (9th Cir. Sept. 13, 2023) (*en banc*) (citations omitted). *Id.,* at *5

### IV.   Injunction Not Adverse to Public Interest

Potential harm to Respondent and the public interest merge when
the government is the opposing party.  "Next, we turn to whether the
balance of the equities warrants an injunction and whether such relief is
in the public interest. Where the government is the opposing party, harm
to the opposing party and the public interest "merge." *Niken v Holder,*
556 U.S. 418, 435 (2009)

Mandating that Respondent act ***forthwith*** in compliance with 28
U.S.C. §2243 presents no risk to Respondent, nor the public interest.
Benshoof's Amended Habeas Petition is supported by facts and law under
penalty of perjury, and Respondent should issue the writ forthwith or
issue an order to show cause, compelling the Warden to make Return.
Alternatively, if Respondent truly believes that Benshoof's application is
without merit, Respondent should ***forthwith*** deny Benshoof's Amended
Petition.  None of the foregoing options present any risk to Respondent
or the public.

Respondent is faced with an uncomfortable predicament: Respondent's tautological assertions across multiple cases have finally been exposed by the Amended Habeas as sophomoric attempts to immunize Appellees from civil and criminal liability. Benshoof's prior petitions for redress were subjected to Respondent's *ispe dixit ipso facto* gaslighting. "Benshoof alleges Narver conspired with other Defendants to deny him equal protection of the law. Benshoof does not identify how Narver allegedly deprived him this constitutional guarantee. This unsupported, conclusory statement lacks merit and does not amount to a constitutional deprivation." (WAWD No. 2:23-cv-1829, Dkt. #66, pg. 12 ¶2) The chickens have now come home to roost. No one can now deny that family law attorney, Appellee Cliber, suborned the perjury of Appellee Owen in their extrinsic fraud to kidnap Benshoof's minor son under color of law *for more than three years.* (Amended Habeas, ¶¶30; 39; 41; 44; 150-175; 218; 226; 380; 383; 397; 398)

The public interest requires Respondent to comply with 28 U.S.C. §2243 so that public trust in the integrity and impartiality of our courts is not further eroded. No public interest exists in Respondent violating

the Due Process Clause of the Fourteenth Amendment by refusing to adjudicate Benshoof's petitions for habeas relief.

## V.   The Equities Entirely Favor Injunctive Relief

The immediate threat of escalating and irreparable harm to Benshoof is beyond rational dispute. Seattle Municipal Court is being "used to harass and injure [Benshoof], either because the state courts [are] powerless to stop deprivations or [are] in league with those who [are] bent upon abrogation of federally protected rights." *Mitchum v. Foster,* 407 U.S. 225, 240 (1972) If this Court does not enjoin Respondent from its ongoing nonfeasance, Benshoof will be simultaneously denied his right to habeas relief and his right to appeal a dismissal order.

## CERTIFICATE OF COMPLIANCE

This motion contains 3,212 words, in compliance with Fed.R.App.P. 27(d)(2)(A), excluding the items exempted by Fed.R.App.P. 32(f). The type size and typeface comply with Circuit Rule 27(d)(1)(D) and (E).

## VERIFICATION

I, Kurt A. Benshoof, do hereby declare that the foregoing facts are true and correct to the best of my knowledge, under penalty of perjury of the laws of the United States. Executed this twenty-sixth day of

December in the year 2024, in the city of Mountlake Terrace, in the county of Snohomish, in the state of Washington.

Kurt A. Benshoof, Petitioner, *pro se*

✗ I

## DISCIPLINARY CHECK LIST & STATEMENT APPEAR.

### Inmate or Witness Statement (917) 340-0561

☒ Statement of Inmate: Name: KURT BENSHOOF

☐ Statement of Inmate Witness: Name: _____  B/A: 2024-008067

2:23-CV-1392-JNW

☐ Other: ✻ INCORPORATE BY REFERENCE AS IF FULLY RESTATED HEREIN: SIXTH TRO AND CLAIM FOR DAMAGES.

Statement:
I AM BEING UNLAWFULLY IMPRISONED — RCW 9A.40.040 BY KING COUNTY AND CITY OF SEATTLE OFFICIALS UNDER COLOR OF LAW BY MALICIOUS PROSECUTION — RCW 9.62.010. STEPHANIE BRENNAN IS RENDERING CRIMINAL ASSISTANCE — RCW 9A.76.070 Class B felony — TO THE ON-GOING KIDNAPPING OF MY SON — RCW 9A.40.02 Class A felony — BEING PERPETRATED BY TWO PERJURING PROSTITUTES, JESSICA RAE OWEN DOB 11-23-1975 AND MAGALIE ELIZABETH LERMAN DOB 1-31-1986. I HAVE PROOF THAT SPD DETECTIVE RYAN G. ELLIS IS RENDERING CRIMINAL ASSISTANCE AS ELLIS PERJURED HIMSELF ON 9-25-2024 IN SMC NO. 671384. JESSICA OWEN PERJURED HERSELF ON 9-24-2024 IN THE SAME CASE — RCW 9A.72.020 Class B FELONY.

I HAVE PROOF THAT PROSECUTOR BRENNAN IS CONSPIRING WITH SEATTLE PROSECUTOR KATRINA OUTLAND IN A RICO ENTERPRISE — 18 USC §1962. ONE OF THE PREDICATE ACTS OF THE ONGOING RICO ENTERPRISE IS WITNESS & VICTIM RETALIATION — 18 USC §1512 (b).

DAJB PERSONNEL & THE KCPAO PERSONNEL ARE HINDERING AND DELAYING ME FROM PROVIDING EVIDENCE AND TESTIMONY OF FEDERAL FELONIES — 18 USC §§ 3; 4; 241; 242; 1512(b); 1201(g); 2113; et seq.

BY HINDERING ME FROM PROVIDING EVIDENCE & TESTIMONY TO A FEDERAL JUDGE, MAGISTRATE, OR LAW ENFORCEMENT OFFICER COUNTY & CITY OFFICIALS ARE VIOLATING 18 USC § 1512 (b)(3). I HAVE A RIGHT & A DUTY TO PROVIDE EVIDENCE AND TESTIMONY TO LAW ENFORCEMENT & THIS PUNISHMENT CONSTITUTES VIOLATION OF 18 USC § 1512(b)

Signed by: Kurt A. Benshoof   Date: 11/9/2024

☒Inmate; ☐Inmate Witness; ☐ Other (as indicated above)

☐ Inmate refused to participate in his/her hearing. This was witnessed by;

_Kurt A. Benshoof_   11/9/2024

Hearing Specialist Signature   and/or   Witness Signature   Date / Time

# THE SUPREME COURT
STATE OF WASHINGTON

**ERIN L. LENNON**
SUPREME COURT CLERK

**SARAH R. PENDLETON**
DEPUTY CLERK/
CHIEF STAFF ATTORNEY



TEMPLE OF JUSTICE
P.O. BOX 40929
OLYMPIA, WA 98504-0929

(360) 357-2077
e-mail: supreme@courts.wa.gov
www.courts.wa.gov

November 27, 2024

Kurt Alden Benshoof
BA# 2024-008067
Maleng Regional Justice Center
620 W. James Street
Kent WA 98032

Urve Maggitti  **(sent by e-mail only)**
58 E. Swedesford Road
Malvern, PA 19355

Re:    Petitions for Writ of Habeas Corpus on behalf of Kurt Benshoof

Kurt Benshoof and Urve Maggitti:

On November 26, 2024, this Court received two copies of a document titled "Petition for Writ of Habeas Corpus" from Urve Maggiti on behalf of Kurt Benshoof. Copies of the petitions are enclosed for Kurt Benshoof.

Review of the petitions discloses that they are primarily complaints alleging unlawful restraint. The Rules of Appellate Procedure (RAP) 16.3 through 16.15 establish a single procedure for obtaining relief <u>in the appellate courts</u> for an alleged unlawful restraint. That procedure is known as a personal restraint petition. **In the appellate courts the personal restraint petition procedure supersedes the petition for writ of habeas corpus procedure (and also other writ processes when it applies).**

The petitions did not include the required $250 filing fee. In the event you believe you are unable to pay the filing fee, I have enclosed a "Statement of Finances" form with which waiver of the filing fee may be requested (a statement of your total assets and liabilities should support any such request; see RAP 16.7(a)(4)).

To proceed with this case, please notify the Court in writing if you would like to proceed with the writ that will be treated as a personal restraint petition and transferred to the Court of Appeals and pay the $250 filing fee or submit a statement of finances form to request waiver of the filing fee. Until such time, the documents will be placed in unfiled papers without further action.

Sincerely,

Sarah R. Pendleton
Acting Supreme Court Clerk

**1365**

FILED
SUPREME COURT
STATE OF WASHINGTON
11/26/2024 8:00 AM
BY ERIN L. LENNON
CLERK

**King County Superior Court:**
**516 Third Avenue, Room C-203, Seattle, WA 98104**

**MELINDA YOUNG Chief, Criminal Judge - Superior Court**
King County Courthouse. 516 Third Ave Rm C-203, Seattle, WA 98104
**melinda.young@kingcounty.gov,  young.court@kingcounty.gov**
Primary Phone:  206-477-1361, Bailiff- Jennifer McBeth  (206) 477-1361

**SUZANNE R. PARISIEN Judge**
King County Superior Court, 16 Third Ave, C-203, Seattle, WA 98104
**parisien.court@kingcounty.gov,  suzanne.parisien@kingcounty.gov**
Phone: 206-477-1579  Bailiff: Julie Salle

# Petition for Writ of Habeas Corpus

**Wash. Const. Art. I §13 - The** privilege of the **writ of habeas corpus shall not be**
**suspended,** unless in case of rebellion or invasion the public safety requires it.

## IN RE: KURT BENSHOOF - BAIL PAID
## STILL INCARCERATED

Comes now the undersigned URVE MAGGITTI ("Applicant" and "Petitioner"), on behalf

of Kurt Benshoof ("Petitioner") and on behalf of herself as Guarantor of Bail Bond

("Petitioner") applying for a writ of habeas corpus from this Honorable Court, and asking

that it be issued without delay, as contemplated by Wash. Rev. Code §7.36, [1] and per the

---

[1] **RCW 7.36.010 Who may prosecute writ.**
Every person restrained of his or her liberty under any pretense whatever, may prosecute a
writ of habeas corpus to inquire into the cause of the restraint, and shall be delivered
therefrom when illegal.

Page 1 of 21

**1366**

concurrent guarantees of <u>Wash. Const. Art. I §13,</u> [2] <u>US Const. Art. I. Sec. 9 Cl. 2,</u>[3]
<u>Wash. Const. Art. I § 20</u>[4]

and <u>Wash. Const. Art. I § 14</u>[5], RCW 7.36.150, [6] RCW 7.36.160, [7] and RCW 7.36.230 [8],
stating in support:

On July 3, 2024, Petitioner Benshoof was unlawfully removed from the security of
home without due process and a lawfully Judicially signed search warrant for reasons not

---

[2] **Wash. Const. Art. 1 §13** The privilege of the writ of habeas corpus shall not be
suspended, unless in case of rebellion or invasion the public safety requires it.

[3] **US Const. Art. I, Sec. 9 Cl. 2** The Privilege of the Writ of Habeas Corpus shall not be
suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.

[4] **Wash. Const. Art. I § 20**
All persons charged with crime **shall be bailable by sufficient sureties,**
- except for capital offenses when the proof is evident, or the presumption great.
- Bail may be denied for offenses punishable by the possibility of life in prison upon a
  showing by clear and convincing evidence of a propensity for violence that creates a
  substantial likelihood of danger to the community or any persons, subject to such
  limitations as shall be determined by the legislature.

[5] **Wash. Const. Art. I § 14** EXCESSIVE BAIL, FINES AND PUNISHMENTS. Excessive
bail shall not be required, excessive fines imposed, nor cruel punishment inflicted.

[6] **RCW 7.36.150 Admission to bail or discharge—Duty of court.**
No person shall be discharged from an order of commitment issued by any judicial or peace
officer for want of bail, or in cases not bailable on account of any defect in the charge or
process, or for alleged want of probable cause; but in all cases the court or judge shall
summon the prosecuting witnesses, investigate the criminal charge, and discharge, admit
to bail or recommit the prisoner, as may be just and legal, and recognize witnesses when
proper. [Code 1881 s 678; 1877 p 140 s 681; 1869 p 157 s 618; 1854 s 213 s 446; RRS s
1076.]

[7] **RCW 7.36.160 Writ to admit prisoner to bail.**
The **writ** may be had for the purpose of **admitting a prisoner to bail** in civil and **criminal
actions**. When any person has an interest in the detention, and the prisoner shall not be
discharged until the person having such interest is notified. [Code 1881 s 679; 1877 p 140
s 682; 1869 p 158 s 619; 1854 p 214 s 447; RRS s 1077.]

[8] **RCW 7.36.230 Emergency acts on Sunday authorized.**
Any writ or process authorized by this chapter may be issued and served, in cases of
emergency, on Sunday. [Code 1881 s 686; 1877 p 141 s 690; 1869 p 159 s 626; 1854 p 214
s 454; RRS s 1084.] Superior court, issuance of habeas corpus on nonjudicial days: State
Constitution Art. 4 s 6 (Amendment 28).

in accord with Due Process.[9]

Petitioner Benshoof was subjected to excessive bail - totaling $750,000, which was reduced to $420,000 - for non violent court cases and upon information and belief a contempt charge- in violation of Washington Constitution Article I Section 14.

On November 10, 2024, Petitioner Benshoof has satisfied the conditions of release as per two active court orders issued by Seattle Municipal Court and by King County Superior Court. No superseding orders exist on the record.

Petitioner, Kurt Benshoof, is currently unlawfully restrained in his liberty "in violation of the Constitution of the United States or the Constitution or laws of the State of Washington." [10] Petitioner Benshoof is incarcerated in King County Correctional Facility, Seattle, despite having paid unconstitutionally excessive bail since November 10, 2024.

Petitioners, Urve Maggitti and Petitioner Kurt Benshoof ""raise a claim for which there was "no previous opportunity for judicial review, such as constitutional challenges to actions taken by prison officials," a petitioner is not required to make a threshold showing of prejudice. *Gentry* , 170 Wash.2d at 714-15, 245 P.3d 766. Rather, the petitioner must show the conditions or manner of restraint violate state law or the constitution. *Id* . at 715, 245 P.3d 766." *In re Williams,* 496 P.3d 289 (Wash. 2021)

## TIMELINE OF EVENTS
## BY WHOM AND WHERE PER RCW 7.36.040

1. July 5, 2024, Seattle Municipal Court judge Melanie Tratnik signed the "Conditions of Release" case Nos. 676175; 676463; 676492; 676216; 676207; 671384, upon following conditions:

   ☒ Bail set at **$25,000 each count for a total of $150,000.** Pursuant to CrRLJ 3.2, the Court has increased bail due to a substantial likelihood that the defendant will ☒ fail to appear  ☐ commit a violent crime  ☒ interfere with witnesses or administration of justice.

   ☒ Bail AND Electronic Monitoring

---

[9] State Constitutional Violation of Art. 1 Sec. 3, 7, and 14

[10] In re Williams, 496 P.3d 289 (Wash. 2021) , RAP 16.4(c)(6)

Electronic Monitoring is ordered with the following equipment (select all that apply)

☒ EHM   ☐ EHM with Breathalyzer   ☒ GPS with notification to Jessica Owens ☐ GPS Exclusive Zones:

☐ SCRAM ☐ BA/RT   ☐ SCRAM or BA/RT (per Sentinel)

As a condition of your release, you must comply with the following conditions:

☒   No criminal law violations

☒   Possess no weapons

☒   Surrender firearms   ☒   No contact with **Jessica Owens and A.R.W.**

☒   Other conditions: Abide by existing no contact order and King County Superior court Restraining Order (naming Jessica Owens and/or A.R.W. as protected parties)

☒   Appear on time at all future court hearings

☒   Stay in contact with your defense attorney

☒   Keep the court updated of all address/phone number changes.

See attached EXHIBIT A

2. August 6, 2024, King County Superior Court judge Melinda J. Young signed the "CONDITIONS OF RELEASE FOR DEFENDANT" case No. 24-1-02682 SEA upon following conditions:

IT IS HEREBY ORDERED that the above-named defendant shall be released from the King County jail on the following conditions until further order of the court:

☒ On execution of a surety bond or other surety or cash in the amount of $ $250,000    ☐ already posted

☐ On execution of a surety bond or other surety in the amount of $ _____ or on posting of cash in the amount of $ _____

☒ Electronic Home Monitoring (EHM) ☒ with GPS monitoring, and follow Conditions of Conduct ☒ if bond posted

☐ South King County Pretrial Assessment and Linkage Services (PALS) and follow Conditions of Conduct

☒ Have no contact, directly or indirectly in person, in writing, or by phone, personally or through another person, with Jessica Owen, Ms. Owen's children, and Magalie Lerman

☐ Above-named defendant is not to leave the State of Washington without specific approval by court order.

☒ On condition: No new law violations; keep address updated with the court; appear at all future court hearings pursuant to CrR 3.4; maintain contact with counsel; abide by all no contact orders.

In addition to the above conditions, the above-named defendant shall commit no crimes.

See attached EXHIBIT B

3. On November 10, 2024, bail bond was paid. See attached EXHIBIT C

4. On November 14, 2024, Kurt Benshoof signed power of attorney for bail bond, see attached EXHIBIT D

Page **4** of 21

**1369**

5. On November 15, 2024, bail bond was posted in Seattle Municipal Court. See attached EXHIBIT E

6. On November 18, 2024, bail bond was posted in King County Superior Court. See attached EXHIBIT D

7. On November 18, 2024, Seattle Municipal Court scheduled a Motion hearing on December 02, 2024, at 01:30 PM. See attached EXHIBIT F

8. On November 19, 2024, URVE MAGGITTI filed "Formal Request to Provide Proper Notification that Mr. Benshoof's Bail has Been Satisfied and Demand for IMMEDIATE RELEASE of Mr. Benshoof by 4:00 PM Tuesday, November 19, 2024" - fully incorporated herein by reference - by email to following people:

    Judgments - Superior Court
    Catherine Cornwall, Director and Superior Court Clerk
    Beth Freeman, Deputy Director
    Danielle Anderson , Court Services Division Manager
    Denise Fuseini_, Records Access Supervisor
    All City Bail Bonds
    King County Correctional Facility
    Legal Department: Pascal Erzer
    Sentinel
    Electronic Home Detention (EHD)
    Yolima (Yoli) Gerasimov, Administrative Specialist III
    John Markholt , EHD Corrections Supervisor
    Ed Carter, Acting Division Director Community Corrections Division
    Allen Nance, Director

Stating: "Bail in the amount of $420,000 was posted in full under the Benshoof [Kurt Benshoof, B/A 2024-008067, UCN# 10518097. 500 Fifth Ave., Seattle, WA 98104] case, King County Cause No. 24-1-02680-7 back on 14th of November, 2024.

Mr. Benshoof, however, remains in custody. After several attempts to identify justifiable cause for his continued incarceration, it has been concluded one of the primary causes is the failure of this department to notify Sentinel, the sole GPS Tracking Vendor King County works with that bail was satisfied.

Page **5** of **21**

**1370**

It is being formally demanded that notice that Mr. Benshoof has successfully satisfied the monetary requirements be included in the Court's Order to all parties requiring notice to ensure his immediate release from unconstitutional confinement.

Mr. Benshoof should have been released from confinement on the 14th of November. It is currently the 18th of November, 2024 and Mr. Benshoof, who has never committed or been convicted of any violent acts, remains in custody on the 11th floor of the King County Jail. The 11th floor is generally reserved for the worst of the worst and is commonly referred to as Ultra High Security...." See attached EXHIBIT G

9. On November 21, 2024, Kurt Benshoof signed " Conditions of Conduct" form. See attached EXHIBIT H

10. On November 21, 2024, URVE MAGGITTI filed formal "Demand for IMMEDIATE RELEASE of Mr. Benshoof from Unconstitutional detention and REQUEST FOR FORMAL INVESTIGATION"- fully incorporated herein by reference - by email to following people:

1. JUDGMENTS - SUPERIOR COURT
2. DEPARTMENT OF JUDICIAL ADMINISTRATION (DJA)
   Catherine Cornwall, Director and Superior Court Clerk
   Beth Freeman, Deputy Director
   Danielle Anderson , Court Services Division Manager
   Denise Fuseini , Records Access Supervisor
3. All City Bail Bonds: Cherokee Pierce, Troy Hansen
4. KING COUNTY CORRECTIONAL FACILITY: Legal Department: Pascal Erzer
5. SENTINEL OFFENDER SERVICES, LLC: Leo Carson
6. DEPARTMENT OF ENTERPRISE SERVICES
   Tara C. Smith, Director
   Jolene Haney
   Team Cypress G
7. DAJD - COMMUNITY CORRECTIONS DIVISION (CCD)
   Ed Carter, Acting Division Director Community Corrections Division
8. DAJD/CCD - ELECTRONIC HOME DETENTION
   Electronic Home Detention (EHD)
   John Markholt , EHD Corrections Supervisor
   Yolima (Yoli) Gerasimov, Administrative Specialist III
9. DEPARTMENT OF ADULT AND JUVENILE DETENTION (DAJD)

Allen Nance, Director
Steven Larsen, Deputy Director
Jennifer Albright, Deputy Director of Administration
Angela Simmons, Executive Secretary/Assistant II

10. DEPARTMENT OF CORRECTIONS
Cheryl Strange, Secretary

11. KING COUNTY PROSECUTING ATTORNEY'S OFFICE (PAO)
Leesa Manion, Prosecuting Attorney, CRIMINAL DIVISION W554
David Martin, Senior Deputy Prosecutor/ Chair Domestic Violence Unit
Stephanie R. Brennan, WSBA No. 48979

12. SEATTLE CITY ATTORNEY OFFICE
Ann Davison, Seattle City Attorney
Dan Shilling, Seattle City Attorney
Katrina Outland, Assistant City Attorney, WSBA #54342
Daniel H. O'Brien, City Prosecutor

13. KING COUNTY SUPERIOR COURT
Melinda J. Young, Chief, Criminal Judge
Suzanne R. Parisien, Judge

14. SEATTLE MUNICIPAL COURT
Magistrate Andrea Chin, King County Seattle Municipal Court
Judge Faye R. Chess, Presiding Judge King County Seattle Municipal Court

15. WASHINGTON STATE ATTORNEY GENERAL'S OFFICE
Robert W. Ferguson Attorney General of Washington
Joyce Bruce, Legislative Director
Purcell, Noah Guzzo (ATG)
Young, Alicia O. (ATG)
Rupert, Jeffrey G. (ATG)
Brionna Aho, Communications Director
WING LUKE CIVIL RIGHTS UNIT
Chalia Stallings-Ala'ilima, Assistant Attorney General
CONSUMER PROTECTION DIVISION

16. ANTITRUST DIVISION, **Antitrust Assistant Attorneys General**
Paula Pera
Holly Williams
Travis Kennedy

17. OFFICE OF THE GOVERNOR
Governor Jay Inslee
Kathryn Leathers, General Counsel
Joby Shimomura, Chief of Staff

Stating: "On Tuesday November 19, 2024, undersigned Urve Maggitti [2] [11] sent an email

---

[11] Guarantor of Bail Bond

requesting that the King County Superior Court notify Sentinel, the sole GPS Tracking Vendor King County works with that bail for Mr. Kurt Benshoof was satisfied. (See email thread below as EXHIBIT A).

Bail in the amount of $420,000 was posted in full under the Benshoof [Kurt Benshoof, B/A 2024-008067, UCN# 10518097. 500 Fifth Ave., Seattle, WA 98104] case, King County Cause No. 24-1-02680-7 back on 14th of November, 2024.

Mr. Benshoof, however, remains in custody.

To date no one has provided answers based on WA State Constitution, Law, or Rule-why Mr. Benshoof continues to be incarcerated, in violation of two existing court orders, from Seattle Municipal Court and King County Superior Court, both ordering release of Mr. Kurt Benshoof with electronic monitoring upon payment of bail.

It appears that the unconstitutional delay in processing Mr. Benshoof out on bail, as per court orders, *may* be caused by the King County Correctional Facility due to electronic monitoring requirement by two courts with separate jurisdictions.

### This email requires following answers:

1. Provide specific clause(s) in WA State Constitution, WA State Laws (RCW), WA State Rules (WAC), or any administrative rule, policy or custom that supports the continued unconstitutional detention of Mr. Benshoof after he had complied with the legal requirements set in existing Court Orders that are in full effect?

2. Under what authority are the Seattle Municipal Court, King County Superior Court, King County Correctional Facility, and/or any other agency or private contractor violating Mr. Kurt Benshoof right to bail based upon "contract" with any state, county, city funded agency and/or private commercial entity in violation **of RCW 19.86.020?**

3. Under what authority is any department, agency, contractor, violating existing court orders and condition of release that are in full effect and have not been superseded by any order on record?

4. Provide specific clause(s) in WA State Constitution, WA State Laws

Page **8** of **21**

**1373**

(RCW), WA State Rules (WAC) that prohibits Mr. Benshoof from having two (or hundred or more) different electronic monitoring devices?

## Mandatory Reporting of Crimes and Retaliation against Victim/Witness

Mr. Benshoof has reported Hate Crimes 8[12] against himself while incarcerated in prison since July 3, 2024, including reporting federal felonies committed against himself and his minor son. Benshoof has made the reports of such crimes via kite and via phone calls to numerous city, state, jail etc., officials, including over recorded line to Urve Maggitti.

Instead of mandatory reporting and protective action the King County/City of Seattle agents' have retaliated against Mr. Benshoof. 9 [13]

Mr. Benshoof, who has never committed or been convicted of any violent acts, has been and continues to be retaliated against by King County/City of Seattle agents', who as the latest form of retaliation have placed him onto 11th floor of the King County Jail, where he remains in custody as of this date. The 11th floor is generally reserved for the worst of the worst and is commonly referred to as Ultra High Security.

Under federal law, a person who knows that a felony crime occurred and remains quiet can potentially face criminal charges. The federal offense called "misprision of felony" **18 U.S.C. section 4. U.S.** 10[14] .

---

[12] 8 **RCW 9A.36.080. Hate crime offense-Definition and criminal penalty.**
https://apps.leg.wa.gov/rcw/default.aspx?cite=9A.36.080

**RCW 9A.36.078. Hate crime offenses - Finding.**
https://app.leg.wa.gov/rcw/default.aspx?cite=9A.36.078

**RCW 36.28A.030. Hate crime offenses - Information reporting and dissemination.**
https://apps.leg.wa.gov/RCW/default.aspx?cite=36.28A.030

**RCW 43.10.300. Hate crime advisory working group**
https://app.leg.wa.gov/RCW/default.aspx?cite=43.10.300

**RCW 43.10.305. Hate crimes and bias incidents hotline.**
https://app.leg.wa.gov/RCW /default.aspx?cite=43.10.305

[13] 9 **18 U.S. Code§ 1512 -Tampering with a witness, victim, or an informant.**
https://www.law.cornell.edu/uscode/text/18/1512

[14] **18 U.S.C. section 4. U.S.**

"When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning. *Meese v. Keene,* 481 U.S. 465, 484- 485 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term"); *Colautti v. Franklin,* 439 U.S., at 392-393, n. 10 ("As a rule, 'a definition which declares what a term "means" ... excludes any meaning that is not stated'"); *Western Union Telegraph Co. v. Lenroot,* 323 U.S. 490, 502 (1945); *Fox v. Standard Oil Co. of N J.,* 294 U.S. 87, 95-96 (1935) (Cardozo, J.); see also 2 A N. Singer, Sutherland on Statutes and Statutory Construction§ 47.07, p. 152, and n. 10 (5th ed. 1992) (collecting cases). That is to say, the statute, read "as a whole," post, at 998 ( Thomas, J., dissenting), leads the reader to a definition." ***Stenberg v. Carhart,*** **530 U.S. 914, 942-43 (2000)**

"Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them." ***Miranda v. Arizona,*** **384 U.S. 436, 491 (1966)**

***Pulliam v. Allen,*** **466 U.S. 522 (1984); 104 S. Ct. 1781, 1980, 1981,** and **1985.** In 1996,Congress passed a law to overcome this ruling which stated that judicial immunity doesn't exist; citizens can sue judges for prospective injunctive relief. "Our own experience is fully consistent with the common law's rejection of a rule of judicial immunity. We never have had a rule of absolute judicial immunity. At least seven circuits have indicated affirmatively that there is no immunity... to prevent irreparable injury to a citizen's constitutional rights..." **"Subsequent interpretations of the Civil Rights Act by this Court acknowledge Congress' intent to reach unconstitutional actions by all state and federal actors, including judges... The Fourteenth Amendment prohibits a state [federal] from denying any person [citizen] within its jurisdiction the equal protection under the laws. Since a State [or federal] acts only by its legislative, executive or judicial authorities, the constitutional provisions must be addressed to those authorities, including state** and federal **judges...**"We conclude that judicial immunity is not a bar to relief against a judicial officer acting in her [his] judicial capacity." "

### REQUEST FOR FORMAL INVESTIGATION
Page 10 of 21

Upon information and belief, multiple people are victims of:
RCW 19.86.020 11 [15]
18 U.S. Code § 1962 12 [16]
18 U.S.C.A. § 1512 - Tampering with witness, victim, or informant 13 [17]
18 U.S.C.A. §1513. Retaliating against a witness, victim, or an informant 14 [18]
18 U.S.C.A. § 241. Conspiracy against rights 15 [19]
18 U.S.C.A. § 242 Deprivation of rights under color of law 16 [20]

- All of which require immediate civil and criminal investigations by Washington State Attorney General's Office.

Therefore, this communication also serves as a formal request to Washington Governor's Office to authorize Washington State Attorney general to commence criminal investigation to all parties involved in the criminal conspiracy to commit RJCO and Civil Right's Violations against Kurt Benshoof, Urve Maggitti and all residents of Washington State and all consumers who do and have had to conduct business in the state of Washington in relation of bail bond matter(s), including under interstate commerce clause." See attached EXHIBIT I

11. Upon information and belief Kurt Benshoof was to be released on Friday November 23, 2024.

12. On Friday, November 22, 2024, the Court announced that it requires Petitioner Benshoof to appear before judge Suzanne R. Parisien in-person to sign the Code of Conduct, scheduled for Tuesday November 26, 2024, at 10:30 am at KCCH in Courtroom W-355, open to the public.

---

[15] **RCW 19.86.020 - Unfair competition, practices, declared unlawful.**
Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. [ **1961 c 216 s 2.**] **https://app.leg.wa.gov/rcw/default.aspx?cite=19.86.020**

[16] **18 U.S. Code § 1962.** Prohibited activities
[17] **18 U.S.C.A. § 1512.** Tampering with witness, victim, or informant
[18] **18 U.S.C.A. § 1513.** Retaliating against a witness, victim, or an informant
[19] **18 U.S.C.A. § 241.** Conspiracy against rights
[20] **18 U.S.C.A. § 242.** Deprivation of rights under color of law

Page 11 of 21

**1376**

13. On Friday November 22, 2024, Sentinel Electronic Home Monitoring Program Case Manager Julia Burnham filed in the Seattle Municipal Court following report:

"As of 11/22/2024 Sentinel has been unable to pick up Kurt Benshoof from King County Jail, due to another order from King County Superior Court. Currently Mr. Benshoof cannot be released to both EHD and Sentinel at the same time. Sentinel and other parties are currently waiting on additional court orders on whether he should be released to only EHD or Sentinel via King County Superior Court."   See attached EXHIBIT J

## **WHY WRIT MUST BE ISSUED IMMEDIATELY**

Petitioner Benshoof is unlawfully restrained under RAP 16.4. *In re Pers. Restraint of Gentry* , 170 Wash.2d 711, 715, 245 P.3d 766 (2010).

Petitioners, Urve Maggitti and Petitioner Kurt Benshoof ""raise a claim for which there was "no previous opportunity for judicial review, such as constitutional challenges to actions taken by prison officials," a petitioner is not required to make a threshold showing of prejudice. *Gentry* , 170 Wash.2d at 714-15, 245 P.3d 766. Rather, the petitioner must show the conditions or manner of restraint violate state law or the constitution. *Id* . at 715, 245 P.3d 766." *In re Williams,* 496 P.3d 289 (Wash. 2021)

A- It appears that Petitioner Benshoof is **unlawfully imprisoned due existence of private contracts** between the courts, state, and/or county and private Home Monitoring Programs, and/or other Washington State Taxpayer Funded Program(s)

B- By administrative **discretionary delay** announced **by judge Suzanne R. Parisien** on Friday, November 22, 2024, that the Court requires Mr. Benshoof to appear [21] before judge Parisien in-person to sign the Code of Conduct, despite the FACT that Petitioner Benshoof has signed the Code of Conduct on Thursday November 21, 2024!

---

[21] Scheduled for Tuesday November 26, 2024, at 10:30 am at KCCH in Courtroom W-355, open to the public

"The prestatehood prison system in Washington used private contract leasing and was, unsurprisingly, cruel. See id . at 489-90, 90 P.3d 42. In 1877" *In re Williams*

Washington State Supreme Court takes into account the history in interpreting Article II, Section 29 – "CONSTITUTION MANDATORY. *The provisions of this Constitution are mandatory, unless by express words they are declared to be otherwise."*

"See Yarbrough, 151 Wash.2d at 489-93, 90 P.3d 42. From it, we concluded that **Washington's founders intended** the provision, in part, **"to protect inmates from the cruelty of the lease system."** Id . at 485, 90 P.3d 42 ; see also Wash. Water Jet Workers Ass'n v. Yarbrough , 148 Wash.2d 403, 417, 61 P.3d 309 (2003) (noting the **drafters of Washington's constitution opposed the lease system and adopted article II, section 29 to address the "extensive reputation for brutality, corruption, and ineffectiveness that the contract system** of convict labor had in the Washington Territory and throughout the country"), aff'd in part and rev'd in part , 151 Wash.2d 470, 90 P.3d 42.4 **The drafters' decision to enshrine a prohibition on private contract leasing in Washington's constitution demonstrates this state's long-standing interest in providing some measure of protection against harsh conditions of confinement."** *In re Williams*

### *Continued Cruel And Unusual Punishment while bail has been paid*

Petitioner Benshoof has reported Hate Crimes against himself while incarcerated in prison since July 3, 2024, including reporting federal felonies committed against himself and his minor son. Benshoof has made the reports of such crimes via kite and via phone calls to numerous city, state, jail etc., officials, including over recorded line to Petitioner Urve Maggitti.

Petitioner Urve Maggitti has reported threats against Petitioner Benshoof's life and wellbeing made during his incarceration since July 3, 2024, to the jail, court, and prosecutorial authorities.

Instead of mandatory reporting and protective action the King County/City of Seattle agents' have retaliated against Mr. Benshoof.

Mr. Benshoof, who has never committed or been convicted of any violent acts, has been and continues to be retaliated against by King County/City of Seattle agents' –

Page **13** of **21**

**1378**

including jail officials, judges and prosecutorial teams in both City and County levels - who as the latest form of retaliation since November 9, 2024, have placed him onto 11th floor of the King County Jail, where he remains in custody as of this date.

Since November 24, 2024, Petitioner Benshoof has not allowed access to daily "proof of life" phone calls to Petitioner Urve Maggitti.

The 11th floor is generally reserved for the worst of the worst and is commonly referred to as Ultra High Security.

### *No state interest or local concern for continued incarceration exists.*

There is no state interest or local concern to violate Petitioners constitutionally protected rights to bail once the conditions set by existing two court orders have been fully complied by Petitioner. See *Gunwall* 106 Wash.2d at 62, 720 P.2d 808

"*Gunwall* clarifies that courts consider not just the particular constitutional provision but all statutory and case law related to the issue. 106 Wash.2d at 66, 720 P.2d 808 ; Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake , 150 Wash.2d 791, 809, 83 P.3d 419 (2004)." *In re Williams,* 496 P.3d 289 (Wash. 2021)

"Under article I, section 14, whether a condition of confinement is cruel does not depend on the subjective knowledge or intent of particular prison officials. Instead, the text and history of Washington law [496 P.3d 303] recognizes that the **State has a nondelegable obligation** to provide for the health, safety, and well-being of prisoners under its jurisdiction. "This is **a positive duty arising out of the special relationship that results when a custodian has complete control over a prisoner deprived of liberty**." Shea , 17 Wash. App. at 242, 562 P.2d 264." *In re Williams,* 496 P.3d 289 (Wash. 2021)

The administrative **discretionary delay** announced **by judge Suzanne R. Parisien** on Friday, November 22, 2024, that the Court requires Mr. Benshoof to appear [22] before judge Parisien in-person to sign the Code of Conduct, despite the FACT that Petitioner Benshoof has signed the Code of Conduct on Thursday November 21, 2024 – is yet another

---

[22] Scheduled for Tuesday November 26, 2024, at 10:30 am at KCCH in Courtroom W-355, open to the public

Page **14** of **21**

1379

BLATANT violation of Petitioner(s)' constitutionally protected rights.

### *This Honorable Court Is Authorized To Issue This Writ, And Has An Administrative Duty To Do So.*

"The privilege of the **writ of habeas corpus shall not be suspended,** unless in case of rebellion or invasion the public safety requires it." **Wash. Const. Art. I §13**

"Writs of habeas corpus may be granted by the supreme court, the court of appeals, or superior court, or by any judge of such courts, and upon application the writ shall be granted without delay." **Wash. Rev. Code § 7.36.04**

"The writ of habeas corpus commands general recognition as the essential remedy to safeguard a citizen against imprisonment by State or Nation in violation of his constitutional rights. To make this protection effective for unfettered prisoners without friends or funds, federal courts have long disregarded legalistic requirements in examining APPLICATIONS FOR THE WRIT AND JUDGED THE PAPERS BY THE SIMPLE STATUTORY TEST OF WHETHER FACTS ARE ALLEGED THAT ENTITLE THE APPLICANT TO RELIEF." Darr v. Byrford, 339 U.S. 200, 203-204 (1950).

**BY WHOM LIBERTY IS RESTRAINED, AND WHERE**

Petitioners move the Superior Court to ●rder service of this Writ per RCW § 736.060, to either the Sheriff of King County, Chief of Police for Seattle Police Force, or order the Sheriff of King County to deliver the writ, per RCW §736.070 to the appropriate Gaoler if neither aforementioned Parties are correct.

Page 15 of 21

Wherefore, Petitioners moves the Court to grant immediately and without delay this Writ of Habeas Corpus to determine why Petitioner Benshoof is being held unlawfully despite having complied with existing two court orders granting bail.

RESPECTFULLY SUBMITTED,

November 25, 2024

urve.maggitti@gmail.com

Kurt Benshoof, Plaintiff *pro se* [23]
1716 N 128th Street
Seattle, WA 98133
**King County Correctional Facility –
Seattle**[24]
B/A 2024-008067, UCN# 10518097
500 Fifth Ave., Seattle, WA 98104
Kurtbenshoofl@gmail.com
[no access to internet/email]

---

[23] See *Faretta v. California* and Section 35 of the **Judiciary Act of 1789, 1 Stat. 73, 92**
[24] Subject to change without notice, mail delivery [send/receive] not guaranteed.

## AFFIDAVIT

Petitioner KURT ALDEN BENSHOOF, has declared his intent that URVE MAGGITTI shall have the general authority to file Petitions for Writs of Habeas Corpus, Amicus Briefs, and Next Friend Petitions on his behalf into all of his legal actions[25]; therefore, KURT ALDEN BENSHOOF has designate URVE MAGGITTI as a "next friend" of his, and as one of his "assistance of counsel".    See attached EXHIBIT K

In 1975 in *Faretta v. California*, United States Supreme Court acknowledges an established historical fact: *"Section 35 of the Judiciary Act of 1789, 1 Stat. 73, 92, enacted by the First Congress and signed by President Washington one day before the Sixth Amendment *813 was proposed, provided that 'in all the courts of the United States, the parties may plead and manage their own **causes personally or by the assistance of such counsel . . . .' The right is currently codified in 28 U.S.C. s 1654 "[26]**

The Court quoted from Section 35 of the **Judiciary Act of 1789, 1 Stat. 73, 92** which states as follows:

"SEC. 35. And be it further enacted, **That in all courts** of the United States, the **parties may plead and manage their own causes <u>personally or by</u> <u>assistance of such counsel or attorneys at law</u>"** [27]

**Judiciary Act of 1789** was passed before ratification of the Sixth Amendment in the Bill of Rights in 1791. The drafters of the Sixth Amendment had deliberately removed the word ***attorneys at law*** from the Sixth Amendment, and substantially amended the language to read: ***"right to have the Assistance of Counsel."***

Signature: _____    Date: November 25 2024
                /URVE MAGGITTI /   urve.maggitti@gmail.com

---

[25] Next friend standing allows a third party to petition for habeas corpus on behalf of the real party in interest: the detainee. *Whitmore v. Arkansas, 495 U.S. 149, 162 (1990)* ("Most frequently, next friends appear in court on behalf of detained prisoners who are unable, usually because of mental incompetence or inaccessibility, to seek relief themselves."). Scott Harman-Heath, Unnamed & Uncharged: Next Friend Standing and the Anonymous Detainee, 11 Harv. Nat'l Sec. J. 420, 454 (2020)

[26] Faretta v. California, 422 U.S. 806, 812–13, 95 S. Ct. 2525, 2530, 45 L. Ed. 2d 562 (1975)

[27] "The Judiciary Act; September 24, 1789, 1 Stat. 73. An Act to Establish the Judicial Courts of the United States." "APPROVED , September 24, 1789." https://avalon.law.yale.edu/18th_century/judiciary_act.asp

Page 17 of 21

**1382**

## ACKNOWLEDGMENT
## AFFIDAVIT
### (Verification)

STATE OF PENNSYLVANIA  )
COUNTY OF CHESTER   )

I, Urve Maggitti, the undersigned Affiant hereto, do hereby declare under penalties of perjury under the laws of the Commonwealth of Pennsylvania and the United States of America, that the foregoing accounting of facts are true and correct to the best of my current knowledge and belief.

I am over the age of 18 years of age, am a resident of the Commonwealth of Pennsylvania, have personal knowledge of the matters of this affidavit, and am capable of making such affidavit.

Pursuant to 28 U.S. Code § 1746 (1) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _November / 25_ /2024.

Signed:_____
             Urve Maggitti

Notary as JURAT CERTIFICATE
State of Pennsylvania _____
BEFORE ME personally appeared Urve Maggitti who, being by me first duly sworn, executed the foregoing in my presence and stated to me that the facts alleged therein are true and correct according to her own personal knowledge.

_____

Notary Public,
My commission expires: 07/20/27

Commonwealth of Pennsylvania - Notary Seal
Ryan W. Graham, Notary Public
Montgomery County
My commission expires July 20, 2027
Commission number 1433473
Member, Pennsylvania Association of Notaries

Page 18 of 21

**1383**

## CERTIFICATE OF SERVICE

The foregoing writ of habeas corpus will be sent to following entities by email to the addresses listed below.

### KING COUNTY CORRECTIONAL FACILITY

Legal Department: **PASCAL ERZER**
Phone: 206-477-6223
Pascal.erzer@kingcounty.gov

### DEPARTMENT OF JUDICIAL ADMINISTRATION (DJA)

**CATHERINE CORNWALL, Director and Superior Court Clerk**
KCC-JA-0609516 , Third Ave Rm 609
Phone: 206-477-0777
Phone: 206-296-9300
Catherine.Cornwall@kingcounty.gov
**clerksofficecustomerservice@kingcounty.gov**

**BETH FREEMAN, Deputy Director**
Beth.Freeman@kingcounty.gov
Phone: 206-477-0800, KCC-JA-0609516 Third Ave Rm 609

### DEPARTMENT OF CORRECTIONS

**CHERYL STRANGE, Secretary**
360-725-8213
**doccorrespondence@doc1.wa.gov**

### KING COUNTY PROSECUTING ATTORNEY'S OFFICE (PAO)

**LEESA MANION, Prosecuting Attorney,** CRIMINAL DIVISION W554
King County Courthouse 516 Third Avenue Seattle, Washington 98104
(206) 477-3733, FAX (206) 296-9009
**Leesa.Manion@kingcounty.gov**

**DAVID MARTIN, Senior Deputy Prosecutor/ Chair Domestic Violence Unit** [28]
King County Prosecuting Attorney's Office (PAO)
King County Courthouse, 516 Third Avenue, W400, Seattle, WA 98104
PHONE: 206-477-1200
**david.martin@kingcounty.gov**

---

[28] https://www.americanbar.org/groups/domestic_violence/about-us/david-martin/
Page 19 of 21

**1384**

STEPHANIE R. BRENNAN, WSBA No. 48979
King County Prosecuting Attorney's Office (PAO)
State of Washington, Domestic Violence Unit, Seattle
W554 King County Courthouse, 516 Third Avenue, Seattle, WA 98104-2385
PHONE: (206) 296-9000,
stephanie.brennan@kingcounty.gov

**SEATTLE CITY ATTORNEY OFFICE**

**ANN DAVISON, Seattle City Attorney**
701 5th Ave., Suite 2050, Seattle, WA 98104-7097
Phone:  (206) 684-7757
Phone:  (206) 684-8200
**Ann.Davison@seattle.gov**
**SeattleCityAttorney@seattle.gov**
**Law_CityAttorney_Crim_NOA@seattle.gov**

**DAN SHILLING, Seattle City Attorney**
701 5th Ave., Suite 2050, Seattle, WA 98104-7097
Phone: : 206-684-8406,
**Dan.shilling@seattle.gov**

**KATRINA OUTLAND, Assistant City Attorney**, WSBA #54342
City of Seattle Attorney's Office
701 5th Ave., Suite 2050, Seattle, WA 98104-7097
Regional Domestic Violence
Firearms Enforcement Unit
Assistant City Prosecutor
Cell: 206-472-3696
Voicemail: 206-684-7756
**Katrina.Outland@seattle.gov**
**n-koutland@kingcounty.gov**
**SMC_1003@seattle.gov**

**DANIEL H. O'BRIEN, City Prosecutor**
The Seattle City, 701 Fifth Avenue, Suite 2050, Seattle, WA, 98104-7095
Phone: (206) 718-5062
FAX:206-684-4648
**daniel.o'brien@seattle.gov**

Page **20** of 21

**1385**

## KING COUNTY SUPERIOR COURT

**MELINDA J. YOUNG, Chief, Criminal Judge - Superior Court**
C/O King County Courthouse. 516 Third Ave Rm C-203, Seattle, WA 98104
Primary Phone:   206-477-1361
**young.court@kingcounty.gov**
Bailiff- Jennifer McBeth  (206) 477-1361

**SUZANNE R. PARISIEN, Judge**
c/o King County Superior Court, 16 Third Ave, C-203, Seattle, WA 98104
Phone: 206-477-1579
**parisien.court@kingcounty.gov**
**suzanne.parisien@kingcounty.gov**
Bailiff: Julie Salle Courtroom Number: W-355, Department: 42, Assignment: Criminal

## SEATTLE MUNICIPAL COURT

**Magistrate ANDREA CHIN, King County Seattle Municipal Court**
Seattle Justice Center, 600 5th Ave, Seattle, WA 98104-1900
Bailiff:  Nina Cohen - (206) 733-9339
Phone: (206) 684-8709
FAX: **(206) 615-0443**
FAX: **206-615-0446**
FAX: **(206) 615-0766**
**SMC_CTR_1003@seattle.gov**
**smc.publicsvcs@seattle.gov**
**andrea.chinsmc@seattle.gov**

**Judge FAYE R. CHESS, Presiding Judge** King County Seattle Municipal Court
600 Fifth Avenue, Seattle, WA 98124-1900
Phone: main: (206) 684-5600 - *(206) 684-5610*
Fax:  206-615-0446 (Courtroom 1103 fax #)
**smc_publicsvcs@seattle.gov**
**faye.chesssmc@seattle.gov**
Bailiff:  Lynn Milloy - (206) 615-0473

Page 21 of 21

# 1386

IN THE MUNICIPAL COURT OF THE
CITY OF SEATTLE, KING COUNTY WASHINGTON

| | |
|---|---|
| CITY OF SEATTLE,<br>    Plaintiff,<br><br>V.<br><br>Kurt A. Benshoof,<br>    Defendant. | CASE NO. 656748<br>        656749<br><br>MOTION TO DISMISS<br>MOTION TO VACATE |

## I. INTRODUCTION

The City of Seattle's malicious prosecutions
of alleged Defendant Kurt A. Benshoof ("Benshoof")
for shopping at PCC Community Markets sans
face covering in 2020 are stark reminders of
how the tyranny of a majority can discriminate against
and segregate those with minority beliefs if our
public officials shirk their delegated duty to
uphold our state and federal laws prohibiting
discrimination in places of public accommodation.

Washington was once a progressive
bastion of civil rights, enacting our Washington

656748/656749

**1387**

PAGE 1 OF 17

Laws Against Discrimination ("WLAD")
in 1949, fifteen years before the federal
government enacted the Civil Rights Act
of 1964. Unfortunately, no ignorance is
more blind than that of the virtue-sig-
naling self-righteous, nor more deaf.

## II. STATEMENT OF FACTS

1) Benshoof incorporates by reference as if
   fully restated herein the following docu-
   ments: (1) U.S. No. 23A933; (2) WAWD
   No. 2:23-cv-1392-JNW, Dkt #74; (3) SMC No.
   671384 Defendant's Frank's Hearing motion.

2) On September 4, 2024, Benshoof mailed
   his Notice of Removal to U.S. District Court
   for the Western District of Washington, which
   seeks to remove SMC No. 656748 to U.S.
   District Court pursuant to 28 U.S.C.§1443(1)
   and §1455, as well as to transfer Benshoof
   to federal custody under 28 U.S.C. § 1455(c).

3) Despite the court order from Judge Andrea
   Chin on September 3, 2024, King County
   Department of Adult & Juvenile Detention

656748/656749

("DAJD") personnel continue to refuse to provide Benshoof with office supplies and equipment to write and mail briefs.

4) City of Seattle allegedly arraigned Benshoof in SMC No. 656748 on November 27, 2020.

5) On November 27, 2020, Judge Mary Lynch denied Benshoof's right to enter the courtroom or speak under threat of arrest.

6) On November 27, 2020 Judge Lynch granted a continuance of SMC No. 656927 until April 6, 2021. However, SMC No. 656748 and SMC No. 656749 were not joined to 656927, and no continuance of SMC Nos. 656748 or 656749 were motioned for, nor granted by Judge Lynch.

7) To date, the City of Seattle ("City") has refused to make its witnesses available for witness interviews, including SPD Ofc. Terry Whalen #6879, Ofc. Richard Lima #7760, Ofc. Jonathan Kiehn #6904, and PCC employees Tyler Goslin and Steve Mitchell.

656748/656749

**1389**

PAGE 3 OF 17

8) On July 3, 2024 more than twenty (20) SPD SWAT busted out the windows of Benshoof's home church by shooting chemical weapons cannisters, believed to be Olesoresin Capsicum aerosol ("OC" or "pepper spray.") SPD posted a sign outside the door of Benshoof's home church warning of the danger to anyone entering.

9) Professional estimates to clean the OC contamination from Benshoof's home church range from $80,000 - $100,000. Benshoof is indigent,

10) Benshoof is being held on $25,000 bail for SMC NO. 656748 and $20,000 bail for SMC No. 656749.

11) To date, the City has not complied with Benshoof's discovery requests for SPD officer body worn video, in car camera video, 911 calls, PCC in store surveillance video, nor the Office of Inspector General 2022 report on officer mask wearing compliance, nor the SPD policy manual.

656748/656749

**1390**

PAGE 4 OF 17

12) The City continues to withhold Benshoof's papers and effects which SPD seized on July 3, 2024. Contained on his computers and iPhone are video evidence of the alleged incidents, as well as other evidence which Benshoof believes to be exculpatory.

## III. ARGUMENT AND AUTHORITY

The police report written by SPD Ofc. Kiehn ("Kiehn") on November 4, 2020 acknowledges that Benshoof is "a pastor for a small home church" and that Benshoof was concerned that PCC policy of using store signs "to decide who comes into their store is a 'slippery slope' because [PCC] could simply say something like 'Homeless people can't come into this store'" because they have more germs on them.

Kiehn acknowledged that Benshoof pointed to RCW 9A.52.070(2), which states that it is a defense that "the premises were at the time open to the members of the public and the actor complied with all lawful conditions imposed on access to or remaining in the premises.

656748 / 656749

**1391**

PAGE 5 OF 17

Kiehn decided to go back to the North Precinct and use a Webster's dictionary to decide that "violating" a store sign is legally indistinguishable from violating a <u>law.</u>

Clearly, the City has failed to train its officers in the most fundamental legal concepts. Fortunately, the Civil Rights Act of 1964 and United States Supreme Court cases settled any confusion sixty years ago. What was true in 1964 remains true today; "the convictions must be vacated and the prosecutions dismissed. The Civil Rights Act of 1964 forbids discrimination in places of public accommodation and removes peaceful attempts to be served on an equal basis from the category of punishable activities." <u>Hamm v. City of Rock Hill, Lupper v. State of Ark-ansas</u>, 379 U.S. 306, 308 (1964)

No one has denied that PCC Aurora, located at 7504 Aurora Avenue North, serves food to be eaten inside their store, which provides tables, chairs, counters, utensils, napkins, cups, and beverages. In legal terms, it is undeniably a "place of public accommodation" covered by

656748/656749

**1392**

PAGE 6 OF 17

the Civil Rights Act of 1964 and WLAD, including RCW 9.91.010 and RCW 49.60.030.

The Civil Rights Act of 1964 "§201(a) guarantees to all 'the full and equal enjoyment of the facilities of any place of public accommodation without discrimination on the ground of race, religion, or national origin,'" The City's prosecutions "may fairly be read to allege that [Benshoof] will be brought to trial solely as a result of peaceful attempts to obtain service at places of public accommodation." State of Georgia v. Rachel, 384 U.S. 780, 793 (1966).

The City was prohibited from acting as an accessory to PCC's discrimination against Benshoof. In fact, it's a crime pursuant to RCW 9.91.010 to deny Benshoof's civil rights because of Benshoof's Creed. On November 4, 2020 It was Benshoof who first called 911 from the sidewalk before entering PCC. He told 911 dispatch operator that he had reason to believe that PCC employees, SPD and prosecutors with the Seattle City Attorney's

656748/656749

**1393**

PAGE 7 OF 17

were acting in Concert to violate RCW 9.91.010 due to Benshoof's Creed because his Creed proscribes him being coerced to wear a face covering as a condition of entry to any public accommodation. As Benshoof suspected, that is precisely what has unfolded since November 4, 2020.

"Hamm emphasized the precise terms of §203(c) that prohibit any 'attempt to punish' persons for exercising rights of equality conferred upon them by the Act. *805* The explicit terms of that section compelled the conclusion that 'nonforcible attempts to gain admittance to, or remain in, establishments covered by the Act, are immunized from prosecution. 379 U.S. at 311.'" State of Georgia v. Rachel, 384 U.S. 780, 804-805 (1966)

Benshoof was immunized from any threat of punishment. "The 1964 Act therefore 'substitutes a right for a crime.' 379 U.S., at 314. Hence, if as alleged in the present removal petition, the defendants were asked to leave solely for [religious] reasons, then the mere pendency of the prosecutions enables the

656748, 656749

**1394**

federal court to make the clear prediction that [Benshoof] will be 'denied or cannot enforce in [Seattle Municipal Court]' the right to be free of any 'attempt to punish' [Benshoof] for protected activity. It is no answer in these circumstances that [Benshoof] might eventually prevail in the state court "or an appeal." The burden of having to defend the prosecutions is itself a denial of a right explicitly conferred by the Civil Rights Act of 1964 as construed in Hamm v. City of Rock Hill, supra." State of Georgia v. Rachel, 384 U.S. 780, 805 (1966)

Whether this is argued in a state or federal court, "the conduct of [Benshoof] is 'immunized from prosecution' in any court," And the State of Georgia v. Rachel, at 805-806. The Court continued to affirm that "[t]he Civils Rights Act of 1964 endows [Benshoof] with a right not to be prosecuted for such conduct. Section 203 provides that, 'No person shall (c) punish or attempt to punish any person for

exercising or attempting to exercise any right or privilege secured by Section 201 or 202," State of Georgia v. Rachel, 384 U.S. 780, 793 (1966).

The "Act prohibits the application of state laws in a way that would deprive any person of the rights granted under the Act. The Supremacy Clause, Art. VI, cl 2, requires this result where 'there is a clear collision' between state and federal law, Kesler v. Dept. of Safety, 369 U.S. 153, 172 (1962). "Hamm v. City of Rock Hill, at 311. "'This plainly means that a defendant in a criminal trespass... can assert the rights created by 201 and 202 and that State Courts must entertain defenses grounded upon these provisions.' 110 Cong. Rec. 9767" Id., at 311.

This court must abate the prosecutions in Smc No. 656748. "Since the provisions of the Act would abate all federal prosecutions it follows that the same rule must prevail under the Supremacy Clause, which requires that a contrary state practice or state statute must give way." Id., at 315.

**1396**

656748/650749

"The great purpose of the civil rights legislation was to obliterate the effect of a distressing chapter of our history. This demands no less than the application of ~~the~~ a normal rule of statutory construction to strike down pending convictions inconsistent with the purposes of the Act." Id. at 315.

The City's "conviction" of Benshoof in SMC No. 656749 must also be vacated. "[T]here is no public interest to be served in the further prosecution of [Benshoof]. And in accordance with the long-established rule of our cases, they must be abated and the judgment in each is therefore vacated and the charges are ordered dismissed." Hamm v. City of Rock Hill, at 317.

Benshoof's beliefs never posed a threat to anyone, nor did his body. Each time Benshoof was forced to undergo a PCR "test" upon his unlawful imprisonment, he tested negative. Every time.

656748/656749

**1397**

PAGE 11 OF 17

## EXCULPATORY EVIDENCE

The City continues to withhold Benshoof's personal documents and videos which will exonerate Benshoof at trial and prove that PCC employees knowingly and willfully conspired, in joint action with City officials, to maliciously prosecute Benshoof in violation of RCW 9.62.010 through their use of perjury, fraud, threats, and coercion. See _Brady v. Maryland_, 373 U.S. 83 (1963)

## STATUTE OF LIMITATIONS

The City is long past the Statute of limitations to prosecute Benshoof regarding the 2020 trespass charges, or to sentence Benshoof for the fraudulent 2021 "conviction."

## VIOLATION OF SPEEDY TRIAL

Benshoof was arrested and imprisoned on July 3, 2024. The City, under Washington case law and the Criminal Rules of Procedure, had sixty (60) days to prosecute Benshoof,

656748/656749

**1398**

The City chose to sit Judge Faye Chss on the bench on July 17, 2024, despite knowing Faye Chss is a named defendant in 9th Cir. No. 24-4223. With that ruse, the City claimed the authority to toll the ~~statute of~~ speedy trial days for three weeks. That would be a clear violation of Benshoof's right to speedy trial under _Barker V. Wingo_.

## RIGHT TO JURY TRIAL

The City explicitly claimed the authority to prosecute and sentence Benshoof to CONSECUTIVE sentences. Therefore, the City is attempting to imprison Benshoof for four years in SMC No. 656748 without allowing Benshoof a twelve-man jury of his peers. This is a shocking attempt to circumnavigate the Sixth Amendment. "Really, given the history of the jury-trial

right before _Williams v. Florida_, 399 U.S. 78, 103, it was nearly 'unthinkable to suggest that the Sixth Amendment's right to a trial by jury is satisfied' by any ~~less the~~ lesser number." _Cunningham v. Florida_, No. 23-5171 (May 28, 2024) "[O]ur cases have warned of the gradual 'erosion' of the jury trial right. Our cases have insisted, repeatedly, that the right to trial by jury should mean no less today, and afford no fewer protections for individual liberty, than it did at the Nation's founding. See e.g., _Apprendi v. New Jersey_, 530 U.S. 466 (2000); _Ramos v. Louisiana_, 590 U.S. 83 (2020)." _Cunningham v. Florida_, No. 23-5171, at 2 (May 28, 2024).

## PRO SE MATERIALS

The City set in motion a series of events by which Benshoof would be denied access to pro se materials and office equipment in violation of Wash. Const. art I § 22 and the Due Process Clause of the Fourteenth Amendment.

**1400**

656748/656749

Wash. Const. art I §22 affords a
pro se pretrial detainee a greater access
to the courts than the federal constitution
provides, yet Benshoof can't even obtain
a pencil sharpener, let alone an ink pen.
See State v. Silva, 107 Wn. App. 605, 27 P.3d
663, 107 Wash. App. 605 (Wash. App. 2001)

## NO MENS REA

RCW 9A.52.070 explicitly requires
mens rea, yet the SPD even stated in its
reports that Benshoof spent considerable
time explaining that he was complying with
all lawful conditions of entry. Thus,
the requirement that Benshoof knowingly
entered PCC in violation of any lawful
condition cannot withstand even a moment
of scrutiny. See e.g. Elonis v. United
States, 575 U.S. 723 (2015); Rehaif v.
United States, 139 S. Ct. 2191 (2019).

## NO THEFT

At trial in September 2021, Judge Lynch and prosecutor Sarah MacDonald denied Benshoof's right to show the jury exculpatory video evidence that Benshoof left payment inside the store and that Tyler Goslin demanded that Benshoof leave payment _away_ from the cash registers.

This ruse then involved Goslin and Ms. MacDonald only showing the jury the PCC surveillance video of the checkout area — not where Benshoof left payment. Steve Mitchell eventually admitted in his sworn declaration in federal court that Benshoof left payment in the deli, the bakery, and store shelves _away_ from the checkout area, but the malicious prosecution had long before concluded. Benshoof has proof

656748/656749

**1402**

PAGE 16 OF 17

of this conspiracy now and deserves the right to be exonerated and have the true criminals brought to justice for their malice and fraud.

Sworn this seventh day of September 2024, under penalty of perjury of the laws of Washington state, in the city of Seattle, County of King, state of Washington.

Kurt A. Benshoof

656748/656749

**1403**

PAGE 17 OF 17